UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
Civil Action No.: 8:23-cv-00709-WFJ-SPF

GABRIEL LUC HADDON,

     Plaintiff(s),

vs.

FS INVESTMENTS OF AMERICA, INC.,
d/b/a POWERHOUSE AUTOMOTIVE, a
Florida corporation, and WESTLAKE
SERVICES, LLC, d/b/a WESTLAKE
FINANCIAL SERVICES, a Foreign
corporation,
     Defendant(s).
_____ /

VIDEOCONFERENCE DEPOSITION OF
FRANKLYN STRUSBERG
(as corporate representative of
FS Investments of America, Inc.)


Pages 1 through 154

Tuesday, April 23, 2024
10:13 a.m. - 1:19 p.m.


Stenographically Reported By:
WANDA D. GOOD, CERTIFIED COURT REPORTER

```
 1   APPEARANCES:

 2

 3

     On behalf of Plaintiff(s)
 4        SUE YOUR DEALER - A LAW FIRM
          JOSHUA FEYGIN, PLLC
 5        P.O. Box 85293 (33008-5293)
          1930 Harrison St., Ste. 208F
 6        Hollywood, Florida   33020
          954.228.5674
 7        BY:  JOSHUA FEYGIN, ESQUIRE (VIA ZOOM)
               Josh@JFeyginEsq.com
 8

 9

     On behalf of Defendant FS Investments of America, Inc.,
10   d/b/a Powerhouse Automotive
          ARMSTRONG TEASDALE, LLP
11        355 Alhambra Cir., Ste. 1250
          Coral Gables, Florida   33134
12        305.371.8809
          BY:  JOSE ARIEL PERALTA, ESQUIRE (VIA ZOOM)
13             jperalta@atllp.com
               KEITH D. SILVERSTEIN, ESQUIRE (VIA ZOOM)
14             keith@silversteinpa.com
15

16   On behalf of Third-Party Defendant McCombs West Ford,
     LLC
17        NICKLAUS & ASSOCIATES, P.A.
          4651 Ponce De Leon Blvd., Ste. 200
18        Coral Gables, Florida   33146
          305.460.9888
19        BY:  NICOLAS TORRES, ESQUIRE (VIA ZOOM)
               nicolast@nicklauslaw.com
20

21

22

23

24

25
```

INDEX OF PROCEEDINGS

WITNESS:                                              PAGE

FRANKLYN STRUSBERG

DIRECT EXAMINATION BY MR. FEYGIN                        5

CROSS-EXAMINATION BY MR. TORRES                       104

CROSS-EXAMINATION BY MR. PERALTA                      125

REDIRECT EXAMINATION BY MR. FEYGIN                    144

RECROSS-EXAMINATION BY MR. TORRES                     148

RECROSS-EXAMINATION BY MR. PERALTA                    149

PLAINTIFF

EXHIBIT              DESCRIPTION                      PAGE

    A    PLTF'S NOTICE OF TAKING CORP. REP DEPO      13

    B    VEHICLE INFORMATION SHEET                   32

    C    TEXAS CERTIFICATE OF TITLE, FSIA 000020     41

    D    5/25/20 BUYER'S ORDER FORM                  51

    E    5/25/20 RETAIL INSTALLMENT CONTRACT AND     56
           SECURITY AGREEMENT
    F    5/25/20 ODOMETER DISCLOSURE STATEMENT       61
    G    5/25/20 APPLICATION FOR CERTIFICATE OF      64
           TITLE WITH/WITHOUT REGISTRATION

                              PLAINTIFF

  EXHIBIT                    DESCRIPTION                    PAGE

      H    5/25/20 POWER OF ATTORNEY                         67

      I    3/6/19 TEXAS CERTIFICATE OF TITLE                 73
              SCAN TRANSACTION NUMBER 539994086
      J   DEFT FS INVESTMENTS AMENDED AFFIRMATIVE            87
              DEFENSES AND THIRD-PARTY COMPLAINT

      K   DEFT FS INVESTMENTS MOTION FOR LEAVE TO            96
              FILE A THIRD-PARTY COMPLAINT AND AMEND
              ITS AFFIRMATIVE DEFENSES

      L   12/21/22 DEMAND FOR VIOLATIONS OF THE              99
              MOTOR VEHICLE AND INFORMATION COST
              SAVINGS ACT

      M   12/21/22 FEYGIN/POWERHOUSE AUTOMOTIVE             101
              LETTER W/ATTACHMENTS


                              DEFENSE

  EXHIBIT                    DESCRIPTION                    PAGE
      A    FSIA 000011, Bill of Sale from Manheim          136


  (Reporter's Note:  Defendant Exhibit a was not provided
  for attachment.)

1    Thereupon,

2    the following proceedings began at 10:13 a.m.:

3              THE COURT REPORTER:  Good morning.  My name

4         is Wanda Good.  I am a Florida certified

5         stenographic reporter.

6              Today's date is Tuesday, April 23rd, 2024,

7         and the time is approximately 10:13 a.m.

8              This is the deposition of Frank Strusberg in

9         the matter of Gabriel Luc Haddon versus FS

10        Investments of America, Inc., et. al.

11             This case is venued in the United States

12        District Court, Middle District of Florida, Tampa

13        Division.  The case number is

14        8:23-cv-00709-WFJ-SPF.

15             The attorneys participating in this

16        deposition acknowledge that I am not physically

17        present in the deposition room and that I will be

18        reporting this deposition remotely.  They further

19        acknowledge that in lieu of an oath administered in

20        person I will administer the oath remotely.  This

21        arrangement is pursuant to the Florida Supreme

22        Court Administrative Order Number AOSC20-16.

23             The parties and their counsel consent to the

24        arrangement and waive any objections to this manner

25        of reporting.  Please indicate your agreement by

Case 8:23-cv-00709-WFJ-SPF Document 70-2 Filed 09/25/24 Page 6 of 173 PageID 529

GABRIEL LUC HADDON vs. POWERHOUSE OF DELRAY, INC. FRANKLYN STRUSBERG 05/07/2024
CR of FS Investments (Franklyn Strusberg)
6

```
 1        stating your name, whom you represent and your

 2        agreement on the record starting with the

 3        Plaintiff.

 4             MR. FEYGIN:  Attorney Joshua Feygin on behalf

 5        of the Plaintiff, Gabriel Luc Haddon.  We

 6        acknowledge.

 7             MR. PERALTA:  Jose Peralta on behalf of -- of

 8        the Defendant Powerhouse, and I acknowledge.

 9             MR. TORRES:  Nicolas Torres on behalf of

10        Third-Party Defendant McCombs Ford West, and we

11        acknowledge as well.

12             THE COURT REPORTER:  Please raise your right

13        hand.

14             Do you swear or affirm the testimony you

15        shall give in this matter will be the truth, the

16        whole truth and nothing but the truth?

17             THE WITNESS:  Yes.

18             THE COURT REPORTER:  Thank you.

19   Thereupon,

20                       FRANKLYN STRUSBERG,

21   having been first duly sworn or affirmed, was examined

22   and testified as follows:

23                       DIRECT EXAMINATION

24   BY MR. FEYGIN:

25        Q.   All righty.  Good morning, Mr. Strusberg.
```

```
 1   How are you today?
 2           MR. PERALTA:  Joshua, before -- before we
 3        begin, I'm so sorry, I just -- I just want to
 4        correct something that Wanda said.  This is the
 5        deposition of the corporate representative of FS
 6        Investments, not Frank Strusberg as -- as a person,
 7        so personally.  That makes sense?
 8           MR. FEYGIN:  Yes, this is the corporate
 9        representative deposition.
10           MR. PERALTA:  Correct, and then also I want
11        to get on the record that Mr. Keith Silverstein
12        might join us.  He's also an -- an attorney for the
13        Defendant in this case.  Go ahead, Joshua.
14   BY MR. FEYGIN:
15        Q.   All righty, Mr. Strusberg.
16             How are you this morning?
17        A.   Good.
18        Q.   Good to hear.  So, obviously we're here to
19   take the deposition of the corporate representative of
20   the dealership, which is FS Investments of America,
21   Inc.  I'm going to start off with a few ground rules to
22   hopefully make this an easy process.
23             So first, if I ask you a question and it's
24   unclear or confusing, please ask me to rephrase the
25   question.  Okay?
```

1          A.    Yes.

2          Q.    If you answer a question, I'm going to assume

3     you understood it, though.  Okay?

4          A.    Okay.

5          Q.    Because the court reporter can't record both

6     of us talking at the same time, please wait until I'm

7     finished asking a question before you answer it.

8          A.    Okay.

9          Q.    When you provide a response, make sure you

10    provide an audible response.  Do not nod your head.  Do

11    not use some sort uh-uh, nuh-uh, anything like that

12    because she's not going to able to record it.  Okay?

13         A.    Okay.

14         Q.    Occasionally your attorney may raise an

15    objection, but unless you're instructed not to answer

16    the question, you may answer.

17               Do you understand?

18         A.    Yes.

19         Q.    And if you need to take a break, I can

20    certainly accommodate you.  I hope we're not going to

21    be here for too long, but in the event that you do need

22    a break, the only thing I ask is that if there is a

23    question pending that you -- you finish answering that

24    question.  Okay?

25         A.    Okay.

```
1          Q.   And if I refer to you, I'm referring to

2    Powerhouse and I intend to refer to the -- to the

3    Defendant FS Investments.  Okay?

4          A.   Okay.

5          Q.   All righty.  And state your name for the

6    record.  Can you state your name for the record?

7          A.   Franklyn Strusberg.

8          Q.   And what is your date of birth?

9          A.   5/30/81.

10         Q.   Have you ever been in a deposition before?

11         A.   Never in my life.

12         Q.   Have you ever been convicted of any felonies

13   or crimes of dishonesty?

14         A.   Never in my life.

15         Q.   Have you ever been accused of any felonies or

16   crimes of dishonesty?

17         A.   Never.

18         Q.   What is your educational background?

19         A.   Do what?

20         Q.   What is the highest level of education that

21   you achieved?

22         A.   University.

23         Q.   Okay.  And what did you study in the

24   university?

25         A.   Business administration.
```

 1          Q.   And was that in the United States?

 2          A.   In Colombia.

 3          Q.   How long have you been living in the United

 4     States?

 5          A.   I was born here.

 6          Q.   Okay.  So, what do you do for a living?

 7          A.   I sell cars.

 8          Q.   Okay.  And what is the name of the dealership

 9     that you sell cars at?

10          A.   Powerhouse Automotive.

11          Q.   Are you employed by or --

12          A.   Yes.

13          Q.   -- derive any --

14          A.   Correct.

15          Q.   Are you employed by or do you derive income

16     from any other dealership?

17          A.   Employed by.

18          Q.   Okay.  What other dealerships are you

19     employed by?

20          A.   Powerhouse Automotive.

21          Q.   Aside from Powerhouse, who else --

22          A.   Only -- only Powerhouse Automotive.

23          Q.   How long have you worked at the dealership?

24          A.   I don't remember.  Like, twelve years.

25          Q.   What is your position there?

 1        A.    I'm the owner.

 2        Q.    And did you start this business or did you

 3   acquire it from somebody else?

 4        A.    I start it.

 5        Q.    So, have you ever been involved in a lawsuit

 6   before?

 7        A.    Yes.

 8        Q.    Okay.  For what?

 9            MR. PERALTA:  Objection; relevance and

10        narrative.

11            MR. FEYGIN:  Go ahead and answer.

12            THE WITNESS:  Do what?

13            MR. PERALTA:  Yes, Frank.  I objected as to

14        relevance and narrative.

15   BY MR. FEYGIN:

16        Q.    You can proceed to answer the question.  What

17   was -- what was the lawsuit for or lawsuits?

18        A.    For we sold a car.

19        Q.    Okay.  And there was only one lawsuit against

20   you?

21        A.    Yeah.

22        Q.    Okay.  And when was this lawsuit?

23        A.    Like, a year and-a-half ago.

24        Q.    And where was this lawsuit filed?

25        A.    I don't remember.

```
 1        Q.   State court or federal court?

 2        A.   State.

 3        Q.   And it's only one lawsuit?

 4        A.   That I remember.

 5        Q.   Okay.

 6             MR. PERALTA:  I'm also -- I'm also objecting

 7        because it goes against the parties' agreement as

 8        to the scope of the question.

 9             MR. FEYGIN:  Well, he already answered, but

10        we can get to that later.

11   BY MR. FEYGIN:

12        Q.   With respect to the preparation, did anybody

13   help you prepare for today's deposition?

14        A.   Excuse me?

15        Q.   Did anybody help you prepare for today's

16   deposition?

17        A.   What do you mean?

18        Q.   How did you prepare for today's deposition?

19        A.   I don't prepare for nothing.  I'm here to

20   answer questions about a car that I bought from Manheim

21   and Manheim made a mistake, and you took -- I already

22   told you this a hundred times.

23        Q.   Well, this is the first time we're speaking.

24        A.   It's -- it's a -- it's a very simple

25   situation that you guys are making it look big, but
```

```
 1    it's a -- it's a simple mistake from the auction.

 2         Q.    Sure.  We'll get to that.

 3         A.    This -- this doesn't need any preparation.

 4    It's -- it's -- it's -- it's a simple mistake from the

 5    auction.

 6         Q.    Okay.  So --

 7         A.    Anybody can make a mistake.

 8         Q.    So, your -- your position is that you did not

 9    prepare for today's deposition?

10         A.    No.  I have -- I -- I've been telling you

11    guys what happened since Day 1, and --

12              MR. FEYGIN:  I'm going to pull up what is

13         going to be Plaintiff's Exhibit A, which is the

14         Claimant's deposition notice.

15              (Plaintiff Exhibit A was marked for

16         identification.)

17              (Whereupon, document(s) shared on the

18         screen.)

19    BY MR. FEYGIN:

20         Q.    Have you seen this before?

21         A.    Yeah, but I didn't read it.

22         Q.    Okay.  What did you do when you saw it?

23         A.    Nothing.

24         Q.    Okay.  So, as you sit here today, you are not

25    prepared to testify on any of matters of examination?
```

     A.   I know exactly --

          MR. PERALTA:  Objection; leading.

          THE WITNESS:  I know exactly what happened

     with this -- with this particular truck, so any

     questions you have, I can answer them.

          MR. FEYGIN:  Okay.  But --

          THE WITNESS:  I don't need -- I don't need to

     read that.

BY MR. FEYGIN:

     Q.   Okay.  So, you -- you didn't read this,

you're not prepared to answer these questions, are you?

          MR. PERALTA:  Objection; leading.

          THE WITNESS:  I -- I am prepared to answer

     any question, but I don't need to read nothing

     because I know exactly what happened, so you can

     ask me what --

          MR. PERALTA:  Frank, if you could -- Frank,

     if you could wait at least a second so I can get my

     objection in.

          Objection; leading and objection; mis- --

     mis -- mischaracterizes the -- the testimony of the

     witness.

          MR. FEYGIN:  I think the testimony is

     sufficiently clear.

          MR. PERALTA:  No, it -- no.  No, it's not.

Case 8:23-cv-00709-WFJ-SPF   Document 70-2   Filed 09/25/24   Page 15 of 173 PageID 538

GABRIEL LUC HADDON vs. JOSHUA WILSON ... 09/11/2024

CR of FS Investments (Franklyn Strusberg)

15

 1          MR. FEYGIN:  Okay.

 2          MR. PERALTA:  And if you want to argue with

 3      me during your -- your depo, we can do that, but I

 4      suggest you use your time wisely, Joshua.

 5          MR. FEYGIN:  Noted, Jose.  Thank you.

 6  BY MR. FEYGIN:

 7      Q.   So, Franklyn, to -- to recap, did you review

 8  this document or did you not review this document?

 9      A.   No, I did not.

10      Q.   Thank you.  Did you bring any documents with

11  you today?

12      A.   I have my computer in front of me.  I can

13  provide whatever you need.

14      Q.   What documents do you have up on your

15  computer?

16      A.   I can click on the -- on the Manheim site,

17  and I can see the truck when we bought it.

18      Q.   Aside from that, do you have any other

19  documents?

20      A.   No.

21      Q.   Okay.  Regarding the dealership, is it a

22  licensed car dealer under Florida law?

23      A.   Correct.

24      Q.   Since when?

25      A.   Like, four years.

 1        Q.   And prior to those four years, was the

 2   dealership operating without a license?

 3        A.   Do what?  No.

 4        Q.   You mentioned that you've been employed at

 5   the dealership for twelve years.

 6             Do you --

 7        A.   No, from FS Investments, which is my

 8   corporation.  Powerhouse is a d/b/a from FS

 9   Investments.  FS Investments has been open for, like

10   fourteen years.

11        Q.   Okay.  So, the dealership has only been in

12   operation for four years of those fourteen, correct?

13        A.   Almost five years.

14        Q.   Okay.  And you have been licensed for

15   approximately five years, then?

16        A.   Correct.

17        Q.   How many locations does the dealership have?

18        A.   One location.

19        Q.   How many employees?

20        A.   I don't know.  Like, fifteen.

21        Q.   Do you own any other dealerships?

22        A.   No.

23        Q.   How many cars does Powerhouse sell per month?

24        A.   Like, thirty.

25        Q.   And approximately how many per year?

 1          A.   360.

 2          Q.   How many cars would you say the dealership

 3   has sold since it opened its door?

 4          A.   Multiply three-sixty times four.

 5          Q.   Do you agree the dealership has the

 6   responsibility to know the laws that govern its

 7   business?

 8          A.   Of course.

 9          Q.   As the corporate representative for the

10   dealership today, are you familiar with the laws that

11   the dealership must abide by?

12          A.   Of course.

13          Q.   Are truthful and accurate mileage disclosures

14   important in the used car industry?

15          A.   Very important.

16          Q.   And why is that?

17          A.   Because it's important.

18          Q.   Okay.  What is the reason for being

19   important?

20          A.   Do what?

21          Q.   Why is it important?  Why does the dealership

22   believe truthful and accurate mileage disclosures are

23   important?

24          A.   It has to go -- when you get your license,

25   you have to -- the DMV gives you paperwork.  And you

Case 8:23-cv-00709-WFJ-SPF Document 70-2 Filed 09/25/24 Page 18 of 173 PageID 541

GABRIEL LUC HADDON v. FS INVESTMENTS OF CENTRAL FLORIDA, LLC   September 10, 2024
CR of FS Investments (Franklyn Strusberg)

18

1  have to provide every customer with the -- you know,

2  with the paperwork, so one of the paperworks that are

3  very important are the -- are the mileage disclosure.

4  So, you have to -- whatever it says on the car, you

5  have to put it on the mileage disclosure.

6      Q.   And would that be because an odometer reading

7  impacts the value of the vehicle?

8      A.   The whole legal -- legal situation of the

9  vehicle, when the car is -- you know, it's not a TMU,

10  it's not revealed, it's clean, of course it gives value

11  to the car.

12      Q.   Does the dealership believe it is important

13  that the Certificate of Title reflect truthful and

14  accurate disclosures of a vehicle's mileage history?

15      A.   Of course, and I do that on every car sold.

16      Q.   And would you agree that an inaccurate

17  odometer reading would negatively impact the vehicle's

18  value?

19           MR. PERALTA:  Objection; leading.

20           THE WITNESS:  Yes.

21  BY MR. FEYGIN:

22      Q.   Could a vehicle with an inaccurate odometer

23  be worth less than the same exact vehicle with an

24  accurate odometer?

25      A.   Yes.

 1              MR. PERALTA:  Objection; speculative.

 2   BY MR. FEYGIN:

 3       Q.   In your experience, would a vehicle with

 4   higher mileage need more maintenance than the

 5   lower-mileage vehicle?

 6       A.   It's relative.  I get cars with low mileage

 7   that are being rented -- rentals destroyed, and I get

 8   cars with really high mileage that are one owner in

 9   immaculate condition.

10       Q.   Is it important to Powerhouse that it be

11   considered as an honest company?

12       A.   Of course.  I'm the one here

13   twenty-four/seven.

14       Q.   And why is it important?

15       A.   My reputation is everything.  My reputation

16   is -- you know, is why I keep selling so much, you

17   know, the cars.  Customers keep coming back because

18   they trust us.

19       Q.   Is it important to Powerhouse that consumers

20   have trust in the dealership?

21       A.   100 percent.

22       Q.   So, in addition to selling vehicles, does the

23   dealership originate financing agreements for the

24   vehicles it sells?

25       A.   I sell, and I have lenders.  When the

 1    customer wants to finance, we use the lenders.

 2         Q.    Does the dealership have an in-house

 3    financing --

 4         A.    No.

 5         Q.    -- program?  No buy here/pay here, then?

 6         A.    No buy here/pay here.

 7         Q.    So, what did the dealership have to do to

 8    become licensed under Florida law to be a dealer?

 9         A.    To have an office, a printer, a computer,

10    insurance and a bond.

11         Q.    And does the DMV require that the dealership

12    take ongoing training courses?

13         A.    Yes.

14         Q.    Okay.  And has the dealership taken these

15    courses?

16         A.    Of course.

17         Q.    When was the last one?

18         A.    Five years ago.

19         Q.    Do you recall the topics that were covered

20    during that training session?

21         A.    Just to teach you how to print the paperwork.

22         Q.    And who do you use as the course provider?

23         A.    DLMRB.

24         Q.    And did you personally attend that course or

25    did somebody else from the dealership attend the

```
 1    course?

 2         A.    No, I did.  The license is in my name.

 3         Q.    So, do you only sell used cars?

 4         A.    Only used cars.

 5         Q.    Okay.  And where do you get these used cars

 6    from?

 7         A.    I only buy from Manheim, the auction.  It's

 8    the biggest auction in the United States.

 9         Q.    You don't buy any vehicles that come in on

10    trade?

11         A.    I get a lot of trades.

12         Q.    So, in addition to Manheim, you also have

13    trade-in vehicles on your lot?

14         A.    Trade-in vehicles, yes.

15         Q.    So, explain to me how do you select used cars

16    for your inventory?

17         A.    I'm the buyer, so I dig very, very into it

18    when I buy them, and I look at the comments.  Every

19    car, when you buy it in the auction, they give you a

20    Condition Report, and they give you comments from the

21    seller, so when the car is revealed title, they put on

22    the comments revealed title.  They put a CR.  They tell

23    you the whole story about the car.

24         Q.    And what type of used cars do you buy?

25         A.    Pickup trucks and commercial vans.
```

1      Q.   And why is that?

2      A.   Because of the customers that my target is

3   the people that has -- own businesses.

4      Q.   Do you ever rely on CARFAX™ or AutoCheck

5   reports when you decide to purchase a vehicle?

6      A.   No.

7      Q.   Do you inspect the vehicles at the time of

8   the purchase?

9      A.   When I buy them from the auction, the auction

10  inspects the vehicles for me, and if the car passes the

11  inspection, then I bring it to my dealer.

12     Q.   So, explain to me what happens when you get a

13  car from the auction, let's say, and you first get it

14  onto your lot.  What happens?

15     A.   I drive it myself.  I take it to the car

16  wash.  I put it on the spot to take pictures, and I

17  advise it everywhere.  I change the oil, make sure the

18  car is good, and I park it in my lot for sale.

19     Q.   Okay.  So, you do -- you personally do a test

20  drive?

21     A.   I do, yes, most of the times.

22     Q.   Do you personally wash the car?

23     A.   No.  I have a lot of people that wash them.

24     Q.   And do you personally take pictures of the

25  car?

 1        A.    I personally take pictures of the car, yes.

 2        Q.    And what about changing the oil?

 3        A.    I take it to Jiffy Lube.

 4        Q.    And is this every vehicle that comes in?

 5        A.    Most of them, because some of them, they come

 6   with a sticker with a new oil, so I don't change the

 7   oil on those, but most of them, I change the oil on

 8   Jiffy Lube.

 9        Q.    Do you ever look at the title before you

10   place the vehicle up for sale?

11        A.    Never.

12        Q.    So, let's discuss inspecting these vehicles.

13              Do you ever inspect them before you put them

14   for sale?

15        A.    The auction does.  The auction inspects the

16   whole car legally and technically, and if the car

17   passes the inspection, then I have a company that is

18   called Central Dispatch.  And I post the car, and a

19   truck driver picks it up because I buy nationwide, and

20   they bring it to my dealer.

21        Q.    Aside from the auction inspection, does the

22   dealership perform its own inspection of a vehicle

23   before it goes up for sale?

24        A.    I drive it.

25              MR. PERALTA:  Objection.

```
 1                THE WITNESS:  I drive it.

 2                MR. PERALTA:  Objection; asked and answered.

 3                MR. FEYGIN:  Please answer.

 4                THE WITNESS:  Yes.  I drive them to --

 5    BY MR. FEYGIN:

 6        Q.   Aside from driving the vehicle, what else do

 7    you do to inspect it?

 8        A.   That's it.  That's it.

 9                MR. PERALTA:  Objection; asked and answered.

10        Yeah.

11                THE WITNESS:  If I feel any -- any funny,

12        maybe like the transmission is leaking or anything,

13        I file a claim, and then I can return the car to

14        the auction.

15    BY MR. FEYGIN:

16        Q.   Do you ever recondition vehicles aside from

17    the oil changes?

18        A.    If the car needs paint, yes.

19        Q.    Anything else?

20        A.    Tires, whatever the car -- maybe a

21    windshield.  Anything that the car needs, I like to

22    make them, you know, good so I can sell them.

23        Q.   Do you have an account with CARFAX™?

24        A.    No.

25        Q.   Do you have an account with AutoCheck?
```

CR of FS Investments (Franklyn Strusberg)

```
 1        A.   No.

 2        Q.   Do you have an account with any other entity

 3   that would provide vehicle history reports aside from

 4   the Manheim Condition Report?

 5        A.   No.

 6        Q.   So, who determines the price that a used

 7   vehicle is sold for at the dealership?

 8        A.   Me.

 9        Q.   Okay.  And what -- what factors play into

10   that analysis?

11        A.   Depending on the car.  What the determines

12   the car is the -- the trim.  If it's a Laramie, if

13   it's -- if it's lifted, if it has wheels and tires, you

14   know, like big ones, that determines the price of the

15   car.

16        Q.   Do you have a mechanic on your staff?

17        A.   No.

18        Q.   Do you have a vehicle lift on your premises?

19        A.   No.

20        Q.   When you're evaluating the price of a vehicle

21   that you're planning on selling, is mileage a factor

22   that goes into the evaluation?

23        A.   No.

24        Q.   So, mileage is irrelevant?

25        A.   Irrelevant, depends on the condition.  Like I
```

 1   said, if I get a rental that has been low mileage but

 2   the car is destroyed or you get a car that is one owner

 3   with high mileage but it's in perfect condition.

 4        Q.   So, let's say you do you have a vehicle that

 5   is in good condition.

 6             Would the mileage play any part in

 7   determining the vehicle's value?

 8             MR. PERALTA:  Asked and answered; objection.

 9             Go ahead, Frank.

10             MR. FEYGIN:  You can answer the question.

11             THE WITNESS:  No.

12   BY MR. FEYGIN:

13        Q.   All right.  So, walk me through a typical car

14   transaction.  A client walks through the door, and what

15   happens?

16             MR. PERALTA:  Objection; narrative.

17             Go ahead, Frank.

18             MR. FEYGIN:  What was the objection?

19             MR. PERALTA:  You're asking for a narrative.

20        You're not asking for a specific answer.

21             MR. FEYGIN:  Okay.

22   BY MR. FEYGIN:

23        Q.   When the client walks in the door, who is the

24   first person that greets the client?

25        A.   The salesperson.

 1          Q.    And once the salesperson greets the client,

 2    what do they do?

 3          A.    They listen to what the customer wants.

 4          Q.    And once they determine what the customer

 5    wants, what do they do?

 6          A.    They show -- they show them cars.

 7          Q.    And once they show them the car and they make

 8    a decision on which car they want to purchase, what

 9    happens?

10          A.    They do a test drive.

11          Q.    After the test drive, what happens?

12          A.    They come into the office.  They sit.  The

13    salesman takes the license, makes a copy.  Depending on

14    if they want to pay cash or finance, if it's financed,

15    they have to do a credit application.

16          Q.    So, once they take the driver's license and

17    complete a credit application, then what happens?

18          A.    Then the finance manager submits the deal to

19    the bank to get them approved.

20          Q.    And does the approval usually happen on the

21    spot?

22          A.    In one second.

23          Q.    And after that one second occurs, what

24    happens?

25          A.    It's under the lender's conditions, so they

```
 1    approve you under these conditions, and the conditions
 2    are proof of income, proof of residence, full coverage
 3    insurance.  If they have everything, then they sign the
 4    contract and they leave with the car.
 5        Q.   Okay.
 6        A.   They have to give a down payment, get a
 7    receipt, full insurance, full coverage with all the
 8    information, and they leave.
 9        Q.   How are the contracts presented to a consumer
10    for signing?
11        A.   On the computer.
12        Q.   Is it electronic?
13        A.   Electronic, and some of the -- the DMV
14    paperwork are handwritten.
15        Q.   And for the electronically-signed documents,
16    how are they presented to the consumer, is it an iPad
17    or is it on a computer screen?
18        A.   It's on a -- on a computer with a mouse.
19        Q.   And is that the same computer that the
20    finance manager or the sales agent is sitting at or is
21    it a completely separate computer dedicated for --
22        A.   It's the one with the finance manager.
23        Q.   And how does the consumer see the screen, is
24    it turned around to them?
25        A.   Of course.  They have to see it, and they
```

Case 8:23-cv-00709-WFJ-SPF   Document 70-2   Filed 09/25/24   Page 29 of 173 PageID 552
GABRIEL LUIS RIVAS, III vs. POWERHOUSE AUTOMOTIVE, INC., et al.   July 31, 2024
CR of FS Investments (Franklyn Strusberg)
29

```
 1   have to click on -- it's like any contract.  You have

 2   to click on -- on the -- on the box.

 3        Q.   And does the signature get applied to every

 4   everywhere with one click or does the consumer have to

 5   go --

 6        A.   Just one click.

 7        Q.   -- click by click?

 8        A.   No, just one click.

 9             THE COURT REPORTER:  Mr. -- Mr. Strusberg, if

10        you could just wait until he finishes his complete

11        question, that way you're not talking over each

12        other, I would appreciate it.  Thank you.

13   BY MR. FEYGIN:

14        Q.   So, what would be the first document the

15   consumer sees when they sit down to start signing the

16   paperwork?

17        A.   I don't know.

18        Q.   Who would know?

19        A.   The finance manager.

20        Q.   And what are the names of your finance

21   managers?

22        A.   Heron Guzman and Angel Castillo.

23        Q.   And were these gentlemen employed by

24   Powerhouse at the time of my client's transaction?

25        A.   Angel was.  Alex Reyes is no longer with me.
```

1        Q.   And why is that?

2        A.   There's no reason.

3        Q.   I'm sorry.  You said Guzman is no longer with

4   you?

5        A.   Alex Reyes.  He was the one who sold the car

6   to your --

7        Q.   And when did he leave the dealership?

8        A.   Like, a month ago.

9        Q.   And why did he leave the dealership?

10       A.   There's no reason.  He -- he tried --

11       Q.   Are you --

12       A.   -- to get better opportunities.

13       Q.   Okay.  So, once the deal is signed, then what

14   happens?

15       A.   They go to the lady with the tags to do the

16   transfer or the new tag to release the car under the

17   person's name.

18       Q.   Okay.  And once they get the tag done, what's

19   next?

20       A.   They put it on the car, and the customer

21   leaves.  We take a picture, and we get a good review.

22       Q.   What is the dealership management software

23   used by the dealership?

24       A.   DealerCenter.

25       Q.   And was that the same software you used

1   during the time of my client's transaction?

2       A.   Correct.

3       Q.   Have you ever changed your DMS software?

4       A.   No.  I have it since Day 1.

5       Q.   So, what is Powerhouse's relation to Auto

6   Deal Corp.?

7       A.   The owner of Auto Deal is my friend.  When I

8   first open, he put me cars on consignment.  I buy cars

9   with his -- with his money pretty much.  He support me,

10  so I buy cars with his license.  And I bring it to my

11  dealer, and pretty much he's wholesaling the car to me.

12      Q.   Have you ever earned a salary from Auto Deal

13  Corp.?

14      A.   No.  It's straight commission.

15      Q.   Did you have authority to bind Auto Deal

16  Corp. to purchase the vehicle from McCombs Ford?

17      A.   Yes.  I was a buyer for Auto Deal Corp.

18      Q.   And how did you find the car that my client

19  purchased?

20      A.   Like I find all the cars.  In Manheim.

21      Q.   And what were you searching for when you came

22  across the car?

23      A.   Lifted trucks.

24           MR. FEYGIN:  I'm going to pull up what's

25      going to be Plaintiff's B.  It's going to be the

```
 1              vehicle information sheet that we received in

 2              discovery.  This is FSIA 000014.

 3                   (Whereupon, document(s) shared on the

 4              screen.)

 5    BY MR. FEYGIN:

 6         Q.   Mr. Strusberg, does this look familiar to

 7    you?

 8         A.   Are you showing me something?

 9         Q.   Yes.

10         A.   I can't see the screen.  I'm sorry.  What do

11    I do?

12              MR. PERALTA:  Joshua, may I suggest that you

13         stop mirroring and mirror again, and I think that

14         will present the full screen to him one more time.

15              THE WITNESS:  No, because somebody called me,

16         and I put it on do not disturb.

17              MR. PERALTA:  Yeah.  Yeah.

18              THE WITNESS:  I don't know why I'm getting

19         the call if it's under do not disturb.

20              MR. PERALTA:  What about -- what about now,

21         Frank?

22              THE WITNESS:  No, I cannot see it.

23              THE COURT REPORTER:  Is you view on gallery

24         view?

25              THE WITNESS:  Now it is.  I'm sorry for my
```

```
 1            ignorance.

 2                   MR. PERALTA:  That's fine.  Make Zoom cover

 3            your whole screen, so not on -- what do you call

 4            it.  Let me see.

 5                   THE WITNESS:  Let me see.

 6                   MR. PERALTA:  Press maximize, the square.

 7                   THE WITNESS:  There we go.

 8                   MR. PERALTA:  Can you see it now?

 9                   THE WITNESS:  Yes.

10                   MR. PERALTA:  Okay.

11     BY MR. FEYGIN:

12            Q.   Okay.  So, does this document look familiar

13     to you?

14            A.   Of course.  That's the -- that's the Bill of

15     Sale from Manheim.

16            Q.   So, up here in the upper left-hand corner --

17            A.   How do I make it big?

18            Q.   (Complies with request.)

19            A.   Jesus Christ.

20                   MR. PERALTA:  So, if you -- if you click on

21            the right under the X, it says view, you can put

22            standard, actually, will make the --

23                   THE WITNESS:  I see, like four scares up on

24            the left corner.

25                   MR. PERALTA:  Okay.
```

```
 1            THE WITNESS:  And I click on each of them,
 2       and they it just shows you guys, and this one
 3       doesn't show.
 4            MR. PERALTA:  But do you see the document?
 5            THE WITNESS:  I see it, but it's super small.
 6       Like, on -- okay.  I can see it, yeah.  Yeah, I can
 7       see it.
 8  BY MR. FEYGIN:
 9       Q.   So, what I'm looking at is the upper
10  left-hand corner of this document.
11            Does what does CR stand for over here
12  (indicating)?
13       A.   Condition Report.
14       Q.   And in your experience, what is the purpose
15  of a Condition Report score?
16       A.   Two and up is -- is a good car.  It's a good
17  used car, and two and under is -- is a car, you know,
18  that is beat up with maybe scratches or -- it's very
19  relative.
20       Q.   And what is the grading scale, one through
21  ten, one through twenty?
22       A.   No.  One to five.
23       Q.   So, if I understood you correctly, a lower
24  score indicates that the vehicle is in bad condition?
25       A.   Yes.
```

Case 8:23-cv-00709-WFJ-SPF  Document 70-2  Filed 09/25/24  Page 35 of 173 PageID 558
GABRIEL JONES V. FS INVESTMENTS, et al. · ·OCTOBER 21, 2024
CR of FS Investments (Franklyn Strusberg)
35

1 · · · · · · MR. PERALTA:· Objection; mischaracterizes his

2 · · ·testimony.

