UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
Civil Action No.: 8:23-cv-00709-WFJ-SPF

GABRIEL LUC HADDON,

    Plaintiff(s),

vs.

FS INVESTMENTS OF AMERICA, INC.,
d/b/a POWERHOUSE AUTOMOTIVE, a
Florida corporation, and WESTLAKE
SERVICES, LLC, d/b/a WESTLAKE
FINANCIAL SERVICES, a Foreign
corporation,

    Defendant(s).

_____ /

VIDEOCONFERENCE DEPOSITION OF
FRANKLYN STRUSBERG
(as corporate representative of
FS Investments of America, Inc.)

Pages 1 through 154

Tuesday, April 23, 2024
10:13 a.m. - 1:19 p.m.

Stenographically Reported By:
WANDA D. GOOD, CERTIFIED COURT REPORTER

APPEARANCES:


On behalf of Plaintiff(s)
    SUE YOUR DEALER - A LAW FIRM
    JOSHUA FEYGIN, PLLC
    P.O. Box 85293 (33008-5293)
    1930 Harrison St., Ste. 208F
    Hollywood, Florida   33020
    954.228.5674
    BY:  JOSHUA FEYGIN, ESQUIRE (VIA ZOOM)
        Josh@JFeyginEsq.com


On behalf of Defendant FS Investments of America, Inc.,
d/b/a Powerhouse Automotive
    ARMSTRONG TEASDALE, LLP
    355 Alhambra Cir., Ste. 1250
    Coral Gables, Florida   33134
    305.371.8809
    BY:  JOSE ARIEL PERALTA, ESQUIRE (VIA ZOOM)
        jperalta@atllp.com
        KEITH D. SILVERSTEIN, ESQUIRE (VIA ZOOM)
        keith@silversteinpa.com

On behalf of Third-Party Defendant McCombs West Ford,
LLC
    NICKLAUS & ASSOCIATES, P.A.
    4651 Ponce De Leon Blvd., Ste. 200
    Coral Gables, Florida   33146
    305.460.9888
    BY:  NICOLAS TORRES, ESQUIRE (VIA ZOOM)
        nicolast@nicklauslaw.com

```
 1                    INDEX OF PROCEEDINGS
 2
 3
     WITNESS:                                    PAGE
 4
 5   FRANKLYN STRUSBERG
 6
     DIRECT EXAMINATION BY MR. FEYGIN               5
 7
     CROSS-EXAMINATION BY MR. TORRES              104
 8
     CROSS-EXAMINATION BY MR. PERALTA             125
 9
     REDIRECT EXAMINATION BY MR. FEYGIN           144
10
     RECROSS-EXAMINATION BY MR. TORRES            148
11
     RECROSS-EXAMINATION BY MR. PERALTA           149
12
13
14                     PLAINTIFF
15
     EXHIBIT                 DESCRIPTION           PAGE
16
         A     PLTF'S NOTICE OF TAKING CORP. REP DEPO   13
17
         B     VEHICLE INFORMATION SHEET            32
18
         C     TEXAS CERTIFICATE OF TITLE, FSIA 000020  41
19
         D     5/25/20 BUYER'S ORDER FORM           51
20
         E     5/25/20 RETAIL INSTALLMENT CONTRACT AND  56
21               SECURITY AGREEMENT
22       F     5/25/20 ODOMETER DISCLOSURE STATEMENT  61
23       G     5/25/20 APPLICATION FOR CERTIFICATE OF  64
                 TITLE WITH/WITHOUT REGISTRATION
24
25
```

PLAINTIFF

EXHIBIT                    DESCRIPTION                    PAGE

    H    5/25/20 POWER OF ATTORNEY                        67

    I    3/6/19 TEXAS CERTIFICATE OF TITLE                73
         SCAN TRANSACTION NUMBER 539994086

    J    DEFT FS INVESTMENTS AMENDED AFFIRMATIVE          87
         DEFENSES AND THIRD-PARTY COMPLAINT

    K    DEFT FS INVESTMENTS MOTION FOR LEAVE TO          96
         FILE A THIRD-PARTY COMPLAINT AND AMEND
         ITS AFFIRMATIVE DEFENSES

    L    12/21/22 DEMAND FOR VIOLATIONS OF THE            99
         MOTOR VEHICLE AND INFORMATION COST
         SAVINGS ACT

    M    12/21/22 FEYGIN/POWERHOUSE AUTOMOTIVE           101
         LETTER W/ATTACHMENTS



                         DEFENSE

EXHIBIT                    DESCRIPTION                    PAGE
    A    FSIA 000011, Bill of Sale from Manheim          136

(Reporter's Note:  Defendant Exhibit a was not provided
for attachment.)

1   Thereupon,

2   the following proceedings began at 10:13 a.m.:

3               THE COURT REPORTER:  Good morning.  My name

4        is Wanda Good.  I am a Florida certified

5        stenographic reporter.

6               Today's date is Tuesday, April 23rd, 2024,

7        and the time is approximately 10:13 a.m.

8               This is the deposition of Frank Strusberg in

9        the matter of Gabriel Luc Haddon versus FS

10       Investments of America, Inc., et. al.

11              This case is venued in the United States

12       District Court, Middle District of Florida, Tampa

13       Division.  The case number is

14       8:23-cv-00709-WFJ-SPF.

15              The attorneys participating in this

16       deposition acknowledge that I am not physically

17       present in the deposition room and that I will be

18       reporting this deposition remotely.  They further

19       acknowledge that in lieu of an oath administered in

20       person I will administer the oath remotely.  This

21       arrangement is pursuant to the Florida Supreme

22       Court Administrative Order Number AOSC20-16.

23              The parties and their counsel consent to the

24       arrangement and waive any objections to this manner

25       of reporting.  Please indicate your agreement by

 1         stating your name, whom you represent and your

 2         agreement on the record starting with the

 3         Plaintiff.

 4             MR. FEYGIN:  Attorney Joshua Feygin on behalf

 5         of the Plaintiff, Gabriel Luc Haddon.  We

 6         acknowledge.

 7             MR. PERALTA:  Jose Peralta on behalf of -- of

 8         the Defendant Powerhouse, and I acknowledge.

 9             MR. TORRES:  Nicolas Torres on behalf of

10         Third-Party Defendant McCombs Ford West, and we

11         acknowledge as well.

12             THE COURT REPORTER:  Please raise your right

13         hand.

14             Do you swear or affirm the testimony you

15         shall give in this matter will be the truth, the

16         whole truth and nothing but the truth?

17             THE WITNESS:  Yes.

18             THE COURT REPORTER:  Thank you.

19     Thereupon,

20                     FRANKLYN STRUSBERG,

21     having been first duly sworn or affirmed, was examined

22     and testified as follows:

23                     DIRECT EXAMINATION

24     BY MR. FEYGIN:

25         Q.   All righty.  Good morning, Mr. Strusberg.

1    How are you today?

2          MR. PERALTA:  Joshua, before -- before we

3      begin, I'm so sorry, I just -- I just want to

4      correct something that Wanda said.  This is the

5      deposition of the corporate representative of FS

6      Investments, not Frank Strusberg as -- as a person,

7      so personally.  That makes sense?

8          MR. FEYGIN:  Yes, this is the corporate

9      representative deposition.

10          MR. PERALTA:  Correct, and then also I want

11      to get on the record that Mr. Keith Silverstein

12      might join us.  He's also an -- an attorney for the

13      Defendant in this case.  Go ahead, Joshua.

14  BY MR. FEYGIN:

15      Q.   All righty, Mr. Strusberg.

16           How are you this morning?

17      A.   Good.

18      Q.   Good to hear.  So, obviously we're here to

19  take the deposition of the corporate representative of

20  the dealership, which is FS Investments of America,

21  Inc.  I'm going to start off with a few ground rules to

22  hopefully make this an easy process.

23           So first, if I ask you a question and it's

24  unclear or confusing, please ask me to rephrase the

25  question.  Okay?

1      A.    Yes.

2      Q.    If you answer a question, I'm going to assume

3   you understood it, though.   Okay?

4      A.    Okay.

5      Q.    Because the court reporter can't record both

6   of us talking at the same time, please wait until I'm

7   finished asking a question before you answer it.

8      A.    Okay.

9      Q.    When you provide a response, make sure you

10   provide an audible response.   Do not nod your head.   Do

11   not use some sort uh-uh, nuh-uh, anything like that

12   because she's not going to able to record it.   Okay?

13      A.    Okay.

14      Q.    Occasionally your attorney may raise an

15   objection, but unless you're instructed not to answer

16   the question, you may answer.

17            Do you understand?

18      A.    Yes.

19      Q.    And if you need to take a break, I can

20   certainly accommodate you.   I hope we're not going to

21   be here for too long, but in the event that you do need

22   a break, the only thing I ask is that if there is a

23   question pending that you -- you finish answering that

24   question.   Okay?

25      A.    Okay.

1       Q.   And if I refer to you, I'm referring to

2   Powerhouse and I intend to refer to the -- to the

3   Defendant FS Investments.   Okay?

4       A.   Okay.

5       Q.   All righty.   And state your name for the

6   record.   Can you state your name for the record?

