1    obtained from the DMV through a public records

2    question.

3         (Plaintiff Exhibit I was marked for

4    identification.)

5         (Whereupon, document(s) shared on the

6    screen.)

7 BY MR. FEYGIN:

8    Q.   Does this look familiar to you?

9    A.   No.

10   Q.   You have never seen this document before?

11   A.   I've seen on other ones, but not this one.

12   Q.   Okay.  Did you submit title documents to the

13 DMV?

14   A.   No.  Betty.

15   Q.   Okay.  We can agree that this is a truthful

16 and accurate representation of the face of the title?

17   A.   Correct.

18   Q.   And what is this scan number at the top of

19 this document (indicating)?

20   A.   I don't know.

21   Q.   Okay.  Let me zoom in so you can see it

22 better.

23        What is the number over here?

24   A.   No, I already told you.  539994086.  It's a

25 transaction number there.

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                                    4/23/2024
                        CR of FS Investments (Franklyn Strusberg)                              74

```
 1        Q.    Correct.   The scan transaction number?

 2        A.    Yes.

 3        Q.    Going to the second page, which is the back

 4   of the title, can you read the scan transaction number

 5   on the top?

 6        A.    Can you please zoom out a little bit, please?

 7        Q.    Sure.   (Complies with request.)

 8        A.    539994087.

 9        Q.    And you said that you don't remember or you

10   don't recall this form, do you?

11        A.    No.

12        Q.    Do you have a copy of the Certificate of

13   Title.

14        A.    In the deal jacket, might be.

15        Q.    Do you have a copy of the Certificate of

16   Title my client actually signed?

17        A.    Yes.   It has to be in the deal jacket.

18        Q.    Okay.   Do you have a copy of the Certificate

19   of Title where Auto Deal Corp. transferred the title to

20   Powerhouse?

21        A.    It must be in the -- in the papers.

22        Q.    Okay.   And do you agree to provide this

23   document?

24        A.    Yes, whatever you need.

25        Q.    Do you have the document in front of you now?
```

 1      A.    No.

 2      Q.    Can you find the document as we sit here?

 3      A.    No.

 4      Q.    So, looking at this document here, do you

 5  have any reason to believe this is not the document

 6  where the Certificate of Title was transferred from

 7  Powerhouse to Auto Deal -- I'm sorry, from Auto Deal to

 8  Powerhouse?

 9      A.    No.

10      Q.    Do you have any reason to believe that this

11  document is not the Certificate of Title in which

12  Powerhouse transferred the title to my client?

13      A.    No.

14      Q.    Okay.  I'm going to start off with the

15  transaction from McCombs to Auto Deal Corp, which is --

16  I'm going to highlight it so we can all focus in on it.

17            Do you see what I'm looking at?

18      A.    Yes.

19      Q.    Were you personally involved in this

20  transfer?

21      A.    No.

22      Q.    So, you did not sign this?

23      A.    No.

24      Q.    You did not see this transfer?

25      A.    I never touch titles.  I never do paperwork,

1    not -- not one in my life.  I don't even know how to do

2    it.

3         Q.   Okay.  Moving on to the transfer from Auto

4    Deal to Powerhouse, see where I'm highlighting?

5         A.   Yes.

6         Q.   Okay.  Whose signature is this on the

7    left-hand side (indicating)?

8         A.   I don't know.

9         Q.   Who would know?

10        A.   Betty.

11        Q.   And is this your name to the right of the

12   signature (indicating)?

13        A.   Yes.

14        Q.   Why would your name be there, then?

15        A.   Because I'm the owner of the dealership.

16        Q.   But that's not your signature, though, is it?

17        A.   No.

18        Q.   Okay.  And we don't know who signed it?

19        A.   Betty.

20        Q.   So, now it's your position that this is

21   Betty's signature?

22        A.   I'm assuming because she's the only one that

23   does the -- the transfers at the moment of the -- of

24   the -- of the transfers.  In -- in that moment, back in

25   2020, she was the only one doing it.

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC
CR of FS Investments (Franklyn Strusberg)
4/23/2024
77

1       Q.    And Betty is not an employee of the

2    dealership, is she?

3       A.    Yeah, she works in the time.  Not anymore,

4    but back in the day she was working with me.

5       Q.    Was she a 1099 or a salaried employee?

6       A.    1099.

7       Q.    And how often did she get paid?

8       A.    Weekly.

9       Q.    Did Powerhouse ever sign a Power of Attorney

10   appointing Betty as the Power of Attorney to bind it in

11   this Certificate of Title transaction?

12      A.    I don't remember.

13      Q.    Let's look at the odometer disclosure here.

14      A.    One thirty-one three six -- 131630.

15      Q.    Okay.  And I'm going to delete the

16   highlighting so it might be easier for you.

17            On what date was the Certificate of Title

18   transferred to Powerhouse?

19      A.    I don't know.

20      Q.    What is the date that is listed on --

21      A.    Oh, it says 5/15/20.

22      Q.    And is that the actual date that the

23   Certificate of Title was transferred to Powerhouse?

24      A.    If it's there, yes.

25      Q.    Okay.  And when Powerhouse accepted this

```
 1    Certificate of Title, did it look at the face of the
 2    title before signing this document, whoever --
 3         A.   I don't know.
 4         Q.   -- signed this?
 5         A.   I don't know.
 6         Q.   And who would know?
 7         A.   Betty.
 8         Q.   Okay.  And you didn't speak with her to
 9    prepare for today, did you?
10         A.   No.
11         Q.   And do we know who Juliana A. is?
12         A.   That's the secretary from Auto Deal Corp.
13         Q.   Okay.  And you weren't present personally
14    when this transfer occurred?
15         A.   Correct.
16              MR. FEYGIN:  Okay.  I'm going to scroll down
17         to the transaction from Powerhouse to Gabriel Luc
18         Haddon.  It's the third reassignment.  I'm going to
19         highlight it just for a moment so everybody can see
20         what we're looking at.
21              Does everybody see what I'm talking about?
22              THE WITNESS:  Yes.
23    BY MR. FEYGIN:
24         Q.   What was the mileage disclosure at the time
25    of this transfer?
```

 1          A.    131636.

 2          Q.    And what was the date that this disclosure

 3   was made?

 4          A.    It says there 5/25/20.

 5          Q.    And is that the date that the -- the

 6   disclosure was actually made on this title?

 7          A.    Yes.

 8          Q.    And how do you know that?

 9          A.    By looking at the date right here.

10          Q.    And it's your position that the information

11   on this title document is truthful and accurate and

12   depicts exactly the date that this transfer occurred?

13          A.    Correct.

14          Q.    Who signed on behalf of the dealership?

15          A.    Betty.

16          Q.    And again, Betty's name doesn't appear there,

17   does it?

18          A.    No.  That's my name.

19          Q.    Okay.  So, to the right, that is your name,

20   Franklyn Strusberg?

21          A.    Correct.

22          Q.    And who signed on behalf of my client?

23          A.    He signed on the front, not on the title.

24          Q.    That's not the question.  I'm looking at --

25          A.    Him, the -- the customer.

```
 1          Q.   So, it's your position --

 2          A.   You don't -- you don't sign.  They put the

 3     name on it.

 4          Q.   Okay.  Let's look at it a little bit more

 5     closely here.

 6               Do you see where I'm pointing at

 7     (indicating)?

 8          A.   Yes.

 9          Q.   Underneath, what does it say right there

10     (indicating)?

11          A.   "Signature of borrower."

12          Q.   Okay.  And is it your position that my client

13     did not sign this document?

14          A.   That's why you got the Power of Attorney.

15          Q.   Okay.  And now is it your position that a

16     Power of Attorney signed this document on my client's

17     behalf?

18          A.   No.  He signed it.  He signed the Power of

19     Attorney for me to sign for him.

20          Q.   Okay.  So, let's unpack that.

21               My client signed a Power of Attorney,

22     correct?

23          A.   Correct.

24          Q.   And he let you sign this document on his

25     behalf?
```

```
 1        A.    That's what the Power of Attorney says.

 2        Q.    And did you sign this document on my client's

 3   behalf?

 4        A.    No.

 5        Q.    Who signed this document on my client's

 6   behalf?

 7        A.    Somebody in the dealership.  Betty.  I'm

 8   assuming Betty.

 9        Q.    How would you find out who signed this

10   document?

11        A.    I can call her and ask her.

12        Q.    And you didn't speak with her in preparation

13   for today's deposition?

14        A.    Oh, no.  No.  No.

15              MR. PERALTA:  Asked and answered.

16              THE WITNESS:  I haven't talked to her for,

17        like two months.

18   BY MR. FEYGIN:

19        Q.    And why is that?

20        A.    She no longer works with me.  I have a new

21   lady.

22        Q.    When this mileage disclosure was made on

23   5/25/2020, did Powerhouse Automotive look at the face

24   of the title?

25        A.    No.
```

1      Q.   And at the time of the sale of the vehicle to

2  Mr. Haddon, did the dealership have this title in its

3  possession?

4      A.   No.

5      Q.   Didn't you just testify that it was sign on

6  May 25th of 2020?

7           MR. PERALTA:  Objection; mischaracterizes his

8      testimony.

9           Go ahead, Frank.

10          THE WITNESS:  I got the title on 5/15.

11 BY MR. FEYGIN:

12     Q.   Okay.  So, was the dealership in possession

13 of this title on 5/25?

14          MR. PERALTA:  Objection; asked and answered.

15          THE WITNESS:  On 5/25?  Yes.

16 BY MR. FEYGIN:

17     Q.   Okay.  So, it wasn't being held by a lender

18 when my client signed it, was it?

19     A.   By Auto Deal Corp.

20     Q.   Let me -- let me ask you a different

21 question.

22          Looking at the document we're looking at here

23 today, right, it wasn't in the possession of a lender

24 at the time this signature was applied to the title,

25 was it?

```
 1        A.    No.

 2        Q.    And the title wasn't lost or in the process

 3   of being replaced, was it?

 4        A.    Correct.

 5        Q.    So, why is it that a Power of Attorney was

 6   used to sign this document instead of having my client

 7   sign the document?

 8        A.    I don't know.

 9        Q.    Who would know?

10        A.    Betty.

11        Q.    Okay.  Again, you didn't speak to her about

12   this question either, did you?

13        A.    Correct.

14        Q.    So, after the vehicle was sold, did the

15   dealership ever inform my client that it had a tampered

16   odometer?

17        A.    No.

18             MR. PERALTA:  Objection; assumes facts not in

19        evidence.

20   BY MR. FEYGIN:

21        Q.    When did the dealership first learn that the

22   odometer reading was inaccurate?

23        A.    When the bond called me.

24        Q.    And do we agree that the mileage reading is

25   inaccurate?
```

1         A.    Yes.

2         Q.    Okay.  And why do we have that agreement, is

3    that because the face of the title says a different

4    mileage reading?

5         A.    Because we dig -- dig into it when the bond

6    called me.  And I called Manheim, and Manheim told me

7    that the seller, Ford, made a mistake.

8         Q.    So, there's no dispute that the mileage is

9    inaccurate on this vehicle?

10        A.    Correct.

11        Q.    Excellent.  Has the dealership ever been sued

12   before?

13        A.    No.

14             MR. PERALTA:  Asked and answered; objection.

15   BY MR. FEYGIN:

16        Q.    Has the dealership ever been sued for

17   odometer issues before?

18        A.    Never.

19             MR. PERALTA:  Asked and answered; objection.

20   BY MR. FEYGIN:

21        Q.    Has a consumer ever filed a Complaint against

22   the dealership with the Better Business Bureau?

23        A.    Yes.

24        Q.    When?

25        A.    I don't know.

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC
CR of FS Investments (Franklyn Strusberg)

4/23/2024
85

1       Q.   Who would know?

2       A.   The -- if you look into the Better Business

3   Bureau page, you can see that.

4       Q.   Do you have access to the Better Business

5   Bureau page and all of the Complaints that were waged

6   against you?

7       A.   No.

8       Q.   Do you have an account with the Better

9   Business Bureau?

10      A.   I think so.

11      Q.   How can you determine whether or not you have

12  an account?

13      A.   I might have it, but maybe it expired.  I

14  have to activate it again.

15      Q.   Did anybody ever file a Complaint with a

16  county department against the -- the dealership?

17      A.   Not that I know of.

18      Q.   Did anybody ever file a Complaint with the

19  Department of Agriculture and Consumer Services against

20  the dealership?

21      A.   No.  With the DMV.

22      Q.   Has anybody filed a Complaint with the DMV?

23      A.   Yes.

24      Q.   How many?

25      A.   I don't know.

1     Q.   Who would know?

2     A.   The DMV records.

3     Q.   Do you not maintain possession of these

4 records in -- in your office?

5     A.   No, because they -- we solved all the issues.

6 The Complaints are for different reasons, like the

7 compressor is not working, the -- the -- the

8 transmission is -- any mechanical issues, and we always

9 help the -- the community.

10     Q.   And is it your position that you were never

11 cited by the DMV?

12     A.   Every time there is a complaint, the DMV

13 comes to the dealer to solve the issue.

14     Q.   Did you ever receive a citation from the DMV?

15     A.   Yes.

16     Q.   What was that citation for?

17     A.   I don't know.

18     Q.   Has anybody filed a Complaint with the

19 attorney general's office against the dealership?

20     A.   Not that I know of.

21     Q.   Who would know?

22     A.   No, I don't know.

23     Q.   I understand you don't know, but who in the

24 organization would know?

25     A.   Nobody.

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                                    4/23/2024
                      CR of FS Investments (Franklyn Strusberg)                            87

```
 1              MR. FEYGIN:  Okay.  I'm going to move on to

 2      Exhibit J, which is going to be the Amended Answer

 3      and Affirmative Defenses.

 4              (Plaintiff Exhibit J was marked for

 5      identification.)

 6              (Whereupon, document(s) shared on the

 7      screen.)

 8  BY MR. FEYGIN:

 9      Q.   Have you ever seen this document?

10      A.   No.

11      Q.   Okay.  I'm going to look at the affirmative

12  defenses that your attorneys filed with the Court.

13          For your first affirmative defense, what

14  facts do you rely upon to assert accord and

15  satisfaction?

16      A.   You're asking me?

17      Q.   Yes.

18      A.   I don't understand the question.

19      Q.   What facts do you rely upon when you say the

20  Plaintiff's actual damages have been fully resolved by

21  the parties' agreement and the Defendant's payment?

22      A.   The -- the bond called me asking for a check

23  for $9,000, and I sent it.

24      Q.   For your third affirmative defense -- I'm

25  sorry.
```

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC
4/23/2024
CR of FS Investments (Franklyn Strusberg)
88

1       For your second affirmative defense, what

2   facts do you rely upon when you assert that the

3   Plaintiff was aware of any discrepancy in the odometer

4   reading of the subject vehicle on or soon after

5   May 25th, 2020?

6       A.    What is the question?

7       Q.    What facts do you rely upon when the

8   dealership asserts that the Plaintiff was aware of any

9   discrepancy in the odometer reading?

10      A.    I called -- I called Manheim automatically.

11  The second I -- I received the -- the call from the

12  bond about the claim of the mileage, the discrepancy, I

13  called the -- Manheim, the auction.

14      And I asked them why if the car was a

15  rollback they didn't disclose it on the comments,

16  because normally when the car has a discrepancy with

17  the mileage they have to disclose it on the comments

18  and they sell me the car TMU.  This car was sold to me.

19  I bought the car under the -- under the impression that

20  the car had a 131,000 miles.  That's why I bought it,

21  but then when I find out, that is when I called

22  Manheim.  And they dig into it, and the answer was

23  Ford, the seller, made a mistake.

24      Q.    What facts do you have that my client knew

25  that the odometer was rolled back shortly after the

```
 1    purchase?

 2         A.   No.  I find out because of the bond.  That's

 3    when I find out.

 4         Q.   I understand when you found out.  What I'm

 5    asking you is:  You have asserted that my client knew

 6    that the mileage was inaccurate shortly after the

 7    purchase.

 8              What facts do you have to support my client

 9    knew that the mileage was inaccurate shortly after

10    purchase?

11         A.   I don't know.

12         Q.   For your third affirmative defense, what

13    facts do you rely upon when you assert that the

14    Plaintiff's cause of action is barred by the doctrine

15    of laches?

16              MR. PERALTA:  Objection; calls for a legal

17         conclusion.

18              THE WITNESS:  Can you please explain the

19         question a little better for me, please?

20              MR. FEYGIN:  For the third affirmative

21         defense --

22              THE WITNESS:  Yes.

23              MR. FEYGIN:  -- the dealership has asserted

24         that the client -- the consumer's causes of action

25         are barred by the doctrine of laches.
```

1          How was the dealership prejudiced by the

2     Plaintiff filing a lawsuit two years and ten months

3     after he purchased the vehicle?

4          THE WITNESS:  No, this is -- we completely

5     understand that it's a human mistake.  We're not

6     here to blame nobody.  It's -- it's -- they made a

7     mistake, and since Day 1 when I contacted the bond,

8     I told them that Manheim was open to receive the

9     car back and to refund me the money.

10   BY MR. FEYGIN:

11        Q.   How was the dealership prejudiced by the

12   filing of this lawsuit two years and ten months after

13   the purchase?

14        A.   I don't understand the question.  I'm sorry.

15        Q.   As in for your fourth affirmative defense,

16   what facts does the dealership rely upon when you

17   assert that the Plaintiff has not suffered and cannot

18   honestly allege any actual damages?

19        A.   I don't understand the question.

20        Q.   For your sixth affirmative defense, what

21   facts do you rely upon when you assert Counts II and

22   III are barred under the Independent Tort Doctrine?

23        A.   Are you talking to me in Chinese.

24        Q.   Are we in agreement that the mileage

25   disclosures provided to my client on the title

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC
CR of FS Investments (Franklyn Strusberg)
4/23/2024
91

1   documents was inaccurate?

2       A.   Yes.

3       Q.   So, for your seventh affirmative defense,

4   what facts does the dealership rely upon when it

5   asserts my client waived his rights?

6       A.   I don't understand the question.

7       Q.   What rights did my client waive?

8       A.   No, he's -- he's -- he -- it's his right

9   to -- to complain about that.  If I was him, I -- I

10  would have done the same.  I -- there's no -- I'm not

11  discussing that.  He's a hundred percent right.  Your

12  client is 100 percent right, and I'm with him.

13      Q.   For your eighth affirmative defense, what

14  facts do you rely upon when you assert Plaintiff's

15  claims are barred by a prior settlement and release?

16      A.   Well, the -- the solution that I offered

17  since Day 1 is just to unwind the deal so I can just

18  give the car back to Manheim so -- so he doesn't need

19  to keep that car, and Manheim opened up that -- that

20  door for us.  They say just to unwind the deal.

21      Q.   Are you still willing to unwind the deal?

22      A.   I got to call Manheim again.  I spoke with

23  them maybe, like a year ago, but I've got to talk to

24  them again.  I'm pretty sure they're going to want the

25  deal.

```
 1        Q.    And would you be interested in exploring that
 2   option again?
 3        A.    Whatever we need to do to -- to -- I mean,
 4   it's -- it's a -- it's a mistake, and I understand your
 5   point.  And me as a dealer, I learned my lesson with
 6   this particular case because next time I'm going to try
 7   to -- to make sure the mileage are right, to ask --
 8   triple check with the auction, "are you sure this
 9   mileage are right?"  Call them when they do the
10   inspection, make sure they check on -- because they
11   have access to -- to CARFAX™ and all that, so just to
12   make sure they -- they check the mileage.
13        Q.    And so, from what I understand, and correct
14   me if I'm wrong, but I think you're saying that you
15   didn't take necessary steps to verify the mileage, you
16   just relied on --
17        A.    No.  We go -- my process is --
18             MR. PERALTA:  Objection; mischaracterizes his
19        testimony.
20             THE WITNESS:  Yeah.  My -- my process is
21        simple.  When we buy the cars, we go by the Bill of
22        Sale of Manheim and -- and the odometer that
23        Manheim provides.  Because Manheim is the biggest
24        company in the U.S., so we go by -- whatever they
25        provide, we go by that.
```

1    BY MR. FEYGIN:

2         Q.    Did my client ever sign a Settlement and

3    Release Agreement regarding his odometer claim

4    odometer?

5         A.    I don't remember.

6         Q.    Did my client ever sign a Settlement and

7    Release Agreement regarding his fraud claim?

8         A.    I don't know.

9         Q.    For your ninth affirmative defense, what

10   facts do you rely upon when you assert Defendant acted

11   in good faith and followed commercially and reasonable

12   standards?

13        A.    He acted in good faith, yes.

14        Q.    What commercial reasonable standards did the

15   dealership follow?

16        A.    We go by -- like, I said, by whatever

17   Manheim -- we only buy from Manheim because it's --

18   it's a trustworthy company, so whatever they tell us is

19   what we tell the -- the customers, whatever is on the

20   paper, on the Bill of Sale of the truck.

21        Q.    For your eleventh and twelfth affirmative

22   defenses, what facts do you rely upon when you assert

23   Plaintiff is estopped from asserting the actions in the

24   Complaint as his own conduct and/or the conduct of

25   third-parties outside of the Defendant's control?  What

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC
CR of FS Investments (Franklyn Strusberg)
4/23/2024
94

1    third-parties are you referring to?

2        A.    I don't know.

3        Q.    What did those third-parties do to contribute

4    to this liability?

5        A.    I don't know.

6        Q.    For your thirteenth affirmative defense, what

7    facts do you rely upon when you assert Plaintiff was

8    negligent?

9        A.    Who was negligent?

10       Q.    My client.

11       A.    Why was he?

12       Q.    It says my client was negligent.

13             How was my client negligent?

14       A.    I don't know.

15       Q.    For your fourteenth affirmative defense, what

16   facts do you rely upon when you assert Plaintiff's

17   claims are barred in whole or in part by of the

18   Doctrines of Unclean Hands, estoppel, laches,

19   acquiescence and other doctrines of equitable relief?

20       A.    Can you please repeat that question again?

21       Q.    For your fourteenth affirmative defense, it's

22   titled unclean hands, and it states that the

23   Plaintiff's claims are barred in whole or in part by

24   the doctrines of unclean hands, estoppel, laches,

25   anquience (sic) -- acquiescence and other doctrines of

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                4/23/2024
CR of FS Investments (Franklyn Strusberg)                                    95

```
 1    equitable relief.
 2              What facts do you rely upon to assert this
 3    affirmative defense?
 4         A.   I don't know.
 5         Q.   For your sixteenth affirmative defense, what
 6    facts do you rely upon when you assert Plaintiff failed
 7    to mitigate damages?
 8         A.   We always help the customers.
 9         Q.   What should have my client done differently
10    here?
11         A.   I mean, it -- he did what he thought it was
12    good to do.  He's -- he's been down -- he's been down
13    before, because I remember when he was talking about a
14    lawsuit that he win, so he's been down this road
15    before.  Me, no.  For me, this is new.
16         Q.   For your nineteenth affirmative defense, what
17    facts do you rely upon when you assert Plaintiff's
18    cause of action for breach of express warranty is
19    barred by his alteration of the vehicle?
20              MR. PERALTA:  Would you mind showing it,
21         Joshua?
22              MR. FEYGIN:  (Complies with request.)
23              MR. PERALTA:  Thank you.
24    BY MR. FEYGIN:
25         Q.   Number 19 over here, Plaintiff's cause of
```

1    action for breach of express warranty is barred by his

2    alteration of the vehicle while in his possession.

3           What facts do you have to support that my

4    client altered the vehicle?

5         A.    I don't know.

6         Q.    Are you aware of any other affirmative

7    defenses in this case that they the dealership intends

8    to rely on?

9         A.    I don't remember.  I'm sorry.

10          MR. FEYGIN:  Okay.  I'm going to move on to

11          Plaintiff's Exhibit K, and this is the Leave to

12          Amend, Motion for Leave to Amend.

13              (Plaintiff Exhibit K was marked for

14          identification.)

15              (Whereupon, document(s) shared on the

16          screen.)

17   BY MR. FEYGIN:

18        Q.    Have you ever seen this document?

19        A.    I don't -- let me see.  I saw it, yeah, but I

20   didn't read it.

21        Q.    Okay.  I'm going to scroll down to what

22   appears to be Page 3 of 12.  In here in the highlighted

23   section it states:  However, before selling the vehicle

24   to Plaintiff, Defendant did not have any knowledge or

25   information that a 131,636 miles was not the actual

1    mileage of the vehicle.  The Defendant was not in

2    possession, nor was it aware of the content of the

3    Certificate of Title or CARFAX™ report.  Defendant was

4    guided only by the vehicle's dashboard and the

5    information provided by the McCombs when Defendant

6    purchased the vehicle from McCombs.

7              Is this truthful and accurate?

8         A.   Correct.

9         Q.   Okay.  You previously testified, though, that

10   you did have possession of the title at the time of the

11   transfer?

12             MR. PERALTA:  Objection mis- --

13        mischaracterizes his testimony.

14             THE WITNESS:  No.  When you sell the car, you

15        get -- you give them a temporary register.  In that

16        moment, you don't have the title.  I got the title

17        after I sold the car.

