UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO: 8:23-cv-00709

GABRIEL LUC HADDON, AN          :
INDIVIDUAL,                     :
                                :
    Plaintiff,                  :
                                :
  vs.                           :
                                :
FS INVESTMENTS OF               :
AMERICA, INC., D/B/A            :
POWERHOUSE AUTOMOTIVE, A        :
FLORIDA CORPORATION, AND        :
WESTLAKE SERVICES, LLC,         :
D/B/A WESTLAKE FINANCIAL        :
SERVICES, A FOREIGN             :
CORPORATION,                    :
                                :
    Defendants.                 :

FS INVESTMENTS OF AMERICA,
INC., D/B/A POWERHOUSE
AUTOMOTIVE,

     Third-Party Plaintiff,

VS.

MCCOMBS WEST FORD, LLC,
D/B/A MCCOMBS FORD WEST,
A FOREIGN CORPORATION,

     Third-Party Defendant.
_____/

Exhibit A

737a1972-1373-49b4-a270-e8465e49d65d

Page 2

```
 1        REMOTE              GABRIEL LUC HADDON
          DEPOSITION OF:
 2        PURSUANT TO:        Notice by Counsel for
                              Third-Party Plaintiff
 3                            FS Investments of America,
                              Inc.
 4
          DATE:              Monday, July 22, 2024
 5
          TIME:              10:02 a.m. to 12:51 p.m.
 6
          REPORTED BY:       Jessica Tenenbaum
 7                           Notary Public
                             State of Florida at Large
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25            Pages 1 - 91
```

Choice - United

737a1972-1373-49b4-a270-e8465e49d65d

```
                                                     Page 3
 1  REMOTE APPEARANCES:

 2          JOSHUA FEYGIN, ESQUIRE
            1930 Harrison Street, Suite 208F
 3          Hollywood, Florida 33020
            (954) 228-5674, FAX (954) 697-0357
 4          josh@jfeyginesq.com

 5      Appeared on behalf of Plaintiff Gabriel Luc
        Haddon, an individual
 6
    (Appearing Telephonically)
 7
            BRUCE B. BALDWIN, ESQUIRE
 8          Nicklaus & Associates, P.A.
            4651 Ponce De Leon Boulevard, Suite 200
 9          Coral Gables, Florida 33146
            (305) 460-9888, FAX (305) 460-9889
10          bruceb@nicklauslaw.com

11      Appeared on behalf of Third-Party Defendant
        McCombs Ford
12
            JOSE A. PERALTA, ESQUIRE
13          Armstrong Teasdale LLP
            355 Alhambra Circle, Suite 1200
14          Coral Gables, Florida 33134
            (786) 822-3700, FAX (305) 675-3605
15          jperalta@atllp.com

16      Appeared on behalf of Third-Party Plaintiff
        FS Investments of America, Inc.
17

18

19

20

21

22

23

24

25
```

737a1972-1373-49b4-a270-e8465e49d65d

Page 4

1  TESTIMONY OF GABRIEL LUC HADDON

2  DIRECT EXAMINATION BY MR. PERALTA................5

3  CROSS-EXAMINATION OF MR. BALDWIN................80

4  CROSS-EXAMINATION OF MR. FEYGIN.................82

5  STIPULATIONS....................................89

6  CERTIFICATE OF OATH.............................98

7  CERTIFICATE OF REPORTER.........................99

8  ERRATA SHEET....................................90

9  READ AND SIGN LETTER............................91

10

11

12  PLAINTIFF FS                 DESCRIPTION            PAGE
    INVESTMENTS' EXHIBITS
13  FOR IDENTIFICATION

14  NO. 1                        TITLE                  31

15  NO. 2                        ODOMETER
                                 DISCLOSURE STATEMENT   33
16
    NO. 3                        INTERROGATORIES        36
17
    NO. 4                        DISCLOSURES            61
18
    NO. 5                        INVOICES               71
19  Composite

20  NO. 6                         COMPLAINT             75

21  NO. 7                        TEXT MESSAGES          77

22

23  PLAINTIFF/HADDON             DESCRIPTION            PAGE
    EXHIBIT
24
    NO. 1                        CARFAX                 84
25            (Exhibits retained by Counsel)

737a1972-1373-49b4-a270-e8465e49d65d

Page 5

1    The remote deposition of GABRIEL LUC HADDON, taken

2 pursuant to notice by Counsel for the

3 Defendant/Third-Party plaintiff, on Monday,

4 July 22, 2024, commencing at 10:02 a.m., before Jessica

5 Tenenbaum, Notary Public, State of Florida at Large.

6                    GABRIEL LUC HADDON,

7 having been duly sworn to tell the truth, the whole

8 truth, and nothing but the truth, was examined and

9 testified as follows:

10                    DIRECT EXAMINATION

11 BY MR. PERALTA:

12     **Q.    Good morning, Mr. Haddon.**

13           **Is it Haddon or Haddon?**

14     A.    Haddon.

15     **Q.    Haddon. Perfect.**

16           **Mr. Haddon, you know, have you been deposed**

17 **before?**

18     A.    Have I -- say it again?

19     **Q.    Have you been deposed before?**

20     A.    I have not.

21     **Q.    Okay.  So I'll go over some instructions to get**

22 **you familiarized with the whole process.**

23           **You know, this is the attorney's opportunity to**

24 **learn more about your claims in this case, and for that**

25 **reason we will be asking some questions, and you will be**

Page 6

1  answering those questions.

2          Your attorney may object.  You know, you have

3  to still respond, despite his objections, unless he asks

4  you to not respond.  If that's the case, then, you know,

5  you withhold from responding, and I will talk to your

6  counsel and we'll see whether we could resolve the

7  issue.

8          If you do not understand our questions, just

9  ask.  I will try to, you know, either ask it again or

10 change the question to make it more clear.

11         If you need a break just let -- you know, let

12 us know.  I just ask that you do not take it in the

13 middle of your answer or after I ask the question, but

14 after you answer, you know, you just let me know if you

15 need 5 minutes, or 10 minutes, and that's okay.

16         Is that -- is that all clear?

17    A.   That's okay.

18    Q.   Great.

19         MR. PERALTA:  Joshua, would you like to add

20    anything?

21         MR. FEYGIN:  That would be all.

22         MR. PERALTA:  Okay.

23 BY MR. PERALTA:

24    Q.   So Mr. Haddon, how old are you?

25    A.   I am 25.

737a1972-1373-49b4-a270-e8465e49d65d

Page 7

1    Q.    Where are you from?

2    A.    I -- Florida.

3    Q.    Were you born in Florida?

4    A.    I was born in Idaho Falls, Idaho.

5    Q.    Oh, great.

6          So since -- how long have you been living in

7 Florida?

8    A.    The last 13 years.

9    Q.    So, yeah, pretty much your -- so, yeah, I get

10 it.  So pretty much you are from -- from Florida.

11         Did you reside -- where in Florida do you

12 reside?

13   A.    We currently live in Bushnell, Florida.

14   Q.    Okay.  Is that -- is it like a city or -- or a

15 county?

16   A.    It's a city.

17   Q.    Where is -- in what county is it located?

18   A.    It's Sumter County.

19   Q.    Is that, like, up north, Florida?

20   A.    Yes, sir.

21   Q.    Okay.  What's your highest level of education?

22   A.    High school diploma.

23   Q.    What do you do for work?

24   A.    I am a patient care technician.

25   Q.    What does that entail?

737a1972-1373-49b4-a270-e8465e49d65d

1      A.    It's like a CNA at a hospital.

2      **Q.    Okay.  In what hospital do you work in?**

3      A.    Oak Hill Florida Hospital.

4      **Q.    And how long have you been working there?**

5      A.    The past four months.

6      **Q.    Okay.  And what did you do before you were**

7   **patient care technician?**

8      A.    I was -- I was doing quality control.

9      **Q.    Okay.  Were you doing -- for how long did you**

10  **do quality control?**

11     A.    For about a year.

12     **Q.    And where did you work before Oak Hill Florida**

13  **Hospital?**

14     A.    The company's name was CheckSum.

15     **Q.    Were you a quality control -- what was it?**

16  **Quality control technician?**

17     A.    It was just quality control.

18     **Q.    Got it.**

19          **And you did that at that -- at that company,**

20  **CheckSum?**

21     A.    Yes, sir.

22     **Q.    Okay.  So where did you work before CheckSum?**

23     A.    For a company called ESS.

24          It's a subbing company.

25     **Q.    A subbing?**

737a1972-1373-49b4-a270-e8465e49d65d

1          **What is that?**

2     A.    Like a substitute teacher.

3     **Q.    Oh, great.**

4          **For how long did you do that?**

5     A.    I don't remember.

6     **Q.    Okay.  Does that include -- I'm not -- I'm not**

7  **-- so for the past 4 years, have you held any other**

8  **positions from the ones that we just covered today?**

9     A.    I don't think so.

10    **Q.    Okay.  So then it's fair to say that you were a**

11 **substitute teacher for about 2, 3 years?**

12    A.    Something like that.

13    **Q.    Okay.  Are you married, Mr. Haddon?**

14    A.    Yes, sir.

15    **Q.    How long have you been married?**

16    A.    For about 2 years.

17    **Q.    Congrats.**

18    A.    Thank you.

19    **Q.    That's awesome.**

20         **Do you reside with another person other than**

21 **your wife?**

22    A.    Yes.

23    **Q.    Who's that person?  Or who are those**

24 **individuals?**

25    A.    That is my side of the family.

Page 10

1        So, my mother, my father, and then I have two

2 brothers.

3    Q.   Okay.  Are those all the individuals that make

4 up your household?

5    A.   Yes.

6    Q.   How many -- how many vehicles have you

7 purchased in the past?

8    A.   Two.

9    Q.   Which are they?

10   A.   A 2012 Ford F-150 and then a 2023 Subaru

11 Crosstrek.

12        MR. PERALTA:  Give me one second.

13        Let me close my window.

14        I had the sun hitting me in my face.

15 BY MR. PERALTA:

16   Q.   Okay.  Is the 2012 F-150 the vehicle at issue

17 in this case?

18   A.   Yes, sir.

19   Q.   Okay.  I'm going to refer to it as just the

20 F-150 going forward, just so you know.

21        Have you -- have you ever accompanied any other

22 person to buy a vehicle before?

23   A.   Can you rephrase the question?

24   Q.   So have you -- let's say, have you maybe

25 cosigned a vehicle for an individual to purchase before?

Page 11

1      A.    No, sir.

2      Q.    Okay.  Have you been present when another

3 individual purchased a vehicle before?

4      A.    No, sir.

5      Q.    So the first time that you've seen -- sorry,

6 strike that.

7            The first time that you participated in the

8 purchase of a vehicle was with the F-150; is that

9 correct?

10     A.    Yes, sir.

11     Q.    Okay.  Are you familiar with CARFAX reports?

12     A.    I have some familiarity.

13     Q.    When you say "some," can you explain?

14     A.    I have used CARFAX before.

15     Q.    When?

16     A.    When I was looking up the F-150.

17     Q.    When you say that you were looking up, does

18 that mean -- so when were you looking up the F-150?

19     A.    A couple years after I bought it when someone

20 told me to look up the CARFAX.

21     Q.    Who told you to look up -- look up the CARFAX?

22     A.    A potential buyer.

23     Q.    Okay.  And this was around what time?

24     A.    I don't remember.

25     Q.    The first time that you saw the CARFAX, was it

737a1972-1373-49b4-a270-e8465e49d65d

Page 12

1  when that potential buyer asked you to look for the

2  CARFAX?

3       A.   Yes, sir.

4       Q.   And why were you trying to sell the F-150?

5       A.   I couldn't afford the truck anymore.

6       Q.   What do you mean?

7       A.   The miles to gallon.  The miles per gallon was

8  too low for my job at the time.

9       Q.   Okay.  So you wanted to sell the F-150 in order

10 to save some money to get to your job; is that correct?

11      A.   Yes, sir.

12      Q.   Okay.  Did you know about any mileage

13 discrepancy on the F-150 at the time that you were

14 searching for the CARFAX report?

15      A.   I -- can you repeat the question?

16      Q.   So did you know about any mileage discrepancy

17 in the F-150 when you were searching for the CARFAX

18 report?

19      A.   I didn't know about mileage discrepancy until I

20 looked at the CARFAX.

21      Q.   Okay.  Did you have -- did you have to pay to

22 look -- to look at the CARFAX report of the F-150 when

23 you were searching for it?

24      A.   I don't remember.

25      Q.   So how do you obtain this report?  Do you just

737a1972-1373-49b4-a270-e8465e49d65d

Page 13

 1  go to CARFAX.com and put the VIN number?

 2      A.   I don't remember.

 3      Q.   Okay.  And what happened to this potential

 4  buyer after you found the CARFAX report?

 5      A.   She didn't want to buy it after that.

 6      Q.   Why?

 7      A.   Because of the mileage discrepancy.

 8      Q.   Okay.  Do you have the buyer's name?

 9      A.   I do not.

10      Q.   Is she related to you somehow?  Friendship?

11  Family member?

12      A.   No, sir.

13      Q.   Did you ever post it -- the car for sale

14  online?

15      A.   Yes, sir.

16      Q.   Where?

17      A.   Facebook Marketplace.

18      Q.   Where else?

19      A.   I think that was it.

20      Q.   Okay.  Do you have a copy of the posting in

21  Facebook Marketplace?

22      A.   I can probably find it.

23      Q.   Okay.  How long do you post it, the F-150 for

24  sale, in Facebook Marketplace?

25      A.   It was probably -- I don't remember an exact

Page 14

1  date.

2      Q.    Do you remember when you pulled the CARFAX

3  report?

4      A.    I don't remember the date.

5      Q.    Do you have a copy of that report that you

6  pulled for the potential buyer?

7      A.    I don't have the exact copy, but I have a copy

8  -- I have a copy of the CARFAX.

9      Q.    Okay.  When you say "the exact copy," do you

10  mean that you have a copy -- so explain that to me.

11          What do you mean that you don't have an exact

12  copy?

13      A.    I mean, I have a -- when I looked it up the

14  first time -- I don't have screenshots of that specific

15  time when I looked it up.

16      Q.    Got it.

17      A.    But I have other screenshots from other times.

18      Q.    Okay.  When you say "screenshots," do you mean

19  that you literally took a screenshot of your computer

20  screen of the CARFAX report?

21      A.    I took screenshots of the case documents.

22      Q.    Got it.

23          So the copy of the CARFAX report that you have

24  is the one that Counsel provided to you?

25      A.    I'm not sure what you mean.

Page 15

1    Q.   I'm just -- I'm just trying to understand what

2  copies do you have.

3         And, you know, I was wondering whether or not

4  you have a copy of the report or a piece of the report

5  of when you were searching for it for this potential

6  buyer.

7         Do you have any of those copies?

8    A.   Not from that time, no.

9    Q.   Okay.  Got it.

10         For how much were you trying to sell the

11  vehicle in Facebook Marketplace?  How much?

12    A.   I don't remember.

13    Q.   Do you have an idea?

14    A.   Around 18,000.

15    Q.   Do you continue to try to sell the vehicle

16  after you acquire the CARFAX report on the F-150?

17    A.   I don't remember.

18    Q.   Okay.  Did you speak with more than one

19  potential buyer for the F-150?

20    A.   Yes.

21    Q.   Okay.  How many?

22    A.   I couldn't give you an exact number.

23    Q.   Okay.  Did you ever communicate with any

24  potential buyer through Facebook Marketplace for the

25  F-150?

737a1972-1373-49b4-a270-e8465e49d65d

1   A.   Yes.

2   Q.   Okay.  Do you have a record of those

3 communications?

4   A.   There might be --

5   Q.   Okay.

6   A.   -- through Facebook, but I'm not sure.

7   Q.   Are you able to search for them to see whether

8 they -- they exist?

9   A.   Yeah.

10       Would you like me to?

11   Q.   No, no.  Not right now.  That's fine.

12       I will -- you will know when we request it from

13 your -- from your attorney.

14       But thank you for offering, though.

15       Have you tried to sell the vehicle recently,

16 the F-150?

17   A.   No, sir.

18   Q.   Okay.  So I just -- I just want to get

19 something clear.

20       So before the potential buyer of the F-150

21 asked you for a CARFAX report, did you have any

22 knowledge of what a CARFAX report was?

23   A.   Yes, sir.

24   Q.   Okay.  And how did you acquire that knowledge?

25   A.   Through commercials, word of mouth.

737a1972-1373-49b4-a270-e8465e49d65d

1    Q.    Okay.  Have you seen a CARFAX report before you

2  pulled this report for the potential buyer for the

3  F-150?

4    A.    No, sir.

5    Q.    Since you had some familiarity with CARFAX

6  reports before you pull this for the potential buyer, to

7  your knowledge, do you know how consumers generally use

8  this report?

9          MR. FEYGIN:  Objection; form.

10         You can answer.

11         THE WITNESS:  Can you repeat the question?

12  BY MR. PERALTA:

13   Q.    So, to your knowledge, do you know how

14  consumers generally use CARFAX reports?

15   A.    Yes.

16   Q.    Okay.  How would you describe that?

17   A.    To look up previous history of a certain car.

18   Q.    When you say "history," would that include the

19  use of the vehicle, maintenance of the vehicle, as well

20  as the mileage of the vehicle?

21   A.    Yes, sir.

22   Q.    Okay.  Okay.  When you purchased the 2023

23  Subaru Crosstrek, did you receive a title to that

24  vehicle when you were signing the documents in order to

25  purchase that vehicle?

Page 18

1      A.   I don't remember.

2      Q.   Do you have a copy of the title to the vehicle

3 now?

4      A.   I am currently financing the vehicle.

5      Q.   Okay.  But are you -- but do you have a

6 physical copy of the title to that vehicle?

7      A.   I don't remember.

8      Q.   Okay.  Do you have the documents that you

9 signed to purchase that vehicle?  A copy of them?

10     A.   I don't remember.

11     Q.   Do you know when you purchased this vehicle?

12     A.   Yes, sir.

13     Q.   When?

14     A.   It was February 28th, 2023.

15     Q.   So about a year-and-a-half ago.

16     A.   Yeah.

17     Q.   Do you purchase the Subaru in person?

18     A.   Yes, sir.

19     Q.   And how come you don't remember whether you

20 have copies of the documents that you signed to purchase

21 this vehicle if you bought it on February 28th, 2023?

22     A.   I don't wanna give you a wrong answer, but I

23 have every -- every document that I've gotten for that

24 car.  It's all in my glove compartment.

25     Q.   Okay.  That's fine.

737a1972-1373-49b4-a270-e8465e49d65d

Page 19

1           I appreciate you playing it safe, it's just --
2    you know, some things just don't click, so that's why I
3    have to ask the question.
4           Okay.  From where do you purchase this vehicle?
5    A.    It was Bert Ogden Subaru.
6    Q.    Is that a franchise dealer of Subaru?
7    A.    Yes, sir.
8    Q.    Okay.  How much did you pay for the vehicle?
9    A.    It was 31, before interest.
10   Q.    Do you put a down payment?
11   A.    $500 down payment.
12   Q.    Is it your understanding being that this
13   vehicle will provide you with a better gas mileage
14   ratio?
15   A.    Yes, sir.
16   Q.    Okay.  Is that why you purchased the vehicle?
17   A.    Among other reasons.
18   Q.    What are the other reasons?
19   A.    I recently had a -- a -- a child, so safety was
20   a big factor for me, as well.
21   Q.    Any other reasons?
22   A.    I was a big fan of the way it looked.
23   Q.    Do you recall signing a power of attorney on
24   behalf of the dealership when you purchased the Subaru?
25   A.    I don't remember.