3 · · · · · · THE WITNESS:· Two and up is a -- is a good --

4 · · ·like, 2.8 to me is a good car.

5 BY MR. FEYGIN:

6 · · ·Q.· ·And what was the condition of this vehicle?

7 · · ·A.· ·He's -- he's been driving it since then, so

8 it's a good car.

9 · · ·Q.· ·What was the Condition Report grade for the

10 vehicle when you bought it?

11 · · ·A.· ·Do what?· 2.8.· I'm looking at it.· 2.8.· It

12 says there, 2.8.

13 · · ·Q.· ·And when did the dealership, meaning Auto

14 Deal, purchase the vehicle from McCombs Ford?

15 · · ·A.· ·April 11th.· It says there April 11th.

16 · · ·Q.· ·And remind me, was this during the pandemic?

17 · · ·A.· ·I don't remember.· I'm sorry.

18 · · ·Q.· ·Can you describe the car market during the

19 pandemic in general based upon your experience?

20 · · ·A.· ·It was good.

21 · · ·Q.· ·In what sense?

22 · · ·A.· ·Every dealer closed because they give --

23 like, they didn't make you pay interest for, like six

24 months, so a lot of dealers closed, and we were open

25 helping the community.· Everybody was working.

GABRIELA CASTRO-CABRERA vs. CORPUS CHRISTI FORD NISSAN, June 21, 2024
CR of FS Investments (Franklyn Strusberg)

 1    Everybody was sick at home, and we were working.

 2          Q.   Were wholesale prices on the used cars higher

 3    than normal?

 4          A.   No.  Prices were almost the same.

 5          Q.   And were retail prices on used cars higher

 6    than normal?

 7          A.   Kind of.

 8          Q.   In what sense?

 9          A.   All the -- the factories, they closed, the

10    new cars, so used cars were selling more than new cars.

11          Q.   So, when you purchased this vehicle, what

12    representations did McCombs Ford tell you about the

13    vehicle?

14          A.   No, I never get to speak with the seller.  I

15    buy the car -- the car through Manheim, and I bought it

16    based on the information that I saw.

17          Q.   So, did you complete the sale or purchase of

18    this vehicle directly with the seller or --

19          A.   No, never.  Never.  I -- I buy the car

20    through Manheim.  Manheim was pretty much the seller.

21    The auction is -- is, like the middle person.  You have

22    the seller and the buyer, and the auction is the one

23    who conducts the whole -- the whole process.

24               Like, for example, in this particular car, I

25    called them.  They made a mistake.  When I called them

1    about the discrepancy in the mileage, I called Manheim

2    because they are responsible for this.  Because if the

3    car, they -- somebody get -- I mean, I always buy cars,

4    let's say revealed.  They disclose the condition and

5    the situation of the car, so on this -- on this

6    particular car, I called Manheim.  They said that Ford,

7    the seller, made a mistake.

8         Q.   And what did Manheim do for you in this

9    circumstance?

10        A.   No.  They told me that they were going to dig

11   into it, they were going to call the franchise who sold

12   it.  And they called me back and they say "yes, we

13   called the franchise," and they -- and Ford made a

14   mistake on the mileage.  Because if the car was a TMU,

15   then Manheim needs to disclose it to me TMU, and then I

16   know, and then when I -- when I sell the vehicle, I

17   have to sell it TMU.

18             I cannot sell a car TMU with original

19   mileage.  I can't.  That's why the auction is supposed

20   to inspect that before I do, and they -- they never put

21   no comments nowhere.  They sold me the car with a

22   131,000 miles, and the vehicle, you saw everywhere, was

23   131,000 miles.

24        Q.   What did -- what did Manheim do to compensate

25   you for this mistake?

```
 1         A.    Nothing yet.

 2         Q.    Why do you say "yet"?

 3         A.    They -- they asked me to bring the car back.

 4    They asked me if I can bring -- if I can return the car

 5    and they give me the money back.

 6         Q.    When did this occur?

 7         A.    I don't know.  When you guys first -- when I

 8    first find out about -- about this.

 9         Q.    And what about McCombs Ford, have they done

10    anything to correct this mistake?

11         A.    No.

12         Q.    So, getting back to the actual purchase of

13    the vehicle, did you pick it up or was it delivered to

14    you?

15         A.    It was delivered to us have.

16               (Whereupon, Counsel Silverstein enters Zoom

17         deposition.)

18    BY MR. FEYGIN:

19         Q.    And how was it delivered?

20         A.    On a tow truck.

21         Q.    Did you ever look at any sort of vehicle

22    history report before you bought this particular

23    vehicle aside from the Condition Report?

24         A.    Just the Condition Report.

25               MR. PERALTA:  Objection; asked -- asked and
```

 1           answered.

 2                   THE WITNESS:  No.

 3     BY MR. FEYGIN:

 4           Q.   Did you inspect the vehicle after you bought

 5     it?

 6           A.   I drove it, and I took it for pictures.

 7           Q.   Aside from that, did you put it on a lift?

 8           A.   No.

 9           Q.   Did you inspect the engine?

10           A.   While I drive it, I feel it.

11           Q.   Did you inspect the brakes?

12           A.   Yeah.  When I drive it, I inspect the whole

13     car.  Like, when you drive it, you feel the car, and

14     you know if something's wrong or something's good.

15           Q.   So, the inspection itself was strictly

16     driving the vehicle, then?

17           A.   Correct.

18           Q.   Were the seats torn in the vehicle?

19           A.   I don't remember.

20           Q.   Were the seats worn?

21           A.   It's a 2012, but I don't remember.  Most of

22     the cars, they come with -- you know, a clean 2.8, it's

23     a clean car, but it's been too -- too long.

24           Q.   Was the steering wheel worn?

25           A.   I don't remember.  I'm sorry.

```
 1        Q.   Was the bed scratched?

 2        A.   I don't remember.

 3        Q.   Was the bed dented?

 4        A.   I don't know.

 5        Q.   Were there signs of rust in the bed?

 6        A.   I don't remember.

 7        Q.   Were there dents on the exterior?

 8        A.   I don't remember.  I'm sorry.

 9        Q.   Were either of the turn signals chipped or

10   cracked?

11        A.   I don't remember.

12        Q.   Were either of the headlights chipped or

13   cracked?

14        A.   I don't remember.  I'm sorry.

15        Q.   Was there evidence of prior paint?

16        A.   No.

17        Q.   Was the brake pedal worn?

18        A.   I don't remember.

19        Q.   Was the gas pedal worn?

20        A.   I don't remember.  I'm sorry.

21        Q.   Was there any sludge in the engine?

22        A.   Not that I know of.

23        Q.   How much did you pay for the vehicle?

24        A.   9,000 and change.

25        Q.   And is that reflected in this invoice?  Is
```

```
 1    that a truthful and accurate --

 2         A.   Correct.

 3         Q.   -- representation of --

 4         A.   Correct.

 5         Q.   -- how much you paid?

 6         A.   Yes.  Correct.

 7         Q.   And did Powerhouse tender this money or did

 8    Auto Deal Corp. tender the money?

 9         A.   No.  Auto Deal paid Manheim.

10         Q.   And where did Auto Deal get the funds for the

11    payment?

12         A.   From his bank account.

13         Q.   How much did you pay Auto Deal Corp. for the

14    vehicle?

15         A.   The price of the car, plus the transport,

16    plus I -- I was giving him 25 percent of the profits.

17         Q.   Did you receive a Certificate of Title for

18    the vehicle when you bought it?

19         A.   No.

20              MR. FEYGIN:  Okay.  I'm going to pull up

21         what's going to be Plaintiff's Exhibit C.

22              (Plaintiff Exhibit C was marked for

23         identification.)

24              (Whereupon, document(s) shared on the

25         screen.)
```

```
 1    BY MR. FEYGIN:

 2         Q.   Can you see this?

 3         A.   What's that?  Yeah, I see it now.

 4         Q.   Does it look familiar?

 5         A.   It's a title.

 6         Q.   And this is FSIA 00019 and FSIA 00020, do we

 7    agree?

 8         A.   What is these numbers?

 9         Q.   It's Bates stamps.  It's how you identify a

10    document that was produced in discovery.  Your

11    attorneys produced it with these numbers stamped on

12    bottom (indicating.)

13         A.   Okay.

14         Q.   I just want to make sure we're looking at the

15    same thing.

16         A.   Yeah.  Yeah.  Okay.

17         Q.   Okay.  Is this a true and correct copy of the

18    Certificate of Title Auto Deal Corp. received when it

19    purchased the vehicle?

20              MR. PERALTA:  Objection; no -- no foundation

21         and facts not in evidence, speculative, et cetera.

22    BY MR. FEYGIN:

23         Q.   Is this a copy of the Certificate of Title

24    you produced in discovery?

25         A.   That's not a Certificate of Title.  That's --
```

```
 1    that's a title.

 2         Q.   Okay.  Is this the title that you produced in

 3    discovery?

 4         A.   When I sold the car, after the customer took

 5    possession of the car and left, I got the title in my

 6    hands, maybe like ten days later.

 7         Q.   So, let's unpack that.

 8         A.   Excuse me?

 9         Q.   Let's -- let's go into that a little bit.

10         A.   Do what?

11         Q.   Hold on one second, please.

12              How did you -- let's take a step back here.

13              How did you get this particular title in this

14    particular format?  Where did this come from?

15         A.   Auto Deal Corp.

16         Q.   Do you maintain this in your own business

17    records or did Auto Deal Corp. provide it to you?

18         A.   Auto Deal Corp. --

19              MR. PERALTA:  Objection.

20              THE WITNESS:  -- provide it to me.

21              MR. PERALTA:  Objection; asked and answered

22         and leading as well.

23    BY MR. FEYGIN:

24         Q.   When did Auto Deal Corp. get this title?

25         A.   It tells you there in -- one second.  I can
```

1    tell you right now.  One second.  It shows the ship

2    date and everything.

3         Q.   What are you looking at?

4         A.   When the auction send the title to Auto Deal.

5         Q.   And where are you finding that information?

6         A.   In Manheim.  My account with Manheim.  What

7    is the last six of the VIN?

8         Q.   I'm sorry?

9         A.   What is the last six of the VIN?

10        Q.   A12718.

11        A.   So, it says there they shipped the title

12   to -- to Auto Deal Corp. on April 28, 2020 by USPS.

13   So, I bought it April 11th, and they sent the title

14   April 28.

15        Q.   And do you happen to know when Auto Deal

16   Corp. actually received the title?

17        A.   They shipped -- I'm assuming a day later, two

18   days later on April 30th.

19        Q.   Do you have the ability to determine the

20   exact date Auto Deal Corp. received --

21        A.   No.

22        Q.   -- the title?

23        A.   No.

24        Q.   So, looking at the face of the title, what is

25   the disclosed odometer reading (indicating)?

 1          A.    201150.

 2          Q.    And underneath that, what does the title

 3    state regarding the mileage?

 4          A.    The actual mileage.

 5          Q.    I'm going to move on to my client's

 6    transaction.

 7                Were you personally involved in the sale of

 8    the vehicle to my client?

 9          A.    No.

10          Q.    Who was?

11          A.    Alex Reyes.

12          Q.    And he's no longer employed by the

13    dealership, correct?

14          A.    Correct.

15          Q.    Who else was involved in the transaction?

16          A.    Might be a salesman, but I don't know which

17    salesman it was.

18          Q.    Do you have a way to figure it out?

19          A.    The only way is the -- the -- the person who

20    bought the car, he can tell me the name of the person,

21    and then I know exactly who it was.

22          Q.    Do you not have commissions for sales?

23          A.    I do.

24          Q.    Do you keep track of the commissions you pay?

25          A.    No.

Case 8:23-cv-00709-WFJ-SPF    Document 70-2    Filed 09/25/24    Page 46 of 173 PageID 569
GABRIEL LUIS JIMENEZ, et al. vs. CARMAX, et al.
CR of FS Investments (Franklyn Strusberg)
46

 1      Q.   Do you keep track in any other way of who is
 2   involved in a sale?
 3      A.   No.  I got to see the deal jacket.  Maybe on
 4   top of the deal jacket it states the name of the
 5   person.
 6      Q.   Do you have the deal jacket with you?
 7      A.   No.
 8      Q.   Where is the deal jacket?
 9      A.   It's on a file cabinet.
10      Q.   And is that file cabinet in your office?
11      A.   No.
12      Q.   Where is the file cabinet located?
13      A.   It's in a container.  I put all the file
14   cabinets.
15      Q.   And where is this container located?
16      A.   In the dealership.
17      Q.   Did you speak with Alex Reyes to prepare for
18   today?
19      A.   No.
20      Q.   So, you're unable to testify as to what
21   occurred with my client during the transaction?
22           MR. PERALTA:  Objection; leading,
23      speculative.
24           THE WITNESS:  Correct.
25           MR. PERALTA:  And stating facts not in

1      evidence.

2  BY MR. FEYGIN:

3      Q.   Are you able to testify what occurred during

4  the transaction with my client?

5      A.   Yes.

6      Q.   How did he find the dealership?

7      A.   We post everywhere; Marketplace, OfferUp,

8  Craig's List.

9      Q.   Where was this vehicle advertised?

10      A.   Everywhere; Craig's List, Marketplace, in my

11  web page, Cars for Sale.

12      Q.   Are you able to access any of the

13  advertisements for this vehicle?

14      A.   Yeah.

15      Q.   Are you able to provide them to me?

16      A.   Of course.

17      Q.   Do you agree to provide the advertisements to

18  me?

19      A.   If I find it.  Can I have the last six again?

20  Let me see if I can find it right now.

21      Q.   A12718.

22      A.   I found it.

23      Q.   Where is -- what -- what are you looking at?

24      A.   I'm looking at the web page.  I had it

25  advertised for twenty-one nine.

CR of FS Investments (Franklyn Strusberg)

```
 1        Q.   And you'll agree to provide that copy?

 2        A.   Yes.  Of course, yes.

 3        Q.   So, when my client got to the dealership, was

 4   he by himself or was with people?

 5        A.   I don't know.

 6        Q.   What happened when he got there?

 7        A.   I don't know.

 8        Q.   Do you know if he actually test drove the

 9   vehicle?

10        A.   No.

11        Q.   Do you know what part of the day he arrived?

12        A.   No.

13        Q.   Do you know if the documents he signed were

14   done electronically or in wet ink?

15        A.   If it was wet ink?  I'm assuming it was, of

16   course, electronically and paper.  It's the standard

17   for every customer.

18        Q.   For the electronic documents, how did you get

19   his consent to sign the documents electronically?

20        A.   They have to go with the mouse on the

21   computer.

22        Q.   Do you know if he provided his consent on

23   paper or electronically?

24        A.   If he took possession of the car, he must

25   have.
```

CR of FS Investments (Franklyn Strusberg)

1    Q.   Well, was it done on paper or was it done

2  electronically, particularly the providing of his

3  consent?

4    A.   They do both.  They do paper and Internet.

5  They sign both papers.  They sign on the e-contracting

6  and the DMV paper, like the ASCIIs.  The odometer,

7  everything goes handwritten.

8    Q.   Okay.  But before we even get to that

9  process, he has to give his consent to sign a document,

10 correct?

11   A.   He has give -- no.  He has to give a credit

12 application.  He has to leave the commission to us.  Do

13 it on --

14   Q.   After that --

15   A.   -- on-line.

16   Q.   After that, before he starts signing the

17 contracts, does he have to provide consent to sign the

18 documents?

19   A.   There is no such thing.

20        MR. PERALTA:  Objection; asked and answered.

21 BY MR. FEYGIN:

22   Q.   Please repeat yourself, Mr. Strusberg?

23   A.   There is no such thing.

24   Q.   There is no consent form?

25   A.   No.  It's the credit application itself.  At

```
 1    the end of the credit application, we have a click box

 2    that says he's authorizing us to run his information,

 3    so yeah, he does it on-line, not on paper.

 4         Q.   So, that authorization comes at the end of

 5    the transaction?

 6         A.   At the beginning.

 7         Q.   What e-mail address did he use to provide his

 8    consent?

 9         A.   I don't know.

10         Q.   Who would know?

11         A.   I don't even know if he provided a -- an

12    e-mail address.  That's not required.  If they have

13    e-mail, they put it.  Sometimes they -- they don't have

14    an e-mail, but that's --

15         Q.   Do you know if he was provided notice that he

16    could get a copy of the contract in paper format?

17         A.   I don't know.

18         Q.   Who would know?

19         A.   Alexander Reyes.

20         Q.   Was he provided notice that he could withdraw

21    his consent to sign electronically?

22         A.   You do it on -- on the credit application.

23    In the beginning, you do the credit app, and then at

24    the end it's a click box that he authorizes us to run

25    the credit, so he has to claim that.
```

 1       Q.    But was he provided notice that he could

 2   withdraw consent?

 3       A.    What is that?  I don't understand the

 4   question.

 5       Q.    Was he provided notice that he can cancel his

 6   authorization?

 7       A.    No.

 8       Q.    How does the dealership store the electronic

 9   documents?

10       A.    It stays in the DMS, DealerCenter.

11       Q.    And is there a log of his electronic

12   signatures?

13       A.    In every deal, of course.  I can look for it.

14   One second.  The whole deal is saved in DealerCenter.

15   I can send you copies if you want.

16       Q.    That would be great.

17       A.    Yeah.

18            MR. FEYGIN:  I'm going to pull up what's

19       going to be Claimant's Exhibit D, which is

20       effectively a Buyer's Order -- Buyer's Order

21       Contract.  This is stamped FSIA 00005, and it goes

22       down to FSIA 00007.

23            (Plaintiff Exhibit D was marked for

24       identification.)

25            (Whereupon, document(s) shared on the

GABRIEL JEANLOUIS -vs- OLIVER USA, L.P., et al., 11/15/2024
CR of FS Investments (Franklyn Strusberg)

```
 1            screen.)

 2                 MR. FEYGIN:  Does everybody see this?

 3                 THE WITNESS:  Yes.

 4   BY MR. FEYGIN:

 5       Q.   Mr. Strusberg, does this look familiar to

 6   you?

 7       A.   One -- one second, please.  That's the Bill

 8   of Sale.

 9       Q.   Is this a true and correct copy of the Bill

10   of Sale for my Plaintiff's transaction?

11       A.   Excuse me?

12       Q.   Is this a true and correct copy --

13       A.   Yes.

14       Q.   -- of the -- can you explain the significance

15   of a Bill of Sale?

16       A.   It's a -- it's a document that you have to

17   provide.  It's -- it's already printed.  It shows you

18   the -- the price the customer's paying, the taxes, the

19   transfer, the -- the -- the description of the vehicle

20   that he's buying, the money down he's coming up with.

21       Q.   Who prepared this document?

22       A.   The finance manager.

23       Q.   And who was that again?

24       A.   Alexander Reyes.

25       Q.   So, how much did my client pay for this
```

```
 1   vehicle?
 2        A.   Can you -- one second.  I have it here.
 3   He -- 25,000.
 4        Q.   And what was the vehicle sales price before
 5   all of the incidental charges?
 6        A.   Twenty-one nine ninety-eight.
 7        Q.   What was his down payment?
 8        A.   5,000.
 9        Q.   Did the dealership actually receive the
10   $5,000 down payment?
11        A.   Yes.
12        Q.   And what was the date of purchase?
13        A.   It says there, hang on, May 25th, 2020.
14        Q.   So, looking on the itemization of the sale on
15   the right-hand side over here, I see a predelivery
16   service fee of $799.
17        A.   That's dealer fee.
18        Q.   And what is this fee for?
19        A.   To cover my expenses.
20        Q.   And what would those expenses be in this
21   transaction?
22        A.   Rent, light bill, water bill, advertising,
23   secretary, et cetera.
24        Q.   Were any services performed specifically as
25   it relates to my client's vehicle --
```

 1      A.   No.

 2      Q.   -- for this fee?

 3      A.   No.

 4      Q.   Is everyone charged the same fee?

 5      A.   Yes.

 6      Q.   Has this fee ever changed?

 7      A.   Now, it's eight ninety-nine.  Now, it's more.

 8      Q.   And when did that change occur?

 9      A.   When I moved to this building location, like

10  two years ago.

11      Q.   So, what is the mileage disclosure here on

12  this form?

13      A.   The same mileage from the Bill of Sale from

14  Manheim from the auction.

15      Q.   Which was?

16      A.   One thirty-one six three six.

17      Q.   And does this form indicate anywhere that the

18  mileage was inaccurate?

19      A.   No.

20      Q.   Who signed the form on the dealership's

21  behalf?  I'll scroll down to the bottom so you can see

22  the signature.

23      A.   Alex Reyes.

24      Q.   Did you see this document before Mr. Reyes

25  signed it?

```
 1        A.    Yeah.

 2        Q.    Did you approve of this document?

 3        A.    No.  I'm not there when -- when he does it.

 4        Q.    So, when did you see this document?

 5        A.    I never saw it.  I just see it right now.

 6        Q.    Do you have personal knowledge of whether

 7   this document was ever explained to my client?

 8        A.    No.  They have to read it.

 9        Q.    I'm going to look at the top again over here.

10              I'm -- what does V#3 stand for in the upper

11   left-hand corner (indicating)?

12        A.    Do what?

13        Q.    Let me do this.

14        A.    I don't know.  I don't know.  That's -- oh,

15   that's the app number from the bank.  When you finance

16   it --

17        Q.    Uh-huh?

18        A.    -- every deal has an app number, and that's

19   the app number from when he purchased it.  I'm looking

20   at it right now in the deal here.  It's 57987168.

21   That's same one.

22        Q.    Okay.  And then what is this next to it

23   (indicating)?

24        A.    No, I don't know.

25        Q.    Would that be a version number?
```

1        A.    No.  I don't know what is that.

2        Q.    Who would know?

3        A.    The DealerCenter.

4        Q.    If there were prior versions of a contract,

5   would they be in your possession?

6        A.    Do what?

7        Q.    If there were prior versions of a contract,

8   would the dealership maintain copies of those

9   documents?

10       A.    We maintain copies in the system for every

11  single customer.  Everything is in the system since we

12  open.

13       Q.    So, just to make sure I understand you

14  correctly, if there were prior versions, you would have

15  a copy, correct?

16       A.    Oh, yeah.  Yeah.  Yeah.

17            MR. FEYGIN:  I'm going to pull up what's

18       going to be Exhibit E, Plaintiff's Exhibit E, the

19       Retail Installment Sales Contract.  And this is

20       FSIA 000026, and it goes down through FSIA 000031.

21            Does everybody see this document?

22            THE WITNESS:  Yes.

23  BY MR. FEYGIN:

24       Q.    Is this a true and correct copy of the Retail

25  installment Sales Contract for the Plaintiff's

1    transaction?

2         A.    Yes.

3         Q.    And in your words, what is this document?

4         A.    That's the -- that's the contract with the

5    terms; 16 percent, how much money they're going to pay

6    in interest, how much he's financing, what's the

7    payment, what's the -- the months.  It tells you the

8    whole contract history.

9         Q.    Would it be fair to call this a financing

10   agreement?

11        A.    Yes.

12        Q.    So, what is the difference between the first

13   contract we just saw and this one?

14        A.    No.  That's the Bill of Sale.  The Bill of

15   Sale is not a -- it's just a Bill of Sale.  It's not

16   a -- this is the contract.

17        Q.    And this was also electronically signed?

18        A.    Correct.  Right there, you can see the

19   signature.

20        Q.    And obviously Mr. Reyes signed this on behalf

21   of the dealership?

22        A.    Correct.

23        Q.    Was this -- do you have personal knowledge if

24   this contract was explained by Mr. Reyes to my client?

25        A.    He explains to every customer.  They -- they

 1    explain the terms to the customer before they sign, the

 2    payments, everything.

 3         Q.   And what was told to him?

 4         A.   I wasn't there.  I don't know, but I'm

 5    assuming these terms; the payment five seventy-three a

 6    month for 48 payments, the first payment begins July 7,

 7    2020.  He got 16.9 percent APR.  Because when you get a

 8    16 percent APR, it means you have bad credit, so I am

 9    assuming he got bad credit, so everything is explained

10    before they sign.

11         Q.   But that's an assumption and not personal

12    knowledge, correct?

13         A.   You have to tell -- disclose all the terms

14    before the customer signs.  Nobody signs and then reads

15    after.  They -- we explain, and that's what I, you

16    know, taught them to my people.  They first need to

17    explain everything, and after they explain it, they

18    agree.  Then we go ahead and print the paperwork,

19    not -- we don't print paperwork before the customer

20    knowing what's the payment.  We print paperwork after

21    the customer knows everything.

22         Q.   But you weren't there to personally witness

23    anybody --

24         A.   Correct, I was not there.

25         Q.   -- explain --

 1        A.    Correct.

 2        Q.    Okay.  Does this form disclose to my client

 3   that the vehicle had an inaccurate odometer reading?

 4        A.    No.

 5        Q.    And what was the odometer reading disclosure

 6   on this form?

 7        A.    Like, from Manheim, one thirty-one six three

 8   six.

 9        Q.    I'm going to scroll back to the top here.

10   Next to the application number, again we see this V#3.

11              Any idea what that's about?

12        A.    No.

13        Q.    So, after my client left with the vehicle,

14   did my client make his payments directly to Powerhouse?

15        A.    To the bank.

16        Q.    And is that because Powerhouse assigned the

17   Financing Agreement to Westlake?

18        A.    No.  Because we don't do buy here/pay here,

19   so he financed the car, and he needs to pay the lender

20   direct.

21        Q.    And the lender was Westlake, correct?

22        A.    Right.

23        Q.    How much did Powerhouse make in profit off of

24   the assignment of the financing agreement to Westlake?

25        A.    I can tell you right now.  Around $7,000.

 1    Q.   And what did you just look at to make that

 2  determination?

 3    A.   It's my -- my formula, the way I do the math.

 4    Q.   Is there a formal document that spells out

 5  the payout between Westlake and you?

 6    A.   No.  We're taking the customer.  They give me

 7  a check of 18,900.

 8    Q.   How did you come to this agreement with

 9  Westlake?  Is there a master dealer agreement between

10  Westlake and the dealership?

11    A.   Yes.

12    Q.   Okay.  And was that in place at the time of

13  my client's purchase?

14    A.   Yes.

15    Q.   And you have a copy of that?

16    A.   Well, I have my subscription with

17  DealerCenter.

18    Q.   What I'm asking for, is there a formal

19  contract between you and Westlake that dictates how

20  much the dealership is going to make?

21    A.   No.

22    Q.   So, how did you determine with Westlake how

23  much you were going to get paid?

24    A.   You submit the deal to the -- through the

25  platform from DealerCenter, and they give you a

 1   response based on the customer's information, the

 2   income, et cetera.  On this particular deal, my check

 3   was 18,900.

 4        Q.   Did Westlake provide you with a deal recap or

 5   washout sheet?

 6        A.   Yeah.  I have it here.

 7        Q.   Do you agree to provide the deal recap or

 8   washout --

 9        A.   Yes.

10        Q.   -- sheet?

11        A.   Yes, whatever you need.

12        Q.   Where is Westlake located, do you know?

13        A.   California.

14        Q.   How long have you been doing business with

15   Westlake?

16        A.   Five years.

17             MR. FEYGIN:  So, I'm going to pull up what's

18        going to be Plaintiff's Exhibit F.  It's going to

19        be an Odometer Disclosure Statement.  This was

20        produced in discovery by the Defendant, and it's

21        labelled FSIA 000018.

22             (Whereupon, document(s) shared on the

23        screen.)

24   BY MR. FEYGIN:

25        Q.   Does this document look familiar to you?

 1          A.    That's the odometer disclosure.

 2          Q.    Is this a true and correct copy of the

 3    odometer disclosure the dealership had my client

 4    execute?

 5          A.    That's it.  That's the only one.

 6          Q.    What was the mileage disclosure on this

 7    document?

 8          A.    131636.  I don't -- I don't see it.  Yeah,

 9    131636.

10          Q.    And was the checkbox selected where it says

11    "I certify the odometer reading is not the actual

12    mileage"?

13          A.    No.

14          Q.    Why did you have my client execute this

15    document?

16          A.    Because this is -- every customer needs to

17    sign it.  It's standard for every customer.

18          Q.    And is that because the DMV requires it or is

19    that because Westlake --

20          A.    The DMV requires it, yes.  The DMV requires

21    it.

22          Q.    Do you know if the Plaintiff personally

23    signed this document?

24          A.    I see both signatures, yes.

25          Q.    But you weren't there to actually see --

```
 1        A.    I wasn't there.

 2        Q.    -- them sign the document?

 3        A.    I was not there.

 4        Q.    Do you have personal knowledge of whether

 5   this form was explained to my client?

 6        A.    No.

 7        Q.    When did my client see this form, was it

 8   before or after the Buyer's Order?

 9        A.    While -- while signing all of the documents.

10   That's -- that's part of the package.

11        Q.    Was it before or after the Buyer's Order

12   form?

13        A.    That's after.

14        Q.    Was it before or after the Retail Installment

15   Sales Contract?

16        A.    I don't know.  I don't know the order, if

17   it's for -- if it's before or after.  I don't know.

18        Q.    Is there a way to figure out the order that

19   these contracts were provided to --

20        A.    I can --

21        Q.    -- to my client?

22        A.    I can ask the finance guy here, and he can

23   tell me.

24        Q.    Is there an actual log somewhere of how these

25   documents were signed with timestamps?
```

```
 1          A.   No.  I have to look a contract and tell you
 2     what's the order.
 3               MR. PERALTA:  Objection; asked and answered.
 4               THE WITNESS:  Actually, they have -- do you
 5          see the paper in the bottom?  They have, like --
 6          like a number.  It's a sequence.  If you scroll --
 7          if you scroll down, they -- like, in the corner, on
 8          the paper in the corner in the bottom, there has to
 9          be -- see it over there?  There is, like a --
10          that's the date.  It doesn't show the -- the
11          sequence.  Yeah, I don't know the sequence.
12     BY MR. FEYGIN:
13          Q.   Who would know?
14          A.   DealerCenter.
15               MR. FEYGIN:  I'll move on to the Application
16          for Certificate of Title.  This is going to be
17          Plaintiff's Exhibit G.
18               (Plaintiff Exhibit G was marked for
19          identification.)
20               (Whereupon, document(s) shared on the
21          screen.)
22               MR. FEYGIN:  And this is FSIA 000034.
23               Do we all see this document?
24               THE WITNESS:  Yes.
25     BY MR. FEYGIN:
```

Case 8:23-cv-00709-WFJ-SPF   Document 70-2   Filed 09/25/24   Page 65 of 173 PageID 588
GABRIEL LUC HADDON vs. ON SCENE, LLC, et al.
CR of FS Investments (Franklyn Strusberg)
65

 1     Q.   Does this look like a true and accurate copy

 2  of the Application for Certificate of Title with --

 3  without registration my client signed?

 4     A.   Yes.

 5     Q.   What is the purpose of this document?

 6     A.   The customer authorizes the dealership to

 7  transfer the car over to his name.

 8     Q.   And why did my client have to sign this

 9  document?

10     A.   That's not something they have to sign.

11  There -- there's no place to -- to sign it.  Only the

12  dealership.

13     Q.   So, is it your position that it's only one

14  page, this document?

15     A.   Correct.

16     Q.   There is no second page?

17     A.   No, no second page.  No.  Whatever --

18  whatever they have to sign, they sign, and -- and if

19  there's no space for them to sign, they don't sign.

20     Q.   Over here in the bottom right corner there's

21  the dealer agent signature.

22          Whose signature is that?

23     A.   Alexander Reyes.

24     Q.   Did my client ever see this document?

25     A.   Yes.  All of them.

1     Q.   Were you there personally to witness my

2  client --

3     A.   No.

4     Q.   -- sign this document?

5     A.   No, but that's part of the package, and it

6  shows the lienholder, Westlake Financial.

7     Q.   So, when did Mr. Haddon see this form, was it

8  before or after the Buyer's Order?

9     A.   I don't know.

10     Q.   Was it before or after the Retail Installment

11  Sales Contract?

12     A.   I don't know.

13     Q.   So, how do you know that he saw it?

14     A.   It's in the package.  They give him a

15  package, and he needs to sign.  And whatever he doesn't

16  need to sign, he -- it's a package, but not all the

17  package is for him to sign.  Some -- some -- some

18  papers, like this one, doesn't need the customer's

19  signature.

20     Q.   What was the mileage disclosure on this form?

21     A.   131636.

22     Q.   And that was filled out by who?

23     A.   By the system, DealerCenter.

24     Q.   Who put the information into DealerCenter?

25     A.   Me and Alexander.

1    Q.   And on what date was this information entered

2    into the system?

3    A.   I can tell you right now.  Well, this one

4    particular, when they sold the car, but I -- when I

5    post the cars on the web page -- let's see.  I posted

6    this car, so when I posted -- when -- when the first --

7    the car first arrived, I take pictures, and I post it.

8    The mileage, I put 131636.  It's on the -- the web page

9    since Day 1.

10   Q.   Getting back to this form, it says the

11   mileage reading is one thirty-one six thirty-six, date

12   read 5/25/2020.

13        Was the mileage read on that date?

14   A.   Yeah.

15   Q.   And did the dealership select that it was

16   actual mileage or --

17   A.   Yes.

18   Q.   -- not the actual mileage?

19   A.   Actual mileage.

20        MR. FEYGIN:  I'm going to move on to

21   Exhibit H.  This is Plaintiff's RFP 018.

22        (Plaintiff Exhibit H was marked for

23   identification.)