7       A.   Franklyn Strusberg.

8       Q.   And what is your date of birth?

9       A.   5/30/81.

10      Q.   Have you ever been in a deposition before?

11      A.   Never in my life.

12      Q.   Have you ever been convicted of any felonies

13  or crimes of dishonesty?

14      A.   Never in my life.

15      Q.   Have you ever been accused of any felonies or

16  crimes of dishonesty?

17      A.   Never.

18      Q.   What is your educational background?

19      A.   Do what?

20      Q.   What is the highest level of education that

21  you achieved?

22      A.   University.

23      Q.   Okay.   And what did you study in the

24  university?

25      A.   Business administration.

1        Q.    And was that in the United States?

2        A.    In Colombia.

3        Q.    How long have you been living in the United

4   States?

5        A.    I was born here.

6        Q.    Okay.  So, what do you do for a living?

7        A.    I sell cars.

8        Q.    Okay.  And what is the name of the dealership

9   that you sell cars at?

10       A.    Powerhouse Automotive.

11       Q.    Are you employed by or --

12       A.    Yes.

13       Q.    -- derive any --

14       A.    Correct.

15       Q.    Are you employed by or do you derive income

16  from any other dealership?

17       A.    Employed by.

18       Q.    Okay.  What other dealerships are you

19  employed by?

20       A.    Powerhouse Automotive.

21       Q.    Aside from Powerhouse, who else --

22       A.    Only -- only Powerhouse Automotive.

23       Q.    How long have you worked at the dealership?

24       A.    I don't remember.  Like, twelve years.

25       Q.    What is your position there?

```
 1          A.    I'm the owner.

 2          Q.    And did you start this business or did you

 3    acquire it from somebody else?

 4          A.    I start it.

 5          Q.    So, have you ever been involved in a lawsuit

 6    before?

 7          A.    Yes.

 8          Q.    Okay.  For what?

 9                MR. PERALTA:  Objection; relevance and

10          narrative.

11                MR. FEYGIN:  Go ahead and answer.

12                THE WITNESS:  Do what?

13                MR. PERALTA:  Yes, Frank.  I objected as to

14          relevance and narrative.

15    BY MR. FEYGIN:

16          Q.    You can proceed to answer the question.  What

17    was -- what was the lawsuit for or lawsuits?

18          A.    For we sold a car.

19          Q.    Okay.  And there was only one lawsuit against

20    you?

21          A.    Yeah.

22          Q.    Okay.  And when was this lawsuit?

23          A.    Like, a year and-a-half ago.

24          Q.    And where was this lawsuit filed?

25          A.    I don't remember.
```

```
 1        Q.    State court or federal court?

 2        A.    State.

 3        Q.    And it's only one lawsuit?

 4        A.    That I remember.

 5        Q.    Okay.

 6              MR. PERALTA:  I'm also -- I'm also objecting

 7        because it goes against the parties' agreement as

 8        to the scope of the question.

 9              MR. FEYGIN:  Well, he already answered, but

10        we can get to that later.

11   BY MR. FEYGIN:

12        Q.    With respect to the preparation, did anybody

13   help you prepare for today's deposition?

14        A.    Excuse me?

15        Q.    Did anybody help you prepare for today's

16   deposition?

17        A.    What do you mean?

18        Q.    How did you prepare for today's deposition?

19        A.    I don't prepare for nothing.  I'm here to

20   answer questions about a car that I bought from Manheim

21   and Manheim made a mistake, and you took -- I already

22   told you this a hundred times.

23        Q.    Well, this is the first time we're speaking.

24        A.    It's -- it's a -- it's a very simple

25   situation that you guys are making it look big, but
```

1    it's a -- it's a simple mistake from the auction.

2         Q.   Sure.  We'll get to that.

3         A.   This -- this doesn't need any preparation.

4    It's -- it's -- it's -- it's a simple mistake from the

5    auction.

6         Q.   Okay.  So --

7         A.   Anybody can make a mistake.

8         Q.   So, your -- your position is that you did not

9    prepare for today's deposition?

10        A.   No.  I have -- I -- I've been telling you

11   guys what happened since Day 1, and --

12             MR. FEYGIN:  I'm going to pull up what is

13        going to be Plaintiff's Exhibit A, which is the

14        Claimant's deposition notice.

15             (Plaintiff Exhibit A was marked for

16        identification.)

17             (Whereupon, document(s) shared on the

18        screen.)

19   BY MR. FEYGIN:

20        Q.   Have you seen this before?

21        A.   Yeah, but I didn't read it.

22        Q.   Okay.  What did you do when you saw it?

23        A.   Nothing.

24        Q.   Okay.  So, as you sit here today, you are not

25   prepared to testify on any of matters of examination?

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                    4/23/2024
                    CR of FS Investments (Franklyn Strusberg)
                                                                            14

```
 1        A.    I know exactly --

 2              MR. PERALTA:  Objection; leading.

 3              THE WITNESS:  I know exactly what happened

 4        with this -- with this particular truck, so any

 5        questions you have, I can answer them.

 6              MR. FEYGIN:  Okay.  But --

 7              THE WITNESS:  I don't need -- I don't need to

 8        read that.

 9  BY MR. FEYGIN:

10        Q.    Okay.  So, you -- you didn't read this,

11  you're not prepared to answer these questions, are you?

12              MR. PERALTA:  Objection; leading.

13              THE WITNESS:  I -- I am prepared to answer

14        any question, but I don't need to read nothing

15        because I know exactly what happened, so you can

16        ask me what --

17              MR. PERALTA:  Frank, if you could -- Frank,

18        if you could wait at least a second so I can get my

19        objection in.

20              Objection; leading and objection; mis- --

21        mis -- mischaracterizes the -- the testimony of the

22        witness.

23              MR. FEYGIN:  I think the testimony is

24        sufficiently clear.

25              MR. PERALTA:  No, it -- no.  No, it's not.
```

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                              4/23/2024
CR of FS Investments (Franklyn Strusberg)                                              15

```
 1              MR. FEYGIN:  Okay.

 2              MR. PERALTA:  And if you want to argue with

 3         me during your -- your depo, we can do that, but I

 4         suggest you use your time wisely, Joshua.

 5              MR. FEYGIN:  Noted, Jose.  Thank you.

 6    BY MR. FEYGIN:

 7         Q.   So, Franklyn, to -- to recap, did you review

 8    this document or did you not review this document?

 9         A.   No, I did not.

10         Q.   Thank you.  Did you bring any documents with

11    you today?

12         A.   I have my computer in front of me.  I can

13    provide whatever you need.

14         Q.   What documents do you have up on your

15    computer?

16         A.   I can click on the -- on the Manheim site,

17    and I can see the truck when we bought it.

18         Q.   Aside from that, do you have any other

19    documents?

20         A.   No.

21         Q.   Okay.  Regarding the dealership, is it a

22    licensed car dealer under Florida law?

23         A.   Correct.

24         Q.   Since when?

25         A.   Like, four years.
```

1    Q.   And prior to those four years, was the

2    dealership operating without a license?

3    A.   Do what?  No.

4    Q.   You mentioned that you've been employed at

5    the dealership for twelve years.

6         Do you --

7    A.   No, from FS Investments, which is my

8    corporation.  Powerhouse is a d/b/a from FS

9    Investments.  FS Investments has been open for, like

10   fourteen years.

11   Q.   Okay.  So, the dealership has only been in

12   operation for four years of those fourteen, correct?

13   A.   Almost five years.

14   Q.   Okay.  And you have been licensed for

15   approximately five years, then?

16   A.   Correct.

17   Q.   How many locations does the dealership have?

18   A.   One location.

19   Q.   How many employees?

20   A.   I don't know.  Like, fifteen.

21   Q.   Do you own any other dealerships?

22   A.   No.

23   Q.   How many cars does Powerhouse sell per month?

24   A.   Like, thirty.

25   Q.   And approximately how many per year?

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                                    4/23/2024
CR of FS Investments (Franklyn Strusberg)                                                   17

```
 1          A.    360.

 2          Q.    How many cars would you say the dealership

 3    has sold since it opened its door?

 4          A.    Multiply three-sixty times four.

 5          Q.    Do you agree the dealership has the

 6    responsibility to know the laws that govern its

 7    business?

 8          A.    Of course.

 9          Q.    As the corporate representative for the

10    dealership today, are you familiar with the laws that

11    the dealership must abide by?

12          A.    Of course.

13          Q.    Are truthful and accurate mileage disclosures

14    important in the used car industry?

15          A.    Very important.

16          Q.    And why is that?

17          A.    Because it's important.

18          Q.    Okay.  What is the reason for being

19    important?

20          A.    Do what?

21          Q.    Why is it important?  Why does the dealership

22    believe truthful and accurate mileage disclosures are

23    important?

24          A.    It has to go -- when you get your license,

25    you have to -- the DMV gives you paperwork.  And you
```

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                4/23/2024
CR of FS Investments (Franklyn Strusberg)                                  18

1   have to provide every customer with the -- you know,

2   with the paperwork, so one of the paperworks that are

3   very important are the -- are the mileage disclosure.

4   So, you have to -- whatever it says on the car, you

5   have to put it on the mileage disclosure.

6       Q.   And would that be because an odometer reading

7   impacts the value of the vehicle?