18             MR. FEYGIN:  So, you testified that the date

19        on the Certificate of Title for the transfer for my

20        client's transaction was 5/25/20, and you're --

21             THE WITNESS:  That's what's -- that's what is

22        on the title.

23   BY MR. FEYGIN:

24        Q.   That's not the date that it was transferred,

25   though, was it?

```
 1        A.    I don't remember.
 2              MR. PERALTA:  Objection; leading.
 3              THE WITNESS:  I got to ask the lady, Betty.
 4   BY MR. FEYGIN:
 5        Q.    So, is it possible that the date on the
 6   Certificate of Title does not reflect the actual date
 7   that the transfer occurred to my client?
 8        A.    It could be.
 9        Q.    How would you figure this out?
10        A.    I don't know.  I -- I -- I don't remember.  I
11   don't know how they do paperwork.  I'm sorry.
12        Q.    After --
13        A.    I've got to ask Betty.
14        Q.    Okay.  And Betty was working for the
15   dealership at the time that this occurred?
16        A.    At the time, correct.
17        Q.    So, over here, it states that you relied upon
18   the information provided by McCombs.
19              What information was provided by McCombs?
20        A.    The Bill of Sale.
21        Q.    That was the only information you received
22   from McCombs?
23        A.    Correct.
24              MR. FEYGIN:  I'm going to move on to what's
25        going to be Plaintiff's Exhibit L.
```

```
 1              (Plaintiff Exhibit L was marked for

 2        identification.)

 3              (Whereupon, document(s) shared on the

 4        screen.)

 5              THE WITNESS:  McCombs.

 6              MR. FEYGIN:  McCombs, McCumbs.  I don't know

 7        how to pronounce it.

 8              THE WITNESS:  It's McCombs.

 9   BY MR. FEYGIN:

10        Q.   Have you done a lot of business with them?

11        A.   No.  First.  First and last.

12        Q.   First and last, huh?  Yeah, I don't blame

13   you.

14              So, do you recall receiving this demand

15   letter?

16        A.   See, what is that?  Not that I remember.  Not

17   that I remember.

18        Q.   Okay.  Do you recall receiving demand letters

19   from my dealer -- my -- my law firm?

20        A.   No.  I only got a letter from -- from the

21   bond.

22        Q.   Okay.  And what did the bond attach with that

23   letter?

24        A.   They only requested $9,000.

25        Q.   So, walk me through that process.  They
```

1    simply sent you a letter saying "we need 9,000 from

2    you"?

3         A.   Yes, and -- and if -- if you don't pay the

4    bond, they -- they pretty much, they cancel your bond,

5    and if I don't have a bond, I cannot sell cars, so...

6         Q.   Prior to receiving that letter, did Stephanie

7    reach out to you to let you know that there was an

8    active bond claim?

9         A.   Yes.  That's why I had to send the check, and

10   then I say, "Let me dig into it."  And that's when I

11   called my attorney, and that's why --

12        Q.   How did Stephanie contact you?

13        A.   That's when I called Manheim.  I'm sorry.

14   What?

15        Q.   How did Stephanie from Hudson contact you

16   first?

17        A.   She sent me an e-mail.  Through e-mail.

18   We -- we spoke through e-mails.

19        Q.   Do you have a copy of that e-mail string

20   saved?

21        A.   I got to look for it, but it might be in my

22   e-mail.

23        Q.   Do you recall what was attached to the e-mail

24   Stephanie sent to you?

25        A.   I don't know.

```
 1          Q.    Do you agree to search for that e-mail?
 2          A.    Yes.
 3          Q.    And if you can find it, you agree to provide
 4    it?
 5          A.    Yes, sir.
 6          Q.    Where did you send the check?
 7          A.    To the address they provided.
 8          Q.    And what was the amount of the check?
 9          A.    I don't remember.
10          Q.    Was it $10,000?
11          A.    It was under that.
12          Q.    Was it less than $9,000?
13          A.    It was like, 8,000-something, yes.
14    8,900-something.
15               MR. FEYGIN:  I'm going to move on to what's
16          Exhibit M.
17               (Plaintiff Exhibit M was marked for
18          identification.)
19               (Whereupon, document(s) shared on the
20          screen.)
21    BY MR. FEYGIN:
22          Q.    This is another one of the demand letters.
23               Do you recall receiving this?
24          A.    No.
25          Q.    Do you recall Stephanie providing you with
```

1    this?

2         A.    I don't remember.  I'm sorry.

3              MR. FEYGIN:  I think that's about it.

4              Jose, got any cross?

5              MR. PERALTA:  Yes, I will.  I need to go to

6    the restroom first.

7              MR. FEYGIN:  All right.  Let's take a break.

8              MR. PERALTA:  McCombs, are you -- well, I --

9    I -- I would rather go after McCombs, so if -- does

10   McCombs have any questions?

11             MR. TORRES:  I do have a few.

12             MR. PERALTA:  Can we wait so I can go to the

13   restroom?

14             MR. TORRES:  Yeah, I'm okay with taking a

15   five-minute break.

16             MR. PERALTA:  Thank you.

17             MR. TORRES:  You want to be back at 12:06?

18             MR. PERALTA:  Yeah, that works for me.

19             MR. TORRES:  All right.

20             (Thereupon, an off-the-record recess was had

21   from 12:01 until 12:06 p.m.)

22             MR. FEYGIN:  Before we move on, I have one

23   more question to ask.

24             MR. PERALTA:  Yeah.

25   BY MR. FEYGIN:

1    Q.   Mr. Strusberg, are you ready to proceed?

2    A.   Yeah.  Yeah, I'm here.

3    Q.   Are you aware that the Plaintiff issued a

4  settlement offer on March 14th where he agreed to

5  return the vehicle is-as, where-is in exchange for

6  $30,000 to settle the case?

7    A.   I don't remember.

8    Q.   That offer was never conveyed to you?

9    A.   Through who, through my attorney?

10   Q.   Correct.

11   A.   I don't remember.  I'm sorry.

12        MR. FEYGIN:  Okay.  All right.  That's good

13        enough for now.

14        MR. PERALTA:  Josh, if you could please

15        e-mail me that -- the Certificate of -- of Title

16        with the transfer history attached?

17        MR. FEYGIN:  Sure.  Not a problem.  It was

18        disclosed in discovery.

19        MR. PERALTA:  I'm not saying that it wasn't,

20        but since you have it, you know, it will be nice;

21        otherwise, I would have to pause the deposition and

22        look for it and you know.

23        MR. FEYGIN:  Oh, you want it right now?

24        MR. PERALTA:  Yeah, if you don't mind.

25        MR. FEYGIN:  Sent.

```
 1              MR. PERALTA:  Thank you.

 2              MR. TORRES:  See?  Can we go?

 3              MR. PERALTA:  Yeah.

 4              MR. TORRES:  Awesome.

 5                          CROSS-EXAMINATION

 6   BY MR. TORRES:

 7        Q.   I just have a few questions, Mr. Strusberg.

 8   Thank you so much.  My name is Nicolas Torres.  I

 9   represent McCombs in this case.

10              First you went over your relationship with

11   Auto Deal Corp.  You mentioned that you and their owner

12   are friends, so you-all have a relationship where he

13   helped you get started, helped you with the financing

14   at first.

15              Whenever you -- and these questions, I'm not

16   talking about what you and your operation is like now.

17   I want to take you back to 2020 when this specific

18   transaction happened.

19              At the time when you were going through the

20   Manheim website and you were searching for vehicles,

21   you were making deals at that time, were you doing so

22   under an account that was named for Auto Deal Corp. or

23   was it one that was under your dealership's name?

24        A.   Auto Deal Corp.

25        Q.   So, the -- the Manheim account itself was
```

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC
CR of FS Investments (Franklyn Strusberg)
4/23/2024
105

 1    under Auto Deal Corp.'s name?

 2         A.   No.   No.   It's -- it's -- it's my Manheim

 3    account.   I'm just added as a buyer on Auto Deal Corp.

 4         Q.   Got it, but the Manheim account is you

 5    personally?

 6         A.   Is mine, yeah, yeah.   Yeah, FS -- FS

 7    Investments.   Yes, it's my account.

 8         Q.   Okay.   And I know that you're here as a

 9    corporate rep, so when you say yours and FS Investment,

10    you mean it's under the company name, right?

11         A.   Correct.   Correct.

12         Q.   Not under Franklyn Strusberg?

13         A.   Correct, yes.

14         Q.   Okay.   And are you -- at the time were you

15    added as a buyer to any other company or any other --

16         A.   Just --

17         Q.   -- car buyer?

18         A.   Just Auto Deal Corp.

19         Q.   Just Auto Deal Corp.?

20         A.   Correct.

21         Q.   So, whenever you would identify a vehicle and

22    you would say "okay, this is the vehicle that I want to

23    buy," you would submit information to Auto Deal Corp.

24    to finalize that process or would you do the clicking

25    and the processing yourself?

1    A.    I -- I do the click, and I buy it.

2          THE COURT REPORTER:  Again, Mr. Strusberg --

3          MR. TORRES:  Why --

4          THE COURT REPORTER:  I'm sorry.  Again,

5    Mr. Strusberg, please let him finish his question

6    before you begin your answer.  You're talking over

7    each other.  Thank you.

8          THE WITNESS:  I'm sorry, your honor.

9          THE COURT REPORTER:  No worries.

10   BY MR. TORRES:

11   Q.    Okay.  If it was you that made the

12   purchasing, why is it that this Juliana name comes out

13   as the agent signing the Certificates of Title on

14   behalf of Auto Deal and not you, yourself?

15   A.    She's the one who does the paperwork.

16   Q.    So, whenever you purchase a vehicle through

17   the Manheim website, does Juliana or does Auto Deal

18   Corp. automatically get notified that there's been a

19   purchase and they have to get the paperwork started and

20   done for that purchase?

21   A.    Yes.

22   Q.    Is that notification automatic from Manheim

23   to Auto Deal Corp.?

24   A.    Yes.

25   Q.    Do you, yourself, then reach out to Auto Deal

1   Corp. in any way to let them know what vehicles you

2   purchased and what paperwork needs to be done?

3        A.   No.  Just to show them the cars that are --

4   that I purchased so they can pay for them so I can pick

5   them up.  Because as soon as they pay, they generate a

6   gate pass, and then I can have the truck driver pick it

7   up.

8        Q.   That gate pass is sent to Auto Deal Corp.,

9   though, right?

10       A.   Correct.

11       Q.   So, Auto Deal essentially gets notified

12  twice, once from Manheim and once from you, that

13  there's been vehicles that you've selected for

14  purchase?

15       A.   Correct.

16       Q.   Your communication with Auto Deal during this

17  time regarding specific purchases, over any purchase

18  really that you were making during this time, but

19  specifically this one vehicle, is that communication

20  done through e-mail, phone, any messaging within the

21  Manheim website?

22       A.   Phone.  Phone call.

23       Q.   Any text messages?

24       A.   Sometimes.

25       Q.   Regular text messages, WhatsApp?

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC
CR of FS Investments (Franklyn Strusberg)

4/23/2024
108

1      A.    WhatsApp.

2      Q.    WhatsApp?

3      A.    Correct.

4      Q.    Who would you be contacting from Auto Deal

5 Corp. through WhatsApp?

6      A.    My friend, Martine.

7      Q.    Did you ever communicate directly with

8 Juliana or any other person --

9      A.    I don't know --

10      Q.    -- Auto Deal Corp.?

11      A.    I don't even know her.  I don't know her.

12      Q.    Did you ever communicate with anyone from

13 Auto Deal that was not your friend?

14      A.    No.

15      Q.    Do you know how many employees Auto Deal

16 Corp. has?

17      A.    No.

18      Q.    Have you ever entered into any formal

19 agreement or contract with Auto Deal to serve as their

20 agent or representative in any way?

21      A.    No.

22      Q.    The nature of your authority to buy cars on

23 behalf of them or using their account, that is strictly

24 a conversation between you and your friend --

25      A.    I'm --

1    Q.   -- and an understanding with you and your

2    friend.

3    A.   I'm registered in Manheim under Auto Deal

4    Corp. as a buyer.

5    Q.   But the authority to add you as a buyer under

6    Manheim, that was given to you by your friend from Auto

7    Deal Corp., right?

8    A.   Correct.

9    Q.   Is there any written or recorded copy of that

10   agreement in any way?

11   A.   No.

12   Q.   Based on what you've testified to so far, and

13   please correct me if I'm wrong, the first notice that

14   you received of there being any issues with the

15   odometer was when you were contacted by the bond

16   office?

17   A.   Correct.

18   Q.   And that was sometime in 2022?

19   A.   No clue.

20   Q.   Do you remember when that was?

21   A.   No.

22   Q.   And an estimation, was it within months of

23   the sale, within a year, within two?

24   A.   I don't remember.  I'm sorry.

25   Q.   Okay.  And the first notice of -- the first

```
 1    time that you received any notice was through the

 2    Stephanie person from the bond company, right?

 3         A.   Correct.

 4         Q.   You also testified earlier that Manheim

 5    shipped a -- the Certificate of Title, the actual

 6    Certificate of Title sometime, I believe the date was

 7    April 28th, 2020 and that they Fed Ex'd it or UPS'ed it

 8    over to Auto Deal Corp.

 9              Do you recall that?

10         A.   Yes.

11         Q.   Do you know or do you have any memory of how

12    Auto Deal Corp. then transferred that title to you?

13         A.   No.

14         Q.   Did Auto Deal Corp. ever transfer that title

15    to you?

16         A.   They have to.

17         Q.   So, Auto Deal transfers the title, the

18    physical title to you, and then you transfer that

19    physical title to whoever you sell the vehicle to?

20              MR. PERALTA:  Objection; assumes facts not in

21         evidence.

22    BY MR. TORRES:

23         Q.   Is that correct?

24         A.   Correct.

25         Q.   Now, as we have seen now, that Certificate of
```

```
 1    Title does reflect mileage that is above the 131,000
 2    that is reflected elsewhere in that deal, correct?
 3         A.   Correct.
 4         Q.   So, it's fair to say that at least at some
 5    point in May of 2020 your company had a copy of the
 6    physical Certificate of Title reflecting 2000 -- at
 7    least 200,000 miles as the actual miles, correct?
 8         A.   No.  No.  I always receive the title after I
 9    sell the car.
10         Q.   Okay.
11         A.   Not before.
12         Q.   Okay.  So, at some point after 4/28/2020 Auto
13    Deal Corp. gets the certificate, the actual title, then
14    your position is that they do not immediately send that
15    to you, but they send that to you only after you have
16    sold the vehicle?
17         A.   Yes.  That's the agreement I have with my
18    investor.
19         Q.   Okay.  So, Auto Deal holds the Certificate of
20    Title.
21              Do you know what type of envelope or what
22    type of packaging that comes in from Manheim?
23         A.   They -- they always send them Fed Ex.
24         Q.   Okay.  Regular, one of those Fed Ex
25    envelopes, the flat --
```

1      A.    Fed Ex envelopes, correct.

2      Q.    Is it -- is there any further packaging once

3 you open one of those envelopes?

4      A.    No.

5      Q.    So, if you open up the envelope, you take out

6 the Certificate of Title?

7      A.    Yes.

8      Q.    Whenever Auto Deal Corp. sends the

9 Certificate of Title to you, do they also use UPS or

10 any type of shipping company?

11      A.    They use Fed Ex only.

12      Q.    Fed Ex only.  Do you have records of that

13 shipment or are you able to get records of that

14 shipment --

15      A.    I can try to --

16      Q.    -- or do we need --

17      A.    I can try to get it.

18      Q.    If we can't get those from you, we can get

19 those directly from Auto Deal Corp., right?

20      A.    Correct.

21      Q.    So, at some point in -- okay.

22            So, you sell the vehicle, then you let Auto

23 Deal Corp. know that you've sold the vehicle --

24      A.    Correct.

25      Q.    -- so they can send you the title?

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                    4/23/2024
                    CR of FS Investments (Franklyn Strusberg)                113

1        A.    Correct.

2        Q.    Now, that Certificate of Title on it will

3   only reflect the transaction between McCombs and Auto

4   Deal Corp., correct?

5        A.    Correct.

6        Q.    There would be no indication there of the

7   transfer between Auto Deal and your dealership?

8        A.    Correct.

9        Q.    Once you do receive this from Auto Deal

10  Corp., what is your normal Standard Operating

11  Procedures for your dealership when it comes to getting

12  that title and sending it out to the buyer?

13       A.    Betty, the lady that I have --

14            MR. PERALTA:  Objection; assumes facts not in

15       evidence.

16            THE WITNESS:  The -- the -- the lady that I

17       have, she comes, picks up the deals, prepares them

18       and takes them to the DMV.

19  BY MR. TORRES:

20       Q.    So, that Certificate of Title then goes to

21  the DMV along with what?

22       A.    I don't know.

23       Q.    But then you don't ship anything directly to

24  the buyer?

25       A.    No.

1      Q.   Okay.  Do you have any employee handbook that

2  you have your employees read or hold or have to be

3  responsible for?

4      A.   No.

5      Q.   You mentioned that Betty recently left her

6  position.

7           Did she have an opportunity to train her

8  replacement?

9      A.   No.

10     Q.   Who trained her replacement?

11          MR. PERALTA:  Objection; facts not in

12      evidence.

13          THE WITNESS:  The finance guy.

14          MR. TORRES:  The finance guy would have been

15      the one who trained the new person who does the

16      titling for your dealers --

17          THE WITNESS:  Yes.

18          MR. TORRES:  -- correct?

19          THE WITNESS:  Yes.

20  BY MR. TORRES:

21     Q.   And who would have trained the finance guy to

22  train the title person's job?

23     A.   Betty.

24     Q.   So, if that person were to leave, who teaches

25  that afterwards?

```
 1          A.    Which person?  I'm sorry?

 2          Q.    If your finance manager leaves unexpectedly,

 3   who will teach that role if he's the one that teaches

 4   it?

 5          A.    The -- the -- the -- the software provider.

 6   She can just call the software provider, and they do,

 7   like a -- like a composition on-line.

 8          Q.    On how to use the system?

 9          A.    How to use the system, correct.

10          Q.    How to set up and --

11          A.    Correct.  Correct.

12          Q.    So, the dealership itself does not have or

13   does not offer any further training aside from what the

14   DMV's software provider gives --

15          A.    Correct.

16          Q.    -- to the dealership?

17          A.    Correct.

18          Q.    So, there's no written requirement as part of

19   your standard business practices that has the person

20   who receives the title from Auto Deal Corp. or from

21   Manheim to take a look at that Certificate of Title and

22   verify it for accuracy, correct?

23          A.    Correct.

24          Q.    All right.  So, when you first received

25   notice that there was an issue with the miles on this
```

1    car, you said you immediately called Manheim because

2    that's who you usually go to, and -- and you called

3    them, right?  That's what you did?

4         A.   Correct.

5         Q.   Did you file a formal claim with Manheim

6    related to this car?

7         A.   No.

8         Q.   Why was that?

9         A.   Because at the time they give you a timeframe

10   to do it.

11        Q.   All right.  And this was outside of the

12   timeframe that Manheim --

13        A.   Correct.

14        Q.   -- gave you?

15        A.   They only give you two weeks.

16        Q.   Those two weeks are for you to inspect the

17   vehicle, make sure what they represented is fair and

18   accurate, that was --

19        A.   Any -- any legal mechanical problems, you

20   have two weeks to -- to file a claim.  After that, you

21   just have to just call them like I did.

22        Q.   Okay.  When you do contact them to -- to

23   bring out an issue like this, do you go through your

24   portal with Manheim and --

25        A.   Yes.

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                                    4/23/2024
CR of FS Investments (Franklyn Strusberg)                                                      117

```
 1          Q.    Sorry?

 2          A.    Okay.  I'm sorry.

 3          Q.    You're good.  Is there anybody else in the

 4   room with you?

 5                MR. PERALTA:  You can mute yourself, Frank.

 6                THE WITNESS:  I'm sorry.  I'm sorry about

 7       that.

 8   BY MR. TORRES:

 9          Q.    You're good.  Are you alone now?

10          A.    Yes.

11          Q.    Okay.  Whenever you do go into or whenever

12   you contact Manheim to bring its -- bring up this

13   issue, do you do it through your web portal access that

14   you normally go through?

15          A.    Yeah.  I gave -- on the seller location,

16   Manheim was -- in this case, it was Manheim Houston, I

17   think, if I'm not mistaken.  San Antonio.  I'm sorry.

18   I contacted -- if you click on San Antonio, it gives

19   you a phone number, so I called that phone number.

20          Q.    Okay.  So, you called the number directly for

21   the San Antonio warehouse or option site for Manheim,

22   right?

23          A.    Correct.  I called them, and I explained to

24   them the situation.

25          Q.    All right.  Did you use your cell phone or
```

1    did you use your --

2          A.    My cell phone.

3          Q.    The judge is going to yell us again.  You're

4    going to have to wait until I finish with my questions.

5          A.    Okay.  Okay.

6          Q.    That way there's no issues.  Okay?

7          A.    Yes.

8          Q.    All right.  So, did you use your cell phone

9    or did you use the office or any other company number?

10         A.    My cell phone.

11         Q.    Do you recall who you spoke to in Manheim?

12         A.    No.

13         Q.    Do you recall if this process of -- of

14   talking to them and them offering you to take the car

15   back, was that a one-phone-call process or did that

16   take more than one phone call?

17         A.    One phone call.

18         Q.    Did Manheim ever send you any e-mails or any

19   type of correspondence confirming or verifying the

20   conversation that you-all had?

21         A.    No.

22         Q.    Did you ever send out an e-mail, a text

23   message or any other type of communication around the

24   time that you had that conversation with Manheim that

25   memorializes what Manheim told you?

1      A.    No.

2      Q.    Other than going straight to Manheim and

3  getting the person who you spoke to, the only way to

4  know what Manheim said about the issue of the miles is

5  what you are telling us here today, right?

6      A.    Correct.

7      Q.    So, what exactly did Manheim tell you about

8  the mileage issue?

9      A.    I don't remember too much, but what -- what

10  I'm thinking is I -- I -- I spoke with an agent from

11  Manheim.  They told me they were going to call Ford to

12  dig into it.  And then she called me back, and she told

13  me that they made a mistake.

14      Q.    So, it wasn't just one phone call, right?

15      A.    It was, like two phone calls.

16      Q.    How sure are you about there just being two?

17  Are you sure there wasn't other call-backs?  You didn't

18  have to follow up?  They didn't have to follow up

19  anymore?

20      A.    No.  No.  No.  I just called them, and -- and

21  they confirmed that there was a discrepancy with the

22  mileage and that they made a mistake.

23      Q.    How long after that initial phone call did

24  Manheim call you back?

25      A.    Same day.

1    Q.    Was it the same agent that you had spoken to?

2    A.    Correct.

3    Q.    Do you remember their name?

4    A.    No.  It was a lady.  I don't know her name.

5    Q.    It was a lady?

6    A.    Mm-hmm.  Yes.

7    Q.    Sorry if this question is inappropriate in

8  any way, but was that conversation in Spanish or

9  English?

10   A.    English.

11   Q.    Okay.  From what you recall from what Manheim

12 told you, they said that they called Ford and then Ford

13 told them that, indeed, they had made a mistake?

14   A.    Yes.

15   Q.    So, you recall specifically Manheim saying

16 that was Ford who made a mistake?

17   A.    Yes.

18   Q.    Do you recall how long those phone calls

19 took?

20   A.    A couple of minutes.

21   Q.    Is it hard to get ahold of them or do they

22 leave you on hold forever or is there --

23   A.    Automatically.  You call them, and they pick

24 up right away.

25   Q.    Now, you had also testified that Manheim

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                4/23/2024
                 CR of FS Investments (Franklyn Strusberg)                    121

 1   acts as a, sort of the center piece where everything

 2   gets handled, they take the car, they process the

 3   paperwork, they make sure that the car is both legally

 4   and mechanically up to -- up to standards for what they

 5   represent and then they are ones who give you as the

 6   buyer the title, the -- you know, the -- the receipt

 7   for the purchase, all of the documents are sent from

 8   entitlement and not the seller, correct?

 9           MR. PERALTA:  Objection mischaracterizes his

10       testimony.

11           THE WITNESS:  Yes.

12   BY MR. TORRES:

13       Q.   That's why you never had any direct contact

14   with McCombs, correct?

15       A.   Correct.

16       Q.   Your contact was limited to Manheim, who is

17   selling you the vehicle?