737a1972-1373-49b4-a270-e8465e49d65d

Page 20

1    Q.    Do you remember reading the documents that you

2 signed when you purchased the Subaru?

3          Like, I don't -- I don't mean the actual

4 content, just you reading them.

5          Like, do you -- do you remember taking that

6 action?

7    A.    Yes.

8    Q.    Okay.  Do you usually read documents before you

9 sign them?

10   A.    Depends on what I'm purchasing.

11   Q.    What about the purchase of a vehicle?

12   A.    I would read some -- some of it.

13   Q.    Okay.  Will you agree that buyer should read

14 the documents that they're signing before they sign

15 them?  Especially, when they're buying a vehicle?

16   A.    Yes, sir.

17   Q.    Okay.  So when did you first learn of FS --

18 well, first of all, do you know who FS Investments is?

19   A.    I've heard of the name.

20   Q.    Do you know who Powerhouse is?

21   A.    Yes, sir.

22   Q.    Okay.  Is Powerhouse the dealership from where

23 you purchased the F-150?

24   A.    Yes, sir.

25   Q.    So how do you come to learn of Powerhouse

737a1972-1373-49b4-a270-e8465e49d65d

Page 21

1  before purchasing the F-150?

2      A.   Google.  Google Map searches.

3      Q.   So what -- what were you searching for when you

4  were doing the searches?

5      A.   Dealerships.

6      Q.   Were you searching for vehicles to purchase or

7  were you just looking at dealerships?

8      A.   We were looking for vehicles to purchase.

9      Q.   Got it.

10          So do you see an ad for the F-150?

11     A.   We didn't see an ad for the F-150, but the

12 dealership, so we went and looked around.

13     Q.   Got it.

14          So what attracted you to Powerhouse?

15     A.   Um.

16     Q.   Like, what was it that you saw that you said,

17 "You know, this is the dealership where I'm going to go

18 and talk about buying a car"?

19     A.   I don't remember.

20     Q.   Okay.  Did you call Powerhouse before going in

21 person?

22     A.   No, sir.

23     Q.   So when you went in person, do you know what

24 day was that?

25     A.   I don't remember.

1    Q.    Did you know with whom did you speak when you

2  went to Powerhouse to purchase that F-150?

3    A.    No, I don't remember that.

4    Q.    Okay.  Do you know the number of people that

5  you spoke at Powerhouse when you went to purchase that

6  F-150?

7    A.    I don't recall.

8    Q.    Okay.  Do you remember what you were told at

9  Powerhouse when you went in person to purchase the

10  F-150?

11    A.    No, sir.

12    Q.    Do you remember them telling you anything about

13  the mileage of the F-150 when you went to purchase the

14  F-150 at Powerhouse?

15    A.    I remember they didn't tell me about the

16  mileage discrepancy.

17    Q.    Okay.  But besides that, did they tell you

18  anything about the mileage on the F-150?

19    A.    No, sir.

20    Q.    Okay.

21        MR. PERALTA:  Sorry about the noises.  I guess

22    there's some construction going on in the top

23    office.

24        MR. FEYGIN:  And I hate to interrupt this early

25    on, but would it be possible to take a quick

737a1972-1373-49b4-a270-e8465e49d65d

Page 23

1      5-minute restroom break?

2           My morning Espresso is --

3           MR. PERALTA:  Is kicking in?

4           MR. FEYGIN:  Yeah.

5           MR. PERALTA:  Yeah, no, that's fine.

6           I'll do the same.

7           MR. FEYGIN:  Sorry about that.

8           Thanks guys.

9           (Brief recess.)

10  BY MR. PERALTA:

11      Q.   Mr. Haddon, did you recall any answer to the

12  questions that I was asking before and you said you

13  didn't remember during the break?

14      A.   No, sir.

15      Q.   Okay.  Did you speak with anyone during your

16  break?

17      A.   No, sir, just -- just got me a Coke.

18      Q.   I need the caffeine, too.

19           I got something stronger.

20           Okay.  So we were covering what Powerhouse, you

21  know, what -- what you recall from the conversation that

22  you had at Powerhouse.

23           And you were saying that you don't remember any

24  of the conversation; is that correct?

25      A.   Yeah.  Yes, sir.

Page 24

1    Q.    You paused there for a moment.

2          Do you -- do you remember any of the

3 conversations?

4    A.    No, I was -- I just remember that they didn't

5 tell me about anything that was wrong with the truck,

6 like the mileage discrepancy, and all that.

7    Q.    Okay.  So before you purchased the F-150, did

8 you visually inspect this vehicle, the outside of the

9 vehicle?

10   A.    After I purchased it?

11   Q.    Before.

12   A.    Oh, before?

13         Yes, we did an inspection.

14   Q.    Okay.  Do you inspect the inside of this

15 vehicle?

16   A.    Yes.

17   Q.    Did you take the vehicle for a test drive?

18   A.    Yes, sir.

19   Q.    Do you look at the mileage on the dashboard of

20 the F-150 when you were test driving it?

21   A.    Yes, sir.

22   Q.    Do you recall the number of that mileage?

23   A.    I don't recall the exact number, but it was,

24 like, 130s.

25   Q.    Okay.  Was that -- was that the mileage that --

737a1972-1373-49b4-a270-e8465e49d65d

Page 25

1  well, strike that.

2          Did the mileage that you saw on the dashboard

3  of the F-150 before you purchased this vehicle, did it

4  match the mileage in the documents that you signed to

5  purchase the vehicle?

6      A.   Yes, sir.

7      Q.   Okay.  When you test drove the vehicle, do you

8  like how it drove?

9      A.   It was a small test drive, but, yes.

10     Q.   Okay.  When you say "small," you drove it --

11 like, for how long did you drive the vehicle?

12     A.   It wasn't -- it wasn't even 5 minutes.

13     Q.   Okay.  Do you go, like, around the dealership,

14 like, do you --

15     A.   We went out, down the street, turned around,

16 and then came back.

17     Q.   Okay.  Did you go with anybody else to purchase

18 the F-150?

19     A.   Yes, sir.

20     Q.   With whom?

21     A.   My dad was there and my brother was there.

22     Q.   Okay.  Let me ask you this:  Did you go to

23 Powerhouse place of business more than one time?

24     A.   No, sir.

25     Q.   Okay.  Was there anybody else besides your dad,

Page 26

1  your brother with you when you were purchasing this

2  F-150?

3      A.   Nope.

4      Q.   Okay.  Did your dad or your brother test drove

5  the F-150?

6      A.   No, sir.

7      Q.   Okay.  Why is that?

8      A.   I don't know.  I'm not sure.

9      Q.   Okay.  So were you satisfied on how the F-150

10  drove when you test drive it?

11          Did you have any complaints?

12      A.   No.  Like I said, it was a small test drive, so

13  I couldn't -- I didn't drive it long enough to find

14  anything I disliked with it.

15      Q.   Okay.  Did you rely on the mileage that

16  appeared on the dashboard of the F-150 when purchasing

17  this vehicle?

18      A.   The mileage matched the documents, so between

19  the two, I -- I believed it.

20      Q.   Okay.  So the answer to my question, did you

21  rely on the mileage that appeared on the dashboard of

22  the F-150 would be yes; is that correct?

23      A.   Yes, sir.

24      Q.   Let me ask you:  Did you request a CARFAX

25  report from Powerhouse before you purchased the F-150?

737a1972-1373-49b4-a270-e8465e49d65d

Page 27

1    A.   No, sir.

2    **Q.   Why is that?**

3    A.   There was nothing that prompted me to look at

4 the CARFAX, and, then, you know, the mileage matched the

5 documents, so I didn't -- I didn't see a need to.

6    **Q.   Okay.  Did anybody that you know told you that**

7 **-- to look at the CARFAX before purchasing the F-150?**

8    A.   No, sir.

9    **Q.   To your knowledge, do buyers usually ask for**

10 **the CARFAX report before purchasing vehicles?**

11   A.   I don't know.

12   **Q.   Do you ask for the -- for the CARFAX report**

13 **before you purchased the Subaru?**

14   A.   No, sir, it was a brand-new vehicle.

15   **Q.   Oh.**

16        **If you were to buy a used car in the future,**

17 **would you ask for the CARFAX report?**

18   A.   Yes, sir.

19   **Q.   So would you agree that it's a good practice**

20 **for buyers to ask for a CARFAX report before purchasing**

21 **used vehicles?**

22   A.   Yes, sir.

23   **Q.   Did you request a copy of the title to the**

24 **F-150 before purchasing this vehicle?**

25   A.   No, sir.

Page 28

1   Q.   Did you expect to receive a copy of the title

2 to the F-150 before purchasing the F-150 or -- well,

3 answer that question first.

4   A.   We were financing the vehicle, so I expected

5 the bank to have the title.

6   Q.   So to your understanding, buyers that finance

7 the vehicles, they do not get a copy of the title when

8 purchasing the used vehicles?

9   A.   I'm not really -- I'm not sure.

10   Q.   Well, let me ask you this, then:  Why did you

11 say that because you were financing the vehicle you

12 expect that the bank would have title to the vehicle and

13 not you?

14        MR. FEYGIN:   Objection; misstates the

15     testimony.

16 BY MR. PERALTA:

17   Q.   You can answer.

18   A.   I -- that's how I thought the transaction

19 worked.

20   Q.   Okay.  So just to make it clear since your

21 attorney objected.

22        How do you think that the transaction works

23 when you finance a used vehicle in terms of the title?

24   A.   The way I thought it worked was I would

25 purchase the vehicle, the bank would keep the title till

737a1972-1373-49b4-a270-e8465e49d65d

Page 29

1  the truck is paid off, then I would receive the title.

2       Q.    Got it.

3            And how do you acquire that knowledge?

4       A.    From my own head.

5       Q.    Okay.  Not bad.

6            Before we leave the CARFAX report behind, let

7  me ask you one more question, because now we're talking

8  about the title, but...

9            To your knowledge, would you agree that the

10  majority of used car buyers ask for the CARFAX report

11  before purchasing vehicles?

12            MR. FEYGIN:  Objection; speculation.

13  BY MR. PERALTA:

14       Q.    You can answer.

15       A.    Yes.

16       Q.    Which members of your household have purchased

17  used vehicles before?

18       A.    Two of them.

19       Q.    Who are they?

20       A.    Both of my brothers.

21       Q.    Your father and mother have never purchased a

22  used vehicle before?

23       A.    No.  I take that back.

24            My father has, as well.

25       Q.    And were any of those used vehicles purchased

737a1972-1373-49b4-a270-e8465e49d65d

Page 30

1  from a used car dealership?

2      A.   I'm not sure what you mean.

3           Like, does the Toyota dealership count as a

4  used car dealership?

5      Q.   Well, I'll -- I'll rephrase the question

6  because that was a good note.

7           Did they buy any of those used vehicles from a

8  car dealership?

9      A.   Yes, sir.

10     Q.   Okay.  Did they request a CARFAX report before

11 they purchased the vehicles from the dealership?

12     A.   No, sir.

13     Q.   Okay.  So when do you see a copy of the title

14 to the F-150?

15     A.   I don't remember.

16     Q.   Did you see it before filing this lawsuit?

17     A.   I don't remember.

18     Q.   Who provided you with a copy to the F-150?

19          MR. FEYGIN:  Objection.  A copy of what?

20          MR. PERALTA:  Oh, sorry.

21 BY MR. PERALTA:

22     Q.   Who provided you with a copy to the title of

23 the F-150?

24     A.   I don't recall.

25     Q.   Do you know whether it was your attorney who

737a1972-1373-49b4-a270-e8465e49d65d

Page 31

1  provided you with a copy to the F-150?

2      A.   I don't remember.

3      Q.   Okay.  Did you know why you got a copy to the

4  F-150?

5           MR. FEYGIN:  Same objection.

6           MR. PERALTA:  Ah, sorry.  Sorry.

7  BY MR. PERALTA:

8      Q.   Do you know why -- why you received a copy of

9  the title to the F-150?

10     A.   I don't know.

11     Q.   Okay.

12          MR. PERALTA:  All right.  I'll show you my

13     first exhibit.  It's going to be marked as Exhibit

14     1.

15          (Exhibit 1 was marked)

16          Give me one second.

17          Okay.  This is Exhibit 1.  It has been marked

18     by Powerhouse as FSIA000052.  Title, Power of

19     Attorney For Motor Vehicle, Mobile Home, Or Vessel.

20  BY MR. PERALTA:

21     Q.   Mr. Haddon, I'm going to scroll slowly through

22  this document.

23          Please take a look at it.

24          If you cannot see it, let me know, I can zoom

25  in, zoom out, et cetera.

737a1972-1373-49b4-a270-e8465e49d65d

Page 32

1              Were you able to look at the document?

2      A.    Yes, sir.

3      Q.    Will you mind, please, reading -- one second --

4 this paragraph up here (indicating)?

5      A.    "I/we" --

6      Q.    No, no.  That's -- sorry, that's my mistake.

7              Read it to yourself and then I'll ask you a

8 question.

9      A.    Perfect.

10             I'm done reading.

11     Q.    Thank you.

12             Mr. Haddon, is this your signature that appears

13 in this document?

14     A.    Yes, sir.

15     Q.    Do you recall signing this document when you

16 purchased the F-150 from Powerhouse?

17     A.    I don't remember.

18             It was a long time ago.

19     Q.    Okay.  To your understanding, are you granting

20 Powerhouse the right to act on your behalf to obtain

21 title to the F-150 by signing this document?

22     A.    That's what it sounds like.

23     Q.    Who is Maria Haddon?

24     A.    That is my mother.

25     Q.    Was she present with you when you purchased the

737a1972-1373-49b4-a270-e8465e49d65d

Page 33

1  F-150?

2      A.   I don't remember.

3      Q.   **Is this her signature?**

4      A.   That is her signature, yes.

5      Q.   **So if -- if you don't remember whether she was**

6  **with you when you purchased the F-150, do you have any**

7  **idea how her signature would appear on this document?**

8      A.   No, sir, I have no idea.

9      Q.   **Did your mother cosign your purchase of the**

10 **F-150 from Powerhouse?**

11     A.   It looks like it.

12     Q.   **Okay.  Mr. Haddon, did you take any medications**

13 **that would prevent you from testifying accurately today?**

14     A.   No, sir.

15     Q.   **Do you use any recreational drugs?**

16     A.   No, sir.

17     Q.   **Okay.  Do you take any drugs?**

18     A.   No, sir.

19     Q.   **Okay.  I wanted to ask you another question as**

20 **to this power of attorney.**

21          **Do you recall -- well, is this your handwritten**

22 **signature?**

23     A.   Yes, sir.

24     Q.   **Okay.  And is this your mother's handwritten**

25 **signature?**

737a1972-1373-49b4-a270-e8465e49d65d

Page 34

1    A.   Yes, sir, it looks like it.

2    **Q.   Okay.  Do you recall whether you signed some**

3  **documents via handwriting and others electronically at**

4  **Powerhouse when you purchased the F-150?**

5    A.   I don't remember.

6    **Q.   Okay.**

7         MR. PERALTA:  Okay.  I'm going to show you

8    Exhibit 2 titled Odometer Disclosure Statement.

9         I'll show it to you on the screen right now.

10         And this document has been marked FS- --

11    FSIA000018.

12         (Exhibit 2 was marked)

13  BY MR. PERALTA:

14    **Q.   Mr. Haddon, same thing, I'm going to scroll**

15  **slowly.  I'm going to allow you to scan the document.**

16         **Mr. Haddon, have you seen this document before?**

17    A.   It looks familiar.

18    **Q.   Do you remember signing this document when you**

19  **purchased the F-150?**

20    A.   Yes, sir.

21    **Q.   Okay.  It says here, "E-sign."**

22         **Did you sign this document via handwriting or**

23  **did you sign this document electronically?**

24    A.   Well, I don't remember how I signed it, but it

25  looks like it's an electronic signature.

737a1972-1373-49b4-a270-e8465e49d65d

1    Q.   Okay.  Did you suspect any discrepancy of the

2 mileage of the F-150 while you were driving -- test

3 driving this vehicle?

4    A.   No, sir.

5    Q.   To your knowledge, was Powerhouse relying on

6 the mileage on the dashboard of the F-150 when they

7 presented this document to you?

8    A.   I'm not sure.

9    Q.   So let me ask you this --

10        I'm going to have to -- one second.  This is

11     going to take me too long.

12        I'm just going to --

13        MR. FEYGIN:  I was going to --

14        MR. PERALTA:  I was -- I was going to use your

15     rectangle, but I didn't have it ready, Josh, so I'm

16     just going to do this.

17 BY MR. PERALTA:

18    Q.   Mr. Haddon, this sentence, it says, "I,

19 Powerhouse Automotive, state that the odometer now

20 reads" --

21        THE COURT REPORTER:  I'm sorry, Counsel, if you

22     could slow down a little bit.

23        MR. PERALTA:  That's fine.

24        I'm just reading this paragraph here that I

25     shadowed.

Page 36

1              THE COURT REPORTER:  "This sentence, it says"?

2    BY MR. PERALTA:

3        Q.   "I, Powerhouse Automotive, state that the

4    odometer now reads 131,636 miles."

5              Knowing what the dashboard -- what the mileage

6    appeared on the dashboard of the F-150, would you say

7    that that statement is correct?  It's accurate?

8        A.   Yes, sir.

9        Q.   Okay.

10             MR. PERALTA:  I'm going to mark as Exhibit 3,

11        Plaintiff answers to FS Investments'

12        Interrogatories.

13             (Exhibit 3 was marked)

14    BY MR. PERALTA:

15        Q.   Okay, Mr. Haddon, same thing, I'm gonna scroll

16    through this document.

17             Please take a chance to look at it.

18             Mr. Haddon, do you recognize this document?

19        A.   Yes, sir.

20        Q.   Did you provide the answers to this document?

21             Sorry, strike that.

22             Do you provide the answers to the questions

23    that appear in this document?

24        A.   I don't remember.

25        Q.   So how do you recognize this document?

737a1972-1373-49b4-a270-e8465e49d65d

 1    A.    I -- my attorney had sent it to me.

 2    Q.    **Okay.  Is this one of the documents that you**

 3 **reviewed to prepare for this deposition today?**

 4    A.    Yes, sir.

 5    Q.    **What other documents did you review to prepare**

 6 **for this deposition?**

 7    A.    What other documents?

 8    Q.    **Yeah.**

 9          **What other documents did you review to prepare**

10 **for this deposition?**

11    A.    There were a couple of exhibits that I had

12 reviewed, and this one up on the screen, and there were

13 a couple response papers that I had reviewed.