24        (Whereupon, document(s) shared on the

25   screen.)

```
 1   BY MR. FEYGIN:

 2        Q.   Does this document look familiar to you?

 3        A.   That's the Power of Attorney.

 4        Q.   And what is the scan number at the top of

 5   this document (indicating)?

 6        A.   I don't know.

 7        Q.   Can you see it now?

 8        A.   Yeah, I can see it, but I don't know what is

 9   it.

10        Q.   Can you read that into the record, please?

11        A.   539994090.

12        Q.   Is this a true and correct copy of the Power

13   of Attorney the dealership had my client sign?

14        A.   Yes, and that's their signatures.

15        Q.   And is this a true and correct copy of the

16   Power of Attorney that was submitted to the DMV by the

17   dealership --

18        A.   Yes.

19        Q.   -- for this transaction?

20        A.   Yes.

21        Q.   In your words, what is the purpose of this

22   document?

23        A.   It's a Power of Attorney that the customer

24   authorizes to transfer the car over to them.

25        Q.   And why does the dealership use a Power of
```

```
 1  Attorney form?
 2       A.   It's a standard.  The DMV gives you the
 3  paperwork.
 4       Q.   How often does the dealership use this form?
 5       A.   Every single deal.  When you print it, you
 6  hit print, and the package comes automatically.  It's
 7  standard in every customer.
 8       Q.   And I just want to make sure that we're on
 9  the same page here.
10            This is HSMV form 82053?
11       A.   Correct.
12       Q.   Read 12/11?
13       A.   Correct.
14       Q.   And it is your position as you sit here today
15  that you use this form in every single vehicle
16  transaction?
17       A.   Correct.
18       Q.   Who prepared this form for my client's
19  signature?
20       A.   The system and the -- and the finance
21  manager.
22       Q.   Okay.  And how do you know my client signed
23  this document?
24       A.   Because I can see the signature there.  I can
25  see two signatures.
```

Case 8:23-cv-00709-WFJ-SPF   Document 70-2   Filed 09/25/24   Page 70 of 173 PageID 593

GABRIEL JAMES HADDON vs. ONE OAK MOTORS                                              JUNE 27, 2024
CR of FS Investments (Franklyn Strusberg)
70

```
 1           Q.    And was this ever explained to my client?

 2           A.    Like I said, everything is explained, yes.

 3           Q.    Were you there --

 4           A.    I was not there.

 5           Q.    -- to watch --

 6           A.    No, I was not there.

 7           Q.    When did Mr. Haddon see this form?

 8           A.    When he signed it.

 9           Q.    I should have been a little bit more

10    specific.

11                 Was it before or after the RISC?

12           A.    At the moment of the sale.

13           Q.    Okay.  Was it before or after signing the

14    Retail Installment Sales Contract.

15           A.    At the moment of the sale?

16           Q.    Was it before or after signing the Buyer's

17    Order form?

18           A.    At the moment of the sale.

19           Q.    Was it before or after any of the other

20    documents we just reviewed?

21           A.    At the moment of the sale.

22           Q.    Okay.  Is it your position that you don't

23    know when this document was actually signed, then?

24           A.    Correct.

25           Q.    So, at the top over here, on what date was
```

```
 1    this signed?

 2         A.   It says 5/25/2020.

 3         Q.   And then beneath that, who is it that my

 4    client appointed as the Power of Attorney (indicating)?

 5         A.   Don Hall.

 6         Q.   Who is Don Hall?

 7         A.   I don't know.

 8         Q.   Does Don Hall work for the dealership?

 9         A.   No.

10         Q.   Is the dealership in the business of having

11    consumers sign Power of Attorneys appointing people

12    that are not employed by the dealership to act on their

13    behalf?

14         A.   Who's not -- who's not --

15         Q.   I'm asking you.  This is the form that you

16    submitted to the DMV that you just testified --

17         A.   No, because I --

18         Q.   -- that was part of my client's transaction.

19         A.   That part is -- it's the DMV office.  They

20    do --

21         Q.   Okay.

22         A.   They put names on them.  I think that must be

23    the DMV office where they transferred the car.

24         Q.   Okay.  When my client signed this document,

25    was the name Don Hall already put onto this document?
```

```
 1            A.   I don't know.

 2            Q.   Who would know?

 3            A.   The lady who does the transfers for -- for

 4   me.

 5            Q.   Who is that?

 6            A.   Oh, I think -- Betty.  Betty does my titles.

 7            Q.   And where does Betty work?

 8            A.   She's mobile.

 9            Q.   What is the name of her company?

10            A.   I don't know.

11            Q.   What is her contact information?

12            A.   I have her phone number.

13            Q.   Do you agree to provide that to me?

14            A.   Yes.

15            Q.   Okay.

16            A.   Yeah.  That whole -- the DMV office where

17   they transfer the car.

18            Q.   And how do you know that?

19            A.   It -- the name sounds familiar.

20            Q.   Does this document disclose the vehicle's

21   mileage anywhere?

22            A.   Not this one.  The odometer disclosure does

23   and the Bill of Sale and the contract.

24            MR. FEYGIN:  Okay.  I'm going to move on to

25       Exhibit I.  This is the Certificate of Title we
```

1          obtained from the DMV through a public records

2          question.

3                    (Plaintiff Exhibit I was marked for

4          identification.)

5                    (Whereupon, document(s) shared on the

6          screen.)

7     BY MR. FEYGIN:

8          Q.    Does this look familiar to you?

9          A.    No.

10         Q.    You have never seen this document before?

11         A.    I've seen on other ones, but not this one.

12         Q.    Okay.  Did you submit title documents to the

13    DMV?

14         A.    No.  Betty.

15         Q.    Okay.  We can agree that this is a truthful

16    and accurate representation of the face of the title?

17         A.    Correct.

18         Q.    And what is this scan number at the top of

19    this document (indicating)?

20         A.    I don't know.

21         Q.    Okay.  Let me zoom in so you can see it

22    better.

23                What is the number over here?

24         A.    No, I already told you.  539994086.  It's a

25    transaction number there.

1    Q.   Correct.  The scan transaction number?

2    A.   Yes.

3    Q.   Going to the second page, which is the back

4    of the title, can you read the scan transaction number

5    on the top?

6    A.   Can you please zoom out a little bit, please?

7    Q.   Sure.  (Complies with request.)

8    A.   539994087.

9    Q.   And you said that you don't remember or you

10   don't recall this form, do you?

11   A.   No.

12   Q.   Do you have a copy of the Certificate of

13   Title.

14   A.   In the deal jacket, might be.

15   Q.   Do you have a copy of the Certificate of

16   Title my client actually signed?

17   A.   Yes.  It has to be in the deal jacket.

18   Q.   Okay.  Do you have a copy of the Certificate

19   of Title where Auto Deal Corp. transferred the title to

20   Powerhouse?

21   A.   It must be in the -- in the papers.

22   Q.   Okay.  And do you agree to provide this

23   document?

24   A.   Yes, whatever you need.

25   Q.   Do you have the document in front of you now?

```
 1        A.    No.

 2        Q.    Can you find the document as we sit here?

 3        A.    No.

 4        Q.    So, looking at this document here, do you

 5   have any reason to believe this is not the document

 6   where the Certificate of Title was transferred from

 7   Powerhouse to Auto Deal -- I'm sorry, from Auto Deal to

 8   Powerhouse?

 9        A.    No.

10        Q.    Do you have any reason to believe that this

11   document is not the Certificate of Title in which

12   Powerhouse transferred the title to my client?

13        A.    No.

14        Q.    Okay.  I'm going to start off with the

15   transaction from McCombs to Auto Deal Corp, which is --

16   I'm going to highlight it so we can all focus in on it.

17              Do you see what I'm looking at?

18        A.    Yes.

19        Q.    Were you personally involved in this

20   transfer?

21        A.    No.

22        Q.    So, you did not sign this?

23        A.    No.

24        Q.    You did not see this transfer?

25        A.    I never touch titles.  I never do paperwork,
```

```
 1   not -- not one in my life.  I don't even know how to do
 2   it.
 3         Q.   Okay.  Moving on to the transfer from Auto
 4   Deal to Powerhouse, see where I'm highlighting?
 5         A.   Yes.
 6         Q.   Okay.  Whose signature is this on the
 7   left-hand side (indicating)?
 8         A.   I don't know.
 9         Q.   Who would know?
10         A.   Betty.
11         Q.   And is this your name to the right of the
12   signature (indicating)?
13         A.   Yes.
14         Q.   Why would your name be there, then?
15         A.   Because I'm the owner of the dealership.
16         Q.   But that's not your signature, though, is it?
17         A.   No.
18         Q.   Okay.  And we don't know who signed it?
19         A.   Betty.
20         Q.   So, now it's your position that this is
21   Betty's signature?
22         A.    I'm assuming because she's the only one that
23   does the -- the transfers at the moment of the -- of
24   the -- of the transfers.  In -- in that moment, back in
25   2020, she was the only one doing it.
```

1    Q.   And Betty is not an employee of the

2    dealership, is she?

3    A.   Yeah, she works in the time.  Not anymore,

4    but back in the day she was working with me.

5    Q.   Was she a 1099 or a salaried employee?

6    A.   1099.

7    Q.   And how often did she get paid?

8    A.   Weekly.

9    Q.   Did Powerhouse ever sign a Power of Attorney

10   appointing Betty as the Power of Attorney to bind it in

11   this Certificate of Title transaction?

12   A.   I don't remember.

13   Q.   Let's look at the odometer disclosure here.

14   A.   One thirty-one three six -- 131630.

15   Q.   Okay.  And I'm going to delete the

16   highlighting so it might be easier for you.

17        On what date was the Certificate of Title

18   transferred to Powerhouse?

19   A.   I don't know.

20   Q.   What is the date that is listed on --

21   A.   Oh, it says 5/15/20.

22   Q.   And is that the actual date that the

23   Certificate of Title was transferred to Powerhouse?

24   A.   If it's there, yes.

25   Q.   Okay.  And when Powerhouse accepted this

Case 8:23-cv-00709-WFJ-SPF   Document 70-2   Filed 09/25/24   Page 78 of 173 PageID 601

GABRIEL LUC HADDON vs. FS INVESTMENTS OF AMERICA INC. - 6/26/2024
CR of FS Investments (Franklyn Strusberg)

78

```
 1    Certificate of Title, did it look at the face of the

 2    title before signing this document, whoever --

 3         A.   I don't know.

 4         Q.   -- signed this?

 5         A.   I don't know.

 6         Q.   And who would know?

 7         A.   Betty.

 8         Q.   Okay.  And you didn't speak with her to

 9    prepare for today, did you?

10         A.   No.

11         Q.   And do we know who Juliana A. is?

12         A.   That's the secretary from Auto Deal Corp.

13         Q.   Okay.  And you weren't present personally

14    when this transfer occurred?

15         A.   Correct.

16              MR. FEYGIN:  Okay.  I'm going to scroll down

17         to the transaction from Powerhouse to Gabriel Luc

18         Haddon.  It's the third reassignment.  I'm going to

19         highlight it just for a moment so everybody can see

20         what we're looking at.

21              Does everybody see what I'm talking about?

22              THE WITNESS:  Yes.

23    BY MR. FEYGIN:

24         Q.   What was the mileage disclosure at the time

25    of this transfer?
```

```
 1            A.    131636.
 2            Q.    And what was the date that this disclosure
 3   was made?
 4            A.    It says there 5/25/20.
 5            Q.    And is that the date that the -- the
 6   disclosure was actually made on this title?
 7            A.    Yes.
 8            Q.    And how do you know that?
 9            A.    By looking at the date right here.
10            Q.    And it's your position that the information
11   on this title document is truthful and accurate and
12   depicts exactly the date that this transfer occurred?
13            A.    Correct.
14            Q.    Who signed on behalf of the dealership?
15            A.    Betty.
16            Q.    And again, Betty's name doesn't appear there,
17   does it?
18            A.    No.  That's my name.
19            Q.    Okay.  So, to the right, that is your name,
20   Franklyn Strusberg?
21            A.    Correct.
22            Q.    And who signed on behalf of my client?
23            A.    He signed on the front, not on the title.
24            Q.    That's not the question.  I'm looking at --
25            A.    Him, the -- the customer.
```

Case 8:23-cv-00709-WFJ-SPF   Document 70-2   Filed 09/25/24   Page 80 of 173 PageID 603
GABRIEL LUC HADDON vs. SUN CC, et al. GABRIEL LUC HADDON 4/17/2024
CR of FS Investments (Franklyn Strusberg)
80

1      Q.   So, it's your position --

2      A.   You don't -- you don't sign.  They put the

3  name on it.

4      Q.   Okay.  Let's look at it a little bit more

5  closely here.

6           Do you see where I'm pointing at

7  (indicating)?

8      A.   Yes.

9      Q.   Underneath, what does it say right there

10  (indicating)?

11     A.   "Signature of borrower."

12     Q.   Okay.  And is it your position that my client

13  did not sign this document?

14     A.   That's why you got the Power of Attorney.

15     Q.   Okay.  And now is it your position that a

16  Power of Attorney signed this document on my client's

17  behalf?

18     A.   No.  He signed it.  He signed the Power of

19  Attorney for me to sign for him.

20     Q.   Okay.  So, let's unpack that.

21          My client signed a Power of Attorney,

22  correct?

23     A.   Correct.

24     Q.   And he let you sign this document on his

25  behalf?

1        A.   That's what the Power of Attorney says.

2        Q.   And did you sign this document on my client's

3   behalf?

4        A.   No.

5        Q.   Who signed this document on my client's

6   behalf?

7        A.   Somebody in the dealership.  Betty.  I'm

8   assuming Betty.

9        Q.   How would you find out who signed this

10  document?

11       A.   I can call her and ask her.

12       Q.   And you didn't speak with her in preparation

13  for today's deposition?

14       A.   Oh, no.  No.  No.

15            MR. PERALTA:  Asked and answered.

16            THE WITNESS:  I haven't talked to her for,

17       like two months.

18  BY MR. FEYGIN:

19       Q.   And why is that?

20       A.   She no longer works with me.  I have a new

21  lady.

22       Q.   When this mileage disclosure was made on

23  5/25/2020, did Powerhouse Automotive look at the face

24  of the title?

25       A.   No.

```
 1        Q.   And at the time of the sale of the vehicle to

 2   Mr. Haddon, did the dealership have this title in its

 3   possession?

 4        A.   No.

 5        Q.   Didn't you just testify that it was sign on

 6   May 25th of 2020?

 7             MR. PERALTA:  Objection; mischaracterizes his

 8        testimony.

 9             Go ahead, Frank.

10             THE WITNESS:  I got the title on 5/15.

11   BY MR. FEYGIN:

12        Q.   Okay.  So, was the dealership in possession

13   of this title on 5/25?

14             MR. PERALTA:  Objection; asked and answered.

15             THE WITNESS:  On 5/25?  Yes.

16   BY MR. FEYGIN:

17        Q.   Okay.  So, it wasn't being held by a lender

18   when my client signed it, was it?

19        A.   By Auto Deal Corp.

20        Q.   Let me -- let me ask you a different

21   question.

22             Looking at the document we're looking at here

23   today, right, it wasn't in the possession of a lender

24   at the time this signature was applied to the title,

25   was it?
```

 1        A.   No.

 2        Q.   And the title wasn't lost or in the process

 3   of being replaced, was it?

 4        A.   Correct.

 5        Q.   So, why is it that a Power of Attorney was

 6   used to sign this document instead of having my client

 7   sign the document?

 8        A.   I don't know.

 9        Q.   Who would know?

10        A.   Betty.

11        Q.   Okay.  Again, you didn't speak to her about

12   this question either, did you?

13        A.   Correct.

14        Q.   So, after the vehicle was sold, did the

15   dealership ever inform my client that it had a tampered

16   odometer?

17        A.   No.

18             MR. PERALTA:  Objection; assumes facts not in

19        evidence.

20   BY MR. FEYGIN:

21        Q.   When did the dealership first learn that the

22   odometer reading was inaccurate?

23        A.   When the bond called me.

24        Q.   And do we agree that the mileage reading is

25   inaccurate?

```
 1        A.    Yes.

 2        Q.    Okay.  And why do we have that agreement, is

 3   that because the face of the title says a different

 4   mileage reading?

 5        A.    Because we dig -- dig into it when the bond

 6   called me.  And I called Manheim, and Manheim told me

 7   that the seller, Ford, made a mistake.

 8        Q.    So, there's no dispute that the mileage is

 9   inaccurate on this vehicle?

10        A.    Correct.

11        Q.    Excellent.  Has the dealership ever been sued

12   before?

13        A.    No.

14              MR. PERALTA:  Asked and answered; objection.

15   BY MR. FEYGIN:

16        Q.    Has the dealership ever been sued for

17   odometer issues before?

18        A.    Never.

19              MR. PERALTA:  Asked and answered; objection.

20   BY MR. FEYGIN:

21        Q.    Has a consumer ever filed a Complaint against

22   the dealership with the Better Business Bureau?

23        A.    Yes.

24        Q.    When?

25        A.    I don't know.
```

 1        Q.    Who would know?

 2        A.    The -- if you look into the Better Business

 3   Bureau page, you can see that.

 4        Q.    Do you have access to the Better Business

 5   Bureau page and all of the Complaints that were waged

 6   against you?

 7        A.    No.

 8        Q.    Do you have an account with the Better

 9   Business Bureau?

10        A.    I think so.

11        Q.    How can you determine whether or not you have

12   an account?

13        A.    I might have it, but maybe it expired.  I

14   have to activate it again.

15        Q.    Did anybody ever file a Complaint with a

16   county department against the -- the dealership?

17        A.    Not that I know of.

18        Q.    Did anybody ever file a Complaint with the

19   Department of Agriculture and Consumer Services against

20   the dealership?

21        A.    No.  With the DMV.

22        Q.    Has anybody filed a Complaint with the DMV?

23        A.    Yes.

24        Q.    How many?

25        A.    I don't know.

CR of FS Investments (Franklyn Strusberg)

```
 1          Q.    Who would know?

 2          A.    The DMV records.

 3          Q.    Do you not maintain possession of these

 4    records in -- in your office?

 5          A.    No, because they -- we solved all the issues.

 6    The Complaints are for different reasons, like the

 7    compressor is not working, the -- the -- the

 8    transmission is -- any mechanical issues, and we always

 9    help the -- the community.

10          Q.    And is it your position that you were never

11    cited by the DMV?

12          A.    Every time there is a complaint, the DMV

13    comes to the dealer to solve the issue.

14          Q.    Did you ever receive a citation from the DMV?

15          A.    Yes.

16          Q.    What was that citation for?

17          A.    I don't know.

18          Q.    Has anybody filed a Complaint with the

19    attorney general's office against the dealership?

20          A.    Not that I know of.

21          Q.    Who would know?

22          A.    No, I don't know.

23          Q.    I understand you don't know, but who in the

24    organization would know?

25          A.    Nobody.
```

```
 1              MR. FEYGIN:  Okay.  I'm going to move on to

 2        Exhibit J, which is going to be the Amended Answer

 3        and Affirmative Defenses.

 4              (Plaintiff Exhibit J was marked for

 5        identification.)

 6              (Whereupon, document(s) shared on the

 7        screen.)

 8   BY MR. FEYGIN:

 9        Q.    Have you ever seen this document?

10        A.    No.

11        Q.    Okay.  I'm going to look at the affirmative

12   defenses that your attorneys filed with the Court.

13              For your first affirmative defense, what

14   facts do you rely upon to assert accord and

15   satisfaction?

16        A.    You're asking me?

17        Q.    Yes.

18        A.    I don't understand the question.

19        Q.    What facts do you rely upon when you say the

20   Plaintiff's actual damages have been fully resolved by

21   the parties' agreement and the Defendant's payment?

22        A.    The -- the bond called me asking for a check

23   for $9,000, and I sent it.

24        Q.    For your third affirmative defense -- I'm

25   sorry.
```

1          For your second affirmative defense, what

2    facts do you rely upon when you assert that the

3    Plaintiff was aware of any discrepancy in the odometer

4    reading of the subject vehicle on or soon after

5    May 25th, 2020?

6          A.    What is the question?

7          Q.    What facts do you rely upon when the

8    dealership asserts that the Plaintiff was aware of any

9    discrepancy in the odometer reading?

10         A.    I called -- I called Manheim automatically.

11   The second I -- I received the -- the call from the

12   bond about the claim of the mileage, the discrepancy, I

13   called the -- Manheim, the auction.

14         And I asked them why if the car was a

15   rollback they didn't disclose it on the comments,

16   because normally when the car has a discrepancy with

17   the mileage they have to disclose it on the comments

18   and they sell me the car TMU.  This car was sold to me.

19   I bought the car under the -- under the impression that

20   the car had a 131,000 miles.  That's why I bought it,

21   but then when I find out, that is when I called

22   Manheim.  And they dig into it, and the answer was

23   Ford, the seller, made a mistake.

24         Q.    What facts do you have that my client knew

25   that the odometer was rolled back shortly after the

 1   purchase?

 2        A.    No.   I find out because of the bond.   That's

 3   when I find out.

 4        Q.    I understand when you found out.   What I'm

 5   asking you is:   You have asserted that my client knew

 6   that the mileage was inaccurate shortly after the

 7   purchase.

 8             What facts do you have to support my client

 9   knew that the mileage was inaccurate shortly after

10   purchase?

11        A.    I don't know.

12        Q.    For your third affirmative defense, what

13   facts do you rely upon when you assert that the

14   Plaintiff's cause of action is barred by the doctrine

15   of laches?

16             MR. PERALTA:   Objection; calls for a legal

17        conclusion.

18             THE WITNESS:   Can you please explain the

19        question a little better for me, please?

20             MR. FEYGIN:   For the third affirmative

21        defense --

22             THE WITNESS:   Yes.

23             MR. FEYGIN:   -- the dealership has asserted

24        that the client -- the consumer's causes of action

25        are barred by the doctrine of laches.

```
 1            How was the dealership prejudiced by the
 2       Plaintiff filing a lawsuit two years and ten months
 3       after he purchased the vehicle?
 4            THE WITNESS:  No, this is -- we completely
 5       understand that it's a human mistake.  We're not
 6       here to blame nobody.  It's -- it's -- they made a
 7       mistake, and since Day 1 when I contacted the bond,
 8       I told them that Manheim was open to receive the
 9       car back and to refund me the money.
10   BY MR. FEYGIN:
11       Q.   How was the dealership prejudiced by the
12   filing of this lawsuit two years and ten months after
13   the purchase?
14       A.   I don't understand the question.  I'm sorry.
15       Q.   As in for your fourth affirmative defense,
16   what facts does the dealership rely upon when you
17   assert that the Plaintiff has not suffered and cannot
18   honestly allege any actual damages?
19       A.   I don't understand the question.
20       Q.   For your sixth affirmative defense, what
21   facts do you rely upon when you assert Counts II and
22   III are barred under the Independent Tort Doctrine?
23       A.   Are you talking to me in Chinese.
24       Q.   Are we in agreement that the mileage
25   disclosures provided to my client on the title
```

```
 1   documents was inaccurate?

 2        A.   Yes.

 3        Q.   So, for your seventh affirmative defense,

 4   what facts does the dealership rely upon when it

 5   asserts my client waived his rights?

 6        A.   I don't understand the question.

 7        Q.   What rights did my client waive?

 8        A.   No, he's -- he's -- he -- it's his right

 9   to -- to complain about that.  If I was him, I -- I

10   would have done the same.  I -- there's no -- I'm not

11   discussing that.  He's a hundred percent right.  Your

12   client is 100 percent right, and I'm with him.

13        Q.   For your eighth affirmative defense, what

14   facts do you rely upon when you assert Plaintiff's

15   claims are barred by a prior settlement and release?

16        A.   Well, the -- the solution that I offered

17   since Day 1 is just to unwind the deal so I can just

18   give the car back to Manheim so -- so he doesn't need

19   to keep that car, and Manheim opened up that -- that

20   door for us.  They say just to unwind the deal.

21        Q.   Are you still willing to unwind the deal?

22        A.   I got to call Manheim again.  I spoke with

23   them maybe, like a year ago, but I've got to talk to

24   them again.  I'm pretty sure they're going to want the

25   deal.
```

CR of FS Investments (Franklyn Strusberg)

1    Q.   And would you be interested in exploring that

2    option again?

3    A.   Whatever we need to do to -- to -- I mean,

4    it's -- it's a -- it's a mistake, and I understand your

5    point.  And me as a dealer, I learned my lesson with

6    this particular case because next time I'm going to try

7    to -- to make sure the mileage are right, to ask --

8    triple check with the auction, "are you sure this

9    mileage are right?"  Call them when they do the

10   inspection, make sure they check on -- because they

11   have access to -- to CARFAX™ and all that, so just to

12   make sure they -- they check the mileage.

13   Q.   And so, from what I understand, and correct

14   me if I'm wrong, but I think you're saying that you

15   didn't take necessary steps to verify the mileage, you

16   just relied on --

17   A.   No.  We go -- my process is --

18        MR. PERALTA:  Objection; mischaracterizes his

19        testimony.

20        THE WITNESS:  Yeah.  My -- my process is

21        simple.  When we buy the cars, we go by the Bill of

22        Sale of Manheim and -- and the odometer that

23        Manheim provides.  Because Manheim is the biggest

24        company in the U.S., so we go by -- whatever they

25        provide, we go by that.

CR of FS Investments (Franklyn Strusberg)

1  BY MR. FEYGIN:

2      Q.   Did my client ever sign a Settlement and

3  Release Agreement regarding his odometer claim

4  odometer?

5      A.   I don't remember.

6      Q.   Did my client ever sign a Settlement and

7  Release Agreement regarding his fraud claim?

8      A.   I don't know.

9      Q.   For your ninth affirmative defense, what

10  facts do you rely upon when you assert Defendant acted

11  in good faith and followed commercially and reasonable

12  standards?

13      A.   He acted in good faith, yes.

14      Q.   What commercial reasonable standards did the

15  dealership follow?

16      A.   We go by -- like, I said, by whatever

17  Manheim -- we only buy from Manheim because it's --

18  it's a trustworthy company, so whatever they tell us is

19  what we tell the -- the customers, whatever is on the

20  paper, on the Bill of Sale of the truck.

21      Q.   For your eleventh and twelfth affirmative

22  defenses, what facts do you rely upon when you assert

23  Plaintiff is estopped from asserting the actions in the

24  Complaint as his own conduct and/or the conduct of

25  third-parties outside of the Defendant's control?  What

 1   third-parties are you referring to?

 2        A.   I don't know.

 3        Q.   What did those third-parties do to contribute

 4   to this liability?

 5        A.   I don't know.

 6        Q.   For your thirteenth affirmative defense, what

 7   facts do you rely upon when you assert Plaintiff was

 8   negligent?

 9        A.   Who was negligent?

10        Q.   My client.

11        A.   Why was he?

12        Q.   It says my client was negligent.

13             How was my client negligent?

14        A.   I don't know.

15        Q.   For your fourteenth affirmative defense, what

16   facts do you rely upon when you assert Plaintiff's

17   claims are barred in whole or in part by of the

18   Doctrines of Unclean Hands, estoppel, laches,

19   acquiescence and other doctrines of equitable relief?

20        A.   Can you please repeat that question again?

21        Q.   For your fourteenth affirmative defense, it's

22   titled unclean hands, and it states that the

23   Plaintiff's claims are barred in whole or in part by

24   the doctrines of unclean hands, estoppel, laches,

25   anquience (sic) -- acquiescence and other doctrines of

 1    equitable relief.

 2            What facts do you rely upon to assert this

 3    affirmative defense?

 4        A.    I don't know.

 5        Q.    For your sixteenth affirmative defense, what

 6    facts do you rely upon when you assert Plaintiff failed

 7    to mitigate damages?

 8        A.    We always help the customers.

 9        Q.    What should have my client done differently

10    here?

11        A.    I mean, it -- he did what he thought it was

12    good to do.  He's -- he's been down -- he's been down

13    before, because I remember when he was talking about a

14    lawsuit that he win, so he's been down this road

15    before.  Me, no.  For me, this is new.

16        Q.    For your nineteenth affirmative defense, what

17    facts do you rely upon when you assert Plaintiff's

18    cause of action for breach of express warranty is

19    barred by his alteration of the vehicle?

20            MR. PERALTA:  Would you mind showing it,

21        Joshua?

22            MR. FEYGIN:  (Complies with request.)

23            MR. PERALTA:  Thank you.

24    BY MR. FEYGIN:

25        Q.    Number 19 over here, Plaintiff's cause of

Case 8:23-cv-00709-WFJ-SPF Document 70-2 Filed 09/25/24 Page 96 of 173 PageID 619

GABRIEL DeJESUS vs SUTHERLIN NISSAN OF ORLANDO, et al.   June 11, 2024
CR of FS Investments (Franklyn Strusberg)
96

 1   action for breach of express warranty is barred by his

 2   alteration of the vehicle while in his possession.

 3            What facts do you have to support that my

 4   client altered the vehicle?

 5        A.   I don't know.

 6        Q.   Are you aware of any other affirmative

 7   defenses in this case that they the dealership intends

 8   to rely on?

 9        A.   I don't remember.  I'm sorry.

10            MR. FEYGIN:  Okay.  I'm going to move on to

11       Plaintiff's Exhibit K, and this is the Leave to

12       Amend, Motion for Leave to Amend.

13            (Plaintiff Exhibit K was marked for

14       identification.)

15            (Whereupon, document(s) shared on the

16       screen.)

17   BY MR. FEYGIN:

18        Q.   Have you ever seen this document?

19        A.   I don't -- let me see.  I saw it, yeah, but I

20   didn't read it.

21        Q.   Okay.  I'm going to scroll down to what

22   appears to be Page 3 of 12.  In here in the highlighted

23   section it states:  However, before selling the vehicle

24   to Plaintiff, Defendant did not have any knowledge or

25   information that a 131,636 miles was not the actual

```
 1   mileage of the vehicle.  The Defendant was not in

 2   possession, nor was it aware of the content of the

 3   Certificate of Title or CARFAX™ report.  Defendant was

 4   guided only by the vehicle's dashboard and the

 5   information provided by the McCombs when Defendant

 6   purchased the vehicle from McCombs.

 7           Is this truthful and accurate?

 8       A.   Correct.

 9       Q.   Okay.  You previously testified, though, that

10   you did have possession of the title at the time of the

11   transfer?

12           MR. PERALTA:  Objection mis- --

13       mischaracterizes his testimony.

14           THE WITNESS:  No.  When you sell the car, you

15       get -- you give them a temporary register.  In that

16       moment, you don't have the title.  I got the title

17       after I sold the car.

18           MR. FEYGIN:  So, you testified that the date

19       on the Certificate of Title for the transfer for my

20       client's transaction was 5/25/20, and you're --

21           THE WITNESS:  That's what's -- that's what is

22       on the title.

23   BY MR. FEYGIN:

24       Q.   That's not the date that it was transferred,

25   though, was it?
```

```
 1        A.   I don't remember.

 2             MR. PERALTA:  Objection; leading.

 3             THE WITNESS:  I got to ask the lady, Betty.

 4   BY MR. FEYGIN:

 5        Q.   So, is it possible that the date on the

 6   Certificate of Title does not reflect the actual date

 7   that the transfer occurred to my client?

 8        A.   It could be.

 9        Q.   How would you figure this out?

10        A.   I don't know.  I -- I -- I don't remember.  I

11   don't know how they do paperwork.  I'm sorry.

12        Q.   After --

13        A.   I've got to ask Betty.

14        Q.   Okay.  And Betty was working for the

15   dealership at the time that this occurred?

16        A.   At the time, correct.

17        Q.   So, over here, it states that you relied upon

18   the information provided by McCombs.

19             What information was provided by McCombs?

20        A.   The Bill of Sale.

21        Q.   That was the only information you received

22   from McCombs?

23        A.   Correct.

24             MR. FEYGIN:  I'm going to move on to what's

25        going to be Plaintiff's Exhibit L.
```

1          (Plaintiff Exhibit L was marked for

2     identification.)

3          (Whereupon, document(s) shared on the

4     screen.)

5          THE WITNESS:  McCombs.

6          MR. FEYGIN:  McCombs, McCumbs.  I don't know

7     how to pronounce it.

8          THE WITNESS:  It's McCombs.

9   BY MR. FEYGIN:

10     Q.   Have you done a lot of business with them?

11     A.   No.  First.  First and last.

12     Q.   First and last, huh?  Yeah, I don't blame

13  you.

14          So, do you recall receiving this demand

15  letter?

16     A.   See, what is that?  Not that I remember.  Not

17  that I remember.

18     Q.   Okay.  Do you recall receiving demand letters

19  from my dealer -- my -- my law firm?

20     A.   No.  I only got a letter from -- from the

21  bond.

22     Q.   Okay.  And what did the bond attach with that

23  letter?

24     A.   They only requested $9,000.

25     Q.   So, walk me through that process.  They

1   simply sent you a letter saying "we need 9,000 from

2   you"?

3        A.   Yes, and -- and if -- if you don't pay the

4   bond, they -- they pretty much, they cancel your bond,

5   and if I don't have a bond, I cannot sell cars, so...

6        Q.   Prior to receiving that letter, did Stephanie

7   reach out to you to let you know that there was an

8   active bond claim?

9        A.   Yes.  That's why I had to send the check, and

10  then I say, "Let me dig into it."  And that's when I

11  called my attorney, and that's why --

12       Q.   How did Stephanie contact you?

13       A.   That's when I called Manheim.  I'm sorry.

14  What?

15       Q.   How did Stephanie from Hudson contact you

16  first?

17       A.   She sent me an e-mail.  Through e-mail.

18  We -- we spoke through e-mails.

19       Q.   Do you have a copy of that e-mail string

20  saved?

21       A.   I got to look for it, but it might be in my

22  e-mail.

23       Q.   Do you recall what was attached to the e-mail

24  Stephanie sent to you?

25       A.   I don't know.

CR of FS Investments (Franklyn Strusberg)

1    Q.    Do you agree to search for that e-mail?

2    A.    Yes.

3    Q.    And if you can find it, you agree to provide

4  it?

5    A.    Yes, sir.

6    Q.    Where did you send the check?

7    A.    To the address they provided.

8    Q.    And what was the amount of the check?

9    A.    I don't remember.

10   Q.    Was it $10,000?

11   A.    It was under that.

12   Q.    Was it less than $9,000?

13   A.    It was like, 8,000-something, yes.

14  8,900-something.

15        MR. FEYGIN:  I'm going to move on to what's

16        Exhibit M.

17        (Plaintiff Exhibit M was marked for

18        identification.)

19        (Whereupon, document(s) shared on the

20        screen.)

21  BY MR. FEYGIN:

22   Q.    This is another one of the demand letters.

23        Do you recall receiving this?

24   A.    No.

25   Q.    Do you recall Stephanie providing you with

```
 1   this?

 2        A.   I don't remember.  I'm sorry.

 3             MR. FEYGIN:  I think that's about it.

 4             Jose, got any cross?

 5             MR. PERALTA:  Yes, I will.  I need to go to

 6        the restroom first.

 7             MR. FEYGIN:  All right.  Let's take a break.

 8             MR. PERALTA:  McCombs, are you -- well, I --

 9        I -- I would rather go after McCombs, so if -- does

10        McCombs have any questions?

11             MR. TORRES:  I do have a few.

12             MR. PERALTA:  Can we wait so I can go to the

13        restroom?

14             MR. TORRES:  Yeah, I'm okay with taking a

15        five-minute break.

16             MR. PERALTA:  Thank you.

17             MR. TORRES:  You want to be back at 12:06?

18             MR. PERALTA:  Yeah, that works for me.

19             MR. TORRES:  All right.

20             (Thereupon, an off-the-record recess was had

21        from 12:01 until 12:06 p.m.)

22             MR. FEYGIN:  Before we move on, I have one

23        more question to ask.

24             MR. PERALTA:  Yeah.

25   BY MR. FEYGIN:
```

1     Q.   Mr. Strusberg, are you ready to proceed?

2     A.   Yeah.  Yeah, I'm here.

3     Q.   Are you aware that the Plaintiff issued a

4  settlement offer on March 14th where he agreed to

5  return the vehicle is-as, where-is in exchange for

6  $30,000 to settle the case?

7     A.   I don't remember.

8     Q.   That offer was never conveyed to you?

9     A.   Through who, through my attorney?

10     Q.   Correct.

11     A.   I don't remember.  I'm sorry.

12          MR. FEYGIN:  Okay.  All right.  That's good

13     enough for now.

14          MR. PERALTA:  Josh, if you could please

15     e-mail me that -- the Certificate of -- of Title

16     with the transfer history attached?