8       A.   The whole legal -- legal situation of the

9   vehicle, when the car is -- you know, it's not a TMU,

10  it's not revealed, it's clean, of course it gives value

11  to the car.

12      Q.   Does the dealership believe it is important

13  that the Certificate of Title reflect truthful and

14  accurate disclosures of a vehicle's mileage history?

15      A.   Of course, and I do that on every car sold.

16      Q.   And would you agree that an inaccurate

17  odometer reading would negatively impact the vehicle's

18  value?

19           MR. PERALTA:   Objection; leading.

20           THE WITNESS:   Yes.

21  BY MR. FEYGIN:

22      Q.   Could a vehicle with an inaccurate odometer

23  be worth less than the same exact vehicle with an

24  accurate odometer?

25      A.   Yes.

1          MR. PERALTA:   Objection; speculative.

2     BY MR. FEYGIN:

3          Q.   In your experience, would a vehicle with

4     higher mileage need more maintenance than the

5     lower-mileage vehicle?

6          A.   It's relative.  I get cars with low mileage

7     that are being rented -- rentals destroyed, and I get

8     cars with really high mileage that are one owner in

9     immaculate condition.

10         Q.   Is it important to Powerhouse that it be

11    considered as an honest company?

12         A.   Of course.  I'm the one here

13    twenty-four/seven.

14         Q.   And why is it important?

15         A.   My reputation is everything.  My reputation

16    is -- you know, is why I keep selling so much, you

17    know, the cars.  Customers keep coming back because

18    they trust us.

19         Q.   Is it important to Powerhouse that consumers

20    have trust in the dealership?

21         A.   100 percent.

22         Q.   So, in addition to selling vehicles, does the

23    dealership originate financing agreements for the

24    vehicles it sells?

25         A.   I sell, and I have lenders.  When the

```
 1    customer wants to finance, we use the lenders.

 2         Q.   Does the dealership have an in-house

 3    financing --

 4         A.   No.

 5         Q.   -- program?  No buy here/pay here, then?

 6         A.   No buy here/pay here.

 7         Q.   So, what did the dealership have to do to

 8    become licensed under Florida law to be a dealer?

 9         A.   To have an office, a printer, a computer,

10    insurance and a bond.

11         Q.   And does the DMV require that the dealership

12    take ongoing training courses?

13         A.   Yes.

14         Q.   Okay.  And has the dealership taken these

15    courses?

16         A.   Of course.

17         Q.   When was the last one?

18         A.   Five years ago.

19         Q.   Do you recall the topics that were covered

20    during that training session?

21         A.   Just to teach you how to print the paperwork.

22         Q.   And who do you use as the course provider?

23         A.   DLMRB.

24         Q.   And did you personally attend that course or

25    did somebody else from the dealership attend the
```

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                    4/23/2024
                    CR of FS Investments (Franklyn Strusberg)
                                                                              21

 1   course?

 2        A.   No, I did.  The license is in my name.

 3        Q.   So, do you only sell used cars?

 4        A.   Only used cars.

 5        Q.   Okay.  And where do you get these used cars

 6   from?

 7        A.   I only buy from Manheim, the auction.  It's

 8   the biggest auction in the United States.

 9        Q.   You don't buy any vehicles that come in on

10   trade?

11        A.   I get a lot of trades.

12        Q.   So, in addition to Manheim, you also have

13   trade-in vehicles on your lot?

14        A.   Trade-in vehicles, yes.

15        Q.   So, explain to me how do you select used cars

16   for your inventory?

17        A.   I'm the buyer, so I dig very, very into it

18   when I buy them, and I look at the comments.  Every

19   car, when you buy it in the auction, they give you a

20   Condition Report, and they give you comments from the

21   seller, so when the car is revealed title, they put on

22   the comments revealed title.  They put a CR.  They tell

23   you the whole story about the car.

24        Q.   And what type of used cars do you buy?

25        A.   Pickup trucks and commercial vans.

1    Q.   And why is that?

2    A.   Because of the customers that my target is

3  the people that has -- own businesses.

4    Q.   Do you ever rely on CARFAX™ or AutoCheck

5  reports when you decide to purchase a vehicle?

6    A.   No.

7    Q.   Do you inspect the vehicles at the time of

8  the purchase?

9    A.   When I buy them from the auction, the auction

10 inspects the vehicles for me, and if the car passes the

11 inspection, then I bring it to my dealer.

12   Q.   So, explain to me what happens when you get a

13 car from the auction, let's say, and you first get it

14 onto your lot.  What happens?

15   A.   I drive it myself.  I take it to the car

16 wash.  I put it on the spot to take pictures, and I

17 advise it everywhere.  I change the oil, make sure the

18 car is good, and I park it in my lot for sale.

19   Q.   Okay.  So, you do -- you personally do a test

20 drive?

21   A.   I do, yes, most of the times.

22   Q.   Do you personally wash the car?

23   A.   No.  I have a lot of people that wash them.

24   Q.   And do you personally take pictures of the

25 car?

1    A.    I personally take pictures of the car, yes.

2    Q.    And what about changing the oil?

3    A.    I take it to Jiffy Lube.

4    Q.    And is this every vehicle that comes in?

5    A.    Most of them, because some of them, they come

6    with a sticker with a new oil, so I don't change the

7    oil on those, but most of them, I change the oil on

8    Jiffy Lube.

9    Q.    Do you ever look at the title before you

10   place the vehicle up for sale?

11   A.    Never.

12   Q.    So, let's discuss inspecting these vehicles.

13         Do you ever inspect them before you put them

14   for sale?

15   A.    The auction does.  The auction inspects the

16   whole car legally and technically, and if the car

17   passes the inspection, then I have a company that is

18   called Central Dispatch.  And I post the car, and a

19   truck driver picks it up because I buy nationwide, and

20   they bring it to my dealer.

21   Q.    Aside from the auction inspection, does the

22   dealership perform its own inspection of a vehicle

23   before it goes up for sale?

24   A.    I drive it.

25         MR. PERALTA:  Objection.

```
 1              THE WITNESS:  I drive it.

 2              MR. PERALTA:  Objection; asked and answered.

 3              MR. FEYGIN:  Please answer.

 4              THE WITNESS:  Yes.  I drive them to --

 5  BY MR. FEYGIN:

 6       Q.   Aside from driving the vehicle, what else do

 7  you do to inspect it?

 8       A.   That's it.  That's it.

 9              MR. PERALTA:  Objection; asked and answered.

10         Yeah.

11              THE WITNESS:  If I feel any -- any funny,

12         maybe like the transmission is leaking or anything,

13         I file a claim, and then I can return the car to

14         the auction.

15  BY MR. FEYGIN:

16       Q.   Do you ever recondition vehicles aside from

17  the oil changes?

18       A.   If the car needs paint, yes.

19       Q.   Anything else?

20       A.   Tires, whatever the car -- maybe a

21  windshield.  Anything that the car needs, I like to

22  make them, you know, good so I can sell them.

23       Q.   Do you have an account with CARFAX™?

24       A.   No.

25       Q.   Do you have an account with AutoCheck?
```

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC
CR of FS Investments (Franklyn Strusberg)
4/23/2024
25

```
 1        A.    No.

 2        Q.    Do you have an account with any other entity

 3   that would provide vehicle history reports aside from

 4   the Manheim Condition Report?

 5        A.    No.

 6        Q.    So, who determines the price that a used

 7   vehicle is sold for at the dealership?

 8        A.    Me.

 9        Q.    Okay.  And what -- what factors play into

10   that analysis?

11        A.    Depending on the car.  What the determines

12   the car is the -- the trim.  If it's a Laramie, if

13   it's -- if it's lifted, if it has wheels and tires, you

14   know, like big ones, that determines the price of the

15   car.

16        Q.    Do you have a mechanic on your staff?

17        A.    No.

18        Q.    Do you have a vehicle lift on your premises?

19        A.    No.

20        Q.    When you're evaluating the price of a vehicle

21   that you're planning on selling, is mileage a factor

22   that goes into the evaluation?

23        A.    No.

24        Q.    So, mileage is irrelevant?

25        A.    Irrelevant, depends on the condition.  Like I
```

1   said, if I get a rental that has been low mileage but

2   the car is destroyed or you get a car that is one owner

3   with high mileage but it's in perfect condition.

4       Q.   So, let's say you do you have a vehicle that

5   is in good condition.

6            Would the mileage play any part in

7   determining the vehicle's value?

8            MR. PERALTA:  Asked and answered; objection.

9            Go ahead, Frank.

10           MR. FEYGIN:  You can answer the question.

11           THE WITNESS:  No.

12  BY MR. FEYGIN:

13      Q.   All right.  So, walk me through a typical car

14  transaction.  A client walks through the door, and what

15  happens?

16           MR. PERALTA:  Objection; narrative.

17           Go ahead, Frank.

18           MR. FEYGIN:  What was the objection?

19           MR. PERALTA:  You're asking for a narrative.

20       You're not asking for a specific answer.

21           MR. FEYGIN:  Okay.

22  BY MR. FEYGIN:

23      Q.   When the client walks in the door, who is the

24  first person that greets the client?

25      A.   The salesperson.

1    Q.   And once the salesperson greets the client,

2  what do they do?