18       A.   Correct.

19       Q.   So, whenever you receive the Certificate of

20   Title -- or scratch that.

21           Whatever Auto Deal Corp. receives that

22   Certificate of Title, they're getting that from

23   Manheim, correct?

24       A.   Correct.

25       Q.   Isn't it fair to say that if Manheim is doing

```
 1    the checking of the legal status of the vehicle that

 2    they would review the Certificate of Title in their

 3    possession before --

 4              MR. PERALTA:  Objection.

 5              MR. TORRES:  -- sending it, correct?

 6              THE WITNESS:  What --

 7              MR. PERALTA:  Objection; speculation.

 8              MR. TORRES:  You should wait until I'm done

 9         with my question, man, because otherwise --

10              MR. PERALTA:  That's the first time it

11         happened, man.  Go ahead.  First time it happened,

12         man.  Go head.  Say it again.  Say -- say it again

13         because it was -- it was cut, so go ahead.

14              MR. TORRES:  Madam Court Reporter, can you

15         read that back?

16              (Requested portion of the record was read by

17         the court reporter.)

18              MR. TORRES:  Before they send it out to Auto

19         Deal Corp.

20              THE WITNESS:  Yes.

21              MR. PERALTA:  Objection; speculative.

22    BY MR. TORRES:

23         Q.   Was that a yes?

24         A.   Yes.

25         Q.   So, isn't it -- does it not add up when
```

```
 1   Manheim says that it was Ford who made a mistake but
 2   they themselves have in their own possession a
 3   Certificate of Title that reflects higher mileage than
 4   what was listed?
 5           MR. PERALTA:  Objection; speculative and
 6       assumes facts not in evidence.
 7           MR. TORRES:  You can answer.
 8           THE WITNESS:  What is the question?
 9           MR. TORRES:  Do you not find it weird or at
10       all concerning that Manheim tells you that --
11           THE WITNESS:  Yes.
12           MR. TORRES:  Again, you got to let me finish.
13           MR. PERALTA:  Yeah, Frank.  Frank, just --
14           THE WITNESS:  Let him finish.  I'm sorry.
15           MR. PERALTA:  No.  No.  Just -- just count
16       two seconds, and then you answer.  Always just, you
17       know, they -- they -- they -- they ask.  One, two,
18       and then you answer.
19           THE WITNESS:  Okay.
20   BY MR. TORRES:
21       Q.   All right.  So, let's try that one more time.
22           Do you find it at all troublesome or
23   disturbing in any way that Manheim would tell you that
24   two years after the event that McCombs made a mistake
25   when they, themselves, were responsible for doing the
```

1    investigation as to the mileage, had possession of a

2    Certificate of Title that reflected higher mileage than

3    what was communicated to you?

4            MR. PERALTA:  Same objection, and I'm going

5        to add leading and argumentative.

6            Go ahead, Frank.

7            THE WITNESS:  Yes.

8    BY MR. TORRES:

9        Q.   You mentioned that you -- you did your own

10   inspection when -- when you got the vehicle or when the

11   vehicle was delivered to you.

12           Was there anything, based on your experience

13   selling and buying vehicles and inspecting them, was

14   there anything about the condition of the vehicle when

15   you were testing it that would lead you to believe that

16   the mileage on the odometer was not accurate?

17       A.   No.

18           MR. TORRES:  All right.  I don't have any

19       other questions.  Thank you very much,

20       Mr. Strusberg.

21           THE WITNESS:  Thank you, Mr. Torres.

22           MR. PERALTA:  Josh?

23           MR. FEYGIN:  Go ahead.

24           MR. PERALTA:  You don't have anymore

25       questions?

```
1              MR. FEYGIN:  No.  Done?

2              MR. PERALTA:  No.  I have -- I have some

3         questions.  Let me just look at the documents you

4         just sent to me.  Thank you for sending them, by

5         the way.  You didn't have to.

6              MR. FEYGIN:  Anything for you, my friend.

7              MR. PERALTA:  Share screen.

8              (Whereupon, document(s) shared on the

9         screen.)

10                       CROSS-EXAMINATION

11   BY MR. PERALTA:

12        Q.   Okay.  There -- there appears to be some

13   confusion as to when Powerhouse received a copy of the

14   Certificate of Title, and I'm talking about the

15   document entitled Texas Certificate of Title, of which

16   the numbers were read in deposition, and those numbers

17   are 539994086.

18              MR. FEYGIN:  Is there a question?

19              MR. PERALTA:  So, Mr. -- I'm trying to -- to

20         identify the document because there's no Bates

21         stamp, and I'm not sure what -- what exhibit was

22         it.

23              MR. FEYGIN:  It should be on the title

24         itself.  If you look on the top of your screen,

25         it's Exhibit I, Transfer of Title.
```

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                          4/23/2024
CR of FS Investments (Franklyn Strusberg)                                         126

```
 1                MR. PERALTA:  I'm looking at it.
 2                MR. FEYGIN:  If you look at the top of your
 3        screen in the purple bar.
 4                MR. PERALTA:  Oh, in the -- as -- as a
 5        document of -- as the title of the document?
 6                MR. FEYGIN:  Correct.
 7                MR. PERALTA:  Okay.  Well, I think this is --
 8        this conversation was enough to identify the
 9        document.
10   BY MR. PERALTA:
11        Q.   Okay.  So, Frank?
12        A.   Yes.
13        Q.   Here -- here it says that Auto Deal Corp.,
14   right -- wait.  Here, it says -- in this box here, it
15   says that Auto Deal Corp. transferred title to the
16   vehicle to Powerhouse and it has the date of sale
17   5/15/20.
18                Was that the date that Powerhouse received a
19   physical copy of this title?
20        A.   When?  It says when?
21        Q.   So, my question is:  Did Powerhouse receive a
22   copy of this document, right, this document up here
23   (indicating), did Powerhouse receive a copy of this
24   document on May --
25        A.   After -- after -- after we sold the car.
```

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                                      4/23/2024
                CR of FS Investments (Franklyn Strusberg)                                     127

1          Q.    And when did you sell the car?

2          A.    Whatever is on the contract.

3          Q.    Okay.

4          A.    We always receive it -- we always get the

5    titles after -- I mean, from -- specifically from Auto

6    Deal after I sell the car.

7          Q.    Okay.  And why is that?

8          A.    Because the owner of Auto Deal is not going

9    to release the title until I pay him.

10         Q.    Okay.  So, that is the agreement that you

11   have --

12         A.    That's the agreement, yes, pretty much.

13         Q.    -- with McCombs?

14         A.    After -- after I sell the car and -- and the

15   deal is booked by the bank, then he sends the title

16   after I sell the car.

17         Q.    Okay.  And that is -- this is the agreement

18   between Auto Deal Corp. --

19         A.    Correct.

20         Q.    -- and Powerhouse?

21         A.    Yes.

22         Q.    Okay.  So, every time that Powerhouse

23   purchases a vehicle -- sorry.  Strike that.

24               Every time that you as an agent of Auto Deal

25   Corp. purchases a vehicle through Auto Deal Corp. for

1    you to sell in -- in -- in the dealership that's

2    operated by Powerhouse, Auto Deal retains a copy of the

3    title until you sell the vehicle?

4        A.   Yes, only when I sell it.

5        Q.   Okay.  So, I think we all know for a fact

6    that the sale did not happen on 5/15/2020.

7             Does this mean that --

8             MR. FEYGIN:  Objection.  It assumes facts not

9        in evidence.  It's a narration.  I mean, what are

10       we doing here?

11            MR. PERALTA:  Sure.  That's fine.  I mean,

12       you -- you actually covered that in the deposition,

13       but I could -- I could put up some documents.  Give

14       me one second.  Actually, I'm going to stop

15       sharing.  Okay.  Auto Deal, okay.  Is it showing me

16       here?  Yes.

17            (Whereupon, document(s) shared on the

18       screen.)

19   BY MR. PERALTA:

20       Q.   Okay.  Frank, this is a document Bates

21   stamped FSIA 00005.

22            Do you recall Plaintiff's attorney,

23   Mr. Feygin, showing you this document earlier?

24       A.   Yes.

25       Q.   Do you recall answering his question that

1    stated that this document was true and accurate --

2    was -- was a true and accurate document that was kept

3    in the business records of Powerhouse?  Is this a true

4    and accurate document that's kept in the business

5    records of Powerhouse?

6         A.   Yes.

7         Q.   Okay.  It states here that the date of the

8    sale was May 25, 2020; is that correct?

9         A.   Yes.

10         Q.   Okay.  So, if the buyer orders -- hold on.

11    Actually, let's go down here.  Here on Page 3 of 3 it

12    shows that the document was signed by Gabriel Haddon.

13              Is that the -- the name of the Plaintiff?

14         A.   Yes.

15         Q.   Is that the signature of the Plaintiff?

16         A.   Yes.

17         Q.   What is the date next to the signature of the

18    Plaintiff?

19         A.   5/25/2020.

20         Q.   If the Buyer's Order was signed on 5/25/2020,

21    is that an indication that the sale occurred on

22    5/25/2020?

23         A.   Yes.

24         Q.   Okay.  Would there ever be -- is there any

25    reason why the sale did not happen on 5/25/2020?

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                    4/23/2024
                    CR of FS Investments (Franklyn Strusberg)              130

1        A.    No.

2        Q.    Okay.  So, you testified earlier that Auto

3   Deal only -- strike that.

4              You testified earlier that Auto Deal sent

5   the -- sent a copy of the Certificate of Title to

6   Powerhouse only after Powerhouse sold the vehicle to

7   Mr. Haddon, the Plaintiff; is that correct?

8        A.    Yes.

9        Q.    Okay.  So, is -- is it fair to say that on

10  May -- sorry.  Strike that.

11             Is it fair to say to say that this date --

12  let me -- here.

13             Is it fair to say that May 15, 2020 was not

14  the date that Auto Deal Corp. provided a copy of the

15  title that -- regarding the vehicle that's at issue to

16  Powerhouse?

17       A.    Correct.

18       Q.    Okay.  Do you have any -- do you know why it

19  would say 5/15 --

20       A.    No clue --

21       Q.    -- here?

22       A.    -- but I can get the Fed Ex label.

23       Q.    Okay.  There's more down here.  Here, it

24  shows --

25             MR. FEYGIN:  We're -- we're looking at the

```
 1        Buyer's Order form, Jose.  I don't know what you're

 2        pointing at.

 3             MR. PERALTA:  This one here (indicating.)  I

 4        don't know -- I don't know how to do the whole

 5        highlighting thing, though it's super nice,

 6        actually.

 7             MR. FEYGIN:  Are we looking at the Buyer's

 8        Order form?

 9             MR. PERALTA:  No, because we're looking at

10        the --

11             MR. FEYGIN:  Because --

12             MR. PERALTA:  -- Certificate of Title.

13             MR. FEYGIN:  -- all I see at the top of my

14        screen is the Buyer's Order form.

15             THE WITNESS:  Yeah, me too.

16             MR. PERALTA:  Really?

17             MR. TORRES:  You're only sharing one of your

18        screens, so if you have multiple screens, we won't

19        be able to see it.

20             MR. PERALTA:  Oh.  Actually, hold on.  I

21        don't know how this works, because what I did was:

22        I put the Certificate of Title on the screen that I

23        was sharing.  Interesting.  Hold on.

24             (Whereupon, document(s) shared on the

25        screen.)
```

1          MR. PERALTA:  Okay.  Thank you, Joshua.

2   BY MR. PERALTA:

3       Q.   Just to clarify, Frank, when I asked you

4   earlier about 5/15/2020 not being the date that

5   Automotive -- that Auto Deal Corp. transferred title to

6   Powerhouse or provided a copy of a title to Powerhouse,

7   were you aware that I was talking about this box down

8   here (indicating)?

9       A.   One second, please.  Okay.  There we go.

10      Q.   Can you see it?

11      A.   Now I can see it.

12      Q.   Now you can see it?  Okay.

13      A.   Yeah.

14      Q.   Let me ask you it this way now -- now that I

15  have the document on the screen:  This date that

16  appears here (indicating), this one here, right,

17  5/15/2020, is that the date -- this date, 5/15/2020

18  that appears in the Certificate of Title regarding the

19  transfer as to Auto Deal Corp. to Powerhouse, is this

20  the date that Powerhouse received a copy of the

21  Certificate of Title?

22      A.   No.

23      Q.   Okay.  So, let's go down here, this one here

24  (indicating.)

25          So then, is it fair to say then this date

```
 1    also does not depict the date that Powerhouse received

 2    a copy of the Certificate of Title from Auto -- from

 3    Auto Deal Corp.?

 4         A.   Correct.

 5         Q.   Is that correct?

 6         A.   Correct.

 7         Q.   And do you know why this date appears in this

 8    box down here, the date 5/15?

 9         A.   No clue.

10         Q.   Five -- okay.  Now, when you -- when

11    Powerhouse included the mileage on its sales documents

12    to Haddon, did it get the mileage of the vehicle by

13    looking at the odometer of the vehicle, by looking at

14    the dashboard of the vehicle?

15         A.   The web page.

16         Q.   The web page.  What -- what --

17         A.   Web page.

18         Q.   What web page?

19         A.   Powerhouse web page.

20         Q.   Okay.  So, the information that appears on

21    the Powerhouse web page, is that gathered by looking at

22    the dashboard --

23         A.   Of the dashboard, correct.

24         Q.   -- of the vehicle?

25         A.   Yes.
```

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                    4/23/2024
CR of FS Investments (Franklyn Strusberg)                                   134

1          Q.   Okay.  You've been -- you've been in -- in

2     the business of selling vehicles for how long now,

3     selling used -- used vehicles?

4          A.   15 years.

5          Q.   15 years.  Would you say that it's customary

6     practice for dealers to look at the dashboard of the

7     vehicle and guide themselves by the information that

8     appears there when they are filling out sales documents

9     to sell the -- the vehicles?

10         A.   Yes.

11              MR. PERALTA:  Okay.  One second.

12              (Whereupon, screen sharing was stopped.)

13              MR. PERALTA:  Here, we have the Buyer's Order

14         again.  That's Bates Stamp FSIA 000005.

15              (Whereupon, document(s) shared on the

16         screen.)

17              MR. PERALTA:  Okay.  So, let me zoom in.

18              Here where it says odometer reading, a

19         131,636, did Powerhouse obtain this odometer

20         reading from looking at the dashboard --

21              THE WITNESS:  Yes.

22              MR. PERALTA:  -- of the vehicle?

23              THE WITNESS:  Yes.

24    BY MR. PERALTA:

25         Q.   Okay.  When Powerhouse filled in the

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                    4/23/2024
CR of FS Investments (Franklyn Strusberg)                                    135

1    information, this information here, the odometer

2    reading (indicating) in the Buyer's Order, in the

3    Odometer Disclosure and in the Retail Installment

4    Contract, a/k/a financing agreement, did it obtain the

5    odometer reading from the vehicle dashboard?

6        A.    Yes.

7        Q.    When it provided that information and you put

8    that information in those documents, did it have in its

9    possession a copy of the Certificate of Title involving

10   this vehicle?

11       A.    No.

12       Q.    Okay.  Did it have any other documents --

13   strike that.

14            Did it have any document that would

15   contradict -- contradict the reading placed in the

16   Buyer's Orders?

17       A.    No.

18       Q.    Okay.  Now, besides looking at the vehicles

19   dashboard, did Powerhouse obtain the odometer -- strike

20   that.

21            Besides looking at the vehicle's dashboard,

22   did Powerhouse obtain the mileage of the vehicle by

23   looking at -- at the Manheim website?

24       A.    Yes.

25       Q.    Okay.  And was -- and did the -- did the --

```
 1    actually, give me one second.

 2              (Whereupon, screen sharing was stopped.)

 3              THE WITNESS:  Eight miles difference, one

 4        thirty-one six twenty-eight from Manheim.

 5              MR. PERALTA:  Okay.  One second.  Okay.  I'm

 6        showing you a document, FSA -- no, FSIA 000011.  We

 7        can make that Defendant's Exhibit A.

 8              (Defendant Exhibit A was marked for

 9        identification.)

10              (Whereupon, document(s) shared on the

11        screen.)

12    BY MR. PERALTA:

13        Q.    Okay.  Is this -- what is this document?

14        A.    The Bill of Sale from Manheim.

15        Q.    Okay.  And does Manheim provided you this

16    document?

17        A.    Correct.

18        Q.    Okay.  And when I say "you," I'm referring to

19    Powerhouse, just to make clear.

20              Okay.  What is the mileage that appears on

21    the Bill of Sale, if you can read it?

22        A.    One thirty-one six twenty-eight.

23        Q.    Okay.  And who's the seller?

24        A.    McCombs Ford West.

25        Q.    Okay.  Based on your knowledge, from where
```

```
 1    does Manheim get the information as to the mileage of
 2    the vehicle, is it provided by McCombs West Ford?
 3              MR. TORRES:  Objection; form.
 4              THE WITNESS:  I don't know.
 5    BY MR. PERALTA:
 6        Q.   Have you sold any -- any vehicles through
 7    Manheim?
 8        A.   Yeah.
 9        Q.   Okay.  So, walk me through how you do it.
10    When you -- when you post -- well, strike that.
11              Does Manheim works as a middle person between
12    the seller and the buyer of the vehicle?
13        A.   Correct.
14        Q.   Okay.  And when we say "middle person," is
15    it -- is it only to facilitate the transaction, meaning
16    that they will provide information from the seller to
17    the buyer and if the buyer has any questions then
18    Manheim might -- may get back that to the seller,
19    correct?
20        A.   Correct.
21              MR. TORRES:  Objection; form.
22    BY MR. PERALTA:
23        Q.   Correct, you said?
24        A.   Yes.
25        Q.   Okay.  So, when you want to sell a vehicle
```

1   through the Manheim website, do you have to provide

2   Manheim information as to the vehicle?

3       A.   Yes.

4       Q.   Okay.  Does that information include the year

5   of the vehicle?

6       A.   Everything, the -- the VIN.

7       Q.   Everything?

8       A.   Yes.

9       Q.   Everything, including -- including the --

10  the --

11      A.   Mileage.

12      Q.   -- the odometer reading?

13      A.   Yes.

14      Q.   Okay.  Now, based on your experience selling

15  vehicles through Manheim, would -- will Manheim just

16  transfer that information to potential sellers?

17      A.   Buyers, yes.

18      Q.   Thank you.  Buyers.  So, Manheim pretty much

19  just shares the information that the sellers of

20  vehicles provide to it --

21      A.   Correct.

22      Q.   -- correct?  Okay.

23           You mentioned yesterday -- not yesterday.

24  Sorry.  You mentioned earlier that Manheim conducts its

25  own inspection.

```
 1            Do you -- I mean, do they do more than drive
 2     vehicles?
 3            MR. FEYGIN:  Objection; assumes facts not in
 4        evidence.
 5            THE WITNESS:  After you buy them, you --
 6        you request --
 7            MR. PERALTA:  No.  No.  Manheim.  Manheim.
 8        Does --
 9            THE WITNESS:  Yeah.
10     BY MR. PERALTA:
11        Q.   Does Manheim do more than drive the vehicles?
12        A.   They inspect it.
13        Q.   When you say "inspect it," do they just look
14     at it?
15        A.   Yeah.
16        Q.   Okay.  Do they do any mechanical inspection,
17     like, you know --
18            MR. FEYGIN:  Asked and answered.
19            THE WITNESS:  Sometimes if you request it.
20        It's not always.
21     BY MR. PERALTA:
22        Q.   It's not always?
23        A.   No.
24        Q.   So, you have to request it?
25        A.   You have to request it.
```

1    Q.   Okay.  Would you say, based -- based on your

2    experience in selling used vehicles, that it is not the

3    customary practice for used car dealers in -- to

4    request that inspection?

5    A.   What's the question?  I'm sorry?

6    Q.   Would you say that it is not customary

7    practice for used car dealers to request the inspection

8    of every vehicle from which -- you know, that they --

9    that they're selling?

10   A.   If it's legible, yes.

11   Q.   What do you mean legible?

12   A.   Sometimes it's as-is.  Then you cannot

13   request an inspection.

14   Q.   Okay.  Now, when you purchased the vehicle

15   through Auto Deal Corp., as their agent, was your

16   intention all along to sell this vehicle through

17   Powerhouse?

18   A.   Yes.

19   Q.   So, Powerhouse bought the vehicle as an agent

20   of Auto Deal Corp., but it was understood between Auto

21   Deal Corp. and Powerhouse that Powerhouse was going to

22   try to sell this vehicle on its lot?

23            MR. FEYGIN:  Objection.  Objection to form.

24            THE WITNESS:  Correct.

25   BY MR. PERALTA:

1    Q.   Okay.  Now, when you purchase -- you said

2    that the account of Manheim is in the name of

3    Powerhouse?

4    A.   Yes.

5    Q.   But that -- but that you also bought it --

6    sorry.

7         But that you also use this account as an

8    agent of Auto Deal Corp.?

9    A.   Correct.

10   Q.   Okay.  Would you say then that you were using

11   the account for the benefit of Powerhouse?

12   A.   Yes.

13   Q.   Would you say that you were using the account

14   as a representative of Powerhouse --

15   A.   Yes.

16   Q.   -- as well?

17   A.   Yes.

18   Q.   Okay.  Okay.  Hold on.  So, let's talk

19   about -- let's talk about Betty.  You said that Betty

20   was -- she was paid under a 1099.

21        Did she have her own company while she was

22   providing services to Powerhouse?

23   A.   Yes.

24   Q.   So, when you said that she was an employee of

25   Powerhouse, do you mean -- did you mean that she was

```
 1   a -- a contractor or an actual employee of Powerhouse?
 2        A.   No, contractor, like sub- -- subcontractor.
 3        Q.   Okay.
 4             THE COURT REPORTER:  Mr. Peralta, are
 5        finished with this document?
 6             MR. PERALTA:  Yes, I am.
 7             THE COURT REPORTER:  Thank you.
 8             (Whereupon, screen sharing was stopped.)
 9             MR. PERALTA:  Okay.  So, okay.  Now let's
10        talk about the -- well, actually, before -- before
11        I leave Betty, let's stay with Betty for just a few
12        more questions.
13             (Whereupon, document(s) shared on the
14        screen.)
15   BY MR. PERALTA:
16        Q.   So, you stated before that you believe
17   that -- that -- that there's a possibility that this
18   document was completed by Betty; is that correct?
19        A.   Correct.
20        Q.   This section down here where it says -- where
21   Powerhouse transfers title to Gabriel -- to the -- to
22   the Plaintiff, and it's dated 5/25/2020.
23             So, if Powerhouse did not receive a copy of
24   the Certificate of Title until it sold the vehicle to
25   the Plaintiffs, then Betty would not have a copy of
```

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                    4/23/2024
                    CR of FS Investments (Franklyn Strusberg)                      143

```
 1     that Certificate of Title when she might have completed
 2     this section that -- that I'm highlighting?
 3          A.   Correct.
 4               MR. PERALTA:  Okay.  Let's move on to the
 5          bond payment.
 6               (Whereupon, Counsel Silverstein leaves Zoom
 7          deposition.)
 8     BY MR. PERALTA:
 9          Q.   When you -- did you send a check to
10     Plaintiff's counsel of around $9,000?
11          A.   Yes.
12          Q.   Okay.  When you sent that check, was it your
13     understanding that you were settling or -- or resolving
14     Plaintiff's claims in this lawsuit?
15          A.   Correct.
16          Q.   Okay.  You know what damages are, right?
17          A.   Yes.
18          Q.   Is the Plaintiff claiming actual damages in
19     this case?
20          A.   I don't know.
21          Q.   Okay.  Did you receive an e-mail from
22     Plaintiff's counsel telling you --
23          A.   Yes, that that was for damages.
24          Q.   Well, hold on.  Let me -- let me finish.
25               Did you receive an e-mail from Plaintiff's
```

1    counsel telling you that your -- that -- that the check

2    that Powerhouse sent him was to cover the actual

3    damages that the Plaintiff alleges?

4         A.    Yes.

5         Q.    Okay.  Were you surprised when Plaintiff's

6    counsel told you that he was going to still file a

7    lawsuit even though you had already paid him some

8    money?

9         A.    Yes.

10             MR. PERALTA:  Okay.  Gentlemen, allow me

11        three minutes, and then let me see if I'm done.

12             MR. FEYGIN:  Let's do this:  Let's take a

13        five-minute break so I can use the little boy's

14        room.

15             MR. PERALTA:  That works for me too.

16             (Thereupon, an off-the-record recess was had

17        1:04 until 1:12 p.m.)

18             MR. PERALTA:  Okay.  I'm done with -- with my

19        questions for now.

20             MR. FEYGIN:  All right.  I have a redirect.

21                      REDIRECT EXAMINATION

22    BY MR. FEYGIN:

23        Q.    Mr. Strusberg, you have an agreement with

24    Auto Deal Corp. where one way or the other you acquire

25    vehicles from Auto Deal Corp.; is that correct?

```
 1        A.   Correct.

 2        Q.   How many vehicles have you acquired from Auto

 3   Deal Corp. based upon this agreement?

 4        A.   I don't know.

 5        Q.   Would it be more than ten?

 6        A.   Yes.

 7        Q.   Would it be more than twenty?

 8        A.   Yes.

 9        Q.   More than fifty?

10        A.   I don't know.  Somewhere there.

11        Q.   So, between twenty to fifty cars?

12        A.   Correct.

13        Q.   How many years has this been going on for?

14        A.   It was just one year when I first started,

15   not anymore.

16        Q.   So, you first started in May of 2020-ish?

17        A.   When I first opened the dealership back in --

18   I don't -- I don't remember.  He -- he supported me in

19   the beginning.

20        Q.   Okay.  And it's your testimony that you would

21   only receive titles to those vehicles, the twenty to

22   fifty that you bought from them, after you actually

23   sold the vehicle; is that accurate?

24        A.   Correct.

25        Q.   Okay.  Is it the dealership's position that
```

1    it can execute title disclosures as it relates to a

2    mileage reading after a vehicle is sold?