14    Q.    **Okay.  Did you recall the titles?  Can you**

15 **describe them to me?**

16    A.    The titles --

17    Q.    **What they say --**

18    A.    -- of the documents?

19    Q.    **Yeah.**

20    A.    Um.

21    Q.    **Or maybe, you know, generally what they were**

22 **about.**

23    A.    Yeah.  There was -- there was two of 'em that

24 had questions with responses.  There was one that was

25 the claim.  And there was a couple, I don't remember the

Page 38

1  -- the titles of 'em, but they were the -- the -- like

2  the paperwork that has been put into an exhibit, so...

3      Q.   Okay.  So let's look at -- please read

4  Interrogatory Number 2 to yourself and let me know when

5  you're done.

6           This here (indicating).

7      A.   I'm all finished reading.

8      Q.   Thank you.

9           So here it says, you know, as a response to

10 Interrogatory No. 2, it listed Maria Haddon.

11     A.   Uh-huh.

12     Q.   Which we know is your mother.

13          What knowledge exactly does Maria has regarding

14 the purchase and financing of the F-150?

15     A.   Can you repeat the question?

16     Q.   So, to your knowledge, what knowledge exactly

17 does Maria Haddon has with respect to your purchase and

18 financing of the F-150?

19     A.   She -- she paid for the vehicle, and then all

20 of -- she put the down payment and all the financing she

21 had paid for.

22     Q.   Okay.  And why did she pay for the down payment

23 and the financing of this vehicle, of the F-150?

24          So, pretty -- pretty much, the question is:

25 Why not you and why her?

737a1972-1373-49b4-a270-e8465e49d65d

Page 39

1    A.    It was -- I wouldn't -- she wanted to buy each

2  of her children one car, so this was the one.

3    Q.    Got it.

4          So her purchase of the F-150 was a gift to you?

5    A.    Yes, you could say that.

6    Q.    Okay.  So as a gift, did you have to pay your

7  mother back for what she paid for the -- to purchase the

8  F-150?

9    A.    No, sir.

10    Q.    Okay.  Has she charged you for any of the

11  payments that she has made, you know, to purchase the

12  F-150?

13    A.    No, sir.

14    Q.    Okay.  Do you know what knowledge exactly does

15  Maria Haddon has with respect to the representations

16  made by Powerhouse to induce the sale?

17    A.    I'm not sure.

18    Q.    Okay.  And then the same question as to

19  material omissions of facts to induce the sale of the

20  vehicle.

21    A.    I'm not sure, either.

22    Q.    Okay.  So it says here that Maria Haddon has,

23  in her possession, the bill of sale, title, receipts,

24  insurance papers.

25          Do you know when she came in possession to the

737a1972-1373-49b4-a270-e8465e49d65d

Page 40

1   title to the F-150?

2       A.    I don't know.

3       Q.    Do you know what receipts she has with respect

4   to the F-150?

5       A.    Receipts for repairs that had to be done to the

6   F-150.

7       Q.    Do you know what repairs were involved?

8       A.    I wouldn't be able to name all of 'em off the

9   top of my head.

10      Q.    Okay.  So which ones do you remember?

11      A.    One of the turbos in the truck was leaking.

12  That had to get replaced.

13            The tires had to get replaced.

14            The muffler on the vehicle needed to get

15  replaced.

16            And that's all I can remember off the top of my

17  head.

18      Q.    Okay.  And who paid for this repairs?

19      A.    My mother.

20      Q.    Do you have to -- strike that.

21            Do you have an obligation to reimburse your

22  mother for her payments with respect to this repairs?

23      A.    No, sir.

24      Q.    So why did she pay for the repairs and not you?

25      A.    I didn't have money at the time.

737a1972-1373-49b4-a270-e8465e49d65d

Page 41

1   Q.   Okay.  Who used the F-150 from your household?

2   A.   That would be me.

3   Q.   Did anybody else use the F-150?

4   A.   Occasionally, but not often.

5   Q.   Okay.  When you say "occasionally," can you

6   describe for what purpose was it used by other

7   individuals besides yourself?

8   A.   To haul stuff that wouldn't normally fit into a

9   car or a sedan.

10   Q.   Like what stuff?

11   A.   Like camping equipment.

12   Q.   Got it.

13       Any other stuff besides camping equipment?

14   A.   No, I think that was about it.

15   Q.   Okay.  Do you know how many times was it used

16   occasionally by other individuals besides yourself?

17   A.   I don't remember the exact number.

18   Q.   Would you say that it was more than five times?

19   A.   It was probably about -- about that.

20   Q.   Okay.  All right.  So we're going to talk about

21   Franklyn Strusberg.

22       Do you know who Frank- -- Franklyn Strusberg

23   is?

24   A.   The owner of FS Investments.

25   Q.   Have you ever spoken to Mr. Strusberg before?

737a1972-1373-49b4-a270-e8465e49d65d

Page 42

1      A.    No, sir.

2      Q.    How do you know that he's the owner of

3  FS Investments?

4      A.    I read it on A1A.

5      Q.    Oh, good.

6            So here it says -- this line here (indicating)

7  is part of your answer to FS Investments first set of

8  interrogatories.  It says, "Mr. Strusberg also executed

9  the title transfer documents during the course of the

10  sale of the subject vehicle to Plaintiff."

11            Do you know what title transfer documents

12  you're referring to?

13      A.    No, I don't remember.

14      Q.    Did you recall Mr. Strusberg personally signing

15  the transfer documents when you were purchasing the

16  F-150?

17      A.    I don't remember.

18      Q.    Who is Alex Reyes?

19      A.    Salesperson.

20      Q.    Okay.  Do you recall speaking with Alex Reyes

21  personally when you were purchasing the F-150?

22      A.    He sounds familiar, but I don't -- I don't

23  recall.

24      Q.    Okay.  Do you recall any representations made

25  by Mr. Reyes during your purchase of the F-150?

737a1972-1373-49b4-a270-e8465e49d65d

Page 43

1      A.    Could you describe what "representations"

2  means?

3      Q.    **So do you recall anything that he said to you,**

4  **or any of your family members, when you were purchasing**

5  **the F-150?**

6      A.    No, I don't recall.

7      Q.    **So who is Stuart Raskin?**

8      A.    A witness.

9      Q.    **Have you spoken to Mr. Raskin, personally,**

10 **before?**

11     A.    No, sir.

12     Q.    **Have you sent Mr. Raskin any documents?**

13     A.    I don't remember.

14     Q.    **Okay.  Has Mr. Raskin any -- any -- strike**

15 **that.**

16           **Has Mr. Rackin -- Mr. Raskin ever communicated**

17 **anything to you?**

18     A.    I don't remember.

19     Q.    **Who is Junior Rodriguez Alfonso, and then I'll**

20 **cover the description.**

21     A.    He was another, like, witness.

22     Q.    **Okay.  When you say, "he was another, like,**

23 **witness," what do you mean?**

24     A.    He was another customer.

25           He has -- he witnessed --

737a1972-1373-49b4-a270-e8465e49d65d

Page 44

1    Q.   Take your time.

2    A.   I'm trying to -- he was another customer and

3 witness, basically.

4    Q.   Okay.  You mean another customer of Powerhouse?

5    A.   Yes, sir.

6    Q.   Okay.  Have you spoken with Mr. Alfonso before?

7    A.   No, sir.

8    Q.   Has he ever communicated anything to you?

9    A.   I don't remember.

10    Q.   So besides Maria Haddon, Franklyn Strusberg,

11 Alex Reyes, Stuart Raskin, Junior Rodriguez Alfonso, did

12 you know of any other fact witnesses that you intend to

13 introduce in this case?

14    A.   I don't know.

15    Q.   Do you know of any other expert witnesses that

16 you intend to introduce in this case?

17    A.   I don't know.

18    Q.   Okay.  So please read Interrogatory Number 4 to

19 yourself.

20         I'm going to ask you a question about your

21 answer to this interrogatory.

22    A.   Okay.  I'm done.

23    Q.   Let's do this going forward:  Since you said

24 that you reviewed this document to prepare for this

25 deposition, I would just ask you questions, and if you

737a1972-1373-49b4-a270-e8465e49d65d

Page 45

1  wish to read the interrogatory or the answer let me

2  know.  That way we could move it along.

3          So I wanted to ask you -- ask you a question

4  about this statement here (indicating).

5          Mr. Haddon, did you finance the F-150 when you

6  purchased it from Powerhouse?

7     A.   Yes, sir.

8     Q.   So what did you expect for Powerhouse to

9  present you with a certificate of title when you

10 purchase the F-150?

11    A.   Could you repeat the question?

12         I didn't hear you.

13    Q.   So did you -- well, let ask you this way:  Do

14 you have any expectancy that Powerhouse would provide

15 you with a certificate of title when you purchased the

16 F-150?

17    A.   I -- I thought I was gonna see the title, but I

18 never got to see the title when I was purchasing the

19 vehicle.

20    Q.   Well, before you said that you understood that

21 the financing company keeps the title, so...

22    A.   I -- I thought I'd be able to see it, and then

23 they would, you know, the bank would take it.  Not that

24 I would take it.

25         You -- you know what I mean?

737a1972-1373-49b4-a270-e8465e49d65d

Page 46

1      Q.    Okay.  Yeah, I get it.

2            So your understanding was that the dealership

3  was going to let you see a copy and then send it to the

4  financing company.

5      A.    Yes, sir.

6      Q.    Do you have any reason to believe that

7  Powerhouse had a copy of the title when you purchased

8  the F-150?

9      A.    No, sir.

10     Q.    I think I asked you this before, but did you

11  request for a copy of the title to the F-150 when you

12  purchased this vehicle from Powerhouse?

13     A.    I did not.

14     Q.    Okay.  So why didn't you, if you expected to

15  see it, before it was sent to the financing company?

16     A.    I'm not sure.

17           I thought it was just gonna be part of the

18  process, but...

19     Q.    Okay.  So here (indicating), this line here

20  (indicating) you state, "Had I known about the mileage

21  discrepancy I would not have agreed to purchase the

22  vehicle or pay significantly less for it."

23           How much would you have paid for the F-150,

24  Mr. Haddon?

25     A.    Probably -- I would say probably a little more

737a1972-1373-49b4-a270-e8465e49d65d

Page 47

1 or about half the price that I had paid for it.

2    Q.    And why would you have paid about half the

3 price of what Maria Haddon paid for it?

4    A.    Because the actual mileage was way higher than

5 what I had saw.

6    Q.    Mr. Haddon, do you have any experience selling

7 used vehicles besides your attempts to sell the F-150

8 through Facebook Marketplace?

9    A.    No, sir.

10    Q.    Do you have any experience in valuing used

11 vehicles for resale?

12    A.    No, sir.

13    Q.    Do you have any specialized training in valuing

14 used vehicles for resale?

15    A.    No, sir.

16    Q.    What about any members of your household?

17    A.    No, sir.

18         MR. BALDWIN:  Jose, it's been about an hour

19    since our last bathroom break.

20         Could we -- I don't know if you have a pending

21    question.  I don't think you do.

22         Can we take a quickie?

23         MR. PERALTA:  Yeah, 5 minutes is fine.

24         MR. BALDWIN:  Is everybody okay with that?

25         MR. FEYGIN:  Yes, sure.

Page 48

1          MR. BALDWIN:   Okay.

2          Thank you.

3          (Brief recess.)

4  BY MR. PERALTA:

5     Q.   **Mr. Haddon, I highlighted two sentences from**

6  **your response to FS Investments' Interrogatory Number 11**

7  **from its first set of interrogatories.**

8          **Would you mind reading the sentences that I**

9  **highlighted to yourself?**

10    A.   I'm done.

11    Q.   **What is the basis for your statement that**

12 **mileage is a primary indicator --**

13         THE COURT REPORTER:   "A primary" -- I'm sorry,

14    I didn't understand -- "indicator"?

15         MR. PERALTA:   Of a vehicle's usage and overall

16    condition.

17         THE WITNESS:   I mean, what -- I don't know what

18    -- I'm not sure what you're asking.

19 BY MR. PERALTA:

20    Q.   **Well, what's your basis?**

21         **You know, why -- why are you saying that?**

22    A.   I mean, it's like how it goes.

23         I don't know.

24    Q.   **Okay.**

25    A.   So when a vehicle has higher mileage it usually

Page 49

1 means that car's been driven longer.  Parts tend to

2 deteriorate.  Things like that.

3     Q.   And how do you know it's a primary indicator of

4 that?

5     A.   I mean, I -- I don't know.

6          That's just -- I mean, my -- my -- my brother

7 likes to buy cars, so I just -- I just know.

8     Q.   Okay.  And what about the second sentence?

9 What's the basis for you saying, "The mileage plays a

10 significant role in determining the depreciation and

11 future resale value of a vehicle"?

12     A.   Well, I -- I've seen that happen.

13          You see a car that's got 10 miles, it's gonna

14 be more expensive than the same car that has 200,000

15 miles.

16     Q.   Okay.  So is the sole basis what you've seen

17 when you're purchasing used vehicles or when you're

18 searching for used vehicles to purchase?

19     A.   Yes, sir.

20     Q.   Okay.  So let me ask you:  Why do you say that

21 the purchase of the F-150 was a significant financial

22 decision in your life?

23     A.   I was using the car -- or the truck, rather, to

24 drive up to Idaho, and if the car didn't -- if the truck

25 didn't work, then, that would've been a big financial

737a1972-1373-49b4-a270-e8465e49d65d

Page 50

1 loss.

2    Q.   So why were you driving to Idaho?

3    A.   For college.

4    Q.   When do you graduate -- well, did you graduate

5 college?

6    A.   I did not.

7    Q.   Okay.  How often would you drive the F-150 to

8 Idaho?

9    A.   It was once or twice.

10        I don't recall the exact number, but not -- not

11 very many.

12   Q.   How often would you drive to Idaho?

13   A.   I drove -- myself, I drove -- it was once that

14 I drove to Idaho.

15   Q.   Okay.  Well, let me ask you this:  How often do

16 you have the need to drive to Idaho?

17   A.   Other than the one time it's -- I don't drive

18 to Idaho.

19   Q.   Okay.  Were you able to drive to Idaho that one

20 time with the F-150?

21   A.   Yes, sir.

22   Q.   Were you -- were you going to college online or

23 in person?

24   A.   It was in person.

25   Q.   Okay.  So did you live in Idaho while -- while

Page 51

1  you were going to college?

2      A.   Temporarily.

3      Q.   Okay.  Did you drive down to -- sorry.

4           Did you drive from Idaho to Florida?

5      A.   We had the truck shipped down to Florida.

6      Q.   Why was that?

7      A.   Because we didn't want to drive it.

8      Q.   Why?

9      A.   Because of the low miles to the gallon and

10 because of some of the repairs that needed to be done on

11 the car, we didn't feel comfortable.

12     Q.   Okay.  Do you -- do you recall what repair was

13 that at that moment that made you feel uncomfortable to

14 drive the F-150 down to Florida from Idaho?

15     A.   I don't remember.

16     Q.   Okay.  Now, were you able to drive the vehicle

17 that moment that you needed to -- well, strike that.

18          Was the vehicle drivable when you shipped it

19 down to Florida?

20     A.   It was drivable, yes.

21     Q.   Okay.  So besides the -- the one time that you

22 drove to Idaho, what other uses -- strike that.

23          For what other purposes did you use the F-150

24 besides driving to Idaho?

25     A.   To and from work.

737a1972-1373-49b4-a270-e8465e49d65d

Page 52

1          It was my primary daily driving.

2     Q.    Okay.  And what work was that?

3     A.    Oh, what work was that?

4     Q.    Yeah.

5     A.    I -- I worked at a -- an assisted living

6 facility.

7     Q.    What was your title?

8     A.    I was a cook.

9     Q.    How far was this assisted living facility from

10 your -- from where you resided at at the time?

11    A.    15 minutes.

12    Q.    How many miles would you say from your house

13 was this assisted living facility?

14    A.    I don't recall.

15    Q.    Would you -- how many days did you work at this

16 assisted living facility?

17    A.    It was three days a week.

18    Q.    Do you had any other form of employment while

19 you were employed at this assisted living facility?

20    A.    No, sir.

21    Q.    Okay.  So besides driving to work to this

22 assisted living facility and that one time that you

23 drove to Ohio [sic], for what other purposes did you use

24 the F-150?

25    A.    For normal daily things, like, getting

Page 53

1  groceries.  Things like that.

2      Q.    Okay.  Do you know what mileage appears on the

3  dashboard of the F-150 at this moment or today?

4      A.    At this moment, I have -- I have no clue.

5            I'm not sure.

6      Q.    What's the last reading that you've seen on the

7  dashboard of the F-150 in terms of mileage?

8      A.    The last reading, I -- 150 something.

9      Q.    Okay.  Do you still drive the F-150 today?

10     A.    No, sir.

11     Q.    Why not?

12     A.    It's not registered or it doesn't have

13  insurance on it.

14     Q.    Why is that?

15     A.    Because I have a -- a different vehicle.

16     Q.    Makes sense.

17            When do you stop driving the F-150?

18     A.    I don't know an exact date, but it was around

19  the time when we had it shipped back down to Florida.

20     Q.    Did you know -- do you have an idea when was

21  that?

22     A.    Let's see.

23            Maybe a year-and-a-half ago.

24     Q.    Okay.  Do you have a invoice of -- that you pay

25  in order to ship the F-150 down to Florida?

737a1972-1373-49b4-a270-e8465e49d65d

Page 54

1    A.    I don't, personally, but my mom might.

2    Q.    Okay.  So you testified that you stopped using

3 the F-150 after it was shipped from Ohio [sic] to

4 Florida; is that correct?

5    A.    From Idaho to Florida.

6    Q.    From Idaho to Florida.

7          Is that correct?

8    A.    Yes, sir.

9    Q.    Okay.  Now, you said that the vehicle, the

10 F-150, needed repairs.

11          Did you do any repairs to the F-150 after it

12 was shipped down from Idaho to Florida?

13    A.    Not that I can recall, no.

14    Q.    Okay.  So all repairs to the F-150 were done

15 before shipping the vehicle from Idaho to Florida.

16    A.    Yes, sir.

17    Q.    Okay.  I'm sorry.  I'm just trying to think --

18 putting a timeline in my head to see if I understand

19 what exactly happened with this vehicle.

20          So after you shipped the F-150 from Idaho to

21 Florida, why did not -- why didn't you continue using

22 the vehicle once it arrived to Florida?

23    A.    It arrived at my parents' house, and my parents

24 had a vehicle I could use at the time.

25    Q.    Okay.  Which vehicle was this?

Page 55

1    A.    It was a BMW.

2          I don't know what -- what kind.

3    Q.    And who owned this vehicle?

4    A.    My -- one of my parents.

5          I'm not sure.

6    Q.    And why was this vehicle available to you for

7  usage when the F-150 arrived from Idaho?

8    A.    It was an extra vehicle my parents had at the

9  time.

10   Q.    So no one was using this vehicle?

11   A.    No, sir.

12   Q.    Okay.  So when you decided to not use the

13 F-150, you were never without a vehicle; is that

14 correct?