17          MR. FEYGIN:  Sure.  Not a problem.  It was

18     disclosed in discovery.

19          MR. PERALTA:  I'm not saying that it wasn't,

20     but since you have it, you know, it will be nice;

21     otherwise, I would have to pause the deposition and

22     look for it and you know.

23          MR. FEYGIN:  Oh, you want it right now?

24          MR. PERALTA:  Yeah, if you don't mind.

25          MR. FEYGIN:  Sent.

1        MR. PERALTA:  Thank you.

2        MR. TORRES:  See?  Can we go?

3        MR. PERALTA:  Yeah.

4        MR. TORRES:  Awesome.

5                     CROSS-EXAMINATION

6  BY MR. TORRES:

7     Q.   I just have a few questions, Mr. Strusberg.

8  Thank you so much.  My name is Nicolas Torres.  I

9  represent McCombs in this case.

10        First you went over your relationship with

11 Auto Deal Corp.  You mentioned that you and their owner

12 are friends, so you-all have a relationship where he

13 helped you get started, helped you with the financing

14 at first.

15        Whenever you -- and these questions, I'm not

16 talking about what you and your operation is like now.

17 I want to take you back to 2020 when this specific

18 transaction happened.

19        At the time when you were going through the

20 Manheim website and you were searching for vehicles,

21 you were making deals at that time, were you doing so

22 under an account that was named for Auto Deal Corp. or

23 was it one that was under your dealership's name?

24    A.   Auto Deal Corp.

25    Q.   So, the -- the Manheim account itself was

 1    under Auto Deal Corp.'s name?

 2        A.   No.  No.  It's -- it's -- it's my Manheim

 3    account.  I'm just added as a buyer on Auto Deal Corp.

 4        Q.   Got it, but the Manheim account is you

 5    personally?

 6        A.   Is mine, yeah, yeah.  Yeah, FS -- FS

 7    Investments.  Yes, it's my account.

 8        Q.   Okay.  And I know that you're here as a

 9    corporate rep, so when you say yours and FS Investment,

10    you mean it's under the company name, right?

11        A.   Correct.  Correct.

12        Q.   Not under Franklyn Strusberg?

13        A.   Correct, yes.

14        Q.   Okay.  And are you -- at the time were you

15    added as a buyer to any other company or any other --

16        A.   Just --

17        Q.   -- car buyer?

18        A.   Just Auto Deal Corp.

19        Q.   Just Auto Deal Corp.?

20        A.   Correct.

21        Q.   So, whenever you would identify a vehicle and

22    you would say "okay, this is the vehicle that I want to

23    buy," you would submit information to Auto Deal Corp.

24    to finalize that process or would you do the clicking

25    and the processing yourself?

 1          A.   I -- I do the click, and I buy it.

 2               THE COURT REPORTER:  Again, Mr. Strusberg --

 3               MR. TORRES:  Why --

 4               THE COURT REPORTER:  I'm sorry.  Again,

 5          Mr. Strusberg, please let him finish his question

 6          before you begin your answer.  You're talking over

 7          each other.  Thank you.

 8               THE WITNESS:  I'm sorry, your honor.

 9               THE COURT REPORTER:  No worries.

10     BY MR. TORRES:

11          Q.   Okay.  If it was you that made the

12     purchasing, why is it that this Juliana name comes out

13     as the agent signing the Certificates of Title on

14     behalf of Auto Deal and not you, yourself?

15          A.   She's the one who does the paperwork.

16          Q.   So, whenever you purchase a vehicle through

17     the Manheim website, does Juliana or does Auto Deal

18     Corp. automatically get notified that there's been a

19     purchase and they have to get the paperwork started and

20     done for that purchase?

21          A.   Yes.

22          Q.   Is that notification automatic from Manheim

23     to Auto Deal Corp.?

24          A.   Yes.

25          Q.   Do you, yourself, then reach out to Auto Deal

```
 1    Corp. in any way to let them know what vehicles you

 2    purchased and what paperwork needs to be done?

 3         A.   No.  Just to show them the cars that are --

 4    that I purchased so they can pay for them so I can pick

 5    them up.  Because as soon as they pay, they generate a

 6    gate pass, and then I can have the truck driver pick it

 7    up.

 8         Q.   That gate pass is sent to Auto Deal Corp.,

 9    though, right?

10         A.   Correct.

11         Q.   So, Auto Deal essentially gets notified

12    twice, once from Manheim and once from you, that

13    there's been vehicles that you've selected for

14    purchase?

15         A.   Correct.

16         Q.   Your communication with Auto Deal during this

17    time regarding specific purchases, over any purchase

18    really that you were making during this time, but

19    specifically this one vehicle, is that communication

20    done through e-mail, phone, any messaging within the

21    Manheim website?

22         A.   Phone.  Phone call.

23         Q.   Any text messages?

24         A.   Sometimes.

25         Q.   Regular text messages, WhatsApp?
```

CR of FS Investments (Franklyn Strusberg)

```
 1          A.    WhatsApp.

 2          Q.    WhatsApp?

 3          A.    Correct.

 4          Q.    Who would you be contacting from Auto Deal

 5   Corp. through WhatsApp?

 6          A.    My friend, Martine.

 7          Q.    Did you ever communicate directly with

 8   Juliana or any other person --

 9          A.    I don't know --

10          Q.    -- Auto Deal Corp.?

11          A.    I don't even know her.  I don't know her.

12          Q.    Did you ever communicate with anyone from

13   Auto Deal that was not your friend?

14          A.    No.

15          Q.    Do you know how many employees Auto Deal

16   Corp. has?

17          A.    No.

18          Q.    Have you ever entered into any formal

19   agreement or contract with Auto Deal to serve as their

20   agent or representative in any way?

21          A.    No.

22          Q.    The nature of your authority to buy cars on

23   behalf of them or using their account, that is strictly

24   a conversation between you and your friend --

25          A.    I'm --
```

```
 1        Q.    -- and an understanding with you and your

 2   friend.

 3        A.    I'm registered in Manheim under Auto Deal

 4   Corp. as a buyer.

 5        Q.    But the authority to add you as a buyer under

 6   Manheim, that was given to you by your friend from Auto

 7   Deal Corp., right?

 8        A.    Correct.

 9        Q.    Is there any written or recorded copy of that

10   agreement in any way?

11        A.    No.

12        Q.    Based on what you've testified to so far, and

13   please correct me if I'm wrong, the first notice that

14   you received of there being any issues with the

15   odometer was when you were contacted by the bond

16   office?

17        A.    Correct.

18        Q.    And that was sometime in 2022?

19        A.    No clue.

20        Q.    Do you remember when that was?

21        A.    No.

22        Q.    And an estimation, was it within months of

23   the sale, within a year, within two?

24        A.    I don't remember.  I'm sorry.

25        Q.    Okay.  And the first notice of -- the first
```

```
 1    time that you received any notice was through the

 2    Stephanie person from the bond company, right?

 3         A.   Correct.

 4         Q.   You also testified earlier that Manheim

 5    shipped a -- the Certificate of Title, the actual

 6    Certificate of Title sometime, I believe the date was

 7    April 28th, 2020 and that they Fed Ex'd it or UPS'ed it

 8    over to Auto Deal Corp.

 9              Do you recall that?

10         A.   Yes.

11         Q.   Do you know or do you have any memory of how

12    Auto Deal Corp. then transferred that title to you?

13         A.   No.

14         Q.   Did Auto Deal Corp. ever transfer that title

15    to you?

16         A.   They have to.

17         Q.   So, Auto Deal transfers the title, the

18    physical title to you, and then you transfer that

19    physical title to whoever you sell the vehicle to?

20              MR. PERALTA:  Objection; assumes facts not in

21         evidence.

22    BY MR. TORRES:

23         Q.   Is that correct?

24         A.   Correct.

25         Q.   Now, as we have seen now, that Certificate of
```

```
1    Title does reflect mileage that is above the 131,000
2    that is reflected elsewhere in that deal, correct?
3         A.   Correct.
4         Q.   So, it's fair to say that at least at some
5    point in May of 2020 your company had a copy of the
6    physical Certificate of Title reflecting 2000 -- at
7    least 200,000 miles as the actual miles, correct?
8         A.   No.  No.  I always receive the title after I
9    sell the car.
10        Q.   Okay.
11        A.   Not before.
12        Q.   Okay.  So, at some point after 4/28/2020 Auto
13   Deal Corp. gets the certificate, the actual title, then
14   your position is that they do not immediately send that
15   to you, but they send that to you only after you have
16   sold the vehicle?
17        A.   Yes.  That's the agreement I have with my
18   investor.
19        Q.   Okay.  So, Auto Deal holds the Certificate of
20   Title.
21             Do you know what type of envelope or what
22   type of packaging that comes in from Manheim?
23        A.   They -- they always send them Fed Ex.
24        Q.   Okay.  Regular, one of those Fed Ex
25   envelopes, the flat --
```

CR of FS Investments (Franklyn Strusberg)

```
 1        A.    Fed Ex envelopes, correct.
 2        Q.    Is it -- is there any further packaging once
 3   you open one of those envelopes?
 4        A.    No.
 5        Q.    So, if you open up the envelope, you take out
 6   the Certificate of Title?
 7        A.    Yes.
 8        Q.    Whenever Auto Deal Corp. sends the
 9   Certificate of Title to you, do they also use UPS or
10   any type of shipping company?
11        A.    They use Fed Ex only.
12        Q.    Fed Ex only.  Do you have records of that
13   shipment or are you able to get records of that
14   shipment --
15        A.    I can try to --
16        Q.    -- or do we need --
17        A.    I can try to get it.
18        Q.    If we can't get those from you, we can get
19   those directly from Auto Deal Corp., right?
20        A.    Correct.
21        Q.    So, at some point in -- okay.
22              So, you sell the vehicle, then you let Auto
23   Deal Corp. know that you've sold the vehicle --
24        A.    Correct.
25        Q.    -- so they can send you the title?
```

 1          A.   Correct.

 2          Q.   Now, that Certificate of Title on it will

 3    only reflect the transaction between McCombs and Auto

 4    Deal Corp., correct?

 5          A.   Correct.

 6          Q.   There would be no indication there of the

 7    transfer between Auto Deal and your dealership?

 8          A.   Correct.

 9          Q.   Once you do receive this from Auto Deal

10    Corp., what is your normal Standard Operating

11    Procedures for your dealership when it comes to getting

12    that title and sending it out to the buyer?

13          A.   Betty, the lady that I have --

14               MR. PERALTA:  Objection; assumes facts not in

15          evidence.

16               THE WITNESS:  The -- the -- the lady that I

17          have, she comes, picks up the deals, prepares them

18          and takes them to the DMV.

19    BY MR. TORRES:

20          Q.   So, that Certificate of Title then goes to

21    the DMV along with what?

22          A.   I don't know.

23          Q.   But then you don't ship anything directly to

24    the buyer?

25          A.   No.

 1        Q.    Okay.  Do you have any employee handbook that
 2   you have your employees read or hold or have to be
 3   responsible for?
 4        A.    No.
 5        Q.    You mentioned that Betty recently left her
 6   position.
 7              Did she have an opportunity to train her
 8   replacement?
 9        A.    No.
10        Q.    Who trained her replacement?
11              MR. PERALTA:  Objection; facts not in
12         evidence.
13              THE WITNESS:  The finance guy.
14              MR. TORRES:  The finance guy would have been
15         the one who trained the new person who does the
16         titling for your dealers --
17              THE WITNESS:  Yes.
18              MR. TORRES:  -- correct?
19              THE WITNESS:  Yes.
20   BY MR. TORRES:
21        Q.    And who would have trained the finance guy to
22   train the title person's job?
23        A.    Betty.
24        Q.    So, if that person were to leave, who teaches
25   that afterwards?

 1        A.    Which person?  I'm sorry?

 2        Q.    If your finance manager leaves unexpectedly,

 3   who will teach that role if he's the one that teaches

 4   it?

 5        A.    The -- the -- the -- the software provider.

 6   She can just call the software provider, and they do,

 7   like a -- like a composition on-line.

 8        Q.    On how to use the system?

 9        A.    How to use the system, correct.

10        Q.    How to set up and --

11        A.    Correct.  Correct.

12        Q.    So, the dealership itself does not have or

13   does not offer any further training aside from what the

14   DMV's software provider gives --

15        A.    Correct.

16        Q.    -- to the dealership?

17        A.    Correct.

18        Q.    So, there's no written requirement as part of

19   your standard business practices that has the person

20   who receives the title from Auto Deal Corp. or from

21   Manheim to take a look at that Certificate of Title and

22   verify it for accuracy, correct?

23        A.    Correct.

24        Q.    All right.  So, when you first received

25   notice that there was an issue with the miles on this

```
 1  car, you said you immediately called Manheim because

 2  that's who you usually go to, and -- and you called

 3  them, right?  That's what you did?

 4       A.   Correct.

 5       Q.   Did you file a formal claim with Manheim

 6  related to this car?

 7       A.   No.

 8       Q.   Why was that?

 9       A.   Because at the time they give you a timeframe

10  to do it.

11       Q.   All right.  And this was outside of the

12  timeframe that Manheim --

13       A.   Correct.

14       Q.   -- gave you?

15       A.   They only give you two weeks.

16       Q.   Those two weeks are for you to inspect the

17  vehicle, make sure what they represented is fair and

18  accurate, that was --

19       A.   Any -- any legal mechanical problems, you

20  have two weeks to -- to file a claim.  After that, you

21  just have to just call them like I did.

22       Q.   Okay.  When you do contact them to -- to

23  bring out an issue like this, do you go through your

24  portal with Manheim and --

25       A.   Yes.
```

1      Q.   Sorry?

2      A.   Okay.  I'm sorry.

3      Q.   You're good.  Is there anybody else in the

4  room with you?

5           MR. PERALTA:  You can mute yourself, Frank.

6           THE WITNESS:  I'm sorry.  I'm sorry about

7      that.

8  BY MR. TORRES:

9      Q.   You're good.  Are you alone now?

10     A.   Yes.

11     Q.   Okay.  Whenever you do go into or whenever

12 you contact Manheim to bring its -- bring up this

13 issue, do you do it through your web portal access that

14 you normally go through?

15     A.   Yeah.  I gave -- on the seller location,

16 Manheim was -- in this case, it was Manheim Houston, I

17 think, if I'm not mistaken.  San Antonio.  I'm sorry.

18 I contacted -- if you click on San Antonio, it gives

19 you a phone number, so I called that phone number.

20     Q.   Okay.  So, you called the number directly for

21 the San Antonio warehouse or option site for Manheim,

22 right?

23     A.   Correct.  I called them, and I explained to

24 them the situation.

25     Q.   All right.  Did you use your cell phone or

```
1    did you use your --
2         A.   My cell phone.
3         Q.   The judge is going to yell us again.  You're
4    going to have to wait until I finish with my questions.
5         A.   Okay.  Okay.
6         Q.   That way there's no issues.  Okay?
7         A.   Yes.
8         Q.   All right.  So, did you use your cell phone
9    or did you use the office or any other company number?
10        A.   My cell phone.
11        Q.   Do you recall who you spoke to in Manheim?
12        A.   No.
13        Q.   Do you recall if this process of -- of
14   talking to them and them offering you to take the car
15   back, was that a one-phone-call process or did that
16   take more than one phone call?
17        A.   One phone call.
18        Q.   Did Manheim ever send you any e-mails or any
19   type of correspondence confirming or verifying the
20   conversation that you-all had?
21        A.   No.
22        Q.   Did you ever send out an e-mail, a text
23   message or any other type of communication around the
24   time that you had that conversation with Manheim that
25   memorializes what Manheim told you?
```

1        A.    No.

2        Q.    Other than going straight to Manheim and

3   getting the person who you spoke to, the only way to

4   know what Manheim said about the issue of the miles is

5   what you are telling us here today, right?

6        A.    Correct.

7        Q.    So, what exactly did Manheim tell you about

8   the mileage issue?

9        A.    I don't remember too much, but what -- what

10  I'm thinking is I -- I -- I spoke with an agent from

11  Manheim.  They told me they were going to call Ford to

12  dig into it.  And then she called me back, and she told

13  me that they made a mistake.

14       Q.    So, it wasn't just one phone call, right?

15       A.    It was, like two phone calls.

16       Q.    How sure are you about there just being two?

17  Are you sure there wasn't other call-backs?  You didn't

18  have to follow up?  They didn't have to follow up

19  anymore?

20       A.    No.  No.  No.  I just called them, and -- and

21  they confirmed that there was a discrepancy with the

22  mileage and that they made a mistake.

23       Q.    How long after that initial phone call did

24  Manheim call you back?

25       A.    Same day.

 1        Q.    Was it the same agent that you had spoken to?

 2        A.    Correct.

 3        Q.    Do you remember their name?

 4        A.    No.  It was a lady.  I don't know her name.

 5        Q.    It was a lady?

 6        A.    Mm-hmm.  Yes.

 7        Q.    Sorry if this question is inappropriate in

 8   any way, but was that conversation in Spanish or

 9   English?

10        A.    English.

11        Q.    Okay.  From what you recall from what Manheim

12   told you, they said that they called Ford and then Ford

13   told them that, indeed, they had made a mistake?

14        A.    Yes.

15        Q.    So, you recall specifically Manheim saying

16   that was Ford who made a mistake?

17        A.    Yes.

18        Q.    Do you recall how long those phone calls

19   took?

20        A.    A couple of minutes.

21        Q.    Is it hard to get ahold of them or do they

22   leave you on hold forever or is there --

23        A.    Automatically.  You call them, and they pick

24   up right away.

25        Q.    Now, you had also testified that Manheim

 1  acts as a, sort of the center piece where everything

 2  gets handled, they take the car, they process the

 3  paperwork, they make sure that the car is both legally

 4  and mechanically up to -- up to standards for what they

 5  represent and then they are ones who give you as the

 6  buyer the title, the -- you know, the -- the receipt

 7  for the purchase, all of the documents are sent from

 8  entitlement and not the seller, correct?

 9          MR. PERALTA:  Objection mischaracterizes his

10      testimony.

11          THE WITNESS:  Yes.

12  BY MR. TORRES:

13      Q.   That's why you never had any direct contact

14  with McCombs, correct?

15      A.   Correct.

16      Q.   Your contact was limited to Manheim, who is

17  selling you the vehicle?

18      A.   Correct.

19      Q.   So, whenever you receive the Certificate of

20  Title -- or scratch that.

21          Whatever Auto Deal Corp. receives that

22  Certificate of Title, they're getting that from

23  Manheim, correct?

24      A.   Correct.

25      Q.   Isn't it fair to say that if Manheim is doing

```
 1    the checking of the legal status of the vehicle that
 2    they would review the Certificate of Title in their
 3    possession before --
 4              MR. PERALTA:  Objection.
 5              MR. TORRES:  -- sending it, correct?
 6              THE WITNESS:  What --
 7              MR. PERALTA:  Objection; speculation.
 8              MR. TORRES:  You should wait until I'm done
 9         with my question, man, because otherwise --
10              MR. PERALTA:  That's the first time it
11         happened, man.  Go ahead.  First time it happened,
12         man.  Go head.  Say it again.  Say -- say it again
13         because it was -- it was cut, so go ahead.
14              MR. TORRES:  Madam Court Reporter, can you
15         read that back?
16              (Requested portion of the record was read by
17         the court reporter.)
18              MR. TORRES:  Before they send it out to Auto
19         Deal Corp.
20              THE WITNESS:  Yes.
21              MR. PERALTA:  Objection; speculative.
22    BY MR. TORRES:
23         Q.   Was that a yes?
24         A.   Yes.
25         Q.   So, isn't it -- does it not add up when
```

```
 1   Manheim says that it was Ford who made a mistake but

 2   they themselves have in their own possession a

 3   Certificate of Title that reflects higher mileage than

 4   what was listed?

 5            MR. PERALTA:  Objection; speculative and

 6        assumes facts not in evidence.

 7            MR. TORRES:  You can answer.

 8            THE WITNESS:  What is the question?

 9            MR. TORRES:  Do you not find it weird or at

10        all concerning that Manheim tells you that --

11            THE WITNESS:  Yes.

12            MR. TORRES:  Again, you got to let me finish.

13            MR. PERALTA:  Yeah, Frank.  Frank, just --

14            THE WITNESS:  Let him finish.  I'm sorry.

15            MR. PERALTA:  No.  No.  Just -- just count

16        two seconds, and then you answer.  Always just, you

17        know, they -- they -- they -- they ask.  One, two,

18        and then you answer.

19            THE WITNESS:  Okay.

20   BY MR. TORRES:

21        Q.   All right.  So, let's try that one more time.

22            Do you find it at all troublesome or

23   disturbing in any way that Manheim would tell you that

24   two years after the event that McCombs made a mistake

25   when they, themselves, were responsible for doing the
```

 1   investigation as to the mileage, had possession of a

 2   Certificate of Title that reflected higher mileage than

 3   what was communicated to you?

 4           MR. PERALTA:  Same objection, and I'm going

 5       to add leading and argumentative.

 6           Go ahead, Frank.

 7           THE WITNESS:  Yes.

 8   BY MR. TORRES:

 9       Q.   You mentioned that you -- you did your own

10   inspection when -- when you got the vehicle or when the

11   vehicle was delivered to you.

12           Was there anything, based on your experience

13   selling and buying vehicles and inspecting them, was

14   there anything about the condition of the vehicle when

15   you were testing it that would lead you to believe that

16   the mileage on the odometer was not accurate?

17       A.   No.

18           MR. TORRES:  All right.  I don't have any

19       other questions.  Thank you very much,

20       Mr. Strusberg.

21           THE WITNESS:  Thank you, Mr. Torres.

22           MR. PERALTA:  Josh?

23           MR. FEYGIN:  Go ahead.

24           MR. PERALTA:  You don't have anymore

25       questions?

1         MR. FEYGIN:  No.  Done?

2         MR. PERALTA:  No.  I have -- I have some

3     questions.  Let me just look at the documents you

4     just sent to me.  Thank you for sending them, by

5     the way.  You didn't have to.

6         MR. FEYGIN:  Anything for you, my friend.

7         MR. PERALTA:  Share screen.

8         (Whereupon, document(s) shared on the

9     screen.)

10                    CROSS-EXAMINATION

11  BY MR. PERALTA:

12      Q.   Okay.  There -- there appears to be some

13  confusion as to when Powerhouse received a copy of the

14  Certificate of Title, and I'm talking about the

15  document entitled Texas Certificate of Title, of which

16  the numbers were read in deposition, and those numbers

17  are 539994086.

18        MR. FEYGIN:  Is there a question?

19        MR. PERALTA:  So, Mr. -- I'm trying to -- to

20     identify the document because there's no Bates

21     stamp, and I'm not sure what -- what exhibit was

22     it.

23        MR. FEYGIN:  It should be on the title

24     itself.  If you look on the top of your screen,

25     it's Exhibit I, Transfer of Title.

```
 1                MR. PERALTA:  I'm looking at it.

 2                MR. FEYGIN:  If you look at the top of your

 3          screen in the purple bar.

 4                MR. PERALTA:  Oh, in the -- as -- as a

 5          document of -- as the title of the document?

 6                MR. FEYGIN:  Correct.

 7                MR. PERALTA:  Okay.  Well, I think this is --

 8          this conversation was enough to identify the

 9          document.

10   BY MR. PERALTA:

11          Q.   Okay.  So, Frank?

12          A.   Yes.

13          Q.   Here -- here it says that Auto Deal Corp.,

14   right -- wait.  Here, it says -- in this box here, it

15   says that Auto Deal Corp. transferred title to the

16   vehicle to Powerhouse and it has the date of sale

17   5/15/20.

18                Was that the date that Powerhouse received a

19   physical copy of this title?

20          A.   When?  It says when?

21          Q.   So, my question is:  Did Powerhouse receive a

22   copy of this document, right, this document up here

23   (indicating), did Powerhouse receive a copy of this

24   document on May --

25          A.   After -- after -- after we sold the car.
```

```
 1        Q.    And when did you sell the car?

 2        A.    Whatever is on the contract.

 3        Q.    Okay.

 4        A.    We always receive it -- we always get the

 5   titles after -- I mean, from -- specifically from Auto

 6   Deal after I sell the car.

 7        Q.    Okay.  And why is that?

 8        A.    Because the owner of Auto Deal is not going

 9   to release the title until I pay him.

10        Q.    Okay.  So, that is the agreement that you

11   have --

12        A.    That's the agreement, yes, pretty much.

13        Q.    -- with McCombs?

14        A.    After -- after I sell the car and -- and the

15   deal is booked by the bank, then he sends the title

16   after I sell the car.

17        Q.    Okay.  And that is -- this is the agreement

18   between Auto Deal Corp. --

19        A.    Correct.

20        Q.    -- and Powerhouse?

21        A.    Yes.

22        Q.    Okay.  So, every time that Powerhouse

23   purchases a vehicle -- sorry.  Strike that.

24              Every time that you as an agent of Auto Deal

25   Corp. purchases a vehicle through Auto Deal Corp. for
```

 1   you to sell in -- in -- in the dealership that's

 2   operated by Powerhouse, Auto Deal retains a copy of the

 3   title until you sell the vehicle?

 4       A.   Yes, only when I sell it.

 5       Q.   Okay.  So, I think we all know for a fact

 6   that the sale did not happen on 5/15/2020.

 7            Does this mean that --

 8            MR. FEYGIN:  Objection.  It assumes facts not

 9       in evidence.  It's a narration.  I mean, what are

10       we doing here?

11            MR. PERALTA:  Sure.  That's fine.  I mean,

12       you -- you actually covered that in the deposition,

13       but I could -- I could put up some documents.  Give

14       me one second.  Actually, I'm going to stop

15       sharing.  Okay.  Auto Deal, okay.  Is it showing me

16       here?  Yes.

17            (Whereupon, document(s) shared on the

18       screen.)

19   BY MR. PERALTA:

20       Q.   Okay.  Frank, this is a document Bates

21   stamped FSIA 00005.

22            Do you recall Plaintiff's attorney,

23   Mr. Feygin, showing you this document earlier?

24       A.   Yes.

25       Q.   Do you recall answering his question that

```
 1   stated that this document was true and accurate --

 2   was -- was a true and accurate document that was kept

 3   in the business records of Powerhouse?  Is this a true

 4   and accurate document that's kept in the business

 5   records of Powerhouse?

 6        A.   Yes.

 7        Q.   Okay.  It states here that the date of the

 8   sale was May 25, 2020; is that correct?

 9        A.   Yes.

10        Q.   Okay.  So, if the buyer orders -- hold on.

11   Actually, let's go down here.  Here on Page 3 of 3 it

12   shows that the document was signed by Gabriel Haddon.

13             Is that the -- the name of the Plaintiff?

14        A.   Yes.

15        Q.   Is that the signature of the Plaintiff?

16        A.   Yes.

17        Q.   What is the date next to the signature of the

18   Plaintiff?

19        A.   5/25/2020.

20        Q.   If the Buyer's Order was signed on 5/25/2020,

21   is that an indication that the sale occurred on

22   5/25/2020?

23        A.   Yes.

24        Q.   Okay.  Would there ever be -- is there any

25   reason why the sale did not happen on 5/25/2020?
```

1        A.    No.

2        Q.    Okay.  So, you testified earlier that Auto

3   Deal only -- strike that.

4              You testified earlier that Auto Deal sent

5   the -- sent a copy of the Certificate of Title to

6   Powerhouse only after Powerhouse sold the vehicle to

7   Mr. Haddon, the Plaintiff; is that correct?

8        A.    Yes.

9        Q.    Okay.  So, is -- is it fair to say that on

10  May -- sorry.  Strike that.

11             Is it fair to say to say that this date --

12  let me -- here.

13             Is it fair to say that May 15, 2020 was not

14  the date that Auto Deal Corp. provided a copy of the

15  title that -- regarding the vehicle that's at issue to

16  Powerhouse?

17       A.    Correct.

18       Q.    Okay.  Do you have any -- do you know why it

19  would say 5/15 --

20       A.    No clue --

21       Q.    -- here?

22       A.    -- but I can get the Fed Ex label.

23       Q.    Okay.  There's more down here.  Here, it

24  shows --

25             MR. FEYGIN:  We're -- we're looking at the

 1          Buyer's Order form, Jose.  I don't know what you're

 2          pointing at.

 3               MR. PERALTA:  This one here (indicating.)  I

 4          don't know -- I don't know how to do the whole

 5          highlighting thing, though it's super nice,

 6          actually.

 7               MR. FEYGIN:  Are we looking at the Buyer's

 8          Order form?

 9               MR. PERALTA:  No, because we're looking at

10          the --

11               MR. FEYGIN:  Because --

12               MR. PERALTA:  -- Certificate of Title.

13               MR. FEYGIN:  -- all I see at the top of my

14          screen is the Buyer's Order form.

15               THE WITNESS:  Yeah, me too.

16               MR. PERALTA:  Really?

17               MR. TORRES:  You're only sharing one of your

18          screens, so if you have multiple screens, we won't

19          be able to see it.

20               MR. PERALTA:  Oh.  Actually, hold on.  I

21          don't know how this works, because what I did was:

22          I put the Certificate of Title on the screen that I

23          was sharing.  Interesting.  Hold on.

24               (Whereupon, document(s) shared on the

25          screen.)

```
 1              MR. PERALTA:  Okay.  Thank you, Joshua.
 2     BY MR. PERALTA:
 3         Q.   Just to clarify, Frank, when I asked you
 4     earlier about 5/15/2020 not being the date that
 5     Automotive -- that Auto Deal Corp. transferred title to
 6     Powerhouse or provided a copy of a title to Powerhouse,
 7     were you aware that I was talking about this box down
 8     here (indicating)?
 9         A.   One second, please.  Okay.  There we go.
10         Q.   Can you see it?
11         A.   Now I can see it.
12         Q.   Now you can see it?  Okay.
13         A.   Yeah.
14         Q.   Let me ask you it this way now -- now that I
15     have the document on the screen:  This date that
16     appears here (indicating), this one here, right,
17     5/15/2020, is that the date -- this date, 5/15/2020
18     that appears in the Certificate of Title regarding the
19     transfer as to Auto Deal Corp. to Powerhouse, is this
20     the date that Powerhouse received a copy of the
21     Certificate of Title?
22         A.   No.
23         Q.   Okay.  So, let's go down here, this one here
24     (indicating.)
25              So then, is it fair to say then this date
```

 1    also does not depict the date that Powerhouse received

 2    a copy of the Certificate of Title from Auto -- from

 3    Auto Deal Corp.?

 4          A.   Correct.

 5          Q.   Is that correct?

 6          A.   Correct.

 7          Q.   And do you know why this date appears in this

 8    box down here, the date 5/15?

 9          A.   No clue.

10          Q.   Five -- okay.  Now, when you -- when

11    Powerhouse included the mileage on its sales documents

12    to Haddon, did it get the mileage of the vehicle by

13    looking at the odometer of the vehicle, by looking at

14    the dashboard of the vehicle?

15          A.   The web page.

16          Q.   The web page.  What -- what --

17          A.   Web page.

18          Q.   What web page?

19          A.   Powerhouse web page.

20          Q.   Okay.  So, the information that appears on

21    the Powerhouse web page, is that gathered by looking at

22    the dashboard --

23          A.   Of the dashboard, correct.

24          Q.   -- of the vehicle?

25          A.   Yes.

 1          Q.   Okay.  You've been -- you've been in -- in

 2     the business of selling vehicles for how long now,

 3     selling used -- used vehicles?

 4          A.   15 years.

 5          Q.   15 years.  Would you say that it's customary

 6     practice for dealers to look at the dashboard of the

 7     vehicle and guide themselves by the information that

 8     appears there when they are filling out sales documents

 9     to sell the -- the vehicles?

10          A.   Yes.

11               MR. PERALTA:  Okay.  One second.

12               (Whereupon, screen sharing was stopped.)

13               MR. PERALTA:  Here, we have the Buyer's Order

14          again.  That's Bates Stamp FSIA 000005.

15               (Whereupon, document(s) shared on the

16          screen.)

17               MR. PERALTA:  Okay.  So, let me zoom in.

18               Here where it says odometer reading, a

19          131,636, did Powerhouse obtain this odometer

20          reading from looking at the dashboard --

21               THE WITNESS:  Yes.

22               MR. PERALTA:  -- of the vehicle?

23               THE WITNESS:  Yes.

24     BY MR. PERALTA:

25          Q.   Okay.  When Powerhouse filled in the

 1    information, this information here, the odometer

 2    reading (indicating) in the Buyer's Order, in the

 3    Odometer Disclosure and in the Retail Installment

 4    Contract, a/k/a financing agreement, did it obtain the

 5    odometer reading from the vehicle dashboard?

 6        A.   Yes.

 7        Q.   When it provided that information and you put

 8    that information in those documents, did it have in its

 9    possession a copy of the Certificate of Title involving

10    this vehicle?

11        A.   No.

12        Q.   Okay.  Did it have any other documents --

13    strike that.

14             Did it have any document that would

15    contradict -- contradict the reading placed in the

16    Buyer's Orders?

17        A.   No.

18        Q.   Okay.  Now, besides looking at the vehicles

19    dashboard, did Powerhouse obtain the odometer -- strike

20    that.

21             Besides looking at the vehicle's dashboard,

22    did Powerhouse obtain the mileage of the vehicle by

23    looking at -- at the Manheim website?

24        A.   Yes.

25        Q.   Okay.  And was -- and did the -- did the --

1    actually, give me one second.

2              (Whereupon, screen sharing was stopped.)

3              THE WITNESS:  Eight miles difference, one

4         thirty-one six twenty-eight from Manheim.

5              MR. PERALTA:  Okay.  One second.  Okay.  I'm

6         showing you a document, FSA -- no, FSIA 000011.  We

7         can make that Defendant's Exhibit A.

8              (Defendant Exhibit A was marked for

9         identification.)

10             (Whereupon, document(s) shared on the

11        screen.)

12   BY MR. PERALTA:

13        Q.   Okay.  Is this -- what is this document?

14        A.   The Bill of Sale from Manheim.

15        Q.   Okay.  And does Manheim provided you this

16   document?

17        A.   Correct.

18        Q.   Okay.  And when I say "you," I'm referring to

19   Powerhouse, just to make clear.

20             Okay.  What is the mileage that appears on

21   the Bill of Sale, if you can read it?