3    A.   They listen to what the customer wants.

4    Q.   And once they determine what the customer

5  wants, what do they do?

6    A.   They show -- they show them cars.

7    Q.   And once they show them the car and they make

8  a decision on which car they want to purchase, what

9  happens?

10   A.   They do a test drive.

11   Q.   After the test drive, what happens?

12   A.   They come into the office.  They sit.  The

13  salesman takes the license, makes a copy.  Depending on

14  if they want to pay cash or finance, if it's financed,

15  they have to do a credit application.

16   Q.   So, once they take the driver's license and

17  complete a credit application, then what happens?

18   A.   Then the finance manager submits the deal to

19  the bank to get them approved.

20   Q.   And does the approval usually happen on the

21  spot?

22   A.   In one second.

23   Q.   And after that one second occurs, what

24  happens?

25   A.   It's under the lender's conditions, so they

1    approve you under these conditions, and the conditions

2    are proof of income, proof of residence, full coverage

3    insurance.  If they have everything, then they sign the

4    contract and they leave with the car.

5         Q.    Okay.

6         A.    They have to give a down payment, get a

7    receipt, full insurance, full coverage with all the

8    information, and they leave.

9         Q.    How are the contracts presented to a consumer

10   for signing?

11        A.    On the computer.

12        Q.    Is it electronic?

13        A.    Electronic, and some of the -- the DMV

14   paperwork are handwritten.

15        Q.    And for the electronically-signed documents,

16   how are they presented to the consumer, is it an iPad

17   or is it on a computer screen?

18        A.    It's on a -- on a computer with a mouse.

19        Q.    And is that the same computer that the

20   finance manager or the sales agent is sitting at or is

21   it a completely separate computer dedicated for --

22        A.    It's the one with the finance manager.

23        Q.    And how does the consumer see the screen, is

24   it turned around to them?

25        A.    Of course.  They have to see it, and they

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC
CR of FS Investments (Franklyn Strusberg)
4/23/2024
29

 1    have to click on -- it's like any contract.  You have

 2    to click on -- on the -- on the box.

 3         Q.   And does the signature get applied to every

 4    everywhere with one click or does the consumer have to

 5    go --

 6         A.   Just one click.

 7         Q.   -- click by click?

 8         A.   No, just one click.

 9              THE COURT REPORTER:  Mr. -- Mr. Strusberg, if

10         you could just wait until he finishes his complete

11         question, that way you're not talking over each

12         other, I would appreciate it.  Thank you.

13    BY MR. FEYGIN:

14         Q.   So, what would be the first document the

15    consumer sees when they sit down to start signing the

16    paperwork?

17         A.   I don't know.

18         Q.   Who would know?

19         A.   The finance manager.

20         Q.   And what are the names of your finance

21    managers?

22         A.   Heron Guzman and Angel Castillo.

23         Q.   And were these gentlemen employed by

24    Powerhouse at the time of my client's transaction?

25         A.   Angel was.  Alex Reyes is no longer with me.

```
 1        Q.   And why is that?

 2        A.   There's no reason.

 3        Q.   I'm sorry.  You said Guzman is no longer with

 4   you?

 5        A.   Alex Reyes.  He was the one who sold the car

 6   to your --

 7        Q.   And when did he leave the dealership?

 8        A.   Like, a month ago.

 9        Q.   And why did he leave the dealership?

10        A.   There's no reason.  He -- he tried --

11        Q.   Are you --

12        A.   -- to get better opportunities.

13        Q.   Okay.  So, once the deal is signed, then what

14   happens?

15        A.   They go to the lady with the tags to do the

16   transfer or the new tag to release the car under the

17   person's name.

18        Q.   Okay.  And once they get the tag done, what's

19   next?

20        A.   They put it on the car, and the customer

21   leaves.  We take a picture, and we get a good review.

22        Q.   What is the dealership management software

23   used by the dealership?

24        A.   DealerCenter.

25        Q.   And was that the same software you used
```

1    during the time of my client's transaction?

2          A.   Correct.

3          Q.   Have you ever changed your DMS software?

4          A.   No.  I have it since Day 1.

5          Q.   So, what is Powerhouse's relation to Auto

6    Deal Corp.?

7          A.   The owner of Auto Deal is my friend.  When I

8    first open, he put me cars on consignment.  I buy cars

9    with his -- with his money pretty much.  He support me,

10   so I buy cars with his license.  And I bring it to my

11   dealer, and pretty much he's wholesaling the car to me.

12         Q.   Have you ever earned a salary from Auto Deal

13   Corp.?

14         A.   No.  It's straight commission.

15         Q.   Did you have authority to bind Auto Deal

16   Corp. to purchase the vehicle from McCombs Ford?

17         A.   Yes.  I was a buyer for Auto Deal Corp.

18         Q.   And how did you find the car that my client

19   purchased?

20         A.   Like I find all the cars.  In Manheim.

21         Q.   And what were you searching for when you came

22   across the car?

23         A.   Lifted trucks.

24              MR. FEYGIN:  I'm going to pull up what's

25         going to be Plaintiff's B.  It's going to be the

```
 1              vehicle information sheet that we received in

 2              discovery.  This is FSIA 000014.

 3                   (Whereupon, document(s) shared on the

 4              screen.)

 5    BY MR. FEYGIN:

 6              Q.   Mr. Strusberg, does this look familiar to

 7    you?

 8              A.   Are you showing me something?

 9              Q.   Yes.

10              A.   I can't see the screen.  I'm sorry.  What do

11    I do?

12                   MR. PERALTA:  Joshua, may I suggest that you

13              stop mirroring and mirror again, and I think that

14              will present the full screen to him one more time.

15                   THE WITNESS:  No, because somebody called me,

16              and I put it on do not disturb.

17                   MR. PERALTA:  Yeah.  Yeah.

18                   THE WITNESS:  I don't know why I'm getting

19              the call if it's under do not disturb.

20                   MR. PERALTA:  What about -- what about now,

21              Frank?

22                   THE WITNESS:  No, I cannot see it.

23                   THE COURT REPORTER:  Is you view on gallery

24              view?

25                   THE WITNESS:  Now it is.  I'm sorry for my
```

```
 1            ignorance.

 2                 MR. PERALTA:  That's fine.  Make Zoom cover

 3            your whole screen, so not on -- what do you call

 4            it.  Let me see.

 5                 THE WITNESS:  Let me see.

 6                 MR. PERALTA:  Press maximize, the square.

 7                 THE WITNESS:  There we go.

 8                 MR. PERALTA:  Can you see it now?

 9                 THE WITNESS:  Yes.

10                 MR. PERALTA:  Okay.

11       BY MR. FEYGIN:

12            Q.   Okay.  So, does this document look familiar

13       to you?

14            A.   Of course.  That's the -- that's the Bill of

15       Sale from Manheim.

16            Q.   So, up here in the upper left-hand corner --

17            A.   How do I make it big?

18            Q.   (Complies with request.)

19            A.   Jesus Christ.

20                 MR. PERALTA:  So, if you -- if you click on

21            the right under the X, it says view, you can put

22            standard, actually, will make the --

23                 THE WITNESS:  I see, like four scares up on

24            the left corner.

25                 MR. PERALTA:  Okay.
```

1          THE WITNESS:  And I click on each of them,

2      and they it just shows you guys, and this one

3      doesn't show.

4          MR. PERALTA:  But do you see the document?

5          THE WITNESS:  I see it, but it's super small.

6      Like, on -- okay.  I can see it, yeah.  Yeah, I can

7      see it.

8  BY MR. FEYGIN:

9      Q.   So, what I'm looking at is the upper

10  left-hand corner of this document.

11          Does what does CR stand for over here

12  (indicating)?

13      A.   Condition Report.

14      Q.   And in your experience, what is the purpose

15  of a Condition Report score?

16      A.   Two and up is -- is a good car.  It's a good

17  used car, and two and under is -- is a car, you know,

18  that is beat up with maybe scratches or -- it's very

19  relative.

20      Q.   And what is the grading scale, one through

21  ten, one through twenty?

22      A.   No.  One to five.

23      Q.   So, if I understood you correctly, a lower

24  score indicates that the vehicle is in bad condition?

25      A.   Yes.

1              MR. PERALTA:  Objection; mischaracterizes his

2       testimony.

3              THE WITNESS:  Two and up is a -- is a good --

4       like, 2.8 to me is a good car.

5   BY MR. FEYGIN:

6       Q.   And what was the condition of this vehicle?

7       A.   He's -- he's been driving it since then, so

8   it's a good car.

9       Q.   What was the Condition Report grade for the

10  vehicle when you bought it?

11      A.   Do what?  2.8.  I'm looking at it.  2.8.  It

12  says there, 2.8.

13      Q.   And when did the dealership, meaning Auto

14  Deal, purchase the vehicle from McCombs Ford?

15      A.   April 11th.  It says there April 11th.

16      Q.   And remind me, was this during the pandemic?

17      A.   I don't remember.  I'm sorry.

18      Q.   Can you describe the car market during the

19  pandemic in general based upon your experience?

20      A.   It was good.

21      Q.   In what sense?

22      A.   Every dealer closed because they give --

23  like, they didn't make you pay interest for, like six

24  months, so a lot of dealers closed, and we were open

25  helping the community.  Everybody was working.