3        A.   Yes.

4        Q.   Is it the dealership's position that the

5    title transfer from Auto Deal to Powerhouse was not

6    actually filled in on 5/15/2020?

7        A.   I don't remember.

8        Q.   Is it now the dealership's position that the

9    title transfer and mileage disclosure to my client did

10   not actually get filled out on May 25th of 2020?

11       A.   Correct.

12       Q.   How did the dealership know that the mileage

13   it entered on May 25th, 2020 was the actual mileage on

14   that date?

15       A.   Based on the -- the Bill of Sale from

16   Manheim.

17       Q.   But it wasn't based upon its own inspection

18   of the vehicle?

19       A.   Yeah.  When -- when we take -- get the cars,

20   we -- I post it myself on the page based on the

21   odometer reading.

22       Q.   Does the dealership routinely execute title

23   transfers after a vehicle is sold?

24       A.   Yes.

25       Q.   Is it now the dealership's position that it

```
 1    received this title after it sold the vehicle to my

 2    client?

 3         A.    Correct.

 4         Q.    Aside from Manheim and the dashboard of the

 5    vehicle, did Powerhouse complete any other sort of

 6    investigation into the mileage history?

 7         A.    No.

 8              MR. FEYGIN:  My apologies.  I just noticed my

 9         video was off.  I don't want to be rude.

10    BY MR. FEYGIN:

11         Q.    Does the dealership have any other policies

12    or procedures in place to investigate vehicle mileage

13    other than relying upon a seller's disclosure?

14         A.    No.

15         Q.    And you mentioned that Manheim provides the

16    option to inspect vehicles.

17              Do you ever recall requesting an inspection

18    of this particular vehicle to be performed by Manheim?

19         A.    No.

20         Q.    And is that because it never occurred?

21         A.    Correct.

22         Q.    And with respect to Betty, was Betty acting

23    with the dealer's authority when she completed the

24    title transfers --

25         A.    -- correct.
```

```
 1        Q.   -- to my client?

 2             And she wasn't doing this for her on benefit,

 3   was she?

 4        A.   She gets paid for that.

 5        Q.   Okay.  But she was doing it on behalf of the

 6   dealership, though, correct?

 7        A.   Correct.

 8             MR. FEYGIN:  Okay.  Okay.  Nothing further.

 9             MR. TORRES:  I just have only, like two

10        questions.

11                         RECROSS-EXAMINATION

12   BY MR. TORRES:

13        Q.   Back in 2021 when your friend at Auto Deal

14   Corp. was working with you and helping you out, did

15   y'all at any time share office space?

16        A.   No.

17        Q.   Was Betty ever in the same location as

18   Juliana?

19        A.   No, never.

20             MR. TORRES:  That's all.  Thank you.

21             MR. FEYGIN:  All right.  Explain reading

22        versus waiving?

23             MR. PERALTA:  No, I have -- I have -- I have

24        some questions too on -- on recross.  It's just

25        like, one -- like three.
```

```
 1              MR. FEYGIN:  That's fine.
 2                       RECROSS-EXAMINATION
 3   BY MR. PERALTA:
 4        Q.   Frank?
 5        A.   Yes.
 6        Q.   When Plaintiff's counsel just asked you if
 7   the dealership provides odometer disclosures and title
 8   transfers after the vehicle is sold, let's talk about
 9   the -- the word -- the term after the vehicle is sold.
10              Does that mean after the Plaintiff has signed
11   all documents to sell the vehicle?
12        A.   What is the question?
13        Q.   So, what does it mean after it's sold?  It
14   means that that's -- that's after -- that is after --
15        A.   Before it's sold.
16        Q.   Huh?
17        A.   Before.
18        Q.   Okay.  Listen to my question.
19              Does the dealership provides the -- the --
20   the transfer the --
21        A.   The title.
22        Q.   No.  Hold on.
23              MR. PERALTA:  Okay.  That's fine.  I have no
24        more questions for my friend.  I'll -- I'll leave
25        it at that.
```

```
 1            MR. FEYGIN:  Jose, do you want to explain to

 2       him reading versus waiving?

 3            MR. PERALTA:  We're going to read.

 4            MR. TORRES:  And I will go ahead and order.

 5       If no one else orders, then I'll make it the first.

 6       Otherwise, a copy.

 7            MR. FEYGIN:  I don't want to be ordering just

 8       yet.  I'll let you know.

 9            MR. PERALTA:  Okay.  Me neither.

10            (Thereupon, the proceedings concluded at

11       1:19 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    CERTIFICATE  OF  OATH

2

                            -   -   -

3

4    THE STATE OF FLORIDA,      )

5    COUNTY OF PALM BEACH.       )

6

7

8         I, the undersigned authority, certify that

9    FRANKLYN STRUSBERG personally appeared before me and

10   was duly sworn on the 23rd day of April, 2024.

11

12

13

14        Signed this 6th day of May, 2024.

15

16

17

18        Wanda D. Good, Certified Court Reporter

          Notary Public - State of Florida

19        My Commission No. #HH 216106

          My Commission Expires:  January 26, 2026

20

21

22

23

24

25

```
1                    C E R T I F I C A T E
2
     THE STATE OF FLORIDA,      )
3
     COUNTY OF PALM BEACH.      )
4
5
6              I, WANDA D. GOOD, Florida Professional
     Reporter, certify that I was authorized to and did
7    stenographically report the deposition of FRANKLYN
     STRUSBERG, pages numbered 1 through 151; that a review
8    of the transcript was requested; and that the
     transcript is a true and complete record of my
9    stenographic notes.
10
11             I further certify that I am not a relative,
     employee, attorney, or counsel of any of the parties,
12   nor am I a relative or employee of any of the parties'
     attorney or counsel connected with the action, nor am I
13   financially interested in the action.
14
15
               DATED this 6th day of May, 2024.
16
17
18
19
20             WANDA D. GOOD, Certified Court Reporter
21
22
23
24
25
```

```
 1   May 6, 2024
 2   FRANKLYN STRUSBERG
     c/o Jose Ariel Peralta, Esquire
 3   jperalta@atllp.com
     ARMSTRONG TEASDALE, LLP
 4   355 Alhambra Cir., Ste. 1250
     Coral Gables, Florida   33134
 5
     IN RE:  GABRIEL LUC HADDON v. FS INVESTMENTS OF
 6           AMERICA, INC., et. al.
     CASE NO.:  8:23-cv-00709-WFJ-SPF
 7
     Please take notice that on the 23rd day of April, 2024,
 8   you gave your deposition in the above cause.  At that
     time you did not waive your signature.  The transcript
 9   is now available for your review.
10   Please call (561) 689-0999 or 1-800-765-3576 or e-mail
     Depos@FloridaCourtReporting.com between the hours of
11   9:00 a.m. and 4:00 p.m., Monday through Friday, to make
     arrangements to read your deposition transcript.  Once
12   completed, please sign and return same to us for
     distribution to all parties.
13
     If you do not read and sign the deposition within a
14   reasonable amount of time, the original, which has
     already been forwarded to the ordering attorney, may be
15   filed with the Clerk of the Court.
16   If you wish to waive your signature now, please sign
     your name in the blank at the bottom of this letter and
17   return it to the address listed below.
18   Very truly yours,
19
20
     Wanda D. Good, Certified Court Reporter
21   Florida Court Reporting
     2161 Palm Beach Lakes Boulevard, Suite 302
22   West Palm Beach, Florida 33409
23   I do hereby waive my signature.
24
25   FRANKLYN STRUSBERG
```