15   A.    Yes, sir.

16   Q.    Okay.  So, maybe you answered this, but I don't

17 recall hearing your answer.

18          So why did you decide not to use the F-150 once

19 you shipped it from Idaho to Florida?

20   A.    At the time we had already gotten our attorney,

21 and I didn't want to use the vehicle anymore.

22   Q.    Okay.  So who has the vehicle now -- who has

23 the F-150 now?

24   A.    It's with us.

25   Q.    Where is it located?

Page 56

1    A.    In our yard.

2    Q.    When you say in your yard, is it in your yard

3 house?  Like -- like whose -- whose yard?

4    A.    My parents' yard.

5    Q.    Okay.  Are you guys providing any kind of

6 maintenance to the F-150?

7    A.    Every now and then we'll start it to make sure

8 the battery doesn't die.

9    Q.    Okay.  Do you guys drive it around the block or

10 anything?

11    A.    No, sir.

12    Q.    So at the end of this lawsuit if you were to

13 stay with the F-150, what do you plan to do with this

14 vehicle?

15    A.    I haven't really talked with my mom about that,

16 so...

17    Q.    What do you have to talk to your mom about

18 that?

19    A.    I mean, technically, it's her -- it's her

20 truck.

21    Q.    Is that because she paid for it?

22    A.    Yes, sir.

23    Q.    Let me ask you:  Who -- who paid for the

24 insurance of the F-150?

25    A.    My mom did.

737a1972-1373-49b4-a270-e8465e49d65d

Page 57

1    Q.    Do you have any obligation to reimburse your

2  mom for the insurance payments she made with respect to

3  the F-150?

4    A.    No, sir.

5    Q.    So I'm going to read a sentence that you -- a

6  sentence of your answer to the 11th interrogatory of

7  FS Investments' first set of interrogatories.

8         So here you stated, "I had no reason to not

9  believe the defendants," which is Powerhouse,

10 "representations regarding the mileage as the dealership

11 representative seemed to be honest and trustworthy."

12        So why -- what do you say that the

13 representatives at Powerhouse appears honest and

14 trustworthy?

15   A.    I mean, if you're honest and trustworthy -- I

16 don't know -- I don't know what else to say about that.

17   Q.    Okay.  Would you say that you were provided a

18 good service by the staff at Powerhouse when you

19 purchased the F-150?

20   A.    In the first half, yes.

21   Q.    "First half"?

22        What do you mean?

23   A.    When we had purchased the vehicle we had a

24 positive interaction.

25   Q.    Okay.  So the first half, when you purchased

737a1972-1373-49b4-a270-e8465e49d65d

Page 58

1   the vehicle you were satisfied with the service that the

2   staff at Powerhouse provided you.

3       A.   Yes, sir.

4       Q.   Is that correct?

5       A.   Yes, sir.

6       Q.   And what's the second half?

7       A.   When we went back to get the -- the license

8   plate for the vehicle --

9       Q.   Okay.

10      A.   -- we were there for -- it was me and my

11  brother.  We were there for six-plus hours waiting just

12  to learn that the license plate had been in the back the

13  whole time.

14      Q.   Hmm.

15      A.   So...

16      Q.   So how long did you -- did you wait for this

17  license plate?

18      A.   Around six hours.

19      Q.   You were at the dealership for six hours

20  waiting for the license plate?

21      A.   Yeah.

22      Q.   So, besides that one incident, is there any

23  other -- oh, besides the one incident and this lawsuit,

24  is there any other reason why you would say that

25  Powerhouse did not provide you with a good service with

737a1972-1373-49b4-a270-e8465e49d65d

Page 59

1  respect to the F-150?

2          (Reporter clarification)

3  BY MR. PERALTA:

4      Q.   Except that one incident with respect to the

5  license plate and this lawsuit, is there any other

6  instance in which you feel the staff at Powerhouse did

7  not provide you with a good service?

8      A.   No, sir.

9      Q.   Okay.  Did anybody at Powerhouse apologize to

10 you for having to wait six hours for the license plate?

11     A.   No, sir.

12     Q.   Do you recall who you dealt with at Powerhouse

13 with regard to the license plate?

14     A.   I don't remember.

15     Q.   Do you remember the date that you went to

16 Powerhouse for the license plate?

17     A.   I don't remember.

18     Q.   Okay.  So we're still looking at the answer to

19 the same interrogatory, 11.

20          Here you say, "I was burnt with abnormal

21 maintenance cost that I did not anticipate when I made

22 the decision to purchase the vehicle."

23          So we covered some -- we covered some repairs

24 before, and you -- you said there were the turbo leaking

25 that needed to be replaced the tires need to be replaced

737a1972-1373-49b4-a270-e8465e49d65d

Page 60

1  and the muffler needed to be replaced

2         Are these repairs the maintenance costs that

3  you're referring to in this answer?

4     A.    Yeah.   Those, and, you know, the other

5  maintenance repairs that I can't recall off the top of

6  my head.

7     Q.    Okay.  So why do you say that they were

8  abnormal?

9     A.    Some of these maintenance repairs were

10 something that I've never seen that needed to get

11 repaired in a vehicle.  They were very expensive.

12    Q.    Okay.  Well, would you agree that a vehicle

13 that's over 100,000 miles likely needs new tires?

14    A.    Yes, sir.

15    Q.    Would you agree that a vehicle that has over

16 100,000 miles likely needs, you know, some parts to be

17 changed or replaced?

18    A.    Yes, sir.

19    Q.    Do you agree that a vehicle over 100,000 miles

20 needs to have its muffler replaced?

21    A.    Um.

22    Q.    Likely?

23    A.    I don't -- I don't think so.

24         I've never seen that in a vehicle.

25    Q.    Okay.  Oh, let me ask you this:  Do you -- is

737a1972-1373-49b4-a270-e8465e49d65d

Page 61

1  it reasonable to expect to have to pay for some repairs

2  and maintenance costs when you purchase a used vehicle

3  with over 100,000 miles?

4      A.   Yes, sir.

5      Q.   Okay.  All right.  In Interrogatory 14 of

6  FS Investments, a/k/a Powerhouse, the dealer asked you

7  about what's the total amount of damages, and, you know,

8  you, or, you, through your attorney, refers to Rule 26

9  Disclosures, so we're gonna go ahead and cover those.

10          MR. PERALTA:  Just give me one second while I

11      fix something on my computer.

12          Okay.  So this is Exhibit 4, and it's

13      Plaintiff's Initial Disclosures pursuant to Federal

14      Rules and Procedure 26(a)(1)(A).

15          (Exhibit 4 was marked)

16  BY MR. PERALTA:

17      Q.   So we're going to cover this paragraph here

18  (indicating) -- well, first of all, let me ask you:  Do

19  you -- do you recognize your disclosures pursuant to 26

20  -- Federal Rule Civil Procedure 26?

21          Yes or no.

22      A.   Yes, sir.

23      Q.   Is this one of the documents that you reviewed

24  to prepare for this deposition?

25      A.   It should've been, yes.

737a1972-1373-49b4-a270-e8465e49d65d

Page 62

1    Q.   Okay.  So I'll try to go faster through this

2 document.

3         So as to your actual damages -- do you know

4 what "actual damages" means?

5    A.   No.

6    Q.   Okay.  So I'll represent to you that actual

7 damages refers to the money that you're claiming that

8 you lost in this lawsuit.

9         So here you're saying that you experienced a

10 loss of income from being unable to use the Ford in

11 furtherance of business purposes.

12        Well, is this -- does that seem inaccurate?

13   A.   There was points where my truck had to be in

14 the shop for repairs leading me to call out of work.

15   Q.   How many points were there?

16   A.   Say again?

17   Q.   Or times?

18   A.   Oh.

19   Q.   Yeah.

20        How many times were that?

21   A.   I don't recall an exact number.

22   Q.   Do you have an idea of that number?

23   A.   Hmm.

24   Q.   Was it once?

25   A.   Three to five.

737a1972-1373-49b4-a270-e8465e49d65d

Page 63

1    Q.   Do you know the reasons for the call -- for the

2  F-150 needed to be in the shop?

3    A.   Yeah, there was the turbo replacement and the

4  tire replacements.

5    Q.   Were you able to drive the F-150 with the turbo

6  leaking?

7    A.   Yes, sir.

8    Q.   Were you able to drive the F-150 despite its

9  tires not being replaced?

10   A.   Yes, sir.

11   Q.   Were there any other reasons why you claim that

12 you missed work because of the F-150?

13   A.   Not that I can recall.

14   Q.   Okay.  So why didn't you take the F-150 to be

15 repaired on the weekend?

16   A.   Um.

17   Q.   Or, actually, strike that.

18        Why didn't you take the F-150 to be repaired on

19 days that you did not have to go to work?

20   A.   There was -- it was snowing where I was, and

21 the tires needed to be replaced, and it was -- it would

22 become a dangerous, you know, weapon.

23   Q.   So the reason that you needed to replace the

24 tire was to obtain a better grip in the snow where you

25 were; is that correct?

737a1972-1373-49b4-a270-e8465e49d65d

Page 64

1    A.   Yes, sir.

2    Q.   Okay.  When do you realize that the tires

3 needed to be replaced?

4    A.   What do you mean?

5    Q.   Well, when did you come to learn that, you

6 know, you needed to replace the tire?

7         Was it -- was it because you were driving in

8 the snow and you couldn't get a better grip or was it

9 something else?

10    A.   Yeah, that -- I mean, when I would start

11 slipping and sliding in the snow --

12    Q.   Uh-huh.

13    A.   -- and I got to inspect my tires and there

14 wasn't much tread left.

15    Q.   Got it.

16         Have you -- had you inspected your tires before

17 that time in the snow that you inspected them?

18    A.   Yes, sir.

19    Q.   Did it have more trim [sic] when you inspected

20 them at that time?

21    A.   Yes, sir.

22    Q.   So would you say that your use of the vehicle

23 was the cause of the trim [sic] being reduced on the

24 tires of the F-150?

25    A.   Can you repeat the question?

737a1972-1373-49b4-a270-e8465e49d65d

1   Q.   Would you say that your use of the F-150 was

2 the cause of the reduction of the trims [sic] of the

3 tires that were placed on the F-150?

4   A.   There wasn't -- there wasn't much tread left

5 when I had purchased the vehicle, but, yes.

6   Q.   Okay.  So I didn't ask you when you inspected

7 the tires before the time in the snow.

8        Do you know when?

9   A.   I don't remember.

10   Q.   Was it when you were inspecting the vehicle,

11 the F-150, in order to purchase this vehicle?

12   A.   No -- um, no.

13   Q.   Are you -- so you -- so you said "loss of

14 income," that you couldn't get to work because the the

15 vehicle needed to be repair.

16        But you were in Ohio [sic], so you were going

17 to college.

18        So what job were you doing in Ohio [sic]?

19   A.   Idaho.

20   Q.   Idaho.  Sorry.

21        Thank you for correcting me.

22        Idaho.

23   A.   That was the assisted living facility.

24   Q.   Okay.  Okay.  Were you pay by the hour?

25   A.   Yes, sir.

737a1972-1373-49b4-a270-e8465e49d65d

Page 66

1    Q.    Do you have the ability to take on other

2  shifts?

3    A.    It wasn't really up to me.  It was up to if

4  someone had called out.

5    Q.    Okay.  But you had the ability to talk to your

6  supervisor and request to be considered for other

7  shifts.

8    A.    Yes, sir.

9    Q.    Do you do that?

10    A.    Yes, sir.

11    Q.    Were you able to make up those hours by taking

12  other people's shifts?

13    A.    No.  There were only two people working in the

14  kitchen, so it was unlikely someone called out.

15    Q.    Okay.  So besides your claim that you miss

16  work, is there any other basis, purposes, or basis for

17  your claim of loss of income?

18    A.    No, sir.

19    Q.    Okay.  Okay.  For how much money are you suing

20  Powerhouse?

21    A.    I am not sure.

22          That's what I have an attorney for.

23    Q.    How much money do you wish to be paid by

24  Powerhouse in this lawsuit?

25    A.    I'm not sure.

737a1972-1373-49b4-a270-e8465e49d65d

Page 67

1    Q.    How much money have you lost because of the

2  mileage discrepancy of the F-150?

3    A.    As much as we paid for the truck, and insurance

4  costs, and repair costs.

5    Q.    So payment for the truck and the insurance.

6         Anything else?

7    A.    Repair costs.

8    Q.    And repair.

9         Do you know the total amount that has been

10 paid?

11   A.    I don't know off the top of my head.

12   Q.    Okay.  Have you -- have you paid anything out

13 of your own account with respect to the F-150?

14   A.    I mean, I -- I -- I paid for my gas to fill up

15 the truck.

16   Q.    Anything else?

17   A.    Other than that -- other than that, no.

18   Q.    Okay.  Do you share -- do you share a bank

19 account with Maria Haddon?

20   A.    No, sir.

21   Q.    Okay.  Are you aware that Powerhouse pay your

22 attorney $8,799.20 cents with respect to this lawsuit?

23   A.    Yes, sir.

24   Q.    Did you receive any money from that payment?

25   A.    I don't recall.

737a1972-1373-49b4-a270-e8465e49d65d

Page 68

1   Q.   You don't recall receiving any money from your

2   attorney with regard to this lawsuit?

3   A.   Um.

4        MR. FEYGIN:  Asked and answered.

5   BY MR. PERALTA:

6   Q.   You may answer.

7   A.   I didn't receive any money personally.

8        I'm not sure if my mom received money, or if --

9   I'm not sure any -- anything, so...

10  Q.   Okay.  Are you -- are you or anyone from your

11  household paying your attorney for his services?

12       MR. FEYGIN:  Objection as to attorney-client

13       privilege.

14       And I will be instructing you not to answer

15       that question.

16       MR. PERALTA:  Are you saying that it's

17       privilege for him to say whether or not he's paying

18       you?

19       MR. FEYGIN:  Yes, because that goes into

20       attorney-client privilege based upon our retainer

21       agreement which has no basis in your questioning

22       here.

23       So, yes, it is privileged.

24       MR. PERALTA:  Joshua, you are requesting

25       attorney's fees in this case, so that's not

Page 69

1    privilege.

2         MR. FEYGIN:  Yes, and understand in Federal law

3    attorney's fees are not relevant until they are

4    relevant, and at this point in time in the

5    proceedings they are not relevant.

6         So if you want to bring that to the judge's

7    attention we can certainly argue over it, or we can

8    wait until my attorney's fees are relevant, and then

9    you'll receive a copy of my retainer.

10        MR. PERALTA:  Sure.

11        Bringing things to the judge is part of my job,

12   so that's not a problem.

13        MR. FEYGIN:  Very well.

14   BY MR. PERALTA:

15     **Q.   So Mr. Haddon, to get a clear -- to clear -- to**

16   **understand your testimony, you have not receive any**

17   **payment from your attorney with respect to this lawsuit,**

18   **correct?**

19        MR. FEYGIN:  Objection.  Asked and answered.

20   BY MR. PERALTA:

21     **Q.   You may answer.**

22     A.   No, sir.

23     **Q.   No.  Okay.**

24        **Do you know why Powerhouse pay your attorney**

25   **$8,799.20?**

737a1972-1373-49b4-a270-e8465e49d65d

Page 70

1    A.    I think I have an idea.

2    Q.    What is that idea?

3    A.    For the Federal Odometer Act.

4    Q.    Okay.  To your knowledge, did Powerhouse pay

5 that money to your attorney in order to settle this

6 case?

7    A.    I don't know.

8    Q.    Do you know whether Powerhouse paid that money

9 in order to prevent the filing of this lawsuit?

10    A.    I don't know.

11    Q.    But you do know that Powerhouse paid it with

12 regards to one of the claims made in this lawsuit,

13 correct?

14    A.    Yes, sir.

15    Q.    Okay.  When you say that you have an idea that

16 you think that Powerhouse paid it with respect to the

17 Odometer Act, do you know whether Powerhouse paid it --

18 to your knowledge, this is the question, to your

19 knowledge, do you know whether Powerhouse paid it to

20 satisfy your claim for actual damages?

21    A.    I don't know.

22    Q.    Okay.  Do you know whether he paid it to

23 satisfy your claim for statutory damages?

24    A.    I think it was statutory damages.

25    Q.    Okay.  Why do you think that?

737a1972-1373-49b4-a270-e8465e49d65d

Page 71

1    A.    I don't know.

2    Q.    **Are you guessing?**

3    A.    That's what -- that's what my attorney told me,

4  so that's what I'm going to go off of.

5    Q.    **That's fine.**

6          **Let's stop there, okay?**

7          **All right.  One second.**

8          MR. PERALTA:  So I'm going to show you Exhibit

9    5.

10         So this is -- I'm going to mark it as Composite

11    Exhibit 5, because it includes three invoices

12    produced by Plaintiff in this case.

13         (Exhibit 5 marked)

14  BY MR. PERALTA:

15    Q.    **Mr. Haddon, I'm scrolling through them.**

16          **I'm gonna scroll back up.**

17          **Do you recognize this invoices?**

18    A.    Yes, sir.

19    Q.    **Did you review these invoices to prepare for**

20  **this deposition today?**

21    A.    Yes, sir.

22    Q.    **Do you have a readable copy of this invoices?**

23  **Because as you can see, we cannot read it.**

24    A.    I don't have a copy at the moment.

25    Q.    **Do you possess a copy that it's more readable**

737a1972-1373-49b4-a270-e8465e49d65d

Page 72

1   than this -- than this one that I'm showing you now?

2       A.   I'm not sure.

3            I don't -- I don't want to tell you that I have

4   one and then I don't.

5       Q.   Okay.

6            THE COURT REPORTER:  Counsel, I need to take a

7       short break.

8            MR. PERALTA:  Sure.  Go ahead.

9            We'll take 5 minutes.

10           (Brief recess.)

11  BY MR. PERALTA:

12      Q.   So, Mr. Haddon, this invoice here says,

13  "Tri-State Tire."

14      A.   Uh-huh.

15      Q.   Is this the invoice to replace the tires on the

16  F-150?

17      A.   That is the place that I went to, yes.

18      Q.   Okay.  Did you know how much was paid to

19  Tri-State Tire to replace the tires on the F-150?

20      A.   Yes.  It was -- it was around $1700.

21      Q.   Okay.  Were there new tires placed on the

22  F-150?

23      A.   Yes, sir.

24      Q.   Why didn't you buy used tires for the F-150?

25      A.   I don't think this place had used tires, or, at

Page 73

1 least, I wasn't offered --

2      Q.   Okay.

3      A.   -- used tires.

4      Q.   And this second invoice here, I believe, is

5 this -- is -- does this read as Community Care

6 Automotive Center or Quality Care Automotive Center?

7      A.   Quality.

8           It's Quality Care Automotive Center.

9      Q.   Okay.  What is -- what is this invoice for?

10     A.   Um.

11     Q.   Yeah, assuming, you know, maybe you read it at

12 some point.

13     A.   I don't remember, but I did get -- there was an

14 oil change, and I -- I don't know.

15          I think -- it looks like it's -- I don't know.

16          I don't want to speculate what that says,

17 but...

18     Q.   Okay.

19     A.   I know for sure I got an oil change and there

20 was something else that was done.