22        A.   One thirty-one six twenty-eight.

23        Q.   Okay.  And who's the seller?

24        A.   McCombs Ford West.

25        Q.   Okay.  Based on your knowledge, from where

```
 1   does Manheim get the information as to the mileage of

 2   the vehicle, is it provided by McCombs West Ford?

 3           MR. TORRES:  Objection; form.

 4           THE WITNESS:  I don't know.

 5   BY MR. PERALTA:

 6       Q.   Have you sold any -- any vehicles through

 7   Manheim?

 8       A.   Yeah.

 9       Q.   Okay.  So, walk me through how you do it.

10   When you -- when you post -- well, strike that.

11           Does Manheim works as a middle person between

12   the seller and the buyer of the vehicle?

13       A.   Correct.

14       Q.   Okay.  And when we say "middle person," is

15   it -- is it only to facilitate the transaction, meaning

16   that they will provide information from the seller to

17   the buyer and if the buyer has any questions then

18   Manheim might -- may get back that to the seller,

19   correct?

20       A.   Correct.

21           MR. TORRES:  Objection; form.

22   BY MR. PERALTA:

23       Q.   Correct, you said?

24       A.   Yes.

25       Q.   Okay.  So, when you want to sell a vehicle
```

```
 1    through the Manheim website, do you have to provide

 2    Manheim information as to the vehicle?

 3         A.   Yes.

 4         Q.   Okay.  Does that information include the year

 5    of the vehicle?

 6         A.   Everything, the -- the VIN.

 7         Q.   Everything?

 8         A.   Yes.

 9         Q.   Everything, including -- including the --

10    the --

11         A.   Mileage.

12         Q.   -- the odometer reading?

13         A.   Yes.

14         Q.   Okay.  Now, based on your experience selling

15    vehicles through Manheim, would -- will Manheim just

16    transfer that information to potential sellers?

17         A.   Buyers, yes.

18         Q.   Thank you.  Buyers.  So, Manheim pretty much

19    just shares the information that the sellers of

20    vehicles provide to it --

21         A.   Correct.

22         Q.   -- correct?  Okay.

23              You mentioned yesterday -- not yesterday.

24    Sorry.  You mentioned earlier that Manheim conducts its

25    own inspection.
```

```
 1              Do you -- I mean, do they do more than drive
 2    vehicles?
 3              MR. FEYGIN:  Objection; assumes facts not in
 4         evidence.
 5              THE WITNESS:  After you buy them, you --
 6         you request --
 7              MR. PERALTA:  No.  No.  Manheim.  Manheim.
 8         Does --
 9              THE WITNESS:  Yeah.
10    BY MR. PERALTA:
11         Q.   Does Manheim do more than drive the vehicles?
12         A.   They inspect it.
13         Q.   When you say "inspect it," do they just look
14    at it?
15         A.   Yeah.
16         Q.   Okay.  Do they do any mechanical inspection,
17    like, you know --
18              MR. FEYGIN:  Asked and answered.
19              THE WITNESS:  Sometimes if you request it.
20         It's not always.
21    BY MR. PERALTA:
22         Q.   It's not always?
23         A.   No.
24         Q.   So, you have to request it?
25         A.   You have to request it.
```

1    Q.   Okay.  Would you say, based -- based on your

2  experience in selling used vehicles, that it is not the

3  customary practice for used car dealers in -- to

4  request that inspection?

5    A.   What's the question?  I'm sorry?

6    Q.   Would you say that it is not customary

7  practice for used car dealers to request the inspection

8  of every vehicle from which -- you know, that they --

9  that they're selling?

10   A.   If it's legible, yes.

11   Q.   What do you mean legible?

12   A.   Sometimes it's as-is.  Then you cannot

13  request an inspection.

14   Q.   Okay.  Now, when you purchased the vehicle

15  through Auto Deal Corp., as their agent, was your

16  intention all along to sell this vehicle through

17  Powerhouse?

18   A.   Yes.

19   Q.   So, Powerhouse bought the vehicle as an agent

20  of Auto Deal Corp., but it was understood between Auto

21  Deal Corp. and Powerhouse that Powerhouse was going to

22  try to sell this vehicle on its lot?

23        MR. FEYGIN:  Objection.  Objection to form.

24        THE WITNESS:  Correct.

25  BY MR. PERALTA:

```
 1        Q.   Okay.  Now, when you purchase -- you said

 2   that the account of Manheim is in the name of

 3   Powerhouse?

 4        A.   Yes.

 5        Q.   But that -- but that you also bought it --

 6   sorry.

 7             But that you also use this account as an

 8   agent of Auto Deal Corp.?

 9        A.   Correct.

10        Q.   Okay.  Would you say then that you were using

11   the account for the benefit of Powerhouse?

12        A.   Yes.

13        Q.   Would you say that you were using the account

14   as a representative of Powerhouse --

15        A.   Yes.

16        Q.   -- as well?

17        A.   Yes.

18        Q.   Okay.  Okay.  Hold on.  So, let's talk

19   about -- let's talk about Betty.  You said that Betty

20   was -- she was paid under a 1099.

21             Did she have her own company while she was

22   providing services to Powerhouse?

23        A.   Yes.

24        Q.   So, when you said that she was an employee of

25   Powerhouse, do you mean -- did you mean that she was
```

 1   a -- a contractor or an actual employee of Powerhouse?

 2        A.   No, contractor, like sub- -- subcontractor.

 3        Q.   Okay.

 4             THE COURT REPORTER:  Mr. Peralta, are

 5        finished with this document?

 6             MR. PERALTA:  Yes, I am.

 7             THE COURT REPORTER:  Thank you.

 8             (Whereupon, screen sharing was stopped.)

 9             MR. PERALTA:  Okay.  So, okay.  Now let's

10        talk about the -- well, actually, before -- before

11        I leave Betty, let's stay with Betty for just a few

12        more questions.

13             (Whereupon, document(s) shared on the

14        screen.)

15   BY MR. PERALTA:

16        Q.   So, you stated before that you believe

17   that -- that -- that there's a possibility that this

18   document was completed by Betty; is that correct?

19        A.   Correct.

20        Q.   This section down here where it says -- where

21   Powerhouse transfers title to Gabriel -- to the -- to

22   the Plaintiff, and it's dated 5/25/2020.

23             So, if Powerhouse did not receive a copy of

24   the Certificate of Title until it sold the vehicle to

25   the Plaintiffs, then Betty would not have a copy of

```
 1    that Certificate of Title when she might have completed

 2    this section that -- that I'm highlighting?

 3         A.   Correct.

 4              MR. PERALTA:  Okay.  Let's move on to the

 5         bond payment.

 6              (Whereupon, Counsel Silverstein leaves Zoom

 7         deposition.)

 8    BY MR. PERALTA:

 9         Q.   When you -- did you send a check to

10    Plaintiff's counsel of around $9,000?

11         A.   Yes.

12         Q.   Okay.  When you sent that check, was it your

13    understanding that you were settling or -- or resolving

14    Plaintiff's claims in this lawsuit?

15         A.   Correct.

16         Q.   Okay.  You know what damages are, right?

17         A.   Yes.

18         Q.   Is the Plaintiff claiming actual damages in

19    this case?

20         A.   I don't know.

21         Q.   Okay.  Did you receive an e-mail from

22    Plaintiff's counsel telling you --

23         A.   Yes, that that was for damages.

24         Q.   Well, hold on.  Let me -- let me finish.

25              Did you receive an e-mail from Plaintiff's
```

 1  counsel telling you that your -- that -- that the check

 2  that Powerhouse sent him was to cover the actual

 3  damages that the Plaintiff alleges?

 4      A.   Yes.

 5      Q.   Okay.  Were you surprised when Plaintiff's

 6  counsel told you that he was going to still file a

 7  lawsuit even though you had already paid him some

 8  money?

 9      A.   Yes.

10          MR. PERALTA:  Okay.  Gentlemen, allow me

11      three minutes, and then let me see if I'm done.

12          MR. FEYGIN:  Let's do this:  Let's take a

13      five-minute break so I can use the little boy's

14      room.

15          MR. PERALTA:  That works for me too.

16          (Thereupon, an off-the-record recess was had

17      1:04 until 1:12 p.m.)

18          MR. PERALTA:  Okay.  I'm done with -- with my

19      questions for now.

20          MR. FEYGIN:  All right.  I have a redirect.

21                      REDIRECT EXAMINATION

22  BY MR. FEYGIN:

23      Q.   Mr. Strusberg, you have an agreement with

24  Auto Deal Corp. where one way or the other you acquire

25  vehicles from Auto Deal Corp.; is that correct?

 1        A.    Correct.

 2        Q.    How many vehicles have you acquired from Auto

 3   Deal Corp. based upon this agreement?

 4        A.    I don't know.

 5        Q.    Would it be more than ten?

 6        A.    Yes.

 7        Q.    Would it be more than twenty?

 8        A.    Yes.

 9        Q.    More than fifty?

10        A.    I don't know.  Somewhere there.

11        Q.    So, between twenty to fifty cars?

12        A.    Correct.

13        Q.    How many years has this been going on for?

14        A.    It was just one year when I first started,

15   not anymore.

16        Q.    So, you first started in May of 2020-ish?

17        A.    When I first opened the dealership back in --

18   I don't -- I don't remember.  He -- he supported me in

19   the beginning.

20        Q.    Okay.  And it's your testimony that you would

21   only receive titles to those vehicles, the twenty to

22   fifty that you bought from them, after you actually

23   sold the vehicle; is that accurate?

24        A.    Correct.

25        Q.    Okay.  Is it the dealership's position that

1    it can execute title disclosures as it relates to a

2    mileage reading after a vehicle is sold?

3         A.   Yes.

4         Q.   Is it the dealership's position that the

5    title transfer from Auto Deal to Powerhouse was not

6    actually filled in on 5/15/2020?

7         A.   I don't remember.

8         Q.   Is it now the dealership's position that the

9    title transfer and mileage disclosure to my client did

10   not actually get filled out on May 25th of 2020?

11        A.   Correct.

12        Q.   How did the dealership know that the mileage

13   it entered on May 25th, 2020 was the actual mileage on

14   that date?

15        A.   Based on the -- the Bill of Sale from

16   Manheim.

17        Q.   But it wasn't based upon its own inspection

18   of the vehicle?

19        A.   Yeah.  When -- when we take -- get the cars,

20   we -- I post it myself on the page based on the

21   odometer reading.

22        Q.   Does the dealership routinely execute title

23   transfers after a vehicle is sold?

24        A.   Yes.

25        Q.   Is it now the dealership's position that it

 1    received this title after it sold the vehicle to my

 2    client?

 3         A.   Correct.

 4         Q.   Aside from Manheim and the dashboard of the

 5    vehicle, did Powerhouse complete any other sort of

 6    investigation into the mileage history?

 7         A.   No.

 8              MR. FEYGIN:  My apologies.  I just noticed my

 9         video was off.  I don't want to be rude.

10    BY MR. FEYGIN:

11         Q.   Does the dealership have any other policies

12    or procedures in place to investigate vehicle mileage

13    other than relying upon a seller's disclosure?

14         A.   No.

15         Q.   And you mentioned that Manheim provides the

16    option to inspect vehicles.

17              Do you ever recall requesting an inspection

18    of this particular vehicle to be performed by Manheim?

19         A.   No.

20         Q.   And is that because it never occurred?

21         A.   Correct.

22         Q.   And with respect to Betty, was Betty acting

23    with the dealer's authority when she completed the

24    title transfers --

25         A.   -- correct.

```
 1         Q.   -- to my client?

 2              And she wasn't doing this for her on benefit,

 3    was she?

 4         A.   She gets paid for that.

 5         Q.   Okay.  But she was doing it on behalf of the

 6    dealership, though, correct?

 7         A.   Correct.

 8              MR. FEYGIN:  Okay.  Okay.  Nothing further.

 9              MR. TORRES:  I just have only, like two

10         questions.

11                        RECROSS-EXAMINATION

12    BY MR. TORRES:

13         Q.   Back in 2021 when your friend at Auto Deal

14    Corp. was working with you and helping you out, did

15    y'all at any time share office space?

16         A.   No.

17         Q.   Was Betty ever in the same location as

18    Juliana?

19         A.   No, never.

20              MR. TORRES:  That's all.  Thank you.

21              MR. FEYGIN:  All right.  Explain reading

22         versus waiving?

23              MR. PERALTA:  No, I have -- I have -- I have

24         some questions too on -- on recross.  It's just

25         like, one -- like three.
```

```
 1              MR. FEYGIN:  That's fine.
 2                        RECROSS-EXAMINATION
 3   BY MR. PERALTA:
 4        Q.   Frank?
 5        A.   Yes.
 6        Q.   When Plaintiff's counsel just asked you if
 7   the dealership provides odometer disclosures and title
 8   transfers after the vehicle is sold, let's talk about
 9   the -- the word -- the term after the vehicle is sold.
10             Does that mean after the Plaintiff has signed
11   all documents to sell the vehicle?
12        A.   What is the question?
13        Q.   So, what does it mean after it's sold?  It
14   means that that's -- that's after -- that is after --
15        A.   Before it's sold.
16        Q.   Huh?
17        A.   Before.
18        Q.   Okay.  Listen to my question.
19             Does the dealership provides the -- the --
20   the transfer the --
21        A.   The title.
22        Q.   No.  Hold on.
23             MR. PERALTA:  Okay.  That's fine.  I have no
24        more questions for my friend.  I'll -- I'll leave
25        it at that.
```

1           MR. FEYGIN:  Jose, do you want to explain to

2      him reading versus waiving?

3           MR. PERALTA:  We're going to read.

4           MR. TORRES:  And I will go ahead and order.

5      If no one else orders, then I'll make it the first.

6      Otherwise, a copy.

7           MR. FEYGIN:  I don't want to be ordering just

8      yet.  I'll let you know.

9           MR. PERALTA:  Okay.  Me neither.

10          (Thereupon, the proceedings concluded at

11     1:19 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          CERTIFICATE  OF  OATH


                              -   -   -


THE STATE OF FLORIDA,     )

COUNTY OF PALM BEACH.      )



          I, the undersigned authority, certify that

FRANKLYN STRUSBERG personally appeared before me and

was duly sworn on the 23rd day of April, 2024.



          Signed this 6th day of May, 2024.




          Wanda D. Good, Certified Court Reporter
          Notary Public - State of Florida
          My Commission No. #HH 216106
          My Commission Expires:  January 26, 2026

```
 1                  C E R T I F I C A T E
 2

     THE STATE OF FLORIDA,      )
 3

     COUNTY OF PALM BEACH.      )
 4

 5

 6            I, WANDA D. GOOD, Florida Professional
     Reporter, certify that I was authorized to and did
 7   stenographically report the deposition of FRANKLYN
     STRUSBERG, pages numbered 1 through 151; that a review
 8   of the transcript was requested; and that the
     transcript is a true and complete record of my
 9   stenographic notes.
10

11            I further certify that I am not a relative,
     employee, attorney, or counsel of any of the parties,
12   nor am I a relative or employee of any of the parties'
     attorney or counsel connected with the action, nor am I
13   financially interested in the action.
14

15

              DATED this 6th day of May, 2024.
16

17

18

19

20            WANDA D. GOOD, Certified Court Reporter
21

22

23

24

25
```

CR of FS Investments (Franklyn Strusberg)

```
 1   May 6, 2024
 2   FRANKLYN STRUSBERG
     c/o Jose Ariel Peralta, Esquire
 3   jperalta@atllp.com
     ARMSTRONG TEASDALE, LLP
 4   355 Alhambra Cir., Ste. 1250
     Coral Gables, Florida   33134
 5
     IN RE:  GABRIEL LUC HADDON v. FS INVESTMENTS OF
 6           AMERICA, INC., et. al.
     CASE NO.:  8:23-cv-00709-WFJ-SPF
 7
     Please take notice that on the 23rd day of April, 2024,
 8   you gave your deposition in the above cause.  At that
     time you did not waive your signature.  The transcript
 9   is now available for your review.
10   Please call (561) 689-0999 or 1-800-765-3576 or e-mail
     Depos@FloridaCourtReporting.com between the hours of
11   9:00 a.m. and 4:00 p.m., Monday through Friday, to make
     arrangements to read your deposition transcript.  Once
12   completed, please sign and return same to us for
     distribution to all parties.
13
     If you do not read and sign the deposition within a
14   reasonable amount of time, the original, which has
     already been forwarded to the ordering attorney, may be
15   filed with the Clerk of the Court.
16   If you wish to waive your signature now, please sign
     your name in the blank at the bottom of this letter and
17   return it to the address listed below.
18   Very truly yours,
19
20
     Wanda D. Good, Certified Court Reporter
21   Florida Court Reporting
     2161 Palm Beach Lakes Boulevard, Suite 302
22   West Palm Beach, Florida 33409
23   I do hereby waive my signature.
24
25   FRANKLYN STRUSBERG
```

```
 1                         ERRATA SHEET
 2        DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 3  IN RE:  GABRIEL LUC HADDON v. FS INVESTMENTS OF
 4            AMERICA, INC., et. al.
 5  CASE NO.:  8:23-cv-00709-WFJ-SPF
 6  WITNESS: FRANKLYN STRUSBERG  TAKEN: APRIL 23, 2024
 7  Page No.    Line No.            Change         Reason
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22      Under penalties of perjury, I declare that I have
    read the foregoing document and that the facts stated
23  in it are true.
24
25

    DATE                         FRANKLYN STRUSBERG
```

## WORD INDEX

**< $ >**
**$10,000** 101:*10*
**$30,000** 103:*6*
**$5,000** 53:*10*
**$7,000** 59:*25*
**$799** 53:*16*
**$9,000** 87:*23* 99:*24*
 101:*12* 143:*10*

**< 0 >**
**000005** 134:*14*
**000011** 4:*17* 136:*6*
**000014** 32:*2*
**000018** 61:*21*
**000020** 3:*14*
**000026** 56:*20*
**000031** 56:*20*
**000034** 64:*22*
**00005** 51:*21* 128:*21*
**00007** 51:*22*
**00019** 42:*6*
**00020** 42:*6*
**018** 67:*21*

**< 1 >**
**1** 1:*16* 13:*11* 31:*4*
 67:*9* 90:*7* 91:*17*
 152:*7*
**1:04** 144:*17*
**1:12** 144:*17*
**1:19** 1:*20* 150:*11*
**10:13** 1:*20* 5:*2, 7*
**100** 19:*21* 91:*12*
**101** 4:*10*
**104** 3:*5*
**1099** 77:5,*6* 141:*20*
**11th** 35:*15* 44:*13*
**12** 96:*22*
**12/11** 69:*12*
**12/21/22** 4:*8, 10*
**12:01** 102:*21*
**12:06** 102:*17, 21*
**125** 3:*5*
**1250** 2:*11* 153:*4*
**13** 3:*14*
**131,000** 37:*22, 23*
 88:*20* 111:*1*

**131,636** 96:*25* 134:*19*
**131630** 77:*14*
**131636** 62:8,*9* 66:*21*
 67:8 79:*1*
**136** 4:*17*
**144** 3:*5*
**148** 3:*5*
**149** 3:*5*
**14th** 103:*4*
**15** 130:*13* 134:4, *5*
**151** 152:*7*
**154** 1:*16*
**16** 57:*5* 58:*8*
**16.9** 58:*7*
**18,900** 60:*7* 61:*3*
**1-800-765-3576**
 153:*10*
**19** 95:*25*
**1930** 2:*5*

**< 2 >**
**2.8** 35:4, *11, 12* 39:*22*
**200** 2:*17*
**200,000** 111:*7*
**2000** 111:*6*
**201150** 45:*1*
**2012** 39:*21*
**2020** 44:*12* 53:*13*
 58:*7* 76:*25* 82:*6*
 88:*5* 104:*17* 110:*7*
 111:*5* 129:*8* 130:*13*
 146:*10, 13*
**2020-ish** 145:*16*
**2021** 148:*13*
**2022** 109:*18*
**2024** 1:*20* 5:*6*
 151:*10, 14* 152:*13*
 153:*1, 6* 154:*6*
**2026** 151:*19*
**208F** 2:*5*
**2161** 153:*21*
**216106** 151:*19*
**23** 1:*20* 154:*6*
**23rd** 5:*6* 151:*10*
 153:*6*
**25** 41:*16* 129:*8*
**25,000** 53:*3*
**25th** 53:*13* 82:*6*
 88:*5* 146:*10, 13*

**26** 151:*19*
**28** 44:*12, 14*
**28th** 110:*7*

**< 3 >**
**3** 96:*22* 129:*11*
**3/6/19** 4:*1*
**302** 153:*21*
**305.371.8809** 2:*12*
**305.460.9888** 2:*18*
**30th** 44:*18*
**32** 3:*14*
**33008-5293** 2:*5*
**33020** 2:*6*
**33134** 2:*11* 153:*4*
**33146** 2:*18*
**33409** 153:*22*
**355** 2:*11* 153:*4*
**360** 17:*1*

**< 4 >**
**4/28/2020** 111:*12*
**4:00** 153:*11*
**41** 3:*14*
**4651** 2:*17*
**48** 58:*6*

**< 5 >**
**5** 3:*5*
**5,000** 53:*8*
**5/15** 82:*10* 130:*19*
 133:*8*
**5/15/20** 77:*21* 126:*17*
**5/15/2020** 128:*6*
 132:*4, 17* 146:*6*
**5/25** 82:*13, 15*
**5/25/20** 3:*14, 22, 23*
 4:*1* 79:*4* 97:*20*
**5/25/2020** 67:*12* 71:*2*
 81:*23* 129:*19, 20, 22,*
 *25* 142:*22*
**5/30/81** 9:*9*
**51** 3:*14*
**539994086** 4:*5* 73:*24*
 125:*17*
**539994087** 74:*8*
**539994090** 68:*11*
**56** 3:*14*
**561** 153:*10*

**57987168** 55:*20*

**< 6 >**
**6** 153:*1*
**61** 3:*22*
**64** 3:*23*
**67** 4:*1*
**689-0999** 153:*10*
**6th** 151:*14* 152:*13*

**< 7 >**
**7** 58:*6*
**73** 4:*1*

**< 8 >**
**8,000-something**
 101:*13*
**8,900-something**
 101:*14*
**8:23-cv-00709-WFJ-**
**SPF** 1:*4* 5:*14* 153:*6*
 154:*5*
**82053** 69:*10*
**85293** 2:*5*
**87** 4:*6*

**< 9 >**
**9,000** 40:*24* 100:*1*
**9:00** 153:*11*
**954.228.5674** 2:*6*
**96** 4:*6*
**99** 4:*8*

**< A >**
**a.m** 1:*20* 5:*2, 7*
 153:*11*
**a/k/a** 135:*4*
**A12718** 44:*10* 47:*21*
**abide** 17:*11*
**ability** 44:*19*
**able** 8:*12* 47:*3, 12,*
 *15* 112:*13* 131:*19*
**accepted** 77:*25*
**access** 47:*12* 85:*4*
 92:*11* 117:*13*
**accommodate** 8:*20*
**accord** 87:*14*
**account** 24:*23, 25*
 25:*2* 41:*12* 44:*6*
 85:8, *12* 104:*22, 25*

Case 8:23-cv-00709-WFJ-SPF Document 70-2 Filed 09/25/24 Page 156 of 173 PageID 2679

GABRIEL LUC HADDON vs. FS INVESTMENTS, et al. September 5, 2024
CR of FS Investments (Franklyn Strusberg)
2

105:3, 4, 7  108:23
141:2, 7, 11, 13
**accuracy** 115:22
**accurate** 17:13, 22
18:14, 24  41:1  65:1
73:16  79:11  97:7
116:18  124:16  129:1,
2, 4  145:23
**accused** 9:15
**achieved** 9:21
**acknowledge** 5:16, 19
6:6, 8, 11
**acquiescence** 94:19,
25
**acquire** 11:3  144:24
**acquired** 145:2
**ACT** 4:10  71:12
**acted** 93:10, 13
**acting** 147:22
**Action** 1:4  89:14, 24
95:18  96:1  152:12,
13
**actions** 93:23
**activate** 85:14
**active** 100:8
**acts** 121:1
**actual** 38:12  45:4
62:11  63:24  67:16,
18, 19  77:22  87:20
90:18  96:25  98:6
110:5  111:7, 13
142:1  143:18  144:2
146:13
**add** 109:5  122:25
124:5
**added** 105:3, 15
**addition** 19:22  21:12
**address** 50:7, 12
101:7  153:17
**administer** 5:20
**administered** 5:19
**administration** 9:25
**Administrative** 5:22
**advertised** 47:9, 25
**advertisements** 47:13,
17
**advertising** 53:22
**advise** 22:17
**affirm** 6:14

**AFFIRMATIVE** 4:6,
8  87:3, 11, 13, 24
88:1  89:12, 20  90:15,
20  91:3, 13  93:9, 21
94:6, 15, 21  95:3, 5,
16  96:6
**affirmed** 6:21
**agent** 28:20  65:21
106:13  108:20
119:10  120:1  127:24
140:15, 19  141:8
**ago** 11:23  20:18
30:8  54:10  91:23
**agree** 17:5  18:16
42:7  47:17  48:1
58:18  61:7  72:13
73:15  74:22  83:24
101:1, 3
**agreed** 103:4
**AGREEMENT** 3:21
5:25  6:2  12:7  57:10
59:17, 24  60:8, 9
84:2  87:21  90:24
93:3, 7  108:19
109:10  111:17
127:10, 12, 17  135:4
144:23  145:3
**agreements** 19:23
**Agriculture** 85:19
**ahead** 7:13  11:11
26:9, 17  58:18  82:9
122:11, 13  124:6, 23
150:4
**ahold** 120:21
**al** 5:10  153:6  154:4
**Alex** 29:25  30:5
45:11  46:17  54:23
**Alexander** 50:19
52:24  65:23  66:25
**Alhambra** 2:11
153:4
**allege** 90:18
**alleges** 144:3
**allow** 144:10
**alteration** 95:19  96:2
**altered** 96:4
**AMEND** 4:8  96:12
**AMENDED** 4:6  87:2

**AMERICA** 1:4, 16
2:7  5:10  7:20  153:6
154:4
**amount** 101:8  153:14
**analysis** 25:10
**and/or** 93:24
**and-a-half** 11:23
**Angel** 29:22, 25
**anquience** 94:25
**answer** 8:2, 7, 15, 16
11:11, 16  12:20  14:5,
11, 13  24:3  26:10, 20
87:2  88:22  106:6
123:7, 16, 18
**answered** 12:9  24:2,
9  26:8  39:1  43:21
49:20  64:3  81:15
82:14  84:14, 19
139:18
**answering** 8:23
128:25
**Antonio** 117:17, 18,
21
**anybody** 12:12, 15
13:7  58:23  85:15, 18,
22  86:18  117:3
**anymore** 77:3
119:19  124:24
145:15
**AOSC20-16** 5:22
**apologies** 147:8
**app** 50:23  55:15, 18,
19
**appear** 79:16
**APPEARANCES** 2:1
**appeared** 151:9
**appears** 96:22
125:12  132:16, 18
133:7, 20  134:8
136:20
**APPLICATION** 3:23
27:15, 17  49:12, 25
50:1, 22  59:10  64:15
65:2
**applied** 29:3  82:24
**appointed** 71:4
**appointing** 71:11
77:10
**appreciate** 29:12

**approval** 27:20
**approve** 28:1  55:2
**approved** 27:19
**approximately** 5:7
16:15, 25
**APR** 58:7, 8
**April** 1:20  5:6
35:15  44:12, 13, 14,
18  110:7  151:10
153:6  154:6
**argue** 15:2
**argumentative** 124:5
**ARIEL** 2:12  153:2
**ARMSTRONG** 2:10
153:3
**arrangement** 5:21, 24
**arrangements** 153:11
**arrived** 48:11  67:7
**ASCIIs** 49:6
**Aside** 10:21  15:18
23:21  24:6, 16  25:3
38:23  39:7  115:13
147:4
**as-is** 140:12
**asked** 24:2, 9  26:8
38:3, 4, 25  43:21
49:20  64:3  81:15
82:14  84:14, 19
88:14  132:3  139:18
149:6
**asking** 8:7  26:19, 20
60:18  71:15  87:16,
22  89:5
**assert** 87:14  88:2
89:13  90:17, 21
91:14  93:10, 22  94:7,
16  95:2, 6, 17
**asserted** 89:5, 23
**asserting** 93:23
**asserts** 88:8  91:5
**assigned** 59:16
**assignment** 59:24
**ASSOCIATES** 2:17
**assume** 8:2
**assumes** 83:18
110:20  113:14  123:6
128:8  139:3
**assuming** 44:17
48:15  58:5, 9  76:22

81:*8*
**assumption** 58:*11*
**attach** 99:*22*
**attached** 100:*23*
103:*16*
**attachment** 4:*21*
**attend** 20:*24, 25*
**ATTORNEY** 4:*1*
6:*4* 7:*12* 8:*14* 68:*3,*
*13, 16, 23* 69:*1* 71:*4*
77:*9, 10* 80:*14, 16, 19,*
*21* 81:*1* 83:*5* 86:*19*
100:*11* 103:*9* 128:*22*
152:*11, 12* 153:*14*
**attorneys** 5:*15* 42:*11*
71:*11* 87:*12*
**auction** 13:*1, 5* 21:*7,*
*8, 19* 22:*9, 13* 23:*17,*
*21* 24:*14* 36:*21, 22*
37:*19* 44:*4* 54:*14*
88:*13* 92:*8*
**audible** 8:*10*
**authority** 31:*15*
108:*22* 109:*5* 147:*23*
151:*8*
**authorization** 50:*4*
51:*6*
**authorized** 152:*6*
**authorizes** 50:*24*
65:*6* 68:*24*
**authorizing** 50:*2*
**Auto** 31:*5, 7, 12, 15,*
*17* 35:*13* 41:*8, 9, 10,*
*13* 42:*18* 43:*15, 17,*
*18, 24* 44:*4, 12, 15, 20*
74:*19* 75:*7, 15* 76:*3*
78:*12* 82:*19* 104:*11,*
*22, 24* 105:*1, 3, 18, 19,*
*23* 106:*14, 17, 23, 25*
107:*8, 11, 16* 108:*4,*
*10, 13, 15, 19* 109:*3, 6*
110:*8, 12, 14, 17*
111:*12, 19* 112:*8, 19,*
*22* 113:*3, 7, 9* 115:*20*
121:*21* 122:*18*
126:*13, 15* 127:*5, 8,*
*18, 24, 25* 128:*2, 15*
130:*2, 4, 14* 132:*5, 19*
133:*2, 3* 140:*15, 20*

141:*8* 144:*24, 25*
145:*2* 146:*5* 148:*13*
**AutoCheck** 22:*4*
24:*25*
**automatic** 106:*22*
**automatically** 69:*6*
88:*10* 106:*18* 120:*23*
**AUTOMOTIVE** 1:*9*
2:*10* 4:*10* 10:*10, 20,*
*22* 81:*23* 132:*5*
**available** 153:*9*
**aware** 88:*3, 8* 96:*6*
97:*2* 103:*3* 132:*7*
**Awesome** 104:*4*

**< B >**
**back** 19:*17* 37:*12*
38:*3, 5, 12* 43:*12*
59:*9* 67:*10* 74:*3*
76:*24* 77:*4* 88:*25*
90:*9* 91:*18* 102:*17*
104:*17* 118:*15*
119:*12, 24* 122:*15*
137:*18* 145:*17*
148:*13*
**background** 9:*18*
**bad** 34:*24* 58:*8, 9*
**bank** 27:*19* 41:*12*
55:*15* 59:*15* 127:*15*
**bar** 126:*3*
**barred** 89:*14, 25*
90:*22* 91:*15* 94:*17,*
*23* 95:*19* 96:*1*
**based** 35:*19* 36:*16*
61:*1* 109:*12* 124:*12*
136:*25* 138:*14* 140:*1*
145:*3* 146:*15, 17, 20*
**Bates** 42:*9* 125:*20*
128:*20* 134:*14*
**BEACH** 151:*5* 152:*1*
153:*21, 22*
**beat** 34:*18*
**bed** 40:*1, 3, 5*
**began** 5:*2*
**beginning** 50:*6, 23*
145:*19*
**begins** 58:*6*
**behalf** 2:*1, 7, 16* 6:*4,*
*7, 9* 54:*21* 57:*20*
71:*13* 79:*14, 22*

80:*17, 25* 81:*3, 6*
106:*14* 108:*23* 148:*5*
**believe** 17:*22* 18:*12*
75:*5, 10* 110:*6*
124:*15* 142:*16*
**beneath** 71:*3*
**benefit** 141:*11* 148:*2*
**better** 30:*12* 73:*22*
84:*22* 85:*2, 4, 8*
89:*19*
**Betty** 72:*6, 7* 73:*14*
76:*10, 19* 77:*1, 10*
78:*7* 79:*15* 81:*7, 8*
83:*10* 98:*3, 13, 17*
113:*13* 114:*5, 23*
141:*19* 142:*11, 18, 25*
147:*22* 148:*17*
**Betty's** 76:*21* 79:*16*
**big** 12:*25* 25:*14*
33:*17*
**biggest** 21:*8* 92:*23*
**Bill** 4:*17* 33:*14* 52:*7,*
*9, 15* 53:*22* 54:*13*
57:*14, 15* 72:*23*
92:*21* 93:*20* 98:*20*
136:*14, 21* 146:*15*
**bind** 31:*15* 77:*10*
**birth** 9:*8*
**bit** 43:*9* 70:*9* 74:*6*
80:*4*
**blame** 90:*6* 99:*12*
**blank** 153:*16*
**Blvd** 2:*17*
**bond** 20:*10* 83:*23*
84:*5* 87:*22* 88:*12*
89:*2* 90:*7* 99:*21, 22*
100:*4, 5, 8* 109:*15*
110:*2* 143:*5*
**booked** 127:*15*
**born** 10:*5*
**borrower** 80:*11*
**bottom** 42:*12* 54:*21*
64:*5, 8* 65:*20* 153:*16*
**bought** 12:*20* 15:*17*
35:*10* 36:*15* 38:*22*
39:*4* 41:*18* 44:*13*
45:*20* 88:*19, 20*
140:*19* 141:*5* 145:*22*
**Boulevard** 153:*21*

**Box** 2:*5* 29:*2* 50:*1,*
*24* 126:*14* 132:*7*
133:*8*
**boy's** 144:*13*
**brake** 40:*17*
**brakes** 39:*11*
**breach** 95:*18* 96:*1*
**break** 8:*19, 22* 102:*7,*
*15* 144:*13*
**bring** 15:*10* 22:*11*
23:*20* 31:*10* 38:*3, 4*
116:*23* 117:*12*
**building** 54:*9*
**Bureau** 84:*22* 85:*3,*
*5, 9*
**Business** 9:*25* 11:*2*
17:*7* 43:*16* 61:*14*
71:*10* 84:*22* 85:*2, 4,*
*9* 99:*10* 115:*19*
129:*3, 4* 134:*2*
**businesses** 22:*3*
**buy** 20:*5, 6* 21:*7, 9,*
*18, 19, 24* 22:*9* 23:*19*
31:*8, 10* 36:*15, 19*
37:*3* 59:*18* 92:*21*
93:*17* 105:*23* 106:*1*
108:*22* 139:*5*
**buyer** 21:*17* 31:*17*
36:*22* 105:*3, 15, 17*
109:*4, 5* 113:*12, 24*
121:*6* 129:*10* 137:*12,*
*17*
**Buyers** 138:*17, 18*
**BUYER'S** 3:*14*
51:*20* 63:*8, 11* 66:*8*
70:*16* 129:*20* 131:*1,*
*7, 14* 134:*13* 135:*2,*
*16*
**buying** 52:*20* 124:*13*

**< C >**
**c/o** 153:*2*
**cabinet** 46:*9, 10, 12*
**cabinets** 46:*14*
**California** 61:*13*
**call** 32:*19* 33:*3*
37:*11* 57:*9* 81:*11*
88:*11* 91:*22* 92:*9*
107:*22* 115:*6* 116:*21*