1   Everybody was sick at home, and we were working.

2       Q.   Were wholesale prices on the used cars higher

3   than normal?

4       A.   No.  Prices were almost the same.

5       Q.   And were retail prices on used cars higher

6   than normal?

7       A.   Kind of.

8       Q.   In what sense?

9       A.   All the -- the factories, they closed, the

10  new cars, so used cars were selling more than new cars.

11      Q.   So, when you purchased this vehicle, what

12  representations did McCombs Ford tell you about the

13  vehicle?

14      A.   No, I never get to speak with the seller.  I

15  buy the car -- the car through Manheim, and I bought it

16  based on the information that I saw.

17      Q.   So, did you complete the sale or purchase of

18  this vehicle directly with the seller or --

19      A.   No, never.  Never.  I -- I buy the car

20  through Manheim.  Manheim was pretty much the seller.

21  The auction is -- is, like the middle person.  You have

22  the seller and the buyer, and the auction is the one

23  who conducts the whole -- the whole process.

24           Like, for example, in this particular car, I

25  called them.  They made a mistake.  When I called them

1   about the discrepancy in the mileage, I called Manheim

2   because they are responsible for this.  Because if the

3   car, they -- somebody get -- I mean, I always buy cars,

4   let's say revealed.  They disclose the condition and

5   the situation of the car, so on this -- on this

6   particular car, I called Manheim.  They said that Ford,

7   the seller, made a mistake.

8       Q.   And what did Manheim do for you in this

9   circumstance?

10      A.   No.  They told me that they were going to dig

11  into it, they were going to call the franchise who sold

12  it.  And they called me back and they say "yes, we

13  called the franchise," and they -- and Ford made a

14  mistake on the mileage.  Because if the car was a TMU,

15  then Manheim needs to disclose it to me TMU, and then I

16  know, and then when I -- when I sell the vehicle, I

17  have to sell it TMU.

18           I cannot sell a car TMU with original

19  mileage.  I can't.  That's why the auction is supposed

20  to inspect that before I do, and they -- they never put

21  no comments nowhere.  They sold me the car with a

22  131,000 miles, and the vehicle, you saw everywhere, was

23  131,000 miles.

24      Q.   What did -- what did Manheim do to compensate

25  you for this mistake?

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                                          4/23/2024
                          CR of FS Investments (Franklyn Strusberg)                                38

1          A.    Nothing yet.

2          Q.    Why do you say "yet"?

3          A.    They -- they asked me to bring the car back.

4    They asked me if I can bring -- if I can return the car

5    and they give me the money back.

6          Q.    When did this occur?

7          A.    I don't know.  When you guys first -- when I

8    first find out about -- about this.

9          Q.    And what about McCombs Ford, have they done

10   anything to correct this mistake?

11         A.    No.

12         Q.    So, getting back to the actual purchase of

13   the vehicle, did you pick it up or was it delivered to

14   you?

15         A.    It was delivered to us have.

16               (Whereupon, Counsel Silverstein enters Zoom

17         deposition.)

18   BY MR. FEYGIN:

19         Q.    And how was it delivered?

20         A.    On a tow truck.

21         Q.    Did you ever look at any sort of vehicle

22   history report before you bought this particular

23   vehicle aside from the Condition Report?

24         A.    Just the Condition Report.

25               MR. PERALTA:  Objection; asked -- asked and

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                          4/23/2024
CR of FS Investments (Franklyn Strusberg)                                         39

1              answered.

2                   THE WITNESS:  No.

3       BY MR. FEYGIN:

4              Q.   Did you inspect the vehicle after you bought

5       it?

6              A.   I drove it, and I took it for pictures.

7              Q.   Aside from that, did you put it on a lift?

8              A.   No.

9              Q.   Did you inspect the engine?

10             A.   While I drive it, I feel it.

11             Q.   Did you inspect the brakes?

12             A.   Yeah.  When I drive it, I inspect the whole

13      car.  Like, when you drive it, you feel the car, and

14      you know if something's wrong or something's good.

15             Q.   So, the inspection itself was strictly

16      driving the vehicle, then?

17             A.   Correct.

18             Q.   Were the seats torn in the vehicle?

19             A.   I don't remember.

20             Q.   Were the seats worn?

21             A.   It's a 2012, but I don't remember.  Most of

22      the cars, they come with -- you know, a clean 2.8, it's

23      a clean car, but it's been too -- too long.

24             Q.   Was the steering wheel worn?

25             A.   I don't remember.  I'm sorry.

```
 1        Q.   Was the bed scratched?

 2        A.   I don't remember.

 3        Q.   Was the bed dented?

 4        A.   I don't know.

 5        Q.   Were there signs of rust in the bed?

 6        A.   I don't remember.

 7        Q.   Were there dents on the exterior?

 8        A.   I don't remember.  I'm sorry.

 9        Q.   Were either of the turn signals chipped or

10   cracked?

11        A.   I don't remember.

12        Q.   Were either of the headlights chipped or

13   cracked?

14        A.   I don't remember.  I'm sorry.

15        Q.   Was there evidence of prior paint?

16        A.   No.

17        Q.   Was the brake pedal worn?

18        A.   I don't remember.

19        Q.   Was the gas pedal worn?

20        A.   I don't remember.  I'm sorry.

21        Q.   Was there any sludge in the engine?

22        A.   Not that I know of.

23        Q.   How much did you pay for the vehicle?

24        A.   9,000 and change.

25        Q.   And is that reflected in this invoice?  Is
```

1    that a truthful and accurate --

2         A.   Correct.

3         Q.   -- representation of --

4         A.   Correct.

5         Q.   -- how much you paid?

6         A.   Yes.  Correct.

7         Q.   And did Powerhouse tender this money or did

8    Auto Deal Corp. tender the money?

9         A.   No.  Auto Deal paid Manheim.

10        Q.   And where did Auto Deal get the funds for the

11   payment?

12        A.   From his bank account.

13        Q.   How much did you pay Auto Deal Corp. for the

14   vehicle?

15        A.   The price of the car, plus the transport,

16   plus I -- I was giving him 25 percent of the profits.

17        Q.   Did you receive a Certificate of Title for

18   the vehicle when you bought it?

19        A.   No.

20             MR. FEYGIN:  Okay.  I'm going to pull up

21        what's going to be Plaintiff's Exhibit C.

22             (Plaintiff Exhibit C was marked for

23        identification.)

24             (Whereupon, document(s) shared on the

25        screen.)

 1   BY MR. FEYGIN:

 2        Q.   Can you see this?

 3        A.   What's that?  Yeah, I see it now.

 4        Q.   Does it look familiar?

 5        A.   It's a title.

 6        Q.   And this is FSIA 00019 and FSIA 00020, do we

 7   agree?

 8        A.   What is these numbers?

 9        Q.   It's Bates stamps.  It's how you identify a

10   document that was produced in discovery.  Your

11   attorneys produced it with these numbers stamped on

12   bottom (indicating.)

13        A.   Okay.

14        Q.   I just want to make sure we're looking at the

15   same thing.

16        A.   Yeah.  Yeah.  Okay.

17        Q.   Okay.  Is this a true and correct copy of the

18   Certificate of Title Auto Deal Corp. received when it

19   purchased the vehicle?

20             MR. PERALTA:  Objection; no -- no foundation

21        and facts not in evidence, speculative, et cetera.

22   BY MR. FEYGIN:

23        Q.   Is this a copy of the Certificate of Title

24   you produced in discovery?

25        A.   That's not a Certificate of Title.  That's --

 1   that's a title.

 2       Q.   Okay.  Is this the title that you produced in

 3   discovery?

 4       A.   When I sold the car, after the customer took

 5   possession of the car and left, I got the title in my

 6   hands, maybe like ten days later.

 7       Q.   So, let's unpack that.

 8       A.   Excuse me?

 9       Q.   Let's -- let's go into that a little bit.

10       A.   Do what?

11       Q.   Hold on one second, please.

12            How did you -- let's take a step back here.

13            How did you get this particular title in this

14   particular format?  Where did this come from?

15       A.   Auto Deal Corp.

16       Q.   Do you maintain this in your own business

17   records or did Auto Deal Corp. provide it to you?

18       A.   Auto Deal Corp. --

19            MR. PERALTA:  Objection.

20            THE WITNESS:  -- provide it to me.

21            MR. PERALTA:  Objection; asked and answered

22       and leading as well.

23   BY MR. FEYGIN:

24       Q.   When did Auto Deal Corp. get this title?

25       A.   It tells you there in -- one second.  I can

```
 1    tell you right now.  One second.  It shows the ship

 2    date and everything.

 3         Q.    What are you looking at?

 4         A.    When the auction send the title to Auto Deal.

 5         Q.    And where are you finding that information?

 6         A.    In Manheim.  My account with Manheim.  What

 7    is the last six of the VIN?

 8         Q.    I'm sorry?

 9         A.    What is the last six of the VIN?

10         Q.    A12718.

11         A.    So, it says there they shipped the title

12    to -- to Auto Deal Corp. on April 28, 2020 by USPS.

13    So, I bought it April 11th, and they sent the title

14    April 28.

15         Q.    And do you happen to know when Auto Deal

16    Corp. actually received the title?

17         A.    They shipped -- I'm assuming a day later, two

18    days later on April 30th.

19         Q.    Do you have the ability to determine the

20    exact date Auto Deal Corp. received --

21         A.    No.

22         Q.    -- the title?

23         A.    No.

24         Q.    So, looking at the face of the title, what is

25    the disclosed odometer reading (indicating)?
```

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                                    4/23/2024
                        CR of FS Investments (Franklyn Strusberg)
                                                                                            45

1          A.    201150.

2          Q.    And underneath that, what does the title

3    state regarding the mileage?