```
 1                    ERRATA SHEET
 2        DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 3   IN RE:  GABRIEL LUC HADDON v. FS INVESTMENTS OF
 4           AMERICA, INC., et. al.
 5   CASE NO.:  8:23-cv-00709-WFJ-SPF
 6   WITNESS: FRANKLYN STRUSBERG  TAKEN: APRIL 23, 2024
 7   Page No.    Line No.          Change          Reason
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22        Under penalties of perjury, I declare that I have
     read the foregoing document and that the facts stated
23   in it are true.
24
25
     DATE                         FRANKLYN STRUSBERG
```

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC
CR of FS Investments (Franklyn Strusberg)

4/23/2024
1

## WORD INDEX

**< $ >**
**$10,000**  101:*10*
**$30,000**  103:*6*
**$5,000**  53:*10*
**$7,000**  59:*25*
**$799**  53:*16*
**$9,000**  87:*23*  99:*24*
101:*12*  143:*10*

**< 0 >**
**000005**  134:*14*
**000011**  4:*17*  136:*6*
**000014**  32:*2*
**000018**  61:*21*
**000020**  3:*14*
**000026**  56:*20*
**000031**  56:*20*
**000034**  64:*22*
**00005**  51:*21*  128:*21*
**00007**  51:*22*
**00019**  42:*6*
**00020**  42:*6*
**018**  67:*21*

**< 1 >**
**1**  1:*16*  13:*11*  31:*4*
67:*9*  90:*7*  91:*17*
152:*7*
**1:04**  144:*17*
**1:12**  144:*17*
**1:19**  1:*20*  150:*11*
**10:13**  1:*20*  5:*2, 7*
**100**  19:*21*  91:*12*
**101**  4:*10*
**104**  3:*5*
**1099**  77:*5, 6*  141:*20*
**11th**  35:*15*  44:*13*
**12**  96:*22*
**12/11**  69:*12*
**12/21/22**  4:*8, 10*
**12:01**  102:*21*
**12:06**  102:*17, 21*
**125**  3:*5*
**1250**  2:*11*  153:*4*
**13**  3:*14*
**131,000**  37:*22, 23*
88:*20*  111:*1*

**131,636**  96:*25*  134:*19*
**131630**  77:*14*
**131636**  62:*8, 9*  66:*21*
67:*8*  79:*1*
**136**  4:*17*
**144**  3:*5*
**148**  3:*5*
**149**  3:*5*
**14th**  103:*4*
**15**  130:*13*  134:*4, 5*
**151**  152:*7*
**154**  1:*16*
**16**  57:*5*  58:*8*
**16.9**  58:*7*
**18,900**  60:*7*  61:*3*
**1-800-765-3576**
153:*10*
**19**  95:*25*
**1930**  2:*5*

**< 2 >**
**2.8**  35:*4, 11, 12*  39:*22*
**200**  2:*17*
**200,000**  111:*7*
**2000**  111:*6*
**201150**  45:*1*
**2012**  39:*21*
**2020**  44:*12*  53:*13*
58:*7*  76:*25*  82:*6*
88:*5*  104:*17*  110:*7*
111:*5*  129:*8*  130:*13*
146:*10, 13*
**2020-ish**  145:*16*
**2021**  148:*13*
**2022**  109:*18*
**2024**  1:*20*  5:*6*
151:*10, 14*  152:*13*
153:*1, 6*  154:*6*
**2026**  151:*19*
**208F**  2:*5*
**2161**  153:*21*
**216106**  151:*19*
**23**  1:*20*  154:*6*
**23rd**  5:*6*  151:*10*
153:*6*
**25**  41:*16*  129:*8*
**25,000**  53:*3*
**25th**  53:*13*  82:*6*
88:*5*  146:*10, 13*

**26**  151:*19*
**28**  44:*12, 14*
**28th**  110:*7*

**< 3 >**
**3**  96:*22*  129:*11*
**3/6/19**  4:*1*
**302**  153:*21*
**305.371.8809**  2:*12*
**305.460.9888**  2:*18*
**30th**  44:*18*
**32**  3:*14*
**33008-5293**  2:*5*
**33020**  2:*6*
**33134**  2:*11*  153:*4*
**33146**  2:*18*
**33409**  153:*22*
**355**  2:*11*  153:*4*
**360**  17:*1*

**< 4 >**
**4/28/2020**  111:*12*
**4:00**  153:*11*
**41**  3:*14*
**4651**  2:*17*
**48**  58:*6*

**< 5 >**
**5**  3:*5*
**5,000**  53:*8*
**5/15**  82:*10*  130:*19*
133:*8*
**5/15/20**  77:*21*  126:*17*
**5/15/2020**  128:*6*
132:*4, 17*  146:*6*
**5/25**  82:*13, 15*
**5/25/20**  3:*14, 22, 23*
4:*1*  79:*4*  97:*20*
**5/25/2020**  67:*12*  71:*2*
81:*23*  129:*19, 20, 22,
25*  142:*22*
**5/30/81**  9:*9*
**51**  3:*14*
**539994086**  4:*5*  73:*24*
125:*17*
**539994087**  74:*8*
**539994090**  68:*11*
**56**  3:*14*
**561**  153:*10*

**57987168**  55:*20*

**< 6 >**
**6**  153:*1*
**61**  3:*22*
**64**  3:*23*
**67**  4:*1*
**689-0999**  153:*10*
**6th**  151:*14*  152:*13*

**< 7 >**
**7**  58:*6*
**73**  4:*1*

**< 8 >**
**8,000-something**
101:*13*
**8,900-something**
101:*14*
**8:23-cv-00709-WFJ-
SPF**  1:*4*  5:*14*  153:*6*
154:*5*
**82053**  69:*10*
**85293**  2:*5*
**87**  4:*6*

**< 9 >**
**9,000**  40:*24*  100:*1*
**9:00**  153:*11*
**954.228.5674**  2:*6*
**96**  4:*6*
**99**  4:*8*

**< A >**
**a.m**  1:*20*  5:*2, 7*
153:*11*
**a/k/a**  135:*4*
**A12718**  44:*10*  47:*21*
**abide**  17:*11*
**ability**  44:*19*
**able**  8:*12*  47:*3, 12,
15*  112:*13*  131:*19*
**accepted**  77:*25*
**access**  47:*12*  85:*4*
92:*11*  117:*13*
**accommodate**  8:*20*
**accord**  87:*14*
**account**  24:*23, 25*
25:*2*  41:*12*  44:*6*
85:*8, 12*  104:*22, 25*

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC
CR of FS Investments (Franklyn Strusberg)

4/23/2024
2

105:3, 4, 7  108:23
141:2, 7, 11, 13
accuracy  115:22
accurate  17:13, 22
18:14, 24  41:1  65:1
73:16  79:11  97:7
116:18  124:16  129:1,
2, 4  145:23
accused  9:15
achieved  9:21
acknowledge  5:16, 19
6:6, 8, 11
acquiescence  94:19,
25
acquire  11:3  144:24
acquired  145:2
ACT  4:10  71:12
acted  93:10, 13
acting  147:22
Action  1:4  89:14, 24
95:18  96:1  152:12,
13
actions  93:23
activate  85:14
active  100:8
acts  121:1
actual  38:12  45:4
62:11  63:24  67:16,
18, 19  77:22  87:20
90:18  96:25  98:6
110:5  111:7, 13
142:1  143:18  144:2
146:13
add  109:5  122:25
124:5
added  105:3, 15
addition  19:22  21:12
address  50:7, 12
101:7  153:17
administer  5:20
administered  5:19
administration  9:25
Administrative  5:22
advertised  47:9, 25
advertisements  47:13,
17
advertising  53:22
advise  22:17
affirm  6:14

AFFIRMATIVE  4:6,
8  87:3, 11, 13, 24
88:1  89:12, 20  90:15,
20  91:3, 13  93:9, 21
94:6, 15, 21  95:3, 5,
16  96:6
affirmed  6:21
agent  28:20  65:21
106:13  108:20
119:10  120:1  127:24
140:15, 19  141:8
ago  11:23  20:18
30:8  54:10  91:23
agree  17:5  18:16
42:7  47:17  48:1
58:18  61:7  72:13
73:15  74:22  83:24
101:1, 3
agreed  103:4
AGREEMENT  3:21
5:25  6:2  12:7  57:10
59:17, 24  60:8, 9
84:2  87:21  90:24
93:3, 7  108:19
109:10  111:17
127:10, 12, 17  135:4
144:23  145:3
agreements  19:23
Agriculture  85:19
ahead  7:13  11:11
26:9, 17  58:18  82:9
122:11, 13  124:6, 23
150:4
ahold  120:21
al  5:10  153:6  154:4
Alex  29:25  30:5
45:11  46:17  54:23
Alexander  50:19
52:24  65:23  66:25
Alhambra  2:11
153:4
allege  90:18
alleges  144:3
allow  144:10
alteration  95:19  96:2
altered  96:4
AMEND  4:8  96:12
AMENDED  4:6  87:2

AMERICA  1:4, 16
2:7  5:10  7:20  153:6
154:4
amount  101:8  153:14
analysis  25:10
and/or  93:24
and-a-half  11:23
Angel  29:22, 25
anquience  94:25
answer  8:2, 7, 15, 16
11:11, 16  12:20  14:5,
11, 13  24:3  26:10, 20
87:2  88:22  106:6
123:7, 16, 18
answered  12:9  24:2,
9  26:8  39:1  43:21
49:20  64:3  81:15
82:14  84:14, 19
139:18
answering  8:23
128:25
Antonio  117:17, 18,
21
anybody  12:12, 15
13:7  58:23  85:15, 18,
22  86:18  117:3
anymore  77:3
119:19  124:24
145:15
AOSC20-16  5:22
apologies  147:8
app  50:23  55:15, 18,
19
appear  79:16
APPEARANCES  2:1
appeared  151:9
appears  96:22
125:12  132:16, 18
133:7, 20  134:8
136:20
APPLICATION  3:23
27:15, 17  49:12, 25
50:1, 22  59:10  64:15
65:2
applied  29:3  82:24
appointed  71:4
appointing  71:11
77:10
appreciate  29:12

approval  27:20
approve  28:1  55:2
approved  27:19
approximately  5:7
16:15, 25
APR  58:7, 8
April  1:20  5:6
35:15  44:12, 13, 14,
18  110:7  151:10
153:6  154:6
argue  15:2
argumentative  124:5
ARIEL  2:12  153:2
ARMSTRONG  2:10
153:3
arrangement  5:21, 24
arrangements  153:11
arrived  48:11  67:7
ASCIIs  49:6
Aside  10:21  15:18
23:21  24:6, 16  25:3
38:23  39:7  115:13
147:4
as-is  140:12
asked  24:2, 9  26:8
38:3, 4, 25  43:21
49:20  64:3  81:15
82:14  84:14, 19
88:14  132:3  139:18
149:6
asking  8:7  26:19, 20
60:18  71:15  87:16,
22  89:5
assert  87:14  88:2
89:13  90:17, 21
91:14  93:10, 22  94:7,
16  95:2, 6, 17
asserted  89:5, 23
asserting  93:23
asserts  88:8  91:5
assigned  59:16
assignment  59:24
ASSOCIATES  2:17
assume  8:2
assumes  83:18
110:20  113:14  123:6
128:8  139:3
assuming  44:17
48:15  58:5, 9  76:22

81:*8*
**assumption** 58:*11*
**attach** 99:*22*
**attached** 100:*23*
103:*16*
**attachment** 4:*21*
**attend** 20:*24, 25*
**ATTORNEY** 4:*1*
6:*4* 7:*12* 8:*14* 68:*3,*
*13, 16, 23* 69:*1* 71:*4*
77:*9, 10* 80:*14, 16, 19,*
*21* 81:*1* 83:*5* 86:*19*
100:*11* 103:*9* 128:*22*
152:*11, 12* 153:*14*
**attorneys** 5:*15* 42:*11*
71:*11* 87:*12*
**auction** 13:*1, 5* 21:*7,*
*8, 19* 22:*9, 13* 23:*15,*
*21* 24:*14* 36:*21, 22*
37:*19* 44:*4* 54:*14*
88:*13* 92:*8*
**audible** 8:*10*
**authority** 31:*15*
108:*22* 109:*5* 147:*23*
151:*8*
**authorization** 50:*4*
51:*6*
**authorized** 152:*6*
**authorizes** 50:*24*
65:*6* 68:*24*
**authorizing** 50:*2*
**Auto** 31:*5, 7, 12, 15,*
*17* 35:*13* 41:*8, 9, 10,*
*13* 42:*18* 43:*15, 17,*
*18, 24* 44:*4, 12, 15, 20*
74:*19* 75:*7, 15* 76:*3*
78:*12* 82:*19* 104:*11,*
*22, 24* 105:*1, 3, 18, 19,*
*23* 106:*14, 17, 23, 25*
107:*8, 11, 16* 108:*4,*
*10, 13, 15, 19* 109:*3, 6*
110:*8, 12, 14, 17*
111:*12, 19* 112:*8, 19,*
*22* 113:*3, 7, 9* 115:*20*
121:*21* 122:*18*
126:*13, 15* 127:*5, 8,*
*18, 24, 25* 128:*2, 15*
130:*2, 4, 14* 132:*5, 19*
133:*2, 3* 140:*15, 20*

141:*8* 144:*24, 25*
145:*2* 146:*5* 148:*13*
**AutoCheck** 22:*4*
24:*25*
**automatic** 106:*22*
**automatically** 69:*6*
88:*10* 106:*18* 120:*23*
**AUTOMOTIVE** 1:*9*
2:*10* 4:*10* 10:*10, 20,*
*22* 81:*23* 132:*5*
**available** 153:*9*
**aware** 88:*3, 8* 96:*6*
97:*2* 103:*3* 132:*7*
**Awesome** 104:*4*

**< B >**
**back** 19:*17* 37:*12*
38:*3, 5, 12* 43:*12*
59:*9* 67:*10* 74:*3*
76:*24* 77:*4* 88:*25*
90:*9* 91:*18* 102:*17*
104:*17* 118:*15*
119:*12, 24* 122:*15*
137:*18* 145:*17*
148:*13*
**background** 9:*18*
**bad** 34:*24* 58:*8, 9*
**bank** 27:*19* 41:*12*
55:*15* 59:*15* 127:*15*
**bar** 126:*3*
**barred** 89:*14, 25*
90:*22* 91:*15* 94:*17,*
*23* 95:*19* 96:*1*
**based** 35:*19* 36:*16*
61:*1* 109:*12* 124:*12*
136:*25* 138:*14* 140:*1*
145:*3* 146:*15, 17, 20*
**Bates** 42:*9* 125:*20*
128:*20* 134:*14*
**BEACH** 151:*5* 152:*1*
153:*21, 22*
**beat** 34:*18*
**bed** 40:*1, 3, 5*
**began** 5:*2*
**beginning** 50:*6, 23*
145:*19*
**begins** 58:*6*
**behalf** 2:*1, 7, 16* 6:*4,*
*7, 9* 54:*21* 57:*20*
71:*13* 79:*14, 22*

80:*17, 25* 81:*3, 6*
106:*14* 108:*23* 148:*5*
**believe** 17:*22* 18:*12*
75:*5, 10* 110:*6*
124:*15* 142:*16*
**beneath** 71:*3*
**benefit** 141:*11* 148:*2*
**better** 30:*12* 73:*22*
84:*22* 85:*2, 4, 8*
89:*19*
**Betty** 72:*6, 7* 73:*14*
76:*10, 19* 77:*1, 10*
78:*7* 79:*15* 81:*7, 8*
83:*10* 98:*3, 13, 14*
113:*13* 114:*5, 23*
141:*19* 142:*11, 18, 25*
147:*22* 148:*17*
**Betty's** 76:*21* 79:*16*
**big** 12:*25* 25:*14*
33:*17*
**biggest** 21:*8* 92:*23*
**Bill** 4:*17* 33:*14* 52:*7,*
*9, 15* 53:*22* 54:*13*
57:*14, 15* 72:*23*
92:*21* 93:*20* 98:*20*
136:*14, 21* 146:*15*
**bind** 31:*15* 77:*10*
**birth** 9:*8*
**bit** 43:*9* 70:*9* 74:*6*
80:*4*
**blame** 90:*6* 99:*12*
**blank** 153:*16*
**Blvd** 2:*17*
**bond** 20:*10* 83:*23*
84:*5* 87:*22* 88:*12*
89:*2* 90:*7* 99:*21, 22*
100:*4, 5, 8* 109:*15*
110:*2* 143:*5*
**booked** 127:*15*
**born** 10:*5*
**borrower** 80:*11*
**bottom** 42:*12* 54:*21*
64:*5, 8* 65:*20* 153:*16*
**bought** 12:*20* 15:*17*
35:*10* 36:*15* 38:*22*
39:*4* 41:*18* 44:*13*
45:*20* 88:*19, 20*
140:*19* 141:*5* 145:*22*
**Boulevard** 153:*21*

**Box** 2:*5* 29:*2* 50:*1,*
*24* 126:*14* 132:*7*
133:*8*
**boy's** 144:*13*
**brake** 40:*17*
**brakes** 39:*11*
**breach** 95:*18* 96:*1*
**break** 8:*19, 22* 102:*7,*
*15* 144:*13*
**bring** 15:*10* 22:*11*
23:*20* 31:*10* 38:*3, 4*
116:*23* 117:*12*
**building** 54:*9*
**Bureau** 84:*22* 85:*3,*
*5, 9*
**Business** 9:*25* 11:*2*
17:*7* 43:*16* 61:*14*
71:*10* 84:*22* 85:*2, 4,*
*9* 99:*10* 115:*19*
129:*3, 4* 134:*2*
**businesses** 22:*3*
**buy** 20:*5, 6* 21:*7, 9,*
*18, 19, 24* 22:*9* 23:*19*
31:*8, 10* 36:*15, 19*
37:*3* 59:*18* 92:*21*
93:*17* 105:*23* 106:*1*
108:*22* 139:*5*
**buyer** 21:*17* 31:*17*
36:*22* 105:*3, 15, 17*
109:*4, 5* 113:*12, 24*
121:*6* 129:*10* 137:*12,*
*17*
**Buyers** 138:*17, 18*
**BUYER'S** 3:*14*
51:*20* 63:*8, 11* 66:*8*
70:*16* 129:*20* 131:*1,*
*7, 14* 134:*13* 135:*2,*
*16*
**buying** 52:*20* 124:*13*

**< C >**
**c/o** 153:*2*
**cabinet** 46:*9, 10, 12*
**cabinets** 46:*14*
**California** 61:*13*
**call** 32:*19* 33:*3*
37:*11* 57:*9* 81:*11*
88:*11* 91:*22* 92:*9*
107:*22* 115:*6* 116:*21*

118:*16*, *17*  119:*11*, *14*, *23*, *24*  120:*23*  153:*10*
**call-backs**  119:*17*
**called**  23:*18*  32:*15*  36:*25*  37:*1*, *6*, *12*, *13*  83:*23*  84:*6*  87:*22*  88:*10*, *13*, *21*  100:*11*, *13*  116:*1*, *2*  117:*19*, *20*, *23*  119:*12*, *20*  120:*12*
**calls**  89:*16*  119:*15*  120:*18*
**cancel**  51:*5*  100:*4*
**car**  11:*18*  12:*20*  15:*22*  17:*14*  18:*4*, *9*, *11*, *15*  21:*19*, *21*, *23*  22:*10*, *13*, *15*, *18*, *22*, *25*  23:*1*, *16*, *18*  24:*13*, *18*, *20*, *21*  25:*11*, *12*, *15*  26:*2*, *13*  27:*7*, *8*  28:*4*  30:*5*, *16*, *20*  31:*11*, *18*, *22*  34:*16*, *17*  35:*4*, *8*, *18*  36:*15*, *19*, *24*  37:*3*, *5*, *6*, *14*, *18*, *21*  38:*3*, *4*  39:*13*, *23*  41:*15*  43:*4*, *5*  45:*20*  48:*24*  59:*19*  65:*7*  67:*4*, *6*, *7*  68:*24*  71:*23*  72:*17*  88:*14*, *16*, *18*, *19*, *20*  90:*9*  91:*18*, *19*  97:*14*, *17*  105:*17*  111:*9*  116:*1*, *6*  118:*14*  121:*2*, *3*  126:*25*  127:*1*, *6*, *14*, *16*  140:*3*, *7*
**CARFAX**  22:*4*  24:*23*  92:*11*  97:*3*
**cars**  10:*7*, *9*  16:*23*  17:*2*  19:*6*, *8*, *17*  21:*3*, *4*, *5*, *15*, *24*  27:*6*  31:*8*, *10*, *20*  36:*2*, *5*, *10*  37:*3*  39:*22*  47:*11*  67:*5*  92:*21*  100:*5*  107:*3*  108:*22*  145:*11*  146:*19*
**case**  5:*11*, *13*  7:*13*  92:*6*  96:*7*  103:*6*  104:*9*  117:*16*  143:*19*  153:*6*  154:*5*

**cash**  27:*14*
**Castillo**  29:*22*
**cause**  89:*14*  95:*18*, *25*  153:*8*
**causes**  89:*24*
**cell**  117:*25*  118:*2*, *8*, *10*
**center**  121:*1*
**Central**  23:*18*
**certainly**  8:*20*
**CERTIFICATE**  3:*14*, *23*  4:*1*  18:*13*  41:*17*  42:*18*, *23*, *25*  64:*16*  65:*2*  72:*25*  74:*12*, *15*, *18*  75:*6*, *11*  77:*11*, *17*, *23*  78:*1*  97:*3*, *19*  98:*6*  103:*15*  110:*5*, *6*, *25*  111:*6*, *13*, *19*  112:*6*, *9*  113:*2*, *20*  115:*21*  121:*19*, *22*  122:*2*  123:*3*  124:*2*  125:*14*, *15*  130:*5*  131:*12*, *22*  132:*18*, *21*  133:*2*  135:*9*  142:*24*  143:*1*  151:*1*
**Certificates**  106:*13*
**CERTIFIED**  1:*24*  5:*4*  151:*18*  152:*20*  153:*18*
**certify**  62:*11*  151:*8*  152:*6*, *11*
**cetera**  42:*21*  53:*23*  61:*2*
**change**  22:*17*  23:*6*, *7*  40:*24*  54:*8*  154:*7*
**changed**  31:*3*  54:*6*
**changes**  24:*17*  154:*2*
**changing**  23:*2*
**charged**  54:*4*
**charges**  53:*5*
**check**  60:*7*  61:*2*  87:*22*  92:*8*, *10*, *12*  100:*9*  101:*6*, *8*  143:*9*, *12*  144:*1*
**checkbox**  62:*10*
**checking**  122:*1*
**Chinese**  90:*23*
**chipped**  40:*9*, *12*
**Christ**  33:*19*

**Cir**  2:*11*  153:*4*
**circumstance**  37:*9*
**citation**  86:*14*, *16*
**cited**  86:*11*
**Civil**  1:*4*
**claim**  24:*13*  50:*25*  88:*12*  93:*3*, *7*  100:*8*  116:*5*, *20*
**Claimant's**  13:*14*  51:*19*
**claiming**  143:*18*
**claims**  91:*15*  94:*17*, *23*  143:*14*
**clarify**  132:*3*
**clean**  18:*10*  39:*22*, *23*
**clear**  14:*24*  136:*19*
**Clerk**  153:*15*
**click**  15:*16*  29:*1*, *2*, *4*, *6*, *7*, *8*  33:*20*  34:*1*  50:*1*, *24*  106:*1*  117:*18*
**clicking**  105:*24*
**client**  26:*14*, *23*, *24*  27:*1*  31:*18*  45:*8*  46:*21*  47:*4*  48:*3*  52:*25*  55:*7*  57:*24*  59:*2*, *13*, *14*  62:*3*, *14*  63:*5*, *7*, *21*  65:*3*, *8*, *24*  66:*2*  68:*13*  69:*22*  70:*1*  71:*4*, *24*  74:*16*  75:*12*  79:*22*  80:*12*, *21*  82:*18*  83:*6*, *15*  88:*24*  89:*5*, *8*, *24*  90:*25*  91:*5*, *7*, *12*  93:*2*, *6*  94:*10*, *12*, *13*  95:*9*  96:*4*  98:*7*  146:*9*  147:*2*  148:*1*
**client's**  29:*24*  31:*1*  45:*5*  53:*25*  60:*13*  69:*18*  71:*18*  80:*16*  81:*2*, *5*  97:*20*
**closed**  35:*22*, *24*  36:*9*
**closely**  80:*5*
**clue**  109:*19*  130:*20*  133:*9*
**Colombia**  10:*2*
**come**  21:*9*  23:*5*  27:*12*  39:*22*  43:*14*  60:*8*

**comes**  23:*4*  50:*4*  69:*6*  86:*13*  106:*12*  111:*22*  113:*11*, *17*
**coming**  19:*17*  52:*20*
**comments**  21:*18*, *20*, *22*  37:*21*  88:*15*, *17*
**commercial**  21:*25*  93:*14*
**commercially**  93:*11*
**commission**  31:*14*  49:*12*  151:*19*
**commissions**  45:*22*, *24*
**communicate**  108:*7*, *12*
**communicated**  124:*3*
**communication**  107:*16*, *19*  118:*23*
**community**  35:*25*  86:*9*
**company**  19:*11*  23:*17*  72:*9*  92:*24*  93:*18*  105:*10*, *15*  110:*2*  111:*5*  112:*10*  118:*9*  141:*21*
**compensate**  37:*24*
**complain**  91:*9*
**COMPLAINT**  4:*6*, *8*  84:*21*  85:*15*, *18*, *22*  86:*12*, *18*  93:*24*
**Complaints**  85:*5*  86:*6*
**complete**  27:*17*  29:*10*  36:*17*  147:*5*  152:*8*
**completed**  142:*18*  143:*1*  147:*23*  153:*12*
**completely**  28:*21*  90:*4*
**Complies**  33:*18*  74:*7*  95:*22*
**composition**  115:*7*
**compressor**  86:*7*
**computer**  15:*12*, *15*  20:*9*  28:*11*, *17*, *18*, *19*, *21*  48:*21*
**concerning**  123:*10*
**concluded**  150:*10*
**conclusion**  89:*17*

**condition** 19:9 21:20
25:4, 25 26:3, 5
34:13, 15, 24 35:6, 9
37:4 38:23, 24
124:14
**conditions** 27:25
28:1
**conduct** 93:24
**conducts** 36:23
138:24
**confirmed** 119:21
**confirming** 118:19
**confusing** 7:24
**confusion** 125:13
**connected** 152:12
**consent** 5:23 48:19,
22 49:3, 9, 17, 24
50:8, 21 51:2
**considered** 19:11
**consignment** 31:8
**consumer** 28:9, 16,
23 29:4, 15 84:21
85:19
**consumers** 19:19
71:11
**consumer's** 89:24
**contact** 72:11 100:12,
15 116:22 117:12
121:13, 16
**contacted** 90:7
109:15 117:18
**contacting** 108:4
**container** 46:13, 15
**content** 97:2
**CONTRACT** 3:14
28:4 29:1 50:16
51:21 56:4, 7, 19, 25
57:4, 8, 13, 16, 24
60:19 63:15 64:1
66:11 70:14 72:23
108:19 127:2 135:4
**contractor** 142:1, 2
**contracts** 28:9 49:17
63:19
**contradict** 135:15
**contribute** 94:3
**control** 93:25
**conversation** 108:24
118:20, 24 120:8

**condition** 126:8
**conveyed** 103:8
**convicted** 9:12
**copies** 51:15 56:8, 10
**copy** 27:13 42:17, 23
48:1 50:16 52:9, 12
56:15, 24 60:15 62:2
65:1 68:12, 15 74:12,
15, 18 100:19 109:9
111:5 125:13 126:19,
22, 23 128:2 130:5,
14 132:6, 20 133:2
135:9 142:23, 25
150:6
**Coral** 2:11, 18 153:4
**corner** 33:16, 24
34:10 55:11 64:7, 8
65:20
**CORP** 3:14 31:6, 13,
16, 17 41:8, 13 42:18
43:15, 17, 18, 24
44:12, 16, 20 74:19
75:15 78:12 82:19
104:11, 22, 24 105:3,
18, 19, 23 106:18, 23
107:1, 8 108:5, 10, 16
109:4, 7 110:8, 12, 14
111:13 112:8, 19, 23
113:4, 10 115:20
121:21 122:19
126:13, 15 127:18, 25
130:14 132:5, 19
133:3 140:15, 20, 21
141:8 144:24, 25
145:3 148:14
**Corp.'s** 105:1
**corporate** 1:16 7:5,
8, 19 17:9 105:9
**corporation** 1:9, 11
16:8
**correct** 7:4, 10 10:14
15:23 16:12, 16 31:2
38:10 39:17 41:2, 4,
6 42:17 45:13, 14
46:24 49:10 52:9, 12
56:15, 24 57:18, 22
58:12, 24 59:1, 21
62:2 65:15 68:12, 15
69:11, 13, 17 70:24
73:17 74:1 78:15

**correct** 79:13, 21 80:22, 23
83:4, 13 84:10 92:13