21     Q.   Okay.  But you don't know what it was for,

22 correct?

23     A.   The top one, I can't -- I can't --

24     Q.   Besides the oil change, you don't know what

25 this invoice was for, correct?

737a1972-1373-49b4-a270-e8465e49d65d

Page 74

1    A.   Yes, sir.

2    Q.   Okay.  And then this invoice here from Land O'

3 Lakes, do you know what it was for?

4    A.   I want to say -- I'm not sure.

5    Q.   Okay.  Do you know where the -- well, strike

6 that.

7         Are these the -- the invoice marked as

8 Exhibit 5 the invoices that Maria Haddon paid for?

9    A.   Yes, sir.

10    Q.   Okay.  Did you -- after you learned of the

11 mileage discrepancy in the CARFAX report of the F-150,

12 did you contact Powerhouse to attempt to resolve your

13 issue with this discrepancy?

14    A.   No, sir, we had just gotten an attorney.

15    Q.   And why -- why did you not contact Powerhouse

16 to try to resolve that discrepancy or that issue?

17    A.   'Cause my attorney knows better than I.

18    Q.   Okay.  Did you discuss with your family, not in

19 the presence of your attorney, whether or not to contact

20 Powerhouse in order to resolve the mileage discrepancy?

21    A.   No, sir.

22    Q.   To your knowledge, is Powerhouse a small

23 dealership?

24    A.   Say again?

25    Q.   Would you consider Powerhouse a small

737a1972-1373-49b4-a270-e8465e49d65d

Page 75

1 dealership?

2    A.   I mean, they're not a -- an authorized, like,

3 you know, like, Toyota or Honda.

4    Q.   So you would consider them smaller than the

5 authorized dealerships like Toyota and Honda.

6    A.   Yes, sir.

7    Q.   Correct?

8    A.   Yes, sir.

9    Q.   Do you know whether Powerhouse is (inaudible)

10 owned?

11    A.   I don't know.

12    Q.   Do you know the impact that this lawsuit may

13 have on Powerhouse, financially?

14    A.   I don't know.

15    Q.   All right.

16         MR. PERALTA:   I'm going to mark as Exhibit 6

17    your complaint in this lawsuit.

18         (Exhibit 6 marked)

19 BY MR. PERALTA:

20    Q.   Is this one of the documents that you reviewed

21 in order to prepare for this deposition today,

22 Mr. Haddon?

23    A.   Yes, sir.

24    Q.   In Paragraph 36 of your complaint it states,

25 "Despite having both actual and constructive notice, the

737a1972-1373-49b4-a270-e8465e49d65d

Page 76

1  vehicle's mileage was in excess of 131,636 miles.  The

2  defendant certify under penalty of perjury that

3  disclosed mileage reflects actual mileage."

4          Do you know what constructive notice means,

5  Mr. Haddon?

6      A.   No, sir.

7      Q.   But you do know what actual notice means,

8  correct?

9      A.   Yes, sir.

10          THE COURT REPORTER:  I'm sorry, but you do know

11      what what means?

12          MR. PERALTA:  Actual notice.

13          THE COURT REPORTER:  Actual notice?

14          MR. PERALTA:  (No audible response.)

15          THE COURT REPORTER:  Thank you.

16          MR. PERALTA:  Yeah.

17          Did you get his answer, as well?

18          THE COURT REPORTER:  Yes.

19          MR. PERALTA:  Okay.

20  BY MR. PERALTA:

21      Q.   Do you have any basis to allege that Powerhouse

22  had any actual notice of the mileage discrepancy in the

23  F-150?

24      A.   Can you repeat the question?

25      Q.   So do you have any -- any basis to allege that

737a1972-1373-49b4-a270-e8465e49d65d

Page 77

1 Powerhouse knew of any mileage discrepancy with -- with

2 respect to the F-150?

3     A.   No, sir.

4     Q.   So I'm going to have you read -- well, if you

5 could please read Paragraph 37 to yourself.

6     A.   Okay.  I'm done.

7     Q.   Mr. Haddon, what is the basis for your claim

8 that the dealership affix your signature to the

9 certificate of title in order to feign compliance with

10 the act and its requirements?

11    A.   I don't know.

12    Q.   So, Mr. Haddon, what is the basis for your

13 claim that the dealership intentionally failed to select

14 the check box that the odometer reading was inaccurate?

15    A.   Um.

16    Q.   Intentionally.

17         That's the focus of my question.

18         What is the basis?  Do you have any factual

19 basis for that claim?

20    A.   I don't.

21         I don't remember.

22    Q.   Okay.

23         MR. PERALTA:  Okay.  And then I mark as

24    Exhibit 7 a copy of text messages that Plaintiff

25    produce in this case.

737a1972-1373-49b4-a270-e8465e49d65d

Page 78

1          (Exhibit 7 marked)

2  BY MR. PERALTA:

3      **Q.    Mr. Haddon, do you recognize this copy of text**

4  **messages?**

5      A.    Yes, sir.

6      **Q.    Who's this phone number?**

7      A.    I don't remember the company, but it was a -- a

8  company that buys and sells vehicles.

9      **Q.    Is this you sending the photos of the F-150 to**

10  **this company?**

11      A.    Yes, sir.

12      **Q.    Okay.  And here they respond, "Thanks for**

13  **sending the pictures with the two mileage rollbacks on**

14  **the CARFAX we will be at 1,050.  Our process is simple**

15  **and I can get everything done the same day."**

16          **Is this company writing this to you,**

17  **Mr. Haddon?**

18      A.    Say again?

19      **Q.    Is this the company that you referred to that**

20  **buys and sells vehicles writing this to you?**

21      A.    Yes, sir.

22      **Q.    Why did you send these photos to this company?**

23      A.    I had called them to try and sell my vehicle,

24  and they wanted me to send them photos.

25      **Q.    Okay.  But it looks like they were aware of the**

737a1972-1373-49b4-a270-e8465e49d65d

Page 79

1  CARFAX report.

2        Does that mean that they offered you $1,050 for

3  this vehicle?

4     A.   After they had saw the CARFAX, it looks like

5  they offered 1,050.

6     Q.   Okay.  Do you know the name of this company?

7     A.   I don't recall.

8     Q.   Do you have any more communication -- strike

9  that.

10        Do you have a record of any other

11 communications between you and this company?

12    A.   No, sir.

13    Q.   Have you conducted any other similar companies

14 besides this company to sell the F-150?

15    A.   Not through text message, no.

16    Q.   Okay.  Through what other medium?

17    A.   On certain websites.

18    Q.   Can you provide me with some examples?

19    A.   Cars.com.

20    Q.   Okay.  Any others?

21    A.   I don't remember any of them off the top of my

22 head, but there was a couple more.

23    Q.   Okay.  Mr. Haddon, what's the basis for your

24 claim that the odometer in the F-150 has been actually

25 rolled back?

737a1972-1373-49b4-a270-e8465e49d65d

Page 80

1    A.    The CARFAX report.

2    **Q.    Are you relying on anything else besides the**

3 **CARFAX report?**

4    A.    The title.

5    **Q.    Any- --**

6    A.    And that's it.

7    **Q.    Anything else?**

8    A.    No, sir.

9          MR. PERALTA:  No further questions for now.

10         MR. FEYGIN:  Bruce, you got anything?

11         MR. BALDWIN:  (No audible response.)

12         MR. FEYGIN:  Bruce, you there?

13         MR. BALDWIN:  Sorry, I forgot I was on mute.

14         Yeah, real quickly.

15              CROSS-EXAMINATION

16 BY MR. BALDWIN:

17   **Q.    Hi, Mr. Haddon.  This is Bruce Baldwin.**

18         **I represent McCombs.**

19         **So on the heels of the questions and answers**

20 **that just took place, so you haven't had anybody**

21 **physically -- and I say anybody, that'd be, you know,**

22 **anyone actually inspect the F-150's odometer?**

23   A.    No, I haven't had anyone that's inspected the

24 odometer, no.

25   **Q.    What's the physical address where the F-150 is**

737a1972-1373-49b4-a270-e8465e49d65d

Page 81

1  now?

2      A.   The whole address?

3      **Q.   The F-150 is parked someplace, right?**

4      A.   Yeah.

5      **Q.   Where is that?**

6      A.   It's 3775 County Road 48, Bushnell -- or it's

7  West County Road 48, Bushnell, Florida.  33513 is the

8  zip code.

9      **Q.   All right.  You corrected yourself, and it**

10 **threw off my handwriting.**

11          **So 3775.**

12     A.   I'm sorry.

13     **Q.   Is it West County Road?**

14     A.   West County Road 48.

15     **Q.   48.  Okay.  Great.**

16          **So the -- the vehicle is available to be**

17 **inspected if someone were to be sent there, and with**

18 **your permission and observation, of course, it's -- it**

19 **exists someplace where it can be looked at by -- by**

20 **somebody?**

21     A.   Yes, sir.

22     **Q.   Okay.  And the title of the vehicle, is it you**

23 **and Maria Haddon, both, on the title now?**

24     A.   It should be, yes, sir.

25     **Q.   So you're co-owners, basically.**

737a1972-1373-49b4-a270-e8465e49d65d

Page 82

1    A.   Yes, sir.

2    Q.   Okay.  Just a moment.

3         Okay.  Do you have any intent of having the

4  F-150 looked at physically?  The odometer looked at

5  physically?

6    A.   Say it -- can you repeat the question?

7    Q.   Do you have any intent to have somebody

8  physically inspect the odometer of the F-150?

9    A.   Not at this time, no.

10   Q.   Okay.  And why would that be?

11   A.   I don't know.

12        I just never thought of it.  Of doing that.

13   Q.   Just a second.  I don't have much.

14        Are you still seeking to sell the F-150?

15   A.   Not at this time.

16        It's -- I'm not -- it's not on any websites for

17 sale.

18   Q.   Okay.

19        MR. BALDWIN:  That's all I got.

20        MR. FEYGIN:  All right.  I have a few

21    follow-ups here.

22             CROSS-EXAMINATION

23 BY MR. FEYGIN:

24   Q.   Mr. Haddon, are you legally trained?

25   A.   No, sir.

737a1972-1373-49b4-a270-e8465e49d65d

Page 83

1    Q.    Any training as a mechanic?

2    A.    No, sir.

3    Q.    Any training as a car salesperson?

4    A.    No, sir.

5    Q.    You ever worked at a car dealership?

6    A.    I have not, no, sir.

7    Q.    So you previously testified that you tried to

8 sell the F-150, I believe that's an accurate statement,

9 but I'll let you correct me if I'm wrong.

10   A.    No, that's correct.

11   Q.    Okay.  And did anybody agree to buy it?

12   A.    No, sir.

13   Q.    What sort of offers did you receive for it?

14   A.    Very, very lowball offer, if -- if any at all.

15   Q.    So let's unpack that.

16         Why were the offers so low?

17   A.    I think between -- between the mileage

18 discrepancy and the amount of repairs that needed to be

19 done no one wanted to pay what I had it selling for.

20   Q.    And the price that you were trying to sell the

21 vehicle for, was that comparable to what the market

22 value was for the vehicle?

23   A.    I think it was less than what the market value.

24   Q.    Okay.  And why do you think that?

25   A.    At the time on Facebook Marketplace I was

737a1972-1373-49b4-a270-e8465e49d65d

Page 84

1 looking at trucks of the same year, make, and model,

2 they were upwards of 25,000.

3    Q.   **And remind me, what were you trying to sell**

4 **your car for?**

5    A.   I had put it between 18 -- 18 and 20.

6    Q.   **Did anybody outright refuse to buy the vehicle?**

7    A.   There was a couple that just did not want to

8 even give me an offer.

9    Q.   **Okay.  And, again, why was that?  Was that for**

10 **the same reasons you just testified?**

11    A.   For the same reasons exactly.

12         MR. FEYGIN:  I'm going to pull up what's going

13      to be Plaintiff's Exhibit 1.  This is going to be

14      Plaintiff's Exhibit 1.

15         Can everyone see what I'm seeing?

16         (Exhibit 1 marked)

17         THE WITNESS:  Yep.

18         MR. FEYGIN:  With a date at the top left corner

19      of 8/2/22 and then on the bottom right-hand side,

20      this is identified with Bates stamping as

21      Plaintiff's RESFSRFP185 and this is going to go all

22      the way through RFP 194.

23 BY MR. FEYGIN:

24    Q.   **So, Mr. Haddon, you previously testified that a**

25 **buyer asked you to pull a CARFAX report; is that**

737a1972-1373-49b4-a270-e8465e49d65d

Page 85

1  accurate?

2     A.   She had pulled the CARFAX herself and told me

3  what she had found.

4     Q.   Okay.

5     A.   Which, in turn, led me to pull my own CARFAX.

6     Q.   Okay.  And I'm going to scroll through this

7  particular CARFAX report, and I want you to look at it.

8          I'm now going through Page 2 -- actually,

9  technically, Page 3.

10          Starting at the top of it, what is Page 4.

11          Let me know if you need me to slow down.

12          Starting now at the top of Page 5.

13          Now at the top of Page 6.

14          Now at the top of Page 7.

15          Now at the top of Page 8.

16          Now at the top of Page 9.

17          And now we're at the top of Page 10.

18          So we can agree that we went through the entire

19  CARFAX report, correct?

20          Yes?

21     A.   Yes, sir.

22     Q.   Okay.  When you pulled the CARFAX report when

23  that potential buyer told you to pull the CARFAX report

24  to double check what she had seen --

25     A.   Uh-huh.

Page 86

1      Q.    -- is this an accurate representation of what

2  you had seen?

3      A.    Yes, sir.

4            MR. PERALTA:  Objection; form.

5  BY MR. FEYGIN:

6      Q.    Okay.

7            MR. FEYGIN:  Okay.  Nothing further from the

8      plaintiff's side.

9            We will be reading.

10            MR. PERALTA:  Okay.

11            Thank you everybody.

12            Madam Court Reporter, I will send you the

13      exhibits.

14            I'm gonna have my paralegal mark them.

15            THE COURT REPORTER:  And are you ordering,

16      Mr. Peralta?

17            MR. PERALTA:  Not at the moment.

18            THE COURT REPORTER:  Okay.  Thank you.

19            MR. PERALTA:  Thank you.

20            (The deposition concluded at 12:51 p.m.)

21

22

23

24

25

Page 87

1                          STIPULATIONS

2

3        It was stipulated by and between counsel for

4    the respective parties herein that:

5        1.   Reading and signing of the remote

6    deposition by the deponent before filing ARE NOT

7    waived.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

737a1972-1373-49b4-a270-e8465e49d65d

Page 88

1                   CERTIFICATE OF OATH

2   STATE OF FLORIDA
    COUNTY OF MANATEE

3

4          I, the undersigned authority, certify that

5      BAGRIEL LUC HADDON appeared remotely before me on

6      July 22, 2024 and was duly sworn.

7          WITNESS my hand and official seal

8      October 1, 2024.

9

10

11

12          _____

13          JESSICA TENENBAUM, Court Reporter
            Notary Public, State of Florida
14          Commission No.:  HHS 077464
            Expires:  January 9, 2025

15

16

17

18

19

20

21

22

23

24

25

Page 89

1                    CERTIFICATE OF REPORTER

2  STATE OF FLORIDA
   COUNTY OF MANATEE

3

4          I, JESSICA TENENBAUM, court reporter, do hereby

5      certify that I was authorized to and did

6      stenographically report the remote deposition of the

7      aforementioned witness, and that the transcript is a

8      true and complete record of my stenographic notes

9      thereof.

10         I FURTHER CERTIFY that I am not a relative,

11     employee, attorney or counsel of any of the parties,

12     nor am I a relative or employee of any of the

13     parties' attorneys or counsel connected with the

14     action, nor am I financially interested in the

15     action.

16         DATED this October 1, 2024.

17

18

19

20     _____

21         JESSICA TENENBAUM, Court Reporter

22

23

24

25

737a1972-1373-49b4-a270-e8465e49d65d

Page 90

1     DEPOSITION ERRATA SHEET.

2   WITNESS:  GABRIEL LUC HADDON

3   STYLE:  GABRIEL LUC HADDON, AN INDIVIDUAL, PLAINTIFF VS.
    FS INVESTMENTS OF AMERICA, INC., ET AL., DEFENDANTS.

4
    PAGE:  LINE:  CHANGE FROM:   TO:          REASON:

5

6

7

8

9

10

11

12

13

14

15

16

17                       _____

18                       Signature of Witness - Date

19                       _____

20                       Notary Public - Date

21

22

23

24

25

Choice - United

737a1972-1373-49b4-a270-e8465e49d65d

Page 91

1  September 27, 2024

2  TO:    JOSHUA FEYGIN, ESQUIRE
              1930 Harrison Street, Suite 208F
3             Hollywood, Florida 33020
              josh@jfeyginesq.com
4
   GABRIEL LUC HADDON, AN INDIVIDUAL, PLAINTIFF VS. FS
5  INVESTMENTS OF AMERICA, INC., ET AL., DEFENDANTS.

6  At the conclusion of your remote remote deposition given
   in the above-styled cause you indicated you wished to
7  read and sign the transcript.  This letter is to advise
   you that your deposition is ready, and we ask that you
8  call our office at (888) 811-3408 at your earliest
   convenience to make arrangements for reading and
9  signing.