118:*16, 17*  119:*11, 14,*
*23, 24*  120:*23*  153:*10*
**call-backs**  119:*17*
**called**  23:*18*  32:*15*
36:*25*  37:*1, 6, 12, 13*
83:*23*  84:*6*  87:*22*
88:*10, 13, 21*  100:*11,*
*13*  116:*1, 2*  117:*19,*
*20, 23*  119:*12, 20*
120:*12*
**calls**  89:*16*  119:*15*
120:*18*
**cancel**  51:*5*  100:*4*
**car**  11:*18*  12:*20*
15:*22*  17:*14*  18:*4, 9,*
*11, 15*  21:*19, 21, 23*
22:*10, 13, 15, 18, 22,*
*25*  23:*1, 16, 18*  24:*13,*
*18, 20, 21*  25:*11, 12,*
*15*  26:*2, 13*  27:*7, 8*
28:*4*  30:*5, 16, 20*
31:*11, 18, 22*  34:*16,*
*17*  35:*4, 8, 18*  36:*15,*
*19, 24*  37:*3, 5, 6, 14,*
*18, 21*  38:*3, 4*  39:*13,*
*23*  41:*15*  43:*4, 5*
45:*20*  48:*24*  59:*19*
65:*7*  67:*4, 6, 7*  68:*24*
71:*23*  72:*17*  88:*14,*
*16, 18, 19, 20*  90:*9*
91:*18, 19*  97:*14, 17*
105:*17*  111:*9*  116:*1,*
*6*  118:*14*  121:*2, 3*
126:*25*  127:*1, 6, 14,*
*16*  140:*3, 7*
**CARFAX**  22:*4*
24:*23*  92:*11*  97:*3*
**cars**  10:*7, 9*  16:*23*
17:*2*  19:*6, 8, 17*  21:*3,*
*4, 5, 15, 24*  27:*6*  31:*8,*
*10, 20*  36:*2, 5, 10*
37:*3*  39:*22*  47:*11*
67:*5*  92:*21*  100:*5*
107:*3*  108:*22*  145:*11*
146:*19*
**case**  5:*11, 13*  7:*13*
92:*6*  96:*7*  103:*6*
104:*9*  117:*16*  143:*19*
153:*6*  154:*5*

**cash**  27:*14*
**Castillo**  29:*22*
**cause**  89:*14*  95:*18,*
*25*  153:*8*
**causes**  89:*24*
**cell**  117:*25*  118:*2, 8,*
*10*
**center**  121:*1*
**Central**  23:*18*
**certainly**  8:*20*
**CERTIFICATE**  3:*14,*
*23*  4:*1*  18:*13*  41:*17*
42:*18, 23, 25*  64:*16*
65:*2*  72:*25*  74:*12, 15,*
*18*  75:*6, 11*  77:*11, 17,*
*23*  78:*1*  97:*3, 19*
98:*6*  103:*15*  110:*5, 6,*
*25*  111:*6, 13, 19*
112:*6, 9*  113:*2, 20*
115:*21*  121:*19, 22*
122:*2*  123:*3*  124:*2*
125:*14, 15*  130:*5*
131:*12, 22*  132:*18, 21*
133:*2*  135:*9*  142:*24*
143:*1*  151:*1*
**Certificates**  106:*13*
**CERTIFIED**  1:*24*
5:*4*  151:*18*  152:*20*
153:*18*
**certify**  62:*11*  151:*8*
152:*6, 11*
**cetera**  42:*21*  53:*23*
61:*2*
**change**  22:*17*  23:*6, 7*
40:*24*  54:*8*  154:*7*
**changed**  31:*3*  54:*6*
**changes**  24:*17*  154:*2*
**changing**  23:*2*
**charged**  54:*4*
**charges**  53:*5*
**check**  60:*7*  61:*2*
87:*22*  92:*8, 10, 12*
100:*9*  101:*6, 8*  143:*9,*
*12*  144:*1*
**checkbox**  62:*10*
**checking**  122:*1*
**Chinese**  90:*23*
**chipped**  40:*9, 12*
**Christ**  33:*19*

**Cir**  2:*11*  153:*4*
**circumstance**  37:*9*
**citation**  86:*14, 16*
**cited**  86:*11*
**Civil**  1:*4*
**claim**  24:*13*  50:*25*
88:*12*  93:*3, 7*  100:*8*
116:*5, 20*
**Claimant's**  13:*14*
51:*19*
**claiming**  143:*18*
**claims**  91:*15*  94:*17,*
*23*  143:*14*
**clarify**  132:*3*
**clean**  18:*10*  39:*22, 23*
**clear**  14:*24*  136:*19*
**Clerk**  153:*15*
**click**  15:*16*  29:*1, 2, 4,*
*6, 7, 8*  33:*20*  34:*1*
50:*1, 24*  106:*1*
117:*18*
**clicking**  105:*24*
**client**  26:*14, 23, 24*
27:*1*  31:*18*  45:*8*
46:*21*  47:*4*  48:*3*
52:*25*  55:*7*  57:*24*
59:*2, 13, 14*  62:*3, 14*
63:*5, 7, 21*  65:*3, 8, 24*
66:*2*  68:*13*  69:*22*
70:*1*  71:*4, 24*  74:*16*
75:*12*  79:*22*  80:*12,*
*21*  82:*18*  83:*6, 15*
88:*24*  89:*5, 8, 24*
90:*25*  91:*5, 7, 12*
93:*2, 6*  94:*10, 12, 13*
95:*9*  96:*4*  98:*7*
146:*9*  147:*2*  148:*1*
**client's**  29:*24*  31:*1*
45:*5*  53:*25*  60:*13*
69:*18*  71:*18*  80:*16*
81:*2, 5*  97:*20*
**closed**  35:*22, 24*  36:*9*
**closely**  80:*5*
**clue**  109:*19*  130:*20*
133:*9*
**Colombia**  10:*2*
**come**  21:*9*  23:*5*
27:*12*  39:*22*  43:*14*
60:*8*

**comes**  23:*4*  50:*4*
69:*6*  86:*13*  106:*12*
111:*22*  113:*11, 17*
**coming**  19:*17*  52:*20*
**comments**  21:*18, 20,*
*22*  37:*21*  88:*15, 17*
**commercial**  21:*25*
93:*14*
**commercially**  93:*11*
**commission**  31:*14*
49:*12*  151:*19*
**commissions**  45:*22,*
*24*
**communicate**  108:*7,*
*12*
**communicated**  124:*3*
**communication**
107:*16, 19*  118:*23*
**community**  35:*25*
86:*9*
**company**  19:*11*
23:*17*  72:*9*  92:*24*
93:*18*  105:*10, 15*
110:*2*  111:*5*  112:*10*
118:*9*  141:*21*
**compensate**  37:*24*
**complain**  91:*9*
**COMPLAINT**  4:*6, 8*
84:*21*  85:*15, 18, 22*
86:*12, 18*  93:*24*
**Complaints**  85:*5*
86:*6*
**complete**  27:*17*
29:*10*  36:*17*  147:*5*
152:*8*
**completed**  142:*18*
143:*1*  147:*23*  153:*12*
**completely**  28:*21*
90:*4*
**Complies**  33:*18*  74:*7*
95:*22*
**composition**  115:*7*
**compressor**  86:*7*
**computer**  15:*12, 15*
20:*9*  28:*11, 17, 18, 19,*
*21*  48:*21*
**concerning**  123:*10*
**concluded**  150:*10*
**conclusion**  89:*17*

Case 8:23-cv-00709-WFJ-SPF Document 70-2 Filed 09/25/24 Page 159 of 173 PageID 2682

GABRIELA MUNOZ vs. FS INVESTMENTS OF AMERICA, INC. 9/17/2024
CR of FS Investments (Franklyn Strusberg)
5

**condition** 19:9 21:20 25:4, 25 26:3, 5 34:13, 15, 24 35:6, 9 37:4 38:23, 24 124:14

**conditions** 27:25 28:1

**conduct** 93:24

**conducts** 36:23 138:24

**confirmed** 119:21

**confirming** 118:19

**confusing** 7:24

**confusion** 125:13

**connected** 152:12

**consent** 5:23 48:19, 22 49:3, 9, 17, 24 50:8, 21 51:2

**considered** 19:11

**consignment** 31:8

**consumer** 28:9, 16, 23 29:4, 15 84:21 85:19

**consumers** 19:19 71:11

**consumer's** 89:24

**contact** 72:11 100:12, 15 116:22 117:12 121:13, 16

**contacted** 90:7 109:15 117:18

**contacting** 108:4

**container** 46:13, 15

**content** 97:2

**CONTRACT** 3:14 28:4 29:1 50:16 51:21 56:4, 7, 19, 25 57:4, 8, 13, 16, 24 60:19 63:15 64:1 66:11 70:14 72:23 108:19 127:2 135:4

**contractor** 142:1, 2

**contracts** 28:9 49:17 63:19

**contradict** 135:15

**contribute** 94:3

**control** 93:25

**conversation** 108:24 118:20, 24 120:8

126:8

**conveyed** 103:8

**convicted** 9:12

**copies** 51:15 56:8, 10

**copy** 27:13 42:17, 23 48:1 50:16 52:9, 12 56:15, 24 60:15 62:2 65:1 68:12, 15 74:12, 15, 18 100:19 109:9 111:5 125:13 126:19, 22, 23 128:2 130:5, 14 132:6, 20 133:2 135:9 142:23, 25 150:6

**Coral** 2:11, 18 153:4

**corner** 33:16, 24 34:10 55:11 64:7, 8 65:20

**CORP** 3:14 31:6, 13, 16, 17 41:8, 13 42:18 43:15, 17, 18, 24 44:12, 16, 20 74:19 75:15 78:12 82:19 104:11, 22, 24 105:3, 18, 19, 23 106:18, 23 107:1, 8 108:5, 10, 16 109:4, 7 110:8, 12, 14 111:13 112:8, 19, 23 113:4, 10 115:20 121:21 122:19 126:13, 15 127:18, 25 130:14 132:5, 19 133:3 140:15, 20, 21 141:8 144:24, 25 145:3 148:14

**Corp.'s** 105:1

**corporate** 1:16 7:5, 8, 19 17:9 105:9

**corporation** 1:9, 11 16:8

**correct** 7:4, 10 10:14 15:23 16:12, 16 31:2 38:10 39:17 41:2, 4, 6 42:17 45:13, 14 46:24 49:10 52:9, 12 56:15, 24 57:18, 22 58:12, 24 59:1, 21 62:2 65:15 68:12, 15 69:11, 13, 17 70:24 73:17 74:1 78:15

79:13, 21 80:22, 23 83:4, 13 84:10 92:13 97:8 98:16, 23 103:10 105:11, 13, 20 107:10, 15 108:3 109:8, 13, 17 110:3, 23, 24 111:2, 3, 7 112:1, 20, 24 113:1, 4, 5, 8 114:18 115:9, 11, 15, 17, 22, 23 116:4, 13 117:23 119:6 120:2 121:8, 14, 15, 18, 23, 24 122:5 126:6 127:19 129:8 130:7, 17 133:4, 5, 6, 23 136:17 137:13, 19, 20, 23 138:21, 22 140:24 141:9 142:18, 19 143:3, 15 144:25 145:1, 12, 24 146:11 147:3, 21, 25 148:6, 7

**correctly** 34:23 56:14

**correspondence** 118:19

**COST** 4:10

**counsel** 5:23 38:16 143:6, 10, 22 144:1, 6 149:6 152:11, 12

**count** 123:15

**Counts** 90:21

**county** 85:16 151:5 152:1

**couple** 120:20

**course** 17:8, 12 18:10, 15 19:12 20:16, 22, 24 21:1 28:25 33:14 47:16 48:2, 16 51:13

**courses** 20:12, 15

**COURT** 1:1, 24 5:3, 12, 22 6:12, 18 8:5 12:1 29:9 32:23 87:12 106:2, 4, 9 122:14, 17 142:4, 7 151:18 152:20 153:15, 18, 21

**cover** 33:2 53:19 144:2

**coverage** 28:2, 7

**covered** 20:19 128:12

**CR** 21:22 34:11

**cracked** 40:10, 13

**Craig's** 47:8, 10

**credit** 27:15, 17 49:11, 25 50:1, 22, 23, 25 58:8, 9

**crimes** 9:13, 16

**cross** 102:4

**CROSS-EXAMINATION** 3:5 104:5 125:10

**customary** 134:5 140:3, 6

**customer** 18:1 20:1 27:3, 4 30:20 43:4 48:17 56:11 57:25 58:1, 14, 19, 21 60:6 62:16, 17 65:6 68:23 69:7 79:25

**Customers** 19:17 22:2 93:19 95:8

**customer's** 52:18 61:1 66:18

**cut** 122:13

**< D >**

**d/b/a** 1:9, 10 2:10 16:8

**damages** 87:20 90:18 95:7 143:16, 18, 23 144:3

**dashboard** 97:4 133:14, 22, 23 134:6, 20 135:5, 19, 21 147:4

**date** 5:6 9:8 44:2, 20 53:12 64:10 67:1, 11, 13 70:25 77:17, 20, 22 79:2, 5, 9, 12 97:18, 24 98:5, 6 110:6 126:16, 18 129:7, 17 130:11, 14 132:4, 15, 17, 20, 25 133:1, 7, 8 146:14 154:23

**dated** 142:22 152:13

**Day** 13:11 31:4 44:17 48:11 67:9 77:4 90:7 91:17

119:*25*  151:*10, 14*
152:*13*  153:*6*
**days** 43:*6*  44:*18*
**De** 2:*17*
**deal** 27:*18*  30:*13*
31:*6, 7, 12, 15, 17*
35:*14*  41:*8, 9, 10, 13*
42:*18*  43:*15, 17, 18,*
*24*  44:*4, 12, 15, 20*
46:*3, 4, 6, 8*  51:*13, 14*
55:*18, 20*  60:*24*  61:*2,*
*4, 7*  69:*5*  74:*14, 17,*
*19*  75:*7, 15*  76:*4*
78:*12*  82:*19*  91:*17,*
*20, 21, 25*  104:*11, 22,*
*24*  105:*1, 3, 18, 19, 23*
106:*14, 17, 23, 25*
107:*8, 11, 16*  108:*4,*
*10, 13, 15, 19*  109:*3, 7*
110:*8, 12, 14, 17*
111:*2, 13, 19*  112:*8,*
*19, 23*  113:*4, 7, 9*
115:*20*  121:*21*
122:*19*  126:*13, 15*
127:*6, 8, 15, 18, 24, 25*
128:*2, 15*  130:*3, 4, 14*
132:*5, 19*  133:*3*
140:*15, 20, 21*  141:*8*
144:*24, 25*  145:*3*
146:*5*  148:*13*
**DEALER** 2:*4*  15:*22*
20:*8*  22:*11*  23:*20*
31:*11*  35:*22*  53:*17*
60:*9*  65:*21*  86:*13*
92:*5*  99:*19*
**DealerCenter** 30:*24*
51:*10, 14*  56:*3*  60:*17,*
*25*  64:*14*  66:*23, 24*
**dealers** 35:*24*  114:*16*
134:*6*  140:*3, 7*
**dealer's** 147:*23*
**dealership** 7:*20*  10:*8,*
*16, 23*  15:*21*  16:*2, 5,*
*11, 17*  17:*2, 5, 10, 11,*
*21*  18:*12*  19:*20, 23*
20:*2, 7, 11, 14, 25*
23:*22*  25:*7*  30:*7, 9,*
*22, 23*  35:*13*  45:*13*
46:*16*  47:*6*  48:*3*
51:*8*  53:*9*  56:*8*

57:*21*  60:*10, 20*  62:*3*
65:*6, 12*  67:*15*  68:*13,*
*17, 25*  69:*4*  71:*8, 10,*
*12*  76:*15*  77:*2*  79:*14*
81:*7*  82:*2, 12*  83:*15,*
*21*  84:*11, 16, 22*
85:*16, 20*  86:*19*  88:*8*
89:*23*  90:*1, 11, 16*
91:*4*  93:*15*  96:*7*
98:*15*  113:*7, 11*
115:*12, 16*  128:*1*
145:*17*  146:*12, 22*
147:*11*  148:*6*  149:*7,*
*19*
**dealerships** 10:*18*
16:*21*
**dealership's** 54:*20*
104:*23*  145:*25*  146:*4,*
*8, 25*
**deals** 104:*21*  113:*17*
**decide** 22:*5*
**decision** 27:*8*
**declare** 154:*22*
**dedicated** 28:*21*
**Defendant** 2:*7, 16*
4:*17*  6:*8, 10*  7:*13*
9:*3*  61:*20*  93:*10*
96:*24*  97:*1, 3, 5*
136:*8*
**Defendant(s** 1:*12*
**Defendant's** 87:*21*
93:*25*  136:*7*
**DEFENSE** 4:*12*
87:*13, 24*  88:*1*  89:*12,*
*21*  90:*15, 20*  91:*3, 13*
93:*9*  94:*6, 15, 21*
95:*3, 5, 16*
**DEFENSES** 4:*6, 8*
87:*3, 12*  93:*22*  96:*7*
**DEFT** 4:*6*
**delete** 77:*15*
**delivered** 38:*13, 15,*
*19*  124:*11*
**DEMAND** 4:*8*  99:*14,*
*18*  101:*22*
**dented** 40:*3*
**dents** 40:*7*
**department** 85:*16, 19*
**Depending** 25:*11*

27:*13*
**depends** 25:*25*
**depict** 133:*1*
**depicts** 79:*12*
**DEPO** 3:*14*  15:*3*
**Depos@FloridaCourt**
**Reporting.com** 153:*10*
**DEPOSITION** 1:*15*
5:*8, 16, 17, 18*  7:*5, 9,*
*19*  9:*10*  12:*13, 16, 18*
13:*9, 14*  38:*17*  81:*13*
103:*21*  125:*16*
128:*12*  143:*7*  152:*7*
153:*8, 11, 12*
**derive** 10:*13, 15*
**describe** 35:*18*
**DESCRIPTION** 3:*14*
4:*1, 16*  52:*19*
**destroyed** 19:*7*  26:*2*
**determination** 60:*2*
**determine** 27:*4*
44:*19*  60:*22*  85:*11*
**determines** 25:*6, 11,*
*14*
**determining** 26:*7*
**dictates** 60:*19*
**difference** 57:*12*
136:*3*
**different** 82:*20*  84:*3*
86:*6*
**differently** 95:*9*
**dig** 21:*17*  37:*10*
84:*5*  88:*22*  100:*10*
119:*12*
**DIRECT** 3:*5*  6:*23*
59:*20*  121:*13*
**directly** 36:*18*  59:*14*
108:*7*  112:*19*  113:*23*
117:*20*
**disclose** 37:*4, 15*
58:*13*  59:*2*  72:*20*
88:*15, 17*
**disclosed** 44:*25*
103:*18*
**DISCLOSURE** 3:*22*
18:*3, 5*  54:*11*  59:*5*
61:*19*  62:*1, 3, 6*
66:*20*  72:*22*  77:*13*
78:*24*  79:*2, 6*  81:*22*
135:*3*  146:*9*  147:*13*

**disclosures** 17:*13, 22*
18:*14*  90:*25*  146:*1*
149:*7*
**discovery** 32:*2*  42:*10,*
*24*  43:*3*  61:*20*
103:*18*
**discrepancy** 37:*1*
88:*3, 9, 12, 16*  119:*21*
**discuss** 23:*12*
**discussing** 91:*11*
**dishonesty** 9:*13, 16*
**Dispatch** 23:*18*
**dispute** 84:*8*
**distribution** 153:*12*
**DISTRICT** 1:*1, 2*
5:*12*
**disturb** 32:*16, 19*
**disturbing** 123:*23*
**DIVISION** 1:*3*  5:*13*
**DLMRB** 20:*23*
**DMS** 31:*3*  51:*10*
**DMV** 17:*25*  20:*11*
28:*13*  49:*6*  62:*18, 20*
68:*16*  69:*2*  71:*16, 19,*
*23*  72:*16*  73:*1, 13*
85:*21, 22*  86:*2, 11, 12,*
*14*  113:*18, 21*
**DMV's** 115:*14*
**doctrine** 89:*14, 25*
90:*22*
**Doctrines** 94:*18, 19,*
*24, 25*
**document** 15:*8*
29:*14*  33:*12*  34:*4, 10*
42:*10*  49:*9*  52:*16, 21*
54:*24*  55:*2, 4, 7*
56:*21*  57:*3*  60:*4*
61:*25*  62:*7, 15, 23*
63:*2*  64:*23*  65:*5, 9,*
*14, 24*  66:*4*  68:*2, 5,*
*22*  69:*23*  70:*23*
71:*24, 25*  72:*20*
73:*10, 19*  74:*23, 25*
75:*2, 4, 5, 11*  78:*2*
79:*11*  80:*13, 16, 24*
81:*2, 5, 10*  82:*22*
83:*6, 7*  87:*9*  96:*18*
125:*15, 20*  126:*5, 9,*
*22, 24*  128:*20, 23*
129:*1, 2, 4, 12*  132:*15*

Case 8:23-cv-00709-WFJ-SPF   Document 70-2   Filed 09/25/24   Page 161 of 173 PageID 684
GABRIEL LUC HADDON vs MANATEE COUNTY, et al.
CR of FS Investments (Franklyn Strusberg)
7

135:*14*  136:*6*, *13*, *16*
142:*5*, *18*  154:*22*
**document(s** 13:*17*
32:*3*  41:*24*  51:*25*
61:*22*  64:*20*  67:*24*
73:*5*  87:*6*  96:*15*
99:*3*  101:*19*  125:*8*
128:*17*  131:*24*
134:*15*  136:*10*
142:*13*
**documents** 15:*10*, *14*,
*19*  28:*15*  48:*13*, *18*,
*19*  49:*18*  51:*9*  56:*9*
63:*9*, *25*  70:*20*  73:*12*
91:*1*  121:*7*  125:*3*
128:*13*  133:*11*  134:*8*
135:*8*, *12*  149:*11*
**doing** 61:*14*  76:*25*
104:*21*  121:*25*
123:*25*  128:*10*  148:*2*,
*5*
**Don** 71:*5*, *6*, *8*, *25*
**door** 17:*3*  26:*14*, *23*
91:*20*
**drive** 22:*15*, *20*
23:*24*  24:*1*, *4*  27:*10*,
*11*  39:*10*, *12*, *13*
139:*1*, *11*
**driver** 23:*19*  107:*6*
**driver's** 27:*16*
**driving** 24:*6*  35:*7*
39:*16*
**drove** 39:*6*  48:*8*
**duly** 6:*21*  151:*10*

**< E >**
**earlier** 110:*4*  128:*23*
130:*2*, *4*  132:*4*
138:*24*
**earned** 31:*12*
**easier** 77:*16*
**easy** 7:*22*
**e-contracting** 49:*5*
**education** 9:*20*
**educational** 9:*18*
**effectively** 51:*20*
**eight** 54:*7*  136:*3*
**eighth** 91:*13*
**either** 40:*9*, *12*  83:*12*

**electronic** 28:*12*, *13*
48:*18*  51:*8*, *11*
**electronically** 48:*14*,
*16*, *19*, *23*  49:*2*  50:*21*
57:*17*
**electronically-signed**
28:*15*
**eleventh** 93:*21*
**e-mail** 50:*7*, *12*, *13*,
*14*  100:*17*, *19*, *22*, *23*
101:*1*  103:*15*  107:*20*
118:*22*  143:*21*, *25*
153:*10*
**e-mails** 100:*18*
118:*18*
**employed** 10:*11*, *15*,
*17*, *19*  16:*4*  29:*23*
45:*12*  71:*12*
**employee** 77:*1*, *5*
114:*1*  141:*24*  142:*1*
152:*11*, *12*
**employees** 16:*19*
108:*15*  114:*2*
**engine** 39:*9*  40:*21*
**English** 120:*9*, *10*
**ENTER** 154:*2*
**entered** 67:*1*  108:*18*
146:*13*
**enters** 38:*16*
**entitled** 125:*15*
**entitlement** 121:*8*
**entity** 25:*2*
**envelope** 111:*21*
112:*5*
**envelopes** 111:*25*
112:*1*, *3*
**equitable** 94:*19*  95:*1*
**ERRATA** 154:*1*
**ESQUIRE** 2:*7*, *12*, *13*,
*19*  153:*2*
**essentially** 107:*11*
**estimation** 109:*22*
**estopped** 93:*23*
**estoppel** 94:*18*, *24*
**et** 5:*10*  42:*21*  53:*23*
61:*2*  153:*6*  154:*4*
**evaluating** 25:*20*
**evaluation** 25:*22*
**event** 8:*21*  123:*24*

**Everybody** 35:*25*
36:*1*  52:*2*  56:*21*
78:*19*, *21*
**evidence** 40:*15*
42:*21*  47:*1*  83:*19*
110:*21*  113:*15*
114:*12*  123:*6*  128:*9*
139:*4*
**Ex** 111:*23*, *24*  112:*1*,
*11*, *12*  130:*22*
**exact** 18:*23*  44:*20*
**exactly** 14:*1*, *3*, *15*
45:*21*  79:*12*  119:*7*
**EXAMINATION** 3:*5*
6:*23*  13:*25*  144:*21*
**examined** 6:*21*
**example** 36:*24*
**Excellent** 84:*11*
**exchange** 103:*5*
**Excuse** 12:*14*  43:*8*
52:*11*
**Ex'd** 110:*7*
**execute** 62:*4*, *14*
146:*1*, *22*
**EXHIBIT** 3:*14*  4:*1*,
*16*, *17*  13:*13*, *15*
41:*21*, *22*  51:*19*, *23*
56:*18*  61:*18*  64:*17*,
*18*  67:*21*, *22*  72:*25*
73:*3*  87:*2*, *4*  96:*11*,
*13*  98:*25*  99:*1*
101:*16*, *17*  125:*21*, *25*
136:*7*, *8*
**expenses** 53:*19*, *20*
**experience** 19:*3*
34:*14*  35:*19*  124:*12*
138:*14*  140:*2*
**expired** 85:*13*
**Expires** 151:*19*
**explain** 21:*15*  22:*12*
52:*14*  58:*1*, *15*, *17*, *25*
89:*18*  148:*21*  150:*1*
**explained** 55:*7*
57:*24*  58:*9*  63:*5*
70:*1*, *2*  117:*23*
**explains** 57:*25*
**exploring** 92:*1*
**express** 95:*18*  96:*1*
**exterior** 40:*7*

**< F >**
**face** 44:*24*  73:*16*
78:*1*  81:*23*  84:*3*
**facilitate** 137:*15*
**fact** 128:*5*
**factor** 25:*21*
**factories** 36:*9*
**factors** 25:*9*
**facts** 42:*21*  46:*25*
83:*18*  87:*14*, *19*  88:*2*,
*7*, *24*  89:*8*, *13*  90:*16*,
*21*  91:*4*, *14*  93:*10*, *22*
94:*7*, *16*  95:*2*, *6*, *17*
96:*3*  110:*20*  113:*14*
114:*11*  123:*6*  128:*8*
139:*3*  154:*22*
**failed** 95:*6*
**fair** 57:*9*  111:*4*
116:*17*  121:*25*  130:*9*,
*11*, *13*  132:*25*
**faith** 93:*11*, *13*
**familiar** 17:*10*  32:*6*
33:*12*  42:*4*  52:*5*
61:*25*  68:*2*  72:*19*
73:*8*
**far** 109:*12*
**Fed** 110:*7*  111:*23*,
*24*  112:*1*, *11*, *12*
130:*22*
**federal** 12:*1*
**fee** 53:*16*, *17*, *18*
54:*2*, *4*, *6*
**feel** 24:*11*  39:*10*, *13*
**felonies** 9:*12*, *15*
**FEYGIN** 2:*4*, *7*  3:*5*
6:*4*, *24*  7:*8*, *14*  11:*11*,
*15*  12:*9*, *11*  13:*12*, *19*
14:*6*, *9*, *23*  15:*1*, *5*, *6*
18:*21*  19:*2*  24:*3*, *5*,
*15*  26:*10*, *12*, *18*, *21*,
*22*  29:*13*  31:*24*  32:*5*
33:*11*  34:*8*  35:*5*
38:*18*  39:*3*  41:*20*
42:*1*, *22*  43:*23*  47:*2*
49:*21*  51:*18*  52:*2*, *4*
56:*17*, *23*  61:*17*, *24*
64:*12*, *15*, *22*, *25*
67:*20*  68:*1*  72:*24*
73:*7*  78:*16*, *23*  81:*18*

82:*11, 16* 83:*20*
84:*15, 20* 87:*1, 8*
89:*20, 23* 90:*10* 93:*1*
95:*22, 24* 96:*10, 17*
97:*18, 23* 98:*4, 24*
99:*6, 9* 101:*15, 21*
102:*3, 7, 22, 25*
103:*12, 17, 23, 25*
124:*23* 125:*1, 6, 18,*
*23* 126:*2, 6* 128:*8, 23*
130:*25* 131:*7, 11, 13*
139:*3, 18* 140:*23*
144:*12, 20, 22* 147:*8,*
*10* 148:*8, 21* 149:*1*
150:*1, 7*
**FEYGIN/POWERHO**
**USE** 4:*10*
**fifteen** 16:*20*
**fifty** 145:*9, 11, 22*
**figure** 45:*18* 63:*18*
98:*9*
**FILE** 4:*8* 24:*13*
46:*9, 10, 12, 13* 85:*15,*
*18* 116:*5, 20* 144:*6*
**filed** 11:*24* 84:*21*
85:*22* 86:*18* 87:*12*
153:*15*
**filing** 90:*2, 12*
**filled** 66:*22* 134:*25*
146:*6, 10*
**filling** 134:*8*
**finalize** 105:*24*
**finance** 20:*1* 27:*14,*
*18* 28:*20, 22* 29:*19,*
*20* 52:*22* 55:*15*
63:*22* 69:*20* 114:*13,*
*14, 21* 115:*2*
**financed** 27:*14* 59:*19*
**FINANCIAL** 1:*10*
66:*6*
**financially** 152:*13*
**financing** 19:*23* 20:*3*
57:*6, 9* 59:*17, 24*
104:*13* 135:*4*
**find** 31:*18, 20* 38:*8*
47:*6, 19, 20* 75:*2*
81:*9* 88:*21* 89:*2, 3*
101:*3* 123:*9, 22*
**finding** 44:*5*

**fine** 33:*2* 128:*11*
149:*1, 23*
**finish** 8:*23* 106:*5*
118:*4* 123:*12, 14*
143:*24*
**finished** 8:*7* 142:*5*
**finishes** 29:*10*
**FIRM** 2:*4* 99:*19*
**first** 6:*21* 7:*23*
12:*23* 22:*13* 26:*24*
29:*14* 31:*8* 38:*7, 8*
57:*12* 58:*6, 16* 67:*6,*
*7* 83:*21* 87:*13* 99:*11,*
*12* 100:*16* 102:*6*
104:*10, 14* 109:*13, 25*
115:*24* 122:*10, 11*
145:*14, 16, 17* 150:*5*
**five** 16:*13, 15* 20:*18*
34:*22* 58:*5* 61:*16*
133:*10*
**five-minute** 102:*15*
144:*13*
**flat** 111:*25*
**FLORIDA** 1:*2, 9*
2:*6, 11, 18* 5:*4, 12, 21*
15:*22* 20:*8* 151:*4, 18*
152:*1, 6* 153:*4, 21, 22*
**focus** 75:*16*
**follow** 93:*15* 119:*18*
**followed** 93:*11*
**following** 5:*2*
**follows** 6:*22*
**Ford** 2:*16* 6:*10*
31:*16* 35:*14* 36:*12*
37:*6, 13* 38:*9* 84:*7*
88:*23* 119:*11* 120:*12,*
*16* 123:*1* 136:*24*
137:*2*
**foregoing** 154:*22*
**Foreign** 1:*10*
**forever** 120:*22*
**FORM** 3:*14* 49:*24*
54:*12, 17, 20* 59:*2, 6*
63:*5, 7, 12* 66:*7, 20*
67:*10* 69:*1, 4, 10, 15,*
*18* 70:*7, 17* 71:*15*
74:*10* 131:*1, 8, 14*
137:*3, 21* 140:*23*
**formal** 60:*4, 18*

108:*18* 116:*5*
**format** 43:*14* 50:*16*
**formula** 60:*3*
**forwarded** 153:*14*
**found** 47:*22* 89:*4*
**foundation** 42:*20*
**four** 15:*25* 16:*1, 12*
17:*4* 33:*23*
**fourteen** 16:*10, 12*
**fourteenth** 94:*15, 21*
**fourth** 90:*15*
**franchise** 37:*11, 13*
**Frank** 5:*8* 7:*6*
11:*13* 14:*17* 26:*9, 17*
32:*21* 82:*9* 117:*5*
123:*13* 124:*6* 126:*11*
128:*20* 132:*3* 149:*4*
**FRANKLYN** 1:*5*
3:*5* 6:*20* 9:*7* 15:*7*
79:*20* 105:*12* 151:*9*
152:*7* 153:*2, 25*
154:*6, 23*
**fraud** 93:*7*
**Friday** 153:*11*
**friend** 31:*7* 108:*6,*
*13, 24* 109:*2, 6* 125:*6*
148:*13* 149:*24*
**friends** 104:*12*
**front** 15:*12* 74:*25*
79:*23*
**FS** 1:*4, 16* 2:*7* 4:*6*
5:*9* 7:*5, 20* 9:*3* 16:*7,*
*8, 9* 105:*6, 9* 153:*4*
154:*3*
**FSA** 136:*6*
**FSIA** 3:*14* 4:*17*
32:*2* 42:*6* 51:*21, 22*
56:*20* 61:*21* 64:*22*
128:*21* 134:*14* 136:*6*
**full** 28:*2, 7* 32:*14*
**fully** 87:*20*
**funds** 41:*10*
**funny** 24:*11*
**further** 5:*18* 112:*2*
115:*13* 148:*8* 152:*11*

**< G >**
**Gables** 2:*11, 18*
153:*4*

**GABRIEL** 1:*4* 5:*9*
6:*5* 78:*17* 129:*12*
142:*21* 153:*4* 154:*3*
**gallery** 32:*23*
**gas** 40:*19*
**gate** 107:*6, 8*
**gathered** 133:*21*
**general** 35:*19*
**general's** 86:*19*
**generate** 107:*5*
**gentlemen** 29:*23*
144:*10*
**getting** 32:*18* 38:*12*
67:*10* 113:*11* 119:*3*
121:*22*
**give** 6:*15* 21:*19, 20*
28:*6* 35:*22* 38:*5*
49:*9, 11* 60:*6, 25*
66:*14* 91:*18* 97:*15*
116:*9, 15* 121:*5*
128:*13* 136:*1*
**given** 109:*6*
**gives** 17:*25* 18:*10*
69:*2* 115:*14* 117:*18*
**giving** 41:*16*
**Go** 7:*13* 11:*11*
17:*24* 26:*9, 17* 29:*5*
30:*15* 33:*7* 43:*9*
48:*20* 58:*18* 82:*9*
92:*17, 21, 24, 25*
93:*16* 102:*5, 9, 12*
104:*2* 116:*2, 23*
117:*11, 14* 122:*11, 12,*
*13* 124:*6, 23* 129:*11*
132:*9, 23* 150:*4*
**goes** 12:*7* 23:*23*
25:*22* 49:*7* 51:*21*
56:*20* 113:*20*
**going** 7:*21* 8:*2, 12,*
*20* 13:*12, 13* 31:*24,*
*25* 37:*10, 11* 41:*20,*
*21* 45:*5* 51:*18, 19*
55:*9* 56:*17, 18* 57:*5*
59:*9* 60:*20, 23* 61:*17,*
*18* 64:*16* 67:*20*
72:*24* 74:*3* 75:*14, 16*
77:*15* 78:*16, 18* 87:*1,*
*2, 11* 91:*24* 92:*6*
96:*10, 21* 98:*24, 25*
101:*15* 104:*19* 118:*3,*