4          A.    The actual mileage.

5          Q.    I'm going to move on to my client's

6    transaction.

7                Were you personally involved in the sale of

8    the vehicle to my client?

9          A.    No.

10         Q.    Who was?

11         A.    Alex Reyes.

12         Q.    And he's no longer employed by the

13   dealership, correct?

14         A.    Correct.

15         Q.    Who else was involved in the transaction?

16         A.    Might be a salesman, but I don't know which

17   salesman it was.

18         Q.    Do you have a way to figure it out?

19         A.    The only way is the -- the -- the person who

20   bought the car, he can tell me the name of the person,

21   and then I know exactly who it was.

22         Q.    Do you not have commissions for sales?

23         A.    I do.

24         Q.    Do you keep track of the commissions you pay?

25         A.    No.

1      Q.   Do you keep track in any other way of who is

2    involved in a sale?

3      A.   No.  I got to see the deal jacket.  Maybe on

4    top of the deal jacket it states the name of the

5    person.

6      Q.   Do you have the deal jacket with you?

7      A.   No.

8      Q.   Where is the deal jacket?

9      A.   It's on a file cabinet.

10     Q.   And is that file cabinet in your office?

11     A.   No.

12     Q.   Where is the file cabinet located?

13     A.   It's in a container.  I put all the file

14   cabinets.

15     Q.   And where is this container located?

16     A.   In the dealership.

17     Q.   Did you speak with Alex Reyes to prepare for

18   today?

19     A.   No.

20     Q.   So, you're unable to testify as to what

21   occurred with my client during the transaction?

22          MR. PERALTA:  Objection; leading,

23       speculative.

24          THE WITNESS:  Correct.

25          MR. PERALTA:  And stating facts not in

 1        evidence.

 2   BY MR. FEYGIN:

 3        Q.   Are you able to testify what occurred during

 4   the transaction with my client?

 5        A.   Yes.

 6        Q.   How did he find the dealership?

 7        A.   We post everywhere; Marketplace, OfferUp,

 8   Craig's List.

 9        Q.   Where was this vehicle advertised?

10        A.   Everywhere; Craig's List, Marketplace, in my

11   web page, Cars for Sale.

12        Q.   Are you able to access any of the

13   advertisements for this vehicle?

14        A.   Yeah.

15        Q.   Are you able to provide them to me?

16        A.   Of course.

17        Q.   Do you agree to provide the advertisements to

18   me?

19        A.   If I find it.  Can I have the last six again?

20   Let me see if I can find it right now.

21        Q.   A12718.

22        A.   I found it.

23        Q.   Where is -- what -- what are you looking at?

24        A.   I'm looking at the web page.  I had it

25   advertised for twenty-one nine.

1      Q.    And you'll agree to provide that copy?

2      A.    Yes.  Of course, yes.

3      Q.    So, when my client got to the dealership, was

4  he by himself or was with people?

5      A.    I don't know.

6      Q.    What happened when he got there?

7      A.    I don't know.

8      Q.    Do you know if he actually test drove the

9  vehicle?

10     A.    No.

11     Q.    Do you know what part of the day he arrived?

12     A.    No.

13     Q.    Do you know if the documents he signed were

14  done electronically or in wet ink?

15     A.    If it was wet ink?  I'm assuming it was, of

16  course, electronically and paper.  It's the standard

17  for every customer.

18     Q.    For the electronic documents, how did you get

19  his consent to sign the documents electronically?

20     A.    They have to go with the mouse on the

21  computer.

22     Q.    Do you know if he provided his consent on

23  paper or electronically?

24     A.    If he took possession of the car, he must

25  have.

1       Q.   Well, was it done on paper or was it done

2   electronically, particularly the providing of his

3   consent?

4       A.   They do both.  They do paper and Internet.

5   They sign both papers.  They sign on the e-contracting

6   and the DMV paper, like the ASCIIs.  The odometer,

7   everything goes handwritten.

8       Q.   Okay.  But before we even get to that

9   process, he has to give his consent to sign a document,

10  correct?

11      A.   He has give -- no.  He has to give a credit

12  application.  He has to leave the commission to us.  Do

13  it on --

14      Q.   After that --

15      A.   -- on-line.

16      Q.   After that, before he starts signing the

17  contracts, does he have to provide consent to sign the

18  documents?

19      A.   There is no such thing.

20           MR. PERALTA:  Objection; asked and answered.

21  BY MR. FEYGIN:

22      Q.   Please repeat yourself, Mr. Strusberg?

23      A.   There is no such thing.

24      Q.   There is no consent form?

25      A.   No.  It's the credit application itself.  At

1   the end of the credit application, we have a click box

2   that says he's authorizing us to run his information,

3   so yeah, he does it on-line, not on paper.

4       Q.   So, that authorization comes at the end of

5   the transaction?

6       A.   At the beginning.

7       Q.   What e-mail address did he use to provide his

8   consent?

9       A.   I don't know.

10      Q.   Who would know?

11      A.   I don't even know if he provided a -- an

12  e-mail address.  That's not required.  If they have

13  e-mail, they put it.  Sometimes they -- they don't have

14  an e-mail, but that's --

15      Q.   Do you know if he was provided notice that he

16  could get a copy of the contract in paper format?

17      A.   I don't know.

18      Q.   Who would know?

19      A.   Alexander Reyes.

20      Q.   Was he provided notice that he could withdraw

21  his consent to sign electronically?

22      A.   You do it on -- on the credit application.

23  In the beginning, you do the credit app, and then at

24  the end it's a click box that he authorizes us to run

25  the credit, so he has to claim that.

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                          4/23/2024
                    CR of FS Investments (Franklyn Strusberg)
                                                                                     51

1       Q.   But was he provided notice that he could
2   withdraw consent?
3       A.   What is that?  I don't understand the
4   question.
5       Q.   Was he provided notice that he can cancel his
6   authorization?
7       A.   No.
8       Q.   How does the dealership store the electronic
9   documents?
10      A.   It stays in the DMS, DealerCenter.
11      Q.   And is there a log of his electronic
12  signatures?
13      A.   In every deal, of course.  I can look for it.
14  One second.  The whole deal is saved in DealerCenter.
15  I can send you copies if you want.
16      Q.   That would be great.
17      A.   Yeah.
18           MR. FEYGIN:  I'm going to pull up what's
19      going to be Claimant's Exhibit D, which is
20      effectively a Buyer's Order -- Buyer's Order
21      Contract.  This is stamped FSIA 00005, and it goes
22      down to FSIA 00007.
23           (Plaintiff Exhibit D was marked for
24      identification.)
25           (Whereupon, document(s) shared on the

 1          screen.)

 2               MR. FEYGIN:  Does everybody see this?

 3               THE WITNESS:  Yes.

 4     BY MR. FEYGIN:

 5          Q.   Mr. Strusberg, does this look familiar to

 6     you?

 7          A.   One -- one second, please.  That's the Bill

 8     of Sale.

 9          Q.   Is this a true and correct copy of the Bill

10     of Sale for my Plaintiff's transaction?

11          A.   Excuse me?

12          Q.   Is this a true and correct copy --

13          A.   Yes.

14          Q.   -- of the -- can you explain the significance

15     of a Bill of Sale?

16          A.   It's a -- it's a document that you have to

17     provide.  It's -- it's already printed.  It shows you

18     the -- the price the customer's paying, the taxes, the

19     transfer, the -- the -- the description of the vehicle

20     that he's buying, the money down he's coming up with.

21          Q.   Who prepared this document?

22          A.   The finance manager.

23          Q.   And who was that again?

24          A.   Alexander Reyes.

25          Q.   So, how much did my client pay for this

1 | vehicle?

2 |     A.   Can you -- one second.  I have it here.

3 | He -- 25,000.

4 |     Q.   And what was the vehicle sales price before

5 | all of the incidental charges?

6 |     A.   Twenty-one nine ninety-eight.

7 |     Q.   What was his down payment?

8 |     A.   5,000.

9 |     Q.   Did the dealership actually receive the

10 | $5,000 down payment?

11 |     A.   Yes.

12 |     Q.   And what was the date of purchase?

13 |     A.   It says there, hang on, May 25th, 2020.

14 |     Q.   So, looking on the itemization of the sale on

15 | the right-hand side over here, I see a predelivery

16 | service fee of $799.

17 |     A.   That's dealer fee.

18 |     Q.   And what is this fee for?

19 |     A.   To cover my expenses.

20 |     Q.   And what would those expenses be in this

21 | transaction?

22 |     A.   Rent, light bill, water bill, advertising,

23 | secretary, et cetera.