97:8 98:16, 23
103:10 105:11, 13, 20
107:10, 15 108:3
109:8, 13, 17 110:3,
23, 24 111:2, 3, 7
112:1, 20, 24 113:1, 4,
5, 8 114:18 115:9, 11,
15, 17, 22, 23 116:4,
13 117:23 119:6
120:2 121:8, 14, 15,
18, 23, 24 122:5
126:6 127:19 129:8
130:7, 17 133:4, 5, 6,
23 136:17 137:13, 19,
20, 23 138:21, 22
140:24 141:9 142:18,
19 143:3, 15 144:25
145:1, 12, 24 146:11
147:3, 21, 25 148:6, 7
**correctly** 34:23 56:14
**correspondence**
118:19
**COST** 4:10
**counsel** 5:23 38:16
143:6, 10, 22 144:1, 6
149:6 152:11, 12
**count** 123:15
**Counts** 90:21
**county** 85:16 151:5
152:1
**couple** 120:20
**course** 17:8, 12
18:10, 15 19:12
20:16, 22, 24 21:1
28:25 33:14 47:16
48:2, 16 51:13
**courses** 20:12, 15
**COURT** 1:1, 24 5:3,
12, 22 6:12, 18 8:5
12:1 29:9 32:23
87:12 106:2, 4, 9
122:14, 17 142:4, 7
151:18 152:20
153:15, 18, 21
**cover** 33:2 53:19
144:2
**coverage** 28:2, 7

**covered** 20:19 128:12
**CR** 21:22 34:11
**cracked** 40:10, 13
**Craig's** 47:8, 10
**credit** 27:15, 17
49:11, 25 50:1, 22, 23,
25 58:8, 9
**crimes** 9:13, 16
**cross** 102:4
**CROSS-
EXAMINATION** 3:5
104:5 125:10
**customary** 134:5
140:3, 6
**customer** 18:1 20:1
27:3, 4 30:20 43:4
48:17 56:11 57:5
58:1, 14, 19, 21 60:6
62:16, 17 65:6 68:23
69:7 79:25
**Customers** 19:17
22:2 93:19 95:8
**customer's** 52:18
61:1 66:18
**cut** 122:13

**< D >**
**d/b/a** 1:9, 10 2:10
16:8
**damages** 87:20
90:18 95:7 143:16,
18, 23 144:3
**dashboard** 97:4
133:14, 22, 23 134:6,
20 135:5, 19, 21
147:4
**date** 5:6 9:8 44:2,
20 53:12 64:10 67:1,
11, 13 70:25 77:17,
20, 22 79:2, 5, 9, 12
97:18, 24 98:5, 6
110:6 126:16, 18
129:7, 17 130:11, 14
132:4, 15, 17, 20, 25
133:1, 7, 8 146:14
154:23
**dated** 142:22 152:13
**Day** 13:11 31:4
44:17 48:11 67:9
77:4 90:7 91:17

119:*25* 151:*10, 14*
152:*13* 153:*6*
**days** 43:*6* 44:*18*
**De** 2:*17*
**deal** 27:*18* 30:*13*
31:*6, 7, 12, 15, 17*
35:*14* 41:*8, 9, 10, 13*
42:*18* 43:*15, 17, 18,
24* 44:*4, 12, 15, 20*
46:*3, 4, 6, 8* 51:*13, 14*
55:*18, 20* 60:*24* 61:*2,
4, 7* 69:*5* 74:*14, 17,
19* 75:*7, 15* 76:*4*
78:*12* 82:*19* 91:*17,
20, 21, 25* 104:*11, 22,
24* 105:*1, 3, 18, 19, 23*
106:*14, 17, 23, 25*
107:*8, 11, 16* 108:*4,
10, 13, 15, 19* 109:*3, 7*
110:*8, 12, 14, 17*
111:*2, 13, 19* 112:*8,
19, 23* 113:*4, 7, 9*
115:*20* 121:*21*
122:*19* 126:*13, 15*
127:*6, 8, 15, 18, 24, 25*
128:*2, 15* 130:*3, 4, 14*
132:*5, 19* 133:*3*
140:*15, 20, 21* 141:*8*
144:*24, 25* 145:*3*
146:*5* 148:*13*
**DEALER** 2:*4* 15:*22*
20:*8* 22:*11* 23:*20*
31:*11* 35:*22* 53:*17*
60:*9* 65:*21* 86:*13*
92:*5* 99:*19*
**DealerCenter** 30:*24*
51:*10, 14* 56:*3* 60:*17,
25* 64:*14* 66:*23, 24*
**dealers** 35:*24* 114:*16*
134:*6* 140:*3, 7*
**dealer's** 147:*23*
**dealership** 7:*20* 10:*8,
16, 23* 15:*21* 16:*2, 5,
11, 17* 17:*2, 5, 10, 11,
21* 18:*12* 19:*20, 23*
20:*2, 7, 11, 14, 25*
23:*22* 25:*7* 30:*7, 9,
22, 23* 35:*13* 45:*13*
46:*16* 47:*6* 48:*3*
51:*8* 53:*9* 56:*8*

57:*21* 60:*10, 20* 62:*3*
65:*6, 12* 67:*15* 68:*13,
17, 25* 69:*4* 71:*8, 10,
12* 76:*15* 77:*2* 79:*14*
81:*7* 82:*2, 12* 83:*15,
21* 84:*11, 16, 22*
85:*16, 20* 86:*19* 88:*8*
89:*23* 90:*1, 11, 16*
91:*4* 93:*15* 96:*7*
98:*15* 113:*7, 11*
115:*12, 16* 128:*1*
145:*17* 146:*12, 22*
147:*11* 148:*6* 149:*7,
19*
**dealerships** 10:*18*
16:*21*
**dealership's** 54:*20*
104:*23* 145:*25* 146:*4,
8, 25*
**deals** 104:*21* 113:*17*
**decide** 22:*5*
**decision** 27:*8*
**declare** 154:*22*
**dedicated** 28:*21*
**Defendant** 2:*7, 16*
4:*17* 6:*8, 10* 7:*13*
9:*3* 61:*20* 93:*10*
96:*24* 97:*1, 3, 5*
136:*8*
**Defendant(s** 1:*12*
**Defendant's** 87:*21*
93:*25* 136:*7*
**DEFENSE** 4:*12*
87:*13, 24* 88:*1* 89:*12,
21* 90:*15, 20* 91:*3, 13*
93:*9* 94:*6, 15, 21*
95:*3, 5, 16*
**DEFENSES** 4:*6, 8*
87:*3, 12* 93:*22* 96:*7*
**DEFT** 4:*6*
**delete** 77:*15*
**delivered** 38:*13, 15,
19* 124:*11*
**DEMAND** 4:*8* 99:*14,
18* 101:*22*
**dented** 40:*3*
**dents** 40:*7*
**department** 85:*16, 19*
**Depending** 25:*11*

27:*13*
**depends** 25:*25*
**depict** 133:*1*
**depicts** 79:*12*
**DEPO** 3:*14* 15:*3*
**Depos@FloridaCourt
Reporting.com** 153:*10*
**DEPOSITION** 1:*15*
5:*8, 16, 17, 18* 7:*5, 9,
19* 9:*10* 12:*13, 16, 18*
13:*9, 14* 38:*17* 81:*13*
103:*21* 125:*16*
128:*12* 143:*7* 152:*7*
153:*8, 11, 12*
**derive** 10:*13, 15*
**describe** 35:*18*
**DESCRIPTION** 3:*14*
4:*1, 16* 52:*19*
**destroyed** 19:*7* 26:*2*
**determination** 60:*2*
**determine** 27:*4*
44:*19* 60:*22* 85:*11*
**determines** 25:*6, 11,
14*
**determining** 26:*7*
**dictates** 60:*19*
**difference** 57:*12*
136:*3*
**different** 82:*20* 84:*3*
86:*6*
**differently** 95:*9*
**dig** 21:*17* 37:*10*
84:*5* 88:*22* 100:*10*
119:*12*
**DIRECT** 3:*5* 6:*23*
59:*20* 121:*13*
**directly** 36:*18* 59:*14*
108:*7* 112:*19* 113:*23*
117:*20*
**disclose** 37:*4, 15*
58:*13* 59:*2* 72:*20*
88:*15, 17*
**disclosed** 44:*25*
103:*18*
**DISCLOSURE** 3:*22*
18:*3, 5* 54:*11* 59:*5*
61:*19* 62:*1, 3, 6*
66:*20* 72:*22* 77:*13*
78:*24* 79:*2, 6* 81:*22*
135:*3* 146:*9* 147:*13*

**disclosures** 17:*13, 22*
18:*14* 90:*25* 146:*1*
149:*7*
**discovery** 32:*2* 42:*10,
24* 43:*3* 61:*20*
103:*18*
**discrepancy** 37:*1*
88:*3, 9, 12, 16* 119:*21*
**discuss** 23:*12*
**discussing** 91:*11*
**dishonesty** 9:*13, 16*
**Dispatch** 23:*18*
**dispute** 84:*8*
**distribution** 153:*12*
**DISTRICT** 1:*1, 2*
5:*12*
**disturb** 32:*16, 19*
**disturbing** 123:*23*
**DIVISION** 1:*3* 5:*13*
**DLMRB** 20:*23*
**DMS** 31:*3* 51:*10*
**DMV** 17:*25* 20:*11*
28:*13* 49:*6* 62:*18, 20*
68:*16* 69:*2* 71:*16, 19,
23* 72:*16* 73:*1, 13*
85:*21, 22* 86:*2, 11, 12,
14* 113:*18, 21*
**DMV's** 115:*14*
**doctrine** 89:*14, 25*
90:*22*
**Doctrines** 94:*18, 19,
24, 25*
**document** 15:*8*
29:*14* 33:*12* 34:*4, 10*
42:*10* 49:*9* 52:*16, 21*
54:*24* 55:*2, 4, 7*
56:*21* 57:*3* 60:*4*
61:*25* 62:*7, 15, 23*
63:*2* 64:*23* 65:*5, 9,
14, 24* 66:*4* 68:*2, 5,
22* 69:*23* 70:*23*
71:*24, 25* 72:*20*
73:*10, 19* 74:*23, 25*
75:*2, 4, 5, 11* 78:*2*
79:*11* 80:*13, 16, 24*
81:*2, 5, 10* 82:*22*
83:*6, 7* 87:*9* 96:*18*
125:*15, 20* 126:*5, 9,
22, 24* 128:*20, 23*
129:*1, 2, 4, 12* 132:*15*

135:*14* 136:*6, 13, 16*
142:*5, 18* 154:*22*
**document(s** 13:*17*
32:*3* 41:*24* 51:*25*
61:*22* 64:*20* 67:*24*
73:*5* 87:*6* 96:*15*
99:*3* 101:*19* 125:*8*
128:*17* 131:*24*
134:*15* 136:*10*
142:*13*
**documents** 15:*10, 14,*
*19* 28:*15* 48:*13, 18,*
*19* 49:*18* 51:*9* 56:*9*
63:*9, 25* 70:*20* 73:*12*
91:*1* 121:*7* 125:*3*
128:*13* 133:*11* 134:*8*
135:*8, 12* 149:*11*
**doing** 61:*14* 76:*25*
104:*21* 121:*25*
123:*25* 128:*10* 148:*2,*
*5*
**Don** 71:*5, 6, 8, 25*
**door** 17:*3* 26:*14, 23*
91:*20*
**drive** 22:*15, 20*
23:*24* 24:*1, 4* 27:*10,*
*11* 39:*10, 12, 13*
139:*1, 11*
**driver** 23:*19* 107:*6*
**driver's** 27:*16*
**driving** 24:*6* 35:*7*
39:*16*
**drove** 39:*6* 48:*8*
**duly** 6:*21* 151:*10*

**< E >**
**earlier** 110:*4* 128:*23*
130:*2, 4* 132:*4*
138:*24*
**earned** 31:*12*
**easier** 77:*16*
**easy** 7:*22*
**e-contracting** 49:*5*
**education** 9:*20*
**educational** 9:*18*
**effectively** 51:*20*
**eight** 54:*7* 136:*3*
**eighth** 91:*13*
**either** 40:*9, 12* 83:*12*

**electronic** 28:*12, 13*
48:*18* 51:*8, 11*
**electronically** 48:*14,*
*16, 19, 23* 49:*2* 50:*21*
57:*17*
**electronically-signed**
28:*15*
**eleventh** 93:*21*
**e-mail** 50:*7, 12, 13,*
*14* 100:*17, 19, 22, 23*
101:*1* 103:*15* 107:*20*
118:*22* 143:*21, 25*
153:*10*
**e-mails** 100:*18*
118:*18*
**employed** 10:*11, 15,*
*17, 19* 16:*4* 29:*23*
45:*12* 71:*12*
**employee** 77:*1, 5*
114:*1* 141:*24* 142:*1*
152:*11, 12*
**employees** 16:*19*
108:*15* 114:*2*
**engine** 39:*9* 40:*21*
**English** 120:*9, 10*
**ENTER** 154:*2*
**entered** 67:*1* 108:*18*
146:*13*
**enters** 38:*16*
**entitled** 125:*15*
**entitlement** 121:*8*
**entity** 25:*2*
**envelope** 111:*21*
112:*5*
**envelopes** 111:*25*
112:*1, 3*
**equitable** 94:*19* 95:*1*
**ERRATA** 154:*1*
**ESQUIRE** 2:*7, 12, 13,*
*19* 153:*2*
**essentially** 107:*11*
**estimation** 109:*22*
**estopped** 93:*23*
**estoppel** 94:*18, 24*
**et** 5:*10* 42:*21* 53:*23*
61:*2* 153:*6* 154:*4*
**evaluating** 25:*20*
**evaluation** 25:*22*
**event** 8:*21* 123:*24*

**Everybody** 35:*25*
36:*1* 52:*2* 56:*21*
78:*19, 21*
**evidence** 40:*15*
42:*21* 47:*1* 83:*19*
110:*21* 113:*15*
114:*12* 123:*6* 128:*9*
139:*4*
**Ex** 111:*23, 24* 112:*1,*
*11, 12* 130:*22*
**exact** 18:*23* 44:*20*
**exactly** 14:*1, 3, 15*
45:*21* 79:*12* 119:*7*
**EXAMINATION** 3:*5*
6:*23* 13:*25* 144:*21*
**examined** 6:*21*
**example** 36:*24*
**Excellent** 84:*11*
**exchange** 103:*5*
**Excuse** 12:*14* 43:*8*
52:*11*
**Ex'd** 110:*7*
**execute** 62:*4, 14*
146:*1, 22*
**EXHIBIT** 3:*14* 4:*1,*
*16, 17* 13:*13, 15*
41:*21, 22* 51:*19, 23*
56:*18* 61:*18* 64:*17,*
*18* 67:*21, 22* 72:*25*
73:*3* 87:*2, 4* 96:*11,*
*13* 98:*25* 99:*1*
101:*16, 17* 125:*21, 25*
136:*7, 8*
**expenses** 53:*19, 20*
**experience** 19:*3*
34:*14* 35:*19* 124:*12*
138:*14* 140:*2*
**expired** 85:*13*
**Expires** 151:*19*
**explain** 21:*15* 22:*12*
52:*14* 58:*1, 15, 17, 25*
89:*18* 148:*21* 150:*1*
**explained** 55:*7*
57:*24* 58:*9* 63:*5*
70:*1, 2* 117:*23*
**explains** 57:*25*
**exploring** 92:*1*
**express** 95:*18* 96:*1*
**exterior** 40:*7*

**< F >**
**face** 44:*24* 73:*16*
78:*1* 81:*23* 84:*3*
**facilitate** 137:*15*
**fact** 128:*5*
**factor** 25:*21*
**factories** 36:*9*
**factors** 25:*9*
**facts** 42:*21* 46:*25*
83:*18* 87:*14, 19* 88:*2,*
*7, 24* 89:*8, 13* 90:*16,*
*21* 91:*4, 14* 93:*10, 22*
94:*7, 16* 95:*2, 6, 17*
96:*3* 110:*20* 113:*14*
114:*11* 123:*6* 128:*8*
139:*3* 154:*22*
**failed** 95:*6*
**fair** 57:*9* 111:*4*
116:*17* 121:*25* 130:*9,*
*11, 13* 132:*25*
**faith** 93:*11, 13*
**familiar** 17:*10* 32:*6*
33:*12* 42:*4* 52:*5*
61:*25* 68:*2* 72:*19*
73:*8*
**far** 109:*12*
**Fed** 110:*7* 111:*23,*
*24* 112:*1, 11, 12*
130:*22*
**federal** 12:*1*
**fee** 53:*16, 17, 18*
54:*2, 4, 6*
**feel** 24:*11* 39:*10, 13*
**felonies** 9:*12, 15*
**FEYGIN** 2:*4, 7* 3:*5*
6:*4, 24* 7:*8, 14* 11:*11,*
*15* 12:*9, 11* 13:*12, 19*
14:*6, 9, 23* 15:*1, 5, 6*
18:*21* 19:*2* 24:*3, 5,*
*15* 26:*10, 12, 18, 21,*
*22* 29:*13* 31:*24* 32:*5*
33:*11* 34:*8* 35:*5*
38:*18* 39:*3* 41:*20*
42:*1, 22* 43:*23* 47:*2*
49:*21* 51:*18* 52:*2, 4*
56:*17, 23* 61:*17, 24*
64:*12, 15, 22, 25*
67:*20* 68:*1* 72:*24*
73:*7* 78:*16, 23* 81:*18*

82:*11, 16*   83:*20*
84:*15, 20*   87:*1, 8*
89:*20, 23*   90:*10*   93:*1*
95:*22, 24*   96:*10, 17*
97:*18, 23*   98:*4, 24*
99:*6, 9*   101:*15, 21*
102:*3, 7, 22, 25*
103:*12, 17, 23, 25*
124:*23*   125:*1, 6, 18,*
*23*   126:*2, 6*   128:*8, 23*
130:*25*   131:*7, 11, 13*
139:*3, 18*   140:*23*
144:*12, 20, 22*   147:*8,*
*10*   148:*8, 21*   149:*1*
150:*1, 7*
**FEYGIN/POWERHO**
**USE**   4:*10*
**fifteen**   16:*20*
**fifty**   145:*9, 11, 22*
**figure**   45:*18*   63:*18*
98:*9*
**FILE**   4:*8*   24:*13*
46:*9, 10, 12, 13*   85:*15,*
*18*   116:*5, 20*   144:*6*
**filed**   11:*24*   84:*21*
85:*22*   86:*18*   87:*12*
153:*15*
**filing**   90:*2, 12*
**filled**   66:*22*   134:*25*
146:*6, 10*
**filling**   134:*8*
**finalize**   105:*24*
**finance**   20:*1*   27:*14,*
*18*   28:*20, 22*   29:*19,*
*20*   52:*22*   55:*15*
*63:22*   69:*20*   114:*13,*
*14, 21*   115:*2*
**financed**   27:*14*   59:*19*
**FINANCIAL**   1:*10*
66:*6*
**financially**   152:*13*
**financing**   19:*23*   20:*3*
57:*6, 9*   59:*17, 24*
104:*13*   135:*4*
**find**   31:*18, 20*   38:*8*
47:*6, 19, 20*   75:*2*
81:*9*   88:*21*   89:*2, 3*
101:*3*   123:*9, 22*
**finding**   44:*5*

**fine**   33:*2*   128:*11*
149:*1, 23*
**finish**   8:*23*   106:*5*
118:*4*   123:*12, 14*
143:*24*
**finished**   8:*7*   142:*5*
**finishes**   29:*10*
**FIRM**   2:*4*   99:*19*
**first**   6:*21*   7:*23*
12:*23*   22:*13*   26:*24*
29:*14*   31:*8*   38:*7, 8*
57:*12*   58:*6, 16*   67:*6,*
*7*   83:*21*   87:*13*   99:*11,*
*12*   100:*16*   102:*6*
104:*10, 14*   109:*13, 25*
115:*24*   122:*10, 11*
145:*14, 16, 17*   150:*5*
**five**   16:*13, 15*   20:*18*
34:*22*   58:*5*   61:*16*
133:*10*
**five-minute**   102:*15*
144:*13*
**flat**   111:*25*
**FLORIDA**   1:*2, 9*
2:*6, 11, 18*   5:*4, 12, 21*
15:*22*   20:*8*   151:*4, 18*
152:*1, 6*   153:*4, 21, 22*
**focus**   75:*16*
**follow**   93:*15*   119:*18*
**followed**   93:*11*
**following**   5:*2*
**follows**   6:*22*
**Ford**   2:*16*   6:*10*
31:*16*   35:*14*   36:*12*
37:*6, 13*   38:*9*   84:*7*
88:*23*   119:*11*   120:*12,*
*16*   123:*1*   136:*24*
137:*2*
**foregoing**   154:*22*
**Foreign**   1:*10*
**forever**   120:*22*
**FORM**   3:*14*   49:*24*
54:*12, 17, 20*   59:*2, 6*
63:*5, 7, 12*   66:*7, 20*
67:*10*   69:*1, 4, 10, 15,*
*18*   70:*7, 17*   71:*15*
74:*10*   131:*1, 8, 14*
137:*3, 21*   140:*23*
**formal**   60:*4, 18*

108:*18*   116:*5*
**format**   43:*14*   50:*16*
**formula**   60:*3*
**forwarded**   153:*14*
**found**   47:*22*   89:*4*
**foundation**   42:*20*
**four**   15:*25*   16:*1, 12*
17:*4*   33:*23*
**fourteen**   16:*10, 12*
**fourteenth**   94:*15, 21*
**fourth**   90:*15*
**franchise**   37:*11, 13*
**Frank**   5:*8*   7:*6*
11:*13*   14:*17*   26:*9, 17*
32:*21*   82:*9*   117:*5*
123:*13*   124:*6*   126:*11*
128:*20*   132:*3*   149:*4*
**FRANKLYN**   1:*15*
3:*5*   6:*20*   9:*7*   15:*7*
79:*20*   105:*12*   151:*9*
152:*7*   153:*2, 25*
154:*6, 23*
**fraud**   93:*7*
**Friday**   153:*11*
**friend**   31:*7*   108:*6,*
*13, 24*   109:*2, 6*   125:*6*
148:*13*   149:*24*
**friends**   104:*12*
**front**   15:*12*   74:*25*
79:*23*
**FS**   1:*4, 16*   2:*7*   4:*6*
5:*9*   7:*5, 20*   9:*3*   16:*7,*
*8, 9*   105:*6, 9*   153:*4*
154:*3*
**FSA**   136:*6*
**FSIA**   3:*14*   4:*17*
32:*2*   42:*6*   51:*21, 22*
56:*20*   61:*21*   64:*22*
128:*21*   134:*14*   136:*6*
**full**   28:*2, 7*   32:*14*
**fully**   87:*20*
**funds**   41:*10*
**funny**   24:*11*
**further**   5:*18*   112:*2*
115:*13*   148:*8*   152:*11*

< G >
**Gables**   2:*11, 18*
153:*4*

**GABRIEL**   1:*4*   5:*9*
6:*5*   78:*17*   129:*12*
142:*21*   153:*4*   154:*3*
**gallery**   32:*23*
**gas**   40:*19*
**gate**   107:*6, 8*
**gathered**   133:*21*
**general**   35:*19*
**general's**   86:*19*
**generate**   107:*5*
**gentlemen**   29:*23*
144:*10*
**getting**   32:*18*   38:*12*
67:*10*   113:*11*   119:*3*
121:*22*
**give**   6:*15*   21:*19, 20*
28:*6*   35:*22*   38:*5*
49:*9, 11*   60:*6, 25*
66:*14*   91:*18*   97:*15*
116:*9, 15*   121:*5*
128:*13*   136:*1*
**given**   109:*6*
**gives**   17:*25*   18:*10*
69:*2*   115:*14*   117:*18*
**giving**   41:*16*
**Go**   7:*13*   11:*11*
17:*24*   26:*9, 17*   29:*5*
30:*15*   33:*7*   43:*9*
48:*20*   58:*18*   82:*9*
92:*17, 21, 24, 25*
93:*16*   102:*5, 9, 12*
104:*2*   116:*2, 23*
117:*11, 14*   122:*11, 12,*
*13*   124:*6, 23*   129:*11*
132:*9, 23*   150:*4*
**goes**   12:*7*   23:*23*
25:*22*   49:*7*   51:*21*
56:*20*   113:*20*
**going**   7:*21*   8:*2, 12,*
*20*   13:*12, 13*   31:*24,*
*25*   37:*10, 11*   41:*20,*
*21*   45:*5*   51:*18, 19*
55:*9*   56:*17, 18*   57:*5*
59:*9*   60:*20, 23*   61:*17,*
*18*   64:*16*   67:*20*
72:*24*   74:*3*   75:*14, 16*
77:*15*   78:*16, 18*   87:*1,*
*2, 11*   91:*24*   92:*6*
96:*10, 21*   98:*24, 25*
101:*15*   104:*19*   118:*3,*

*4* 119:*2, 11* 124:*4*
127:*8* 128:*14* 140:*21*
144:*6* 145:*13* 150:*3*
**GOOD** 1:*24* 5:*3, 4*
6:*25* 7:*17, 18* 22:*18*
24:*22* 26:*5* 30:*21*
34:*16* 35:*3, 4, 8, 20*
39:*14* 93:*11, 13*
95:*12* 103:*12* 117:*3,*
*9* 151:*18* 152:*6, 20*
153:*18*
**govern** 17:*6*
**grade** 35:*9*
**grading** 34:*20*
**great** 51:*16*
**greets** 26:*24* 27:*1*
**ground** 7:*21*
**guide** 134:*7*
**guided** 97:*4*
**guy** 63:*22* 114:*13, 14,*
*21*
**guys** 12:*25* 13:*11*
34:*2* 38:*7*
**Guzman** 29:*22* 30:*3*

**< H >**
**HADDON** 1:*4* 5:*9*
6:*5* 66:*7* 70:*7* 78:*18*
82:*2* 129:*12* 130:*7*
133:*12* 153:*4* 154:*3*
**Hall** 71:*5, 6, 8, 25*
**hand** 6:*13*
**handbook** 114:*1*
**handled** 121:*2*
**hands** 43:*6* 94:*18, 22,*
*24*
**handwritten** 28:*14*
49:*7*
**hang** 53:*13*
**happen** 27:*20* 44:*15*
128:*6* 129:*25*
**happened** 13:*11*
14:*3, 15* 48:*6* 104:*18*
122:*11*
**happens** 22:*12, 14*
26:*15* 27:*9, 11, 17, 24*
30:*14*
**hard** 120:*21*
**Harrison** 2:*5*

**head** 8:*10* 122:*12*
**headlights** 40:*12*
**hear** 7:*18*
**held** 82:*17*
**help** 12:*13, 15* 86:*9*
95:*8*
**helped** 104:*13*
**helping** 35:*25* 148:*14*
**here/pay** 20:*5, 6*
59:*18*
**Heron** 29:*22*
**HH** 151:*19*
**high** 19:*8* 26:*3*
**higher** 19:*4* 36:*2, 5*
123:*3* 124:*2*
**highest** 9:*20*
**highlight** 75:*16* 78:*19*
**highlighted** 96:*22*
**highlighting** 76:*4*
77:*16* 131:*5* 143:*2*
**history** 18:*14* 25:*3*
38:*22* 57:*8* 103:*16*
147:*6*
**hit** 69:*6*
**Hold** 43:*11* 114:*2*
120:*22* 129:*10*
131:*20, 23* 141:*18*
143:*24* 149:*22*
**holds** 111:*19*
**Hollywood** 2:*6*
**home** 36:*1*
**honest** 19:*11*
**honestly** 90:*18*
**honor** 106:*8*
**hope** 8:*20*
**hopefully** 7:*22*
**hours** 153:*10*
**Houston** 117:*16*
**HSMV** 69:*10*
**Hudson** 100:*15*
**huh** 99:*12* 149:*16*
**human** 90:*5*
**hundred** 12:*22* 91:*11*

**< I >**
**idea** 59:*11*
**identification** 13:*16*
41:*23* 51:*24* 64:*19*
67:*23* 73:*4* 87:*5*

96:*14* 99:*2* 101:*18*
136:*9*
**identify** 42:*9* 105:*21*
125:*20* 126:*8*
**ignorance** 33:*1*
**II** 90:*21*
**III** 90:*22*
**immaculate** 19:*9*
**immediately** 111:*14*
116:*1*
**impact** 18:*17*
**impacts** 18:*7*
**important** 17:*14, 15,*
*17, 19, 21, 23* 18:*3, 12*
19:*10, 14, 19*
**impression** 88:*19*
**inaccurate** 18:*16, 22*
54:*18* 59:*3* 83:*22, 25*
84:*9* 89:*6, 9* 91:*1*
**inappropriate** 120:*7*
**incidental** 53:*5*
**include** 138:*4*
**included** 133:*11*
**including** 138:*9*
**income** 10:*15* 28:*2*
61:*2*
**Independent** 90:*22*
**INDEX** 3:*1*
**indicate** 5:*25* 54:*17*
**indicates** 34:*24*
**indicating** 34:*12*
42:*12* 44:*25* 55:*11,*
*23* 68:*5* 71:*4* 73:*19*
76:*7, 12* 80:*7, 10*
126:*23* 131:*3* 132:*8,*
*16, 24* 135:*2*
**indication** 113:*6*
129:*21*
**industry** 17:*14*
**inform** 83:*15*
**INFORMATION**
3:*14* 4:*10* 28:*8* 32:*1*
36:*16* 44:*5* 50:*2*
61:*1* 66:*24* 67:*1*
72:*11* 79:*10* 96:*25*
97:*5* 98:*18, 19, 21*
105:*23* 133:*20* 134:*7*
135:*1, 7, 8* 137:*1, 16*
138:*2, 4, 16, 19*

**in-house** 20:*2*
**initial** 119:*23*
**ink** 48:*14, 15*
**inspect** 22:*7* 23:*13*
24:*7* 37:*20* 39:*4, 9,*
*11, 12* 116:*16* 139:*12,*
*13* 147:*16*
**inspecting** 23:*12*
124:*13*
**inspection** 22:*11*
23:*17, 21, 22* 39:*15*
92:*10* 124:*10* 138:*25*
139:*16* 140:*4, 7, 13*
146:*17* 147:*17*
**inspects** 22:*10* 23:*15*
**INSTALLMENT**
3:*14* 56:*19, 25* 63:*14*
66:*10* 70:*14* 135:*3*
**instructed** 8:*15*
**insurance** 20:*10*
28:*3, 7*
**intend** 9:*2*
**intends** 96:*7*
**intention** 140:*16*
**interest** 35:*23* 57:*6*
**interested** 92:*1*
152:*13*
**Interesting** 131:*23*
**Internet** 49:*4*
**inventory** 21:*16*
**investigate** 147:*12*
**investigation** 124:*1*
147:*6*