10 If you are a party in this action and your attorney has
   ordered a copy of this transcript, you may wish to read
11 their copy and forward to us a copy of your errata
   sheet.  It is necessary that you do this as soon as
12 possible, or no later than 30 days from the date of this
   letter.
13
   If you wish to waive reading and signing of the
14 transcript, please sign below and return this letter to
   our office.
15
   Thank you for your prompt attention.
16
                  I wish to waive reading and signing:
17         _____ Date_____

18

19

20

21

22

23

24

25

737a1972-1373-49b4-a270-e8465e49d65d

**A**

**a.m** 2:5 5:4
**a/k/a** 61:6
**A1A** 42:4
**ability** 66:1,5
**able** 16:7 32:1 40:8
   45:22 50:19 51:16
   63:5,8 66:11
**abnormal** 59:20 60:8
**above-styled** 91:6
**accompanied** 10:21
**account** 67:13,19
**accurate** 36:7 83:8
   85:1 86:1
**accurately** 33:13
**acquire** 15:16 16:24
   29:3
**act** 32:20 70:3,17
   77:10
**action** 20:6 89:14,15
   91:10
**actual** 20:3 47:4 62:3
   62:4,6 70:20 75:25
   76:3,7,12,13,22
**ad** 21:10,11
**add** 6:19
**address** 80:25 81:2
**advise** 91:7
**affix** 77:8
**afford** 12:5
**aforementioned** 89:7
**ago** 18:15 32:18
   53:23
**agree** 20:13 27:19
   29:9 60:12,15,19
   83:11 85:18
**agreed** 46:21
**agreement** 68:21
**Ah** 31:6
**ahead** 61:9 72:8
**AL** 90:3 91:5
**Alex** 42:18,20 44:11
**Alfonso** 43:19 44:6
   44:11
**Alhambra** 3:13
**allege** 76:21,25
**allow** 34:15
**America** 1:7,12 2:3
   3:16 90:3 91:5
**amount** 61:7 67:9
   83:18
**answer** 6:13,14 17:10
   18:22 23:11 26:20

28:3,17 29:14 42:7
   44:21 45:1 55:17
   57:6 59:18 60:3
   68:6,14 69:21
   76:17
**answered** 55:16 68:4
   69:19
**answering** 6:1
**answers** 36:11,20,22
   80:19
**anticipate** 59:21
**Any-** 80:5
**anybody** 25:17,25
   27:6 41:3 59:9
   80:20,21 83:11
   84:6
**anymore** 12:5 55:21
**apologize** 59:9
**appear** 33:7 36:23
**APPEARANCES**
   3:1
**appeared** 3:5,11,16
   26:16,21 36:6 88:5
**Appearing** 3:6
**appears** 32:12 53:2
   57:13
**appreciate** 19:1
**argue** 69:7
**Armstrong** 3:13
**arrangements** 91:8
**arrived** 54:22,23
   55:7
**asked** 12:1 16:21
   46:10 61:6 68:4
   69:19 84:25
**asking** 5:25 23:12
   48:18
**asks** 6:3
**assisted** 52:5,9,13,16
   52:19,22 65:23
**Associates** 3:8
**assuming** 73:11
**attempt** 74:12
**attempts** 47:7
**attention** 69:7 91:15
**attorney** 6:2 16:13
   19:23 28:21 30:25
   31:19 33:20 37:1
   55:20 61:8 66:22
   67:22 68:2,11
   69:17,24 70:5 71:3
   74:14,17,19 89:11
   91:10

**attorney's** 5:23 68:25
   69:3,8
**attorney-client** 68:12
   68:20
**attorneys** 89:13
**attracted** 21:14
**audible** 76:14 80:11
**authority** 88:4
**authorized** 75:2,5
   89:5
**Automotive** 1:8,13
   35:19 36:3 73:6,6,8
**available** 55:6 81:16
**aware** 67:21 78:25
**awesome** 9:19

**B**

**B** 3:7
**back** 25:16 29:23
   39:7 53:19 58:7,12
   71:16 79:25
**bad** 29:5
**BAGRIEL** 88:5
**Baldwin** 3:7 4:3
   47:18,24 48:1
   80:11,13,16,17
   82:19
**bank** 28:5,12,25
   45:23 67:18
**based** 68:20
**basically** 44:3 81:25
**basis** 48:11,20 49:9
   49:16 66:16,16
   68:21 76:21,25
   77:7,12,18,19
   79:23
**Bates** 84:20
**bathroom** 47:19
**battery** 56:8
**behalf** 3:5,11,16
   19:24 32:20
**believe** 46:6 57:9
   73:4 83:8
**believed** 26:19
**Bert** 19:5
**better** 19:13 63:24
   64:8 74:17
**big** 19:20,22 49:25
**bill** 39:23
**bit** 35:22
**block** 56:9
**BMW** 55:1
**born** 7:3,4

**bottom** 84:19
**bought** 11:19 18:21
**Boulevard** 3:8
**box** 77:14
**brand-new** 27:14
**break** 6:11 23:1,13
   23:16 47:19 72:7
**Brief** 23:9 48:3 72:10
**bring** 69:6
**Bringing** 69:11
**brother** 25:21 26:1,4
   49:6 58:11
**brothers** 10:2 29:20
**Bruce** 3:7 80:10,12
   80:17
**bruceb@nicklausl...**
   3:10
**burnt** 59:20
**Bushnell** 7:13 81:6,7
**business** 55:23 62:11
**buy** 10:22 13:5 27:16
   30:7 39:1 49:7
   72:24 83:11 84:6
**buyer** 11:22 12:1
   13:4 14:6 15:6,19
   15:24 16:20 17:2,6
   20:13 84:25 85:23
**buyer's** 13:8
**buyers** 27:9,20 28:6
   29:10
**buying** 20:15 21:18
**buys** 78:8,20

**C**

**caffeine** 23:18
**call** 21:20 62:14 63:1
   91:8
**called** 8:23 66:4,14
   78:23
**camping** 41:11,13
**car** 13:13 17:17
   18:24 21:18 27:16
   29:10 30:1,4,8 39:2
   41:9 49:13,14,23
   49:24 51:11 83:3,5
   84:4
**car's** 49:1
**care** 7:24 8:7 73:5,6,8
**CARFAX** 4:24 11:11
   11:14,20,21,25
   12:2,14,17,20,22
   13:4 14:2,8,20,23
   15:16 16:21,22

17:1,5,14 26:24
   27:4,7,10,12,17,20
   29:6,10 30:10
   74:11 78:14 79:1,4
   80:1,3 84:25 85:2,5
   85:7,19,22,23
**CARFAX.com** 13:1
**cars** 49:7
**Cars.com** 79:19
**case** 1:2 5:24 6:4
   10:17 14:21 44:13
   44:16 68:25 70:6
   71:12 77:25
**cause** 64:23 65:2
   74:17 91:6
**Center** 73:6,6,8
**cents** 67:22
**certain** 17:17 79:17
**certainly** 69:7
**certificate** 4:6,7 45:9
   45:15 77:9 88:1
   89:1
**certify** 76:2 88:4 89:5
   89:10
**cetera** 31:25
**chance** 36:17
**change** 6:10 73:14,19
   73:24 90:4
**changed** 60:17
**charged** 39:10
**check** 77:14 85:24
**CheckSum** 8:14,20
   8:22
**child** 19:19
**children** 39:2
**Circle** 3:13
**city** 7:14,16
**Civil** 61:20
**claim** 37:25 63:11
   66:15,17 70:20,23
   77:7,13,19 79:24
**claiming** 62:7
**claims** 5:24 70:12
**clarification** 59:2
**clear** 6:10,16 16:19
   28:20 69:15,15
**click** 19:2
**close** 10:13
**clue** 53:4
**CNA** 8:1
**co-owners** 81:25
**code** 81:8
**Coke** 23:17

**college** 50:3,5,22
  51:1 65:17
**come** 18:19 20:25
  64:5
**comfortable** 51:11
**commencing** 5:4
**commercials** 16:25
**Commission** 88:14
**communicate** 15:23
**communicated** 43:16
  44:8
**communication** 79:8
**communications**
  16:3 79:11
**Community** 73:5
**companies** 79:13
**company** 8:19,23,24
  45:21 46:4,15 78:7
  78:8,10,16,19,22
  79:6,11,14
**company's** 8:14
**comparable** 83:21
**compartment** 18:24
**complaint** 4:20 75:17
  75:24
**complaints** 26:11
**complete** 89:8
**compliance** 77:9
**Composite** 4:19
  71:10
**computer** 14:19
  61:11
**concluded** 86:20
**conclusion** 91:6
**condition** 48:16
**conducted** 79:13
**Congrats** 9:17
**connected** 89:13
**consider** 74:25 75:4
**considered** 66:6
**construction** 22:22
**constructive** 75:25
  76:4
**consumers** 17:7,14
**contact** 74:12,15,19
**content** 20:4
**continue** 15:15 54:21
**control** 8:8,10,15,16
  8:17
**convenience** 91:8
**conversation** 23:21
  23:24
**conversations** 24:3

**cook** 52:8
**copies** 15:2,7 18:20
**copy** 13:20 14:5,7,7,8
  14:9,10,12,23 15:4
  18:2,6,9 27:23 28:1
  28:7 30:13,18,19
  30:22 31:1,3,8 46:3
  46:7,11 69:9 71:22
  71:24,25 77:24
  78:3 91:10,11,11
**Coral** 3:9,14
**corner** 84:18
**CORPORATION**
  1:8,10,17
**correct** 11:9 12:10
  23:24 26:22 36:7
  54:4,7 55:14 58:4
  63:25 69:18 70:13
  73:22,25 75:7 76:8
  83:9,10 85:19
**corrected** 81:9
**correcting** 65:21
**cosign** 33:9
**cosigned** 10:25
**cost** 59:21
**costs** 60:2 61:2 67:4,4
  67:7
**counsel** 2:2 4:25 5:2
  6:6 14:24 35:21
  72:6 87:3 89:11,13
**count** 30:3
**county** 7:15,17,18
  81:6,7,13,14 88:2
  89:2
**couple** 11:19 37:11
  37:13,25 79:22
  84:7
**course** 42:9 81:18
**court** 1:1 35:21 36:1
  48:13 72:6 76:10
  76:13,15,18 86:12
  86:15,18 88:13
  89:4,21
**cover** 43:20 61:9,17
**covered** 9:8 59:23,23
**covering** 23:20
**CROSS-EXAMIN...**
  4:3,4 80:15 82:22
**Crosstrek** 10:11
  17:23
**currently** 7:13 18:4
**customer** 43:24 44:2
  44:4

**D**

**D/B/A** 1:7,9,13,17
**dad** 25:21,25 26:4
**daily** 52:1,25
**damages** 61:7 62:3,4
  62:7 70:20,23,24
**dangerous** 63:22
**dashboard** 24:19
  25:2 26:16,21 35:6
  36:5,6 53:3,7
**date** 2:4 14:1,4 53:18
  59:15 84:18 90:18
  90:20 91:12,17
**DATED** 89:16
**day** 21:24 78:15
**days** 52:15,17 63:19
  91:12
**De** 3:8
**dealer** 19:6 61:6
**dealership** 19:24
  20:22 21:12,17
  25:13 30:1,3,4,8,11
  46:2 57:10 58:19
  74:23 75:1 77:8,13
  83:5
**dealerships** 21:5,7
  75:5
**dealt** 59:12
**decide** 55:18
**decided** 55:12
**decision** 49:22 59:22
**defendant** 1:18 3:11
  76:2
**Defendant/Third-...**
  5:3
**defendants** 1:11 57:9
  90:3 91:5
**Depends** 20:10
**deponent** 87:6
**deposed** 5:16,19
**deposition** 2:1 5:1
  37:3,6,10 44:25
  61:24 71:20 75:21
  86:20 87:6 89:6
  90:1 91:6,7
**depreciation** 49:10
**describe** 17:16 37:15
  41:6 43:1
**description** 4:12,23
  43:20
**despite** 6:3 63:8
  75:25
**deteriorate** 49:2

**determining** 49:10
**die** 56:8
**different** 53:15
**diploma** 7:22
**DIRECT** 4:2 5:10
**disclosed** 76:3
**Disclosure** 4:15 34:8
**disclosures** 4:17 61:9
  61:13,19
**discrepancy** 12:13,16
  12:19 13:7 22:16
  24:6 35:1 46:21
  67:2 74:11,13,16
  74:20 76:22 77:1
  83:18
**discuss** 74:18
**disliked** 26:14
**DISTRICT** 1:1,1
**document** 18:23
  31:22 32:1,13,15
  32:21 33:7 34:10
  34:15,16,18,22,23
  35:7 36:16,18,20
  36:23,25 44:24
  62:2
**documents** 14:21
  17:24 18:8,20 20:1
  20:8,14 25:4 26:18
  27:5 34:3 37:2,5,7
  37:9,18 42:9,11,15
  43:12 61:23 75:20
**doing** 8:8,9 21:4
  65:18 82:12
**double** 85:24
**drivable** 51:18,20
**drive** 24:17 25:9,11
  26:10,12,13 49:24
  50:7,12,16,17,19
  51:3,4,7,14,16 53:9
  56:9 63:5,8
**driven** 49:1
**driving** 24:20 35:2,3
  50:2 51:24 52:1,21
  53:17 64:7
**drove** 25:7,8,10 26:4
  26:10 50:13,13,14
  51:22 52:23
**drugs** 33:15,17
**duly** 5:7 88:6

**E**

**E-sign** 34:21
**earliest** 91:8

**early** 22:24
**education** 7:21
**either** 6:9 39:21
**electronic** 34:25
**electronically** 34:3
  34:23
**em** 37:23 38:1 40:8
**employed** 52:19
**employee** 89:11,12
**employment** 52:18
**entail** 7:25
**entire** 85:18
**equipment** 41:11,13
**errata** 4:8 90:1 91:11
**Especially** 20:15
**Espresso** 23:2
**ESQUIRE** 3:2,7,12
  91:2
**ESS** 8:23
**et** 31:25 90:3 91:5
**everybody** 47:24
  86:11
**exact** 13:25 14:7,9,11
  15:22 24:23 41:17
  50:10 53:18 62:21
**exactly** 38:13,16
  39:14 54:19 84:11
**EXAMINATION**
  4:2 5:10
**examined** 5:8
**examples** 79:18
**excess** 76:1
**executed** 42:8
**exhibit** 4:23 31:13,13
  31:15,17 34:8,12
  36:10,13 38:2
  61:12,15 71:8,11
  71:13 74:8 75:16
  75:18 77:24 78:1
  84:13,14,16
**exhibits** 4:12,25
  37:11 86:13
**exist** 16:8
**exists** 81:19
**expect** 28:1,12 45:8
  61:1
**expectancy** 45:14
**expected** 28:4 46:14
**expensive** 49:14
  60:11
**experience** 47:6,10
**experienced** 62:9
**expert** 44:15

Expires 88:14
explain 11:13 14:10
extra 55:8

**F**

F-150 10:10,16,20
    11:8,16,18 12:4,9
    12:13,17,22 13:23
    15:16,19,25 16:16
    16:20 17:3 20:23
    21:1,10,11 22:2,6
    22:10,13,14,18
    24:7,20 25:3,18
    26:2,5,9,16,22,25
    27:7,24 28:2,2
    30:14,18,23 31:1,4
    31:9 32:16,21 33:1
    33:6,10 34:4,19
    35:2,6 36:6 38:14
    38:18,23 39:4,8,12
    40:1,4,6 41:1,3
    42:16,21,25 43:5
    45:5,10,16 46:8,11
    46:23 47:7 49:21
    50:7,20 51:14,23
    52:24 53:3,7,9,17
    53:25 54:3,10,11
    54:14,20 55:7,13
    55:18,23 56:6,13
    56:24 57:3,19 59:1
    63:2,5,8,12,14,18
    64:24 65:1,3,11
    67:2,13 72:16,19
    72:22,24 74:11
    76:23 77:2 78:9
    79:14,24 80:25
    81:3 82:4,8,14 83:8
F-150's 80:22
face 10:14
Facebook 13:17,21
    13:24 15:11,24
    16:6 47:8 83:25
facility 52:6,9,13,16
    52:19,22 65:23
fact 44:12
factor 19:20
facts 39:19
factual 77:18
failed 77:13
fair 9:10
Falls 7:4
familiar 11:11 34:17
    42:22

familiarity 11:12
    17:5
familiarized 5:22
family 9:25 13:11
    43:4 74:18
fan 19:22
far 52:9
faster 62:1
father 10:1 29:21,24
FAX 3:3,9,14
February 18:14,21
Federal 61:13,20
    69:2 70:3
feel 51:11,13 59:6
fees 68:25 69:3,8
feign 77:9
FEYGIN 3:2 4:4
    6:21 17:9 22:24
    23:4,7 28:14 29:12
    30:19 31:5 35:13
    47:25 68:4,12,19
    69:2,13,19 80:10
    80:12 82:20,23
    84:12,18,23 86:5,7
    91:2
filing 30:16 70:9 87:6
fill 67:14
finance 28:6,23 45:5
financial 1:9 49:21
    49:25
financially 75:13
    89:14
financing 18:4 28:4
    28:11 38:14,18,20
    38:23 45:21 46:4
    46:15
find 13:22 26:13
fine 16:11 18:25 23:5
    35:23 47:23 71:5
finished 38:7
first 11:5,7,25 14:14
    20:17,18 28:3
    31:13 42:7 48:7
    57:7,20,21,25
    61:18
fit 41:8
five 41:18 62:25
fix 61:11
Florida 1:1,8 2:7 3:3
    3:9,14 5:5 7:2,3,7
    7:10,11,13,19 8:3
    8:12 51:4,5,14,19
    53:19,25 54:4,5,6

54:12,15,21,22
    55:19 81:7 88:2,13
    89:2 91:3
focus 77:17
follow-ups 82:21
follows 5:9
Ford 1:16,17 3:11
    10:10 62:10
FOREIGN 1:10,17
forgot 80:13
form 17:9 52:18 86:4
forward 10:20 44:23
    91:11
found 13:4 85:3
four 8:5
franchise 19:6
Frank- 41:22
Franklyn 41:21,22
    44:10
Friendship 13:10
FS 1:7,12 2:3 3:16
    4:12 20:17,18
    36:11 41:24 42:3,7
    48:6 57:7 61:6 90:3
    91:4
FS- 34:10
FSIA000018 34:11
FSIA000052 31:18
further 80:9 86:7
    89:10
furtherance 62:11
future 27:16 49:11

**G**

Gables 3:9,14
Gabriel 1:3 2:1 3:5
    4:1 5:1,6 90:2,3
    91:4
gallon 12:7,7 51:9
gas 19:13 67:14
generally 17:7,14
    37:21
getting 52:25
gift 39:4,6
give 10:12 15:22
    18:22 31:16 61:10
    84:8
given 91:6
glove 18:24
go 5:21 13:1 21:17
    25:13,17,22 61:9
    62:1 63:19 71:4
    72:8 84:21

goes 48:22 68:19
going 10:19,20 21:17
    21:20 22:22 31:13
    31:21 34:7,14,15
    35:10,11,12,13,14
    35:16 36:10 41:20
    44:20,23 46:3
    50:22 51:1 57:5
    61:17 65:16 71:4,8
    71:10 75:16 77:4
    84:12,12,13,21
    85:6,8
gonna 36:15 45:17
    46:17 49:13 61:9
    71:16 86:14
good 5:12 27:19 30:6
    42:5 57:18 58:25
    59:7
Google 21:2,2
gotten 18:23 55:20
    74:14
graduate 50:4,4
granting 32:19
great 6:18 7:5 9:3
    81:15
grip 63:24 64:8
groceries 53:1
guess 22:21
guessing 71:2
guys 23:8 56:5,9

**H**

Haddon 1:3 2:1 3:5
    4:1 5:1,6,12,13,13
    5:14,15,16 6:24
    9:13 23:11 31:21
    32:12,23 33:12
    34:14,16 35:18
    36:15,18 38:10,17
    39:15,22 44:10
    45:5 46:24 47:3,6
    48:5 67:19 69:15
    71:15 72:12 74:8
    75:22 76:5 77:7,12
    78:3,17 79:23
    80:17 81:23 82:24
    84:24 88:5 90:2,3
    91:4
half 47:1,2 57:20,21
    57:25 58:6
hand 88:7
handwriting 34:3,22
    81:10

handwritten 33:21
    33:24
happen 49:12
happened 13:3 54:19
Harrison 3:2 91:2
hate 22:24
haul 41:8
head 29:4 40:9,17
    54:18 60:6 67:11
    79:22
hear 45:12
heard 20:19
hearing 55:17
heels 80:19
held 9:7
HHS 88:14
Hi 80:17
High 7:22
higher 47:4 48:25
highest 7:21
highlighted 48:5,9
Hill 8:3,12
history 17:17,18
hitting 10:14
Hmm 58:14 62:23
Hollywood 3:3 91:3
Home 31:19
Honda 75:3,5
honest 57:11,13,15
hospital 8:1,2,3,13
hour 47:18 65:24
hours 58:11,18,19
    59:10 66:11
house 52:12 54:23
    56:3
household 10:4 29:16
    41:1 47:16 68:11