*4* 119:*2*, *11* 124:*4*
127:*8* 128:*14* 140:*21*
144:*6* 145:*13* 150:*3*
**GOOD** 1:*24* 5:*3, 4*
6:*25* 7:*17, 18* 22:*18*
24:*22* 26:*5* 30:*21*
34:*16* 35:*3, 4, 8, 20*
39:*14* 93:*11, 13*
95:*12* 103:*12* 117:*3,*
*9* 151:*18* 152:*6, 20*
153:*18*
**govern** 17:*6*
**grade** 35:*9*
**grading** 34:*20*
**great** 51:*16*
**greets** 26:*24* 27:*1*
**ground** 7:*21*
**guide** 134:*7*
**guided** 97:*4*
**guy** 63:*22* 114:*13, 14,*
*21*
**guys** 12:*25* 13:*11*
34:*2* 38:*7*
**Guzman** 29:*22* 30:*3*

**< H >**
**HADDON** 1:*4* 5:*9*
6:*5* 66:*7* 70:*7* 78:*18*
82:*2* 129:*12* 130:*7*
133:*12* 153:*4* 154:*3*
**Hall** 71:*5, 6, 8, 25*
**hand** 6:*13*
**handbook** 114:*1*
**handled** 121:*2*
**hands** 43:*6* 94:*18, 22,*
*24*
**handwritten** 28:*14*
49:*7*
**hang** 53:*13*
**happen** 27:*20* 44:*15*
128:*6* 129:*25*
**happened** 13:*11*
14:*3, 15* 48:*6* 104:*18*
122:*11*
**happens** 22:*12, 14*
26:*15* 27:*9, 11, 17, 24*
30:*14*
**hard** 120:*21*
**Harrison** 2:*5*

**head** 8:*10* 122:*12*
**headlights** 40:*12*
**hear** 7:*18*
**held** 82:*17*
**help** 12:*13, 15* 86:*9*
95:*8*
**helped** 104:*13*
**helping** 35:*25* 148:*14*
**here/pay** 20:*5, 6*
59:*18*
**Heron** 29:*22*
**HH** 151:*19*
**high** 19:*8* 26:*3*
**higher** 19:*4* 36:*2, 5*
123:*3* 124:*2*
**highest** 9:*20*
**highlight** 75:*16* 78:*19*
**highlighted** 96:*22*
**highlighting** 76:*4*
77:*16* 131:*5* 143:*2*
**history** 18:*14* 25:*3*
38:*22* 57:*8* 103:*16*
147:*6*
**hit** 69:*6*
**Hold** 43:*11* 114:*2*
120:*22* 129:*10*
131:*20, 23* 141:*18*
143:*24* 149:*22*
**holds** 111:*19*
**Hollywood** 2:*6*
**home** 36:*1*
**honest** 19:*11*
**honestly** 90:*18*
**honor** 106:*8*
**hope** 8:*20*
**hopefully** 7:*22*
**hours** 153:*10*
**Houston** 117:*16*
**HSMV** 69:*10*
**Hudson** 100:*15*
**huh** 99:*12* 149:*16*
**human** 90:*5*
**hundred** 12:*22* 91:*11*

**< I >**
**idea** 59:*11*
**identification** 13:*16*
41:*23* 51:*24* 64:*19*
67:*23* 73:*4* 87:*5*

96:*14* 99:*2* 101:*18*
136:*9*
**identify** 42:*9* 105:*21*
125:*20* 126:*8*
**ignorance** 33:*1*
**II** 90:*21*
**III** 90:*22*
**immaculate** 19:*9*
**immediately** 111:*14*
116:*1*
**impact** 18:*17*
**impacts** 18:*7*
**important** 17:*14, 15,*
*17, 19, 21, 23* 18:*3, 12*
19:*10, 14, 19*
**impression** 88:*19*
**inaccurate** 18:*16, 22*
54:*18* 59:*3* 83:*22, 25*
84:*9* 89:*6, 9* 91:*1*
**inappropriate** 120:*7*
**incidental** 53:*5*
**include** 138:*4*
**included** 133:*11*
**including** 138:*9*
**income** 10:*15* 28:*2*
61:*2*
**Independent** 90:*22*
**INDEX** 3:*1*
**indicate** 5:*25* 54:*17*
**indicates** 34:*24*
**indicating** 34:*12*
42:*12* 44:*25* 55:*11,*
*23* 68:*5* 71:*4* 73:*19*
76:*7, 12* 80:*7, 10*
126:*23* 131:*3* 132:*8,*
*16, 24* 135:*2*
**indication** 113:*6*
129:*21*
**industry** 17:*14*
**inform** 83:*15*
**INFORMATION**
3:*14* 4:*10* 28:*8* 32:*1*
36:*16* 44:*5* 50:*2*
61:*1* 66:*24* 67:*1*
72:*11* 79:*10* 96:*25*
97:*5* 98:*18, 19, 21*
105:*23* 133:*20* 134:*7*
135:*1, 7, 8* 137:*1, 16*
138:*2, 4, 16, 19*

**in-house** 20:*2*
**initial** 119:*23*
**ink** 48:*14, 15*
**inspect** 22:*7* 23:*13*
24:*7* 37:*20* 39:*4, 9,*
*11, 12* 116:*16* 139:*12,*
*13* 147:*16*
**inspecting** 23:*12*
124:*13*
**inspection** 22:*11*
23:*17, 21, 22* 39:*15*
92:*10* 124:*10* 138:*25*
139:*16* 140:*4, 7, 13*
146:*17* 147:*17*
**inspects** 22:*10* 23:*15*
**INSTALLMENT**
3:*14* 56:*19, 25* 63:*14*
66:*10* 70:*14* 135:*3*
**instructed** 8:*15*
**insurance** 20:*10*
28:*3, 7*
**intend** 9:*2*
**intends** 96:*7*
**intention** 140:*16*
**interest** 35:*23* 57:*6*
**interested** 92:*1*
152:*13*
**Interesting** 131:*23*
**Internet** 49:*4*
**inventory** 21:*16*
**investigate** 147:*12*
**investigation** 124:*1*
147:*6*
**Investment** 105:*9*
**INVESTMENTS** 1:*4,*
*16* 2:*7* 4:*6* 5:*10* 7:*6,*
*20* 9:*3* 16:*7, 9* 105:*7*
153:*4* 154:*3*
**investor** 111:*18*
**invoice** 40:*25*
**involved** 11:*5* 45:*7,*
*15* 46:*2* 75:*19*
**involving** 135:*9*
**iPad** 28:*16*
**irrelevant** 25:*24, 25*
**is-as** 103:*5*
**issue** 86:*13* 115:*25*
116:*23* 117:*13* 119:*4,*
*8* 130:*15*
**issued** 103:*3*

**issues** 84:17 86:5, 8 109:14 118:6
**itemization** 53:14
**ITS** 4:8 17:3, 6 23:22 82:2 117:12 133:11 135:8 138:24 140:22 146:17

**< J >**
**jacket** 46:3, 4, 6, 8 74:14, 17
**January** 151:19
**Jesus** 33:19
**Jiffy** 23:3, 8
**job** 114:22
**join** 7:12
**JOSE** 2:12 6:7 15:5 102:4 131:1 150:1 153:2
**Josh** 103:14 124:22

**Josh@JFeyginEsq.com** 2:7
**JOSHUA** 2:4, 7 6:4 7:2, 13 15:4 32:12 95:21 132:1
**jperalta@atllp.com** 2:13 153:3
**judge** 118:3
**Juliana** 78:11 106:12, 17 108:8 148:18
**July** 58:6

**< K >**
**keep** 19:16, 17 45:24 46:1 91:19
**KEITH** 2:13 7:11
**keith@silversteinpa.com** 2:14
**kept** 129:2, 4
**Kind** 36:7
**knew** 88:24 89:5, 9
**know** 14:1, 3, 15 16:20 17:6 18:1, 9 19:16, 17 24:22 25:14 29:17, 18 32:18 34:17 37:16 38:7 39:14, 22 40:4, 22 44:15 45:16, 21

48:5, 7, 8, 11, 13, 22 50:9, 10, 11, 15, 17, 18 55:14, 24 56:1, 2 58:4, 16 61:12 62:22 63:16, 17 64:11, 13 66:9, 12, 13 68:6, 8 69:22 70:23 71:7 72:1, 2, 10, 18 73:20 76:1, 8, 9, 18 77:19 78:3, 5, 6, 11 79:8 83:8, 9 84:25 85:1, 17, 25 86:1, 17, 20, 21, 22, 23, 24 89:11 93:8 94:2, 5, 14 95:4 96:5 98:10, 11 99:6 100:7, 25 103:20, 22 105:8 107:1 108:9, 11, 15 110:11 111:21 112:23 113:22 119:4 120:4 121:6 123:17 128:5 130:18 131:1, 4, 21 133:7 137:4 139:17 140:8 143:16, 20 145:4, 10 146:12 150:8
**knowing** 58:20
**knowledge** 55:6 57:23 58:12 63:4 96:24 136:25
**knows** 58:21

**< L >**
**label** 130:22
**labelled** 61:21
**laches** 89:15, 25 94:18, 24
**lady** 30:15 72:3 81:21 98:3 113:13, 16 120:4, 5
**Lakes** 153:21
**Laramie** 25:12
**LAW** 2:4 15:22 20:8 99:19
**laws** 17:6, 10
**lawsuit** 11:5, 17, 19, 22, 24 12:3 90:2, 12 95:14 143:14 144:7
**lawsuits** 11:17
**lead** 124:15

**leading** 14:2, 12, 20 18:19 43:22 46:22 98:2 124:5
**leaking** 24:12
**learn** 83:21
**learned** 92:5
**LEAVE** 4:6 28:4, 8 30:7, 9 49:12 96:11, 12 114:24 120:22 142:11 149:24
**leaves** 30:21 115:2 143:6
**left** 33:24 43:5 59:13 114:5
**left-hand** 33:16 34:10 55:11 76:7
**legal** 18:8 89:16 116:19 122:1
**legally** 23:16 121:3
**legible** 140:10, 11
**lender** 59:19, 21 82:17, 23
**lenders** 19:25 20:1
**lender's** 27:25
**Leon** 2:17
**lesson** 92:5
**LETTER** 4:12 99:15, 20, 23 100:1, 6 153:16
**letters** 99:18 101:22
**level** 9:20
**liability** 94:4
**license** 16:2 17:24 21:2 27:13, 16 31:10 20:8
**licensed** 15:22 16:14 20:8
**lienholder** 66:6
**lieu** 5:19
**life** 9:11, 14 76:1
**lift** 25:18 39:7
**lifted** 25:13 31:23
**light** 53:22
**limited** 121:16
**Line** 154:7
**List** 47:8, 10
**listed** 77:20 123:4 153:17
**listen** 27:3 149:18
**little** 43:9 70:9 74:6

80:4 89:19 144:13
**living** 10:3, 6
**LLC** 1:10 2:16
**LLP** 2:10 153:3
**located** 46:12, 15 61:12
**location** 16:18 54:9 117:15 148:17
**locations** 16:17
**log** 51:11 63:24
**long** 8:21 10:3, 23 39:23 61:14 119:23 120:18 134:2
**longer** 29:25 30:3 45:12 81:20
**look** 12:25 21:18 23:9 32:6 33:12 38:21 42:4 51:13 52:5 55:9 60:1 61:25 64:1 65:1 68:2 73:8 77:13 78:1 80:4 81:23 85:2 87:11 100:21 103:22 115:21 125:3, 24 126:2 134:6 139:13
**looking** 34:9 35:11 42:14 44:3, 24 47:23, 24 53:14 55:19 75:4, 17 78:20 79:9, 24 82:22 126:1 130:25 131:7, 9 133:13, 21 134:20 135:18, 21, 23
**lost** 83:2
**lot** 21:11, 13 22:14, 18, 23 35:24 99:10 140:22
**low** 19:6 26:1
**lower** 34:23
**lower-mileage** 19:5
**Lube** 23:3, 8
**LUC** 1:4 5:9 6:5 78:17 153:4 154:3

**< M >**
**Madam** 122:14
**maintain** 43:16 56:8, 10 86:3
**maintenance** 19:4

making 12:25
104:21 107:18
man 122:9, 11, 12
management 30:22
manager 27:18
28:20, 22 29:19
52:22 69:21 115:2
managers 29:21
Manheim 4:17
12:20, 21 15:16 21:7,
12 25:4 31:20 33:15
36:15, 20 37:1, 6, 8,
15, 24 41:9 44:6
54:14 59:7 84:6
88:10, 13, 22 90:8
91:18, 19, 22 92:22,
23 93:17 100:13
104:20, 25 105:2, 4
106:17, 22 107:12, 21
109:3, 6 110:4
111:22 115:21 116:1,
5, 12, 24 117:12, 16,
21 118:11, 18, 24, 25
119:2, 4, 7, 11, 24
120:11, 15, 25 121:16,
23, 25 123:1, 10, 23
135:23 136:4, 14, 15
137:1, 7, 11, 18 138:1,
2, 15, 18, 24 139:7, 11
141:2 146:16 147:4,
15, 18
manner 5:24
March 103:4
marked 13:15 41:22
51:23 64:18 67:22
73:3 87:4 96:13
99:1 101:17 136:8
market 35:18
Marketplace 47:7, 10
Martine 108:6
master 60:9
math 60:3
matter 5:9 6:15
matters 13:25
maximize 33:6
McCombs 2:16 6:10
31:16 35:14 36:12
38:9 75:15 97:5, 6
98:18, 19, 22 99:5, 6,
8 102:8, 9, 10 104:9

113:3 121:14 123:24
127:13 136:24 137:2
McCumbs 99:6
mean 12:17 37:3
92:3 95:11 105:10
127:5 128:7, 9, 11
139:1 140:11 141:25
149:10, 13
meaning 35:13
137:15
means 58:8 149:14
mechanic 25:16
mechanical 86:8
116:19 139:16
mechanically 121:4
memorializes 118:25
memory 110:11
mentioned 16:4
104:11 114:5 124:9
138:23, 24 147:15
message 118:23
messages 107:23, 25
messaging 107:20
MIDDLE 1:2 5:12
36:21 137:11, 14
mileage 17:13, 22
18:3, 5, 14 19:4, 6, 8
25:21, 24 26:1, 3, 6
37:1, 14, 19 45:3, 4
54:11, 13, 18 62:6, 12
66:20 67:8, 11, 13, 16,
18, 19 72:21 78:24
81:22 83:24 84:4, 8
88:12, 17 89:6, 9
90:24 92:7, 9, 12, 15
97:1 111:1 119:8, 22
123:3 124:1, 2, 16
133:11, 12 135:22
136:20 137:1 138:11
146:2, 9, 12, 13 147:6,
12
miles 37:22, 23
88:20 96:25 111:7
115:25 119:4 136:3
mind 95:20 103:24
mine 105:6
minutes 120:20
144:11
mirror 32:13

mirroring 32:13
mis 14:20, 21 97:12
mischaracterizes
14:21 35:1 82:7
92:18 97:13 121:9
mistake 12:21 13:1,
4, 7 36:25 37:7, 14,
25 38:10 84:7 88:23
90:5, 7 92:4 119:13,
22 120:13, 16 123:1,
24
mistaken 117:17
mitigate 95:7
Mm-hmm 120:6
mobile 72:8
moment 70:12, 15, 18,
21 76:23, 24 78:19
97:16
Monday 153:11
money 31:9 38:5
41:7, 8 52:20 57:5
90:9 144:8
month 16:23 30:8
58:6
months 35:24 57:7
81:17 90:2, 12
109:22
morning 5:3 6:25
7:16
MOTION 4:6 96:12
MOTOR 4:10
mouse 28:18 48:20
move 45:5 64:15
67:20 72:24 87:1
96:10 98:24 101:15
102:22 143:4
moved 54:9
Moving 76:3
multiple 131:18
Multiply 17:4
mute 117:5

< N >
name 5:3 6:1 9:5, 6
10:8 21:2 30:17
45:20 46:4 65:7
71:25 72:9, 19 76:11,
14 79:16, 18, 19 80:3
104:8, 23 105:1, 10

106:12 120:3, 4
129:13 141:2 153:16
named 104:22
names 29:20 71:22
narration 128:9
narrative 11:10, 14
26:16, 19
nationwide 23:19
nature 108:22
necessary 92:15
need 8:19, 21 13:3
14:7, 14 15:13 19:4
58:16 61:11 66:16,
18 74:24 91:18 92:3
100:1 102:5 112:16
needs 24:18, 21
37:15 59:19 62:16
66:15 107:2
negatively 18:17
negligent 94:8, 9, 12,
13
neither 150:9
Never 9:11, 14, 17
23:11 36:14, 19
37:20 55:5 73:10
75:25 84:18 86:10
103:8 121:13 147:20
148:19
new 23:6 30:16
36:10 81:20 95:15
114:15
nice 103:20 131:5
NICKLAUS 2:17
NICOLAS 2:19 6:9
104:8
nicolast@nicklauslaw.
com 2:19
nine 47:25 53:6
nineteenth 95:16
ninety-eight 53:6
ninety-nine 54:7
ninth 93:9
nod 8:10
normal 36:3, 6
113:10
normally 88:16
117:14
Notary 151:18
Note 4:17

**Noted** 15:*5*
**notes** 152:*9*
**NOTICE** 3:*14* 13:*14*
50:*15, 20* 51:*1, 5*
109:*13, 25* 110:*1*
115:*25* 153:*6*
**noticed** 147:*8*
**notification** 106:*22*
**notified** 106:*18*
107:*11*
**nuh-uh** 8:*11*
**NUMBER** 4:*5* 5:*13,
22* 55:*15, 18, 19, 25*
59:*10* 64:*6* 68:*4*
72:*12* 73:*18, 23, 25*
74:*1, 4* 95:*25* 117:*19,
20* 118:*9*
**numbered** 152:*7*
**numbers** 42:*8, 11*
125:*16*

**< O >**
**oath** 5:*19, 20* 151:*1*
**objected** 11:*13*
**objecting** 12:*6*
**objection** 8:*15* 11:*9*
14:*2, 12, 19, 20* 18:*19*
19:*1* 23:*25* 24:*2, 9*
26:*8, 16, 18* 35:*1*
38:*25* 42:*20* 43:*19,
21* 46:*22* 49:*20* 64:*3*
82:*7, 14* 83:*18* 84:*14,
19* 89:*16* 92:*18*
97:*12* 98:*2* 110:*20*
113:*14* 114:*11* 121:*9*
122:*4, 7, 21* 123:*5*
124:*4* 128:*8* 137:*3,
21* 139:*3* 140:*23*
**objections** 5:*24*
**obtain** 134:*19* 135:*4,
19, 22*
**obtained** 73:*1*
**obviously** 7:*18* 57:*20*
**Occasionally** 8:*14*
**occur** 38:*6* 54:*8*
**occurred** 46:*21* 47:*3*
78:*14* 79:*12* 98:*7, 15*
129:*21* 147:*20*
**occurs** 27:*23*

**ODOMETER** 3:*22*
18:*6, 17, 22, 24* 44:*25*
49:*6* 59:*3, 5* 61:*19*
62:*1, 3, 11* 72:*22*
77:*13* 83:*16, 22*
84:*17* 88:*3, 9, 25*
92:*22* 93:*3, 4* 109:*15*
124:*16* 133:*13*
134:*18, 19* 135:*1, 3, 5,
19* 138:*12* 146:*21*
149:*7*
**offer** 103:*4, 8* 115:*13*
**offered** 91:*16*
**offering** 118:*14*
**OfferUp** 47:*7*
**office** 20:*9* 27:*12*
46:*10* 71:*19, 23*
72:*16* 86:*4, 19*
109:*16* 118:*9* 148:*15*
**off-the-record** 102:*20*
144:*16*
**oh** 55:*14* 56:*16* 72:*6*
77:*21* 81:*14* 103:*23*
126:*4* 131:*20*
**oil** 22:*17* 23:*2, 6, 7*
24:*17*
**Okay** 7:*25* 8:*3, 4, 8,
12, 13, 24, 25* 9:*3, 4,
23* 10:*6, 8, 18* 11:*8,
19, 22* 12:*5* 13:*6, 22,
24* 14:*6, 10* 15:*1, 21*
16:*11, 14* 17:*18*
20:*14* 21:*5* 22:*19*
25:*9* 26:*21* 28:*5*
30:*13, 18* 33:*10, 12,
25* 34:*6* 41:*20* 42:*13,
16, 17* 43:*2* 49:*8*
55:*22* 59:*2* 60:*12*
69:*22* 70:*13, 22*
71:*21, 24* 72:*15, 24*
73:*12, 15, 21* 74:*18,
22* 75:*14* 76:*3, 6, 18*
77:*15, 25* 78:*8, 13, 16*
79:*19* 80:*4, 12, 15, 20*
82:*12, 17* 83:*11* 84:*2*
87:*1, 11* 96:*10, 21*
97:*9* 98:*14* 99:*18, 22*
102:*14* 103:*12* 105:*8,
14, 22* 106:*11* 109:*25*
111:*10, 12, 19, 24*

112:*21* 114:*1* 116:*22*
117:*2, 11, 20* 118:*5, 6*
120:*11* 123:*19*
125:*12* 126:*7, 11*
127:*3, 7, 10, 17, 22*
128:*5, 15, 20* 129:*7,
10, 24* 130:*2, 9, 18, 23*
132:*1, 9, 12, 23*
133:*10, 20* 134:*1, 11,
17, 25* 135:*12, 18, 25*
136:*5, 13, 15, 18, 20,
23, 25* 137:*9, 14, 25*
138:*4, 14, 22* 139:*16*
140:*1, 14* 141:*1, 10,
18* 142:*3, 9* 143:*4, 12,
16, 21* 144:*5, 10, 18*
145:*20, 25* 148:*5, 8*
149:*18, 23* 150:*9*
**once** 27:*1, 4, 7, 16*
30:*13, 18* 107:*12*
112:*2* 113:*9* 153:*11*
**one-phone-call** 118:*15*
**ones** 25:*14* 73:*11*
121:*5*
**ongoing** 20:*12*
**on-line** 49:*15* 50:*3*
115:*7*
**open** 16:*9* 31:*8*
35:*24* 56:*12* 90:*8*
112:*3, 5*
**opened** 17:*3* 91:*19*
145:*17*
**operated** 128:*2*
**operating** 16:*2*
113:*10*
**operation** 16:*12*
104:*16*
**opportunities** 30:*12*
**opportunity** 114:*7*
**option** 92:*2* 117:*21*
147:*16*
**ORDER** 3:*14* 5:*22*
51:*20* 63:*8, 11, 16, 18*
64:*2* 66:*8* 70:*17*
129:*20* 131:*1, 8, 14*
134:*13* 135:*2* 150:*4*
**ordering** 150:*7*
153:*14*
**orders** 129:*10*

135:*16* 150:*5*
**organization** 86:*24*
**original** 37:*18* 153:*14*
**originate** 19:*23*
**outside** 93:*25* 116:*11*
**owner** 11:*1* 19:*8*
26:*2* 31:*7* 76:*15*
104:*11* 127:*8*

**< P >**
**P.A** 2:*17*
**p.m** 1:*20* 102:*21*
144:*17* 150:*11*
153:*11*
**P.O** 2:*5*
**package** 63:*10* 66:*5,
14, 15, 16, 17* 69:*6*
**packaging** 111:*22*
112:*2*
**PAGE** 3:*1, 14* 4:*1,
16* 47:*11, 24* 65:*14,
16, 17* 67:*5, 8* 69:*9*
74:*3* 85:*3, 5* 96:*22*
129:*11* 133:*15, 16, 17,
18, 19, 21* 146:*20*
154:*7*
**Pages** 1:*16* 152:*7*
**paid** 41:*5, 9* 60:*23*
77:*7* 141:*20* 144:*7*
148:*4*
**paint** 24:*18* 40:*15*
**PALM** 151:*5* 152:*1*
153:*21, 22*
**pandemic** 35:*16, 19*
**paper** 48:*16, 23* 49:*1,
4, 6* 50:*3, 16* 64:*5, 8*
93:*20*
**papers** 49:*5* 66:*18*
74:*21*
**paperwork** 17:*25*
18:*2* 20:*21* 28:*14*
29:*16* 58:*18, 19, 20*
69:*3* 75:*25* 98:*11*
106:*15, 19* 107:*2*
121:*3*
**paperworks** 18:*2*
**park** 22:*18*
**part** 26:*6* 48:*11*
63:*10* 66:*5* 71:*18, 19*

94:*17, 23* 115:*18*
**participating** 5:*15*
**particular** 14:*4*
36:*24* 37:*6* 38:*22*
43:*13, 14* 61:*2* 67:*4*
92:*6* 147:*18*
**particularly** 49:*2*
**parties** 5:*23* 12:*7*
87:*21* 152:*11, 12*
153:*12*
**pass** 107:*6, 8*
**passes** 22:*10* 23:*17*
**pause** 103:*21*
**pay** 27:*14* 35:*23*
40:*23* 41:*13* 45:*24*
52:*25* 57:*5* 59:*19*
100:*3* 107:*4, 5* 127:*9*
**paying** 52:*18*
**payment** 28:*6* 41:*11*
53:*7, 10* 57:*7* 58:*5, 6,*
*20* 87:*21* 143:*5*
**payments** 58:*2, 6*
59:*14*
**payout** 60:*5*
**pedal** 40:*17, 19*
**penalties** 154:*22*
**pending** 8:*23*
**people** 22:*3, 23* 48:*4*
58:*16* 71:*11*
**PERALTA** 2:*12* 3:*5*
6:*7* 7:*2, 10* 11:*9, 13*
12:*6* 14:*2, 12, 17, 25*
15:*2* 18:*19* 19:*1*
23:*25* 24:*2, 9* 26:*8,*
*16, 19* 32:*12, 17, 20*
33:*2, 6, 8, 10, 20, 25*
34:*4* 35:*1* 38:*25*
42:*20* 43:*19, 21*
46:*22, 25* 49:*20* 64:*3*
81:*15* 82:*7, 14* 83:*18*
84:*14, 19* 89:*16*
92:*18* 95:*20, 23*
97:*12* 98:*2* 102:*5, 8,*
*12, 16, 18, 24* 103:*14,*
*19, 24* 104:*1, 3*
110:*20* 113:*14*
114:*11* 117:*5* 121:*9*
122:*4, 7, 10, 21* 123:*5,*
*13, 15* 124:*4, 22, 24*
125:*2, 7, 11, 19* 126:*1,*

*4, 7, 10* 128:*11, 19*
131:*3, 9, 12, 16, 20*
132:*1, 2* 134:*11, 13,*
*17, 22, 24* 136:*5, 12*
137:*5, 22* 139:*7, 10,*
*21* 140:*25* 142:*4, 6, 9,*
*15* 143:*4, 8* 144:*10,*
*15, 18* 148:*23* 149:*3,*
*23* 150:*3, 9* 153:*2*
**percent** 19:*21* 41:*16*
57:*5* 58:*7, 8* 91:*11,*
*12*
**perfect** 26:*3*
**perform** 23:*22*
**performed** 53:*24*
147:*18*
**perjury** 154:*22*
**person** 5:*20* 7:*6*
26:*24* 36:*21* 45:*19,*
*20* 46:*5* 108:*8* 110:*2*
114:*15, 24* 115:*1, 19*
119:*3* 137:*11, 14*
**personal** 55:*6* 57:*23*
58:*11* 63:*4*
**personally** 7:*7* 20:*24*
22:*19, 22, 24* 23:*1*
45:*7* 58:*22* 62:*22*
66:*1* 75:*19* 78:*13*
105:*5* 151:*9*
**person's** 30:*17*
114:*22*
**phone** 72:*12* 107:*20,*
*22* 117:*19, 25* 118:*2,*
*8, 10, 16, 17* 119:*14,*
*15, 23* 120:*18*
**physical** 110:*18, 19*
111:*6* 126:*19*
**physically** 5:*16*
**pick** 38:*13* 107:*4, 6*
120:*23*
**picks** 23:*19* 113:*17*
**Pickup** 21:*25*
**picture** 30:*21*
**pictures** 22:*16, 24*
23:*1* 39:*6* 67:*7*
**piece** 121:*1*
**place** 23:*10* 60:*12*
65:*11* 147:*12*
**placed** 135:*15*

**PLAINTIFF** 3:*14*
4:*1* 6:*3, 5* 13:*15*
41:*22* 51:*23* 62:*22*
64:*18* 67:*22* 73:*3*
87:*4* 88:*3, 8* 90:*2, 17*
93:*23* 94:*7* 95:*6*
96:*13, 24* 99:*1*
101:*17* 103:*3* 129:*13,*
*15, 18* 130:*7* 142:*22*
143:*18* 144:*3* 149:*10*
**Plaintiff(s** 1:*4* 2:*1*
**Plaintiffs** 142:*25*
**Plaintiff's** 13:*13*
31:*25* 41:*21* 52:*10*
56:*18, 25* 61:*18*
64:*17* 67:*21* 87:*20*
89:*14* 91:*14* 94:*16,*
*23* 95:*17, 25* 96:*11*
98:*25* 128:*22* 143:*10,*
*14, 22, 25* 144:*5*
149:*6*
**planning** 25:*21*
**platform** 60:*25*
**play** 25:*9* 26:*6*
**Please** 5:*25* 6:*12*
7:*24* 8:*6* 24:*3* 43:*11*
49:*22* 52:*7* 68:*10*
74:*6* 89:*18, 19* 94:*20*
103:*14* 106:*5* 109:*13*
132:*9* 153:*6, 10, 12,*
*16*
**PLLC** 2:*4*
**PLTF'S** 3:*14*
**plus** 41:*15, 16*
**point** 92:*5* 111:*5, 12*
112:*21*
**pointing** 80:*6* 131:*2*
**policies** 147:*11*
**Ponce** 2:*17*
**portal** 116:*24* 117:*13*
**portion** 122:*16*
**position** 10:*25* 13:*8*
65:*13* 69:*14* 70:*22*
76:*20* 79:*10* 80:*1, 12,*
*15* 86:*10* 111:*14*
114:*6* 145:*25* 146:*4,*
*8, 25*
**possession** 43:*5*
48:*24* 56:*5* 82:*3, 12,*
*23* 86:*3* 96:*2* 97:*2,*

*10* 122:*3* 123:*2*
124:*1* 135:*9*
**possibility** 142:*17*
**possible** 98:*5*
**post** 23:*18* 47:*7*
67:*5, 7* 137:*10*
146:*20*
**posted** 67:*5, 6*
**potential** 138:*16*
**POWER** 4:*1* 68:*3,*
*12, 16, 23, 25* 71:*4, 11*
77:*9, 10* 80:*14, 16, 18,*
*21* 81:*1* 83:*5*
**POWERHOUSE** 1:*9*
2:*10* 6:*8* 9:*2* 10:*10,*
*20, 21, 22* 16:*8, 23*
19:*10, 19* 29:*24* 41:*7*
59:*14, 16, 23* 74:*20*
75:*7, 8, 12* 76:*4* 77:*9,*
*18, 23, 25* 78:*17*
81:*23* 125:*13* 126:*16,*
*18, 21, 23* 127:*20, 22*
128:*2* 129:*3, 5* 130:*6,*
*16* 132:*6, 19, 20*
133:*1, 11, 19, 21*
134:*19, 25* 135:*19, 22*
136:*19* 140:*17, 19, 21*
141:*3, 11, 14, 22, 25*
142:*1, 21, 23* 144:*2*
146:*5* 147:*5*
**Powerhouse's** 31:*5*
**practice** 134:*6* 140:*3,*
*7*
**practices** 115:*19*
**predelivery** 53:*15*
**prejudiced** 90:*1, 11*
**premises** 25:*18*
**preparation** 12:*12*
13:*3* 81:*12*
**prepare** 12:*13, 15, 18,*
*19* 13:*9* 46:*17* 78:*9*
**prepared** 13:*25*
14:*11, 13* 52:*21*
69:*18*
**prepares** 113:*17*
**present** 5:*17* 32:*14*
78:*13*
**presented** 28:*9, 16*
**Press** 33:*6*

**pretty** 31:*9, 11* 36:*20* 91:*24* 100:*4* 127:*12* 138:*18*

**previously** 97:*9*

**price** 25:*6, 14, 20* 41:*15* 52:*18* 53:*4*

**prices** 36:*2, 4, 5*

**print** 20:*21* 58:*18, 19, 20* 69:*5, 6*

**printed** 52:*17*

**printer** 20:*9*

**prior** 16:*1* 40:*15* 56:*4, 7, 14* 91:*15* 100:*6*

**problem** 103:*17*

**problems** 116:*19*

**Procedures** 113:*11* 147:*12*

**proceed** 11:*16* 103:*1*

**PROCEEDINGS** 3:*1* 5:*2* 150:*10*

**process** 7:*22* 36:*23* 49:*9* 83:*2* 92:*17, 20* 99:*25* 105:*24* 118:*13, 15* 121:*2*

**processing** 105:*25*

**produced** 42:*10, 11, 24* 43:*2* 61:*20*

**Professional** 152:*6*

**profit** 59:*23*

**profits** 41:*16*

**program** 20:*5*

**pronounce** 99:*7*

**proof** 28:*2*

**provide** 8:*9, 10* 15:*13* 18:*1* 25:*3* 43:*17, 20* 47:*15, 17* 48:*1* 49:*17* 50:*7* 52:*17* 61:*4, 7* 72:*13* 74:*22* 92:*25* 101:*3* 137:*16* 138:*1, 20*

**provided** 4:*17* 48:*22* 50:*11, 15, 20* 51:*1, 5* 63:*19* 90:*25* 97:*5* 98:*18, 19* 101:*7* 130:*14* 132:*6* 135:*7* 136:*15* 137:*2*

**provider** 20:*22* 115:*5, 6, 14*

**provides** 92:*23* 147:*15* 149:*7, 19*

**providing** 49:*2* 101:*25* 141:*22*

**public** 73:*1* 151:*18*

**pull** 13:*12* 31:*24* 41:*20* 51:*18* 56:*17* 61:*17*

**purchase** 22:*5, 8* 27:*8* 31:*16* 35:*14* 36:*17* 38:*12* 53:*12* 60:*13* 89:*1, 7, 10* 90:*13* 106:*16, 19, 20* 107:*14, 17* 121:*7* 141:*1*

**purchased** 31:*19* 36:*11* 42:*19* 55:*19* 90:*3* 97:*6* 107:*2, 4* 140:*14*

**purchases** 107:*17* 127:*23, 25*

**purchasing** 106:*12*

**purple** 126:*3*

**purpose** 34:*14* 65:*5* 68:*21*

**pursuant** 5:*21*

**put** 18:*5* 21:*21, 22* 22:*16* 23:*13* 30:*20* 31:*8* 32:*16* 33:*21* 37:*20* 39:*7* 46:*13* 50:*13* 66:*24* 67:*8* 71:*22, 25* 80:*2* 128:*13* 131:*22* 135:*7*

**< Q >**

**question** 7:*23, 25* 8:*2, 7, 16, 23, 24* 11:*16* 12:*8* 14:*14* 26:*10* 29:*11* 51:*4* 73:*2* 79:*24* 82:*21* 83:*12* 87:*18* 88:*6* 89:*19* 90:*14, 19* 91:*6* 94:*20* 102:*23* 106:*5* 120:*7* 122:*9* 123:*8* 125:*18* 126:*21* 128:*25* 140:*5* 149:*12, 18*