24 |     Q.   Were any services performed specifically as

25 | it relates to my client's vehicle --

1      A.    No.

2      Q.    -- for this fee?

3      A.    No.

4      Q.    Is everyone charged the same fee?

5      A.    Yes.

6      Q.    Has this fee ever changed?

7      A.    Now, it's eight ninety-nine.  Now, it's more.

8      Q.    And when did that change occur?

9      A.    When I moved to this building location, like

10   two years ago.

11     Q.    So, what is the mileage disclosure here on

12   this form?

13     A.    The same mileage from the Bill of Sale from

14   Manheim from the auction.

15     Q.    Which was?

16     A.    One thirty-one six three six.

17     Q.    And does this form indicate anywhere that the

18   mileage was inaccurate?

19     A.    No.

20     Q.    Who signed the form on the dealership's

21   behalf?  I'll scroll down to the bottom so you can see

22   the signature.

23     A.    Alex Reyes.

24     Q.    Did you see this document before Mr. Reyes

25   signed it?

1      A.   Yeah.

2      Q.   Did you approve of this document?

3      A.   No.  I'm not there when -- when he does it.

4      Q.   So, when did you see this document?

5      A.   I never saw it.  I just see it right now.

6      Q.   Do you have personal knowledge of whether

7   this document was ever explained to my client?

8      A.   No.  They have to read it.

9      Q.   I'm going to look at the top again over here.

10          I'm -- what does V#3 stand for in the upper

11   left-hand corner (indicating)?

12     A.   Do what?

13     Q.   Let me do this.

14     A.   I don't know.  I don't know.  That's -- oh,

15   that's the app number from the bank.  When you finance

16   it --

17     Q.   Uh-huh?

18     A.   -- every deal has an app number, and that's

19   the app number from when he purchased it.  I'm looking

20   at it right now in the deal here.  It's 57987168.

21   That's same one.

22     Q.   Okay.  And then what is this next to it

23   (indicating)?

24     A.   No, I don't know.

25     Q.   Would that be a version number?

 1       A.    No.  I don't know what is that.

 2       Q.    Who would know?

 3       A.    The DealerCenter.

 4       Q.    If there were prior versions of a contract,

 5  would they be in your possession?

 6       A.    Do what?

 7       Q.    If there were prior versions of a contract,

 8  would the dealership maintain copies of those

 9  documents?

10       A.    We maintain copies in the system for every

11  single customer.  Everything is in the system since we

12  open.

13       Q.    So, just to make sure I understand you

14  correctly, if there were prior versions, you would have

15  a copy, correct?

16       A.    Oh, yeah.  Yeah.  Yeah.

17            MR. FEYGIN:  I'm going to pull up what's

18       going to be Exhibit E, Plaintiff's Exhibit E, the

19       Retail Installment Sales Contract.  And this is

20       FSIA 000026, and it goes down through FSIA 000031.

21            Does everybody see this document?

22            THE WITNESS:  Yes.

23  BY MR. FEYGIN:

24       Q.    Is this a true and correct copy of the Retail

25  installment Sales Contract for the Plaintiff's

 1    transaction?

 2         A.    Yes.

 3         Q.    And in your words, what is this document?

 4         A.    That's the -- that's the contract with the

 5    terms; 16 percent, how much money they're going to pay

 6    in interest, how much he's financing, what's the

 7    payment, what's the -- the months.  It tells you the

 8    whole contract history.

 9         Q.    Would it be fair to call this a financing

10    agreement?

11         A.    Yes.

12         Q.    So, what is the difference between the first

13    contract we just saw and this one?

14         A.    No.  That's the Bill of Sale.  The Bill of

15    Sale is not a -- it's just a Bill of Sale.  It's not

16    a -- this is the contract.

17         Q.    And this was also electronically signed?

18         A.    Correct.  Right there, you can see the

19    signature.

20         Q.    And obviously Mr. Reyes signed this on behalf

21    of the dealership?

22         A.    Correct.

23         Q.    Was this -- do you have personal knowledge if

24    this contract was explained by Mr. Reyes to my client?

25         A.    He explains to every customer.  They -- they

1   explain the terms to the customer before they sign, the

2   payments, everything.

3        Q.    And what was told to him?

4        A.    I wasn't there.  I don't know, but I'm

5   assuming these terms; the payment five seventy-three a

6   month for 48 payments, the first payment begins July 7,

7   2020.  He got 16.9 percent APR.  Because when you get a

8   16 percent APR, it means you have bad credit, so I am

9   assuming he got bad credit, so everything is explained

10  before they sign.

11       Q.    But that's an assumption and not personal

12  knowledge, correct?

13       A.    You have to tell -- disclose all the terms

14  before the customer signs.  Nobody signs and then reads

15  after.  They -- we explain, and that's what I, you

16  know, taught them to my people.  They first need to

17  explain everything, and after they explain it, they

18  agree.  Then we go ahead and print the paperwork,

19  not -- we don't print paperwork before the customer

20  knowing what's the payment.  We print paperwork after

21  the customer knows everything.

22       Q.    But you weren't there to personally witness

23  anybody --

24       A.    Correct, I was not there.

25       Q.    -- explain --

1     A.    Correct.

2     Q.    Okay.  Does this form disclose to my client

3  that the vehicle had an inaccurate odometer reading?

4     A.    No.

5     Q.    And what was the odometer reading disclosure

6  on this form?

7     A.    Like, from Manheim, one thirty-one six three

8  six.

9     Q.    I'm going to scroll back to the top here.

10 Next to the application number, again we see this V#3.

11        Any idea what that's about?

12    A.    No.

13    Q.    So, after my client left with the vehicle,

14 did my client make his payments directly to Powerhouse?

15    A.    To the bank.

16    Q.    And is that because Powerhouse assigned the

17 Financing Agreement to Westlake?

18    A.    No.  Because we don't do buy here/pay here,

19 so he financed the car, and he needs to pay the lender

20 direct.

21    Q.    And the lender was Westlake, correct?

22    A.    Right.

23    Q.    How much did Powerhouse make in profit off of

24 the assignment of the financing agreement to Westlake?

25    A.    I can tell you right now.  Around $7,000.

1      Q.   And what did you just look at to make that

2   determination?

3      A.   It's my -- my formula, the way I do the math.

4      Q.   Is there a formal document that spells out

5   the payout between Westlake and you?

6      A.   No.  We're taking the customer.  They give me

7   a check of 18,900.

8      Q.   How did you come to this agreement with

9   Westlake?  Is there a master dealer agreement between

10   Westlake and the dealership?

11      A.   Yes.

12      Q.   Okay.  And was that in place at the time of

13   my client's purchase?

14      A.   Yes.

15      Q.   And you have a copy of that?

16      A.   Well, I have my subscription with

17   DealerCenter.

18      Q.   What I'm asking for, is there a formal

19   contract between you and Westlake that dictates how

20   much the dealership is going to make?

21      A.   No.

22      Q.   So, how did you determine with Westlake how

23   much you were going to get paid?

24      A.   You submit the deal to the -- through the

25   platform from DealerCenter, and they give you a

1   response based on the customer's information, the

2   income, et cetera.  On this particular deal, my check

3   was 18,900.

4       Q.   Did Westlake provide you with a deal recap or

5   washout sheet?

6       A.   Yeah.  I have it here.

7       Q.   Do you agree to provide the deal recap or

8   washout --

9       A.   Yes.

10      Q.   -- sheet?

11      A.   Yes, whatever you need.

12      Q.   Where is Westlake located, do you know?

13      A.   California.

14      Q.   How long have you been doing business with

15  Westlake?

16      A.   Five years.

17          MR. FEYGIN:  So, I'm going to pull up what's

18      going to be Plaintiff's Exhibit F.  It's going to

19      be an Odometer Disclosure Statement.  This was

20      produced in discovery by the Defendant, and it's

21      labelled FSIA 000018.

22          (Whereupon, document(s) shared on the

23      screen.)

24  BY MR. FEYGIN:

25      Q.   Does this document look familiar to you?

1    A.   That's the odometer disclosure.

2    Q.   Is this a true and correct copy of the

3  odometer disclosure the dealership had my client

4  execute?

5    A.   That's it.  That's the only one.

6    Q.   What was the mileage disclosure on this

7  document?

8    A.   131636.  I don't -- I don't see it.  Yeah,

9  131636.

10    Q.   And was the checkbox selected where it says

11  "I certify the odometer reading is not the actual

12  mileage"?

13    A.   No.

14    Q.   Why did you have my client execute this

15  document?

16    A.   Because this is -- every customer needs to

17  sign it.  It's standard for every customer.

18    Q.   And is that because the DMV requires it or is

19  that because Westlake --

20    A.   The DMV requires it, yes.  The DMV requires

21  it.

22    Q.   Do you know if the Plaintiff personally

23  signed this document?

24    A.   I see both signatures, yes.

25    Q.   But you weren't there to actually see --

1        A.    I wasn't there.

2        Q.    -- them sign the document?

3        A.    I was not there.

4        Q.    Do you have personal knowledge of whether

5    this form was explained to my client?

6        A.    No.

7        Q.    When did my client see this form, was it

8    before or after the Buyer's Order?

9        A.    While -- while signing all of the documents.

10   That's -- that's part of the package.

11       Q.    Was it before or after the Buyer's Order

12   form?