**Investment** 105:*9*
**INVESTMENTS** 1:*4,*
*16* 2:*7* 4:*6* 5:*10* 7:*6,*
*20* 9:*3* 16:*7, 9* 105:*7*
153:*4* 154:*3*
**investor** 111:*18*
**invoice** 40:*25*
**involved** 11:*5* 45:*7,*
*15* 46:*2* 75:*19*
**involving** 135:*9*
**iPad** 28:*16*
**irrelevant** 25:*24, 25*
**is-as** 103:*5*
**issue** 86:*13* 115:*25*
116:*23* 117:*13* 119:*4,*
*8* 130:*15*
**issued** 103:*3*

issues 84:17 86:5, 8
109:14 118:6
itemization 53:14
ITS 4:8 17:3, 6
23:22 82:2 117:12
133:11 135:8 138:24
140:22 146:17

< J >
jacket 46:3, 4, 6, 8
74:14, 17
January 151:19
Jesus 33:19
Jiffy 23:3, 8
job 114:22
join 7:12
JOSE 2:12 6:7 15:5
102:4 131:1 150:1
153:2
Josh 103:14 124:22

Josh@JFeyginEsq.com
2:7
JOSHUA 2:4, 7 6:4
7:2, 13 15:4 32:12
95:21 132:1
jperalta@atllp.com
2:13 153:3
judge 118:3
Juliana 78:11
106:12, 17 108:8
148:18
July 58:6

< K >
keep 19:16, 17 45:24
46:1 91:19
KEITH 2:13 7:11
keith@silversteinpa.co
m 2:14
kept 129:2, 4
Kind 36:7
knew 88:24 89:5, 9
know 14:1, 3, 15
16:20 17:6 18:1, 9
19:16, 17 24:22
25:14 29:17, 18
32:18 34:17 37:16
38:7 39:14, 22 40:4,
22 44:15 45:16, 21

48:5, 7, 8, 11, 13, 22
50:9, 10, 11, 15, 17, 18
55:14, 24 56:1, 2
58:4, 16 61:12 62:22
63:16, 17 64:11, 13
66:9, 12, 13 68:6, 8
69:22 70:23 71:7
72:1, 2, 10, 18 73:20
76:1, 8, 9, 18 77:19
78:3, 5, 6, 11 79:8
83:8, 9 84:25 85:1,
17, 25 86:1, 17, 20, 21,
22, 23, 24 89:11 93:8
94:2, 5, 14 95:4 96:5
98:10, 11 99:6 100:7,
25 103:20, 22 105:8
107:1 108:9, 11, 15
110:11 111:21
112:23 113:22 119:4
120:4 121:6 123:17
128:5 130:18 131:1,
4, 21 133:7 137:4
139:17 140:8 143:16,
20 145:4, 10 146:12
150:8
knowing 58:20
knowledge 55:6
57:23 58:12 63:4
96:24 136:25
knows 58:21

< L >
label 130:22
labelled 61:21
laches 89:15, 25
94:18, 24
lady 30:15 72:3
81:21 98:3 113:13,
16 120:4, 5
Lakes 153:21
Laramie 25:12
LAW 2:4 15:22
20:8 99:19
laws 17:6, 10
lawsuit 11:5, 17, 19,
22, 24 12:3 90:2, 12
95:14 143:14 144:7
lawsuits 11:17
lead 124:15

leading 14:2, 12, 20
18:19 43:22 46:22
98:2 124:5
leaking 24:12
learn 83:21
learned 92:5
LEAVE 4:6 28:4, 8
30:7, 9 49:12 96:11,
12 114:24 120:22
142:11 149:24
leaves 30:21 115:2
143:6
left 33:24 43:5
59:13 114:5
left-hand 33:16
34:10 55:11 76:7
legal 18:8 89:16
116:19 122:1
legally 23:16 121:3
legible 140:10, 11
lender 59:19, 21
82:17, 23
lenders 19:25 20:1
lender's 27:25
Leon 2:17
lesson 92:5
LETTER 4:12 99:15,
20, 23 100:1, 6
153:16
letters 99:18 101:22
level 9:20
liability 94:4
license 16:2 17:24
21:2 27:13, 16 31:10
licensed 15:22 16:14
20:8
lienholder 66:6
lieu 5:19
life 9:11, 14 76:1
lift 25:18 39:7
lifted 25:13 31:23
light 53:22
limited 121:16
Line 154:7
List 47:8, 10
listed 77:20 123:4
153:17
listen 27:3 149:18
little 43:9 70:9 74:6

80:4 89:19 144:13
living 10:3, 6
LLC 1:10 2:16
LLP 2:10 153:3
located 46:12, 15
61:12
location 16:18 54:9
117:15 148:17
locations 16:17
log 51:11 63:24
long 8:21 10:3, 23
39:23 61:14 119:23
120:18 134:2
longer 29:25 30:3
45:12 81:20
look 12:25 21:18
23:9 32:6 33:12
38:21 42:4 51:13
52:5 55:9 60:1
61:25 64:1 65:1
68:2 73:8 77:13
78:1 80:4 81:23
85:2 87:11 100:21
103:22 115:21 125:3,
24 126:2 134:6
139:13
looking 34:9 35:11
42:14 44:3, 24 47:23,
24 53:14 55:19 75:4,
17 78:20 79:9, 24
82:22 126:1 130:25
131:7, 9 133:13, 21
134:20 135:18, 21, 23
lost 83:2
lot 21:11, 13 22:14,
18, 23 35:24 99:10
140:22
low 19:6 26:1
lower 34:23
lower-mileage 19:5
Lube 23:3, 8
LUC 1:4 5:9 6:5
78:17 153:4 154:3

< M >
Madam 122:14
maintain 43:16 56:8,
10 86:3
maintenance 19:4

**making** 12:*25*
104:*21* 107:*18*
**man** 122:*9*, *11*, *12*
**management** 30:*22*
**manager** 27:*18*
28:*20*, *22* 29:*19*
52:*22* 69:*21* 115:*2*
**managers** 29:*21*
**Manheim** 4:*17*
12:*20*, *21* 15:*16* 21:*7*,
*12* 25:*4* 31:*20* 33:*15*
36:*15*, *20* 37:*1*, *6*, *8*,
*15*, *24* 41:*9* 44:*6*
54:*14* 59:*7* 84:*6*
88:*10*, *13*, *22* 90:*8*
91:*18*, *19*, *22* 92:*22*,
*23* 93:*17* 100:*13*
104:*20*, *25* 105:*2*, *4*
106:*17*, *22* 107:*12*, *21*
109:*3*, *6* 110:*4*
111:*22* 115:*21* 116:*1*,
*5*, *12*, *24* 117:*12*, *16*,
*21* 118:*11*, *18*, *24*, *25*
119:*2*, *4*, *7*, *11*, *24*
120:*11*, *15*, *25* 121:*16*,
*23*, *25* 123:*1*, *10*, *23*
135:*23* 136:*4*, *14*, *15*
137:*1*, *7*, *11*, *18* 138:*1*,
*2*, *15*, *18*, *24* 139:*7*, *11*
141:*2* 146:*16* 147:*4*,
*15*, *18*
**manner** 5:*24*
**March** 103:*4*
**marked** 13:*15* 41:*22*
51:*23* 64:*18* 67:*22*
73:*3* 87:*4* 96:*13*
99:*1* 101:*17* 136:*8*
**market** 35:*18*
**Marketplace** 47:*7*, *10*
**Martine** 108:*6*
**master** 60:*9*
**math** 60:*3*
**matter** 5:*9* 6:*15*
**matters** 13:*25*
**maximize** 33:*6*
**McCombs** 2:*16* 6:*10*
31:*16* 35:*14* 36:*12*
38:*9* 75:*15* 97:*5*, *6*
98:*18*, *19*, *22* 99:*5*, *6*,
*8* 102:*8*, *9*, *10* 104:*9*

113:*3* 121:*14* 123:*24*
127:*13* 136:*24* 137:*2*
**McCumbs** 99:*6*
**mean** 12:*17* 37:*3*
92:*3* 95:*11* 105:*10*
127:*5* 128:*7*, *9*, *11*
139:*1* 140:*11* 141:*25*
149:*10*, *13*
**meaning** 35:*13*
137:*15*
**means** 58:*8* 149:*14*
**mechanic** 25:*16*
**mechanical** 86:*8*
116:*19* 139:*16*
**mechanically** 121:*4*
**memorializes** 118:*25*
**memory** 110:*11*
**mentioned** 16:*4*
104:*11* 114:*5* 124:*9*
138:*23*, *24* 147:*15*
**message** 118:*23*
**messages** 107:*23*, *25*
**messaging** 107:*20*
**MIDDLE** 1:*2* 5:*12*
36:*21* 137:*11*, *14*
**mileage** 17:*13*, *22*
18:*3*, *5*, *14* 19:*4*, *6*, *8*
25:*21*, *24* 26:*1*, *3*, *6*
37:*1*, *14*, *19* 45:*3*, *4*
54:*11*, *13*, *18* 62:*6*, *12*
66:*20* 67:*8*, *11*, *13*, *16*,
*18*, *19* 72:*21* 78:*24*
81:*22* 83:*24* 84:*4*, *8*
88:*12*, *17* 89:*6*, *9*
90:*24* 92:*7*, *9*, *12*, *15*
97:*1* 111:*1* 119:*8*, *22*
123:*3* 124:*1*, *2*, *16*
133:*11*, *12* 135:*22*
136:*20* 137:*1* 138:*11*
146:*2*, *9*, *12*, *13* 147:*6*,
*12*
**miles** 37:*22*, *23*
88:*20* 96:*25* 111:*7*
115:*25* 119:*4* 136:*3*
**mind** 95:*20* 103:*24*
**mine** 105:*6*
**minutes** 120:*20*
144:*11*
**mirror** 32:*13*

**mirroring** 32:*13*
**mis** 14:*20*, *21* 97:*12*
**mischaracterizes**
14:*21* 35:*1* 82:*7*
92:*18* 97:*13* 121:*9*
**mistake** 12:*21* 13:*1*,
*4*, *7* 36:*25* 37:*7*, *14*,
*25* 38:*10* 84:*7* 88:*23*
90:*5*, *7* 92:*4* 119:*13*,
*22* 120:*13*, *16* 123:*1*,
*24*
**mistaken** 117:*17*
**mitigate** 95:*7*
**Mm-hmm** 120:*6*
**mobile** 72:*8*
**moment** 70:*12*, *15*, *18*,
*21* 76:*23*, *24* 78:*19*
97:*16*
**Monday** 153:*11*
**money** 31:*9* 38:*5*
41:*7*, *8* 52:*20* 57:*5*
90:*9* 144:*8*
**month** 16:*23* 30:*8*
58:*6*
**months** 35:*24* 57:*7*
81:*17* 90:*2*, *12*
109:*22*
**morning** 5:*3* 6:*25*
7:*16*
**MOTION** 4:*6* 96:*12*
**MOTOR** 4:*10*
**mouse** 28:*18* 48:*20*
**move** 45:*5* 64:*15*
67:*20* 72:*24* 87:*1*
96:*10* 98:*24* 101:*15*
102:*22* 143:*4*
**moved** 54:*9*
**Moving** 76:*3*
**multiple** 131:*18*
**Multiply** 17:*4*
**mute** 117:*5*

**< N >**
**name** 5:*3* 6:*1* 9:*5*, *6*
10:*8* 21:*2* 30:*17*
45:*20* 46:*4* 65:*7*
71:*25* 72:*9*, *19* 76:*11*,
*14* 79:*16*, *18*, *19* 80:*3*
104:*8*, *23* 105:*1*, *10*

106:*12* 120:*3*, *4*
129:*13* 141:*2* 153:*16*
**named** 104:*22*
**names** 29:*20* 71:*22*
**narration** 128:*9*
**narrative** 11:*10*, *14*
26:*16*, *19*
**nationwide** 23:*19*
**nature** 108:*22*
**necessary** 92:*15*
**need** 8:*19*, *21* 13:*3*
14:*7*, *14* 15:*13* 19:*4*
58:*16* 61:*11* 66:*16*,
*18* 74:*24* 91:*18* 92:*3*
100:*1* 102:*5* 112:*16*
**needs** 24:*18*, *21*
37:*15* 59:*19* 62:*16*
66:*15* 107:*2*
**negatively** 18:*17*
**negligent** 94:*8*, *9*, *12*,
*13*
**neither** 150:*9*
**Never** 9:*11*, *14*, *17*
23:*11* 36:*14*, *19*
37:*20* 55:*5* 73:*10*
75:*25* 84:*18* 86:*10*
103:*8* 121:*13* 147:*20*
148:*19*
**new** 23:*6* 30:*16*
36:*10* 81:*20* 95:*15*
114:*15*
**nice** 103:*20* 131:*5*
**NICKLAUS** 2:*17*
**NICOLAS** 2:*19* 6:*9*
104:*8*
**nicolast@nicklauslaw.
com** 2:*19*
**nine** 47:*25* 53:*6*
**nineteenth** 95:*16*
**ninety-eight** 53:*6*
**ninety-nine** 54:*7*
**ninth** 93:*9*
**nod** 8:*10*
**normal** 36:*3*, *6*
113:*10*
**normally** 88:*16*
117:*14*
**Notary** 151:*18*
**Note** 4:*17*

Noted 15:5
notes 152:9
NOTICE 3:14 13:14
50:15, 20 51:1, 5
109:13, 25 110:1
115:25 153:6
noticed 147:8
notification 106:22
notified 106:18
107:11
nuh-uh 8:11
NUMBER 4:5 5:13,
22 55:15, 18, 19, 25
59:10 64:6 68:4
72:12 73:18, 23, 25
74:1, 4 95:25 117:19,
20 118:9
numbered 152:7
numbers 42:8, 11
125:16

< O >
oath 5:19, 20 151:1
objected 11:13
objecting 12:6
objection 8:15 11:9
14:2, 12, 19, 20 18:19
19:1 23:25 24:2, 9
26:8, 16, 18 35:1
38:25 42:20 43:19,
21 46:22 49:20 64:3
82:7, 14 83:18 84:14,
19 89:16 92:18
97:12 98:2 110:20
113:14 114:11 121:9
122:4, 7, 21 123:5
124:4 128:8 137:3,
21 139:3 140:23
objections 5:24
obtain 134:19 135:4,
19, 22
obtained 73:1
obviously 7:18 57:20
Occasionally 8:14
occur 38:6 54:8
occurred 46:21 47:3
78:14 79:12 98:7, 15
129:21 147:20
occurs 27:23

ODOMETER 3:22
18:6, 17, 22, 24 44:25
49:6 59:3, 5 61:19
62:1, 3, 11 72:22
77:13 83:16, 22
84:17 88:3, 9, 25
92:22 93:3, 4 109:15
124:16 133:13
134:18, 19 135:1, 3, 5,
19 138:12 146:21
149:7
offer 103:4, 8 115:13
offered 91:16
offering 118:14
OfferUp 47:7
office 20:9 27:12
46:10 71:19, 23
72:16 86:4, 19
109:16 118:9 148:15
off-the-record 102:20
144:16
oh 55:14 56:16 72:6
77:21 81:14 103:23
126:4 131:20
oil 22:17 23:2, 6, 7
24:17
Okay 7:25 8:3, 4, 8,
12, 13, 24, 25 9:3, 4,
23 10:6, 8, 18 11:8,
19, 22 12:5 13:6, 22,
24 14:6, 10 15:1, 21
16:11, 14 17:18
20:14 21:5 22:19
25:9 26:21 28:5
30:13, 18 33:10, 12,
25 34:6 41:20 42:13,
16, 17 43:2 49:8
55:22 59:2 60:12
69:22 70:13, 22
71:21, 24 72:15, 24
73:12, 15, 21 74:18,
22 75:14 76:3, 6, 18
77:15, 25 78:8, 13, 16
79:19 80:4, 12, 15, 20
82:12, 17 83:11 84:2
87:1, 11 96:10, 21
97:9 98:14 99:18, 22
102:14 103:12 105:8,
14, 22 106:11 109:25
111:10, 12, 19, 24

112:21 114:1 116:22
117:2, 11, 20 118:5, 6
120:11 123:19
125:12 126:7, 11
127:3, 7, 10, 17, 22
128:5, 15, 20 129:7,
10, 24 130:2, 9, 18, 23
132:1, 9, 12, 23
133:10, 20 134:1, 11,
17, 25 135:12, 18, 25
136:5, 13, 15, 18, 20,
23, 25 137:9, 14, 25
138:4, 14, 22 139:16
140:1, 14 141:1, 10,
18 142:3, 9 143:4, 12,
16, 21 144:5, 10, 18
145:20, 25 148:5, 8
149:18, 23 150:9
once 27:1, 4, 7, 16
30:13, 18 107:12
112:2 113:9 153:11
one-phone-call 118:15
ones 25:14 73:11
121:5
ongoing 20:12
on-line 49:15 50:3
115:7
open 16:9 31:8
35:24 56:12 90:8
112:3, 5
opened 17:3 91:19
145:17
operated 128:2
operating 16:2
113:10
operation 16:12
104:16
opportunities 30:12
opportunity 114:7
option 92:2 117:21
147:16
ORDER 3:14 5:22
51:20 63:8, 11, 16, 18
64:2 66:8 70:17
129:20 131:1, 8, 14
134:13 135:2 150:4
ordering 150:7
153:14
orders 129:10

135:16 150:5
organization 86:24
original 37:18 153:14
originate 19:23
outside 93:25 116:11
owner 11:1 19:8
26:2 31:7 76:15
104:11 127:8

< P >
P.A 2:17
p.m 1:20 102:21
144:17 150:11
153:11
P.O 2:5
package 63:10 66:5,
14, 15, 16, 17 69:6
packaging 111:22
112:2
PAGE 3:1, 14 4:1,
16 47:11, 24 65:14,
16, 17 67:5, 8 69:9
74:3 85:3, 5 96:22
129:11 133:15, 16, 17,
18, 19, 21 146:20
154:7
Pages 1:16 152:7
paid 41:5, 9 60:23
77:7 141:20 144:7
148:4
paint 24:18 40:15
PALM 151:5 152:1
153:21, 22
pandemic 35:16, 19
paper 48:16, 23 49:1,
4, 6 50:3, 16 64:5, 8
93:20
papers 49:5 66:18
74:21
paperwork 17:25
18:2 20:21 28:14
29:16 58:18, 19, 20
69:3 75:25 98:11
106:15, 19 107:2
121:3
paperworks 18:2
park 22:18
part 26:6 48:11
63:10 66:5 71:18, 19

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC
CR of FS Investments (Franklyn Strusberg)

4/23/2024
13

**94:**17, 23   **115:**18
**participating**   5:15
**particular**   14:4
  36:24   37:6   38:22
  43:13, 14   61:2   67:4
  92:6   147:18
**particularly**   49:2
**parties**   5:23   12:7
  87:21   152:11, 12
  153:12
**pass**   107:6, 8
**passes**   22:10   23:17
**pause**   103:21
**pay**   27:14   35:23
  40:23   41:13   45:24
  52:25   57:5   59:19
  100:3   107:4, 5   127:9
**paying**   52:18
**payment**   28:6   41:11
  53:7, 10   57:7   58:5, 6,
  20   87:21   143:5
**payments**   58:2, 6
  59:14
**payout**   60:5
**pedal**   40:17, 19
**penalties**   154:22
**pending**   8:23
**people**   22:3, 23   48:4
  58:16   71:11
**PERALTA**   2:12   3:5
  6:7   7:2, 10   11:9, 13
  12:6   14:2, 12, 17, 25
  15:2   18:19   19:1
  23:25   24:2, 9   26:8,
  16, 19   32:12, 17, 20
  33:2, 6, 8, 10, 20, 25
  34:4   35:1   38:25
  42:20   43:19, 21
  46:22, 25   49:20   64:3
  81:15   82:7, 14   83:18
  84:14, 19   89:16
  92:18   95:20, 23
  97:12   98:2   102:5, 8,
  12, 16, 18, 24   103:14,
  19, 24   104:1, 3
  110:20   113:14
  114:11   117:5   121:9
  122:4, 7, 10, 21   123:5,
  13, 15   124:4, 22, 24
  125:2, 7, 11, 19   126:1,

4, 7, 10   128:11, 19
  131:3, 9, 12, 16, 20
  132:1, 2   134:11, 13,
  17, 22, 24   136:5, 12
  137:5, 22   139:7, 10,
  21   140:25   142:4, 6, 9,
  15   143:4, 8   144:10,
  15, 18   148:23   149:3,
  23   150:3, 9   153:2
**percent**   19:21   41:16
  57:5   58:7, 8   91:11,
  12
**perfect**   26:3
**perform**   23:22
**performed**   53:24
  147:18
**perjury**   154:22
**person**   5:20   7:6
  26:24   36:21   45:19,
  20   46:5   108:8   110:2
  114:15, 24   115:1, 19
  119:3   137:11, 14
**personal**   55:6   57:23
  58:11   63:4
**personally**   7:7   20:24
  22:19, 22, 24   23:1
  45:7   58:22   62:22
  66:1   75:19   78:13
  105:5   151:9
**person's**   30:17
  114:22
**phone**   72:12   107:20,
  22   117:19, 25   118:2,
  8, 10, 16, 17   119:14,
  15, 23   120:18
**physical**   110:18, 19
  111:6   126:19
**physically**   5:16
**pick**   38:13   107:4, 6
  120:23
**picks**   23:19   113:17
**Pickup**   21:25
**picture**   30:21
**pictures**   22:16, 24
  23:1   39:6   67:7
**piece**   121:1
**place**   23:10   60:12
  65:11   147:12
**placed**   135:15

**PLAINTIFF**   3:14
  4:1   6:3, 5   13:15
  41:22   51:23   62:22
  64:18   67:22   73:3
  87:4   88:3, 8   90:2, 17
  93:23   94:7   95:6
  96:13, 24   99:1
  101:17   103:3   129:13,
  15, 18   130:7   142:22
  143:18   144:3   149:10
**Plaintiff(s**   1:4   2:1
**Plaintiffs**   142:25
**Plaintiff's**   13:13
  31:25   41:21   52:10
  56:18, 25   61:18
  64:17   67:21   87:20
  89:14   91:14   94:16,
  23   95:17, 25   96:11
  98:25   128:22   143:10,
  14, 22, 25   144:5
  149:6
**planning**   25:21
**platform**   60:25
**play**   25:9   26:6
**Please**   5:25   6:12
  7:24   8:6   24:3   43:11
  49:22   52:7   68:10
  74:6   89:18, 19   94:20
  103:14   106:5   109:13
  132:9   153:6, 10, 12,
  16
**PLLC**   2:4
**PLTF'S**   3:14
**plus**   41:15, 16
**point**   92:5   111:5, 12
  112:21
**pointing**   80:6   131:2
**policies**   147:11
**Ponce**   2:17
**portal**   116:24   117:13
**portion**   122:16
**position**   10:25   13:8
  65:13   69:14   70:22
  76:20   79:10   80:1, 12,
  15   86:10   111:14
  114:6   145:25   146:4,
  8, 25
**possession**   43:5
  48:24   56:5   82:3, 12,
  23   86:3   96:2   97:2,

10   122:3   123:2
  124:1   135:9
**possibility**   142:17
**possible**   98:5
**post**   23:18   47:7
  67:5, 7   137:10
  146:20
**posted**   67:5, 6
**potential**   138:16
**POWER**   4:1   68:3,
  12, 16, 23, 25   71:4, 11
  77:9, 10   80:14, 16, 18,
  21   81:1   83:5
**POWERHOUSE**   1:9
  2:10   6:8   9:2   10:10,
  20, 21, 22   16:8, 23
  19:10, 19   29:24   41:7
  59:14, 16, 23   74:20
  75:7, 8, 12   76:4   77:9,
  18, 23, 25   78:17
  81:23   125:13   126:16,
  18, 21, 23   127:20, 22
  128:2   129:3, 5   130:6,
  16   132:6, 19, 20
  133:1, 11, 19, 21
  134:19, 25   135:19, 22
  136:19   140:17, 19, 21
  141:3, 11, 14, 22, 25
  142:1, 21, 23   144:2
  146:5   147:5
**Powerhouse's**   31:5
**practice**   134:6   140:3,
  7
**practices**   115:19
**predelivery**   53:15
**prejudiced**   90:1, 11
**premises**   25:18
**preparation**   12:12
  13:3   81:12
**prepare**   12:13, 15, 18,
  19   13:9   46:17   78:9
**prepared**   13:25
  14:11, 13   52:21
  69:18
**prepares**   113:17
**present**   5:17   32:14
  78:13
**presented**   28:9, 16
**Press**   33:6

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                                    4/23/2024
CR of FS Investments (Franklyn Strusberg)                                                   14

pretty 31:9, 11 36:20
91:24 100:4 127:12
138:18
previously 97:9
price 25:6, 14, 20
41:15 52:18 53:4
prices 36:2, 4, 5
print 20:21 58:18,
19, 20 69:5, 6
printed 52:17
printer 20:9
prior 16:1 40:15
56:4, 7, 14 91:15
100:6
problem 103:17
problems 116:19
Procedures 113:11
147:12
proceed 11:16 103:1
PROCEEDINGS 3:1
5:2 150:10
process 7:22 36:23
49:9 83:2 92:17, 20
99:25 105:24 118:13,
15 121:2
processing 105:25
produced 42:10, 11,
24 43:2 61:20
Professional 152:6
profit 59:23
profits 41:16
program 20:5
pronounce 99:7
proof 28:2
provide 8:9, 10
15:13 18:1 25:3
43:17, 20 47:15, 17
48:1 49:17 50:7
52:17 61:4, 7 72:13
74:22 92:25 101:3
137:16 138:1, 20
provided 4:17 48:22
50:11, 15, 20 51:1, 5
63:19 90:25 97:5
98:18, 19 101:7
130:14 132:6 135:7
136:15 137:2
provider 20:22
115:5, 6, 14

provides 92:23
147:15 149:7, 19
providing 49:2
101:25 141:22
public 73:1 151:18
pull 13:12 31:24
41:20 51:18 56:17
61:17
purchase 22:5, 8
27:8 31:16 35:14
36:17 38:12 53:12
60:13 89:1, 7, 10
90:13 106:16, 19, 20
107:14, 17 121:7
141:1
purchased 31:19
36:11 42:19 55:19
90:3 97:6 107:2, 4
140:14
purchases 107:17
127:23, 25
purchasing 106:12
purple 126:3
purpose 34:14 65:5
68:21
pursuant 5:21
put 18:5 21:21, 22
22:16 23:13 30:20
31:8 32:16 33:21
37:20 39:7 46:13
50:13 66:24 67:8
71:22, 25 80:2
128:13 131:22 135:7

< Q >
question 7:23, 25
8:2, 7, 16, 23, 24
11:16 12:8 14:14
26:10 29:11 51:4
73:2 79:24 82:21
83:12 87:18 88:6
89:19 90:14, 19 91:6
94:20 102:23 106:5
120:7 122:9 123:8
125:18 126:21
128:25 140:5 149:12,
18
questions 12:20 14:5,
11 102:10 104:7, 15
118:4 124:19, 25

125:3 137:17 142:12
144:19 148:10, 24
149:24

< R >
raise 6:12 8:14
reach 100:7 106:25
read 13:21 14:8, 10,
14 55:8 67:12, 13
68:10 69:12 74:4
96:20 114:2 122:15,
16 125:16 136:21
150:3 153:11, 12
154:22
reading 18:6, 17
44:25 59:3, 5 62:11
67:11 83:22, 24 84:4
88:4, 9 134:18, 20
135:2, 5, 15 138:12
146:2, 21 148:21
150:2
reads 58:14
ready 103:1
really 19:8 107:18
131:16
reason 17:18 30:2,
10 75:5, 10 129:25
154:7
reasonable 93:11, 14
153:14
reasons 86:6
reassignment 78:18
recall 20:19 74:10
99:14, 18 100:23
101:23, 25 110:9
118:11, 13 120:11, 15,
18 128:22, 25 147:17
recap 15:7 61:4, 7
receipt 28:7 121:6
receive 41:17 53:9
86:14 90:8 111:8
113:9 121:19 126:21,
23 127:4 142:23
143:21, 25 145:21
received 32:1 42:18
44:16, 20 88:11
98:21 109:14 110:1
115:24 125:13
126:18 132:20 133:1
147:1

receives 115:20
121:21
receiving 99:14, 18
100:6 101:23
recess 102:20 144:16
recondition 24:16
record 6:2 7:11 8:5,
12 9:6 68:10 122:16
152:8
recorded 109:9
records 43:17 73:1
86:2, 4 112:12, 13
129:3, 5
recross 148:24
RECROSS-
EXAMINATION 3:5
148:11 149:2
REDIRECT 3:5
144:20, 21
refer 9:1, 2
referring 9:1 94:1
136:18
reflect 18:13 98:6
111:1 113:3
reflected 40:25
111:2 124:2
reflecting 111:6
reflects 123:3
refund 90:9
Regarding 15:21
45:3 93:3, 7 107:17
130:15 132:18
register 97:15
registered 109:3
REGISTRATION
3:23 65:3
Regular 107:25
111:24