**I**

I/we 32:5
Idaho 7:4,4 49:24
    50:2,8,12,14,16,18
    50:19,25 51:4,14
    51:22,24 54:5,6,12
    54:15,20 55:7,19
    65:19,20,22
idea 15:13 33:7,8
    53:20 62:22 70:1,2
    70:15
IDENTIFICATION
    4:13
identified 84:20
impact 75:12

inaccurate 62:12
   77:14
inaudible 75:9
incident 58:22,23
   59:4
include 9:6 17:18
includes 71:11
income 62:10 65:14
   66:17
indicated 91:6
indicating 32:4 38:6
   42:6 45:4 46:19,20
   61:18
indicator 48:12,14
   49:3
individual 1:4 3:5
   10:25 11:3 90:3
   91:4
individuals 9:24 10:3
   41:7,16
induce 39:16,19
Initial 61:13
inside 24:14
inspect 24:8,14 64:13
   80:22 82:8
inspected 64:16,17
   64:19 65:6 80:23
   81:17
inspecting 65:10
inspection 24:13
instance 59:6
instructing 68:14
instructions 5:21
insurance 39:24
   53:13 56:24 57:2
   67:3,5
intend 44:12,16
intent 82:3,7
intentionally 77:13
   77:16
interaction 57:24
interest 19:9
interested 89:14
interrogatories 4:16
   36:12 42:8 48:7
   57:7
interrogatory 38:4
   38:10 44:18,21
   45:1 48:6 57:6
   59:19 61:5
interrupt 22:24
introduce 44:13,16
Investments 1:7,12

2:3 3:16 20:18
   41:24 42:3,7 61:6
   90:3 91:5
Investments' 4:12
   36:11 48:6 57:7
invoice 53:24 72:12
   72:15 73:4,9,25
   74:2,7
invoices 4:18 71:11
   71:17,19,22 74:8
involved 40:7
issue 6:7 10:16 74:13
   74:16

_____

J

January 88:14
Jessica 2:6 5:4 88:13
   89:4,21
job 12:8,10 65:18
   69:11
Jose 3:12 47:18
Josh 35:15
josh@jfeyginesq.c...
   3:4 91:3
Joshua 3:2 6:19
   68:24 91:2
jperalta@atllp.com
   3:15
judge 69:11
judge's 69:6
July 2:4 5:4 88:6
Junior 43:19 44:11

_____

K

keep 28:25
keeps 45:21
kicking 23:3
kind 55:2 56:5
kitchen 66:14
knew 77:1
know 5:16,23 6:2,4,9
   6:11,12,14,14
   10:20 12:12,16,19
   15:3 16:12 17:7,13
   18:11 19:2 20:18
   20:20 21:17,23
   22:1,4 23:21 26:8
   27:4,6,11 30:25
   31:3,8,10,24 37:21
   38:4,9,12 39:11,14
   39:25 40:2,3,7
   41:15,22 42:2,11
   44:12,14,15,17

45:2,23,25 47:20
   48:17,21,23 49:3,5
   49:7 53:2,18,20
   55:2 57:16,16 60:4
   60:16 61:7 62:3
   63:1,22 64:6 65:8
   67:9,11 69:24 70:7
   70:8,10,11,17,19
   70:21,22 71:1
   72:18 73:11,14,15
   73:19,21,24 74:3,5
   75:3,9,11,12,14
   76:4,7,10 77:11
   79:6 80:21 82:11
   85:11
Knowing 36:5
knowledge 16:22,24
   17:7,13 27:9 29:3,9
   35:5 38:13,16,16
   39:14 70:4,18,19
   74:22
known 46:20
knows 74:17

_____

L

Lakes 74:3
Land 74:2
Large 2:7 5:5
law 69:2
lawsuit 30:16 56:12
   58:23 59:5 62:8
   66:24 67:22 68:2
   69:17 70:9,12
   75:12,17
leading 62:14
leaking 40:11 59:24
   63:6
learn 5:24 20:17,25
   58:12 64:5
learned 74:10
leave 29:6
led 85:5
left 64:14 65:4 84:18
legally 82:24
Leon 3:8
let's 10:24 38:3 44:23
   53:22 71:6 83:15
letter 4:9 91:7,12,14
level 7:21
license 58:7,12,17,20
   59:5,10,13,16
life 49:22
likes 49:7

line 42:6 46:19 90:4
listed 38:10
literally 14:19
little 35:22 46:25
live 7:13 50:25
living 7:6 52:5,9,13
   52:16,19,22 65:23
LLC 1:9,16
LLP 3:13
located 7:17 55:25
long 7:6 8:4,9 9:4,15
   13:23 25:11 26:13
   32:18 35:11 58:16
longer 49:1
look 11:20,21,21 12:1
   12:22,22 17:17
   24:19 27:3,7 31:23
   32:1 36:17 38:3
   85:7
looked 12:20 14:13
   14:15 19:22 21:12
   81:19 82:4,4
looking 11:16,17,18
   21:7,8 59:18 84:1
looks 33:11 34:1,17
   34:25 73:15 78:25
   79:4
loss 50:1 62:10 65:13
   66:17
lost 62:8 67:1
low 12:8 51:9 83:16
lowball 83:14
Luc 1:3 2:1 3:5 4:1
   5:1,6 88:5 90:2,3
   91:4

_____

M

Madam 86:12
maintenance 17:19
   56:6 59:21 60:2,5,9
   61:2
majority 29:10
MANATEE 88:2
   89:2
Map 21:2
Maria 32:23 38:10
   38:13,17 39:15,22
   44:10 47:3 67:19
   74:8 81:23
mark 36:10 71:10
   75:16 77:23 86:14
marked 31:13,15,17
   34:10,12 36:13

61:15 71:13 74:7
   75:18 78:1 84:16
market 83:21,23
Marketplace 13:17
   13:21,24 15:11,24
   47:8 83:25
married 9:13,15
match 25:4
matched 26:18 27:4
material 39:19
McCombs 1:16,17
   3:11 80:18
mean 11:18 12:6
   14:10,11,13,18,25
   20:3 30:2 43:23
   44:4 45:25 48:17
   48:22 49:5,6 56:19
   57:15,22 64:4,10
   67:14 75:2 79:2
means 43:2 49:1 62:4
   76:4,7,11
mechanic 83:1
medications 33:12
medium 79:16
member 13:11
members 29:16 43:4
   47:16
message 79:15
messages 4:21 77:24
   78:4
middle 1:1 6:13
mileage 12:12,16,19
   13:7 17:20 19:13
   22:13,16,18 24:6
   24:19,22,25 25:2,4
   26:15,18,21 27:4
   35:2,6 36:5 46:20
   47:4 48:12,25 49:9
   53:2,7 57:10 67:2
   74:11,20 76:1,3,3
   76:22 77:1 78:13
   83:17
miles 12:7,7 36:4
   49:13,15 51:9
   52:12 60:13,16,19
   61:3 76:1
mind 32:3 48:8
minutes 6:15,15
   25:12 47:23 52:11
   72:9
missed 63:12
misstates 28:14
mistake 32:6

Mobile 31:19
model 84:1
mom 54:1 56:15,17
    56:25 57:2 68:8
moment 24:1 51:13
    51:17 53:3,4 71:24
    82:2 86:17
Monday 2:4 5:3
money 12:10 40:25
    62:7 66:19,23 67:1
    67:24 68:1,7,8 70:5
    70:8
months 8:5
morning 5:12 23:2
mother 10:1 29:21
    32:24 33:9 38:12
    39:7 40:19,22
mother's 33:24
Motor 31:19
mouth 16:25
move 45:2
muffler 40:14 60:1
    60:20
mute 80:13

**N**
name 8:14 13:8
    20:19 40:8 79:6
necessary 91:11
need 6:11,15 23:18
    27:5 50:16 59:25
    72:6 85:11
needed 40:14 51:10
    51:17 54:10 59:25
    60:1,10 63:2,21,23
    64:3,6 65:15 83:18
needs 60:13,16,20
never 29:21 45:18
    55:13 60:10,24
    82:12
new 60:13 72:21
Nicklaus 3:8
noises 22:21
Nope 26:3
normal 52:25
normally 41:8
north 7:19
Notary 2:7 5:5 88:13
    90:20
note 30:6
notes 89:8
notice 2:2 5:2 75:25
    76:4,7,12,13,22

number 13:1 15:22
    22:4 24:22,23 38:4
    41:17 44:18 48:6
    50:10 62:21,22
    78:6

**O**
O' 74:2
Oak 8:3,12
OATH 4:6 88:1
object 6:2
objected 28:21
objection 17:9 28:14
    29:12 30:19 31:5
    68:12 69:19 86:4
objections 6:3
obligation 40:21 57:1
observation 81:18
obtain 12:25 32:20
    63:24
occasionally 41:4,5
    41:16
October 88:8 89:16
odometer 4:15 34:8
    35:19 36:4 70:3,17
    77:14 79:24 80:22
    80:24 82:4,8
offer 83:14 84:8
offered 73:1 79:2,5
offering 16:14
offers 83:13,16
office 22:23 91:8,14
official 88:7
Ogden 19:5
oh 7:5 9:3 24:12
    27:15 30:20 42:5
    52:3 58:23 60:25
    62:18
Ohio 52:23 54:3
    65:16,18
oil 73:14,19,24
okay 5:21 6:15,17,22
    7:14,21 8:2,6,9,22
    9:6,10,13 10:3,16
    10:19 11:2,11,23
    12:9,12,21 13:3,8
    13:20,23 14:9,18
    15:9,18,21,23 16:2
    16:5,18,24 17:1,16
    17:22,22 18:5,8,25
    19:4,8,16 20:8,13
    20:17,22 21:20
    22:4,8,17,20 23:15

23:20 24:7,14,25
    25:7,10,13,17,22
    25:25 26:4,7,9,15
    26:20 27:6 28:20
    29:5 30:10,13 31:3
    31:11,17 32:19
    33:12,17,19,24
    34:2,6,7,21 35:1
    36:9,15 37:2,14
    38:3,22 39:6,10,14
    39:18,22 40:10,18
    41:1,5,15,20 42:20
    42:24 43:14,22
    44:4,6,18,22 46:1
    46:14,19 47:24
    48:1,24 49:8,16,20
    50:7,15,19,25 51:3
    51:12,16,21 52:2
    52:21 53:2,9,24
    54:2,9,14,17,25
    55:12,16,22 56:5,9
    57:17,25 58:9 59:9
    59:18 60:7,12,25
    61:5,12 62:1,6
    63:14 64:2 65:6,24
    65:24 66:5,15,19
    66:19 67:12,18,21
    68:10 69:23 70:4
    70:15,22,25 71:6
    72:5,18,21 73:2,9
    73:18,21 74:2,5,10
    74:18 76:19 77:6
    77:22,23 78:12,25
    79:6,16,20,23
    81:15,22 82:2,3,10
    82:18 83:11,24
    84:9 85:4,6,22 86:6
    86:7,10,18
old 6:24
omissions 39:19
once 50:9,13 54:22
    55:18 62:24
ones 9:8 40:10
online 13:14 50:22
opportunity 5:23
order 12:9 17:24
    53:25 65:11 70:5,9
    74:20 75:21 77:9
ordered 91:10
ordering 86:15
outright 84:6
outside 24:8
overall 48:15

owned 55:3 75:10
owner 41:24 42:2

**P**
P.A 3:8
p.m 2:5 86:20
Page 4:12,23 85:8,9
    85:10,12,13,14,15
    85:16,17 90:4
Pages 2:25
paid 29:1 38:19,21
    39:7 40:18 46:23
    47:1,2,3 56:21,23
    66:23 67:3,10,12
    67:14 70:8,11,16
    70:17,19,22 72:18
    74:8
papers 37:13 39:24
paperwork 38:2
paragraph 32:4
    35:24 61:17 75:24
    77:5
paralegal 86:14
parents 54:23 55:4,8
parents' 54:23 56:4
parked 81:3
part 42:7 46:17
    69:11
participated 11:7
particular 85:7
parties 87:4 89:11
parties' 89:13
parts 49:1 60:16
party 91:10
patient 7:24 8:7
paused 24:1
pay 12:21 19:8 38:22
    39:6 40:24 46:22
    53:24 61:1 65:24
    67:21 69:24 70:4
    83:19
paying 68:11,17
payment 19:10,11
    38:20,22 67:5,24
    69:17
payments 39:11
    40:22 57:2
penalty 76:2
pending 47:20
people 22:4 66:13
people's 66:12
Peralta 3:12 4:2 5:11
    6:19,22,23 10:12

10:15 17:12 22:21
    23:3,5,10 28:16
    29:13 30:20,21
    31:6,7,12,20 34:7
    34:13 35:14,17,23
    36:2,10,14 47:23
    48:4,15,19 59:3
    61:10,16 68:5,16
    68:24 69:10,14,20
    71:8,14 72:8,11
    75:16,19 76:12,14
    76:16,19,20 77:23
    78:2 80:9 86:4,10
    86:16,17,19
Perfect 5:15 32:9
perjury 76:2
permission 81:18
person 9:20,23 10:22
    18:17 21:21,23
    22:9 50:23,24
personally 42:14,21
    43:9 54:1 68:7
phone 78:6
photos 78:9,22,24
physical 18:6 80:25
physically 80:21 82:4
    82:5,8
pictures 78:13
piece 15:4
place 25:23 72:17,25
    80:20
placed 65:3 72:21
plaintiff 1:5,14 2:2
    3:5,16 4:12 5:3
    36:11 42:10 71:12
    77:24 90:3 91:4
plaintiff's 61:13
    84:13,14,21 86:8
PLAINTIFF/HAD...
    4:23
plan 56:13
plate 58:8,12,17,20
    59:5,10,13,16
playing 19:1
plays 49:9
please 31:23 32:3
    36:17 38:3 44:18
    77:5 91:14
point 69:4 73:12
points 62:13,15
Ponce 3:8
positions 9:8
positive 57:24

**possess** 71:25
**possession** 39:23,25
**possible** 22:25 91:12
**post** 13:13,23
**posting** 13:20
**potential** 11:22 12:1
13:3 14:6 15:5,19
15:24 16:20 17:2,6
85:23
**power** 19:23 31:18
33:20
**Powerhouse** 1:8,13
20:20,22,25 21:14
21:20 22:2,5,9,14
23:20,22 25:23
26:25 31:18 32:16
32:20 33:10 34:4
35:5,19 36:3 39:16
44:4 45:6,8,14 46:7
46:12 57:9,13,18
58:2,25 59:6,9,12
59:16 61:6 66:20
66:24 67:21 69:24
70:4,8,11,16,17,19
74:12,15,20,22,25
75:9,13 76:21 77:1
**practice** 27:19
**prepare** 37:3,5,9
44:24 61:24 71:19
75:21
**presence** 74:19
**present** 11:2 32:25
45:9
**presented** 35:7
**pretty** 7:9,10 38:24
38:24
**prevent** 33:13 70:9
**previous** 17:17
**previously** 83:7
84:24
**price** 47:1,3 83:20
**primary** 48:12,13
49:3 52:1
**privilege** 68:13,17,20
69:1
**privileged** 68:23
**probably** 13:22,25
41:19 46:25,25
**problem** 69:12
**Procedure** 61:14,20
**proceedings** 9:5
**process** 5:22 46:18
78:14

**produce** 77:25
**produced** 71:12
**prompt** 91:15
**prompted** 27:3
**provide** 19:13 36:20
36:22 45:14 58:25
59:7 79:18
**provided** 14:24 30:18
30:22 31:1 57:17
58:2
**providing** 56:5
**Public** 2:7 5:5 88:13
90:20
**pull** 17:6 84:12,25
85:5,23
**pulled** 14:2,6 17:2
85:2,22
**purchase** 10:25 11:8
17:25 18:9,17,20
19:4 20:11 21:6,8
22:2,5,9,13 25:5,17
28:25 33:9 38:14
38:17 39:4,7,11
42:25 45:10 46:21
49:18,21 59:22
61:2 65:11
**purchased** 10:7 11:3
17:22 18:11 19:16
19:24 20:2,23 24:7
24:10 25:3 26:25
27:13 29:16,21,25
30:11 32:16,25
33:6 34:4,19 45:6
45:15 46:7,12
57:19,23,25 65:5
**purchasing** 20:10
21:1 26:1,16 27:7
27:10,20,24 28:2,8
29:11 42:15,21
43:4 45:18 49:17
**purpose** 41:6
**purposes** 51:23 52:23
62:11 66:16
**pursuant** 2:2 5:2
61:13,19
**put** 13:1 19:10 38:2
38:20 84:5
**putting** 54:18

_____
**Q**
**quality** 8:8,10,15,16
8:17 73:6,7,8
**question** 6:10,13

10:23 12:15 17:11
19:3 26:20 28:3
29:7 30:5 32:8
33:19 38:15,24
39:18 44:20 45:3
45:11 47:21 64:25
68:15 70:18 76:24
77:17 82:6
**questioning** 68:21
**questions** 5:25 6:1,8
23:12 36:22 37:24
44:25 80:9,19
**quick** 22:25
**quickie** 47:22
**quickly** 80:14

_____
**R**
**Rackin** 43:16
**Raskin** 43:7,9,12,14
43:16 44:11
**ratio** 19:14
**read** 4:9 20:8,12,13
32:7 38:3 42:4
44:18 45:1 57:5
71:23 73:5,11 77:4
77:5 91:7,10
**readable** 71:22,25
**reading** 20:1,4 32:3
32:10 35:24 38:7
48:8 53:6,8 77:14
86:9 87:5 91:8,13
91:16
**reads** 35:20 36:4
**ready** 35:15 91:7
**real** 80:14
**realize** 64:2
**really** 28:9 56:15
66:3
**reason** 5:25 46:6 57:8
58:24 63:23 90:4
**reasonable** 61:1
**reasons** 19:17,18,21
63:1,11 84:10,11
**recall** 19:23 22:7
23:11,21 24:22,23
30:24 32:15 33:21
34:2 37:14 42:14
42:20,23,24 43:3,6
50:10 51:12 52:14
54:13 55:17 59:12
60:5 62:21 63:13
67:25 68:1 79:7
**receipts** 39:23 40:3,5