**questions** 12:*20* 14:*5, 11* 102:*10* 104:*7, 15* 118:*4* 124:*19, 25*

**< R >**

**raise** 6:*12* 8:*14*

**reach** 100:*7* 106:*25*

**read** 13:*21* 14:*8, 10, 14* 55:*8* 67:*12, 13* 68:*10* 69:*12* 74:*4* 96:*20* 114:*2* 122:*15, 16* 125:*16* 136:*21* 150:*3* 153:*11, 12* 154:*22*

**reading** 18:*6, 17* 44:*25* 59:*3, 5* 62:*11* 67:*11* 83:*22, 24* 84:*4* 88:*4, 9* 134:*18, 20* 135:*2, 5, 15* 138:*12* 146:*2, 21* 148:*21* 150:*2*

**reads** 58:*14*

**ready** 103:*1*

**really** 19:*8* 107:*18* 131:*16*

**reason** 17:*18* 30:*2, 10* 75:*5, 10* 129:*25* 154:*7*

**reasonable** 93:*11, 14* 153:*14*

**reasons** 86:*6*

**reassignment** 78:*18*

**recall** 20:*19* 74:*10* 99:*14, 18* 100:*23* 101:*23, 25* 110:*9* 118:*11, 13* 120:*11, 15, 18* 128:*22, 25* 147:*17*

**recap** 15:*7* 61:*4, 7*

**receipt** 28:*7* 121:*6*

**receive** 41:*17* 53:*9* 86:*14* 90:*8* 111:*8* 113:*9* 121:*19* 126:*21, 23* 127:*4* 142:*23* 143:*21, 25* 145:*21*

**received** 32:*1* 42:*18* 44:*16, 20* 88:*11* 98:*21* 109:*14* 110:*1* 115:*24* 125:*13* 126:*18* 132:*20* 133:*1* 147:*1*

**receives** 115:*20* 121:*21*

**receiving** 99:*14, 18* 100:*6* 101:*23*

**recess** 102:*20* 144:*16*

**recondition** 24:*16*

**record** 6:*2* 7:*11* 8:*5, 12* 9:*6* 68:*10* 122:*16* 152:*8*

**recorded** 109:*9*

**records** 43:*17* 73:*1* 86:*2, 4* 112:*12, 13* 129:*3, 5*

**recross** 148:*24*

**RECROSS-EXAMINATION** 3:*5* 148:*11* 149:*2*

**REDIRECT** 3:*5* 144:*20, 21*

**refer** 9:*1, 2*

**referring** 9:*1* 94:*1* 136:*18*

**reflect** 18:*13* 98:*6* 111:*1* 113:*3*

**reflected** 40:*25* 111:*2* 124:*2*

**reflecting** 111:*6*

**reflects** 123:*3*

**refund** 90:*9*

**Regarding** 15:*21* 45:*3* 93:*3, 7* 107:*17* 130:*15* 132:*18*

**register** 97:*15*

**registered** 109:*3*

**REGISTRATION** 3:*23* 65:*3*

**Regular** 107:*25* 111:*24*

**related** 116:*6*

**relates** 53:*25* 146:*1*

**relation** 31:*5*

**relationship** 104:*10, 12*

**relative** 19:*6* 34:*19* 152:*11, 12*

**release** 30:*16* 91:*15* 93:*3, 7* 127:*9*

**relevance** 11:*9, 14*

**relied** 92:*16* 98:*17*

**relief** 94:*19* 95:*1*

**rely** 22:*4* 87:*14, 19* 88:*2, 7* 89:*13* 90:*16, 21* 91:*4, 14* 93:*10, 22* 94:*7, 16* 95:*2, 6, 17* 96:*8*
**relying** 147:*13*
**remember** 10:*24* 11:*25* 12:*4* 35:*17* 39:*19, 21, 25* 40:*2, 6, 8, 11, 14, 18, 20* 74:*9* 77:*12* 93:*5* 95:*13* 96:*9* 98:*1, 10* 99:*16, 17* 101:*9* 102:*2* 103:*7, 11* 109:*20, 24* 119:*9* 120:*3* 145:*18* 146:*7*
**remind** 35:*16*
**remotely** 5:*18, 20*
**Rent** 53:*22*
**rental** 26:*1*
**rentals** 19:*7*
**rented** 19:*7*
**REP** 3:*14* 105:*9*
**repeat** 49:*22* 94:*20*
**rephrase** 7:*24*
**replaced** 83:*3*
**replacement** 114:*8, 10*
**Report** 21:*20* 25:*4* 34:*13, 15* 35:*9* 38:*22, 23, 24* 97:*3* 152:*7*
**Reported** 1:*20*
**REPORTER** 1:*24* 5:*3, 5* 6:*12, 18* 8:*5* 29:*9* 32:*23* 106:*2, 4, 9* 122:*14, 17* 142:*4, 7* 151:*18* 152:*6, 20* 153:*18*
**Reporter's** 4:*17*
**reporting** 5:*18, 25* 153:*21*
**reports** 22:*5* 25:*3*
**represent** 6:*1* 104:*9* 121:*5*
**representation** 41:*3* 73:*16*
**representations** 36:*12*
**representative** 1:*16* 7:*5, 9, 19* 17:*9* 108:*20* 141:*14*

**represented** 116:*17*
**reputation** 19:*15*
**request** 33:*18* 74:*7* 95:*22* 139:*6, 19, 24, 25* 140:*4, 7, 13*
**requested** 99:*24* 122:*16* 152:*8*
**requesting** 147:*17*
**require** 20:*11*
**required** 50:*12*
**requirement** 115:*18*
**requires** 62:*18, 20*
**residence** 28:*2*
**resolved** 87:*20*
**resolving** 143:*13*
**respect** 12:*12* 147:*22*
**response** 8:*9, 10* 61:*1*
**responsibility** 17:*6*
**responsible** 37:*2* 114:*3* 123:*25*
**restroom** 102:*6, 13*
**RETAIL** 3:*14* 36:*5* 56:*19, 24* 63:*14* 66:*10* 70:*14* 135:*3*
**retains** 128:*2*
**return** 24:*13* 38:*4* 103:*5* 153:*12, 17*
**revealed** 18:*10* 21:*21, 22* 37:*4*
**review** 15:*7, 8* 30:*21* 122:*2* 152:*7* 153:*9*
**reviewed** 70:*20*
**Reyes** 29:*25* 30:*5* 45:*11* 46:*17* 50:*19* 52:*24* 54:*23, 24* 57:*20, 24* 65:*23*
**RFP** 67:*21*
**right** 6:*12* 26:*13* 33:*21* 44:*1* 47:*20* 55:*5, 20* 57:*18* 59:*22, 25* 65:*20* 67:*3* 76:*11* 79:*9, 19* 80:*9* 82:*23* 91:*8, 11, 12* 92:*7, 9* 102:*7, 19* 103:*12, 23* 105:*10* 107:*9* 109:*7* 110:*2* 112:*19* 115:*24* 116:*3, 11* 117:*22, 25* 118:*8* 119:*5, 14* 120:*24* 123:*21* 124:*18* 126:*14, 22*

132:*16* 143:*16* 144:*20* 148:*21*
**right-hand** 53:*15*
**rights** 91:*5, 7*
**righty** 6:*25* 7:*15* 9:*5*
**RISC** 70:*11*
**road** 95:*14*
**role** 115:*3*
**rollback** 88:*15*
**rolled** 88:*25*
**room** 5:*17* 117:*4* 144:*14*
**routinely** 146:*22*
**rude** 147:*9*
**rules** 7:*21*
**run** 50:*2, 24*
**rust** 40:*5*

**< S >**
**salaried** 77:*5*
**salary** 31:*12*
**Sale** 4:*17* 22:*18* 23:*10, 14, 23* 33:*15* 36:*17* 45:*7* 46:*2* 47:*11* 52:*8, 10, 15* 53:*14* 54:*13* 57:*14, 15* 70:*12, 15, 18, 21* 72:*23* 82:*1* 92:*22* 93:*20* 98:*20* 109:*23* 126:*16* 128:*6* 129:*8, 21, 25* 136:*14, 21* 146:*15*
**sales** 28:*20* 45:*22* 53:*4* 56:*19, 25* 63:*15* 66:*11* 70:*14* 133:*11* 134:*8*
**salesman** 27:*13* 45:*16, 17*
**salesperson** 26:*25* 27:*1*
**San** 117:*17, 18, 21*
**satisfaction** 87:*15*
**saved** 51:*14* 100:*20*
**SAVINGS** 4:*10*
**saw** 13:*22* 36:*16* 37:*22* 55:*5* 57:*13* 66:*13* 96:*19*
**saying** 92:*14* 100:*1* 103:*19* 120:*15*

**says** 18:*4* 33:*21* 35:*12, 15* 44:*11* 50:*2* 53:*13* 62:*10* 67:*10* 71:*2* 77:*21* 79:*4* 81:*1* 84:*3* 94:*12* 123:*1* 126:*13, 14, 15, 20* 134:*18* 142:*20*
**scale** 34:*20*
**SCAN** 4:*5* 68:*4* 73:*18* 74:*1, 4*
**scares** 33:*23*
**scope** 12:*8*
**score** 34:*15, 24*
**scratch** 121:*20*
**scratched** 40:*1*
**scratches** 34:*18*
**screen** 13:*18* 28:*17, 23* 32:*4, 10, 14* 33:*3* 41:*25* 52:*1* 61:*23* 64:*21* 67:*25* 73:*6* 87:*7* 96:*16* 99:*4* 101:*20* 125:*7, 9, 24* 126:*3* 128:*18* 131:*14, 22, 25* 132:*15* 134:*12, 16* 136:*2, 11* 142:*8, 14*
**screens** 131:*18*
**scroll** 54:*21* 59:*9* 64:*6, 7* 78:*16* 96:*21*
**search** 101:*1*
**searching** 31:*21* 104:*20*
**seats** 39:*18, 20*
**second** 14:*18* 27:*22, 23* 43:*11, 25* 44:*1* 51:*14* 52:*7* 53:*2* 65:*16, 17* 74:*3* 88:*1, 11* 128:*14* 132:*9* 134:*11* 136:*1, 5*
**seconds** 123:*16*
**secretary** 53:*23* 78:*12*
**section** 96:*23* 142:*20* 143:*2*
**SECURITY** 3:*21*
**see** 15:*17* 28:*23, 25* 32:*10, 22* 33:*4, 5, 8, 23* 34:*4, 5, 6, 7* 42:*2, 3* 46:*3* 47:*20* 52:*2* 53:*15* 54:*21, 24* 55:*4,*

*5* 56:*21* 57:*18* 59:*10*
62:*8, 24, 25* 63:*7*
64:*5, 9, 23* 65:*24*
66:*7* 67:*5* 68:*7, 8*
69:*24, 25* 70:*7* 73:*21*
75:*17, 24* 76:*4* 78:*19,*
*21* 80:*6* 85:*3* 96:*19*
99:*16* 104:*2* 131:*13,*
*19* 132:*10, 11, 12*
144:*11*
**seen** 13:*20* 73:*10, 11*
87:*9* 96:*18* 110:*25*
**sees** 29:*15*
**select** 21:*15* 67:*15*
**selected** 62:*10* 107:*13*
**sell** 10:*7, 9* 16:*23*
19:*25* 21:*3* 24:*22*
37:*16, 17, 18* 88:*18*
97:*14* 100:*5* 110:*19*
111:*9* 112:*22* 127:*1,*
*6, 14, 16* 128:*1, 3, 4*
134:*9* 137:*25* 140:*16,*
*22* 149:*11*
**seller** 21:*21* 36:*14,*
*18, 20, 22* 37:*7* 84:*7*
88:*23* 117:*15* 121:*8*
136:*23* 137:*12, 16, 18*
**sellers** 138:*16, 19*
**seller's** 147:*13*
**selling** 19:*16, 22*
25:*21* 36:*10* 96:*23*
121:*17* 124:*13* 134:*2,*
*3* 138:*14* 140:*2, 9*
**sells** 19:*24*
**send** 44:*4* 51:*15*
100:*9* 101:*6* 111:*14,*
*15, 23* 112:*25* 118:*18,*
*22* 122:*18* 143:*9*
**sending** 113:*12*
122:*5* 125:*4*
**sends** 112:*8* 127:*15*
**sense** 7:*7* 35:*21* 36:*8*
**sent** 44:*13* 87:*23*
100:*1, 17, 24* 103:*25*
107:*8* 121:*7* 125:*4*
130:*4, 5* 143:*12*
144:*2*
**separate** 28:*21*
**sequence** 64:*6, 11*

**serve** 108:*19*
**service** 53:*16*
**SERVICES** 1:*10*
53:*24* 85:*19* 141:*22*
**session** 20:*20*
**set** 115:*10*
**settle** 103:*6*
**settlement** 91:*15*
93:*2, 6* 103:*4*
**settling** 143:*13*
**seventh** 91:*3*
**seventy-three** 58:*5*
**Share** 125:*7* 148:*15*
**shared** 13:*17* 32:*3*
41:*24* 51:*25* 61:*22*
64:*20* 67:*24* 73:*5*
87:*6* 96:*15* 99:*3*
101:*19* 125:*8* 128:*17*
131:*24* 134:*15*
136:*10* 142:*13*
**shares** 138:*19*
**sharing** 128:*15*
131:*17, 23* 134:*12*
136:*2* 142:*8*
**SHEET** 3:*14* 32:*1*
61:*5, 10* 154:*1*
**ship** 44:*1* 113:*23*
**shipment** 112:*13, 14*
**shipped** 44:*11, 17*
110:*5*
**shipping** 112:*10*
**shortly** 88:*25* 89:*6, 9*
**show** 27:*6, 7* 34:*3*
64:*10* 107:*3*
**showing** 32:*8* 95:*20*
128:*15, 23* 136:*6*
**shows** 34:*2* 44:*1*
52:*17* 66:*6* 129:*12*
130:*24*
**sic** 94:*25*
**sick** 36:*1*
**side** 53:*15* 76:*7*
**sign** 28:*3* 48:*19*
49:*5, 9, 17* 50:*21*
58:*1, 10* 62:*17* 63:*2*
65:*8, 10, 11, 18, 19*
66:*4, 15, 16, 17* 68:*13*
71:*11* 75:*22* 77:*9*
80:*2, 13, 19, 24* 81:*2*

82:*5* 83:*6, 7* 93:*2, 6*
153:*12, 16*
**signals** 40:*9*
**signature** 29:*3* 54:*22*
57:*19* 65:*21, 22*
66:*19* 69:*19, 24* 76:*6,*
*12, 16, 21* 80:*11*
82:*24* 129:*15, 17*
153:*8, 16, 23*
**signatures** 51:*12*
62:*24* 68:*14* 69:*25*
**signed** 30:*13* 48:*13*
54:*20, 25* 57:*17, 20*
62:*23* 63:*25* 65:*3*
69:*22* 70:*8, 23* 71:*1,*
*24* 74:*16* 76:*18* 78:*4*
79:*14, 22, 23* 80:*16,*
*18, 21* 81:*5, 9* 82:*18*
129:*12, 20* 149:*10*
151:*14*
**significance** 52:*14*
**signing** 28:*10* 29:*15*
49:*16* 63:*9* 70:*13, 16*
78:*2* 106:*13*
**signs** 40:*5* 58:*14*
**SILVERSTEIN** 2:*13*
7:*11* 38:*16* 143:*6*
**simple** 12:*24* 13:*1, 4*
92:*21*
**simply** 100:*1*
**single** 56:*11* 69:*5, 15*
**sir** 101:*5*
**sit** 13:*24* 27:*12*
29:*15* 69:*14* 75:*2*
**site** 15:*16* 117:*21*
**sitting** 28:*20*
**situation** 12:*25* 18:*8*
37:*5* 117:*24*
**six** 35:*23* 44:*7, 9*
47:*19* 54:*16* 59:*7, 8*
67:*11* 77:*14* 136:*4,*
*22*
**sixteenth** 95:*5*
**sixth** 90:*20*
**sludge** 40:*21*
**small** 34:*5*
**software** 30:*22, 25*
31:*3* 115:*5, 6, 14*
**sold** 11:*18* 17:*3*
18:*15* 25:*7* 30:*5*

37:*11, 21* 43:*4* 67:*4*
83:*14* 88:*18* 97:*17*
111:*16* 112:*23*
126:*25* 130:*6* 137:*6*
142:*24* 145:*23* 146:*2,*
*23* 147:*1* 149:*8, 9, 13,*
*15*
**solution** 91:*16*
**solve** 86:*13*
**solved** 86:*5*
**somebody** 11:*3*
20:*25* 32:*15* 37:*3*
81:*7*
**something's** 39:*14*
**soon** 88:*4* 107:*5*
**sorry** 7:*3* 30:*3*
32:*10, 25* 35:*17*
39:*25* 40:*8, 14, 20*
44:*8* 75:*7* 87:*25*
90:*14* 96:*9* 98:*11*
100:*13* 102:*2* 103:*11*
106:*4, 8* 109:*24*
115:*1* 117:*1, 2, 6, 17*
120:*7* 123:*14* 127:*23*
130:*10* 138:*24* 140:*5*
141:*6*
**sort** 8:*11* 38:*21*
121:*1* 147:*5*
**sounds** 72:*19*
**space** 65:*19* 148:*15*
**Spanish** 120:*8*
**speak** 36:*14* 46:*17*
78:*8* 81:*12* 83:*11*
**speaking** 12:*23*
**specific** 26:*20* 70:*10*
104:*17* 107:*17*
**specifically** 53:*24*
107:*19* 120:*15* 127:*5*
**speculation** 122:*7*
**speculative** 19:*1*
42:*21* 46:*23* 122:*21*
123:*5*
**spells** 60:*4*
**spoke** 91:*22* 100:*18*
118:*11* 119:*3, 10*
**spoken** 120:*1*
**spot** 22:*16* 27:*21*
**square** 33:*6*
**St** 2:*5*

staff 25:16
stamp 125:21 134:14
stamped 42:11
 51:21 128:21
stamps 42:9
stand 34:11 55:10
standard 33:22
 48:16 62:17 69:2, 7
 113:10 115:19
standards 93:12, 14
 121:4
start 7:21 11:2, 4
 29:15 75:14
started 104:13
 106:19 145:14, 16
starting 6:2
starts 49:16
state 9:5, 6 12:1, 2
 45:3 151:4, 18 152:1
stated 129:1 142:16
 154:22
STATEMENT 3:22
 61:19
STATES 1:1 5:11
 10:1, 4 21:8 46:4
 94:22 96:23 98:17
 129:7
stating 6:1 46:25
status 122:1
stay 142:11
stays 51:10
Ste 2:5, 11, 17 153:4
steering 39:24
stenographic 5:5
 152:9
Stenographically
 1:20 152:7
step 43:12
Stephanie 100:6, 12,
 15, 24 101:25 110:2
steps 92:15
sticker 23:6
stop 32:13 128:14
stopped 134:12
 136:2 142:8
store 51:8
story 21:23
straight 31:14 119:2
strictly 39:15 108:23

Strike 127:23 130:3,
 10 135:13, 19 137:10
string 100:19
STRUSBERG 1:15
 3:5 5:8 6:20, 25 7:6,
 15 9:7 29:9 32:6
 49:22 52:5 79:20
 103:1 104:7 105:12
 106:2, 5 124:20
 144:23 151:9 152:7
 153:2, 25 154:6, 23
study 9:23
sub 142:2
subcontractor 142:2
subject 88:4
submit 60:24 73:12
 105:23
submits 27:18
submitted 68:16
 71:16
subscription 60:16
SUE 2:4
sued 84:11, 16
suffered 90:17
sufficiently 14:24
suggest 15:4 32:12
Suite 153:21
super 34:5 131:5
support 31:9 89:8
 96:3
supported 145:18
supposed 37:19
Supreme 5:21
sure 8:9 13:2 22:17
 42:14 56:13 69:8
 74:7 91:24 92:7, 8,
 10, 12 103:17 116:17
 119:16, 17 121:3
 125:21 128:11
surprised 144:5
swear 6:14
sworn 6:21 151:10
system 56:10, 11
 66:23 67:2 69:20
 115:8, 9

< T >
tag 30:16, 18
tags 30:15

take 7:19 8:19
 20:12 22:15, 16, 24
 23:1, 3 27:16 30:21
 43:12 67:7 92:15
 102:7 104:17 112:5
 115:21 118:14, 16
 121:2 144:12 146:19
 153:6
taken 20:14 154:6
takes 27:13 113:18
talk 91:23 141:18,
 19 142:10 149:8
talked 81:16
talking 8:6 29:11
 78:21 90:23 95:13
 104:16 106:6 118:14
 125:14 132:7
TAMPA 1:3 5:12
tampered 83:15
target 22:2
taught 58:16
taxes 52:18
teach 20:21 115:3
teaches 114:24 115:3
TEASDALE 2:10
 153:3
technically 23:16
tell 21:22 36:12
 44:1 45:20 58:13
 59:25 63:23 64:1
 67:3 93:18, 19 119:7
 123:23
telling 13:10 119:5
 143:22 144:1
tells 43:25 57:7
 123:10
temporary 97:15
ten 34:21 43:6 90:2,
 12 145:5
tender 41:7, 8
term 149:9
terms 57:5 58:1, 5,
 13
test 22:19 27:10, 11
 48:8
testified 6:22 71:16
 97:9, 18 109:12
 110:4 120:25 130:2,
 4

testify 13:25 46:20
 47:3 82:5
testimony 6:14
 14:21, 23 35:2 82:8
 92:19 97:13 121:10
 145:20
testing 124:15
TEXAS 3:14 4:1
 125:15
text 107:23, 25
 118:22
Thank 6:18 15:5, 10
 29:12 95:23 102:16
 104:1, 8 106:7
 124:19, 21 125:4
 132:1 138:18 142:7
 148:20
thing 8:22 42:15
 49:19, 23 131:5
think 14:23 32:13
 71:22 72:6 85:10
 92:14 102:3 117:17
 126:7 128:5
thinking 119:10
third 78:18 87:24
 89:12, 20
third-parties 93:25
 94:1, 3
Third-Party 2:16
 4:6, 8 6:10
thirteenth 94:6
thirty 16:24
thirty-one 54:16
 59:7 67:11 77:14
 136:4, 22
thirty-six 67:11
thought 95:11
three 54:16 59:7
 77:14 144:11 148:25
three-sixty 17:4
time 5:7 8:6 12:23
 15:4 22:7 29:24
 31:1 32:14 60:12
 77:3 78:24 82:1, 24
 86:12 92:6 97:10
 98:15, 16 104:19, 21
 105:14 107:17, 18
 110:1 116:9 118:24
 122:10, 11 123:21

127:*22, 24* 148:*15*
153:*8, 14*
**timeframe** 116:*9, 12*
**times** 12:*22* 17:*4*
22:*21*
**timestamps** 63:*25*
**Tires** 24:*20* 25:*13*
**TITLE** 3:*14, 23* 4:*1*
18:*13* 21:*21, 22* 23:*9*
41:*17* 42:*5, 18, 23, 25*
43:*1, 2, 5, 13, 24* 44:*4,
11, 13, 16, 22, 24* 45:*2*
64:*16* 65:*2* 72:*25*
73:*12, 16* 74:*4, 13, 16,
19* 75:*6, 11, 12* 77:*11,
17, 23* 78:*1, 2* 79:*6,
11, 23* 81:*24* 82:*2, 10,
13, 24* 83:*2* 84:*3*
90:*25* 97:*3, 10, 16, 19,
22* 98:*6* 103:*15*
106:*13* 110:*5, 6, 12,
14, 17, 18, 19* 111:*1, 6,
8, 13, 20* 112:*6, 9, 25*
113:*2, 12, 20* 114:*22*
115:*20, 21* 121:*6, 20,
22* 122:*2* 123:*3*
124:*2* 125:*14, 15, 23,
25* 126:*5, 15, 19*
127:*9, 15* 128:*3*
130:*5, 15* 131:*12, 22*
132:*5, 6, 18, 21* 133:*2*
135:*9* 142:*21, 24*
143:*1* 146:*1, 5, 9, 22*
147:*1, 24* 149:*7, 21*
**titled** 94:*22*
**titles** 72:*6* 75:*25*
127:*5* 145:*21*
**titling** 114:*16*
**TMU** 18:*9* 37:*14, 15,
17, 18* 88:*18*
**today** 7:*1* 13:*24*
15:*11* 17:*10* 46:*18*
69:*14* 78:*9* 82:*23*
119:*5*
**Today's** 5:*6* 12:*13,
15, 18* 13:*9* 81:*13*
**told** 12:*22* 37:*10*
58:*3* 73:*24* 84:*6*
90:*8* 118:*25* 119:*11,
12* 120:*12, 13* 144:*6*

**top** 46:*4* 55:*9* 59:*9*
68:*4* 70:*25* 73:*18*
74:*5* 125:*24* 126:*2*
131:*13*
**topics** 20:*19*
**torn** 39:*18*
**TORRES** 2:*19* 3:*5*
6:*9* 102:*11, 14, 17, 19*
104:*2, 4, 6, 8* 106:*3,
10* 110:*22* 113:*19*
114:*14, 18, 20* 117:*8*
121:*12* 122:*5, 8, 14,
18, 22* 123:*7, 9, 12, 20*
124:*8, 18, 21* 131:*17*
137:*3, 21* 148:*9, 12,
20* 150:*4*
**Tort** 90:*22*
**touch** 75:*25*
**tow** 38:*20*
**track** 45:*24* 46:*1*
**trade** 21:*10*
**trade-in** 21:*13, 14*
**trades** 21:*11*
**train** 114:*7, 22*
**trained** 114:*10, 15, 21*
**training** 20:*12, 20*
115:*13*
**TRANSACTION** 4:*5*
26:*14* 29:*24* 31:*1*
45:*6, 15* 46:*21* 47:*4*
50:*5* 52:*10* 53:*21*
57:*1* 68:*19* 69:*16*
71:*18* 73:*25* 74:*1, 4*
75:*15* 77:*11* 78:*17*
97:*20* 104:*18* 113:*3*
137:*15*
**transcript** 152:*8*
153:*8, 11* 154:*2*
**transfer** 30:*16* 52:*19*
65:*7* 68:*24* 72:*17*
75:*20, 24* 76:*3* 78:*14,
25* 79:*12* 97:*11, 19*
98:*7* 103:*16* 110:*14,
18* 113:*7* 125:*25*
132:*19* 138:*16* 146:*5,
9* 149:*20*
**transferred** 71:*23*
74:*19* 75:*6, 12* 77:*18,
23* 97:*24* 110:*12*
126:*15* 132:*5*

**transfers** 72:*3* 76:*23,
24* 110:*17* 142:*21*
146:*23* 147:*24* 149:*8*
**transmission** 24:*12*
86:*8*
**transport** 41:*15*
**tried** 30:*10*
**trim** 25:*12*
**triple** 92:*8*
**troublesome** 123:*22*
**truck** 14:*4* 15:*17*
23:*19* 38:*20* 93:*20*
107:*6*
**trucks** 21:*25* 31:*23*
**true** 42:*17* 52:*9, 12*
56:*24* 62:*2* 65:*1*
68:*12, 15* 129:*1, 2, 3*
152:*8* 154:*23*
**truly** 153:*18*
**trust** 19:*18, 20*
**trustworthy** 93:*18*
**truth** 6:*15, 16*
**truthful** 17:*13, 22*
18:*13* 41:*1* 73:*15*
79:*11* 97:*7*
**try** 92:*6* 112:*15, 17*
123:*21* 140:*22*
**trying** 125:*19*
**Tuesday** 1:*20* 5:*6*
**turn** 40:*9*
**turned** 28:*24*
**twelfth** 93:*21*
**twelve** 10:*24* 16:*5*
**twenty** 34:*21* 145:*7,
11, 21*
**twenty-eight** 136:*4, 22*
**twenty-four/seven**
19:*13*
**twenty-one** 47:*25*
53:*6*
**twice** 107:*12*
**Two** 34:*16, 17* 35:*3*
44:*17* 54:*10* 69:*25*
81:*17* 90:*2, 12*
109:*23* 116:*15, 16, 20*
119:*15, 16* 123:*16, 17,
24* 148:*9*
**type** 21:*24* 111:*21,
22* 112:*10* 118:*19, 23*

**typical** 26:*13*

**< U >**
**U.S** 92:*24*
**Uh-huh** 55:*17*
**uh-uh** 8:*11*
**unable** 46:*20*
**Unclean** 94:*18, 22, 24*
**unclear** 7:*24*
**underneath** 45:*2*
80:*9*
**undersigned** 151:*8*
**understand** 8:*17*
51:*3* 56:*13* 86:*23*
87:*18* 89:*4* 90:*5, 14,
19* 91:*6* 92:*4, 13*
**understanding** 109:*1*
143:*13*
**understood** 8:*3*
34:*23* 140:*20*
**unexpectedly** 115:*2*
**UNITED** 1:*1* 5:*11*
10:*1, 3* 21:*8*
**University** 9:*22, 24*
**unpack** 43:*7* 80:*20*
**unwind** 91:*17, 20, 21*
**upper** 33:*16* 34:*9*
55:*10*
**UPS** 112:*9*
**UPS'ed** 110:*7*
**use** 8:*11* 15:*4* 20:*1,
22* 50:*7* 68:*25* 69:*4,
15* 112:*9, 11* 115:*8, 9*
117:*25* 118:*1, 8, 9*
141:*7* 144:*13*
**USPS** 44:*12*
**usually** 27:*20* 116:*2*

**< V >**
**V#3** 55:*10* 59:*10*
**value** 18:*7, 10, 18*
26:*7*
**vans** 21:*25*
**VEHICLE** 3:*14*
4:*10* 18:*7, 9, 22, 23*
19:*3, 5* 22:*5* 23:*4, 10,
22* 24:*6* 25:*3, 7, 18,
20* 26:*4* 31:*16* 32:*1*
34:*24* 35:*6, 10, 14*
36:*11, 13, 18* 37:*16,*

22 38:13, 21, 23 39:4,
16, 18 40:23 41:14,
18 42:19 45:8 47:9,
13 48:9 52:19 53:1,
4, 25 59:3, 13 69:15
82:1 83:14 84:9
88:4 90:3 95:19
96:2, 4, 23 97:1, 6
103:5 105:21, 22
106:16 107:19
110:19 111:16
112:22, 23 116:17
121:17 122:1 124:10,
11, 14 126:16 127:23,
25 128:3 130:6, 15
133:12, 13, 14, 24
134:7, 22 135:5, 10,
22 137:2, 12, 25
138:2, 5 140:8, 14, 16,
19, 22 142:24 145:23
146:2, 18, 23 147:1, 5,
12, 18 149:8, 9, 11
**vehicles** 19:22, 24
21:9, 13, 14 22:7, 10
23:12 24:16 104:20
107:1, 13 124:13
134:2, 3, 9 135:18
137:6 138:15, 20
139:2, 11 140:2
144:25 145:2, 21
147:16
**vehicle's** 18:14, 17
26:7 72:20 97:4
135:21
**venued** 5:11
**verify** 92:15 115:22
**verifying** 118:19
**version** 55:25
**versions** 56:4, 7, 14
**versus** 5:9 148:22
150:2
**video** 147:9
**VIDEOCONFERENC
E** 1:15
**view** 32:23, 24 33:21
**VIN** 44:7, 9 138:6
**VIOLATIONS** 4:8
**vs** 1:4

**< W >**

**W/ATTACHMENTS**
4:12
**waged** 85:5
**wait** 8:6 14:18
29:10 102:12 118:4
122:8 126:14
**waive** 5:24 91:7
153:8, 16, 23
**waived** 91:5
**waiving** 148:22 150:2
**walk** 26:13 99:25
137:9
**walks** 26:14, 23
**WANDA** 1:24 5:4
7:4 151:18 152:6, 20
153:18
**want** 7:3, 10 15:2
27:8, 14 42:14 51:15
69:8 91:24 102:17
103:23 104:17
105:22 137:25 147:9
150:1, 7
**wants** 20:1 27:3, 5
**warehouse** 117:21
**warranty** 95:18 96:1
**wash** 22:16, 22, 23
**washout** 61:5, 8
**watch** 70:5
**water** 53:22
**way** 29:11 45:18, 19
46:1 60:3 63:18
107:1 108:20 109:10
118:6 119:3 120:8
123:23 125:5 132:14
144:24
**web** 47:11, 24 67:5,
8 117:13 133:15, 16,
17, 18, 19, 21
**website** 104:20
106:17 107:21
135:23 138:1
**Weekly** 77:8
**weeks** 116:15, 16, 20
**weird** 123:9
**well** 6:11 12:9, 23
43:22 49:1 60:16
67:3 91:16 102:8
126:7 137:10 141:16
142:10 143:24
**went** 104:10

**we're** 7:18 8:20
12:23 42:14 60:6
69:8 78:20 82:22
90:5 130:25 131:9
150:3
**West** 2:16 6:10
136:24 137:2 153:22
**WESTLAKE** 1:9, 10
59:17, 21, 24 60:5, 9,
10, 19, 22 61:4, 12, 15
62:19 66:6
**wet** 48:14, 15
**WhatsApp** 107:25
108:1, 2, 5
**wheel** 39:24
**wheels** 25:13
**where-is** 103:5
**wholesale** 36:2
**wholesaling** 31:11
**willing** 91:21
**win** 95:14
**windshield** 24:21
**wisely** 15:4
**wish** 153:16
**WITH/WITHOUT**
3:23
**withdraw** 50:20 51:2
**WITNESS** 3:1 6:17
11:12 14:3, 7, 13, 22
18:20 24:1, 4, 11
26:11 32:15, 18, 22,
25 33:5, 7, 9, 23 34:1,
5 35:3 39:2 43:20
46:24 52:3 56:22
58:22 64:4, 24 66:1
78:22 81:16 82:10,
15 89:18, 22 90:4
92:20 97:14, 21 98:3
99:5, 8 106:8 113:16
114:13, 17, 19 117:6
121:11 122:6, 20
123:8, 11, 14, 19
124:7, 21 131:15
134:21, 23 136:3
137:4 139:5, 9, 19
140:24 154:6
**word** 149:9
**words** 57:3 68:21
**work** 71:8 72:7
**worked** 10:23

**working** 35:25 36:1
77:4 86:7 98:14
148:14
**works** 77:3 81:20
102:18 131:21
137:11 144:15
**worn** 39:20, 24
40:17, 19
**worries** 106:9
**worth** 18:23
**WRITE** 154:2
**written** 109:9 115:18
**wrong** 39:14 92:14
109:13

**< Y >**

**y'all** 148:15
**Yeah** 11:21 13:21
24:10 32:17 34:6
39:12 42:3, 16 47:14
50:3 51:17 55:1
56:16 61:6 62:8
64:11 67:14 68:8
72:16 77:3 92:20
96:19 99:12 102:14,
18, 24 103:2, 24
104:3 105:6 117:15
123:13 131:15
132:13 137:8 139:9,
15 146:19
**year** 11:23 16:25
91:23 109:23 138:4
145:14
**years** 10:24 15:25
16:1, 5, 10, 12, 13, 15
20:18 54:10 61:16
90:2, 12 123:24
134:4, 5 145:13
**yell** 118:3
**yesterday** 138:23
**you-all** 104:12
118:20

**< Z >**

**ZOOM** 2:7, 12, 13,
19 33:2 38:16 73:21
74:6 134:17 143:6