13       A.    That's after.

14       Q.    Was it before or after the Retail Installment

15   Sales Contract?

16       A.    I don't know.  I don't know the order, if

17   it's for -- if it's before or after.  I don't know.

18       Q.    Is there a way to figure out the order that

19   these contracts were provided to --

20       A.    I can --

21       Q.    -- to my client?

22       A.    I can ask the finance guy here, and he can

23   tell me.

24       Q.    Is there an actual log somewhere of how these

25   documents were signed with timestamps?

1       A.    No.   I have to look a contract and tell you

2   what's the order.

3               MR. PERALTA:   Objection; asked and answered.

4               THE WITNESS:   Actually, they have -- do you

5       see the paper in the bottom?   They have, like --

6       like a number.   It's a sequence.   If you scroll --

7       if you scroll down, they -- like, in the corner, on

8       the paper in the corner in the bottom, there has to

9       be -- see it over there?   There is, like a --

10      that's the date.   It doesn't show the -- the

11      sequence.   Yeah, I don't know the sequence.

12  BY MR. FEYGIN:

13      Q.    Who would know?

14      A.    DealerCenter.

15              MR. FEYGIN:   I'll move on to the Application

16      for Certificate of Title.   This is going to be

17      Plaintiff's Exhibit G.

18              (Plaintiff Exhibit G was marked for

19      identification.)

20              (Whereupon, document(s) shared on the

21      screen.)

22              MR. FEYGIN:   And this is FSIA 000034.

23              Do we all see this document?

24              THE WITNESS:   Yes.

25  BY MR. FEYGIN:

1      Q.   Does this look like a true and accurate copy

2   of the Application for Certificate of Title with --

3   without registration my client signed?

4      A.   Yes.

5      Q.   What is the purpose of this document?

6      A.   The customer authorizes the dealership to

7   transfer the car over to his name.

8      Q.   And why did my client have to sign this

9   document?

10      A.   That's not something they have to sign.

11   There -- there's no place to -- to sign it.  Only the

12   dealership.

13      Q.   So, is it your position that it's only one

14   page, this document?

15      A.   Correct.

16      Q.   There is no second page?

17      A.   No, no second page.  No.  Whatever --

18   whatever they have to sign, they sign, and -- and if

19   there's no space for them to sign, they don't sign.

20      Q.   Over here in the bottom right corner there's

21   the dealer agent signature.

22          Whose signature is that?

23      A.   Alexander Reyes.

24      Q.   Did my client ever see this document?

25      A.   Yes.  All of them.

1     Q.   Were you there personally to witness my

2    client --

3     A.   No.

4     Q.   -- sign this document?

5     A.   No, but that's part of the package, and it

6    shows the lienholder, Westlake Financial.

7     Q.   So, when did Mr. Haddon see this form, was it

8    before or after the Buyer's Order?

9     A.   I don't know.

10     Q.   Was it before or after the Retail Installment

11    Sales Contract?

12     A.   I don't know.

13     Q.   So, how do you know that he saw it?

14     A.   It's in the package.  They give him a

15    package, and he needs to sign.  And whatever he doesn't

16    need to sign, he -- it's a package, but not all the

17    package is for him to sign.  Some -- some -- some

18    papers, like this one, doesn't need the customer's

19    signature.

20     Q.   What was the mileage disclosure on this form?

21     A.   131636.

22     Q.   And that was filled out by who?

23     A.   By the system, DealerCenter.

24     Q.   Who put the information into DealerCenter?

25     A.   Me and Alexander.

1    Q.   And on what date was this information entered

2  into the system?

3    A.   I can tell you right now.  Well, this one

4  particular, when they sold the car, but I -- when I

5  post the cars on the web page -- let's see.  I posted

6  this car, so when I posted -- when -- when the first --

7  the car first arrived, I take pictures, and I post it.

8  The mileage, I put 131636.  It's on the -- the web page

9  since Day 1.

10    Q.   Getting back to this form, it says the

11  mileage reading is one thirty-one six thirty-six, date

12  read 5/25/2020.

13         Was the mileage read on that date?

14    A.   Yeah.

15    Q.   And did the dealership select that it was

16  actual mileage or --

17    A.   Yes.

18    Q.   -- not the actual mileage?

19    A.   Actual mileage.

20         MR. FEYGIN:  I'm going to move on to

21    Exhibit H.  This is Plaintiff's RFP 018.

22         (Plaintiff Exhibit H was marked for

23    identification.)

24         (Whereupon, document(s) shared on the

25    screen.)

 1   BY MR. FEYGIN:

 2        Q.   Does this document look familiar to you?

 3        A.   That's the Power of Attorney.

 4        Q.   And what is the scan number at the top of

 5   this document (indicating)?

 6        A.   I don't know.

 7        Q.   Can you see it now?

 8        A.   Yeah, I can see it, but I don't know what is

 9   it.

10        Q.   Can you read that into the record, please?

11        A.   539994090.

12        Q.   Is this a true and correct copy of the Power

13   of Attorney the dealership had my client sign?

14        A.   Yes, and that's their signatures.

15        Q.   And is this a true and correct copy of the

16   Power of Attorney that was submitted to the DMV by the

17   dealership --

18        A.   Yes.

19        Q.   -- for this transaction?

20        A.   Yes.

21        Q.   In your words, what is the purpose of this

22   document?

23        A.   It's a Power of Attorney that the customer

24   authorizes to transfer the car over to them.

25        Q.   And why does the dealership use a Power of

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC
CR of FS Investments (Franklyn Strusberg)
4/23/2024
69

1    Attorney form?

2        A.   It's a standard.  The DMV gives you the

3    paperwork.

4        Q.   How often does the dealership use this form?

5        A.   Every single deal.  When you print it, you

6    hit print, and the package comes automatically.  It's

7    standard in every customer.

8        Q.   And I just want to make sure that we're on

9    the same page here.

10            This is HSMV form 82053?

11       A.   Correct.

12       Q.   Read 12/11?

13       A.   Correct.

14       Q.   And it is your position as you sit here today

15   that you use this form in every single vehicle

16   transaction?

17       A.   Correct.

18       Q.   Who prepared this form for my client's

19   signature?

20       A.   The system and the -- and the finance

21   manager.

22       Q.   Okay.  And how do you know my client signed

23   this document?

24       A.   Because I can see the signature there.  I can

25   see two signatures.

1      Q.    And was this ever explained to my client?

2      A.    Like I said, everything is explained, yes.

3      Q.    Were you there --

4      A.    I was not there.

5      Q.    -- to watch --

6      A.    No, I was not there.

7      Q.    When did Mr. Haddon see this form?

8      A.    When he signed it.

9      Q.    I should have been a little bit more

10  specific.

11         Was it before or after the RISC?

12     A.    At the moment of the sale.

13     Q.    Okay.  Was it before or after signing the

14  Retail Installment Sales Contract.

15     A.    At the moment of the sale?

16     Q.    Was it before or after signing the Buyer's

17  Order form?

18     A.    At the moment of the sale.

19     Q.    Was it before or after any of the other

20  documents we just reviewed?

21     A.    At the moment of the sale.

22     Q.    Okay.  Is it your position that you don't

23  know when this document was actually signed, then?

24     A.    Correct.

25     Q.    So, at the top over here, on what date was

1    this signed?

2         A.    It says 5/25/2020.

3         Q.    And then beneath that, who is it that my

4    client appointed as the Power of Attorney (indicating)?

5         A.    Don Hall.

6         Q.    Who is Don Hall?

7         A.    I don't know.

8         Q.    Does Don Hall work for the dealership?

9         A.    No.

10        Q.    Is the dealership in the business of having

11   consumers sign Power of Attorneys appointing people

12   that are not employed by the dealership to act on their

13   behalf?

14        A.    Who's not -- who's not --

15        Q.    I'm asking you.  This is the form that you

16   submitted to the DMV that you just testified --

17        A.    No, because I --

18        Q.    -- that was part of my client's transaction.

19        A.    That part is -- it's the DMV office.  They

20   do --

21        Q.    Okay.

22        A.    They put names on them.  I think that must be

23   the DMV office where they transferred the car.

24        Q.    Okay.  When my client signed this document,

25   was the name Don Hall already put onto this document?

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                                        4/23/2024
CR of FS Investments (Franklyn Strusberg)                                                        72

```
 1          A.    I don't know.

 2          Q.    Who would know?

 3          A.    The lady who does the transfers for -- for

 4     me.

 5          Q.    Who is that?

 6          A.    Oh, I think -- Betty.  Betty does my titles.

 7          Q.    And where does Betty work?

 8          A.    She's mobile.

 9          Q.    What is the name of her company?

10          A.    I don't know.

11          Q.    What is her contact information?

12          A.    I have her phone number.

13          Q.    Do you agree to provide that to me?

14          A.    Yes.

15          Q.    Okay.

16          A.    Yeah.  That whole -- the DMV office where

17     they transfer the car.

18          Q.    And how do you know that?

19          A.    It -- the name sounds familiar.

20          Q.    Does this document disclose the vehicle's

21     mileage anywhere?

22          A.    Not this one.  The odometer disclosure does

23     and the Bill of Sale and the contract.

24                MR. FEYGIN:  Okay.  I'm going to move on to

25          Exhibit I.  This is the Certificate of Title we
```