related 116:6
relates 53:25 146:1
relation 31:5
relationship 104:10,
12
relative 19:6 34:19
152:11, 12
release 30:16 91:15
93:3, 7 127:9
relevance 11:9, 14
relied 92:16 98:17
relief 94:19 95:1

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC

CR of FS Investments (Franklyn Strusberg)

4/23/2024

15

rely  22:4  87:14, 19
88:2, 7  89:13  90:16,
21  91:4, 14  93:10, 22
94:7, 16  95:2, 6, 17
96:8

relying  147:13

remember  10:24
11:25  12:4  35:17
39:19, 21, 25  40:2, 6,
8, 11, 14, 18, 20  74:9
77:12  93:5  95:13
96:9  98:1, 10  99:16,
17  101:9  102:2
103:7, 11  109:20, 24
119:9  120:3  145:18
146:7

remind  35:16

remotely  5:18, 20

Rent  53:22

rental  26:1

rentals  19:7

rented  19:7

REP  3:14  105:9

repeat  49:22  94:20

rephrase  7:24

replaced  83:3

replacement  114:8, 10

Report  21:20  25:4
34:13, 15  35:9  38:22,
23, 24  97:3  152:7

Reported  1:20

REPORTER  1:24
5:3, 5  6:12, 18  8:5
29:9  32:23  106:2, 4,
9  122:14, 17  142:4, 7
151:18  152:6, 20
153:18

Reporter's  4:17

reporting  5:18, 25
153:21

reports  22:5  25:3

represent  6:1  104:9
121:5

representation  41:3
73:16

representations  36:12

representative  1:16
7:5, 9, 19  17:9
108:20  141:14

represented  116:17

reputation  19:15

request  33:18  74:7
95:22  139:6, 19, 24,
25  140:4, 7, 13

requested  99:24
122:16  152:8

requesting  147:17

require  20:11

required  50:12

requirement  115:18

requires  62:18, 20

residence  28:2

resolved  87:20

resolving  143:13

respect  12:12  147:22

response  8:9, 10  61:1

responsibility  17:6

responsible  37:2
114:3  123:25

restroom  102:6, 13

RETAIL  3:14  36:5
56:19, 24  63:14
66:10  70:14  135:3

retains  128:2

return  24:13  38:4
103:5  153:12, 17

revealed  18:10  21:21,
22  37:4

review  15:7, 8  30:21
122:2  152:7  153:9

reviewed  70:20

Reyes  29:25  30:5
45:11  46:17  50:19
52:24  54:23, 24
57:20, 24  65:23

RFP  67:21

right  6:12  26:13
33:21  44:1  47:20
55:5, 20  57:18  59:22,
25  65:20  67:3  76:11
79:9, 19  80:9  82:23
91:8, 11, 12  92:7, 9
102:7, 19  103:12, 23
105:10  107:9  109:7
110:2  112:19  115:24
116:3, 11  117:22, 25
118:8  119:5, 14
120:24  123:21
124:18  126:14, 22

132:16  143:16
144:20  148:21

right-hand  53:15

rights  91:5, 7

righty  6:25  7:15  9:5

RISC  70:11

road  95:14

role  115:3

rollback  88:15

rolled  88:25

room  5:17  117:4
144:14

routinely  146:22

rude  147:9

rules  7:21

run  50:2, 24

rust  40:5

< S >

salaried  77:5

salary  31:12

Sale  4:17  22:18
23:10, 14, 23  33:15
36:17  45:7  46:2
47:11  52:8, 10, 15
53:14  54:13  57:14,
15  70:12, 15, 18, 21
72:23  82:1  92:22
93:20  98:20  109:23
126:16  128:6  129:8,
21, 25  136:14, 21
146:15

sales  28:20  45:22
53:4  56:19, 25  63:15
66:11  70:14  133:11
134:8

salesman  27:13
45:16, 17

salesperson  26:25
27:1

San  117:17, 18, 21

satisfaction  87:15

saved  51:14  100:20

SAVINGS  4:10

saw  13:22  36:16
37:22  55:5  57:13
66:13  96:19

saying  92:14  100:1
103:19  120:15

says  18:4  33:21
35:12, 15  44:11  50:2
53:13  62:10  67:10
71:2  77:21  79:4
81:1  84:3  94:12
123:1  126:13, 14, 15,
20  134:18  142:20

scale  34:20

SCAN  4:5  68:4
73:18  74:1, 4

scares  33:23

scope  12:8

score  34:15, 24

scratch  121:20

scratched  40:1

scratches  34:18

screen  13:18  28:17,
23  32:4, 10, 14  33:3
41:25  52:1  61:23
64:21  67:25  73:6
87:7  96:16  99:4
101:20  125:7, 9, 24
126:3  128:18  131:14,
22, 25  132:15  134:12,
16  136:2, 11  142:8,
14

screens  131:18

scroll  54:21  59:9
64:6, 7  78:16  96:21

search  101:1

searching  31:21
104:20

seats  39:18, 20

second  14:18  27:22,
23  43:11, 25  44:1
51:14  52:7  53:2
65:16, 17  74:3  88:1,
11  128:14  132:9
134:11  136:1, 5

seconds  123:16

secretary  53:23
78:12

section  96:23  142:20
143:2

SECURITY  3:21

see  15:17  28:23, 25
32:10, 22  33:4, 5, 8,
23  34:4, 5, 6, 7  42:2,
3  46:3  47:20  52:2
53:15  54:21, 24  55:4,

5 56:21 57:18 59:10
62:8, 24, 25 63:7
64:5, 9, 23 65:24
66:7 67:5 68:7, 8
69:24, 25 70:7 73:21
75:17, 24 76:4 78:19,
21 80:6 85:3 96:19
99:16 104:2 131:13,
19 132:10, 11, 12
144:11
seen 13:20 73:10, 11
87:9 96:18 110:25
sees 29:15
select 21:15 67:15
selected 62:10 107:13
sell 10:7, 9 16:23
19:25 21:3 24:22
37:16, 17, 18 88:18
97:14 100:5 110:19
111:9 112:22 127:1,
6, 14, 16 128:1, 3, 4
134:9 137:25 140:16,
22 149:11
seller 21:21 36:14,
18, 20, 22 37:7 84:7
88:23 117:15 121:8
136:23 137:12, 16, 18
sellers 138:16, 19
seller's 147:13
selling 19:16, 22
25:21 36:10 96:23
121:17 124:13 134:2,
3 138:14 140:2, 9
sells 19:24
send 44:4 51:15
100:9 101:6 111:14,
15, 23 112:25 118:18,
22 122:18 143:9
sending 113:12
122:5 125:4
sends 112:8 127:15
sense 7:7 35:21 36:8
sent 44:13 87:23
100:1, 17, 24 103:25
107:8 121:7 125:4
130:4, 5 143:12
144:2
separate 28:21
sequence 64:6, 11

serve 108:19
service 53:16
SERVICES 1:10
53:24 85:19 141:22
session 20:20
set 115:10
settle 103:6
settlement 91:15
93:2, 6 103:4
settling 143:13
seventh 91:3
seventy-three 58:5
Share 125:7 148:15
shared 13:17 32:3
41:24 51:25 61:22
64:20 67:24 73:5
87:6 96:15 99:3
101:19 125:8 128:17
131:24 134:15
136:10 142:13
shares 138:19
sharing 128:15
131:17, 23 134:12
136:2 142:8
SHEET 3:14 32:1
61:5, 10 154:1
ship 44:1 113:23
shipment 112:13, 14
shipped 44:11, 17
110:5
shipping 112:10
shortly 88:25 89:6, 9
show 27:6, 7 34:3
64:10 107:3
showing 32:8 95:20
128:15, 23 136:6
shows 34:2 44:1
52:17 66:6 129:12
130:24
sic 94:25
sick 36:1
side 53:15 76:7
sign 28:3 48:19
49:5, 9, 17 50:21
58:1, 10 62:17 63:2
65:8, 10, 11, 18, 19
66:4, 15, 16, 17 68:13
71:11 75:22 77:9
80:2, 13, 19, 24 81:2

82:5 83:6, 7 93:2, 6
153:12, 16
signals 40:9
signature 29:3 54:22
57:19 65:21, 22
66:19 69:19, 24 76:6,
12, 16, 21 80:11
82:24 129:15, 17
153:8, 16, 23
signatures 51:12
62:24 68:14 69:25
signed 30:13 48:13
54:20, 25 57:17, 20
62:23 63:25 65:3
69:22 70:8, 23 71:1,
24 74:16 76:18 78:4
79:14, 22, 23 80:16,
18, 21 81:5, 9 82:18
129:12, 20 149:10
151:14
significance 52:14
signing 28:10 29:15
49:16 63:9 70:13, 16
78:2 106:13
signs 40:5 58:14
SILVERSTEIN 2:13
7:11 38:16 143:6
simple 12:24 13:1, 4
92:21
simply 100:1
single 56:11 69:5, 15
sir 101:5
sit 13:24 27:12
29:15 69:14 75:2
site 15:16 117:21
sitting 28:20
situation 12:25 18:8
37:5 117:24
six 35:23 44:7, 9
47:19 54:16 59:7, 8
67:11 77:14 136:4,
22
sixteenth 95:5
sixth 90:20
sludge 40:21
small 34:5
software 30:22, 25
31:3 115:5, 6, 14
sold 11:18 17:3
18:15 25:7 30:5

37:11, 21 43:4 67:4
83:14 88:18 97:17
111:16 112:23
126:25 130:6 137:6
142:24 145:23 146:2,
23 147:1 149:8, 9, 13,
15
solution 91:16
solve 86:13
solved 86:5
somebody 11:3
20:25 32:15 37:3
81:7
something's 39:14
soon 88:4 107:5
sorry 7:3 30:3
32:10, 25 35:17
39:25 40:8, 14, 20
44:8 75:7 87:25
90:14 96:9 98:11
100:13 102:2 103:11
106:4, 8 109:24
115:1 117:1, 2, 6, 17
120:7 123:14 127:23
130:10 138:24 140:5
141:6
sort 8:11 38:21
121:1 147:5
sounds 72:19
space 65:19 148:15
Spanish 120:8
speak 36:14 46:17
78:8 81:12 83:11
speaking 12:23
specific 26:20 70:10
104:17 107:17
specifically 53:24
107:19 120:15 127:5
speculation 122:7
speculative 19:1
42:21 46:23 122:21
123:5
spells 60:4
spoke 91:22 100:18
118:11 119:3, 10
spoken 120:1
spot 22:16 27:21
square 33:6
St 2:5

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC                                    4/23/2024
CR of FS Investments (Franklyn Strusberg)                                                   17

staff 25:16
stamp 125:21 134:14
stamped 42:11
51:21 128:21
stamps 42:9
stand 34:11 55:10
standard 33:22
48:16 62:17 69:2, 7
113:10 115:19
standards 93:12, 14
121:4
start 7:21 11:2, 4
29:15 75:14
started 104:13
106:19 145:14, 16
starting 6:2
starts 49:16
state 9:5, 6 12:1, 2
45:3 151:4, 18 152:1
stated 129:1 142:16
154:22
STATEMENT 3:22
61:19
STATES 1:1 5:11
10:1, 4 21:8 46:4
94:22 96:23 98:17
129:7
stating 6:1 46:25
status 122:1
stay 142:11
stays 51:10
Ste 2:5, 11, 17 153:4
steering 39:24
stenographic 5:5
152:9
Stenographically
1:20 152:7
step 43:12
Stephanie 100:6, 12,
15, 24 101:25 110:2
steps 92:15
sticker 23:6
stop 32:13 128:14
stopped 134:12
136:2 142:8
store 51:8
story 21:23
straight 31:14 119:2
strictly 39:15 108:23

Strike 127:23 130:3,
10 135:13, 19 137:10
string 100:19
STRUSBERG 1:15
3:5 5:8 6:20, 25 7:6,
15 9:7 29:9 32:6
49:22 52:5 79:20
103:1 104:7 105:12
106:2, 5 124:20
144:23 151:9 152:7
153:2, 25 154:6, 23
study 9:23
sub 142:2
subcontractor 142:2
subject 88:4
submit 60:24 73:12
105:23
submits 27:18
submitted 68:16
71:16
subscription 60:16
SUE 2:4
sued 84:11, 16
suffered 90:17
sufficiently 14:24
suggest 15:4 32:12
Suite 153:21
super 34:5 131:5
support 31:9 89:8
96:3
supported 145:18
supposed 37:19
Supreme 5:21
sure 8:9 13:2 22:17
42:14 56:13 69:8
74:7 91:24 92:7, 8,
10, 12 103:17 116:17
119:16, 17 121:3
125:21 128:11
surprised 144:5
swear 6:14
sworn 6:21 151:10
system 56:10, 11
66:23 67:2 69:20
115:8, 9

< T >
tag 30:16, 18
tags 30:15

take 7:19 8:19
20:12 22:15, 16, 24
23:1, 3 27:16 30:21
43:12 67:7 92:15
102:7 104:17 112:5
115:21 118:14, 16
121:2 144:12 146:19
153:6
taken 20:14 154:6
takes 27:13 113:18
talk 91:23 141:18,
19 142:10 149:8
talked 81:16
talking 8:6 29:11
78:21 90:23 95:13
104:16 106:6 118:14
125:14 132:7
TAMPA 1:3 5:12
tampered 83:15
target 22:2
taught 58:16
taxes 52:18
teach 20:21 115:3
teaches 114:24 115:3
TEASDALE 2:10
153:3
technically 23:16
tell 21:22 36:12
44:1 45:20 58:13
59:25 63:23 64:1
67:3 93:18, 19 119:7
123:23
telling 13:10 119:5
143:22 144:1
tells 43:25 57:7
123:10
temporary 97:15
ten 34:21 43:6 90:2,
12 145:5
tender 41:7, 8
term 149:9
terms 57:5 58:1, 5,
13
test 22:19 27:10, 11
48:8
testified 6:22 71:16
97:9, 18 109:12
110:4 120:25 130:2,
4

testify 13:25 46:20
47:3 82:5
testimony 6:14
14:21, 23 35:2 82:8
92:19 97:13 121:10
145:20
testing 124:15
TEXAS 3:14 4:1
125:15
text 107:23, 25
118:22
Thank 6:18 15:5, 10
29:12 95:23 102:16
104:1, 8 106:7
124:19, 21 125:4
132:1 138:18 142:7
148:20
thing 8:22 42:15
49:19, 23 131:5
think 14:23 32:13
71:22 72:6 85:10
92:14 102:3 117:17
126:7 128:5
thinking 119:10
third 78:18 87:24
89:12, 20
third-parties 93:25
94:1, 3
Third-Party 2:16
4:6, 8 6:10
thirteenth 94:6
thirty 16:24
thirty-one 54:16
59:7 67:11 77:14
136:4, 22
thirty-six 67:11
thought 95:11
three 54:16 59:7
77:14 144:11 148:25
three-sixty 17:4
time 5:7 8:6 12:23
15:4 22:7 29:24
31:1 32:14 60:12
77:3 78:24 82:1, 24
86:12 92:6 97:10
98:15, 16 104:19, 21
105:14 107:17, 18
110:1 116:9 118:24
122:10, 11 123:21

127:22, 24   148:15
153:8, 14
**timeframe**  116:9, 12
**times**  12:22   17:4
22:21
**timestamps**  63:25
**Tires**  24:20   25:13
**TITLE**  3:14, 23   4:1
18:13   21:21, 22   23:9
41:17   42:5, 18, 23, 25
43:1, 2, 5, 13, 24   44:4,
11, 13, 16, 22, 24   45:2
64:16   65:2   72:25
73:12, 16   74:4, 13, 16,
19   75:6, 11, 12   77:11,
17, 23   78:1, 2   79:6,
11, 23   81:24   82:2, 10,
13, 24   83:2   84:3
90:25   97:3, 10, 16, 19,
22   98:6   103:15
106:13   110:5, 6, 12,
14, 17, 18, 19   111:1, 6,
8, 13, 20   112:6, 9, 25
113:2, 12, 20   114:22
115:20, 21   121:6, 20,
22   122:2   123:3
124:2   125:14, 15, 23,
25   126:5, 15, 19
127:9, 15   128:3
130:5, 15   131:12, 22
132:5, 6, 18, 21   133:2
135:9   142:21, 24
143:1   146:1, 5, 9, 22
147:1, 24   149:7, 21
**titled**  94:22
**titles**  72:6   75:25
127:5   145:21
**titling**  114:16
**TMU**  18:9   37:14, 15,
17, 18   88:18
**today**  7:1   13:24
15:11   17:10   46:18
69:14   78:9   82:23
119:5
**Today's**  5:6   12:13,
15, 18   13:9   81:13
**told**  12:22   37:10
58:3   73:24   84:6
90:8   118:25   119:11,
12   120:12, 13   144:6

**top**  46:4   55:9   59:9
68:4   70:25   73:18
74:5   125:24   126:2
131:13
**topics**  20:19
**torn**  39:18
**TORRES**  2:19   3:5
6:9   102:11, 14, 17, 19
104:2, 4, 6, 8   106:3,
10   110:22   113:19
114:14, 18, 20   117:8
121:12   122:5, 8, 14,
18, 22   123:7, 9, 12, 20
124:8, 18, 21   131:17
137:3, 21   148:9, 12,
20   150:4
**Tort**  90:22
**touch**  75:25
**tow**  38:20
**track**  45:24   46:1
**trade**  21:10
**trade-in**  21:13, 14
**trades**  21:11
**train**  114:7, 22
**trained**  114:10, 15, 21
**training**  20:12, 20
115:13
**TRANSACTION**  4:5
26:14   29:24   31:1
45:6, 15   46:21   47:4
50:5   52:10   53:21
57:1   68:19   69:16
71:18   73:25   74:1, 4
75:15   77:11   78:17
97:20   104:18   113:3
137:15
**transcript**  152:8
153:8, 11   154:2
**transfer**  30:16   52:19
65:7   68:24   72:17
75:20, 24   76:3   78:14,
25   79:12   97:11, 19
98:7   103:16   110:14,
18   113:7   125:25
132:19   138:16   146:5,
9   149:20
**transferred**  71:23
74:19   75:6, 12   77:18,
23   97:24   110:12
126:15   132:5

**transfers**  72:3   76:23,
24   110:17   142:21
146:23   147:24   149:8
**transmission**  24:12
86:8
**transport**  41:15
**tried**  30:10
**trim**  25:12
**triple**  92:8
**troublesome**  123:22
**truck**  14:4   15:17
23:19   38:20   93:20
107:6
**trucks**  21:25   31:23
**true**  42:17   52:9, 12
56:24   62:2   65:1
68:12, 15   129:1, 2, 3
152:8   154:23
**truly**  153:18
**trust**  19:18, 20
**trustworthy**  93:18
**truth**  6:15, 16
**truthful**  17:13, 22
18:13   41:1   73:15
79:11   97:7
**try**  92:6   112:15, 17
123:21   140:22
**trying**  125:19
**Tuesday**  1:20   5:6
**turn**  40:9
**turned**  28:24
**twelfth**  93:21
**twelve**  10:24   16:5
**twenty**  34:21   145:7,
11, 21
**twenty-eight**  136:4, 22
**twenty-four/seven**
19:13
**twenty-one**  47:25
53:6
**twice**  107:12
**Two**  34:16, 17   35:3
44:17   54:10   69:25
81:17   90:2, 12
109:23   116:15, 16, 20
119:15, 16   123:16, 17,
24   148:9
**type**  21:24   111:21,
22   112:10   118:19, 23

**typical**  26:13

**< U >**
**U.S**  92:24
**Uh-huh**  55:17
**uh-uh**  8:11
**unable**  46:20
**Unclean**  94:18, 22, 24
**unclear**  7:24
**underneath**  45:2
80:9
**undersigned**  151:8
**understand**  8:17
51:3   56:13   86:23
87:18   89:4   90:5, 14,
19   91:6   92:4, 13
**understanding**  109:1
143:13
**understood**  8:3
34:23   140:20
**unexpectedly**  115:2
**UNITED**  1:1   5:11
10:1, 3   21:8
**University**  9:22, 24
**unpack**  43:7   80:20
**unwind**  91:17, 20, 21
**upper**  33:16   34:9
55:10
**UPS**  112:9
**UPS'ed**  110:7
**use**  8:11   15:4   20:1,
22   50:7   68:25   69:4,
15   112:9, 11   115:8, 9
117:25   118:1, 8, 9
141:7   144:13
**USPS**  44:12
**usually**  27:20   116:2

**< V >**
**V#3**  55:10   59:10
**value**  18:7, 10, 18
26:7
**vans**  21:25
**VEHICLE**  3:14
4:10   18:7, 9, 22, 23
19:3, 5   22:5   23:4, 10,
22   24:6   25:3, 7, 18,
20   26:4   31:16   32:1
34:24   35:6, 10, 14
36:11, 13, 18   37:16,

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA INC
CR of FS Investments (Franklyn Strusberg)

4/23/2024
19

22 38:*13*, *21*, *23* 39:*4*,
*16*, *18* 40:*23* 41:*14*,
*18* 42:*19* 45:*8* 47:*9*,
*13* 48:*9* 52:*19* 53:*1*,
*4*, *25* 59:*3*, *13* 69:*15*
82:*1* 83:*14* 84:*9*
88:*4* 90:*3* 95:*19*
96:*2*, *4*, *23* 97:*1*, *6*
103:*5* 105:*21*, *22*
106:*16* 107:*19*
110:*19* 111:*16*
112:*22*, *23* 116:*17*
121:*17* 122:*1* 124:*10*,
*11*, *14* 126:*16* 127:*23*,
*25* 128:*3* 130:*6*, *15*
133:*12*, *13*, *14*, *24*
134:*7*, *22* 135:*5*, *10*,
*22* 137:*2*, *12*, *25*
138:*2*, *5* 140:*8*, *14*, *16*,
*19*, *22* 142:*24* 145:*23*
146:*2*, *18*, *23* 147:*1*, *5*,
*12*, *18* 149:*8*, *9*, *11*
**vehicles** 19:*22*, *24*
21:*9*, *13*, *14* 22:*7*, *10*
23:*12* 24:*16* 104:*20*
107:*1*, *13* 124:*13*
134:*2*, *3*, *9* 135:*18*
137:*6* 138:*15*, *20*
139:*2*, *11* 140:*2*
144:*25* 145:*2*, *21*
147:*16*
**vehicle's** 18:*14*, *17*
26:*7* 72:*20* 97:*4*
135:*21*
**venued** 5:*11*
**verify** 92:*15* 115:*22*
**verifying** 118:*19*
**version** 55:*25*
**versions** 56:*4*, *7*, *14*
**versus** 5:*9* 148:*22*
150:*2*
**video** 147:*9*
**VIDEOCONFERENC**
**E** 1:*15*
**view** 32:*23*, *24* 33:*21*
**VIN** 44:*7*, *9* 138:*6*
**VIOLATIONS** 4:*8*
**vs** 1:*4*

**< W >**

**W/ATTACHMENTS**
4:*12*
**waged** 85:*5*
**wait** 8:*6* 14:*18*
29:*10* 102:*12* 118:*4*
122:*8* 126:*14*
**waive** 5:*24* 91:*7*
153:*8*, *16*, *23*
**waived** 91:*5*
**waiving** 148:*22* 150:*2*
**walk** 26:*13* 99:*25*
137:*9*
**walks** 26:*14*, *23*
**WANDA** 1:*24* 5:*4*
7:*4* 151:*18* 152:*6*, *20*
153:*18*
**want** 7:*3*, *10* 15:*2*
27:*8*, *14* 42:*14* 51:*15*
69:*8* 91:*24* 102:*17*
103:*23* 104:*17*
105:*22* 137:*25* 147:*9*
150:*1*, *7*
**wants** 20:*1* 27:*3*, *5*
**warehouse** 117:*21*
**warranty** 95:*18* 96:*1*
**wash** 22:*16*, *22*, *23*
**washout** 61:*5*, *8*
**watch** 70:*5*
**water** 53:*22*
**way** 29:*11* 45:*18*, *19*
46:*1* 60:*3* 63:*18*
107:*1* 108:*20* 109:*10*
118:*6* 119:*3* 120:*8*
123:*23* 125:*5* 132:*14*
144:*24*
**web** 47:*11*, *24* 67:*5*,
*8* 117:*13* 133:*15*, *16*,
*17*, *18*, *19*, *21*
**website** 104:*20*
106:*17* 107:*21*
135:*23* 138:*1*
**Weekly** 77:*8*
**weeks** 116:*15*, *16*, *20*
**weird** 123:*9*
**well** 6:*11* 12:*9*, *23*
43:*22* 49:*1* 60:*16*
67:*3* 91:*16* 102:*8*
126:*7* 137:*10* 141:*16*
142:*10* 143:*24*
**went** 104:*10*

**we're** 7:*18* 8:*20*
12:*23* 42:*14* 60:*6*
69:*8* 78:*20* 82:*22*
90:*5* 130:*25* 131:*9*
150:*3*
**West** 2:*16* 6:*10*
136:*24* 137:*2* 153:*22*
**WESTLAKE** 1:*9*, *10*
59:*17*, *21*, *24* 60:*5*, *9*,
*10*, *19*, *22* 61:*4*, *12*, *15*
62:*19* 66:*6*
**wet** 48:*14*, *15*
**WhatsApp** 107:*25*
108:*1*, *2*, *5*
**wheel** 39:*24*
**wheels** 25:*13*
**where-is** 103:*5*
**wholesale** 36:*2*
**wholesaling** 31:*11*
**willing** 91:*21*
**win** 95:*14*
**windshield** 24:*21*
**wisely** 15:*4*
**wish** 153:*16*
**WITH/WITHOUT**
3:*23*
**withdraw** 50:*20* 51:*2*
**WITNESS** 3:*1* 6:*17*
11:*12* 14:*3*, *7*, *13*, *22*
18:*20* 24:*1*, *4*, *11*
26:*11* 32:*15*, *18*, *22*,
*25* 33:*5*, *7*, *9*, *23* 34:*1*,
*5* 35:*3* 39:*2* 43:*20*
46:*24* 52:*3* 56:*22*
58:*22* 64:*4*, *24* 66:*1*
78:*22* 81:*16* 82:*10*,
*15* 89:*18*, *22* 90:*4*
92:*20* 97:*14*, *21* 98:*3*
99:*5*, *8* 106:*8* 113:*16*
114:*13*, *17*, *19* 117:*6*
121:*11* 122:*6*, *20*
123:*8*, *11*, *14*, *19*
124:*7*, *21* 131:*15*
134:*21*, *23* 136:*3*
137:*4* 139:*5*, *9*, *19*
140:*24* 154:*6*
**word** 149:*9*
**words** 57:*3* 68:*21*
**work** 71:*8* 72:*7*
**worked** 10:*23*

**working** 35:*25* 36:*1*
77:*4* 86:*7* 98:*14*
148:*14*
**works** 77:*3* 81:*20*
102:*18* 131:*21*
137:*11* 144:*15*
**worn** 39:*20*, *24*
40:*17*, *19*
**worries** 106:*9*
**worth** 18:*23*
**WRITE** 154:*2*
**written** 109:*9* 115:*18*
**wrong** 39:*14* 92:*14*
109:*13*

**< Y >**

**y'all** 148:*15*
**Yeah** 11:*21* 13:*21*
24:*10* 32:*17* 34:*6*
39:*12* 42:*3*, *16* 47:*14*
50:*3* 51:*17* 55:*1*
56:*16* 61:*6* 62:*8*
64:*11* 67:*14* 68:*8*
72:*16* 77:*3* 92:*20*
96:*19* 99:*12* 102:*14*,
*18*, *24* 103:*2*, *24*
104:*3* 105:*6* 117:*15*
123:*13* 131:*15*
132:*13* 137:*8* 139:*9*,
*15* 146:*19*
**year** 11:*23* 16:*25*
91:*23* 109:*23* 138:*4*
145:*14*
**years** 10:*24* 15:*25*
16:*1*, *5*, *10*, *12*, *13*, *15*
20:*18* 54:*10* 61:*16*
90:*2*, *12* 123:*24*
134:*4*, *5* 145:*13*
**yell** 118:*3*
**yesterday** 138:*23*
**you-all** 104:*12*
118:*20*

**< Z >**

**ZOOM** 2:*7*, *12*, *13*,
*19* 33:*2* 38:*16* 73:*21*
74:*6* 134:*17* 143:*6*