**receive** 17:23 28:1
29:1 67:24 68:7
69:9,16 83:13
**received** 31:8 68:8
**receiving** 68:1
**recess** 23:9 48:3
72:10
**recognize** 36:18,25
61:19 71:17 78:3
**record** 16:2 79:10
89:8
**recreational** 33:15
**rectangle** 35:15
**reduced** 64:23
**reduction** 65:2
**refer** 10:19
**referred** 78:19
**referring** 42:12 60:3
**refers** 61:8 62:7
**reflects** 76:3
**refuse** 84:6
**regard** 59:13 68:2
**regarding** 38:13
57:10
**regards** 70:12
**registered** 53:12
**reimburse** 40:21
57:1
**related** 13:10
**relative** 89:10,12
**relevant** 69:3,4,5,8
**rely** 26:15,21
**relying** 35:5 80:2
**remember** 9:5 11:24
12:24 13:2,25 14:2
14:4 15:12,17 18:1
18:7,10,19 19:25
20:1,5 21:19,25
22:3,8,12,15 23:13
23:23 24:2,4 30:15
30:17 31:2 32:17
33:2,5 34:5,18,24
36:24 37:25 40:10
40:16 41:17 42:13
42:17 43:13,18
44:9 51:15 59:14
59:15,17 65:9
73:13 77:21 78:7
79:21
**remind** 84:3
**remote** 2:1 3:1 5:1
87:5 89:6 91:6,6
**remotely** 88:5

**repair** 51:12 65:15
67:4,7,8
**repaired** 60:11 63:15
63:18
**repairs** 40:5,7,18,22
40:24 51:10 54:10
54:11,14 59:23
60:2,5,9 61:1 62:14
83:18
**repeat** 12:15 17:11
38:15 45:11 64:25
76:24 82:6
**rephrase** 10:23 30:5
**replace** 63:23 64:6
72:15,19
**replaced** 40:12,13,15
59:25,25 60:1,17
60:20 63:9,21 64:3
**replacement** 63:3
**replacements** 63:4
**report** 12:14,18,22
12:25 13:4 14:3,5
14:20,23 15:4,4,16
16:21,22 17:1,2,8
26:25 27:10,12,17
27:20 29:6,10
30:10 74:1 79:1
80:1,3 84:25 85:7
85:19,22,23 89:6
**REPORTED** 2:6
**reporter** 4:7 35:21
36:1 48:13 59:2
72:6 76:10,13,15
76:18 86:12,15,18
88:13 89:1,4,21
**reports** 11:11 17:6,14
**represent** 62:6 80:18
**representation** 86:1
**representations**
39:15 42:24 43:1
57:10
**representative** 57:11
**representatives**
57:13
**request** 16:12 26:24
27:23 30:10 46:11
66:6
**requesting** 68:24
**requirements** 77:10
**resale** 47:11,14 49:11
**RESFSRFP185**
84:21
**reside** 7:11,12 9:20

resided 52:10
resolve 6:6 74:12,16
  74:20
respect 38:17 39:15
  40:3,22 57:2 59:1,4
  67:13,22 69:17
  70:16 77:2
respective 87:4
respond 6:3,4 78:12
responding 6:5
response 37:13 38:9
  48:6 76:14 80:11
responses 37:24
restroom 23:1
retained 4:25
retainer 68:20 69:9
return 91:14
review 37:5,9 71:19
reviewed 37:3,12,13
  44:24 61:23 75:20
Reyes 42:18,20,25
  44:11
RFP 84:22
right 16:11 31:12
  32:20 34:9 41:20
  61:5 71:7 75:15
  81:3,9 82:20
right-hand 84:19
Road 81:6,7,13,14
Rodriguez 43:19
  44:11
role 49:10
rollbacks 78:13
rolled 79:25
Rule 61:8,20
Rules 61:14

--------

S

safe 19:1
safety 19:19
sale 13:13,24 39:16
  39:19,23 42:10
  82:17
salesperson 42:19
  83:3
satisfied 26:9 58:1
satisfy 70:20,23
save 12:10
saw 11:25 21:16 25:2
  47:5 79:4
saying 23:23 48:21
  49:9 62:9 68:16
says 34:21 35:18 36:1

38:9 39:22 42:6,8
  72:12 73:16
scan 34:15
school 7:22
screen 14:20 34:9
  37:12
screenshot 14:19
screenshots 14:14,17
  14:18,21
scroll 31:21 34:14
  36:15 71:16 85:6
scrolling 71:15
seal 88:7
search 16:7
searches 21:2,4
searching 12:14,17
  12:23 15:5 21:3,6
  49:18
second 10:12 31:16
  32:3 35:10 49:8
  58:6 61:10 71:7
  73:4 82:13
sedan 41:9
see 6:6 16:7 21:10,11
  27:5 30:13,16
  31:24 45:17,18,22
  46:3,15 49:13
  53:22 54:18 71:23
  84:15
seeing 84:15
seeking 82:14
seen 11:5 17:1 34:16
  49:12,16 53:6
  60:10,24 85:24
  86:2
select 77:13
sell 12:4,9 15:10,15
  16:15 47:7 78:23
  79:14 82:14 83:8
  83:20 84:3
selling 47:6 83:19
sells 78:8,20
send 46:3 78:22,24
  86:12
sending 78:9,13
sense 53:16
sent 37:1 43:12 46:15
  81:17
sentence 35:18 36:1
  49:8 57:5,6
sentences 48:5,8
September 91:1
service 57:18 58:1,25

59:7
services 1:9,10 68:11
set 42:7 48:7 57:7
settle 70:5
shadowed 35:25
share 67:18,18
sheet 4:8 90:1 91:11
shifts 66:2,7,12
ship 53:25
shipped 51:5,18
  53:19 54:3,12,20
  55:19
shipping 54:15
shop 62:14 63:2
short 72:7
should've 61:25
show 31:12 34:7,9
  71:8
showing 72:1
sic 52:23 54:3 64:19
  64:23 65:2,16,18
side 9:25 84:19 86:8
sign 4:9 20:9,14
  34:22,23 91:7,14
signature 32:12 33:3
  33:4,7,22,25 34:25
  77:8 90:18
signed 18:9,20 20:2
  25:4 34:2,24
significant 49:10,21
significantly 46:22
signing 17:24 19:23
  20:14 32:15,21
  34:18 42:14 87:5
  91:9,13,16
similar 79:13
simple 78:14
sir 7:20 8:21 9:14
  10:18 11:1,4,10
  12:3,11 13:12,15
  16:17,23 17:4,21
  18:12,18 19:7,15
  20:16,21,24 21:22
  22:11,19 23:14,17
  23:25 24:18,21
  25:6,19,24 26:6,23
  27:1,8,14,18,22,25
  30:9,12 32:2,14
  33:8,14,16,18,23
  34:1,20 35:4 36:8
  36:19 37:4 39:9,13
  40:23 42:1 43:11
  44:5,7 45:7 46:5,9

47:9,12,15,17
  49:19 50:21 52:20
  53:10 54:8,16
  55:11,15 56:11,22
  57:4 58:3,5 59:8,11
  60:14,18 61:4,22
  63:7,10 64:1,18,21
  65:25 66:8,10,18
  67:20,23 69:22
  70:14 71:18,21
  72:23 74:1,9,14,21
  75:6,8,23 76:6,9
  77:3 78:5,11,21
  79:12 80:8 81:21
  81:24 82:1,25 83:2
  83:4,6,12 85:21
  86:3
six 58:18,19 59:10
six-plus 58:11
sliding 64:11
slipping 64:11
slow 35:22 85:11
slowly 31:21 34:15
small 25:9,10 26:12
  74:22,25
smaller 75:4
snow 63:24 64:8,11
  64:17 65:7
snowing 63:20
sole 49:16
somebody 81:20 82:7
someplace 81:3,19
soon 91:11
sorry 11:5 22:21 23:7
  30:20 31:6,6 32:6
  35:21 36:21 48:13
  51:3 54:17 65:20
  76:10 80:13 81:12
sort 83:13
sounds 32:22 42:22
speak 15:18 22:1
  23:15
speaking 42:20
specialized 47:13
specific 14:14
speculate 73:16
speculation 29:12
spoke 22:5
spoken 41:25 43:9
  44:6
staff 57:18 58:2 59:6
stamping 84:20
start 56:7 64:10

Starting 85:10,12
state 2:7 5:5 35:19
  36:3 46:20 88:2,13
  89:2
stated 57:8
statement 4:15 34:8
  36:7 45:4 48:11
  83:8
states 1:1 75:24
statutory 70:23,24
stay 56:13
stenographic 89:8
stenographically
  89:6
stipulated 87:3
STIPULATIONS
  4:5 87:1
stop 53:17 71:6
stopped 54:2
street 3:2 25:15 91:2
strike 11:6 25:1
  36:21 40:20 43:14
  51:17,22 63:17
  74:5 79:8
stronger 23:19
Strusberg 41:21,22
  41:25 42:8,14
  44:10
Stuart 43:7 44:11
stuff 41:8,10,13
STYLE 90:3
Subaru 10:10 17:23
  18:17 19:5,6,24
  20:2 27:13
subbing 8:24,25
subject 42:10
substitute 9:2,11
suing 66:19
Suite 3:2,8,13 91:2
Sumter 7:18
sun 10:14
supervisor 66:6
sure 14:25 16:6 26:8
  28:9 30:2 35:8
  39:17,21 46:16
  47:25 48:18 53:5
  55:5 56:7 66:21,25
  68:8,9 69:10 72:2,8
  73:19 74:4
suspect 35:1
sworn 5:7 88:6

--------

T

**take** 6:12 22:25 24:17
29:23 31:23 33:12
33:17 35:11 36:17
44:1 45:23,24
47:22 63:14,18
66:1 72:6,9
**taken** 5:1
**talk** 6:5 21:18 41:20
56:17 66:5
**talked** 56:15
**talking** 29:7
**teacher** 9:2,11
**Teasdale** 3:13
**technically** 56:19
85:9
**technician** 7:24 8:7
8:16
**Telephonically** 3:6
**tell** 5:7 22:15,17 24:5
72:3
**telling** 22:12
**Temporarily** 51:2
**tend** 49:1
**Tenenbaum** 2:6 5:5
88:13 89:4,21
**terms** 28:23 53:7
**test** 24:17,20 25:7,9
26:4,10,12 35:2
**testified** 5:9 54:2
83:7 84:10,24
**testifying** 33:13
**testimony** 4:1 28:15
69:16
**text** 4:21 77:24 78:3
79:15
**thank** 9:18 16:14
32:11 38:8 48:2
65:21 76:15 86:11
86:18,19 91:15
**Thanks** 23:8 78:12
**that'd** 80:21
**thereof** 89:9
**thing** 34:14 36:15
**things** 19:2 49:2
52:25 53:1 69:11
**think** 9:9 13:19 28:22
41:14 46:10 47:21
54:17 60:23 70:1
70:16,24,25 72:25
73:15 83:17,23,24
**Third-Party** 1:14,18
2:2 3:11,16
**thought** 28:18,24

45:17,22 46:17
82:12
**three** 52:17 62:25
71:11
**threw** 81:10
**till** 28:25
**time** 2:5 11:5,7,23,25
12:8,13 14:14,15
15:8 25:23 32:18
40:25 44:1 50:17
50:20 51:21 52:10
52:22 53:19 54:24
55:9,20 58:13
64:17,20 65:7 69:4
82:9,15 83:25
**timeline** 54:18
**times** 14:17 41:15,18
62:17,20
**tire** 63:4,24 64:6
72:13,19
**tires** 40:13 59:25
60:13 63:9,21 64:2
64:13,16,24 65:3,7
72:15,19,21,24,25
73:3
**title** 4:14 17:23 18:2
18:6 27:23 28:1,5,7
28:12,23,25 29:1,8
30:13,22 31:9,18
32:21 39:23 40:1
42:9,11 45:9,15,17
45:18,21 46:7,11
52:7 77:9 80:4
81:22,23
**titled** 34:8
**titles** 37:14,16 38:1
**today** 9:8 33:13 37:3
53:3,9 71:20 75:21
**told** 11:20,21 22:8
27:6 71:3 85:2,23
**top** 22:22 40:9,16
60:5 67:11 73:23
79:21 84:18 85:10
85:12,13,14,15,16
85:17
**total** 61:7 67:9
**Toyota** 30:3 75:3,5
**trained** 82:24
**training** 47:13 83:1,3
**transaction** 28:18,22
**transcript** 89:7 91:7
91:10,14
**transfer** 42:9,11,15

**tread** 64:14 65:4
**Tri-State** 72:13,19
**tried** 16:15 83:7
**trim** 64:19,23
**trims** 65:2
**truck** 12:5 24:5 29:1
40:11 49:23,24
51:5 56:20 62:13
67:3,5,15
**trucks** 84:1
**true** 89:8
**trustworthy** 57:11,14
57:15
**truth** 5:7,8,8
**try** 6:9 15:15 62:1
74:16 78:23
**trying** 12:4 15:1,10
44:2 54:17 83:20
84:3
**turbo** 59:24 63:3,5
**turbos** 40:11
**turn** 85:5
**turned** 25:15
**twice** 50:9
**two** 10:1,8 26:19
29:18 37:23 48:5
66:13 78:13

---

**U**

**Uh-huh** 38:11 64:12
72:14 85:25
**um** 21:15 37:20
60:21 63:16 65:12
68:3 73:10 77:15
**unable** 62:10
**uncomfortable** 51:13
**undersigned** 88:4
**understand** 6:8 15:1
48:14 54:18 69:2
69:16
**understanding** 19:12
28:6 32:19 46:2
**understood** 45:20
**UNITED** 1:1
**unpack** 83:15
**upwards** 84:2
**usage** 48:15 55:7
**use** 17:7,14,19 33:15
35:14 41:3 51:23
52:23 54:24 55:12
55:18,21 62:10
64:22 65:1
**uses** 51:22

**usually** 20:8 27:9
48:25

---

**V**

**value** 49:11 83:22,23
**valuing** 47:10,13
**vehicle** 10:16,22,25
11:3,8 15:11,15
16:15 17:19,19,20
17:24,25 18:2,4,6,9
18:11,21 19:4,8,13
19:16 20:11,15
24:8,9,15,17 25:3,5
25:7,11 26:17
27:14,24 28:4,11
28:12,23,25 29:22
31:19 35:3 38:19
38:23 39:20 40:14
42:10 45:19 46:12
46:22 48:25 49:11
51:16,18 53:15
54:9,15,19,22,24
54:25 55:3,6,8,10
55:13,21,22 56:14
57:23 58:1,8 59:22
60:11,12,15,19,24
61:2 64:22 65:5,10
65:11,15 78:23
79:3 81:16,22
83:21,22 84:6
**vehicle's** 48:15 76:1
**vehicles** 10:6 21:6,8
27:10,21 28:7,8
29:11,17,25 30:7
30:11 47:7,11,14
49:17,18 78:8,20
**Vessel** 31:19
**VIN** 13:1
**visually** 24:8
**vs** 1:6,15 90:3 91:4

---

**W**

**wait** 58:16 59:10
69:8
**waiting** 58:11,20
**waive** 91:13,16
**waived** 87:7
**wanna** 18:22
**want** 13:5 16:18 51:7
55:21 69:6 72:3
73:16 74:4 84:7
85:7
**wanted** 12:9 33:19

39:1 45:3 78:24
83:19
**wasn't** 25:12,12
64:14 65:4,4 66:3
73:1
**way** 19:22 28:24 45:2
45:13 47:4 84:22
**we'll** 6:6 56:7 72:9
**we're** 29:7 41:20
59:18 61:9,17
85:17
**weapon** 63:22
**websites** 79:17 82:16
**week** 52:17
**weekend** 63:15
**went** 21:12,23 22:2,5
22:9,13 25:15 58:7
59:15 72:17 85:18
**West** 1:16,17 81:7,13
81:14
**WESTLAKE** 1:9,9
**wife** 9:21
**window** 10:13
**wish** 45:1 66:23
91:10,13,16
**wished** 91:6
**withhold** 6:5
**witness** 17:11 43:8,21
43:23 44:3 48:17
84:17 88:7 89:7
90:2,18
**witnessed** 43:25
**witnesses** 44:12,15
**wondering** 15:3
**word** 16:25
**work** 7:23 8:2,12,22
49:25 51:25 52:2,3
52:15,21 62:14
63:12,19 65:14
66:16
**worked** 28:19,24
52:5 83:5
**working** 8:4 66:13
**works** 28:22
**would've** 49:25
**wouldn't** 39:1 40:8
41:8
**writing** 78:16,20
**wrong** 18:22 24:5
83:9

---

**X**

**Y**

**yard** 56:1,2,2,3,4
**yeah** 7:9,9 16:9 18:16
    23:4,5,25 37:8,19
    37:23 46:1 47:23
    52:4 58:21 60:4
    62:19 63:3 64:10
    73:11 76:16 80:14
    81:4
**year** 8:11 84:1
**year-and-a-half**
    18:15 53:23
**years** 7:8 9:7,11,16
    11:19
**Yep** 84:17

**Z**

**zip** 81:8
**zoom** 31:24,25

**0**

**077464** 88:14

**1**

**1** 2:25 4:14,24 31:14
    31:15,17 84:13,14
    84:16 87:5 88:8
    89:16
**1,050** 78:14 79:2,5
**10** 6:15 49:13 85:17
**10:02** 2:5 5:4
**100,000** 60:13,16,19
    61:3
**11** 48:6 59:19
**11th** 57:6
**12:51** 2:5 86:20
**1200** 3:13
**13** 7:8
**130s** 24:24
**131,636** 36:4 76:1
**14** 61:5
**15** 52:11
**150** 53:8
**1700** 72:20
**18** 84:5,5
**18,000** 15:14
**1930** 3:2 91:2
**194** 84:22

**2**

**2** 4:15 9:11,16 34:8
    34:12 38:4,10 85:8
**20** 84:5

**200** 3:8
**200,000** 49:14
**2012** 10:10,16
**2023** 10:10 17:22
    18:14,21
**2024** 2:4 5:4 88:6,8
    89:16 91:1
**2025** 88:14
**208F** 3:2 91:2
**22** 2:4 5:4 88:6
**228-5674** 3:3
**25** 6:25
**25,000** 84:2
**26** 61:8,19,20
**26(a)(1)(A)** 61:14
**27** 91:1
**28th** 18:14,21

**3**

**3** 4:16 9:11 36:10,13
    85:9
**30** 91:12
**305** 3:9,9,14
**31** 4:14 19:9
**33** 4:15
**33020** 3:3 91:3
**33134** 3:14
**33146** 3:9
**33513** 81:7
**355** 3:13
**36** 4:16 75:24
**37** 77:5
**3775** 81:6,11

**4**

**4** 4:17 9:7 44:18
    61:12,15 85:10
**460-9888** 3:9
**460-9889** 3:9
**4651** 3:8
**48** 81:6,7,14,15

**5**

**5** 4:2,18 6:15 25:12
    47:23 71:9,11,13
    72:9 74:8 85:12
**5-minute** 23:1
**500** 19:11

**6**

**6** 4:20 75:16,18 85:13
**61** 4:17
**675-3605** 3:14

**697-0357** 3:3

**7**

**7** 4:21 77:24 78:1
    85:14
**71** 4:18
**75** 4:20
**77** 4:21
**786** 3:14

**8**

**8** 85:15
**8,799.20** 67:22 69:25
**8/2/22** 84:19
**8:23-cv-00709** 1:2
**80** 4:3
**811-3408** 91:8
**82** 4:4
**822-3700** 3:14
**84** 4:24
**888** 91:8
**89** 4:5

**9**

**9** 85:16 88:14
**90** 4:8
**91** 2:25 4:9
**954** 3:3,3
**98** 4:6
**99** 4:7