Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              MIDDLE DISTRICT OF FLORIDA
 3                     TAMPA DIVISION
 4         Civil Action No.: 8:23-cv-00709-WFJ-SPF
 5   GABRIEL LUC HADDON,
 6        Plaintiff(s),
 7   vs.
 8
 9   FS INVESTMENTS OF AMERICA, INC.,
     d/b/a POWERHOUSE AUTOMOTIVE, a
     Florida corporation, and WESTLAKE
10   SERVICES, LLC, d/b/a WESTLAKE
     FINANCIAL SERVICES, a Foreign
11   corporation,
12        Defendant(s).
13   _____ /
14
15          VIDEOCONFERENCE DEPOSITION OF
                  FRANKLYN STRUSBERG
16            (as corporate representative of
               FS Investments of America, Inc.)
17
18
             Pages 1 through 154
19
20           Tuesday, April 23, 2024
             10:13 a.m. - 1:19 p.m.
21
22
23
           Stenographically Reported By:
24   WANDA D. GOOD, CERTIFIED COURT REPORTER
25
```

Page 2

```
 1   APPEARANCES:
 2
 3
     On behalf of Plaintiff(s)
 4        SUE YOUR DEALER - A LAW FIRM
          JOSHUA FEYGIN, PLLC
 5        P.O. Box 85293 (33008-5293)
          1930 Harrison St., Ste. 208F
 6        Hollywood, Florida   33020
          954.228.5674
 7        BY:  JOSHUA FEYGIN, ESQUIRE (VIA ZOOM)
               Josh@JFeyginEsq.com
 8
 9
     On behalf of Defendant FS Investments of America, Inc.,
10   d/b/a Powerhouse Automotive
          ARMSTRONG TEASDALE, LLP
11        355 Alhambra Cir., Ste. 1250
          Coral Gables, Florida   33134
12        305.371.8809
          BY:  JOSE ARIEL PERALTA, ESQUIRE (VIA ZOOM)
13             jperalta@atllp.com
          KEITH D. SILVERSTEIN, ESQUIRE (VIA ZOOM)
14             keith@silversteinpa.com
15
16   On behalf of Third-Party Defendant McCombs West Ford,
     LLC
17        NICKLAUS & ASSOCIATES, P.A.
          4651 Ponce De Leon Blvd., Ste. 200
18        Coral Gables, Florida   33146
          305.460.9888
19        BY:  NICOLAS TORRES, ESQUIRE (VIA ZOOM)
               nicolast@nicklauslaw.com
20
21
22
23
24
25
```

Page 3

```
 1              INDEX OF PROCEEDINGS
 2
 3
 4   WITNESS:                                    PAGE
 5   FRANKLYN STRUSBERG
 6   DIRECT EXAMINATION BY MR. FEYGIN              5
 7   CROSS-EXAMINATION BY MR. TORRES             104
 8   CROSS-EXAMINATION BY MR. PERALTA            125
 9   REDIRECT EXAMINATION BY MR. FEYGIN          144
10   RECROSS-EXAMINATION BY MR. TORRES           148
11   RECROSS-EXAMINATION BY MR. PERALTA          149
12
13
14                  PLAINTIFF
15
     EXHIBIT            DESCRIPTION              PAGE
16   A    PLTF'S NOTICE OF TAKING CORP. REP DEPO   13
17   B    VEHICLE INFORMATION SHEET               32
18   C    TEXAS CERTIFICATE OF TITLE, FSIA 000020  41
19   D    5/25/20 BUYER'S ORDER FORM              51
20   E    5/25/20 RETAIL INSTALLMENT CONTRACT AND  56
          SECURITY AGREEMENT
21
22   F    5/25/20 ODOMETER DISCLOSURE STATEMENT    61
23   G    5/25/20 APPLICATION FOR CERTIFICATE OF    64
          TITLE WITH/WITHOUT REGISTRATION
24
25
```

Page 4

```
 1                  PLAINTIFF
 2
 3   EXHIBIT            DESCRIPTION              PAGE
 4   H    5/25/20 POWER OF ATTORNEY               67
 5   I    3/6/19 TEXAS CERTIFICATE OF TITLE       73
          SCAN TRANSACTION NUMBER 539994086
 6   J    DEFT FS INVESTMENTS AMENDED AFFIRMATIVE  87
          DEFENSES AND THIRD-PARTY COMPLAINT
 7
 8   K    DEFT FS INVESTMENTS MOTION FOR LEAVE TO   96
          FILE A THIRD-PARTY COMPLAINT AND AMEND
 9        ITS AFFIRMATIVE DEFENSES
10   L    12/21/22 DEMAND FOR VIOLATIONS OF THE    99
          MOTOR VEHICLE AND INFORMATION COST
11        SAVINGS ACT
12   M    12/21/22 FEYGIN/POWERHOUSE AUTOMOTIVE    101
          LETTER W/ATTACHMENTS
13
14
15                   DEFENSE
16   EXHIBIT            DESCRIPTION              PAGE
17   A    FSIA 000011, Bill of Sale from Manheim   136
18
19
20
     (Reporter's Note:  Defendant Exhibit a was not provided
21   for attachment.)
22
23
24
25
```

Page 5

1  Thereupon,
2  the following proceedings began at 10:13 a.m.:
3           THE COURT REPORTER:  Good morning.  My name
4       is Wanda Good.  I am a Florida certified
5       stenographic reporter.
6           Today's date is Tuesday, April 23rd, 2024,
7       and the time is approximately 10:13 a.m.
8           This is the deposition of Frank Strusberg in
9       the matter of Gabriel Luc Haddon versus FS
10      Investments of America, Inc., et. al.
11          This case is venued in the United States
12      District Court, Middle District of Florida, Tampa
13      Division.  The case number is
14      8:23-cv-00709-WFJ-SPF.
15          The attorneys participating in this
16      deposition acknowledge that I am not physically
17      present in the deposition room and that I will be
18      reporting this deposition remotely.  They further
19      acknowledge that in lieu of an oath administered in
20      person I will administer the oath remotely.  This
21      arrangement is pursuant to the Florida Supreme
22      Court Administrative Order Number AOSC20-16.
23          The parties and their counsel consent to the
24      arrangement and waive any objections to this manner
25      of reporting.  Please indicate your agreement by

Page 6

1       stating your name, whom you represent and your
2       agreement on the record starting with the
3       Plaintiff.
4           MR. FEYGIN:  Attorney Joshua Feygin on behalf
5       of the Plaintiff, Gabriel Luc Haddon.  We
6       acknowledge.
7           MR. PERALTA:  Jose Peralta on behalf of -- of
8       the Defendant Powerhouse, and I acknowledge.
9           MR. TORRES:  Nicolas Torres on behalf of
10      Third-Party Defendant McCombs Ford West, and we
11      acknowledge as well.
12          THE COURT REPORTER:  Please raise your right
13      hand.
14          Do you swear or affirm the testimony you
15      shall give in this matter will be the truth, the
16      whole truth and nothing but the truth?
17          THE WITNESS:  Yes.
18          THE COURT REPORTER:  Thank you.
19  Thereupon,
20                   FRANKLYN STRUSBERG,
21  having been first duly sworn or affirmed, was examined
22  and testified as follows:
23                   DIRECT EXAMINATION
24  BY MR. FEYGIN:
25      Q.  All righty.  Good morning, Mr. Strusberg.

Page 7

1       How are you today?
2           MR. PERALTA:  Joshua, before -- before we
3       begin, I'm so sorry, I just -- I just want to
4       correct something that Wanda said.  This is the
5       deposition of the corporate representative of FS
6       Investments, not Frank Strusberg as -- as a person,
7       so personally.  That makes sense?
8           MR. FEYGIN:  Yes, this is the corporate
9       representative deposition.
10          MR. PERALTA:  Correct, and then also I want
11      to get on the record that Mr. Keith Silverstein
12      might join us.  He's also an -- an attorney for the
13      Defendant in this case.  Go ahead, Joshua.
14  BY MR. FEYGIN:
15      Q.  All righty, Mr. Strusberg.
16          How are you this morning?
17      A.  Good.
18      Q.  Good to hear.  So, obviously we're here to
19  take the deposition of the corporate representative of
20  the dealership, which is FS Investments of America,
21  Inc.  I'm going to start off with a few ground rules to
22  hopefully make this an easy process.
23          So first, if I ask you a question and it's
24  unclear or confusing, please ask me to rephrase the
25  question.  Okay?

Page 8

1       A.  Yes.
2       Q.  If you answer a question, I'm going to assume
3   you understood it, though.  Okay?
4       A.  Okay.
5       Q.  Because the court reporter can't record both
6   of us talking at the same time, please wait until I'm
7   finished asking a question before you answer it.
8       A.  Okay.
9       Q.  When you provide a response, make sure you
10  provide an audible response.  Do not nod your head.  Do
11  not use some sort uh-uh, nuh-uh, anything like that
12  because she's not going to be able to record it.  Okay?
13      A.  Okay.
14      Q.  Occasionally your attorney may raise an
15  objection, but unless you're instructed not to answer
16  the question, you may answer.
17          Do you understand?
18      A.  Yes.
19      Q.  And if you need to take a break, I can
20  certainly accommodate you.  I hope we're not going to
21  be here for too long, but in the event that you do need
22  a break, the only thing I ask is that if there is a
23  question pending that you -- you finish answering that
24  question.  Okay?
25      A.  Okay.

Case 8:23-cv-00709-WFJ-SPF Document 73-2 Filed 10/07/24 Page 3 of 58 PageID 1072

GABRIEL LUZARDO vs. POWERHOUSE AUTOMOTIVE INC. of FLORIDA, et al. 8/7/2024

CR of FS Investments (Franklyn Strusberg)

3 (9 - 12)

Page 9

1     Q.   And if I refer to you, I'm referring to
2 Powerhouse and I intend to refer to the -- to the
3 Defendant FS Investments.  Okay?
4     A.   Okay.
5     Q.   All righty.  And state your name for the
6 record.  Can you state your name for the record?
7     A.   Franklyn Strusberg.
8     Q.   And what is your date of birth?
9     A.   5/30/81.
10    Q.   Have you ever been in a deposition before?
11    A.   Never in my life.
12    Q.   Have you ever been convicted of any felonies
13 or crimes of dishonesty?
14    A.   Never in my life.
15    Q.   Have you ever been accused of any felonies or
16 crimes of dishonesty?
17    A.   Never.
18    Q.   What is your educational background?
19    A.   Do what?
20    Q.   What is the highest level of education that
21 you achieved?
22    A.   University.
23    Q.   Okay.  And what did you study in the
24 university?
25    A.   Business administration.

Page 10

1     Q.   And was that in the United States?
2     A.   In Colombia.
3     Q.   How long have you been living in the United
4 States?
5     A.   I was born here.
6     Q.   Okay.  So, what do you do for a living?
7     A.   I sell cars.
8     Q.   Okay.  And what is the name of the dealership
9 that you sell cars at?
10    A.   Powerhouse Automotive.
11    Q.   Are you employed by or --
12    A.   Yes.
13    Q.   -- derive any --
14    A.   Correct.
15    Q.   Are you employed by or do you derive income
16 from any other dealership?
17    A.   Employed by.
18    Q.   Okay.  What other dealerships are you
19 employed by?
20    A.   Powerhouse Automotive.
21    Q.   Aside from Powerhouse, who else --
22    A.   Only -- only Powerhouse Automotive.
23    Q.   How long have you worked at the dealership?
24    A.   I don't remember.  Like, twelve years.
25    Q.   What is your position there?

Page 11

1     A.   I'm the owner.
2     Q.   And did you start this business or did you
3 acquire it from somebody else?
4     A.   I start it.
5     Q.   So, have you ever been involved in a lawsuit
6 before?
7     A.   Yes.
8     Q.   Okay.  For what?
9          MR. PERALTA:  Objection; relevance and
10    narrative.
11         MR. FEYGIN:  Go ahead and answer.
12         THE WITNESS:  Do what?
13         MR. PERALTA:  Yes, Frank.  I objected as to
14    relevance and narrative.
15 BY MR. FEYGIN:
16    Q.   You can proceed to answer the question.  What
17 was -- what was the lawsuit for or lawsuits?
18    A.   For we sold a car.
19    Q.   Okay.  And there was only one lawsuit against
20 you?
21    A.   Yeah.
22    Q.   Okay.  And when was this lawsuit?
23    A.   Like, a year and-a-half ago.
24    Q.   And where was this lawsuit filed?
25    A.   I don't remember.

Page 12

1     Q.   State court or federal court?
2     A.   State.
3     Q.   And it's only one lawsuit?
4     A.   That I remember.
5     Q.   Okay.
6          MR. PERALTA:  I'm also -- I'm also objecting
7     because it goes against the parties' agreement as
8     to the scope of the question.
9          MR. FEYGIN:  Well, he already answered, but
10    we can get to that later.
11 BY MR. FEYGIN:
12    Q.   With respect to the preparation, did anybody
13 help you prepare for today's deposition?
14    A.   Excuse me?
15    Q.   Did anybody help you prepare for today's
16 deposition?
17    A.   What do you mean?
18    Q.   How did you prepare for today's deposition?
19    A.   I don't prepare for nothing.  I'm here to
20 answer questions about a car that I bought from Manheim
21 and Manheim made a mistake, and you took -- I already
22 told you this a hundred times.
23    Q.   Well, this is the first time we're speaking.
24    A.   It's -- it's a -- it's a very simple
25 situation that you guys are making it look big, but

Page 13

1  it's a -- it's a simple mistake from the auction.
2      Q.  Sure.  We'll get to that.
3      A.  This -- this doesn't need any preparation.
4  It's -- it's -- it's -- it's a simple mistake from the
5  auction.
6      Q.  Okay.  So --
7      A.  Anybody can make a mistake.
8      Q.  So, your -- your position is that you did not
9  prepare for today's deposition?
10     A.  No.  I have -- I -- I've been telling you
11 guys what happened since Day 1, and --
12         MR. FEYGIN:  I'm going to pull up what is
13     going to be Plaintiff's Exhibit A, which is the
14     Claimant's deposition notice.
15         (Plaintiff Exhibit A was marked for
16     identification.)
17         (Whereupon, document(s) shared on the
18     screen.)
19 BY MR. FEYGIN:
20     Q.  Have you seen this before?
21     A.  Yeah, but I didn't read it.
22     Q.  Okay.  What did you do when you saw this?
23     A.  Nothing.
24     Q.  Okay.  So, as you sit here today, you are not
25 prepared to testify on any of matters of examination?

Page 14

1      A.  I know exactly --
2          MR. PERALTA:  Objection; leading.
3          THE WITNESS:  I know exactly what happened
4      with this -- with this particular truck, so any
5      questions you have, I can answer them.
6          MR. FEYGIN:  Okay.  But --
7          THE WITNESS:  I don't need -- I don't need to
8      read that.
9  BY MR. FEYGIN:
10     Q.  Okay.  So, you -- you didn't read this,
11 you're not prepared to answer these questions, are you?
12         MR. PERALTA:  Objection; leading.
13         THE WITNESS:  I -- I am prepared to answer
14     any question, but I don't need to read nothing
15     because I know exactly what happened, so you can
16     ask me what --
17         MR. PERALTA:  Frank, if you could -- Frank,
18     if you could wait at least a second so I can get my
19     objection in.
20     Objection; leading and objection; mis- --
21     mis -- mischaracterizes the -- the testimony of the
22     witness.
23         MR. FEYGIN:  I think the testimony is
24     sufficiently clear.
25         MR. PERALTA:  No, it -- no.  No, it's not.

Page 15

1          MR. FEYGIN:  Okay.
2          MR. PERALTA:  And if you want to argue with
3      me during your -- your depo, we can do that, but I
4      suggest you use your time wisely, Joshua.
5          MR. FEYGIN:  Noted, Jose.  Thank you.
6  BY MR. FEYGIN:
7      Q.  So, Franklyn, to -- to recap, did you review
8  this document or did you not review this document?
9      A.  No, I did not.
10     Q.  Thank you.  Did you bring any documents with
11 you today?
12     A.  I have my computer in front of me.  I can
13 provide whatever you need.
14     Q.  What documents do you have up on your
15 computer?
16     A.  I can click on the -- on the Manheim site,
17 and I can see the truck when we bought it.
18     Q.  Aside from that, do you have any other
19 documents?
20     A.  No.
21     Q.  Okay.  Regarding the dealership, is it a
22 licensed car dealer under Florida law?
23     A.  Correct.
24     Q.  Since when?
25     A.  Like, four years.

Page 16

1      Q.  And prior to those four years, was the
2  dealership operating without a license?
3      A.  Do what?  No.
4      Q.  You mentioned that you've been employed at
5  the dealership for twelve years.
6          Do you --
7      A.  No, from FS Investments, which is my
8  corporation.  Powerhouse is a d/b/a from FS
9  Investments.  FS Investments has been open for, like
10 fourteen years.
11     Q.  Okay.  So, the dealership has only been in
12 operation for four years of those fourteen, correct?
13     A.  Almost five years.
14     Q.  Okay.  And you have been licensed for
15 approximately five years, then?
16     A.  Correct.
17     Q.  How many locations does the dealership have?
18     A.  One location.
19     Q.  How many employees?
20     A.  I don't know.  Like, fifteen.
21     Q.  Do you own any other dealerships?
22     A.  No.
23     Q.  How many cars does Powerhouse sell per month?
24     A.  Like, thirty.
25     Q.  And approximately how many per year?

Page 17

1      A.   360.
2      Q.   How many cars would you say the dealership
3 has sold since it opened its door?
4      A.   Multiply three-sixty times four.
5      Q.   Do you agree the dealership has the
6 responsibility to know the laws that govern its
7 business?
8      A.   Of course.
9      Q.   As the corporate representative for the
10 dealership today, are you familiar with the laws that
11 the dealership must abide by?
12     A.   Of course.
13     Q.   Are truthful and accurate mileage disclosures
14 important in the used car industry?
15     A.   Very important.
16     Q.   And why is that?
17     A.   Because it's important.
18     Q.   Okay.  What is the reason for being
19 important?
20     A.   Do what?
21     Q.   Why is it important?  Why does the dealership
22 believe truthful and accurate mileage disclosures are
23 important?
24     A.   It has to go -- when you get your license,
25 you have to -- the DMV gives you paperwork.  And you

Page 18

1 have to provide every customer with the -- you know,
2 with the paperwork, so one of the paperworks that are
3 very important are the -- are the mileage disclosure.
4 So, you have to -- whatever it says on the car, you
5 have to put it on the mileage disclosure.
6      Q.   And would that be because an odometer reading
7 impacts the value of the vehicle?
8      A.   The whole legal -- legal situation of the
9 vehicle, when the car is -- you know, it's not a TMU,
10 it's not revealed, it's clean, of course it gives value
11 to the car.
12     Q.   Does the dealership believe it is important
13 that the Certificate of Title reflect truthful and
14 accurate disclosures of a vehicle's mileage history?
15     A.   Of course, and I do that on every car sold.
16     Q.   And would you agree that an inaccurate
17 odometer reading would negatively impact the vehicle's
18 value?
19          MR. PERALTA:  Objection; leading.
20          THE WITNESS:  Yes.
21 BY MR. FEYGIN:
22     Q.   Could a vehicle with an inaccurate odometer
23 be worth less than the same exact vehicle with an
24 accurate odometer?
25     A.   Yes.

Page 19

1          MR. PERALTA:  Objection; speculative.
2 BY MR. FEYGIN:
3      Q.   In your experience, would a vehicle with
4 higher mileage need more maintenance than the
5 lower-mileage vehicle?
6      A.   It's relative.  I get cars with low mileage
7 that are being rented -- rentals destroyed, and I get
8 cars with really high mileage that are one owner in
9 immaculate condition.
10     Q.   Is it important to Powerhouse that it be
11 considered as an honest company?
12     A.   Of course.  I'm the one here
13 twenty-four/seven.
14     Q.   And why is it important?
15     A.   My reputation is everything.  My reputation
16 is -- you know, is why I keep selling so much, you
17 know, the cars.  Customers keep coming back because
18 they trust us.
19     Q.   Is it important to Powerhouse that consumers
20 have trust in the dealership?
21     A.   100 percent.
22     Q.   So, in addition to selling vehicles, does the
23 dealership originate financing agreements for the
24 vehicles it sells?
25     A.   I sell, and I have lenders.  When the

Page 20

1 customer wants to finance, we use the lenders.
2      Q.   Does the dealership have an in-house
3 financing --
4      A.   No.
5      Q.   -- program?  No buy here/pay here, then?
6      A.   No buy here/pay here.
7      Q.   So, what did the dealership have to do to
8 become licensed under Florida law to be a dealer?
9      A.   To have an office, a printer, a computer,
10 insurance and a bond.
11     Q.   And does the DMV require that the dealership
12 take ongoing training courses?
13     A.   Yes.
14     Q.   Okay.  And has the dealership taken these
15 courses?
16     A.   Of course.
17     Q.   When was the last one?
18     A.   Five years ago.
19     Q.   Do you recall the topics that were covered
20 during that training session?
21     A.   Just to teach you how to print the paperwork.
22     Q.   And who do you use as the course provider?
23     A.   DLMRB.
24     Q.   And did you personally attend that course or
25 did somebody else from the dealership attend the

Case 8:23-cv-00709-WFJ-SPF   Document 73-2   Filed 10/07/24   Page 6 of 58 PageID 1075

GABRIEL OLAYA-HERNANDEZ vs FS INVESTMENTS OF AMERICA, INC.                    October 02, 2024
CR of FS Investments (Franklyn Strusberg)                                      6 (21 - 24)

Page 21

1  course?
2       A.   No, I did.  The license is in my name.
3       Q.   So, do you only sell used cars?
4       A.   Only used cars.
5       Q.   Okay.  And where do you get these used cars
6  from?
7       A.   I only buy from Manheim, the auction.  It's
8  the biggest auction in the United States.
9       Q.   You don't buy any vehicles that come in on
10  trade?
11      A.   I get a lot of trades.
12      Q.   So, in addition to Manheim, you also have
13  trade-in vehicles on your lot?
14      A.   Trade-in vehicles, yes.
15      Q.   So, explain to me how do you select used cars
16  for your inventory?
17      A.   I'm the buyer, so I dig very, very into it
18  when I buy them, and I look at the comments.  Every
19  car, when you buy it in the auction, they give you a
20  Condition Report, and they give you comments from the
21  seller, so when the car is revealed title, they put on
22  the comments revealed title.  They put a CR.  They tell
23  you the whole story about the car.
24      Q.   And what type of used cars do you buy?
25      A.   Pickup trucks and commercial vans.

Page 22

1       Q.   And why is that?
2       A.   Because of the customers that my target is
3  the people that has -- own businesses.
4       Q.   Do you ever rely on CARFAX™ or AutoCheck
5  reports when you decide to purchase a vehicle?
6       A.   No.
7       Q.   Do you inspect the vehicles at the time of
8  the purchase?
9       A.   When I buy them from the auction, the auction
10  inspects the vehicles for me, and if the car passes the
11  inspection, then I bring it to my dealer.
12      Q.   So, explain to me what happens when you get a
13  car from the auction, let's say, and you first get it
14  onto your lot.  What happens?
15      A.   I drive it myself.  I take it to the car
16  wash.  I put it on the spot to take pictures, and I
17  advise it everywhere.  I change the oil, make sure the
18  car is good, and I park it in my lot for sale.
19      Q.   Okay.  So, you do -- you personally do a test
20  drive?
21      A.   I do, yes, most of the times.
22      Q.   Do you personally wash the car?
23      A.   No.  I have a lot of people that wash them.
24      Q.   And do you personally take pictures of the
25  car?

Page 23

1       A.   I personally take pictures of the car, yes.
2       Q.   And what about changing the oil?
3       A.   I take it to Jiffy Lube.
4       Q.   And is this every vehicle that comes in?
5       A.   Most of them, because some of them, they come
6  with a sticker with a new oil, so I don't change the
7  oil on those, but most of them, I change the oil on
8  Jiffy Lube.
9       Q.   Do you ever look at the title before you
10  place the vehicle up for sale?
11      A.   Never.
12      Q.   So, let's discuss inspecting these vehicles.
13           Do you ever inspect them before you put them
14  for sale?
15      A.   The auction does.  The auction inspects the
16  whole car legally and technically, and if the car
17  passes the inspection, then I have a company that is
18  called Central Dispatch.  And I post the car, and a
19  truck driver picks it up because I buy nationwide, and
20  they bring it to my dealer.
21      Q.   Aside from the auction inspection, does the
22  dealership perform its own inspection of a vehicle
23  before it goes up for sale?
24      A.   I drive it.
25           MR. PERALTA:  Objection.

Page 24

1           THE WITNESS:  I drive it.
2           MR. PERALTA:  Objection; asked and answered.
3           MR. FEYGIN:  Please answer.
4           THE WITNESS:  Yes.  I drive them to --
5  BY MR. FEYGIN:
6       Q.   Aside from driving the vehicle, what else do
7  you do to inspect it?
8       A.   That's it.  That's it.
9           MR. PERALTA:  Objection; asked and answered.
10  Yeah.
11          THE WITNESS:  If I feel any -- any funny,
12  maybe like the transmission is leaking or anything,
13  I file a claim, and then I can return the car to
14  the auction.
15  BY MR. FEYGIN:
16      Q.   Do you ever recondition vehicles aside from
17  the oil changes?
18      A.   If the car needs paint, yes.
19      Q.   Anything else?
20      A.   Tires, whatever the car -- maybe a
21  windshield.  Anything that the car needs, I like to
22  make them, you know, good so I can sell them.
23      Q.   Do you have an account with CARFAX™?
24      A.   No.
25      Q.   Do you have an account with AutoCheck?

Page 25

1    A.   No.
2    Q.   Do you have an account with any other entity
3 that would provide vehicle history reports aside from
4 the Manheim Condition Report?
5    A.   No.
6    Q.   So, who determines the price that a used
7 vehicle is sold for at the dealership?
8    A.   Me.
9    Q.   Okay.  And what -- what factors play into
10 that analysis?
11    A.   Depending on the car.  What the determines
12 the car is the -- trim.  If it's a Laramie, if
13 it's -- if it's lifted, if it has wheels and tires, you
14 know, like big ones, that determines the price of the
15 car.
16    Q.   Do you have a mechanic on your staff?
17    A.   No.
18    Q.   Do you have a vehicle lift on your premises?
19    A.   No.
20    Q.   When you're evaluating the price of a vehicle
21 that you're planning on selling, is mileage a factor
22 that goes into the evaluation?
23    A.   No.
24    Q.   So, mileage is irrelevant?
25    A.   Irrelevant, depends on the condition.  Like I

Page 26

1 said, if I get a rental that has been low mileage but
2 the car is destroyed or you get a car that is one owner
3 with high mileage but it's in perfect condition.
4    Q.   So, let's say you do you have a vehicle that
5 is in good condition.
6         Would the mileage play any part in
7 determining the vehicle's value?
8         MR. PERALTA:  Asked and answered; objection.
9    Go ahead, Frank.
10         MR. FEYGIN:  You can answer the question.
11         THE WITNESS:  No.
12 BY MR. FEYGIN:
13    Q.   All right.  So, walk me through a typical car
14 transaction.  A client walks through the door, and what
15 happens?
16         MR. PERALTA:  Objection; narrative.
17    Go ahead, Frank.
18         MR. FEYGIN:  What was the objection?
19         MR. PERALTA:  You're asking for a narrative.
20    You're not asking for a specific answer.
21         MR. FEYGIN:  Okay.
22 BY MR. FEYGIN:
23    Q.   When the client walks in the door, who is the
24 first person that greets the client?
25    A.   The salesperson.

Page 27

1    Q.   And once the salesperson greets the client,
2 what do they do?
3    A.   They listen to what the customer wants.
4    Q.   And once they determine what the customer
5 wants, what do they do?
6    A.   They show -- they show them cars.
7    Q.   And once they show them the car and they make
8 a decision on which car they want to purchase, what
9 happens?
10    A.   They do a test drive.
11    Q.   After the test drive, what happens?
12    A.   They come into the office.  They sit.  The
13 salesman takes the license, makes a copy.  Depending on
14 if they want to pay cash or finance, if it's financed,
15 they have to do a credit application.
16    Q.   So, once they take the driver's license and
17 complete a credit application, then what happens?
18    A.   Then the finance manager submits the deal to
19 the bank to get them approved.
20    Q.   And does the approval usually happen on the
21 spot?
22    A.   In one second.
23    Q.   And after that one second occurs, what
24 happens?
25    A.   It's under the lender's conditions, so they

Page 28

1 approve you under these conditions, and the conditions
2 are proof of income, proof of residence, full coverage
3 insurance.  If they have everything, then they sign the
4 contract and they leave with the car.
5    Q.   Okay.
6    A.   They have to give a down payment, get a
7 receipt, full insurance, full coverage with all the
8 information, and they leave.
9    Q.   How are the contracts presented to a consumer
10 for signing?
11    A.   On the computer.
12    Q.   Is it electronic?
13    A.   Electronic, and some of the -- the DMV
14 paperwork are handwritten.
15    Q.   And for the electronically-signed documents,
16 how are they presented to the consumer, is it an iPad
17 or is it on a computer screen?
18    A.   It's on a -- on a computer with a mouse.
19    Q.   And is that the same computer that the
20 finance manager or the sales agent is sitting at or is
21 it a completely separate computer dedicated for --
22    A.   It's the one with the finance manager.
23    Q.   And how does the consumer see the screen, is
24 it turned around to them?
25    A.   Of course.  They have to see it, and they

Case 8:23-cv-00709-WFJ-SPF Document 73-2 Filed 10/07/24 Page 8 of 58 PageID 1077
GABRIELA DIAZ-GUZMAN vs AUTO DEAL INVESTMENTS LLC, et al. 10/04/2024
CR of FS Investments (Franklyn Strusberg)
8 (29 - 32)

Page 29

1  have to click on -- it's like any contract.  You have
2  to click on -- on the -- on the box.
3      Q.   And does the signature get applied to every
4  everywhere with one click or does the consumer have to
5  go --
6      A.   Just one click.
7      Q.   -- click by click?
8      A.   No, just one click.
9          THE COURT REPORTER:  Mr. -- Mr. Strusberg, if
10     you could just wait until he finishes his complete
11     question, that way you're not talking over each
12     other, I would appreciate it.  Thank you.
13 BY MR. FEYGIN:
14     Q.   So, what would be the first document the
15 consumer sees when they sit down to start signing the
16 paperwork?
17     A.   I don't know.
18     Q.   Who would know?
19     A.   The finance manager.
20     Q.   And what are the names of your finance
21 managers?
22     A.   Heron Guzman and Angel Castillo.
23     Q.   And were these gentlemen employed by
24 Powerhouse at the time of my client's transaction?
25     A.   Angel was.  Alex Reyes is no longer with me.

Page 30

1      Q.   And why is that?
2      A.   There's no reason.
3      Q.   I'm sorry.  You said Guzman is no longer with
4  you?
5      A.   Alex Reyes.  He was the one who sold the car
6  to your --
7      Q.   And when did he leave the dealership?
8      A.   Like, a month ago.
9      Q.   And why did he leave the dealership?
10     A.   There's no reason.  He -- he tried --
11     Q.   Are you --
12     A.   -- to get better opportunities.
13     Q.   Okay.  So, once the deal is signed, then what
14 happens?
15     A.   They go to the lady with the tags to do the
16 transfer or the new tag to release the car under the
17 person's name.
18     Q.   Okay.  And once they get the tag done, what's
19 next?
20     A.   They put it on the car, and the customer
21 leaves.  We take a picture, and we get a good review.
22     Q.   What is the dealership management software
23 used by the dealership?
24     A.   DealerCenter.
25     Q.   And was that the same software you used

Page 31

1  during the time of my client's transaction?
2      A.   Correct.
3      Q.   Have you ever changed your DMS software?
4      A.   No.  I have it since Day 1.
5      Q.   So, what is Powerhouse's relation to Auto
6  Deal Corp.?
7      A.   The owner of Auto Deal is my friend.  When I
8  first open, he put me cars on consignment.  I buy cars
9  with his -- with his money pretty much.  He support me,
10 so I buy cars with his license.  And I bring it to my
11 dealer, and pretty much he's wholesaling the car to me.
12     Q.   Have you ever earned a salary from Auto Deal
13 Corp.?
14     A.   No.  It's straight commission.
15     Q.   Did you have authority to bind Auto Deal
16 Corp. to purchase the vehicle from McCombs Ford?
17     A.   Yes.  I was a buyer for Auto Deal Corp.
18     Q.   And how did you find the car that my client
19 purchased?
20     A.   Like I find all the cars.  In Manheim.
21     Q.   And what were you searching for when you came
22 across the car?
23     A.   Lifted trucks.
24         MR. FEYGIN:  I'm going to pull up what's
25     going to be Plaintiff's B.  It's going to be the

Page 32

1      vehicle information sheet that we received in
2      discovery.  This is FSIA 000014.
3          (Whereupon, document(s) shared on the
4          screen.)
5  BY MR. FEYGIN:
6      Q.   Mr. Strusberg, does this look familiar to
7  you?
8      A.   Are you showing me something?
9      Q.   Yes.
10     A.   I can't see the screen.  I'm sorry.  What do
11 I do?
12         MR. PERALTA:  Joshua, may I suggest that you
13     stop mirroring and mirror again, and I think that
14     will present the full screen to him one more time.
15         THE WITNESS:  No, because somebody called me,
16     and I put it on do not disturb.
17         MR. PERALTA:  Yeah.  Yeah.
18         THE WITNESS:  I don't know why I'm getting
19     the call if it's under do not disturb.
20         MR. PERALTA:  What about -- what about now,
21     Frank?
22         THE WITNESS:  No, I cannot see it.
23         THE COURT REPORTER:  Is you view on gallery
24     view?
25         THE WITNESS:  Now it is.  I'm sorry for my

Page 33

1 ignorance.

2 MR. PERALTA: That's fine. Make Zoom cover

3 your whole screen, so not on -- what do you call

4 it. Let me see.

5 THE WITNESS: Let me see.

6 MR. PERALTA: Press maximize, the square.

7 THE WITNESS: There we go.

8 MR. PERALTA: Can you see it now?

9 THE WITNESS: Yes.

10 MR. PERALTA: Okay.

11 BY MR. FEYGIN:

12 Q. Okay. So, does this document look familiar

13 to you?

14 A. Of course. That's the -- that's the Bill of

15 Sale from Manheim.

16 Q. So, up here in the upper left-hand corner --

17 A. How do I make it big?

18 Q. (Complies with request.)

19 A. Jesus Christ.

20 MR. PERALTA: So, if you -- if you click on

21 the right under the X, it says view, you can put

22 standard, actually, will make the --

23 THE WITNESS: I see, like four scares up on

24 the left corner.

25 MR. PERALTA: Okay.

Page 34

1 THE WITNESS: And I click on each of them,

2 and they it just shows you guys, and this one

3 doesn't show.

4 MR. PERALTA: But do you see the document?

5 THE WITNESS: I see it, but it's super small.

6 Like, on -- okay. I can see it, yeah. Yeah, I can

7 see it.

8 BY MR. FEYGIN:

9 Q. So, what I'm looking at is the upper

10 left-hand corner of this document.

11 Does what does CR stand for over here

12 (indicating)?

13 A. Condition Report.

14 Q. And in your experience, what is the purpose

15 of a Condition Report score?

16 A. Two and up is -- is a good car. It's a good

17 used car, and two and under is -- is a car, you know,

18 that is beat up with maybe scratches or -- it's very

19 relative.

20 Q. And what is the grading scale, one through

21 ten, one through twenty?

22 A. No. One to five.

23 Q. So, if I understood you correctly, a lower

24 score indicates that the vehicle is in bad condition?

25 A. Yes.

Page 35

1 MR. PERALTA: Objection; mischaracterizes his

2 testimony.

3 THE WITNESS: Two and up is a -- is a good --

4 like, 2.8 to me is a good car.

5 BY MR. FEYGIN:

6 Q. And what was the condition of this vehicle?

7 A. He's -- he's been driving it since then, so

8 it's a good car.

9 Q. What was the Condition Report grade for the

10 vehicle when you bought it?

11 A. Do what? 2.8. I'm looking at it. 2.8. It

12 says there, 2.8.

13 Q. And when did the dealership, meaning Auto

14 Deal, purchase the vehicle from McCombs Ford?

15 A. April 11th. It says there April 11th.

16 Q. And remind me, was this during the pandemic?

17 A. I don't remember. I'm sorry.

18 Q. Can you describe the car market during the

19 pandemic in general based upon your experience?

20 A. It was good.

21 Q. In what sense?

22 A. Every dealer closed because they give --

23 like, they didn't make you pay interest for, like six

24 months, so a lot of dealers closed, and we were open

25 helping the community. Everybody was working.

Page 36

1 Everybody was sick at home, and we were working.

2 Q. Were wholesale prices on the used cars higher

3 than normal?

4 A. No. Prices were almost the same.

5 Q. And were retail prices on the used cars higher

6 than normal?

7 A. Kind of.

8 Q. In what sense?

9 A. All the -- the factories, they closed, the

10 new cars, so used cars were selling more than new cars.

11 Q. So, when you purchased this vehicle, what

12 representations did McCombs Ford tell you about the

13 vehicle?

14 A. No, I never get to speak with the seller. I

15 buy the car -- the car through Manheim, and I bought it

16 based on the information that I saw.

17 Q. So, did you complete the sale or purchase of

18 this vehicle directly with the seller or --

19 A. No, never. Never. I -- I buy the car

20 through Manheim. Manheim was pretty much the seller.

21 The auction is -- is, like the middle person. You have

22 the seller and the buyer, and the auction is the one

23 who conducts the whole -- the whole process.

24 Like, for example, in this particular car, I

25 called them. They made a mistake. When I called them

**Page 37**

1 about the discrepancy in the mileage, I called Manheim
2 because they are responsible for this. Because if the
3 car, they -- somebody get -- I mean, I always buy cars,
4 let's say revealed. They disclose the condition and
5 the situation of the car, so on this -- on this
6 particular car, I called Manheim. They said that Ford,
7 the seller, made a mistake.
8    Q.   And what did Manheim do for you in this
9 circumstance?
10    A.   No.  They told me that they were going to dig
11 into it, they were going to call the franchise who sold
12 it.  And they called me back and they say "yes, we
13 called the franchise," and they -- and Ford made a
14 mistake on the mileage.  Because if the car was a TMU,
15 then Manheim needs to disclose it to me TMU, and then I
16 know, and then when I -- when I sell the vehicle, I
17 have to sell it TMU.
18         I cannot sell a car TMU with original
19 mileage.  I can't.  That's why the auction is supposed
20 to inspect that before I do, and they -- they never put
21 no comments nowhere.  They sold me the car with a
22 131,000 miles, and the vehicle, you saw everywhere, was
23 131,000 miles.
24    Q.   What did -- what did Manheim do to compensate
25 you for this mistake?

**Page 38**

1    A.   Nothing yet.
2    Q.   Why do you say "yet"?
3    A.   They -- they asked me to bring the car back.
4 They asked me if I can bring -- if I can return the car
5 and they give me the money back.
6    Q.   When did this occur?
7    A.   I don't know.  When you guys first -- when I
8 first find out about -- about this.
9    Q.   And what about McCombs Ford, have they done
10 anything to correct this mistake?
11    A.   No.
12    Q.   So, getting back to the actual purchase of
13 the vehicle, did you pick it up or was it delivered to
14 you?
15    A.   It was delivered to us have.
16         (Whereupon, Counsel Silverstein enters Zoom
17    deposition.)
18 BY MR. FEYGIN:
19    Q.   And how was it delivered?
20    A.   On a tow truck.
21    Q.   Did you ever look at any sort of vehicle
22 history report before you bought this particular
23 vehicle aside from the Condition Report?
24    A.   Just the Condition Report.
25         MR. PERALTA:  Objection; asked -- asked and

**Page 39**

1 answered.
2         THE WITNESS:  No.
3 BY MR. FEYGIN:
4    Q.   Did you inspect the vehicle after you bought
5 it?
6    A.   I drove it, and I took it for pictures.
7    Q.   Aside from that, did you put it on a lift?
8    A.   No.
9    Q.   Did you inspect the engine?
10    A.   While I drive it, I feel it.
11    Q.   Did you inspect the brakes?
12    A.   Yeah.  When I drive it, I inspect the whole
13 car.  Like, when you drive it, you feel the car, and
14 you know if something's wrong or something's good.
15    Q.   So, the inspection itself was strictly
16 driving the vehicle, then?
17    A.   Correct.
18    Q.   Were the seats torn in the vehicle?
19    A.   I don't remember.
20    Q.   Were the seats worn?
21    A.   It's a 2012, but I don't remember.  Most of
22 the cars, they come with -- you know, a clean 2.8, it's
23 a clean car, but it's been too -- too long.
24    Q.   Was the steering wheel worn?
25    A.   I don't remember.  I'm sorry.

**Page 40**

1    Q.   Was the bed scratched?
2    A.   I don't remember.
3    Q.   Was the bed dented?
4    A.   I don't know.
5    Q.   Were there signs of rust in the bed?
6    A.   I don't remember.
7    Q.   Were there dents on the exterior?
8    A.   I don't remember.  I'm sorry.
9    Q.   Were either of the turn signals chipped or
10 cracked?
11    A.   I don't remember.
12    Q.   Were either of the headlights chipped or
13 cracked?
14    A.   I don't remember.  I'm sorry.
15    Q.   Was there evidence of prior paint?
16    A.   No.
17    Q.   Was the brake pedal worn?
18    A.   I don't remember.
19    Q.   Was the gas pedal worn?
20    A.   I don't remember.  I'm sorry.
21    Q.   Was there any sludge in the engine?
22    A.   Not that I know of.
23    Q.   How much did you pay for the vehicle?
24    A.   9,000 and change.
25    Q.   And is that reflected in this invoice?  Is

Case 8:23-cv-00709-WFJ-SPF   Document 73-2   Filed 10/07/24   Page 11 of 58 PageID 1080

GABRIEL LUC HADDON vs. FS INVESTMENTS OF AMERICA INC.                    July 22, 2024
CR of FS Investments (Franklyn Strusberg)
11 (41 - 44)

Page 41

1 that a truthful and accurate --
2      A.   Correct.
3      Q.   -- representation of --
4      A.   Correct.
5      Q.   -- how much you paid?
6      A.   Yes.  Correct.
7      Q.   And did Powerhouse tender this money or did
8 Auto Deal Corp. tender the money?
9      A.   No.  Auto Deal paid Manheim.
10     Q.   And where did Auto Deal get the funds for the
11 payment?
12     A.   From his bank account.
13     Q.   How much did you pay Auto Deal Corp. for the
14 vehicle?
15     A.   The price of the car, plus the transport,
16 plus I -- I was giving him 25 percent of the profits.
17     Q.   Did you receive a Certificate of Title for
18 the vehicle when you bought it?
19     A.   No.
20          MR. FEYGIN:  Okay.  I'm going to pull up
21     what's going to be Plaintiff's Exhibit C.
22          (Plaintiff Exhibit C was marked for
23     identification.)
24          (Whereupon, document(s) shared on the
25     screen.)

Page 42

1 BY MR. FEYGIN:
2      Q.   Can you see this?
3      A.   What's that?  Yeah, I see it now.
4      Q.   Does it look familiar?
5      A.   It's a title.
6      Q.   And this is FSIA 00019 and FSIA 00020, do we
7 agree?
8      A.   What is these numbers?
9      Q.   It's Bates stamps.  It's how you identify a
10 document that was produced in discovery.  Your
11 attorneys produced it with these numbers stamped on
12 bottom (indicating.)
13     A.   Okay.
14     Q.   I just want to make sure we're looking at the
15 same thing.
16     A.   Yeah.  Yeah.  Okay.
17     Q.   Okay.  Is this a true and correct copy of the
18 Certificate of Title Auto Deal Corp. received when it
19 purchased the vehicle?
20          MR. PERALTA:  Objection; no -- no foundation
21     and facts not in evidence, speculative, et cetera.
22 BY MR. FEYGIN:
23     Q.   Is this a copy of the Certificate of Title
24 you produced in discovery?
25     A.   That's not a Certificate of Title.  That's --

Page 43

1 that's a title.
2      Q.   Okay.  Is this the title that you produced in
3 discovery?
4      A.   When I sold the car, after the customer took
5 possession of the car and left, I got the title in my
6 hands, maybe like ten days later.
7      Q.   So, let's unpack that.
8      A.   Excuse me?
9      Q.   Let's -- let's go into that a little bit.
10     A.   Do what?
11     Q.   Hold on one second, please.
12          How did you -- let's take a step back here.
13          How did you get this particular title in this
14 particular format?  Where did this come from?
15     A.   Auto Deal Corp.
16     Q.   Do you maintain this in your own business
17 records or did Auto Deal Corp. provide it to you?
18     A.   Auto Deal Corp. --
19          MR. PERALTA:  Objection.
20          THE WITNESS:  -- provide it to me.
21          MR. PERALTA:  Objection; asked and answered
22     and leading as well.
23 BY MR. FEYGIN:
24     Q.   When did Auto Deal Corp. get this title?
25     A.   It tells you there in -- one second.  I can

Page 44

1 tell you right now.  One second.  It shows the ship
2 date and everything.
3      Q.   What are you looking at?
4      A.   When the auction send the title to Auto Deal.
5      Q.   And where are you finding that information?
6      A.   In Manheim.  My account with Manheim.  What
7 is the last six of the VIN?
8      Q.   I'm sorry?
9      A.   What is the last six of the VIN?
10     Q.   A12718.
11     A.   So, it says there they shipped the title
12 to -- to Auto Deal Corp. on April 28, 2020 by USPS.
13 So, I bought it April 11th, and they sent the title
14 April 28.
15     Q.   And do you happen to know when Auto Deal
16 Corp. actually received the title?
17     A.   They shipped -- I'm assuming a day later, two
18 days later on April 30th.
19     Q.   Do you have the ability to determine the
20 exact date Auto Deal Corp. received --
21     A.   No.
22     Q.   -- the title?
23     A.   No.
24     Q.   So, looking at the face of the title, what is
25 the disclosed odometer reading (indicating)?

Case 8:23-cv-00709-WFJ-SPF   Document 73-2   Filed 10/07/24   Page 12 of 58 PageID 1081
GABRIELA JUAREZ-ESPINOSA vs. FS Investments of America, Inc.                                                                   April 08, 2024
CR of FS Investments (Franklyn Strusberg)
12 (45 - 48)

Page 45

1    A.   201150.
2    Q.   And underneath that, what does the title
3 state regarding the mileage?
4    A.   The actual mileage.
5    Q.   I'm going to move on to my client's
6 transaction.
7         Were you personally involved in the sale of
8 the vehicle to my client?
9    A.   No.
10   Q.   Who was?
11   A.   Alex Reyes.
12   Q.   And he's no longer employed by the
13 dealership, correct?
14   A.   Correct.
15   Q.   Who else was involved in the transaction?
16   A.   Might be a salesman, but I don't know which
17 salesman it was.
18   Q.   Do you have a way to figure it out?
19   A.   The only way is the -- the -- the person who
20 bought the car, he can tell me the name of the person,
21 and then I know exactly who it was.
22   Q.   Do you not have commissions for sales?
23   A.   I do.
24   Q.   Do you keep track of the commissions you pay?
25   A.   No.

Page 46

1    Q.   Do you keep track in any other way of who is
2 involved in a sale?
3    A.   No.  I got to see the deal jacket.  Maybe on
4 top of the deal jacket it states the name of the
5 person.
6    Q.   Do you have the deal jacket with you?
7    A.   No.
8    Q.   Where is the deal jacket?
9    A.   It's on a file cabinet.
10   Q.   And is that file cabinet in your office?
11   A.   No.
12   Q.   Where is the file cabinet located?
13   A.   It's in a container.  I put all the file
14 cabinets.
15   Q.   And where is this container located?
16   A.   In the dealership.
17   Q.   Did you speak with Alex Reyes to prepare for
18 today?
19   A.   No.
20   Q.   So, you're unable to testify as to what
21 occurred with my client during the transaction?
22        MR. PERALTA:  Objection; leading,
23   speculative.
24        THE WITNESS:  Correct.
25        MR. PERALTA:  And stating facts not in

Page 47

1 evidence.
2 BY MR. FEYGIN:
3    Q.   Are you able to testify what occurred during
4 the transaction with my client?
5    A.   Yes.
6    Q.   How did he find the dealership?
7    A.   We post everywhere; Marketplace, OfferUp,
8 Craig's List.
9    Q.   Where was this vehicle advertised?
10   A.   Everywhere; Craig's List, Marketplace, in my
11 web page, Cars for Sale.
12   Q.   Are you able to access any of the
13 advertisements for this vehicle?
14   A.   Yeah.
15   Q.   Are you able to provide them to me?
16   A.   Of course.
17   Q.   Do you agree to provide the advertisements to
18 me?
19   A.   If I find it.  Can I have the last six again?
20 Let me see if I can find it right now.
21   Q.   A12718.
22   A.   I found it.
23   Q.   Where is -- what -- what are you looking at?
24   A.   I'm looking at the web page.  I had it
25 advertised for twenty-one nine.

Page 48

1    Q.   And you'll agree to provide that copy?
2    A.   Yes.  Of course, yes.
3    Q.   So, when my client got to the dealership, was
4 he by himself or was with people?
5    A.   I don't know.
6    Q.   What happened when he got there?
7    A.   I don't know.
8    Q.   Do you know if he actually test drove the
9 vehicle?
10   A.   No.
11   Q.   Do you know what part of the day he arrived?
12   A.   No.
13   Q.   Do you know if the documents he signed were
14 done electronically or in wet ink?
15   A.   If it was wet ink?  I'm assuming it was, of
16 course, electronically and paper.  It's the standard
17 for every customer.
18   Q.   For the electronic documents, how did you get
19 his consent to sign the documents electronically?
20   A.   They have to go with the mouse on the
21 computer.
22   Q.   Do you know if he provided his consent on
23 paper or electronically?
24   A.   If he took possession of the car, he must
25 have.

Page 49

1    Q.   Well, was it done on paper or was it done
2 electronically, particularly the providing of his
3 consent?
4    A.   They do both.  They do paper and Internet.
5 They sign both papers.  They sign on the e-contracting
6 and the DMV paper, like the ASCIIs.  The odometer,
7 everything goes handwritten.
8    Q.   Okay.  But before we even get to that
9 process, he has to give his consent to sign a document,
10 correct?
11    A.   He has give -- no.  He has to give a credit
12 application.  He has to leave the commission to us.  Do
13 it on --
14    Q.   After that --
15    A.   -- on-line.
16    Q.   After that, before he starts signing the
17 contracts, does he have to provide consent to sign the
18 documents?
19    A.   There is no such thing.
20    MR. PERALTA:  Objection; asked and answered.
21 BY MR. FEYGIN:
22    Q.   Please repeat yourself, Mr. Strusberg?
23    A.   There is no such thing.
24    Q.   There is no consent form?
25    A.   No.  It's the credit application itself.  At

Page 50

1 the end of the credit application, we have a click box
2 that says he's authorizing us to run his information,
3 so yeah, he does it on-line, not on paper.
4    Q.   So, that authorization comes at the end of
5 the transaction?
6    A.   At the beginning.
7    Q.   What e-mail address did he use to provide his
8 consent?
9    A.   I don't know.
10    Q.   Who would know?
11    A.   I don't even know if he provided a -- an
12 e-mail address.  That's not required.  If they have
13 e-mail, they put it.  Sometimes they -- they don't have
14 an e-mail, but that's --
15    Q.   Do you know if he was provided notice that he
16 could get a copy of the contract in paper format?
17    A.   I don't know.
18    Q.   Who would know?
19    A.   Alexander Reyes.
20    Q.   Was he provided notice that he could withdraw
21 his consent to sign electronically?
22    A.   You do it on -- on the credit application.
23 In the beginning, you do the credit app, and then at
24 the end it's a click box that he authorizes us to run
25 the credit, so he has to claim that.

Page 51

1    Q.   But was he provided notice that he could
2 withdraw consent?
3    A.   What is that?  I don't understand the
4 question.
5    Q.   Was he provided notice that he can cancel his
6 authorization?
7    A.   No.
8    Q.   How does the dealership store the electronic
9 documents?
10    A.   It stays in the DMS, DealerCenter.
11    Q.   And is there a log of his electronic
12 signatures?
13    A.   In every deal, of course.  I can look for it.
14 One second.  The whole deal is saved in DealerCenter.
15 I can send you copies if you want.
16    Q.   That would be great.
17    A.   Yeah.
18    MR. FEYGIN:  I'm going to pull up what's
19    going to be Claimant's Exhibit D, which is
20    effectively a Buyer's Order -- Buyer's Order
21    Contract.  This is stamped FSIA 00005, and it goes
22    down to FSIA 00007.
23    (Plaintiff Exhibit D was marked for
24    identification.)
25    (Whereupon, document(s) shared on the

Page 52

1    screen.)
2    MR. FEYGIN:  Does everybody see this?
3    THE WITNESS:  Yes.
4 BY MR. FEYGIN:
5    Q.   Mr. Strusberg, does this look familiar to
6 you?
7    A.   One -- one second, please.  That's the Bill
8 of Sale.
9    Q.   Is this a true and correct copy of the Bill
10 of Sale for my Plaintiff's transaction?
11    A.   Excuse me?
12    Q.   Is this a true and correct copy --
13    A.   Yes.
14    Q.   -- of the -- can you explain the significance
15 of a Bill of Sale?
16    A.   It's a -- it's a document that you have to
17 provide.  It's -- it's already printed.  It shows you
18 the -- the price the customer's paying, the taxes, the
19 transfer, the -- the -- the description of the vehicle
20 that he's buying, the money down he's coming up with.
21    Q.   Who prepared this document?
22    A.   The finance manager.
23    Q.   And who was that again?
24    A.   Alexander Reyes.
25    Q.   So, how much did my client pay for this

Page 53

1  vehicle?
2      A.   Can you -- one second.  I have it here.
3  He -- 25,000.
4      Q.   And what was the vehicle sales price before
5  all of the incidental charges?
6      A.   Twenty-one nine ninety-eight.
7      Q.   What was his down payment?
8      A.   5,000.
9      Q.   Did the dealership actually receive the
10 $5,000 down payment?
11     A.   Yes.
12     Q.   And what was the date of purchase?
13     A.   It says there, hang on, May 25th, 2020.
14     Q.   So, looking on the itemization of the sale on
15 the right-hand side over here, I see a predelivery
16 service fee of $799.
17     A.   That's dealer fee.
18     Q.   And what is this fee for?
19     A.   To cover my expenses.
20     Q.   And what would those expenses be in this
21 transaction?
22     A.   Rent, light bill, water bill, advertising,
23 secretary, et cetera.
24     Q.   Were any services performed specifically as
25 it relates to my client's vehicle --

Page 54

1      A.   No.
2      Q.   -- for this fee?
3      A.   No.
4      Q.   Is everyone charged the same fee?
5      A.   Yes.
6      Q.   Has this fee ever changed?
7      A.   Now, it's eight ninety-nine.  Now, it's more.
8      Q.   And when did that change occur?
9      A.   When I moved to this building location, like
10 two years ago.
11     Q.   So, what is the mileage disclosure here on
12 this form?
13     A.   The same mileage from the Bill of Sale from
14 Manheim from the auction.
15     Q.   Which was?
16     A.   One thirty-one six three six.
17     Q.   And does this form indicate anywhere that the
18 mileage was inaccurate?
19     A.   No.
20     Q.   Who signed the form on the dealership's
21 behalf?  I'll scroll down to the bottom so you can see
22 the signature.
23     A.   Alex Reyes.
24     Q.   Did you see this document before Mr. Reyes
25 signed it?

Page 55

1      A.   Yeah.
2      Q.   Did you approve of this document?
3      A.   No.  I'm not there when -- when he does it.
4      Q.   So, when did you see this document?
5      A.   I never saw it.  I just see it right now.
6      Q.   Do you have personal knowledge of whether
7  this document was ever explained to my client?
8      A.   No.  They have to read it.
9      Q.   I'm going to look at the top again over here.
10 I'm -- what does V#3 stand for in the upper
11 left-hand corner (indicating)?
12     A.   Do what?
13     Q.   Let me do this.
14     A.   I don't know.  I don't know.  That's -- oh,
15 that's the app number from the bank.  When you finance
16 it --
17     Q.   Uh-huh?
18     A.   -- every deal has an app number, and that's
19 the app number from when he purchased it.  I'm looking
20 at it right now in the deal here.  It's 57987168.
21 That's same one.
22     Q.   Okay.  And then what is this next to it
23 (indicating)?
24     A.   No, I don't know.
25     Q.   Would that be a version number?

Page 56

1      A.   No.  I don't know what is that.
2      Q.   Who would know?
3      A.   The DealerCenter.
4      Q.   If there were prior versions of a contract,
5  would they be in your possession?
6      A.   Do what?
7      Q.   If there were prior versions of a contract,
8  would the dealership maintain copies of those
9  documents?
10     A.   We maintain copies in the system for every
11 single customer.  Everything is in the system since we
12 open.
13     Q.   So, just to make sure I understand you
14 correctly, if there were prior versions, you would have
15 a copy, correct?
16     A.   Oh, yeah.  Yeah.  Yeah.
17         MR. FEYGIN:  I'm going to pull up what's
18     going to be Exhibit E, Plaintiff's Exhibit E, the
19     Retail Installment Sales Contract.  And this is
20     FSIA 000026, and it goes down through FSIA 000031.
21     Does everybody see this document?
22         THE WITNESS:  Yes.
23 BY MR. FEYGIN:
24     Q.   Is this a true and correct copy of the Retail
25 installment Sales Contract for the Plaintiff's

Page 57

transaction?

 A.   Yes.

 Q.   And in your words, what is this document?

 A.   That's the -- that's the contract with the
terms; 16 percent, how much money they're going to pay
in interest, how much he's financing, what's the
payment, what's the -- the months.  It tells you the
whole contract history.

 Q.   Would it be fair to call this a financing
agreement?

 A.   Yes.

 Q.   So, what is the difference between the first
contract we just saw and this one?

 A.   No.  That's the Bill of Sale.  The Bill of
Sale is not a -- it's just a Bill of Sale.  It's not
a -- this is the contract.

 Q.   And this was also electronically signed?

 A.   Correct.  Right there, you can see the
signature.

 Q.   And obviously Mr. Reyes signed this on behalf
of the dealership.

 A.   Correct.

 Q.   Was this -- do you have personal knowledge if
this contract was explained by Mr. Reyes to my client?

 A.   He explains to every customer.  They -- they

Page 58

explain the terms to the customer before they sign, the
payments, everything.

 Q.   And what was told to him?

 A.   I wasn't there.  I don't know, but I'm
assuming these terms; the payment five seventy-three a
month for 48 payments, the first payment begins July 7,
2020.  He got 16.9 percent APR.  Because when you get a
16 percent APR, it means you have bad credit, so I am
assuming he got bad credit, so everything is explained
before they sign.

 Q.   But that's an assumption and not personal
knowledge, correct?

 A.   You have to tell -- disclose all the terms
before the customer signs.  Nobody signs and then reads
after.  They -- we explain, and that's what I, you
know, taught them to my people.  They first need to
explain everything, and after they explain it, they
agree.  Then we go ahead and print the paperwork,
not -- we don't print paperwork before the customer
knowing what's the payment.  We print paperwork after
the customer knows everything.

 Q.   But you weren't there to personally witness
anybody --

 A.   Correct, I was not there.

 Q.   -- explain --

Page 59

 A.   Correct.

 Q.   Okay.  Does this form disclose to my client
that the vehicle had an inaccurate odometer reading?

 A.   No.

 Q.   And what was the odometer reading disclosure
on this form?

 A.   Like, from Manheim, one thirty-one six three
six.

 Q.   I'm going to scroll back to the top here.
Next to the application number, again we see this V#3.

 Any idea what that's about?

 A.   No.

 Q.   So, after my client left with the vehicle,
did my client make his payments directly to Powerhouse?

 A.   To the bank.

 Q.   And is that because Powerhouse assigned the
Financing Agreement to Westlake?

 A.   No.  Because we don't do buy here/pay here,
so he financed the car, and he needs to pay the lender
direct.

 Q.   And the lender was Westlake, correct?

 A.   Right.

 Q.   How much did Powerhouse make in profit off of
the assignment of the financing agreement to Westlake?

 A.   I can tell you right now.  Around $7,000.

Page 60

 Q.   And what did you just look at to make that
determination?

 A.   It's my -- my formula, the way I do the math.

 Q.   Is there a formal document that spells out
the payout between Westlake and you?

 A.   No.  We're taking the customer.  They give me
a check of 18,900.

 Q.   How did you come to this agreement with
Westlake?  Is there a master dealer agreement between
Westlake and the dealership?

 A.   Yes.

 Q.   Okay.  And was that in place at the time of
my client's purchase?

 A.   Yes.

 Q.   And you have a copy of that?

 A.   Well, I have my subscription with
DealerCenter.

 Q.   What I'm asking for, is there a formal
contract between you and Westlake that dictates how
much the dealership is going to make?

 A.   No.

 Q.   So, how did you determine with Westlake how
much you were going to get paid?

 A.   You submit the deal to the -- through the
platform from DealerCenter, and they give you a

Page 61

1  response based on the customer's information, the
2  income, et cetera.  On this particular deal, my check
3  was 18,900.
4       Q.   Did Westlake provide you with a deal recap or
5  washout sheet?
6       A.   Yeah.  I have it here.
7       Q.   Do you agree to provide the deal recap or
8  washout --
9       A.   Yes.
10      Q.   -- sheet?
11      A.   Yes, whatever you need.
12      Q.   Where is Westlake located, do you know?
13      A.   California.
14      Q.   How long have you been doing business with
15 Westlake?
16      A.   Five years.
17          MR. FEYGIN:  So, I'm going to pull up what's
18      going to be Plaintiff's Exhibit F.  It's going to
19      be an Odometer Disclosure Statement.  This was
20      produced in discovery by the Defendant, and it's
21      labelled FSIA 000018.
22          (Whereupon, document(s) shared on the
23      screen.)
24 BY MR. FEYGIN:
25      Q.   Does this document look familiar to you?

Page 62

1       A.   That's the odometer disclosure.
2       Q.   Is this a true and correct copy of the
3  odometer disclosure the dealership had my client
4  execute?
5       A.   That's it.  That's the only one.
6       Q.   What was the mileage disclosure on this
7  document?
8       A.   131636.  I don't -- I don't see it.  Yeah,
9  131636.
10      Q.   And was the checkbox selected where it says
11 "I certify the odometer reading is not the actual
12 mileage"?
13      A.   No.
14      Q.   Why did you have my client execute this
15 document?
16      A.   Because this is -- every customer needs to
17 sign it.  It's standard for every customer.
18      Q.   And is that because the DMV requires it or is
19 that because Westlake --
20      A.   The DMV requires it, yes.  The DMV requires
21 it.
22      Q.   Do you know if the Plaintiff personally
23 signed this document?
24      A.   I see both signatures, yes.
25      Q.   But you weren't there to actually see --

Page 63

1       A.   I wasn't there.
2       Q.   -- them sign the document?
3       A.   I was not there.
4       Q.   Do you have personal knowledge of whether
5  this form was explained to my client?
6       A.   No.
7       Q.   When did my client see this form, was it
8  before or after the Buyer's Order?
9       A.   While -- while signing all of the documents.
10 That's -- that's part of the package.
11      Q.   Was it before or after the Buyer's Order
12 form?
13      A.   That's after.
14      Q.   Was it before or after the Retail Installment
15 Sales Contract?
16      A.   I don't know.  I don't know the order, if
17 it's for -- if it's before or after.  I don't know.
18      Q.   Is there a way to figure out the order that
19 these contracts were provided to --
20      A.   I can --
21      Q.   -- to my client?
22      A.   I can ask the finance guy here, and he can
23 tell me.
24      Q.   Is there an actual log somewhere of how these
25 documents were signed with timestamps?

Page 64

1       A.   No.  I have to look a contract and tell you
2  what's the order.
3          MR. PERALTA:  Objection; asked and answered.
4          THE WITNESS:  Actually, they have -- do you
5      see the paper in the bottom?  They have, like --
6      like a number.  It's a sequence.  If you scroll --
7      if you scroll down, they -- like, in the corner, on
8      the paper in the corner in the bottom, there has to
9      be -- see it over there?  There is, like a --
10     that's the date.  It doesn't show the -- the
11     sequence.  Yeah, I don't know the sequence.
12 BY MR. FEYGIN:
13      Q.   Who would know?
14      A.   DealerCenter.
15          MR. FEYGIN:  I'll move on to the Application
16     for Certificate of Title.  This is going to be
17     Plaintiff's Exhibit G.
18         (Plaintiff Exhibit G was marked for
19     identification.)
20         (Whereupon, document(s) shared on the
21     screen.)
22          MR. FEYGIN:  And this is FSIA 000034.
23     Do we all see this document?
24          THE WITNESS:  Yes.
25 BY MR. FEYGIN:

Page 65

1    Q.    Does this look like a true and accurate copy
2  of the Application for Certificate of Title with --
3  without registration my client signed?
4    A.    Yes.
5    Q.    What is the purpose of this document?
6    A.    The customer authorizes the dealership to
7  transfer the car over to his name.
8    Q.    And why did my client have to sign this
9  document?
10   A.    That's not something they have to sign.
11 There -- there's no place to -- to sign it.  Only the
12 dealership.
13   Q.    So, is it your position that it's only one
14 page, this document?
15   A.    Correct.
16   Q.    There is no second page?
17   A.    No, no second page.  No.  Whatever --
18 whatever they have to sign, they sign, and -- and if
19 there's no space for them to sign, they don't sign.
20   Q.    Over here in the bottom right corner there's
21 the dealer agent signature.
22         Whose signature is that?
23   A.    Alexander Reyes.
24   Q.    Did my client ever see this document?
25   A.    Yes.  All of them.

Page 66

1    Q.    Were you there personally to witness my
2  client --
3    A.    No.
4    Q.    -- sign this document?
5    A.    No, but that's part of the package, and it
6  shows the lienholder, Westlake Financial.
7    Q.    So, when did Mr. Haddon see this form, was it
8  before or after the Buyer's Order?
9    A.    I don't know.
10   Q.    Was it before or after the Retail Installment
11 Sales Contract?
12   A.    I don't know.
13   Q.    So, how do you know that he saw it?
14   A.    It's in the package.  They give him a
15 package, and he needs to sign.  And whatever he doesn't
16 need to sign, he -- it's a package, but not all the
17 package is for him to sign.  Some -- some -- some
18 papers, like this one, doesn't need the customer's
19 signature.
20   Q.    What was the mileage disclosure on this form?
21   A.    131636.
22   Q.    And that was filled out by who?
23   A.    By the system, DealerCenter.
24   Q.    Who put the information into DealerCenter?
25   A.    Me and Alexander.

Page 67

1    Q.    And on what date was this information entered
2  into the system?
3    A.    I can tell you right now.  Well, this one
4  particular, when they sold the car, but I -- when I
5  post the cars on the web page -- let's see.  I posted
6  this car, so when I posted -- when -- when the first --
7  the car first arrived, I take pictures, and I post it.
8  The mileage, I put 131636.  It's on the -- the web page
9  since Day 1.
10   Q.    Getting back to this form, it says the
11 mileage reading is one thirty-one six thirty-six, date
12 read 5/25/2020.
13         Was the mileage read on that date?
14   A.    Yeah.
15   Q.    And did the dealership select that it was
16 actual mileage or --
17   A.    Yes.
18   Q.    -- not the actual mileage?
19   A.    Actual mileage.
20         MR. FEYGIN:  I'm going to move on to
21   Exhibit H.  This is Plaintiff's RFP 018.
22         (Plaintiff Exhibit H was marked for
23   identification.)
24         (Whereupon, document(s) shared on the
25   screen.)

Page 68

1  BY MR. FEYGIN:
2    Q.    Does this document look familiar to you?
3    A.    That's the Power of Attorney.
4    Q.    And what is the scan number at the top of
5  this document (indicating)?
6    A.    I don't know.
7    Q.    Can you see it now?
8    A.    Yeah, I can see it, but I don't know what is
9  it.
10   Q.    Can you read that into the record, please?
11   A.    539994090.
12   Q.    Is this a true and correct copy of the Power
13 of Attorney the dealership had my client sign?
14   A.    Yes, and that's their signatures.
15   Q.    And is this a true and correct copy of the
16 Power of Attorney that was submitted to the DMV by the
17 dealership --
18   A.    Yes.
19   Q.    -- for this transaction?
20   A.    Yes.
21   Q.    In your words, what is the purpose of this
22 document?
23   A.    It's a Power of Attorney that the customer
24 authorizes to transfer the car over to them.
25   Q.    And why does the dealership use a Power of

Page 69

1 Attorney form?
2     A.   It's a standard.  The DMV gives you the
3 paperwork.
4     Q.   How often does the dealership use this form?
5     A.   Every single deal.  When you print it, you
6 hit print, and the package comes automatically.  It's
7 standard in every customer.
8     Q.   And I just want to make sure that we're on
9 the same page here.
10         This is HSMV form 82053?
11     A.   Correct.
12     Q.   Read 12/11?
13     A.   Correct.
14     Q.   And it is your position as you sit here today
15 that you use this form in every single vehicle
16 transaction?
17     A.   Correct.
18     Q.   Who prepared this form for my client's
19 signature?
20     A.   The system and the -- and the finance
21 manager.
22     Q.   Okay.  And how do you know my client signed
23 this document?
24     A.   Because I can see the signature there.  I can
25 see two signatures.

Page 70

1     Q.   And was this ever explained to my client?
2     A.   Like I said, everything is explained, yes.
3     Q.   Were you there --
4     A.   I was not there.
5     Q.   -- to watch --
6     A.   No, I was not there.
7     Q.   When did Mr. Haddon see this form?
8     A.   When he signed it.
9     Q.   I should have been a little bit more
10 specific.
11         Was it before or after the RISC?
12     A.   At the moment of the sale.
13     Q.   Okay.  Was it before or after signing the
14 Retail Installment Sales Contract.
15     A.   At the moment of the sale?
16     Q.   Was it before or after signing the Buyer's
17 Order form?
18     A.   At the moment of the sale.
19     Q.   Was it before or after any of the other
20 documents we just reviewed?
21     A.   At the moment of the sale.
22     Q.   Okay.  Is it your position that you don't
23 know when this document was actually signed, then?
24     A.   Correct.
25     Q.   So, at the top over here, on what date was

Page 71

1 this signed?
2     A.   It says 5/25/2020.
3     Q.   And then beneath that, who is it that my
4 client appointed as the Power of Attorney (indicating)?
5     A.   Don Hall.
6     Q.   Who is Don Hall?
7     A.   I don't know.
8     Q.   Does Don Hall work for the dealership?
9     A.   No.
10     Q.   Is the dealership in the business of having
11 consumers sign Power of Attorneys appointing people
12 that are not employed by the dealership to act on their
13 behalf?
14     A.   Who's not -- who's not --
15     Q.   I'm asking you.  This is the form that you
16 submitted to the DMV that you just testified --
17     A.   No, because I --
18     Q.   -- that was part of my client's transaction.
19     A.   That part is -- it's the DMV office.  They
20 do --
21     Q.   Okay.
22     A.   They put names on them.  I think that must be
23 the DMV office where they transferred the car.
24     Q.   Okay.  When my client signed this document,
25 was the name Don Hall already put onto this document?

Page 72

1     A.   I don't know.
2     Q.   Who would know?
3     A.   The lady who does the transfers for -- for
4 me.
5     Q.   Who is that?
6     A.   Oh, I think -- Betty.  Betty does my titles.
7     Q.   And where does Betty work?
8     A.   She's mobile.
9     Q.   What is the name of her company?
10     A.   I don't know.
11     Q.   What is her contact information?
12     A.   I have her phone number.
13     Q.   Do you agree to provide that to me?
14     A.   Yes.
15     Q.   Okay.
16     A.   Yeah.  That whole -- the DMV office where
17 they transfer the car.
18     Q.   And how do you know that?
19     A.   It -- the name sounds familiar.
20     Q.   Does this document disclose the vehicle's
21 mileage anywhere?
22     A.   Not this one.  The odometer disclosure does
23 and the Bill of Sale and the contract.
24         MR. FEYGIN:  Okay.  I'm going to move on to
25     Exhibit I.  This is the Certificate of Title we

Page 73

1  obtained from the DMV through a public records
2  question.
3           (Plaintiff Exhibit I was marked for
4  identification.)
5           (Whereupon, document(s) shared on the
6  screen.)
7  BY MR. FEYGIN:
8      Q.  Does this look familiar to you?
9      A.  No.
10     Q.  You have never seen this document before?
11     A.  I've seen on other ones, but not this one.
12     Q.  Okay.  Did you submit title documents to the
13 DMV?
14     A.  No.  Betty.
15     Q.  Okay.  We can agree that this is a truthful
16 and accurate representation of the face of the title?
17     A.  Correct.
18     Q.  And what is this scan number at the top of
19 this document (indicating)?
20     A.  I don't know.
21     Q.  Okay.  Let me zoom in so you can see it
22 better.
23         What is the number over here?
24     A.  No, I already told you.  539994086.  It's a
25 transaction number there.

Page 74

1      Q.  Correct.  The scan transaction number?
2      A.  Yes.
3      Q.  Going to the second page, which is the back
4  of the title, can you read the scan transaction number
5  on the top?
6      A.  Can you please zoom out a little bit, please?
7      Q.  Sure.  (Complies with request.)
8      A.  539994087.
9      Q.  And you said that you don't remember or you
10 don't recall this form, do you?
11     A.  No.
12     Q.  Do you have a copy of the Certificate of
13 Title.
14     A.  In the deal jacket, might be.
15     Q.  Do you have a copy of the Certificate of
16 Title my client actually signed?
17     A.  Yes.  It has to be in the deal jacket.
18     Q.  Okay.  Do you have a copy of the Certificate
19 of Title where Auto Deal Corp. transferred the title to
20 Powerhouse?
21     A.  It must be in the -- in the papers.
22     Q.  Okay.  And do you agree to provide this
23 document?
24     A.  Yes, whatever you need.
25     Q.  Do you have the document in front of you now?

Page 75

1      A.  No.
2      Q.  Can you find the document as we sit here?
3      A.  No.
4      Q.  So, looking at this document here, do you
5  have any reason to believe this is not the document
6  where the Certificate of Title was transferred from
7  Powerhouse to Auto Deal -- I'm sorry, from Auto Deal to
8  Powerhouse?
9      A.  No.
10     Q.  Do you have any reason to believe that this
11 document is not the Certificate of Title in which
12 Powerhouse transferred the title to my client?
13     A.  No.
14     Q.  Okay.  I'm going to start off with the
15 transaction from McCombs to Auto Deal Corp, which is --
16 I'm going to highlight it so we can all focus in on it.
17         Do you see what I'm looking at?
18     A.  Yes.
19     Q.  Were you personally involved in this
20 transfer?
21     A.  No.
22     Q.  So, you did not sign this?
23     A.  No.
24     Q.  You did not see this transfer?
25     A.  I never touch titles.  I never do paperwork,

Page 76

1  not -- not one in my life.  I don't even know how to do
2  it.
3      Q.  Okay.  Moving on to the transfer from Auto
4  Deal to Powerhouse, see where I'm highlighting?
5      A.  Yes.
6      Q.  Okay.  Whose signature is this on the
7  left-hand side (indicating)?
8      A.  I don't know.
9      Q.  Who would know?
10     A.  Betty.
11     Q.  And is this your name to the right of the
12 signature (indicating)?
13     A.  Yes.
14     Q.  Why would your name be there, then?
15     A.  Because I'm the owner of the dealership.
16     Q.  But that's not your signature, though, is it?
17     A.  No.
18     Q.  Okay.  And we don't know who signed it?
19     A.  Betty.
20     Q.  So, now it's your position that this is
21 Betty's signature?
22     A.  I'm assuming because she's the only one that
23 does the -- the transfers at the moment of the -- of
24 the -- of the transfers.  In -- in that moment, back in
25 2020, she was the only one doing it.

Page 77

1    Q.   And Betty is not an employee of the
2 dealership, is she?
3    A.   Yeah, she works in the time.  Not anymore,
4 but back in the day she was working with me.
5    Q.   Was she a 1099 or a salaried employee?
6    A.   1099.
7    Q.   And how often did she get paid?
8    A.   Weekly.
9    Q.   Did Powerhouse ever sign a Power of Attorney
10 appointing Betty as the Power of Attorney to bind it in
11 this Certificate of Title transaction?
12    A.   I don't remember.
13    Q.   Let's look at the odometer disclosure here.
14    A.   One thirty-one three six -- 131630.
15    Q.   Okay.  And I'm going to delete the
16 highlighting so it might be easier for you.
17         On what date was the Certificate of Title
18 transferred to Powerhouse?
19    A.   I don't know.
20    Q.   What is the date that is listed on --
21    A.   Oh, it says 5/15/20.
22    Q.   And is that the actual date that the
23 Certificate of Title was transferred to Powerhouse?
24    A.   If it's there, yes.
25    Q.   Okay.  And when Powerhouse accepted this

Page 78

1 Certificate of Title, did it look at the face of the
2 title before signing this document, whoever --
3    A.   I don't know.
4    Q.   -- signed this?
5    A.   I don't know.
6    Q.   And who would know?
7    A.   Betty.
8    Q.   Okay.  And you didn't speak with her to
9 prepare for today, did you?
10    A.   No.
11    Q.   And do we know who Juliana A. is?
12    A.   That's the secretary from Auto Deal Corp.
13    Q.   Okay.  And you weren't present personally
14 when this transfer occurred?
15    A.   Correct.
16         MR. FEYGIN:  Okay.  I'm going to scroll down
17    to the transaction from Powerhouse to Gabriel Luc
18    Haddon.  It's the third reassignment.  I'm going to
19    highlight it just for a moment so everybody can see
20    what we're looking at.
21         Does everybody see what I'm talking about?
22         THE WITNESS:  Yes.
23 BY MR. FEYGIN:
24    Q.   What was the mileage disclosure at the time
25 of this transfer?

Page 79

1    A.   131636.
2    Q.   And what was the date that this disclosure
3 was made?
4    A.   It says there 5/25/20.
5    Q.   And is that the date that the -- the
6 disclosure was actually made on this title?
7    A.   Yes.
8    Q.   And how do you know that?
9    A.   By looking at the date right here.
10    Q.   And it's your position that the information
11 on this title document is truthful and accurate and
12 depicts exactly the date that this transfer occurred?
13    A.   Correct.
14    Q.   Who signed on behalf of the dealership?
15    A.   Betty.
16    Q.   And again, Betty's name doesn't appear there,
17 does it?
18    A.   No.  That's my name.
19    Q.   Okay.  So, to the right, that is your name,
20 Franklyn Strusberg?
21    A.   Correct.
22    Q.   And who signed on behalf of my client?
23    A.   He signed on the front, not on the title.
24    Q.   That's not the question.  I'm looking at --
25    A.   Him, the -- the customer.

Page 80

1    Q.   So, it's your position --
2    A.   You don't -- you don't sign.  They put the
3 name on it.
4    Q.   Okay.  Let's look at it a little bit more
5 closely here.
6         Do you see where I'm pointing at
7 (indicating)?
8    A.   Yes.
9    Q.   Underneath, what does it say right there
10 (indicating)?
11    A.   "Signature of borrower."
12    Q.   Okay.  And is it your position that my client
13 did not sign this document?
14    A.   That's why you got the Power of Attorney.
15    Q.   Okay.  And now is it your position that a
16 Power of Attorney signed this document on my client's
17 behalf?
18    A.   No.  He signed it.  He signed the Power of
19 Attorney for me to sign for him.
20    Q.   Okay.  So, let's unpack that.
21         My client signed a Power of Attorney,
22 correct?
23    A.   Correct.
24    Q.   And he let you sign this document on his
25 behalf?

Page 81

1    A.   That's what the Power of Attorney says.
2    Q.   And did you sign this document on my client's
3 behalf?
4    A.   No.
5    Q.   Who signed this document on my client's
6 behalf?
7    A.   Somebody in the dealership.  Betty.  I'm
8 assuming Betty.
9    Q.   How would you find out who signed this
10 document?
11   A.   I can call her and ask her.
12   Q.   And you didn't speak with her in preparation
13 for today's deposition?
14   A.   Oh, no.  No.  No.
15        MR. PERALTA:  Asked and answered.
16        THE WITNESS:  I haven't talked to her for,
17   like two months.
18 BY MR. FEYGIN:
19   Q.   And why is that?
20   A.   She no longer works with me.  I have a new
21 lady.
22   Q.   When this mileage disclosure was made on
23 5/25/2020, did Powerhouse Automotive look at the face
24 of the title?
25   A.   No.

Page 82

1    Q.   And at the time of the sale of the vehicle to
2 Mr. Haddon, did the dealership have this title in its
3 possession?
4    A.   No.
5    Q.   Didn't you just testify that it was sign on
6 May 25th of 2020?
7        MR. PERALTA:  Objection; mischaracterizes his
8    testimony.
9        Go ahead, Frank.
10        THE WITNESS:  I got the title on 5/15.
11 BY MR. FEYGIN:
12   Q.   Okay.  So, was the dealership in possession
13 of this title on 5/25?
14        MR. PERALTA:  Objection; asked and answered.
15        THE WITNESS:  On 5/25?  Yes.
16 BY MR. FEYGIN:
17   Q.   Okay.  So, it wasn't being held by a lender
18 when my client signed it, was it?
19   A.   By Auto Deal Corp.
20   Q.   Let me -- let me ask you a different
21 question.
22        Looking at the document we're looking at here
23 today, right, it wasn't in the possession of a lender
24 at the time this signature was applied to the title,
25 was it?

Page 83

1    A.   No.
2    Q.   And the title wasn't lost or in the process
3 of being replaced, was it?
4    A.   Correct.
5    Q.   So, why is it that a Power of Attorney was
6 used to sign this document instead of having my client
7 sign the document?
8    A.   I don't know.
9    Q.   Who would know?
10   A.   Betty.
11   Q.   Okay.  Again, you didn't speak to her about
12 this question either, did you?
13   A.   Correct.
14   Q.   So, after the vehicle was sold, did the
15 dealership ever inform my client that it had a tampered
16 odometer?
17   A.   No.
18        MR. PERALTA:  Objection; assumes facts not in
19   evidence.
20 BY MR. FEYGIN:
21   Q.   When did the dealership first learn that the
22 odometer reading was inaccurate?
23   A.   When the bond called me.
24   Q.   And do we agree that the mileage reading is
25 inaccurate?

Page 84

1    A.   Yes.
2    Q.   Okay.  And why do we have that agreement, is
3 that because the face of the title says a different
4 mileage reading?
5    A.   Because we dig -- dig into it when the bond
6 called me.  And I called Manheim, and Manheim told me
7 that the seller, Ford, made a mistake.
8    Q.   So, there's no dispute that the mileage is
9 inaccurate on this vehicle?
10   A.   Correct.
11   Q.   Excellent.  Has the dealership ever been sued
12 before?
13   A.   No.
14        MR. PERALTA:  Asked and answered; objection.
15 BY MR. FEYGIN:
16   Q.   Has the dealership ever been sued for
17 odometer issues before?
18   A.   Never.
19        MR. PERALTA:  Asked and answered; objection.
20 BY MR. FEYGIN:
21   Q.   Has a consumer ever filed a Complaint against
22 the dealership with the Better Business Bureau?
23   A.   Yes.
24   Q.   When?
25   A.   I don't know.

Page 85

1    Q.   Who would know?
2    A.   The -- if you look into the Better Business
3  Bureau page, you can see that.
4    Q.   Do you have access to the Better Business
5  Bureau page and all of the Complaints that were waged
6  against you?
7    A.   No.
8    Q.   Do you have an account with the Better
9  Business Bureau?
10   A.   I think so.
11   Q.   How can you determine whether or not you have
12 an account?
13   A.   I might have it, but maybe it expired.  I
14 have to activate it again.
15   Q.   Did anybody ever file a Complaint with a
16 county department against the -- the dealership?
17   A.   Not that I know of.
18   Q.   Did anybody ever file a Complaint with the
19 Department of Agriculture and Consumer Services against
20 the dealership?
21   A.   No.  With the DMV.
22   Q.   Has anybody filed a Complaint with the DMV?
23   A.   Yes.
24   Q.   How many?
25   A.   I don't know.

Page 86

1    Q.   Who would know?
2    A.   The DMV records.
3    Q.   Do you not maintain possession of these
4  records in -- in your office?
5    A.   No, because they -- we solved all the issues.
6  The Complaints are for different reasons, like the
7  compressor is not working, the -- the -- the
8  transmission is -- any mechanical issues, and we always
9  help the -- the community.
10   Q.   And is it your position that you were never
11 cited by the DMV?
12   A.   Every time there is a complaint, the DMV
13 comes to the dealer to solve the issue.
14   Q.   Did you ever receive a citation from the DMV?
15   A.   Yes.
16   Q.   What was that citation for?
17   A.   I don't know.
18   Q.   Has anybody filed a Complaint with the
19 attorney general's office against the dealership?
20   A.   Not that I know of.
21   Q.   Who would know?
22   A.   No, I don't know.
23   Q.   I understand you don't know, but who in the
24 organization would know?
25   A.   Nobody.

Page 87

1        MR. FEYGIN:  Okay.  I'm going to move on to
2    Exhibit J, which is going to be the Amended Answer
3    and Affirmative Defenses.
4        (Plaintiff Exhibit J was marked for
5    identification.)
6        (Whereupon, document(s) shared on the
7    screen.)
8  BY MR. FEYGIN:
9    Q.   Have you ever seen this document?
10   A.   No.
11   Q.   Okay.  I'm going to look at the affirmative
12 defenses that your attorneys filed with the Court.
13       For your first affirmative defense, what
14 facts do you rely upon to assert accord and
15 satisfaction?
16   A.   You're asking me?
17   Q.   Yes.
18   A.   I don't understand the question.
19   Q.   What facts do you rely upon when you say the
20 Plaintiff's actual damages have been fully resolved by
21 the parties' agreement and the Defendant's payment?
22   A.   The -- the bond called me asking for a check
23 for $9,000, and I sent it.
24   Q.   For your third affirmative defense -- I'm
25 sorry.

Page 88

1        For your second affirmative defense, what
2  facts do you rely upon when you assert that the
3  Plaintiff was aware of any discrepancy in the odometer
4  reading of the subject vehicle on or soon after
5  May 25th, 2020?
6    A.   What is the question?
7    Q.   What facts do you rely upon when the
8  dealership asserts that the Plaintiff was aware of any
9  discrepancy in the odometer reading?
10   A.   I called -- I called Manheim automatically.
11 The second I -- I received the -- the call from the
12 bond about the claim of the mileage, the discrepancy, I
13 called the -- Manheim, the auction.
14       And I asked them why if the car was a
15 rollback they didn't disclose it on the comments,
16 because normally when the car has a discrepancy with
17 the mileage they have to disclose it on the comments
18 and they sell me the car TMU.  This car was sold to me.
19 I bought the car under the -- under the impression that
20 the car had a 131,000 miles.  That's why I bought it,
21 but then when I find out, that is when I called
22 Manheim.  And they dig into it, and the answer was
23 Ford, the seller, made a mistake.
24   Q.   What facts do you have that my client knew
25 that the odometer was rolled back shortly after the

Case 8:23-cv-00709-WFJ-SPF   Document 73-2   Filed 10/07/24   Page 23 of 58 PageID 1092

GABRIEL JULIA vs. THE CELEBRATION OF FS INVESTMENTS                    4/11/2024
                          CR of FS Investments (Franklyn Strusberg)
                                                                      23 (89 - 92)

Page 89

1  purchase?

2      A.   No.  I find out because of the bond.  That's

3  when I find out.

4      Q.   I understand when you found out.  What I'm

5  asking you is:  You have asserted that my client knew

6  that the mileage was inaccurate shortly after the

7  purchase.

8          What facts do you have to support my client

9  knew that the mileage was inaccurate shortly after

10  purchase?

11     A.   I don't know.

12     Q.   For your third affirmative defense, what

13  facts do you rely upon when you assert that the

14  Plaintiff's cause of action is barred by the doctrine

15  of laches?

16         MR. PERALTA:  Objection; calls for a legal

17     conclusion.

18         THE WITNESS:  Can you please explain the

19     question a little better for me, please?

20         MR. FEYGIN:  For the third affirmative

21     defense --

22         THE WITNESS:  Yes.

23         MR. FEYGIN:  -- the dealership has asserted

24     that the client -- the consumer's causes of action

25     are barred by the doctrine of laches.

Page 90

1          How was the dealership prejudiced by the

2      Plaintiff filing a lawsuit two years and ten months

3      after he purchased the vehicle?

4          THE WITNESS:  No, this is -- we completely

5      understand that it's a human mistake.  We're not

6      here to blame nobody.  It's -- it's -- they made a

7      mistake, and since Day 1 when I contacted the bond,

8      I told them that Manheim was open to receive the

9      car back and to refund me the money.

10  BY MR. FEYGIN:

11     Q.   How was the dealership prejudiced by the

12  filing of this lawsuit two years and ten months after

13  the purchase?

14     A.   I don't understand the question.  I'm sorry.

15     Q.   As in for your fourth affirmative defense,

16  what facts does the dealership rely upon when you

17  assert that the Plaintiff has not suffered and cannot

18  honestly allege any actual damages?

19     A.   I don't understand the question.

20     Q.   For your sixth affirmative defense, what

21  facts do you rely upon when you assert Counts II and

22  III are barred under the Independent Tort Doctrine?

23     A.   Are you talking to me in Chinese.

24     Q.   Are we in agreement that the mileage

25  disclosures provided to my client on the title

Page 91

1  documents was inaccurate?

2      A.   Yes.

3      Q.   So, for your seventh affirmative defense,

4  what facts does the dealership rely upon when it

5  asserts my client waived his rights?

6      A.   I don't understand the question.

7      Q.   What rights did my client waive?

8      A.   No, he's -- he's -- he -- it's his right

9  to -- to complain about that.  If I was him, I -- I

10  would have done the same.  I -- there's no -- I'm not

11  discussing that.  He's a hundred percent right.  Your

12  client is 100 percent right, and I'm with him.

13     Q.   For your eighth affirmative defense, what

14  facts do you rely upon when you assert Plaintiff's

15  claims are barred by a prior settlement and release?

16     A.   Well, the -- the solution that I offered

17  since Day 1 is just to unwind the deal so I can just

18  give the car back to Manheim so -- so he doesn't need

19  to keep that car, and Manheim opened up that -- that

20  door for us.  They say just to unwind the deal.

21     Q.   Are you still willing to unwind the deal?

22     A.   I got to call Manheim again.  I spoke with

23  them maybe, like a year ago, but I've got to talk to

24  them again.  I'm pretty sure they're going to want the

25  deal.

Page 92

1      Q.   And would you be interested in exploring that

2  option again?

3      A.   Whatever we need to do to -- to -- I mean,

4  it's -- it's a -- it's a mistake, and I understand your

5  point.  And me as a dealer, I learned my lesson with

6  this particular case because next time I'm going to try

7  to -- to make sure the mileage are right, to ask --

8  triple check with the auction, "are you sure this

9  mileage are right?"  Call them when they do the

10  inspection, make sure they check on -- because they

11  have access to -- to CARFAX™ and all that, so just to

12  make sure they -- they check the mileage.

13     Q.   And so, from what I understand, and correct

14  me if I'm wrong, but I think you're saying that you

15  didn't take necessary steps to verify the mileage, you

16  just relied on --

17     A.   No.  We go -- my process is --

18         MR. PERALTA:  Objection; mischaracterizes his

19     testimony.

20         THE WITNESS:  Yeah.  My -- my process is

21     simple.  When we buy the cars, we go by the Bill of

22     Sale of Manheim and -- and the odometer that

23     Manheim provides.  Because Manheim is the biggest

24     company in the U.S., so we go by -- whatever they

25     provide, we go by that.

Page 93

BY MR. FEYGIN:

Q.   Did my client ever sign a Settlement and
Release Agreement regarding his odometer claim
odometer?

A.   I don't remember.

Q.   Did my client ever sign a Settlement and
Release Agreement regarding his fraud claim?

A.   I don't know.

Q.   For your ninth affirmative defense, what
facts do you rely upon when you assert Defendant acted
in good faith and followed commercially and reasonable
standards?

A.   He acted in good faith, yes.

Q.   What commercial reasonable standards did the
dealership follow?

A.   We go by -- like, I said, by whatever
Manheim -- we only buy from Manheim because it's --
it's a trustworthy company, so whatever they tell us is
what we tell the -- the customers, whatever is on the
paper, on the Bill of Sale of the truck.

Q.   For your eleventh and twelfth affirmative
defenses, what facts do you rely upon when you assert
Plaintiff is estopped from asserting the actions in the
Complaint as his own conduct and/or the conduct of
third-parties outside of the Defendant's control?  What

Page 94

third-parties are you referring to?

A.   I don't know.

Q.   What did those third-parties do to contribute
to this liability?

A.   I don't know.

Q.   For your thirteenth affirmative defense, what
facts do you rely upon when you assert Plaintiff was
negligent?

A.   Who was negligent?

Q.   My client.

A.   Why was he?

Q.   It says my client was negligent.
How was my client negligent?

A.   I don't know.

Q.   For your fourteenth affirmative defense, what
facts do you rely upon when you assert Plaintiff's
claims are barred in whole or in part of the
Doctrines of Unclean Hands, estoppel, laches,
acquiescence and other doctrines of equitable relief?

A.   Can you please repeat that question again?

Q.   For your fourteenth affirmative defense, it's
titled unclean hands, and it states that the
Plaintiff's claims are barred in whole or in part by
the doctrines of unclean hands, estoppel, laches,
acquience (sic) -- acquiescence and other doctrines of

Page 95

equitable relief.

What facts do you rely upon to assert this
affirmative defense?

A.   I don't know.

Q.   For your sixteenth affirmative defense, what
facts do you rely upon when you assert Plaintiff failed
to mitigate damages?

A.   We always help the customers.

Q.   What should have my client done differently
here?

A.   I mean, it -- he did what he thought it was
good to do.  He's -- he's been down -- he's been down
before, because I remember when he was talking about a
lawsuit that he win, so he's been down this road
before.  Me, no.  For me, this is new.

Q.   For your nineteenth affirmative defense, what
facts do you rely upon when you assert Plaintiff's
cause of action for breach of express warranty is
barred by his alteration of the vehicle?

MR. PERALTA:  Would you mind showing it,
Joshua?

MR. FEYGIN:  (Complies with request.)

MR. PERALTA:  Thank you.

BY MR. FEYGIN:

Q.   Number 19 over here, Plaintiff's cause of

Page 96

action for breach of express warranty is barred by his
alteration of the vehicle while in his possession.

What facts do you have to support that my
client altered the vehicle?

A.   I don't know.

Q.   Are you aware of any other affirmative
defenses in this case that they the dealership intends
to rely on?

A.   I don't remember.  I'm sorry.

MR. FEYGIN:  Okay.  I'm going to move on to
Plaintiff's Exhibit K, and this is the Leave to
Amend, Motion for Leave to Amend.

(Plaintiff Exhibit K was marked for
identification.)

(Whereupon, document(s) shared on the
screen.)

BY MR. FEYGIN:

Q.   Have you ever seen this document?

A.   I don't -- let me see.  I saw it, yeah, but I
didn't read it.

Q.   Okay.  I'm going to scroll down to what
appears to be Page 3 of 12.  In here in the highlighted
section it states:  However, before selling the vehicle
to Plaintiff, Defendant did not have any knowledge or
information that a 131,636 miles was not the actual

Page 97

1 mileage of the vehicle. The Defendant was not in
2 possession, nor was it aware of the content of the
3 Certificate of Title or CARFAX™ report. Defendant was
4 guided only by the vehicle's dashboard and the
5 information provided by the McCombs when Defendant
6 purchased the vehicle from McCombs.
7        Is this truthful and accurate?
8     A.  Correct.
9     Q.  Okay.  You previously testified, though, that
10 you did have possession of the title at the time of the
11 transfer?
12        MR. PERALTA:  Objection mis- --
13        mischaracterizes his testimony.
14        THE WITNESS:  No.  When you sell the car, you
15        get -- you give them a temporary register.  In that
16        moment, you don't have the title.  I got the title
17        after I sold the car.
18        MR. FEYGIN:  So, you testified that the date
19        on the Certificate of Title for the transfer for my
20        client's transaction was 5/25/20, and you're --
21        THE WITNESS:  That's what's -- that's what is
22        on the title.
23 BY MR. FEYGIN:
24     Q.  That's not the date that it was transferred,
25 though, was it?

Page 98

1     A.  I don't remember.
2        MR. PERALTA:  Objection; leading.
3        THE WITNESS:  I got to ask the lady, Betty.
4 BY MR. FEYGIN:
5     Q.  So, is it possible that the date on the
6 Certificate of Title does not reflect the actual date
7 that the transfer occurred to my client?
8     A.  It could be.
9     Q.  How would you figure this out?
10     A.  I don't know.  I -- I -- I don't remember.  I
11 don't know how they do paperwork.  I'm sorry.
12     Q.  After --
13     A.  I've got to ask Betty.
14     Q.  Okay.  And Betty was working for the
15 dealership at the time that this occurred?
16     A.  At the time, correct.
17     Q.  So, over here, it states that you relied upon
18 the information provided by McCombs.
19        What information was provided by McCombs?
20     A.  The Bill of Sale.
21     Q.  That was the only information you received
22 from McCombs?
23     A.  Correct.
24        MR. FEYGIN:  I'm going to move on to what's
25        going to be Plaintiff's Exhibit L.

Page 99

1        (Plaintiff Exhibit L was marked for
2        identification.)
3        (Whereupon, document(s) shared on the
4        screen.)
5        THE WITNESS:  McCombs.
6        MR. FEYGIN:  McCombs, McCumbs.  I don't know
7        how to pronounce it.
8        THE WITNESS:  It's McCombs.
9 BY MR. FEYGIN:
10     Q.  Have you done a lot of business with them?
11     A.  No.  First.  First and last.
12     Q.  First and last, huh?  Yeah, I don't blame
13 you.
14        So, do you recall receiving this demand
15 letter?
16     A.  See, what is that?  Not that I remember.  Not
17 that I remember.
18     Q.  Okay.  Do you recall receiving demand letters
19 from my dealer -- my -- my law firm?
20     A.  No.  I only got a letter from -- from the
21 bond.
22     Q.  Okay.  And what did the bond attach with that
23 letter?
24     A.  They only requested $9,000.
25     Q.  So, walk me through that process.  They

Page 100

1 simply sent you a letter saying "we need 9,000 from
2 you"?
3     A.  Yes, and -- and if -- if you don't pay the
4 bond, they -- they pretty much, they cancel your bond,
5 and if I don't have a bond, I cannot sell cars, so...
6     Q.  Prior to receiving that letter, did Stephanie
7 reach out to you to let you know that there was an
8 active bond claim?
9     A.  Yes.  That's why I had to send the check, and
10 then I say, "Let me dig into it."  And that's when I
11 called my attorney, and that's why --
12     Q.  How did Stephanie contact you?
13     A.  That's when I called Manheim.  I'm sorry.
14 What?
15     Q.  How did Stephanie from Hudson contact you
16 first?
17     A.  She sent me an e-mail.  Through e-mail.
18 We -- we spoke through e-mails.
19     Q.  Do you have a copy of that e-mail string
20 saved?
21     A.  I got to look for it, but it might be in my
22 e-mail.
23     Q.  Do you recall what was attached to the e-mail
24 Stephanie sent to you?
25     A.  I don't know.

Page 101

1    Q.   Do you agree to search for that e-mail?
2    A.   Yes.
3    Q.   And if you can find it, you agree to provide
4    it?
5    A.   Yes, sir.
6    Q.   Where did you send the check?
7    A.   To the address they provided.
8    Q.   And what was the amount of the check?
9    A.   I don't remember.
10   Q.   Was it $10,000?
11   A.   It was under that.
12   Q.   Was it less than $9,000?
13   A.   It was like, 8,000-something, yes.
14   8,900-something.
15        MR. FEYGIN:  I'm going to move on to what's
16   Exhibit M.
17        (Plaintiff Exhibit M was marked for
18   identification.)
19        (Whereupon, document(s) shared on the
20   screen.)
21   BY MR. FEYGIN:
22   Q.   This is another one of the demand letters.
23        Do you recall receiving this?
24   A.   No.
25   Q.   Do you recall Stephanie providing you with

Page 102

1    this?
2    A.   I don't remember.  I'm sorry.
3        MR. FEYGIN:  I think that's about it.
4        Jose, got any cross?
5        MR. PERALTA:  Yes, I will.  I need to go to
6    the restroom first.
7        MR. FEYGIN:  All right.  Let's take a break.
8        MR. PERALTA:  McCombs, are you -- well, I --
9    I -- I would rather go after McCombs, so if -- does
10   McCombs have any questions?
11        MR. TORRES:  I do have a few.
12        MR. PERALTA:  Can we wait so I can go to the
13   restroom?
14        MR. TORRES:  Yeah, I'm okay with taking a
15   five-minute break.
16        MR. PERALTA:  Thank you.
17        MR. TORRES:  You want to be back at 12:06?
18        MR. PERALTA:  Yeah, that works for me.
19        MR. TORRES:  All right.
20        (Thereupon, an off-the-record recess was had
21   from 12:01 until 12:06 p.m.)
22        MR. FEYGIN:  Before we move on, I have one
23   more question to ask.
24        MR. PERALTA:  Yeah.
25   BY MR. FEYGIN:

Page 103

1    Q.   Mr. Strusberg, are you ready to proceed?
2    A.   Yeah.  Yeah, I'm here.
3    Q.   Are you aware that the Plaintiff issued a
4    settlement offer on March 14th where he agreed to
5    return the vehicle is-as, where-is in exchange for
6    $30,000 to settle the case?
7    A.   I don't remember.
8    Q.   That offer was never conveyed to you?
9    A.   Through who, through my attorney?
10   Q.   Correct.
11   A.   I don't remember.  I'm sorry.
12        MR. FEYGIN:  Okay.  All right.  That's good
13   enough for now.
14        MR. PERALTA:  Josh, if you could please
15   e-mail me that -- the Certificate of -- of Title
16   with the transfer history attached?
17        MR. FEYGIN:  Sure.  Not a problem.  It was
18   disclosed in discovery.
19        MR. PERALTA:  I'm not saying that it wasn't,
20   but since you have it, you know, it will be nice;
21   otherwise, I would have to pause the deposition and
22   look for it and you know.
23        MR. FEYGIN:  Oh, you want it right now?
24        MR. PERALTA:  Yeah, if you don't mind.
25        MR. FEYGIN:  Sent.

Page 104

1        MR. PERALTA:  Thank you.
2        MR. TORRES:  See?  Can we go?
3        MR. PERALTA:  Yeah.
4        MR. TORRES:  Awesome.
5             CROSS-EXAMINATION
6    BY MR. TORRES:
7    Q.   I just have a few questions, Mr. Strusberg.
8    Thank you so much.  My name is Nicolas Torres.  I
9    represent McCombs in this case.
10        First you went over your relationship with
11   Auto Deal Corp.  You mentioned that you and their owner
12   are friends, so you-all have a relationship where he
13   helped you get started, helped you with the financing
14   at first.
15        Whenever you -- and these questions, I'm not
16   talking about what you and your operation is like now.
17   I want to take you back to 2020 when this specific
18   transaction happened.
19        At the time when you were going through the
20   Manheim website and you were searching for vehicles,
21   you were making deals at that time, were you doing so
22   under an account that was named for Auto Deal Corp. or
23   was it one that was under your dealership's name?
24   A.   Auto Deal Corp.
25   Q.   So, the -- the Manheim account itself was

Page 105

1 under Auto Deal Corp.'s name?

2    A.   No.  No.  It's -- it's -- it's my Manheim

3 account.  I'm just added as a buyer on Auto Deal Corp.

4    Q.   Got it, but the Manheim account is you

5 personally?

6    A.   Is mine, yeah, yeah.  Yeah, FS -- FS

7 Investments.  Yes, it's my account.

8    Q.   Okay.  And I know that you're here as a

9 corporate rep, so when you say yours and FS Investment,

10 you mean it's under the company name, right?

11   A.   Correct.  Correct.

12   Q.   Not under Franklyn Strusberg?

13   A.   Correct, yes.

14   Q.   Okay.  And are you -- at the time were you

15 added as a buyer to any other company or any other --

16   A.   Just --

17   Q.   -- car buyer?

18   A.   Just Auto Deal Corp.

19   Q.   Just Auto Deal Corp.?

20   A.   Correct.

21   Q.   So, whenever you would identify a vehicle and

22 you would say "okay, this is the vehicle that I want to

23 buy," you would submit information to Auto Deal Corp.

24 to finalize that process or would you do the clicking

25 and the processing yourself?

Page 106

1    A.   I -- I do the click, and I buy it.

2         THE COURT REPORTER:  Again, Mr. Strusberg --

3         MR. TORRES:  Why --

4         THE COURT REPORTER:  I'm sorry.  Again,

5    Mr. Strusberg, please let him finish his question

6    before you begin your answer.  You're talking over

7    each other.  Thank you.

8         THE WITNESS:  I'm sorry, your honor.

9         THE COURT REPORTER:  No worries.

10 BY MR. TORRES:

11   Q.   Okay.  If it was you that made the

12 purchasing, why is it that this Juliana name comes out

13 as the agent signing the Certificates of Title on

14 behalf of Auto Deal and not you, yourself?

15   A.   She's the one who does the paperwork.

16   Q.   So, whenever you purchase a vehicle through

17 the Manheim website, does Juliana or does Auto Deal

18 Corp. automatically get notified that there's been a

19 purchase and they have to get the paperwork started and

20 done for that purchase?

21   A.   Yes.

22   Q.   Is that notification automatic from Manheim

23 to Auto Deal Corp.?

24   A.   Yes.

25   Q.   Do you, yourself, then reach out to Auto Deal

Page 107

1 Corp. in any way to let them know what vehicles you

2 purchased and what paperwork needs to be done?

3    A.   No.  Just to show them the cars that are --

4 that I purchased so they can pay for them so I can pick

5 them up.  Because as soon as they pay, they generate a

6 gate pass, and then I can have the truck driver pick it

7 up.

8    Q.   That gate pass is sent to Auto Deal Corp.,

9 though, right?

10   A.   Correct.

11   Q.   So, Auto Deal essentially gets notified

12 twice, once from Manheim and once from you, that

13 there's been vehicles that you've selected for

14 purchase?

15   A.   Correct.

16   Q.   Your communication with Auto Deal during this

17 time regarding specific purchases, over any purchase

18 really that you were making during this time, but

19 specifically this one vehicle, is that communication

20 done through e-mail, phone, any messaging within the

21 Manheim website?

22   A.   Phone.  Phone call.

23   Q.   Any text messages?

24   A.   Sometimes.

25   Q.   Regular text messages, WhatsApp?

Page 108

1    A.   WhatsApp.

2    Q.   WhatsApp?

3    A.   Correct.

4    Q.   Who would you be contacting from Auto Deal

5 Corp. through WhatsApp?

6    A.   My friend, Martine.

7    Q.   Did you ever communicate directly with

8 Juliana or any other person --

9    A.   I don't know --

10   Q.   -- Auto Deal Corp.?

11   A.   I don't even know her.  I don't know her.

12   Q.   Did you ever communicate with anyone from

13 Auto Deal that was not your friend?

14   A.   No.

15   Q.   Do you know how many employees Auto Deal

16 Corp. has?

17   A.   No.

18   Q.   Have you ever entered into any formal

19 agreement or contract with Auto Deal to serve as their

20 agent or representative in any way?

21   A.   No.

22   Q.   The nature of your authority to buy cars on

23 behalf of them or using their account, that is strictly

24 a conversation between you and your friend --

25   A.   I'm --

Page 109

1  Q.  -- and an understanding with you and your
2 friend.
3  A.  I'm registered in Manheim under Auto Deal
4 Corp. as a buyer.
5  Q.  But the authority to add you as a buyer under
6 Manheim, that was given to you by your friend from Auto
7 Deal Corp., right?
8  A.  Correct.
9  Q.  Is there any written or recorded copy of that
10 agreement in any way?
11  A.  No.
12  Q.  Based on what you've testified to so far, and
13 please correct me if I'm wrong, the first notice that
14 you received of there being any issues with the
15 odometer was when you were contacted by the bond
16 office?
17  A.  Correct.
18  Q.  And that was sometime in 2022?
19  A.  No clue.
20  Q.  Do you remember when that was?
21  A.  No.
22  Q.  And an estimation, was it within months of
23 the sale, within a year, within two?
24  A.  I don't remember.  I'm sorry.
25  Q.  Okay.  And the first notice of -- the first

Page 110

1 time that you received any notice was through the
2 Stephanie person from the bond company, right?
3  A.  Correct.
4  Q.  You also testified earlier that Manheim
5 shipped a -- the Certificate of Title, the actual
6 Certificate of Title sometime, I believe the date was
7 April 28th, 2020 and that they Fed Ex'd it or UPS'ed it
8 over to Auto Deal Corp.
9  Do you recall that?
10  A.  Yes.
11  Q.  Do you know or do you have any memory of how
12 Auto Deal Corp. then transferred that title to you?
13  A.  No.
14  Q.  Did Auto Deal Corp. ever transfer that title
15 to you?
16  A.  They have to.
17  Q.  So, Auto Deal transfers the title, the
18 physical title to you, and then you transfer that
19 physical title to whoever you sell the vehicle to?
20  MR. PERALTA:  Objection; assumes facts not in
21  evidence.
22 BY MR. TORRES:
23  Q.  Is that correct?
24  A.  Correct.
25  Q.  Now, as we have seen now, that Certificate of

Page 111

1 Title does reflect mileage that is above the 131,000
2 that is reflected elsewhere in that deal, correct?
3  A.  Correct.
4  Q.  So, it's fair to say that at least at some
5 point in May of 2020 your company had a copy of the
6 physical Certificate of Title reflecting 2000 -- at
7 least 200,000 miles as the actual miles, correct?
8  A.  No.  No.  I always receive the title after I
9 sell the car.
10  Q.  Okay.
11  A.  Not before.
12  Q.  Okay.  So, at some point after 4/28/2020 Auto
13 Deal Corp. gets the certificate, the actual title, then
14 your position is that they do not immediately send that
15 to you, but they send that to you only after you have
16 sold the vehicle?
17  A.  Yes.  That's the agreement I have with my
18 investor.
19  Q.  Okay.  So, Auto Deal holds the Certificate of
20 Title.
21  Do you know what type of envelope or what
22 type of packaging that comes in from Manheim?
23  A.  They -- they always send them Fed Ex.
24  Q.  Okay.  Regular, one of those Fed Ex
25 envelopes, the flat --

Page 112

1  A.  Fed Ex envelopes, correct.
2  Q.  Is it -- is there any further packaging once
3 you open one of those envelopes?
4  A.  No.
5  Q.  So, if you open up the envelope, you take out
6 the Certificate of Title?
7  A.  Yes.
8  Q.  Whenever Auto Deal Corp. sends the
9 Certificate of Title to you, do they also use UPS or
10 any type of shipping company?
11  A.  They use Fed Ex only.
12  Q.  Fed Ex only.  Do you have records of that
13 shipment or are you able to get records of that
14 shipment --
15  A.  I can try to --
16  Q.  -- or do we need --
17  A.  I can try to get it.
18  Q.  If we can't get those from you, we can get
19 those directly from Auto Deal Corp., right?
20  A.  Correct.
21  Q.  So, at some point in -- okay.
22  So, you sell the vehicle, then you let Auto
23 Deal Corp. know that you've sold the vehicle --
24  A.  Correct.
25  Q.  -- so they can send you the title?

Page 113

1    A.   Correct.

2    Q.   Now, that Certificate of Title on it will

3 only reflect the transaction between McCombs and Auto

4 Deal Corp., correct?

5    A.   Correct.

6    Q.   There would be no indication there of the

7 transfer between Auto Deal and your dealership?

8    A.   Correct.

9    Q.   Once you do receive this from Auto Deal

10 Corp., what is your normal Standard Operating

11 Procedures for your dealership when it comes to getting

12 that title and sending it out to the buyer?

13    A.   Betty, the lady that I have --

14         MR. PERALTA:  Objection; assumes facts not in

15    evidence.

16         THE WITNESS:  The -- the -- the lady that I

17    have, she comes, picks up the deals, prepares them

18    and takes them to the DMV.

19 BY MR. TORRES:

20    Q.   So, that Certificate of Title then goes to

21 the DMV along with what?

22    A.   I don't know.

23    Q.   But then you don't ship anything directly to

24 the buyer?

25    A.   No.

Page 114

1    Q.   Okay.  Do you have any employee handbook that

2 you have your employees read or hold or have to be

3 responsible for?

4    A.   No.

5    Q.   You mentioned that Betty recently left her

6 position.

7         Did she have an opportunity to train her

8 replacement?

9    A.   No.

10    Q.   Who trained her replacement?

11         MR. PERALTA:  Objection; facts not in

12    evidence.

13         THE WITNESS:  The finance guy.

14         MR. TORRES:  The finance guy would have been

15    the one who trained the new person who does the

16    titling for your dealers --

17         THE WITNESS:  Yes.

18         MR. TORRES:  -- correct?

19         THE WITNESS:  Yes.

20 BY MR. TORRES:

21    Q.   And who would have trained the finance guy to

22 train the title person's job?

23    A.   Betty.

24    Q.   So, if that person were to leave, who teaches

25 that afterwards?

Page 115

1    A.   Which person?  I'm sorry?

2    Q.   If your finance manager leaves unexpectedly,

3 who will teach that role if he's the one that teaches

4 it?

5    A.   The -- the -- the -- the software provider.

6 She can just call the software provider, and they do,

7 like a -- like a composition on-line.

8    Q.   On how to use the system?

9    A.   How to use the system, correct.

10    Q.   How to set up and --

11    A.   Correct.  Correct.

12    Q.   So, the dealership itself does not have or

13 does not offer any further training aside from what the

14 DMV's software provider gives --

15    A.   Correct.

16    Q.   -- to the dealership?

17    A.   Correct.

18    Q.   So, there's no written requirement as part of

19 your standard business practices that has the person

20 who receives the title from Auto Deal Corp. or from

21 Manheim to take a look at that Certificate of Title and

22 verify it for accuracy, correct?

23    A.   Correct.

24    Q.   All right.  So, when you first received

25 notice that there was an issue with the miles on this

Page 116

1 car, you said you immediately called Manheim because

2 that's who you usually go to, and -- and you called

3 them, right?  That's what you did?

4    A.   Correct.

5    Q.   Did you file a formal claim with Manheim

6 related to this car?

7    A.   No.

8    Q.   Why was that?

9    A.   Because at the time they give you a timeframe

10 to do it.

11    Q.   All right.  And this was outside of the

12 timeframe that Manheim --

13    A.   Correct.

14    Q.   -- gave you?

15    A.   They only give you two weeks.

16    Q.   Those two weeks are for you to inspect the

17 vehicle, make sure what they represented is fair and

18 accurate, that was --

19    A.   Any -- any legal mechanical problems, you

20 have two weeks to -- to file a claim.  After that, you

21 just have to just call them like I did.

22    Q.   Okay.  When you do contact them to -- to

23 bring out an issue like this, do you go through your

24 portal with Manheim and --

25    A.   Yes.

Page 117

1    Q.   Sorry?
2    A.   Okay.  I'm sorry.
3    Q.   You're good.  Is there anybody else in the
4 room with you?
5         MR. PERALTA:  You can mute yourself, Frank.
6         THE WITNESS:  I'm sorry.  I'm sorry about
7    that.
8 BY MR. TORRES:
9    Q.   You're good.  Are you alone now?
10   A.   Yes.
11   Q.   Okay.  Whenever you do go into or whenever
12 you contact Manheim to bring its -- bring up this
13 issue, do you do it through your web portal access that
14 you normally go through?
15   A.   Yeah.  I gave -- on the seller location,
16 Manheim was -- in this case, it was Manheim Houston, I
17 think, if I'm not mistaken.  San Antonio.  I'm sorry.
18 I contacted -- if you click on San Antonio, it gives
19 you a phone number, so I called that phone number.
20   Q.   Okay.  So, you called the number directly for
21 the San Antonio warehouse or option site for Manheim,
22 right?
23   A.   Correct.  I called them, and I explained to
24 them the situation.
25   Q.   All right.  Did you use your cell phone or

Page 118

1 did you use your --
2    A.   My cell phone.
3    Q.   The judge is going to yell us again.  You're
4 going to have to wait until I finish with my questions.
5    A.   Okay.  Okay.
6    Q.   That way there's no issues.  Okay?
7    A.   Yes.
8    Q.   All right.  So, did you use your cell phone
9 or did you use the office or any other company number?
10   A.   My cell phone.
11   Q.   Do you recall who you spoke to in Manheim?
12   A.   No.
13   Q.   Do you recall if this process of -- of
14 talking to them and them offering you to take the car
15 back, was that a one-phone-call process or did that
16 take more than one phone call?
17   A.   One phone call.
18   Q.   Did Manheim ever send you any e-mails or any
19 type of correspondence confirming or verifying the
20 conversation that you-all had?
21   A.   No.
22   Q.   Did you ever send out an e-mail, a text
23 message or any other type of communication around the
24 time that you had that conversation with Manheim that
25 memorializes what Manheim told you?

Page 119

1    A.   No.
2    Q.   Other than going straight to Manheim and
3 getting the person who you spoke to, the only way to
4 know what Manheim said about the issue of the miles is
5 what you are telling us here today, right?
6    A.   Correct.
7    Q.   So, what exactly did Manheim tell you about
8 the mileage issue?
9    A.   I don't remember too much, but what -- what
10 I'm thinking is I -- I -- I spoke with an agent from
11 Manheim.  They told me they were going to call Ford to
12 dig into it.  And then she called me back, and she told
13 me that they made a mistake.
14   Q.   So, it wasn't just one phone call, right?
15   A.   It was, like two phone calls.
16   Q.   How sure are you about there just being two?
17 Are you sure there wasn't other call-backs?  You didn't
18 have to follow up?  They didn't have to follow up
19 anymore?
20   A.   No.  No.  No.  I just called them, and -- and
21 they confirmed that there was a discrepancy with the
22 mileage and that they made a mistake.
23   Q.   How long after that initial phone call did
24 Manheim call you back?
25   A.   Same day.

Page 120

1    Q.   Was it the same agent that you had spoken to?
2    A.   Correct.
3    Q.   Do you remember their name?
4    A.   No.  It was a lady.  I don't know her name.
5    Q.   It was a lady?
6    A.   Mm-hmm.  Yes.
7    Q.   Sorry if this question is inappropriate in
8 any way, but was that conversation in Spanish or
9 English?
10   A.   English.
11   Q.   Okay.  From what you recall from what Manheim
12 told you, they said that they called Ford and then Ford
13 told them that, indeed, they had made a mistake?
14   A.   Yes.
15   Q.   So, you recall specifically Manheim saying
16 that was Ford who made a mistake?
17   A.   Yes.
18   Q.   Do you recall how long those phone calls
19 took?
20   A.   A couple of minutes.
21   Q.   Is it hard to get ahold of them or do they
22 leave you on hold forever or is there --
23   A.   Automatically.  You call them, and they pick
24 up right away.
25   Q.   Now, you had also testified that Manheim

GABRIEL JOSEPH DESANTIS, et al vs. AutoDealCorp, et al               October 4, 2024
Case 8:23-cv-00709-WFJ-SPF   Document 73-2   Filed 10/07/24   Page 31 of 58 PageID 1100
CR of FS Investments (Franklyn Strusberg)
31 (121 - 124)

Page 121

1  acts as a, sort of the center piece where everything
2  gets handled, they take the car, they process the
3  paperwork, they make sure that the car is both legally
4  and mechanically up to -- up to standards for what they
5  represent and then they are ones who give you as the
6  buyer the title, the -- you know, the -- the receipt
7  for the purchase, all of the documents are sent from
8  entitlement and not the seller, correct?
9          MR. PERALTA:  Objection mischaracterizes his
10         testimony.
11         THE WITNESS:  Yes.
12 BY MR. TORRES:
13     Q.   That's why you never had any direct contact
14 with McCombs, correct?
15     A.   Correct.
16     Q.   Your contact was limited to Manheim, who is
17 selling you the vehicle?
18     A.   Correct.
19     Q.   So, whenever you receive the Certificate of
20 Title -- or scratch that.
21         Whatever Auto Deal Corp. receives that
22 Certificate of Title, they're getting that from
23 Manheim, correct?
24     A.   Correct.
25     Q.   Isn't it fair to say that if Manheim is doing

Page 122

1  the checking of the legal status of the vehicle that
2  they would review the Certificate of Title in their
3  possession before --
4          MR. PERALTA:  Objection.
5          MR. TORRES:  -- sending it, correct?
6          THE WITNESS:  What --
7          MR. PERALTA:  Objection; speculation.
8          MR. TORRES:  You should wait until I'm done
9          with my question, man, because otherwise --
10         MR. PERALTA:  That's the first time it
11         happened, man.  Go ahead.  First time it happened,
12         man.  Go head.  Say it again.  Say -- say it again
13         because it was -- it was cut, so go ahead.
14         MR. TORRES:  Madam Court Reporter, can you
15         read that back?
16         (Requested portion of the record was read by
17         the court reporter.)
18         MR. TORRES:  Before they send it out to Auto
19         Deal Corp.
20         THE WITNESS:  Yes.
21         MR. PERALTA:  Objection; speculative.
22 BY MR. TORRES:
23     Q.   Was that a yes?
24     A.   Yes.
25     Q.   So, isn't it -- does it not add up when

Page 123

1  Manheim says that it was Ford who made a mistake but
2  they themselves have in their own possession a
3  Certificate of Title that reflects higher mileage than
4  what was listed?
5          MR. PERALTA:  Objection; speculative and
6          assumes facts not in evidence.
7          MR. TORRES:  You can answer.
8          THE WITNESS:  What is the question?
9          MR. TORRES:  Do you not find it weird or at
10         all concerning that Manheim tells you that --
11         THE WITNESS:  Yes.
12         MR. TORRES:  Again, you got to let me finish.
13         MR. PERALTA:  Yeah, Frank.  Frank, just --
14         THE WITNESS:  Let him finish.  I'm sorry.
15         MR. PERALTA:  No.  No.  Just -- just count
16         two seconds, and then you answer.  Always just, you
17         know, they -- they -- they -- they ask.  One, two,
18         and then you answer.
19         THE WITNESS:  Okay.
20 BY MR. TORRES:
21     Q.   All right.  So, let's try that one more time.
22         Do you find it at all troublesome or
23 disturbing in any way that Manheim would tell you that
24 two years after the event that McCombs made a mistake
25 when they, themselves, were responsible for doing the

Page 124

1  investigation as to the mileage, had possession of a
2  Certificate of Title that reflected higher mileage than
3  what was communicated to you?
4          MR. PERALTA:  Same objection, and I'm going
5          to add leading and argumentative.
6          Go ahead, Frank.
7          THE WITNESS:  Yes.
8  BY MR. TORRES:
9      Q.   You mentioned that you -- you did your own
10 inspection when -- when you got the vehicle or when the
11 vehicle was delivered to you.
12         Was there anything, based on your experience
13 selling and buying vehicles and inspecting them, was
14 there anything about the condition of the vehicle when
15 you were testing it that would lead you to believe that
16 the mileage on the odometer was not accurate?
17     A.   No.
18         MR. TORRES:  All right.  I don't have any
19         other questions.  Thank you very much,
20         Mr. Strusberg.
21         THE WITNESS:  Thank you, Mr. Torres.
22         MR. PERALTA:  Josh?
23         MR. FEYGIN:  Go ahead.
24         MR. PERALTA:  You don't have anymore
25         questions?

Page 125

1    MR. FEYGIN:  No.  Done?
2    MR. PERALTA:  No.  I have -- I have some
3    questions.  Let me just look at the documents you
4    just sent to me.  Thank you for sending them, by
5    the way.  You didn't have to.
6    MR. FEYGIN:  Anything for you, my friend.
7    MR. PERALTA:  Share screen.
8    (Whereupon, document(s) shared on the
9    screen.)
10                   CROSS-EXAMINATION
11   BY MR. PERALTA:
12   Q.   Okay.  There -- there appears to be some
13   confusion as to when Powerhouse received a copy of the
14   Certificate of Title, and I'm talking about the
15   document entitled Texas Certificate of Title, of which
16   the numbers were read in deposition, and those numbers
17   are 539994086.
18   MR. FEYGIN:  Is there a question?
19   MR. PERALTA:  So, Mr. -- I'm trying to -- to
20   identify the document because there's no Bates
21   stamp, and I'm not sure what -- what exhibit was
22   it.
23   MR. FEYGIN:  It should be on the title
24   itself.  If you look on the top of your screen,
25   it's Exhibit I, Transfer of Title.

Page 126

1    MR. PERALTA:  I'm looking at it.
2    MR. FEYGIN:  If you look at the top of your
3    screen in the purple bar.
4    MR. PERALTA:  Oh, in the -- as -- as a
5    document of -- as the title of the document?
6    MR. FEYGIN:  Correct.
7    MR. PERALTA:  Okay.  Well, I think this is --
8    this conversation was enough to identify the
9    document.
10   BY MR. PERALTA:
11   Q.   Okay.  So, Frank?
12   A.   Yes.
13   Q.   Here -- here it says that Auto Deal Corp.,
14   right -- wait.  Here, it says -- in this box here, it
15   says that Auto Deal Corp. transferred title to the
16   vehicle to Powerhouse and it has the date of sale
17   5/15/20.
18   Was that the date that Powerhouse received a
19   physical copy of this title?
20   A.   When?  It says when?
21   Q.   So, my question is:  Did Powerhouse receive a
22   copy of this document, right, this document up here
23   (indicating), did Powerhouse receive a copy of this
24   document on May --
25   A.   After -- after -- after we sold the car.

Page 127

1    Q.   And when did you sell the car?
2    A.   Whatever is on the contract.
3    Q.   Okay.
4    A.   We always receive it -- we always get the
5    titles after -- I mean, from -- specifically from Auto
6    Deal after I sell the car.
7    Q.   Okay.  And why is that?
8    A.   Because the owner of Auto Deal is not going
9    to release the title until I pay him.
10   Q.   Okay.  So, that is the agreement that you
11   have --
12   A.   That's the agreement, yes, pretty much.
13   Q.   -- with McCombs?
14   A.   After -- after I sell the car and -- and the
15   deal is booked by the bank, then he sends the title
16   after I sell the car.
17   Q.   Okay.  And that is -- this is the agreement
18   between Auto Deal Corp. --
19   A.   Correct.
20   Q.   -- and Powerhouse?
21   A.   Yes.
22   Q.   Okay.  So, every time that Powerhouse
23   purchases a vehicle -- sorry.  Strike that.
24   Every time that you as an agent of Auto Deal
25   Corp. purchases a vehicle through Auto Deal Corp. for

Page 128

1    you to sell in -- in -- in the dealership that's
2    operated by Powerhouse, Auto Deal retains a copy of the
3    title until you sell the vehicle?
4    A.   Yes, only when I sell it.
5    Q.   Okay.  So, I think we all know for a fact
6    that the sale did not happen on 5/15/2020.
7    Does this mean that --
8    MR. FEYGIN:  Objection.  It assumes facts not
9    in evidence.  It's a narration.  I mean, what are
10   we doing here?
11   MR. PERALTA:  Sure.  That's fine.  I mean,
12   you -- you actually covered that in the deposition,
13   but I could -- I could put up some documents.  Give
14   me one second.  Actually, I'm going to stop
15   sharing.  Okay.  Auto Deal, okay.  Is it showing me
16   here?  Yes.
17   (Whereupon, document(s) shared on the
18   screen.)
19   BY MR. PERALTA:
20   Q.   Okay.  Frank, this is a document Bates
21   stamped FSIA 00005.
22   Do you recall Plaintiff's attorney,
23   Mr. Feygin, showing you this document earlier?
24   A.   Yes.
25   Q.   Do you recall answering his question that

Page 129

1  stated that this document was true and accurate --
2  was -- was a true and accurate document that was kept
3  in the business records of Powerhouse?  Is this a true
4  and accurate document that's kept in the business
5  records of Powerhouse?
6      A.  Yes.
7      Q.  Okay.  It states here that the date of the
8  sale was May 25, 2020; is that correct?
9      A.  Yes.
10     Q.  Okay.  So, if the buyer orders -- hold on.
11 Actually, let's go down here.  Here on Page 3 of 3 it
12 shows that the document was signed by Gabriel Haddon.
13         Is that the -- the name of the Plaintiff?
14     A.  Yes.
15     Q.  Is that the signature of the Plaintiff?
16     A.  Yes.
17     Q.  What is the date next to the signature of the
18 Plaintiff?
19     A.  5/25/2020.
20     Q.  If the Buyer's Order was signed on 5/25/2020,
21 is that an indication that the sale occurred on
22 5/25/2020?
23     A.  Yes.
24     Q.  Okay.  Would there ever be -- is there any
25 reason why the sale did not happen on 5/25/2020?

Page 130

1      A.  No.
2      Q.  Okay.  So, you testified earlier that Auto
3  Deal only -- strike that.
4          You testified earlier that Auto Deal sent
5  the -- sent a copy of the Certificate of Title to
6  Powerhouse only after Powerhouse sold the vehicle to
7  Mr. Haddon, the Plaintiff; is that correct?
8      A.  Yes.
9      Q.  Okay.  So, is -- is it fair to say that on
10 May -- sorry.  Strike that.
11         Is it fair to say to say that this date --
12 let me -- here.
13         Is it fair to say that May 15, 2020 was not
14 the date that Auto Deal Corp. provided a copy of the
15 title that -- regarding the vehicle that's at issue to
16 Powerhouse?
17     A.  Correct.
18     Q.  Okay.  Do you have any -- do you know why it
19 would say 5/15 --
20     A.  No clue --
21     Q.  -- here?
22     A.  -- but I can get the Fed Ex label.
23     Q.  Okay.  There's more down here.  Here, it
24 shows --
25         MR. FEYGIN:  We're -- we're looking at the

Page 131

1  Buyer's Order form, Jose.  I don't know what you're
2  pointing at.
3          MR. PERALTA:  This one here (indicating.)  I
4  don't know -- I don't know how to do the whole
5  highlighting thing, though it's super nice,
6  actually.
7          MR. FEYGIN:  Are we looking at the Buyer's
8  Order form?
9          MR. PERALTA:  No, because we're looking at
10 the --
11         MR. FEYGIN:  Because --
12         MR. PERALTA:  -- Certificate of Title.
13         MR. FEYGIN:  -- all I see at the top of my
14 screen is the Buyer's Order form.
15         THE WITNESS:  Yeah, me too.
16         MR. PERALTA:  Really?
17         MR. TORRES:  You're only sharing one of your
18 screens, so if you have multiple screens, we won't
19 be able to see it.
20         MR. PERALTA:  Oh.  Actually, hold on.  I
21 don't know how this works, because what I did was:
22 I put the Certificate of Title on the screen that I
23 was sharing.  Interesting.  Hold on.
24         (Whereupon, document(s) shared on the
25 screen.)

Page 132

1          MR. PERALTA:  Okay.  Thank you, Joshua.
2  BY MR. PERALTA:
3      Q.  Just to clarify, Frank, when I asked you
4  earlier about 5/15/2020 not being the date that
5  Automotive -- that Auto Deal Corp. transferred title to
6  Powerhouse or provided a copy of a title to Powerhouse,
7  were you aware that I was talking about this box down
8  here (indicating)?
9      A.  One second, please.  Okay.  There we go.
10     Q.  Can you see it?
11     A.  Now I can see it.
12     Q.  Now you can see it?  Okay.
13     A.  Yeah.
14     Q.  Let me ask you it this way now -- now that I
15 have the document on the screen:  This date that
16 appears here (indicating), this one here, right,
17 5/15/2020, is that the date -- this date, 5/15/2020
18 that appears in the Certificate of Title regarding the
19 transfer as to Auto Deal Corp. to Powerhouse, is this
20 the date that Powerhouse received a copy of the
21 Certificate of Title?
22     A.  No.
23     Q.  Okay.  So, let's go down here, this one here
24 (indicating).
25         So then, is it fair to say then this date

Page 133

1  also does not depict the date that Powerhouse received
2  a copy of the Certificate of Title from Auto -- from
3  Auto Deal Corp.?
4        A.   Correct.
5        Q.   Is that correct?
6        A.   Correct.
7        Q.   And do you know why this date appears in this
8  box down here, the date 5/15?
9        A.   No clue.
10       Q.   Five -- okay.  Now, when you -- when
11 Powerhouse included the mileage on its sales documents
12 to Haddon, did it get the mileage of the vehicle by
13 looking at the odometer of the vehicle, by looking at
14 the dashboard of the vehicle?
15       A.   The web page.
16       Q.   The web page.  What -- what --
17       A.   Web page.
18       Q.   What web page?
19       A.   Powerhouse web page.
20       Q.   Okay.  So, the information that appears on
21 Powerhouse web page, is that gathered by looking at
22 the dashboard --
23       A.   Of the dashboard, correct.
24       Q.   -- of the vehicle?
25       A.   Yes.

Page 134

1        Q.   Okay.  You've been -- you've been in -- in
2  the business of selling vehicles for how long now,
3  selling used -- used vehicles?
4        A.   15 years.
5        Q.   15 years.  Would you say that it's customary
6  practice for dealers to look at the dashboard of the
7  vehicle and guide themselves by the information that
8  appears there when they are filling out sales documents
9  to sell the -- the vehicles?
10       A.   Yes.
11            MR. PERALTA:  Okay.  One second.
12            (Whereupon, screen sharing was stopped.)
13            MR. PERALTA:  Here, we have the Buyer's Order
14       again.  That's Bates Stamp FSIA 000005.
15            (Whereupon, document(s) shared on the
16       screen.)
17            MR. PERALTA:  Okay.  So, let me zoom in.
18            Here where it says odometer reading, a
19       131,636, did Powerhouse obtain this odometer
20       reading from looking at the dashboard --
21            THE WITNESS:  Yes.
22            MR. PERALTA:  -- of the vehicle?
23            THE WITNESS:  Yes.
24 BY MR. PERALTA:
25       Q.   Okay.  When Powerhouse filled in the

Page 135

1  information, this information here, the odometer
2  reading (indicating) in the Buyer's Order, in the
3  Odometer Disclosure and in the Retail Installment
4  Contract, a/k/a financing agreement, did it obtain the
5  odometer reading from the vehicle dashboard?
6        A.   Yes.
7        Q.   When it provided that information and you put
8  that information in those documents, did it have in its
9  possession a copy of the Certificate of Title involving
10 this vehicle?
11       A.   No.
12       Q.   Okay.  Did it have any other documents --
13 strike that.
14            Did it have any document that would
15 contradict -- contradict the reading placed in the
16 Buyer's Orders?
17       A.   No.
18       Q.   Okay.  Now, besides looking at the vehicles
19 dashboard, did Powerhouse obtain the odometer -- strike
20 that.
21            Besides looking at the vehicle's dashboard,
22 did Powerhouse obtain the mileage of the vehicle by
23 looking at -- at the Manheim website?
24       A.   Yes.
25       Q.   Okay.  And was -- and did the -- did the --

Page 136

1  actually, give me one second.
2            (Whereupon, screen sharing was stopped.)
3            THE WITNESS:  Eight miles difference, one
4       thirty-one six twenty-eight from Manheim.
5            MR. PERALTA:  Okay.  One second.  Okay.  I'm
6       showing you a document, FSA -- no, FSIA 000011.  We
7       can make that Defendant's Exhibit A.
8            (Defendant Exhibit A was marked for
9       identification.)
10            (Whereupon, document(s) shared on the
11       screen.)
12 BY MR. PERALTA:
13       Q.   Okay.  Is this -- what is this document?
14       A.   The Bill of Sale from Manheim.
15       Q.   Okay.  And does Manheim provided you this
16 document?
17       A.   Correct.
18       Q.   Okay.  And when I say "you," I'm referring to
19 Powerhouse, just to make clear.
20            Okay.  What is the mileage that appears on
21 the Bill of Sale, if you can read it?
22       A.   One thirty-one six twenty-eight.
23       Q.   Okay.  And who's the seller?
24       A.   McCombs Ford West.
25       Q.   Okay.  Based on your knowledge, from where

Page 137

1 does Manheim get the information as to the mileage of
2 the vehicle, is it provided by McCombs West Ford?
3      MR. TORRES:  Objection; form.
4      THE WITNESS:  I don't know.
5 BY MR. PERALTA:
6      Q.  Have you sold any -- any vehicles through
7 Manheim?
8      A.  Yeah.
9      Q.  Okay.  So, walk me through how you do it.
10 When you -- when you post -- well, strike that.
11      Does Manheim works as a middle person between
12 the seller and the buyer of the vehicle?
13      A.  Correct.
14      Q.  Okay.  And when we say "middle person," is
15 it -- is it only to facilitate the transaction, meaning
16 that they will provide information from the seller to
17 the buyer and if the buyer has any questions then
18 Manheim might -- may get back that to the seller,
19 correct?
20      A.  Correct.
21      MR. TORRES:  Objection; form.
22 BY MR. PERALTA:
23      Q.  Correct, you said?
24      A.  Yes.
25      Q.  Okay.  So, when you want to sell a vehicle

Page 138

1 through the Manheim website, do you have to provide
2 Manheim information as to the vehicle?
3      A.  Yes.
4      Q.  Okay.  Does that information include the year
5 of the vehicle?
6      A.  Everything, the -- the VIN.
7      Q.  Everything?
8      A.  Yes.
9      Q.  Everything, including -- including the --
10 the --
11      A.  Mileage.
12      Q.  -- the odometer reading?
13      A.  Yes.
14      Q.  Okay.  Now, based on your experience selling
15 vehicles through Manheim, would -- will Manheim just
16 transfer that information to potential sellers?
17      A.  Buyers, yes.
18      Q.  Thank you.  Buyers.  So, Manheim pretty much
19 just shares the information that the sellers of
20 vehicles provide to it --
21      A.  Correct.
22      Q.  -- correct?  Okay.
23      You mentioned yesterday -- not yesterday.
24 Sorry.  You mentioned earlier that Manheim conducts its
25 own inspection.

Page 139

1      Do you -- I mean, do they do more than drive
2 vehicles?
3      MR. FEYGIN:  Objection; assumes facts not in
4 evidence.
5      THE WITNESS:  After you buy them, you --
6 you request --
7      MR. PERALTA:  No.  No.  Manheim.  Manheim.
8 Does --
9      THE WITNESS:  Yeah.
10 BY MR. PERALTA:
11      Q.  Does Manheim do more than drive the vehicles?
12      A.  They inspect it.
13      Q.  When you say "inspect it," do they just look
14 at it?
15      A.  Yeah.
16      Q.  Okay.  Do they do any mechanical inspection,
17 like, you know --
18      MR. FEYGIN:  Asked and answered.
19      THE WITNESS:  Sometimes if you request it.
20 It's not always.
21 BY MR. PERALTA:
22      Q.  It's not always?
23      A.  No.
24      Q.  So, you have to request it?
25      A.  You have to request it.

Page 140

1      Q.  Okay.  Would you say, based -- based on your
2 experience in selling used vehicles, that it is not the
3 customary practice for used car dealers in -- to
4 request that inspection?
5      A.  What's the question?  I'm sorry?
6      Q.  Would you say that it is not customary
7 practice for used car dealers to request the inspection
8 of every vehicle from which -- you know, that they --
9 that they're selling?
10      A.  If it's legible, yes.
11      Q.  What do you mean legible?
12      A.  Sometimes it's as-is.  Then you cannot
13 request an inspection.
14      Q.  Okay.  Now, when you purchased the vehicle
15 through Auto Deal Corp., as their agent, was your
16 intention all along to sell this vehicle through
17 Powerhouse?
18      A.  Yes.
19      Q.  So, Powerhouse bought the vehicle as an agent
20 of Auto Deal Corp., but it was understood between Auto
21 Deal Corp. and Powerhouse that Powerhouse was going to
22 try to sell this vehicle on its lot?
23      MR. FEYGIN:  Objection.  Objection to form.
24      THE WITNESS:  Correct.
25 BY MR. PERALTA:

Case 8:23-cv-00709-WFJ-SPF   Document 73-2   Filed 10/07/24   Page 36 of 58 PageID 1105

GABRIEL RUEDA, ET AL. V. FS INVESTMENTS OF AMERICA, INC.                    October 01, 2024
                        CR of FS Investments (Franklyn Strusberg)
                                                                        36 (141 - 144)

Page 141

1    Q.   Okay.  Now, when you purchase -- you said
2  that the account of Manheim is in the name of
3  Powerhouse?
4    A.   Yes.
5    Q.   But that -- but that you also bought it --
6  sorry.
7         But that you also use this account as an
8  agent of Auto Deal Corp.?
9    A.   Correct.
10   Q.   Okay.  Would you say then that you were using
11 the account for the benefit of Powerhouse?
12   A.   Yes.
13   Q.   Would you say that you were using the account
14 as a representative of Powerhouse --
15   A.   Yes.
16   Q.   -- as well?
17   A.   Yes.
18   Q.   Okay.  Okay.  Hold on.  So, let's talk
19 about -- let's talk about Betty.  You said that Betty
20 was -- she was paid under a 1099.
21        Did she have her own company while she was
22 providing services to Powerhouse?
23   A.   Yes.
24   Q.   So, when you said that she was an employee of
25 Powerhouse, do you mean -- did you mean that she was

Page 142

1  a -- a contractor or an actual employee of Powerhouse?
2    A.   No, contractor, like sub- -- subcontractor.
3    Q.   Okay.
4         THE COURT REPORTER:  Mr. Peralta, are
5    finished with this document?
6         MR. PERALTA:  Yes, I am.
7         THE COURT REPORTER:  Thank you.
8         (Whereupon, screen sharing was stopped.)
9         MR. PERALTA:  Okay.  So, okay.  Now let's
10   talk about the -- well, actually, before -- before
11   I leave Betty, let's stay with Betty for just a few
12   more questions.
13        (Whereupon, document(s) shared on the
14   screen.)
15 BY MR. PERALTA:
16   Q.   So, you stated before that you believe
17 that -- that -- that there's a possibility that this
18 document was completed by Betty; is that correct?
19   A.   Correct.
20   Q.   This section down here where it says -- where
21 Powerhouse transfers title to Gabriel -- to the -- to
22 the Plaintiff, and it's dated 5/25/2020.
23        So, if Powerhouse did not receive a copy of
24 the Certificate of Title until it sold the vehicle to
25 the Plaintiffs, then Betty would not have a copy of

Page 143

1  that Certificate of Title when she might have completed
2  this section that -- that I'm highlighting?
3    A.   Correct.
4         MR. PERALTA:  Okay.  Let's move on to the
5    bond payment.
6         (Whereupon, Counsel Silverstein leaves Zoom
7    deposition.)
8  BY MR. PERALTA:
9    Q.   When you -- did you send a check to
10 Plaintiff's counsel of around $9,000?
11   A.   Yes.
12   Q.   Okay.  When you sent that check, was it your
13 understanding that you were settling or -- or resolving
14 Plaintiff's claims in this lawsuit?
15   A.   Correct.
16   Q.   Okay.  You know what damages are, right?
17   A.   Yes.
18   Q.   Is the Plaintiff claiming actual damages in
19 this case?
20   A.   I don't know.
21   Q.   Okay.  Did you receive an e-mail from
22 Plaintiff's counsel telling you --
23   A.   Yes, that that was for damages.
24   Q.   Well, hold on.  Let me -- let me finish.
25        Did you receive an e-mail from Plaintiff's

Page 144

1  counsel telling you that your -- that -- that the check
2  that Powerhouse sent him was to cover the actual
3  damages that the Plaintiff alleges?
4    A.   Yes.
5    Q.   Okay.  Were you surprised when Plaintiff's
6  counsel told you that he was going to still file a
7  lawsuit even though you had already paid him some
8  money?
9    A.   Yes.
10        MR. PERALTA:  Okay.  Gentlemen, allow me
11   three minutes, and then let me see if I'm done.
12        MR. FEYGIN:  Let's do this:  Let's take a
13   five-minute break so I can use the little boy's
14   room.
15        MR. PERALTA:  That works for me too.
16        (Thereupon, an off-the-record recess was had
17   1:04 until 1:12 p.m.)
18        MR. PERALTA:  Okay.  I'm done with -- with my
19   questions for now.
20        MR. FEYGIN:  All right.  I have a redirect.
21                 REDIRECT EXAMINATION
22 BY MR. FEYGIN:
23   Q.   Mr. Strusberg, you have an agreement with
24 Auto Deal Corp. where one way or the other you acquire
25 vehicles from Auto Deal Corp.; is that correct?

Page 145

1    A.   Correct.
2    Q.   How many vehicles have you acquired from Auto
3 Deal Corp. based upon this agreement?
4    A.   I don't know.
5    Q.   Would it be more than ten?
6    A.   Yes.
7    Q.   Would it be more than twenty?
8    A.   Yes.
9    Q.   More than fifty?
10   A.   I don't know.  Somewhere there.
11   Q.   So, between twenty to fifty cars?
12   A.   Correct.
13   Q.   How many years has this been going on for?
14   A.   It was just one year when I first started,
15 not anymore.
16   Q.   So, you first started in May of 2020-ish?
17   A.   When I first opened the dealership back in --
18 I don't -- I don't remember.  He -- he supported me in
19 the beginning.
20   Q.   Okay.  And it's your testimony that you would
21 only receive titles to those vehicles, the twenty to
22 fifty that you bought from them, after you actually
23 sold the vehicle; is that accurate?
24   A.   Correct.
25   Q.   Okay.  Is it the dealership's position that

Page 146

1 it can execute title disclosures as it relates to a
2 mileage reading after a vehicle is sold?
3    A.   Yes.
4    Q.   Is it the dealership's position that the
5 title transfer from Auto Deal to Powerhouse was not
6 actually filled in on 5/15/2020?
7    A.   I don't remember.
8    Q.   Is it now the dealership's position that the
9 title transfer and mileage disclosure to my client did
10 not actually get filled out on May 25th of 2020?
11   A.   Correct.
12   Q.   How did the dealership know that the mileage
13 it entered on May 25th, 2020 was the actual mileage on
14 that date?
15   A.   Based on the -- the Bill of Sale from
16 Manheim.
17   Q.   But it wasn't based upon its own inspection
18 of the vehicle?
19   A.   Yeah.  When -- when we take -- get the cars,
20 we -- I post it myself on the page based on the
21 odometer reading.
22   Q.   Does the dealership routinely execute title
23 transfers after a vehicle is sold?
24   A.   Yes.
25   Q.   Is it now the dealership's position that it

Page 147

1 received this title after it sold the vehicle to my
2 client?
3    A.   Correct.
4    Q.   Aside from Manheim and the dashboard of the
5 vehicle, did Powerhouse complete any other sort of
6 investigation into the mileage history?
7    A.   No.
8        MR. FEYGIN:  My apologies.  I just noticed my
9 video was off.  I don't want to be rude.
10 BY MR. FEYGIN:
11   Q.   Does the dealership have any other policies
12 or procedures in place to investigate vehicle mileage
13 other than relying upon a seller's disclosure?
14   A.   No.
15   Q.   And you mentioned that Manheim provides the
16 option to inspect vehicles.
17        Do you ever recall requesting an inspection
18 of this particular vehicle to be performed by Manheim?
19   A.   No.
20   Q.   And is that because it never occurred?
21   A.   Correct.
22   Q.   And with respect to Betty, was Betty acting
23 with the dealer's authority when she completed the
24 title transfers --
25   A.   -- correct.

Page 148

1    Q.   -- to my client?
2        And she wasn't doing this for her on benefit,
3 was she?
4    A.   She gets paid for that.
5    Q.   Okay.  But she was doing it on behalf of the
6 dealership, though, correct?
7    A.   Correct.
8        MR. FEYGIN:  Okay.  Okay.  Nothing further.
9        MR. TORRES:  I just have only, like two
10   questions.
11             RECROSS-EXAMINATION
12 BY MR. TORRES:
13   Q.   Back in 2021 when your friend at Auto Deal
14 Corp. was working with you and helping you out, did
15 y'all at any time share office space?
16   A.   No.
17   Q.   Was Betty ever in the same location as
18 Juliana?
19   A.   No, never.
20        MR. TORRES:  That's all.  Thank you.
21        MR. FEYGIN:  All right.  Explain reading
22   versus waiving?
23        MR. PERALTA:  No, I have -- I have -- I have
24   some questions too on -- on recross.  It's just
25   like, one -- like three.

Case 8:23-cv-00709-WFJ-SPF    Document 73-2    Filed 10/07/24    Page 38 of 58 PageID 1107

GABRIEL LUIS PEREZ vs. UNIVERSAL CITY DEVELOPMENT PARTNERS, LTD 4/23/2024
CR of FS Investments (Franklyn Strusberg)
38 (149 - 152)

Page 149

1    MR. FEYGIN:  That's fine.
2         RECROSS-EXAMINATION
3 BY MR. PERALTA:
4    Q.   Frank?
5    A.   Yes.
6    Q.   When Plaintiff's counsel just asked you if
7 the dealership provides odometer disclosures and title
8 transfers after the vehicle is sold, let's talk about
9 the -- the word -- the term after the vehicle is sold.
10        Does that mean after the Plaintiff has signed
11 all documents to sell the vehicle?
12    A.   What is the question?
13    Q.   So, what does it mean after it's sold?  It
14 means that that's -- that's after -- that is after --
15    A.   Before it's sold.
16    Q.   Huh?
17    A.   Before.
18    Q.   Okay.  Listen to my question.
19        Does the dealership provides the -- the --
20 the transfer the --
21    A.   The title.
22    Q.   No.  Hold on.
23        MR. PERALTA:  Okay.  That's fine.  I have no
24    more questions for my friend.  I'll -- I'll leave
25    it at that.

Page 150

1    MR. FEYGIN:  Jose, do you want to explain to
2 him reading versus waiving?
3    MR. PERALTA:  We're going to read.
4    MR. TORRES:  And I will go ahead and order.
5 If no one else orders, then I'll make it the first.
6 Otherwise, a copy.
7    MR. FEYGIN:  I don't want to be ordering just
8 yet.  I'll let you know.
9    MR. PERALTA:  Okay.  Me neither.
10    (Thereupon, the proceedings concluded at
11 1:19 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 151

1         CERTIFICATE  OF  OATH
2
3              -  -  -
4 THE STATE OF FLORIDA,     )
5 COUNTY OF PALM BEACH.     )
6
7
8         I, the undersigned authority, certify that
9 FRANKLYN STRUSBERG personally appeared before me and
10 was duly sworn on the 23rd day of April, 2024.
11
12
13
14        Signed this 6th day of May, 2024.
15
16
17
18        Wanda D. Good, Certified Court Reporter
19        Notary Public - State of Florida
        My Commission No. #HH 216106
        My Commission Expires:  January 26, 2026
20
21
22
23
24
25

Page 152

1         C E R T I F I C A T E
2
  THE STATE OF FLORIDA,     )
3
  COUNTY OF PALM BEACH.     )
4
5
6         I, WANDA D. GOOD, Florida Professional
  Reporter, certify that I was authorized to and did
7 stenographically report the deposition of FRANKLYN
  STRUSBERG, pages numbered 1 through 151; that a review
8 of the transcript was requested; and that the
  transcript is a true and complete record of my
9 stenographic notes.
10
11        I further certify that I am not a relative,
  employee, attorney, or counsel of any of the parties,
12 nor am I a relative or employee of any of the parties'
  attorney or counsel connected with the action, nor am I
13 financially interested in the action.
14
15        DATED this 6th day of May, 2024.
16
17
18
19
20        WANDA D. GOOD, Certified Court Reporter
21
22
23
24
25

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA, INC., et. al.
CR of FS Investments (Franklyn Strusberg)
Case 8:23-cv-00709-WFJ-SPF Document 73-2 Filed 10/07/24 Page 39 of 58 PageID 1108
April 23, 2024
39 (153 - 154)

Page 153

1  May 6, 2024
2  FRANKLYN STRUSBERG
   c/o Jose Ariel Peralta, Esquire
3  jperalta@atllp.com
   ARMSTRONG TEASDALE, LLP
4  355 Alhambra Cir., Ste. 1250
   Coral Gables, Florida   33134
5
   IN RE:  GABRIEL LUC HADDON v. FS INVESTMENTS OF
6          AMERICA, INC., et. al.
   CASE NO.:  8:23-cv-00709-WFJ-SPF
7
   Please take notice that on the 23rd day of April, 2024,
8  you gave your deposition in the above cause.  At that
   time you did not waive your signature.  The transcript
9  is now available for your review.
10 Please call (561) 689-0999 or 1-800-765-3576 or e-mail
   Depos@FloridaCourtReporting.com between the hours of
11 9:00 a.m. and 4:00 p.m., Monday through Friday, to make
   arrangements to read your deposition transcript.  Once
12 completed, please sign and return same to us for
   distribution to all parties.
13
   If you do not read and sign the deposition within a
14 reasonable amount of time, the original, which has
   already been forwarded to the ordering attorney, may be
15 filed with the Clerk of the Court.
16 If you wish to waive your signature now, please sign
   your name in the blank at the bottom of this letter and
17 return it to the address listed below.
18 Very truly yours,
19
20
   Wanda D. Good, Certified Court Reporter
21 Florida Court Reporting
   2161 Palm Beach Lakes Boulevard, Suite 302
22 West Palm Beach, Florida 33409
23 I do hereby waive my signature.
24
25 FRANKLYN STRUSBERG

Page 154

1           ERRATA SHEET
2      DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
3  IN RE:  GABRIEL LUC HADDON v. FS INVESTMENTS OF
4          AMERICA, INC., et. al.
5  CASE NO.:  8:23-cv-00709-WFJ-SPF
6  WITNESS: FRANKLYN STRUSBERG  TAKEN: APRIL 23, 2024
7  Page No.    Line No.          Change          Reason
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22      Under penalties of perjury, I declare that I have
   read the foregoing document and that the facts stated
23 in it are true.
24
25
   DATE                      FRANKLYN STRUSBERG

## WORD INDEX

**< $ >**
**$10,000** 101:*10*
**$30,000** 103:*6*
**$5,000** 53:*10*
**$7,000** 59:*25*
**$799** 53:*16*
**$9,000** 87:*23* 99:*24*
 101:*12* 143:*10*

**< 0 >**
**000005** 134:*14*
**000011** 4:*17* 136:*6*
**000014** 32:2
**000020** 3:*14*
**000026** 56:*20*
**000031** 56:*20*
**000034** 64:*22*
**00005** 51:*21* 128:*21*
**00007** 51:22
**00019** 42:6
**00020** 42:6
**018** 67:*21*

**< 1 >**
**1** 1:*16* 13:*11* 31:4
 67:9 90:7 91:*17*
 152:7
**1:04** 144:*17*
**1:12** 144:*17*
**1:19** 1:*20* 150:*11*
**10:13** 1:*20* 5:2, 7
**100** 19:*21* 91:*12*
**101** 4:*10*
**104** 3:5
**1099** 77:5, 6 141:*20*
**11th** 35:*15* 44:*13*
**12** 96:22
**12/11** 69:*12*
**12/21/22** 4:*8, 10*
**12:01** 102:*21*
**12:06** 102:*17, 21*
**125** 3:5
**1250** 2:*11* 153:*4*
**13** 3:*14*
**131,000** 37:*22, 23*
 88:*20* 111:*1*

**131,636** 96:*25* 134:*19*
**131630** 77:*14*
**131636** 62:*8, 9* 66:*21*
 67:8 79:*1*
**136** 4:*17*
**144** 3:5
**148** 3:5
**149** 3:5
**14th** 103:*4*
**15** 130:*13* 134:*4, 5*
**151** 152:7
**154** 1:*16*
**16** 57:5 58:8
**16.9** 58:7
**18,900** 60:7 61:*3*
**1-800-765-3576**
 153:*10*
**19** 95:*25*
**1930** 2:5

**< 2 >**
**2.8** 35:*4, 11, 12* 39:22
**200** 2:*17*
**200,000** 111:7
**2000** 111:6
**201150** 45:*1*
**2012** 39:*21*
**2020** 44:*12* 53:*13*
 58:7 76:25 82:6
 88:5 104:*17* 110:7
 111:5 129:8 130:*13*
 146:*10, 13*
**2020-ish** 145:*16*
**2021** 148:*13*
**2022** 109:*18*
**2024** 1:*20* 5:6
 151:*10, 14* 152:*13*
 153:*1, 6* 154:6
**2026** 151:*19*
**208F** 2:5
**2161** 153:*21*
**216106** 151:*19*
**23** 1:*20* 154:6
**23rd** 5:6 151:*10*
 153:6
**25** 41:*16* 129:8
**25,000** 53:*3*
**25th** 53:*13* 82:6
 88:5 146:*10, 13*

**26** 151:*19*
**28** 44:*12, 14*
**28th** 110:7

**< 3 >**
**3** 96:22 129:*11*
**3/6/19** 4:*1*
**302** 153:*21*
**305.371.8809** 2:*12*
**305.460.9888** 2:*18*
**30th** 44:*18*
**32** 3:*14*
**33008-5293** 2:5
**33020** 2:6
**33134** 2:*11* 153:*4*
**33146** 2:*18*
**33409** 153:22
**355** 2:*11* 153:*4*
**360** 17:*1*

**< 4 >**
**4/28/2020** 111:*12*
**4:00** 153:*11*
**41** 3:*14*
**4651** 2:*17*
**48** 58:6

**< 5 >**
**5** 3:5
**5,000** 53:8
**5/15** 82:*10* 130:*19*
 133:8
**5/15/20** 77:*21* 126:*17*
**5/15/2020** 128:6
 132:*4, 17* 146:6
**5/25** 82:*13, 15*
**5/25/20** 3:*14, 22, 23*
 4:*1* 79:4 97:*20*
**5/25/2020** 67:*12* 71:2
 81:*23* 129:*19, 20, 22,
 25* 142:22
**5/30/81** 9:9
**51** 3:*14*
**539994086** 4:5 73:*24*
 125:*17*
**539994087** 74:8
**539994090** 68:*11*
**56** 3:*14*
**561** 153:*10*

**57987168** 55:*20*

**< 6 >**
**6** 153:*1*
**61** 3:22
**64** 3:*23*
**67** 4:*1*
**689-0999** 153:*10*
**6th** 151:*14* 152:*13*

**< 7 >**
**7** 58:6
**73** 4:*1*

**< 8 >**
**8,000-something**
 101:*13*
**8,900-something**
 101:*14*
**8:23-cv-00709-WFJ-
 SPF** 1:*4* 5:*14* 153:6
 154:5
**82053** 69:*10*
**85293** 2:5
**87** 4:6

**< 9 >**
**9,000** 40:*24* 100:*1*
**9:00** 153:*11*
**954.228.5674** 2:6
**96** 4:6
**99** 4:8

**< A >**
**a.m** 1:*20* 5:2, 7
 153:*11*
**a/k/a** 135:*4*
**A12718** 44:*10* 47:*21*
**abide** 17:*11*
**ability** 44:*19*
**able** 8:*12* 47:*3, 12,
 15* 112:*13* 131:*19*
**accepted** 77:25
**access** 47:*12* 85:4
 92:*11* 117:*13*
**accommodate** 8:*20*
**accord** 87:*14*
**account** 24:*23, 25*
 25:2 41:*12* 44:6
 85:8, 12* 104:22, 25

105:3, *4*, *7*  108:*23*
141:*2*, *7*, *11*, *13*
**accuracy**  115:*22*
**accurate**  17:*13*, *22*
18:*14*, *24*  41:*1*  65:*1*
73:*16*  79:*11*  97:*7*
116:*18*  124:*16*  129:*1*,
*2*, *4*  145:*23*
**accused**  9:*15*
**achieved**  9:*21*
**acknowledge**  5:*16*, *19*
6:*6*, *8*, *11*
**acquiescence**  94:*19*,
*25*
**acquire**  11:*3*  144:*24*
**acquired**  145:*2*
**ACT**  4:*10*  71:*12*
**acted**  93:*10*, *13*
**acting**  147:*22*
**Action**  1:*4*  89:*14*, *24*
95:*18*  96:*1*  152:*12*,
*13*
**actions**  93:*23*
**activate**  85:*14*
**active**  100:*8*
**acts**  121:*1*
**actual**  38:*12*  45:*4*
62:*11*  63:*24*  67:*16*,
*18*, *19*  77:*22*  87:*20*
90:*18*  96:*25*  98:*6*
110:*5*  111:*7*, *13*
142:*1*  143:*18*  144:*2*
146:*13*
**add**  109:*5*  122:*25*
124:*5*
**added**  105:*3*, *15*
**addition**  19:*22*  21:*12*
**address**  50:*7*, *12*
101:*7*  153:*17*
**administer**  5:*20*
**administered**  5:*19*
**administration**  9:*25*
**Administrative**  5:*22*
**advertised**  47:*9*, *25*
**advertisements**  47:*13*,
*17*
**advertising**  53:*22*
**advise**  22:*17*
**affirm**  6:*14*

**AFFIRMATIVE**  4:*6*,
*8*  87:*3*, *11*, *13*, *24*
88:*1*  89:*12*, *20*  90:*15*,
*20*  91:*3*, *13*  93:*9*, *21*
94:*6*, *15*, *21*  95:*3*, *5*,
*16*  96:*6*
**affirmed**  6:*21*
**agent**  28:*20*  65:*21*
106:*13*  108:*20*
119:*10*  120:*1*  127:*24*
140:*15*, *19*  141:*8*
**ago**  11:*23*  20:*18*
30:*8*  54:*10*  91:*23*
**agree**  17:*5*  18:*16*
42:*7*  47:*17*  48:*1*
58:*18*  61:*7*  72:*13*
73:*15*  74:*22*  83:*24*
101:*1*, *3*
**agreed**  103:*4*
**AGREEMENT**  3:*21*
5:*25*  6:*2*  12:*7*  57:*10*
59:*17*, *24*  60:*8*, *9*
84:*2*  87:*21*  90:*24*
93:*3*, *7*  108:*19*
109:*10*  111:*17*
127:*10*, *12*, *17*  135:*4*
144:*23*  145:*3*
**agreements**  19:*23*
**Agriculture**  85:*19*
**ahead**  7:*13*  11:*11*
26:*9*, *17*  58:*18*  82:*9*
122:*11*, *13*  124:*6*, *23*
150:*4*
**ahold**  120:*21*
**al**  5:*10*  153:*6*  154:*4*
**Alex**  29:*25*  30:*5*
45:*11*  46:*17*  54:*23*
**Alexander**  50:*19*
52:*24*  65:*23*  66:*25*
**Alhambra**  2:*11*
153:*4*
**allege**  90:*18*
**alleges**  144:*3*
**allow**  144:*10*
**alteration**  95:*19*  96:*2*
**altered**  96:*4*
**AMEND**  4:*8*  96:*12*
**AMENDED**  4:*6*  87:*2*

**AMERICA**  1:*4*, *16*
2:*7*  5:*10*  7:*20*  153:*6*
154:*4*
**amount**  101:*8*  153:*14*
**analysis**  25:*10*
**and/or**  93:*24*
**and-a-half**  11:*23*
**Angel**  29:*22*, *25*
**anquience**  94:*25*
**answer**  8:*2*, *7*, *15*, *16*
11:*11*, *16*  12:*20*  14:*5*,
*11*, *13*  24:*3*  26:*10*, *20*
87:*2*  88:*22*  106:*6*
123:*7*, *16*, *18*
**answered**  12:*9*  24:*2*,
*9*  26:*8*  39:*1*  43:*21*
49:*20*  64:*3*  81:*15*
82:*14*  84:*14*, *19*
139:*18*
**answering**  8:*23*
128:*25*
**Antonio**  117:*17*, *18*,
*21*
**anybody**  12:*12*, *15*
13:*7*  58:*23*  85:*15*, *18*,
*22*  86:*18*  117:*3*
**anymore**  77:*3*
119:*19*  124:*24*
145:*15*
**AOSC20-16**  5:*22*
**apologies**  147:*8*
**app**  50:*23*  55:*15*, *18*,
*19*
**appear**  79:*16*
**APPEARANCES**  2:*1*
**appeared**  151:*9*
**appears**  96:*22*
125:*12*  132:*16*, *18*
133:*7*, *20*  134:*8*
136:*20*
**APPLICATION**  3:*23*
27:*15*, *17*  49:*12*, *25*
50:*1*, *22*  59:*10*  64:*15*
65:*2*
**applied**  29:*3*  82:*24*
**appointed**  71:*4*
**appointing**  71:*11*
77:*10*
**appreciate**  29:*12*

**approval**  27:*20*
**approve**  28:*1*  55:*2*
**approved**  27:*19*
**approximately**  5:*7*
16:*15*, *25*
**APR**  58:*7*, *8*
**April**  1:*20*  5:*6*
35:*15*  44:*12*, *13*, *14*,
*18*  110:*7*  151:*10*
153:*6*  154:*6*
**argue**  15:*2*
**argumentative**  124:*5*
**ARIEL**  2:*12*  153:*2*
**ARMSTRONG**  2:*10*
153:*3*
**arrangement**  5:*21*, *24*
**arrangements**  153:*11*
**arrived**  48:*11*  67:*7*
**ASCIIs**  49:*6*
**Aside**  10:*21*  15:*18*
23:*21*  24:*6*, *16*  25:*3*
38:*23*  39:*7*  115:*13*
147:*4*
**as-is**  140:*12*
**asked**  24:*2*, *9*  26:*8*
38:*3*, *4*, *25*  43:*21*
49:*20*  64:*3*  81:*15*
82:*14*  84:*14*, *19*
88:*14*  132:*3*  139:*18*
149:*6*
**asking**  8:*7*  26:*19*, *20*
60:*18*  71:*15*  87:*16*,
*22*  89:*5*
**assert**  87:*14*  88:*2*
89:*13*  90:*17*, *21*
91:*14*  93:*10*, *22*  94:*7*,
*16*  95:*2*, *6*, *17*
**asserted**  89:*5*, *23*
**asserting**  93:*23*
**asserts**  88:*8*  91:*5*
**assigned**  59:*16*
**assignment**  59:*24*
**ASSOCIATES**  2:*17*
**assume**  8:*2*
**assumes**  83:*18*
110:*20*  113:*14*  123:*6*
128:*8*  139:*3*
**assuming**  44:*17*
48:*15*  58:*5*, *9*  76:*22*

81:8
**assumption** 58:11
**attach** 99:22
**attached** 100:23
103:16
**attachment** 4:21
**attend** 20:24, 25
**ATTORNEY** 4:1
6:4 7:12 8:14 68:3,
13, 16, 23 69:1 71:4
77:9, 10 80:14, 16, 19,
21 81:1 83:5 86:19
100:11 103:9 128:22
152:11, 12 153:14
**attorneys** 5:15 42:11
71:11 87:12
**auction** 13:1, 5 21:7,
8, 19 22:9, 13 23:17,
21 24:14 36:21, 22
37:19 44:4 54:14
88:13 92:8
**audible** 8:10
**authority** 31:15
108:22 109:5 147:23
151:8
**authorization** 50:4
51:6
**authorized** 152:6
**authorizes** 50:24
65:6 68:24
**authorizing** 50:2
**Auto** 31:5, 7, 12, 15,
17 35:13 41:8, 9, 10,
13 42:18 43:15, 17,
18, 24 44:4, 12, 15, 20
74:19 75:7, 15 76:3
78:12 82:19 104:11,
22, 24 105:1, 3, 18, 19,
23 106:14, 17, 23, 25
107:8, 11, 16 108:4,
10, 13, 15, 19 109:3, 6
110:8, 12, 14, 17
111:12, 19 112:8, 19,
22 113:3, 7, 9 115:20
121:21 122:18
126:13, 15 127:5, 8,
18, 24, 25 128:2, 15
130:2, 4, 14 132:5, 19
133:2, 3 140:15, 20

141:8 144:24, 25
145:2 146:5 148:13
**AutoCheck** 22:4
24:25
**automatic** 106:22
**automatically** 69:6
88:10 106:18 120:23
**AUTOMOTIVE** 1:9
2:10 4:10 10:10, 20,
22 81:23 132:5
**available** 153:9
**aware** 88:3, 8 96:6
97:2 103:3 132:7
**Awesome** 104:4

< B >
**back** 19:17 37:12
38:3, 5, 12 43:12
59:9 67:10 74:3
76:24 77:4 88:25
90:9 91:18 102:17
104:17 118:15
119:12, 24 122:15
137:18 145:17
148:13
**background** 9:18
**bad** 34:24 58:8, 9
**bank** 27:19 41:12
55:15 59:15 127:15
**bar** 126:3
**barred** 89:14, 25
90:22 91:15 94:17,
23 95:19 96:1
**based** 35:19 36:16
61:1 109:12 124:12
136:25 138:14 140:1
145:3 146:15, 17, 20
**Bates** 42:9 125:20
128:20 134:14
**BEACH** 151:5 152:1
153:21, 22
**beat** 34:18
**bed** 40:1, 3, 5
**began** 5:2
**beginning** 50:6, 23
145:19
**begins** 58:6
**behalf** 2:1, 7, 16 6:4,
7, 9 54:21 57:20
71:13 79:14, 22

80:17, 25 81:3, 6
106:14 108:23 148:5
**believe** 17:22 18:12
75:5, 10 110:6
124:15 142:16
**beneath** 71:3
**benefit** 141:11 148:2
**better** 30:12 73:22
84:22 85:2, 4, 8
89:19
**Betty** 72:6, 7 73:14
76:10, 19 77:1, 10
78:7 79:15 81:7, 8
83:10 98:3, 4, 10
113:13 114:5, 23
141:19 142:11, 18, 25
147:22 148:17
**Betty's** 76:21 79:16
**big** 15:22 25:14
33:17
**biggest** 21:8 92:23
**Bill** 4:17 33:14 52:7,
9, 15 53:22 54:13
57:14, 15 72:23
92:21 93:20 98:20
136:14, 21 146:15
**bind** 31:15 77:10
**birth** 9:8
**bit** 43:9 70:9 74:6
80:4
**blame** 90:6 99:12
**blank** 153:16
**Blvd** 2:17
**bond** 20:10 83:23
84:5 87:22 88:12
89:2 90:7 99:21, 22
100:4, 5, 8 109:15
110:2 143:5
**booked** 127:15
**born** 10:5
**borrower** 80:11
**bottom** 42:12 54:21
64:5, 8 65:20 153:16
**bought** 12:20 15:17
35:10 36:15 38:22
39:4 41:18 44:13
45:20 88:19, 20
140:19 141:5 145:22
**Boulevard** 153:21

**Box** 2:5 29:2 50:1,
24 126:14 132:7
133:8
**boy's** 144:13
**brake** 40:17
**brakes** 39:11
**breach** 95:18 96:1
**break** 8:19, 22 102:7,
15 144:13
**bring** 15:10 22:11
23:20 31:10 38:3, 4
116:23 117:12
**building** 54:9
**Bureau** 84:22 85:3,
5, 9
**Business** 9:25 11:2
17:7 43:16 61:14
71:10 84:22 85:2, 4,
9 99:10 115:19
129:3, 4 134:2
**businesses** 22:3
**buy** 20:5, 6 21:7, 9,
18, 19, 24 22:9 23:19
31:8, 10 36:15, 19
37:3 59:18 92:21
93:17 105:23 106:1
108:22 139:5
**buyer** 21:17 31:17
36:22 105:3, 15, 17
109:4, 5 113:12, 24
121:6 129:10 137:12,
17
**Buyers** 138:17, 18
**BUYER'S** 3:14
51:20 63:8, 11 66:8
70:16 129:20 131:1,
7, 14 134:13 135:2,
16
**buying** 52:20 124:13

< C >
**c/o** 153:2
**cabinet** 46:9, 10, 12
**cabinets** 46:14
**California** 61:13
**call** 32:19 33:3
37:11 57:9 81:11
88:11 91:22 92:9
107:22 115:6 116:21

118:*16, 17* 119:*11, 14, 23, 24* 120:*23* 153:*10*
**call-backs** 119:*17*
**called** 23:*18* 32:*15* 36:*25* 37:*1, 6, 12, 13* 83:*23* 84:*6* 87:*22* 88:*10, 13, 21* 100:*11, 13* 116:*1, 2* 117:*19, 20, 23* 119:*12, 20* 120:*12*
**calls** 89:*16* 119:*15* 120:*18*
**cancel** 51:*5* 100:*4*
**car** 11:*18* 12:*20* 15:*22* 17:*14* 18:*4, 9, 11, 15* 21:*19, 21, 23* 22:*10, 13, 15, 18, 22, 25* 23:*1, 16, 18* 24:*13, 18, 20, 21* 25:*11, 12, 15* 26:*2, 13* 27:*7, 8* 28:*4* 30:*5, 16, 20* 31:*11, 18, 22* 34:*16, 17* 35:*4, 8, 18* 36:*15, 19, 24* 37:*3, 5, 6, 14, 18, 21* 38:*3, 4* 39:*13, 23* 41:*15* 43:*4, 5* 45:*20* 48:*24* 59:*19* 65:*7* 67:*4, 6, 7* 68:*24* 71:*23* 72:*17* 88:*14, 16, 18, 19, 20* 90:*9* 91:*18, 19* 97:*14, 17* 105:*17* 111:*9* 116:*1, 6* 118:*14* 121:*2, 3* 126:*25* 127:*1, 6, 14, 16* 140:*3, 7*
**CARFAX** 22:*4* 24:*23* 92:*11* 97:*3*
**cars** 10:*7, 9* 16:*23* 17:*2* 19:*6, 8, 17* 21:*3, 4, 5, 15, 24* 27:*6* 31:*8, 10, 20* 36:*2, 5, 10* 37:*3* 39:*22* 47:*11* 67:*5* 92:*21* 100:*5* 107:*3* 108:*22* 145:*11* 146:*19*
**case** 5:*11, 13* 7:*13* 92:*6* 96:*7* 103:*6* 104:*9* 117:*16* 143:*19* 153:*6* 154:*5*

**cash** 27:*14*
**Castillo** 29:*22*
**cause** 89:*14* 95:*18, 25* 153:*8*
**causes** 89:*24*
**cell** 117:*25* 118:*2, 8, 10*
**center** 121:*1*
**Central** 23:*18*
**certainly** 8:*20*
**CERTIFICATE** 3:*14, 23* 4:*1* 18:*13* 41:*17* 42:*18, 23, 25* 64:*16* 65:*2* 72:*25* 74:*12, 15, 18* 75:*6, 11* 77:*11, 17, 23* 78:*1* 97:*3, 19* 98:*6* 103:*15* 110:*5, 6, 25* 111:*6, 13, 19* 112:*6, 9* 113:*2, 20* 115:*21* 121:*19, 22* 122:*2* 123:*3* 124:*2* 125:*14, 15* 130:*5* 131:*12, 22* 132:*18, 21* 133:*2* 135:*9* 142:*24* 143:*1* 151:*1*
**Certificates** 106:*13*
**CERTIFIED** 1:*24* 5:*4* 151:*18* 152:*20* 153:*18*
**certify** 62:*11* 151:*8* 152:*6, 11*
**cetera** 42:*21* 53:*23* 61:*2*
**change** 22:*17* 23:*6, 7* 40:*24* 54:*8* 154:*7*
**changed** 31:*3* 54:*6*
**changes** 24:*17* 154:*2*
**changing** 23:*2*
**charged** 54:*4*
**charges** 53:*5*
**check** 60:*7* 61:*2* 87:*22* 92:*8, 10, 12* 100:*9* 101:*6, 8* 143:*9, 12* 144:*1*
**checkbox** 62:*10*
**checking** 122:*1*
**Chinese** 90:*23*
**chipped** 40:*9, 12*
**Christ** 33:*19*

**Cir** 2:*11* 153:*4*
**circumstance** 37:*9*
**citation** 86:*14, 16*
**cited** 86:*11*
**Civil** 1:*4*
**claim** 24:*13* 50:*25* 88:*12* 93:*3, 7* 100:*8* 116:*5, 20*
**Claimant's** 13:*14* 51:*19*
**claiming** 143:*18*
**claims** 91:*15* 94:*17, 23* 143:*14*
**clarify** 132:*3*
**clean** 18:*10* 39:*22, 23*
**clear** 14:*24* 136:*19*
**Clerk** 153:*15*
**click** 15:*16* 29:*1, 2, 4, 6, 7, 8* 33:*20* 34:*1* 50:*1, 24* 106:*1* 117:*18*
**clicking** 105:*24*
**client** 26:*14, 23, 24* 27:*1* 31:*18* 45:*8* 46:*21* 47:*4* 48:*3* 52:*25* 55:*7* 57:*24* 59:*2, 13, 14* 62:*3, 14* 63:*5, 7, 21* 65:*3, 8, 24* 66:*2* 68:*13* 69:*22* 70:*1* 71:*4, 24* 74:*16* 75:*12* 79:*22* 80:*12, 21* 82:*18* 83:*6, 15* 88:*24* 89:*5, 8, 24* 90:*25* 91:*5, 7, 12* 93:*2, 6* 94:*10, 12, 13* 95:*9* 96:*4* 98:*7* 146:*9* 147:*2* 148:*1*
**client's** 29:*24* 31:*1* 45:*5* 53:*25* 60:*13* 69:*18* 71:*18* 80:*16* 81:*2, 5* 97:*20*
**closed** 35:*22, 24* 36:*9*
**closely** 80:*5*
**clue** 109:*19* 130:*20* 133:*9*
**Colombia** 10:*2*
**come** 21:*9* 23:*5* 27:*12* 39:*22* 43:*14* 60:*8*

**comes** 23:*4* 50:*4* 69:*6* 86:*13* 106:*12* 111:*22* 113:*11, 17*
**coming** 19:*17* 52:*20*
**comments** 21:*18, 20, 22* 37:*21* 88:*15, 17*
**commercial** 21:*25* 93:*14*
**commercially** 93:*11*
**commission** 31:*14* 49:*12* 151:*19*
**commissions** 45:*22, 24*
**communicate** 108:*7, 12*
**communicated** 124:*3*
**communication** 107:*16, 19* 118:*23*
**community** 35:*25* 86:*9*
**company** 19:*11* 23:*17* 72:*9* 92:*24* 93:*18* 105:*10, 15* 110:*2* 111:*5* 112:*10* 118:*9* 141:*21*
**compensate** 37:*24*
**complain** 91:*9*
**COMPLAINT** 4:*6, 8* 84:*21* 85:*15, 18, 22* 86:*12, 18* 93:*24*
**Complaints** 85:*5* 86:*6*
**complete** 27:*17* 29:*10* 36:*17* 147:*5* 152:*8*
**completed** 142:*18* 143:*1* 147:*23* 153:*12*
**completely** 28:*21* 90:*4*
**Complies** 33:*18* 74:*7* 95:*22*
**composition** 115:*7*
**compressor** 86:*7*
**computer** 15:*12, 15* 20:*9* 28:*11, 17, 18, 19, 21* 48:*21*
**concerning** 123:*10*
**concluded** 150:*10*
**conclusion** 89:*17*

GABRIEL LUIS HERNANDEZ vs. CR of FS Investments (Franklyn Strusberg)
Case 8:23-cv-00739-WFJ-SPF Document 73-2 Filed 10/07/24 Page 44 of 58 PageID 4113
11/13/2024
5

**condition** 19:9 21:*20*
25:*4*, *25* 26:*3*, *5*
34:*13*, *15*, *24* 35:6, *9*
37:*4* 38:*23*, *24*
124:*14*
**conditions** 27:*25*
28:*1*
**conduct** 93:*24*
**conducts** 36:*23*
138:*24*
**confirmed** 119:*21*
**confirming** 118:*19*
**confusing** 7:*24*
**confusion** 125:*13*
**connected** 152:*12*
**consent** 5:*23* 48:*19*,
*22* 49:*3*, *9*, *17*, *24*
50:*8*, *21* 51:*2*
**considered** 19:*11*
**consignment** 31:*8*
**consumer** 28:*9*, *16*,
*23* 29:*4*, *15* 84:*21*
85:*19*
**consumers** 19:*19*
71:*11*
**consumer's** 89:*24*
**contact** 72:*11* 100:*12*,
*15* 116:22 117:*12*
121:*13*, *16*
**contacted** 90:7
109:*15* 117:*18*
**contacting** 108:*4*
**container** 46:*13*, *15*
**content** 97:2
**CONTRACT** 3:*14*
28:*4* 29:*1* 50:*16*
51:*21* 56:*4*, *7*, *19*, *25*
57:*4*, *8*, *13*, *16*, *24*
60:*19* 63:*15* 64:*1*
66:*11* 70:*14* 72:*23*
108:*19* 127:2 135:*4*
**contractor** 142:*1*, *2*
**contracts** 28:*9* 49:*17*
63:*19*
**contradict** 135:*15*
**contribute** 94:*3*
**control** 93:*25*
**conversation** 108:*24*
118:*20*, *24* 120:*8*

**condition** 126:*8*
**conveyed** 103:*8*
**convicted** 9:*12*
**copies** 51:*15* 56:*8*, *10*
**copy** 27:*13* 42:*17*, *23*
48:*1* 50:*16* 52:*9*, *12*
56:*15*, *24* 60:*15* 62:2
65:*1* 68:*12*, *15* 74:*12*,
*15*, *18* 100:*19* 109:*9*
111:*5* 125:*13* 126:*19*,
*22*, *23* 128:2 130:*5*,
*14* 132:6, *20* 133:2
135:9 142:*23*, *25*
150:*6*
**Coral** 2:*11*, *18* 153:*4*
**corner** 33:*16*, *24*
34:*10* 55:*11* 64:7, *8*
65:*20*
**CORP** 3:*14* 31:6, *13*,
*16*, *17* 41:8, *13* 42:*18*
43:*15*, *17*, *18*, *24*
44:*12*, *16*, *20* 74:*19*
75:*15* 78:*12* 82:*19*
104:*11*, *22*, *24* 105:*3*,
*18*, *19*, *23* 106:*18*, *23*
107:*1*, *8* 108:*5*, *10*, *16*
109:*4*, *7* 110:*8*, *12*, *14*
111:*13* 112:*8*, *19*, *23*
113:*4*, *10* 115:*20*
121:*21* 122:*19*
126:*13*, *15* 127:*18*, *25*
130:*14* 132:*5*, *19*
133:*3* 140:*15*, *20*, *21*
141:*8* 144:*24*, *25*
145:*3* 148:*14*
**Corp.'s** 105:*1*
**corporate** 1:*16* 7:*5*,
*8*, *19* 17:*9* 105:*9*
**corporation** 1:*9*, *11*
16:*8*
**correct** 7:*4*, *10* 10:*14*
15:*23* 16:*12*, *16* 31:2
38:*10* 39:*17* 41:2, *4*,
*6* 42:*17* 45:*13*, *14*
46:*24* 49:*10* 52:*9*, *12*
56:*15*, *24* 57:*18*, *22*
58:*12*, *24* 59:*1*, *21*
62:*2* 65:*15* 68:*12*, *15*
69:*11*, *13*, *17* 70:*24*
73:*17* 74:*1* 78:*15*

**condition** 79:*13*, *21* 80:*22*, *23*
83:*4*, *13* 84:*10* 92:*13*
97:*8* 98:*16*, *23*
103:*10* 105:*11*, *13*, *20*
107:*10*, *15* 108:*3*
109:*8*, *13*, *17* 110:*3*,
*23*, *24* 111:*2*, *3*, *7*
112:*1*, *20*, *24* 113:*1*, *4*,
*5*, *8* 114:*18* 115:*9*, *11*,
*15*, *17*, *22*, *23* 116:*4*,
*13* 117:*23* 119:*6*
120:*2* 121:*8*, *14*, *15*,
*18*, *23*, *24* 122:*5*
126:*6* 127:*19* 129:*8*
130:*7*, *17* 133:*4*, *5*, *6*,
*23* 136:*17* 137:*13*, *19*,
*20*, *23* 138:*21*, *22*
140:*24* 141:*9* 142:*18*,
*19* 143:*3*, *15* 144:*25*
145:*1*, *12*, *24* 146:*11*
147:*3*, *21*, *25* 148:6, *7*
**correctly** 34:*23* 56:*14*
**correspondence**
118:*19*
**COST** 4:*10*
**counsel** 5:*23* 38:*16*
143:6, *10*, 22 144:*1*, *6*
149:6 152:*11*, *12*
**count** 123:*15*
**Counts** 90:*21*
**county** 85:*16* 151:5
152:*1*
**couple** 120:*20*
**course** 17:*8*, *12*
18:*10*, *15* 19:*12*
20:*16*, *22*, *24* 21:*1*
28:*25* 33:*14* 47:*16*
48:*2*, *16* 51:*13*
**courses** 20:*12*, *15*
**COURT** 1:*1*, *24* 5:*3*,
*12*, *22* 6:*12*, *18* 8:*5*
12:*1* 29:9 32:*23*
87:*12* 106:*2*, *4*, *9*
122:*14*, *17* 142:*4*, *7*
151:*18* 152:*20*
153:*15*, *18*, *21*
**cover** 33:2 53:*19*
144:*2*
**coverage** 28:*2*, 7

**covered** 20:*19* 128:*12*
**CR** 21:22 34:*11*
**cracked** 40:*10*, *13*
**Craig's** 47:*8*, *10*
**credit** 27:*15*, *17*
49:*11*, *25* 50:*1*, *22*, *23*,
*25* 58:*8*, 9
**crimes** 9:*13*, *16*
**cross** 102:*4*
**CROSS-
EXAMINATION** 3:*5*
104:5 125:*10*
**customary** 134:*5*
140:*3*, 6
**customer** 18:*1* 20:*1*
27:*3*, *4* 30:*20* 43:*4*
48:*17* 56:*11* 57:*25*
58:*1*, *14*, *19*, *21* 60:6
62:*16*, *17* 65:6 68:*23*
69:7 79:*25*
**Customers** 19:*17*
22:2 93:*19* 95:8
**customer's** 52:*18*
61:*1* 66:*18*
**cut** 122:*13*

**< D >**
**d/b/a** 1:*9*, *10* 2:*10*
16:*8*
**damages** 87:*20*
90:*18* 95:7 143:*16*,
*18*, *23* 144:*3*
**dashboard** 97:*4*
133:*14*, *22*, *23* 134:*6*,
*20* 135:*5*, *19*, *21*
147:*4*
**date** 5:*6* 9:*8* 44:*2*,
*20* 53:*12* 64:*10* 67:*1*,
*11*, *13* 70:*25* 77:*17*,
*20*, *22* 79:*2*, 5, *9*, *12*
97:*18*, *24* 98:*5*, *6*
110:6 126:*16*, *18*
129:*7*, *17* 130:*11*, *14*
132:*4*, *15*, *17*, *20*, *25*
133:*1*, *7*, *8* 146:*14*
154:*23*
**dated** 142:*22* 152:*13*
**Day** 13:*11* 31:*4*
44:*17* 48:*11* 67:9
77:*4* 90:7 91:*17*

GABRIEL LUIS PRADO vs. FS INVESTMENTS OF AMERICA, INC.
CR of FS Investments (Franklyn Strusberg)

Case 8:23-cv-00709-WFJ-SPF   Document 73-2   Filed 10/07/24   Page 45 of 58 PageID 1114
6

119:*25*  151:*10, 14*
152:*13*  153:*6*
**days**  43:*6*  44:*18*
**De**  2:*17*
**deal**  27:*18*  30:*13*
31:*6, 7, 12, 15, 17*
35:*14*  41:*8, 9, 10, 13*
42:*18*  43:*15, 17, 18,*
*24*  44:*4, 12, 15, 20*
46:*3, 4, 6, 8*  51:*13, 14*
55:*18, 20*  60:*24*  61:*2,*
*4, 7*  69:*5*  74:*14, 17,*
*19*  75:*7, 15*  76:*4*
78:*12*  82:*19*  91:*17,*
*20, 21, 25*  104:*11, 22,*
*24*  105:*1, 3, 18, 19, 23*
106:*14, 17, 23, 25*
107:*8, 11, 16*  108:*4,*
*10, 13, 15, 19*  109:*3, 7*
110:*8, 12, 14, 17*
111:*2, 13, 19*  112:*8,*
*19, 23*  113:*4, 7, 9*
115:*20*  121:*21*
122:*19*  126:*13, 15*
127:*6, 8, 15, 18, 24, 25*
128:*2, 15*  130:*3, 4, 14*
132:*5, 19*  133:*3*
140:*15, 20, 21*  141:*8*
144:*24, 25*  145:*3*
146:*5*  148:*13*
**DEALER**  2:*4*  15:*22*
20:*8*  22:*11*  23:*20*
31:*11*  35:*22*  53:*17*
60:*9*  65:*21*  86:*13*
92:*5*  99:*19*
**DealerCenter**  30:*24*
51:*10, 14*  56:*3*  60:*17,*
*25*  64:*14*  66:*23, 24*
**dealers**  35:*24*  114:*16*
134:*6*  140:*3, 7*
**dealer's**  147:*23*
**dealership**  7:*20*  10:*8,*
*16, 23*  15:*21*  16:*2, 5,*
*11, 17*  17:*2, 5, 10, 11,*
*21*  18:*12*  19:*20, 23*
20:*2, 7, 11, 14, 25*
23:*22*  25:*7*  30:*7, 9,*
*22, 23*  35:*13*  45:*13*
46:*16*  47:*6*  48:*3*
51:*8*  53:*9*  56:*8*

57:*21*  60:*10, 20*  62:*3*
65:*6, 12*  67:*15*  68:*13,*
*17, 25*  69:*4*  71:*8, 10,*
*12*  76:*15*  77:*2*  79:*14*
81:*7*  82:*2, 12*  83:*15,*
*21*  84:*11, 16, 22*
85:*16, 20*  86:*19*  88:*8*
89:*23*  90:*1, 11, 16*
91:*4*  93:*15*  96:*7*
98:*15*  113:*7, 11*
115:*12, 16*  128:*1*
145:*17*  146:*12, 22*
147:*11*  148:*6*  149:*7,*
*19*
**dealerships**  10:*18*
16:*21*
**dealership's**  54:*20*
104:*23*  145:*25*  146:*4,*
*8, 25*
**deals**  104:*21*  113:*17*
**decide**  22:*5*
**decision**  27:*8*
**declare**  154:*22*
**dedicated**  28:*21*
**Defendant**  2:*7, 16*
4:*17*  6:*8, 10*  7:*13*
9:*3*  61:*20*  93:*10*
96:*24*  97:*1, 3, 5*
136:*8*
**Defendant(s**  1:*12*
**Defendant's**  87:*21*
93:*25*  136:*7*
**DEFENSE**  4:*12*
87:*13, 24*  88:*1*  89:*12,*
*21*  90:*15, 20*  91:*3, 13*
93:*9*  94:*6, 15, 21*
95:*3, 5, 16*
**DEFENSES**  4:*6, 8*
87:*3, 12*  93:*22*  96:*7*
**DEFT**  4:*6*
**delete**  77:*15*
**delivered**  38:*13, 15,*
*19*  124:*11*
**DEMAND**  4:*8*  99:*14,*
*18*  101:*22*
**dented**  40:*3*
**dents**  40:*7*
**department**  85:*16, 19*
**Depending**  25:*11*

27:*13*
**depends**  25:*25*
**depict**  133:*1*
**depicts**  79:*12*
**DEPO**  3:*14*  15:*3*
**Depos@FloridaCourt**
**Reporting.com**  153:*10*
**DEPOSITION**  1:*15*
5:*8, 16, 17, 18*  7:*5, 9,*
*19*  9:*10*  12:*13, 16, 18*
13:*9, 14*  38:*17*  81:*13*
103:*21*  125:*16*
128:*12*  143:*7*  152:*7*
153:*8, 11, 12*
**derive**  10:*13, 15*
**describe**  35:*18*
**DESCRIPTION**  3:*14*
4:*1, 16*  52:*19*
**destroyed**  19:*7*  26:*2*
**determination**  60:*2*
**determine**  27:*4*
44:*19*  60:*22*  85:*11*
**determines**  25:*6, 11,*
*14*
**determining**  26:*7*
**dictates**  60:*19*
**difference**  57:*12*
136:*3*
**different**  82:*20*  84:*3*
86:*6*
**differently**  95:*9*
**dig**  21:*17*  37:*10*
84:*5*  88:*22*  100:*10*
119:*12*
**DIRECT**  3:*5*  6:*23*
59:*20*  121:*13*
**directly**  36:*18*  59:*14*
108:*7*  112:*19*  113:*23*
117:*20*
**disclose**  37:*4, 15*
58:*13*  59:*2*  72:*20*
88:*15, 17*
**disclosed**  44:*25*
103:*18*
**DISCLOSURE**  3:*22*
18:*3, 5*  54:*11*  59:*5*
61:*19*  62:*1, 3, 6*
66:*20*  72:*22*  77:*13*
78:*24*  79:*2, 6*  81:*22*
135:*3*  146:*9*  147:*13*

**disclosures**  17:*13, 22*
18:*14*  90:*25*  146:*1*
149:*7*
**discovery**  32:*2*  42:*10,*
*24*  43:*3*  61:*20*
103:*18*
**discrepancy**  37:*1*
88:*3, 9, 12, 16*  119:*21*
**discuss**  23:*12*
**discussing**  91:*11*
**dishonesty**  9:*13, 16*
**Dispatch**  23:*18*
**dispute**  84:*8*
**distribution**  153:*12*
**DISTRICT**  1:*1, 2*
5:*12*
**disturb**  32:*16, 19*
**disturbing**  123:*23*
**DIVISION**  1:*3*  5:*13*
**DLMRB**  20:*23*
**DMS**  31:*3*  51:*10*
**DMV**  17:*25*  20:*11*
28:*13*  49:*6*  62:*18, 20*
68:*16*  69:*2*  71:*16, 19,*
*23*  72:*16*  73:*1, 13*
85:*21, 22*  86:*2, 11, 12,*
*14*  113:*18, 21*
**DMV's**  115:*14*
**doctrine**  89:*14, 25*
90:*22*
**Doctrines**  94:*18, 19,*
*24, 25*
**document**  15:*8*
29:*14*  33:*12*  34:*4, 10*
42:*10*  49:*9*  52:*16, 21*
54:*24*  55:*2, 4, 7*
56:*21*  57:*3*  60:*4*
61:*25*  62:*7, 15, 23*
63:*2*  64:*23*  65:*5, 9,*
*14, 24*  66:*4*  68:*2, 5,*
*22*  69:*23*  70:*23*
71:*24, 25*  72:*20*
73:*10, 19*  74:*23, 25*
75:*2, 4, 5, 11*  78:*2*
79:*11*  80:*13, 16, 24*
81:*2, 5, 10*  82:*22*
83:*6, 7*  87:*9*  96:*18*
125:*15, 20*  126:*5, 9,*
*22, 24*  128:*20, 23*
129:*1, 2, 4, 12*  132:*15*

135:*14* 136:*6*, *13*, *16*
142:*5*, *18* 154:*22*
**document(s** 13:*17*
32:*3* 41:*24* 51:*25*
61:*22* 64:*20* 67:*24*
73:*5* 87:*6* 96:*15*
99:*3* 101:*19* 125:*8*
128:*17* 131:*24*
134:*15* 136:*10*
142:*13*
**documents** 15:*10*, *14*,
*19* 28:*15* 48:*13*, *18*,
*19* 49:*18* 51:*9* 56:*9*
63:*9*, *25* 70:*20* 73:*12*
91:*1* 121:*7* 125:*3*
128:*13* 133:*11* 134:*8*
135:*8*, *12* 149:*11*
**doing** 61:*14* 76:*25*
104:*21* 121:*25*
123:*25* 128:*10* 148:*2*,
*5*
**Don** 71:*5*, *6*, *8*, *25*
**door** 17:*3* 26:*14*, *23*
91:*20*
**drive** 22:*15*, *20*
23:*24* 24:*1*, *4* 27:*10*,
*11* 39:*10*, *12*, *13*
139:*1*, *11*
**driver** 23:*19* 107:*6*
**driver's** 27:*16*
**driving** 24:*6* 35:*7*
39:*16*
**drove** 39:*6* 48:*8*
**duly** 6:*21* 151:*10*

**< E >**
**earlier** 110:*4* 128:*23*
130:*2*, *4* 132:*4*
138:*24*
**earned** 31:*12*
**easier** 77:*16*
**easy** 7:*22*
**e-contracting** 49:*5*
**education** 9:*20*
**educational** 9:*18*
**effectively** 51:*20*
**eight** 54:*7* 136:*3*
**eighth** 91:*13*
**either** 40:*9*, *12* 83:*12*

**electronic** 28:*12*, *13*
48:*18* 51:*8*, *11*
**electronically** 48:*14*,
*16*, *19*, *23* 49:*2* 50:*21*
57:*17*
**electronically-signed**
28:*15*
**eleventh** 93:*21*
**e-mail** 50:*7*, *12*, *13*,
*14* 100:*17*, *19*, *22*, *23*
101:*1* 103:*15* 107:*20*
118:*22* 143:*21*, *25*
153:*10*
**e-mails** 100:*18*
118:*18*
**employed** 10:*11*, *15*,
*17*, *19* 16:*4* 29:*23*
45:*12* 71:*12*
**employee** 77:*1*, *5*
114:*1* 141:*24* 142:*1*
152:*11*, *12*
**employees** 16:*19*
108:*15* 114:*2*
**engine** 39:*9* 40:*21*
**English** 120:*9*, *10*
**ENTER** 154:*2*
**entered** 67:*1* 108:*18*
146:*13*
**enters** 38:*16*
**entitled** 125:*15*
**entitlement** 121:*8*
**entity** 25:*2*
**envelope** 111:*21*
112:*5*
**envelopes** 111:*25*
112:*1*, *3*
**equitable** 94:*19* 95:*1*
**ERRATA** 154:*1*
**ESQUIRE** 2:*7*, *12*, *13*,
*19* 153:*2*
**essentially** 107:*11*
**estimation** 109:*22*
**estopped** 93:*23*
**estoppel** 94:*18*, *24*
**et** 5:*10* 42:*21* 53:*23*
61:*2* 153:*6* 154:*4*
**evaluating** 25:*20*
**evaluation** 25:*22*
**event** 8:*21* 123:*24*

**Everybody** 35:*25*
36:*1* 52:*2* 56:*21*
78:*19*, *21*
**evidence** 40:*15*
42:*21* 47:*1* 83:*19*
110:*21* 113:*15*
114:*12* 123:*6* 128:*9*
139:*4*
**Ex** 111:*23*, *24* 112:*1*,
*11*, *12* 130:*22*
**exact** 18:*23* 44:*20*
**exactly** 14:*1*, *3*, *15*
45:*21* 79:*12* 119:*7*
**EXAMINATION** 3:*5*
6:*23* 13:*25* 144:*21*
**examined** 6:*21*
**example** 36:*24*
**Excellent** 84:*11*
**exchange** 103:*5*
**Excuse** 12:*14* 43:*8*
52:*11*
**Ex'd** 110:*7*
**execute** 62:*4*, *14*
146:*1*, *22*
**EXHIBIT** 3:*14* 4:*1*,
*16*, *17* 13:*13*, *15*
41:*21*, *22* 51:*19*, *23*
56:*18* 61:*18* 64:*17*,
*18* 67:*21*, *22* 72:*25*
73:*3* 87:*2*, *4* 96:*11*,
*13* 98:*25* 99:*1*
101:*16*, *17* 125:*21*, *25*
136:*7*, *8*
**expenses** 53:*19*, *20*
**experience** 19:*3*
34:*14* 35:*19* 124:*12*
138:*14* 140:*2*
**expired** 85:*13*
**Expires** 151:*19*
**explain** 21:*15* 22:*12*
52:*14* 58:*1*, *15*, *17*, *25*
89:*18* 148:*21* 150:*1*
**explained** 55:*7*
57:*24* 58:*9* 63:*5*
70:*1*, *2* 117:*23*
**explains** 57:*25*
**exploring** 92:*1*
**express** 95:*18* 96:*1*
**exterior** 40:*7*

**< F >**
**face** 44:*24* 73:*16*
78:*1* 81:*23* 84:*3*
**facilitate** 137:*15*
**fact** 128:*5*
**factor** 25:*21*
**factories** 36:*9*
**factors** 25:*9*
**facts** 42:*21* 46:*25*
83:*18* 87:*14*, *19* 88:*2*,
*7*, *24* 89:*8*, *13* 90:*16*,
*21* 91:*4*, *14* 93:*10*, *22*
94:*7*, *16* 95:*2*, *6*, *17*
96:*3* 110:*20* 113:*14*
114:*11* 123:*6* 128:*8*
139:*3* 154:*22*
**failed** 95:*6*
**fair** 57:*9* 111:*4*
116:*17* 121:*25* 130:*9*,
*11*, *13* 132:*25*
**faith** 93:*11*, *13*
**familiar** 17:*10* 32:*6*
33:*12* 42:*4* 52:*5*
61:*25* 68:*2* 72:*19*
73:*8*
**far** 109:*12*
**Fed** 110:*7* 111:*23*,
*24* 112:*1*, *11*, *12*
130:*22*
**federal** 12:*1*
**fee** 53:*16*, *17*, *18*
54:*2*, *4*, *6*
**feel** 24:*11* 39:*10*, *13*
**felonies** 9:*12*, *15*
**FEYGIN** 2:*4*, *7* 3:*5*
6:*4*, *24* 7:*8*, *14* 11:*11*,
*15* 12:*9*, *11* 13:*12*, *19*
14:*6*, *9*, *23* 15:*1*, *5*, *6*
18:*21* 19:*2* 24:*3*, *5*,
*15* 26:*10*, *12*, *18*, *21*,
*22* 29:*13* 31:*24* 32:*5*
33:*11* 34:*8* 35:*5*
38:*18* 39:*3* 41:*20*
42:*1*, *22* 43:*23* 47:*2*
49:*21* 51:*18* 52:*2*, *4*
56:*17*, *23* 61:*17*, *24*
64:*12*, *15*, *22*, *25*
67:*20* 68:*1* 72:*24*
73:*7* 78:*16*, *23* 81:*18*

82:*11*, *16*  83:*20*
84:*15*, *20*  87:*1*, *8*
89:*20*, *23*  90:*10*  93:*1*
95:22, *24*  96:*10*, *17*
97:*18*, *23*  98:*4*, *24*
99:6, *9*  101:*15*, *21*
102:3, *7*, *22*, *25*
103:*12*, *17*, *23*, *25*
124:*23*  125:*1*, *6*, *18*,
*23*  126:*2*, *6*  128:*8*, *23*
130:*25*  131:*7*, *11*, *13*
139:*3*, *18*  140:*23*
144:*12*, *20*, *22*  147:*8*,
*10*  148:*8*, *21*  149:*1*
150:*1*, *7*
**FEYGIN/POWERHO**
**USE**  4:*10*
**fifteen**  16:*20*
**fifty**  145:*9*, *11*, *22*
**figure**  45:*18*  63:*18*
98:*9*
**FILE**  4:*8*  24:*13*
46:*9*, *10*, *12*, *13*  85:*15*,
*18*  116:*5*, *20*  144:*6*
**filed**  11:*24*  84:*21*
85:22  86:*18*  87:*12*
153:*15*
**filing**  90:*2*, *12*
**filled**  66:22  134:*25*
146:*6*, *10*
**filling**  134:*8*
**finalize**  105:*24*
**finance**  20:*1*  27:*14*,
*18*  28:*20*, 22  29:*19*,
*20*  52:22  55:*15*
*63*:22  69:*20*  114:*13*,
*14*, *21*  115:*2*
**financed**  27:*14*  59:*19*
**FINANCIAL**  1:*10*
66:*6*
**financially**  152:*13*
**financing**  19:*23*  20:*3*
57:6, *9*  59:*17*, *24*
104:*13*  135:*4*
**find**  31:*18*, *20*  38:*8*
47:6, *19*, *20*  75:*2*
81:*9*  88:*21*  89:*2*, *3*
101:*3*  123:*9*, *22*
**finding**  44:*5*

**fine**  33:*2*  128:*11*
149:*1*, *23*
**finish**  8:*23*  106:*5*
118:*4*  123:*12*, *14*
143:*24*
**finished**  8:*7*  142:*5*
**finishes**  29:*10*
**FIRM**  2:*4*  99:*19*
**first**  6:*21*  7:*23*
12:*23*  22:*13*  26:*24*
29:*14*  31:*8*  38:*7*, *8*
57:*12*  58:*6*, *16*  67:*6*,
*7*  83:*21*  87:*13*  99:*11*,
*12*  100:*16*  102:*6*
104:*10*, *14*  109:*13*, *25*
115:*24*  122:*10*, *11*
145:*14*, *16*, *17*  150:*5*
**five**  16:*13*, *15*  20:*18*
34:22  58:*5*  61:*16*
133:*10*
**five-minute**  102:*15*
144:*13*
**flat**  111:*25*
**FLORIDA**  1:*2*, *9*
2:*6*, *11*, *18*  5:*4*, *12*, *21*
15:22  20:*8*  151:*4*, *18*
152:*1*, *6*  153:*4*, *21*, *22*
**focus**  75:*16*
**follow**  93:*15*  119:*18*
**followed**  93:*11*
**following**  5:*2*
**follows**  6:22
**Ford**  2:*16*  6:*10*
31:*16*  35:*14*  36:*12*
37:*6*, *13*  38:*9*  84:*7*
88:*23*  119:*11*  120:*12*,
*16*  123:*1*  136:*24*
137:*2*
**foregoing**  154:*22*
**Foreign**  1:*10*
**forever**  120:*22*
**FORM**  3:*14*  49:*24*
54:*12*, *17*, *20*  59:*2*, *6*
63:*5*, *7*, *12*  66:*7*, *20*
67:*10*  69:*1*, *4*, *10*, *15*,
*18*  70:*7*, *17*  71:*15*
74:*10*  131:*1*, *8*, *14*
137:*3*, *21*  140:*23*
**formal**  60:*4*, *18*

108:*18*  116:*5*
**format**  43:*14*  50:*16*
**formula**  60:*3*
**forwarded**  153:*14*
**found**  47:22  89:*4*
**foundation**  42:*20*
**four**  15:*25*  16:*1*, *12*
17:*4*  33:*23*
**fourteen**  16:*10*, *12*
**fourteenth**  94:*15*, *21*
**fourth**  90:*15*
**franchise**  37:*11*, *13*
**Frank**  5:*8*  7:*6*
11:*13*  14:*17*  26:*9*, *17*
32:*21*  82:*9*  117:*5*
123:*13*  124:*6*  126:*11*
128:*20*  132:*3*  149:*4*
**FRANKLYN**  1:*15*
3:*5*  6:*20*  9:*7*  15:*7*
79:*20*  105:*12*  151:*9*
152:*7*  153:*2*, *25*
154:*6*, *23*
**fraud**  93:*7*
**Friday**  153:*11*
**friend**  31:*7*  108:*6*,
*13*, *24*  109:*2*, *6*  125:*6*
148:*13*  149:*24*
**friends**  104:*12*
**front**  15:*12*  74:*25*
79:*23*
**FS**  1:*4*, *16*  2:*7*  4:*6*
5:*9*  7:*5*, *20*  9:*3*  16:*7*,
*8*, *9*  105:*6*, *9*  153:*4*
154:*3*
**FSA**  136:*6*
**FSIA**  3:*14*  4:*17*
32:*2*  42:*6*  51:*21*, *22*
56:*20*  61:*21*  64:22
128:*21*  134:*14*  136:*6*
**full**  28:*2*, *7*  32:*14*
**fully**  87:*20*
**funds**  41:*10*
**funny**  24:*11*
**further**  5:*18*  112:*2*
115:*13*  148:*8*  152:*11*

**< G >**
**Gables**  2:*11*, *18*
153:*4*

**GABRIEL**  1:*4*  5:*9*
6:*5*  78:*17*  129:*12*
142:*21*  153:*4*  154:*3*
**gallery**  32:*23*
**gas**  40:*19*
**gate**  107:*6*, *8*
**gathered**  133:*21*
**general**  35:*19*
**general's**  86:*19*
**generate**  107:*5*
**gentlemen**  29:*23*
144:*10*
**getting**  32:*18*  38:*12*
67:*10*  113:*11*  119:*3*
121:22
**give**  6:*15*  21:*19*, *20*
28:*6*  35:22  38:*5*
49:*9*, *11*  60:*6*, *25*
66:*14*  91:*18*  97:*15*
116:*9*, *15*  121:*5*
128:*13*  136:*1*
**given**  109:*6*
**gives**  17:*25*  18:*10*
69:*2*  115:*14*  117:*18*
**giving**  41:*16*
**Go**  7:*13*  11:*11*
17:*24*  26:*9*, *17*  29:*5*
30:*15*  33:*7*  43:*9*
48:*20*  58:*18*  82:*9*
92:*17*, *21*, *24*, *25*
93:*16*  102:*5*, *9*, *12*
104:*2*  116:*2*, *23*
117:*11*, *14*  122:*11*, *12*,
*13*  124:*6*, *23*  129:*11*
132:*9*, *23*  150:*4*
**goes**  12:*7*  23:*23*
25:22  49:*7*  51:*21*
56:*20*  113:*20*
**going**  7:*21*  8:*2*, *12*,
*20*  13:*12*, *13*  31:*24*,
*25*  37:*10*, *11*  41:*20*,
*21*  45:*5*  51:*18*, *19*
55:*9*  56:*17*, *18*  57:*5*
59:*9*  60:*20*, *23*  61:*17*,
*18*  64:*16*  67:*20*
72:*24*  74:*3*  75:*14*, *16*
77:*15*  78:*16*, *18*  87:*1*,
*2*, *11*  91:*24*  92:*6*
96:*10*, *21*  98:*24*, *25*
101:*15*  104:*19*  118:*3*,

*4* 119:*2, 11* 124:*4*
127:*8* 128:*14* 140:*21*
144:*6* 145:*13* 150:*3*
**GOOD** 1:*24* 5:*3, 4*
6:*25* 7:*17, 18* 22:*18*
24:22 26:5 30:*21*
34:*16* 35:*3, 4, 8, 20*
39:*14* 93:*11, 13*
95:*12* 103:*12* 117:*3,*
*9* 151:*18* 152:6, *20*
153:*18*
**govern** 17:*6*
**grade** 35:*9*
**grading** 34:*20*
**great** 51:*16*
**greets** 26:*24* 27:*1*
**ground** 7:*21*
**guide** 134:*7*
**guided** 97:*4*
**guy** 63:22 114:*13, 14,*
*21*
**guys** 12:*25* 13:*11*
34:*2* 38:*7*
**Guzman** 29:*22* 30:*3*

< H >
**HADDON** 1:*4* 5:*9*
*6*:*5* 66:*7* 70:*7* 78:*18*
82:*2* 129:*12* 130:*7*
133:*12* 153:*4* 154:*3*
**Hall** 71:*5, 6, 8, 25*
**hand** 6:*13*
**handbook** 114:*1*
**handled** 121:2
**hands** 43:6 94:*18, 22,*
*24*
**handwritten** 28:*14*
49:*7*
**hang** 53:*13*
**happen** 27:*20* 44:*15*
128:*6* 129:*25*
**happened** 13:*11*
14:*3, 15* 48:*6* 104:*18*
122:*11*
**happens** 22:*12, 14*
26:*15* 27:*9, 11, 17, 24*
30:*14*
**hard** 120:*21*
**Harrison** 2:*5*

**head** 8:*10* 122:*12*
**headlights** 40:*12*
**hear** 7:*18*
**held** 82:*17*
**help** 12:*13, 15* 86:*9*
95:*8*
**helped** 104:*13*
**helping** 35:*25* 148:*14*
**here/pay** 20:*5, 6*
59:*18*
**Heron** 29:*22*
**HH** 151:*19*
**high** 19:*8* 26:*3*
**higher** 19:*4* 36:2, *5*
123:*3* 124:*2*
**highest** 9:*20*
**highlight** 75:*16* 78:*19*
**highlighted** 96:22
**highlighting** 76:*4*
77:*16* 131:*5* 143:*2*
**history** 18:*14* 25:*3*
38:22 57:*8* 103:*16*
147:*6*
**hit** 69:*6*
**Hold** 43:*11* 114:2
120:22 129:*10*
131:*20, 23* 141:*18*
143:*24* 149:22
**holds** 111:*19*
**Hollywood** 2:*6*
**home** 36:*1*
**honest** 19:*1*
**honestly** 90:*18*
**honor** 106:*8*
**hope** 8:*20*
**hopefully** 7:*22*
**hours** 153:*10*
**Houston** 117:*16*
**HSMV** 69:*10*
**Hudson** 100:*15*
**huh** 99:*12* 149:*16*
**human** 90:*5*
**hundred** 12:22 91:*11*

< I >
**idea** 59:*11*
**identification** 13:*16*
41:*23* 51:24 64:*19*
67:*23* 73:*4* 87:*5*

96:*14* 99:2 101:*18*
136:*9*
**identify** 42:*9* 105:*21*
125:*20* 126:*8*
**ignorance** 33:*1*
**II** 90:*21*
**III** 90:22
**immaculate** 19:*9*
**immediately** 111:*14*
116:*1*
**impact** 18:*17*
**impacts** 18:7
**important** 17:*14, 15,*
*17, 19, 21, 23* 18:*3, 12*
19:*10, 14, 19*
**impression** 88:*19*
**inaccurate** 18:*16, 22*
54:*18* 59:*3* 83:22, 25
84:*9* 89:*6, 9* 91:*1*
**inappropriate** 120:7
**incidental** 53:*5*
**include** 138:*4*
**included** 133:*11*
**including** 138:*9*
**income** 10:*15* 28:2
61:*2*
**Independent** 90:*22*
**INDEX** 3:*1*
**indicate** 5:*25* 54:*17*
**indicates** 34:*24*
**indicating** 34:*12*
42:*12* 44:25 55:*11,*
*23* 68:*5* 71:*4* 73:*19*
76:7, *12* 80:7, *10*
126:*23* 131:*3* 132:*8,*
*16, 24* 135:2
**indication** 113:*6*
129:*21*
**industry** 17:*14*
**inform** 83:*15*
**INFORMATION**
3:*14* 4:*10* 28:*8* 32:*1*
36:*16* 44:*5* 50:2
61:*1* 66:24 67:*1*
72:*11* 79:*10* 96:25
97:*5* 98:*18, 19, 21*
105:*23* 133:*20* 134:7
135:*1, 7, 8* 137:*1, 16*
138:2, *4, 16, 19*

**in-house** 20:2
**initial** 119:*23*
**ink** 48:*14, 15*
**inspect** 22:7 23:*13*
24:7 37:20 39:*4, 9,*
*11, 12* 116:*16* 139:*12,*
*13* 147:*16*
**inspecting** 23:*12*
124:*13*
**inspection** 22:*11*
23:*17, 21, 22* 39:*15*
92:*10* 124:*10* 138:*25*
139:*16* 140:*4, 7, 13*
146:*17* 147:*17*
**inspects** 22:*10* 23:*15*
**INSTALLMENT**
3:*14* 56:*19, 25* 63:*14*
66:*10* 70:*14* 135:*3*
**instructed** 8:*15*
**insurance** 20:*10*
28:*3, 7*
**intend** 9:2
**intends** 96:7
**intention** 140:*16*
**interest** 35:*23* 57:*6*
**interested** 92:*1*
152:*13*
**Interesting** 131:*23*
**Internet** 49:*4*
**inventory** 21:*16*
**investigate** 147:*12*
**investigation** 124:*1*
147:*6*
**Investment** 105:*9*
**INVESTMENTS** 1:*4,*
*16* 2:7 4:6 5:*10* 7:*6,*
*20* 9:*3* 16:7, *9* 105:*7*
153:*4* 154:*3*
**investor** 111:*18*
**invoice** 40:*25*
**involved** 11:*5* 45:*7,*
*15* 46:2 75:*19*
**involving** 135:*9*
**iPad** 28:*16*
**irrelevant** 25:24, *25*
**is-as** 103:*5*
**issue** 86:*13* 115:25
116:*23* 117:*13* 119:*4,*
*8* 130:*15*
**issued** 103:*3*

**issues** 84:*17* 86:5, *8*
109:*14* 118:6
**itemization** 53:*14*
**ITS** 4:*8* 17:*3, 6*
23:22 82:*2* 117:*12*
133:*11* 135:8 138:*24*
140:22 146:*17*

< J >
**jacket** 46:*3, 4, 6, 8*
74:*14, 17*
**January** 151:*19*
**Jesus** 33:*19*
**Jiffy** 23:*3, 8*
**job** 114:*22*
**join** 7:*12*
**JOSE** 2:*12* 6:*7* 15:5
102:*4* 131:*1* 150:*1*
153:2
**Josh** 103:*14* 124:22

**Josh@JFeyginEsq.com**
2:*7*
**JOSHUA** 2:*4, 7* 6:*4*
7:*2, 13* 15:*4* 32:12
95:*21* 132:*1*
**jperalta@atllp.com**
2:*13* 153:*3*
**judge** 118:*3*
**Juliana** 78:*11*
106:*12, 17* 108:*8*
148:*18*
**July** 58:6

< K >
**keep** 19:*16, 17* 45:24
46:*1* 91:*19*
**KEITH** 2:*13* 7:*11*
**keith@silversteinpa.co**
**m** 2:*14*
**kept** 129:*2, 4*
**Kind** 36:*7*
**knew** 88:*24* 89:5, *9*
**know** 14:*1, 3, 15*
16:*20* 17:6 18:*1, 9*
19:*16, 17* 24:22
25:*14* 29:17, *18*
32:*18* 34:*17* 37:*16*
38:7 39:*14, 22* 40:*4,*
*22* 44:*15* 45:*16, 21*

48:*5, 7, 8, 11, 13, 22*
50:*9, 10, 11, 15, 17, 18*
55:*14, 24* 56:*1, 2*
58:*4, 16* 61:*12* 62:22
63:*16, 17* 64:*11, 13*
66:*9, 12, 13* 68:*6, 8*
69:22 70:*23* 71:7
72:*1, 2, 10, 18* 73:*20*
76:*1, 8, 9, 18* 77:*19*
78:*3, 5, 6, 11* 79:*8*
83:*8, 9* 84:25 85:*1,*
*17, 25* 86:*1, 17, 20, 21,*
*22, 23, 24* 89:*11* 93:8
94:*2, 5, 14* 95:*4* 96:5
98:*10, 11* 99:6 100:*7,*
*25* 103:*20, 22* 105:*8*
107:*1* 108:*9, 11, 15*
110:*11* 111:*21*
112:*23* 113:22 119:*4*
120:*4* 121:*6* 123:*17*
128:*5* 130:*18* 131:*1,*
*4, 21* 133:7 137:*4*
139:*17* 140:*8* 143:*16,*
*20* 145:*4, 10* 146:*12*
150:*8*
**knowing** 58:*20*
**knowledge** 55:*6*
57:*23* 58:*12* 63:*4*
96:*24* 136:25
**knows** 58:*21*

< L >
**label** 130:*22*
**labelled** 61:*21*
**laches** 89:*15, 25*
94:*18, 24*
**lady** 30:*15* 72:*3*
81:*21* 98:*3* 113:*13,*
*16* 120:*4, 5*
**Lakes** 153:*21*
**Laramie** 25:*12*
**LAW** 2:*4* 15:22
20:*8* 99:*19*
**laws** 17:*6, 10*
**lawsuit** 11:*5, 17, 19,*
*22, 24* 12:*3* 90:*2, 12*
95:*14* 143:*14* 144:7
**lawsuits** 11:*17*
**lead** 124:*15*

**leading** 14:*2, 12, 20*
18:*19* 43:22 46:22
98:*2* 124:*5*
**leaking** 24:*12*
**learn** 83:*21*
**learned** 92:*5*
**LEAVE** 4:*6* 28:*4, 8*
30:*7, 9* 49:*12* 96:*11,*
*12* 114:24 120:22
142:*11* 149:*24*
**leaves** 30:*21* 115:2
143:*6*
**left** 33:*24* 43:*5*
59:*13* 114:*5*
**left-hand** 33:*16*
34:*10* 55:*11* 76:7
**legal** 18:*8* 89:*16*
116:*19* 122:*1*
**legally** 23:*16* 121:*3*
**legible** 140:*10, 11*
**lender** 59:*19, 21*
82:*17, 23*
**lenders** 19:*25* 20:*1*
**lender's** 27:*25*
**Leon** 2:*17*
**lesson** 92:*5*
**LETTER** 4:*12* 99:*15,*
*20, 23* 100:*1, 6*
153:*16*
**letters** 99:*18* 101:22
**level** 9:*20*
**liability** 94:*4*
**license** 16:2 17:*24*
21:*2* 27:*13, 16* 31:*10*
**licensed** 15:22 16:*14*
20:*8*
**lienholder** 66:*6*
**lieu** 5:*19*
**life** 9:*11, 14* 76:*1*
**lift** 25:*18* 39:*7*
**lifted** 25:*13* 31:*23*
**light** 53:*22*
**limited** 121:*16*
**Line** 154:*7*
**List** 47:*8, 10*
**listed** 77:*20* 123:*4*
153:*17*
**listen** 27:*3* 149:*18*
**little** 43:*9* 70:*9* 74:6

80:*4* 89:*19* 144:*13*
**living** 10:*3, 6*
**LLC** 1:*10* 2:*16*
**LLP** 2:*10* 153:*3*
**located** 46:*12, 15*
61:*12*
**location** 16:*18* 54:*9*
117:*15* 148:*17*
**locations** 16:*17*
**log** 51:*11* 63:*24*
**long** 8:*21* 10:*3, 23*
39:*23* 61:*14* 119:*23*
120:*18* 134:2
**longer** 29:25 30:*3*
45:*12* 81:*20*
**look** 12:*25* 21:*18*
23:*9* 32:*6* 33:*12*
38:*21* 42:*4* 51:*13*
52:5 55:*9* 60:*1*
61:*25* 64:*1* 65:*1*
68:*2* 73:*8* 77:*13*
78:*1* 80:*4* 81:*23*
85:*2* 87:*11* 100:*21*
103:22 115:*21* 125:*3,*
*24* 126:2 134:*6*
139:*13*
**looking** 34:*9* 35:*11*
42:*14* 44:*3, 24* 47:*23,*
*24* 53:*14* 55:*19* 75:*4,*
*17* 78:20 79:*9, 24*
82:22 126:*1* 130:*25*
131:*7, 9* 133:*13, 21*
134:*20* 135:*18, 21, 23*
**lost** 83:*2*
**lot** 21:*11, 13* 22:*14,*
*18, 23* 35:24 99:*10*
140:22
**low** 19:6 26:*1*
**lower** 34:*23*
**lower-mileage** 19:*5*
**Lube** 23:*3, 8*
**LUC** 1:*4* 5:*9* 6:*5*
78:*17* 153:*4* 154:*3*

< M >
**Madam** 122:*14*
**maintain** 43:*16* 56:*8,*
*10* 86:*3*
**maintenance** 19:*4*

**making** 12:25
104:*21* 107:*18*
**man** 122:*9, 11, 12*
**management** 30:22
**manager** 27:*18*
28:20, 22 29:*19*
52:22 69:*21* 115:2
**managers** 29:*21*
**Manheim** 4:*17*
12:20, 21 15:*16* 21:7,
*12* 25:4 31:20 33:15
36:15, 20 37:1, 6, 8,
*15, 24* 41:9 44:6
54:*14* 59:7 84:6
88:*10, 13, 22* 90:8
91:*18, 19, 22* 92:22,
*23* 93:*17* 100:*13*
104:20, 25 105:2, 4
106:*17, 22* 107:*12, 21*
109:3, 6 110:4
111:22 115:*21* 116:*1,
5, 12, 24* 117:*12, 16,
21* 118:*11, 18, 24, 25*
119:2, 4, 7, 11, 24
120:*11, 15, 25* 121:*16,
23, 25* 123:*1, 10, 23*
135:*23* 136:4, *14, 15*
137:*1, 7, 11, 18* 138:*1,
2, 15, 18, 24* 139:7, *11*
141:2 146:*16* 147:4,
*15, 18*
**manner** 5:*24*
**March** 103:*4*
**marked** 13:*15* 41:22
51:*23* 64:*18* 67:22
73:*3* 87:4 96:*13*
99:*1* 101:*17* 136:8
**market** 35:*18*
**Marketplace** 47:7, *10*
**Martine** 108:6
**master** 60:*9*
**math** 60:*3*
**matter** 5:9 6:15
**matters** 13:*25*
**maximize** 33:6
**McCombs** 2:*16* 6:*10*
31:*16* 35:*14* 36:12
38:9 75:*15* 97:5, *6*
98:*18, 19, 22* 99:5, *6,
8* 102:8, 9, 10 104:9

113:*3* 121:*14* 123:*24*
127:*13* 136:24 137:2
**McCumbs** 99:*6*
**mean** 12:*17* 37:*3*
92:3 95:*11* 105:*10*
127:5 128:7, 9, *11*
139:*1* 140:*11* 141:*25*
149:*10, 13*
**meaning** 35:*13*
137:*15*
**means** 58:8 149:*14*
**mechanic** 25:*16*
**mechanical** 86:8
116:*19* 139:*16*
**mechanically** 121:*4*
**memorializes** 118:*25*
**memory** 110:*11*
**mentioned** 16:*4*
104:*11* 114:5 124:9
138:*23, 24* 147:*15*
**message** 118:*23*
**messages** 107:*23, 25*
**messaging** 107:*20*
**MIDDLE** 1:2 5:*12*
36:*21* 137:*11, 14*
**mileage** 17:*13, 22*
18:3, 5, *14* 19:4, 6, 8
25:*21, 24* 26:*1, 3, 6*
37:*1, 14, 19* 45:3, 4
54:*11, 13, 18* 62:6, *12*
66:*20* 67:8, *11, 13, 16,
18, 19* 72:*21* 78:*24*
81:22 83:*24* 84:*4, 8*
88:*12, 17* 89:6, *9*
90:*24* 92:7, *9, 12, 15*
97:*1* 111:*1* 119:8, *22*
123:*3* 124:*1, 2, 16*
133:*11, 12* 135:22
136:*20* 137:*1* 138:*11*
146:2, *9, 12, 13* 147:6,
*12*
**miles** 37:22, *23*
88:*20* 96:*25* 111:7
115:*25* 119:4 136:*3*
**mind** 95:*20* 103:*24*
**mine** 105:*6*
**minutes** 120:*20*
144:*11*
**mirror** 32:*13*

**mirroring** 32:*13*
**mis** 14:20, *21* 97:*12*
**mischaracterizes**
14:*21* 35:*1* 82:7
92:*18* 97:*13* 121:*9*
**mistake** 12:*21* 13:*1,
4, 7* 36:*25* 37:7, *14,
25* 38:*10* 84:7 88:*23*
90:5, 7 92:*4* 119:*13,
22* 120:*13, 16* 123:*1,
24*
**mistaken** 117:*17*
**mitigate** 95:7
**Mm-hmm** 120:6
**mobile** 72:8
**moment** 70:*12, 15, 18,
21* 76:23, *24* 78:*19*
97:*16*
**Monday** 153:*11*
**money** 31:9 38:*5*
41:7, 8 52:*20* 57:5
90:9 144:8
**month** 16:*23* 30:8
58:6
**months** 35:*24* 57:7
81:*17* 90:2, *12*
109:22
**morning** 5:*3* 6:25
7:16
**MOTION** 4:6 96:*12*
**MOTOR** 4:*17*
**mouse** 28:*18* 48:2*0*
**move** 45:5 64:*15*
67:*20* 72:24 87:*1*
96:*10* 98:24 101:*15*
102:22 143:*4*
**moved** 54:*9*
**Moving** 76:*3*
**multiple** 131:*18*
**Multiply** 17:*4*
**mute** 117:*5*

**< N >**
**name** 5:*3* 6:*1* 9:5, 6
10:8 21:2 30:*17*
45:20 46:*4* 65:7
71:25 72:9, *19* 76:*11,
14* 79:16, *18, 19* 80:*3*
104:8, *23* 105:*1, 10*

106:*12* 120:*3, 4*
129:*13* 141:2 153:*16*
**named** 104:22
**names** 29:20 71:22
**narration** 128:*9*
**narrative** 11:*10, 14*
26:*16, 19*
**nationwide** 23:*19*
**nature** 108:22
**necessary** 92:*15*
**need** 8:*19, 21* 13:3
14:7, *14* 15:*13* 19:4
58:*16* 61:*11* 66:*16,
18* 74:*24* 91:*18* 92:3
100:*1* 102:5 112:*16*
**needs** 24:*18, 21*
37:*15* 59:*19* 62:*16*
66:*15* 107:2
**negatively** 18:*17*
**negligent** 94:8, *9, 12,
13*
**neither** 150:*9*
**Never** 9:*11, 14, 17*
23:*11* 36:*14, 19*
37:*20* 55:5 73:*10*
75:25 84:*18* 86:*10*
103:8 121:*13* 147:2*0*
148:*19*
**new** 23:6 30:*16*
36:*10* 81:20 95:*15*
114:*15*
**nice** 103:2*0* 131:5
**NICKLAUS** 2:*17*
**NICOLAS** 2:*19* 6:9
104:8
**nicolast@nicklauslaw.
com** 2:*19*
**nine** 47:*25* 53:6
**nineteenth** 95:*16*
**ninety-eight** 53:6
**ninety-nine** 54:7
**ninth** 93:9
**nod** 8:*10*
**normal** 36:3, 6
113:*10*
**normally** 88:*16*
117:*14*
**Notary** 151:*18*
**Note** 4:*17*

**Noted** 15:*5*
**notes** 152:*9*
**NOTICE** 3:*14* 13:*14*
50:*15, 20* 51:*1, 5*
109:*13, 25* 110:*1*
115:*25* 153:*6*
**noticed** 147:*8*
**notification** 106:*22*
**notified** 106:*18*
107:*11*
**nuh-uh** 8:*11*
**NUMBER** 4:*5* 5:*13,
22* 55:*15, 18, 19, 25*
59:*10* 64:*6* 68:*4*
72:*12* 73:*18, 23, 25*
74:*1, 4* 95:*25* 117:*19,
20* 118:*9*
**numbered** 152:*7*
**numbers** 42:*8, 11*
125:*16*

**< O >**
**oath** 5:*19, 20* 151:*1*
**objected** 11:*13*
**objecting** 12:*6*
**objection** 8:*15* 11:*9*
14:*2, 12, 19, 20* 18:*19*
19:*1* 23:*25* 24:*2, 9*
26:*8, 16, 18* 35:*1*
38:*25* 42:*20* 43:*19,
21* 46:*22* 49:*20* 64:*3*
82:*7, 14* 83:*18* 84:*14,
19* 89:*16* 92:*18*
97:*12* 98:*2* 110:*20*
113:*14* 114:*11* 121:*9*
122:*4, 7, 21* 123:*5*
124:*4* 128:*8* 137:*3,
21* 139:*3* 140:*23*
**objections** 5:*24*
**obtain** 134:*19* 135:*4,
19, 22*
**obtained** 73:*1*
**obviously** 7:*18* 57:*20*
**Occasionally** 8:*14*
**occur** 38:*6* 54:*8*
**occurred** 46:*21* 47:*3*
78:*14* 79:*12* 98:*7, 15*
129:*21* 147:*20*
**occurs** 27:*23*

**ODOMETER** 3:*22*
18:*6, 17, 22, 24* 44:*25*
49:*6* 59:*3, 5* 61:*19*
62:*1, 3, 11* 72:*22*
77:*13* 83:*16, 22*
84:*17* 88:*3, 9, 25*
92:*22* 93:*3, 4* 109:*15*
124:*16* 133:*13*
134:*18, 19* 135:*1, 3, 5,
19* 138:*12* 146:*21*
149:*7*
**offer** 103:*4, 8* 115:*13*
**offered** 91:*16*
**offering** 118:*14*
**OfferUp** 47:*7*
**office** 20:*9* 27:*12*
46:*10* 71:*19, 23*
72:*16* 86:*4, 19*
109:*16* 118:*9* 148:*15*
**off-the-record** 102:*20*
144:*16*
**oh** 55:*14* 56:*16* 72:*6*
77:*21* 81:*14* 103:*23*
126:*4* 131:*20*
**oil** 22:*17* 23:*2, 6, 7*
24:*17*
**Okay** 7:*25* 8:*3, 4, 8,
12, 13, 24, 25* 9:*3, 4,
23* 10:*6, 8, 18* 11:*8,
19, 22* 12:*5* 13:*6, 22,
24* 14:*6, 10* 15:*1, 21*
16:*11, 14* 17:*18*
20:*14* 21:*5* 22:*19*
25:*9* 26:*21* 28:*5*
30:*13, 18* 33:*10, 12,
25* 34:*6* 41:*20* 42:*13,
16, 17* 43:*2* 49:*8*
55:*22* 59:*2* 60:*12*
69:*22* 70:*13, 22*
71:*21, 24* 72:*15, 24*
73:*12, 15, 21* 74:*18,
22* 75:*14* 76:*3, 6, 18*
77:*15, 25* 78:*8, 13, 16*
79:*19* 80:*4, 12, 15, 20*
82:*12, 17* 83:*11* 84:*2*
87:*1, 11* 96:*10, 21*
97:*9* 98:*14* 99:*18, 22*
102:*14* 103:*12* 105:*8,
14, 22* 106:*11* 109:*25*
111:*10, 12, 19, 24*

112:*21* 114:*1* 116:*22*
117:*2, 11, 20* 118:*5, 6*
120:*11* 123:*19*
125:*12* 126:*7, 11*
127:*3, 7, 10, 17, 22*
128:*5, 15, 20* 129:*7,
10, 24* 130:*2, 9, 18, 23*
132:*1, 9, 12, 23*
133:*10, 20* 134:*1, 11,
17, 25* 135:*12, 18, 25*
136:*5, 13, 15, 18, 20,
23, 25* 137:*9, 14, 25*
138:*4, 14, 22* 139:*16*
140:*1, 14* 141:*1, 10,
18* 142:*3, 9* 143:*4, 12,
16, 21* 144:*5, 10, 18*
145:*20, 25* 148:*5, 8*
149:*18, 23* 150:*9*
**once** 27:*1, 4, 7, 16*
30:*13, 18* 107:*12*
112:*2* 113:*9* 153:*11*
**one-phone-call** 118:*15*
**ones** 25:*14* 73:*11*
121:*5*
**ongoing** 20:*12*
**on-line** 49:*15* 50:*3*
115:*7*
**open** 16:*9* 31:*8*
35:*24* 56:*12* 90:*8*
112:*3, 5*
**opened** 17:*3* 91:*19*
145:*17*
**operated** 128:*2*
**operating** 16:*2*
113:*10*
**operation** 16:*12*
104:*16*
**opportunities** 30:*12*
**opportunity** 114:*7*
**option** 92:*2* 117:*21*
147:*16*
**ORDER** 3:*14* 5:*22*
51:*20* 63:*8, 11, 16, 18*
64:*2* 66:*8* 70:*17*
129:*20* 131:*1, 8, 14*
134:*13* 135:*2* 150:*4*
**ordering** 150:*7*
153:*14*
**orders** 129:*10*

135:*16* 150:*5*
**organization** 86:*24*
**original** 37:*18* 153:*14*
**originate** 19:*23*
**outside** 93:*25* 116:*11*
**owner** 11:*1* 19:*8*
26:*2* 31:*7* 76:*15*
104:*11* 127:*8*

**< P >**
**P.A** 2:*17*
**p.m** 1:*20* 102:*21*
144:*17* 150:*11*
153:*11*
**P.O** 2:*5*
**package** 63:*10* 66:*5,
14, 15, 16, 17* 69:*6*
**packaging** 111:*22*
112:*2*
**PAGE** 3:*1, 14* 4:*1,
16* 47:*11, 24* 65:*14,
16, 17* 67:*5, 8* 69:*9*
74:*3* 85:*3, 5* 96:*22*
129:*11* 133:*15, 16, 17,
18, 19, 21* 146:*20*
154:*7*
**Pages** 1:*16* 152:*7*
**paid** 41:*5, 9* 60:*23*
77:*7* 141:*20* 144:*7*
148:*4*
**paint** 24:*18* 40:*15*
**PALM** 151:*5* 152:*1*
153:*21, 22*
**pandemic** 35:*16, 19*
**paper** 48:*16, 23* 49:*1,
4, 6* 50:*3, 16* 64:*5, 8*
93:*20*
**papers** 49:*5* 66:*18*
74:*21*
**paperwork** 17:*25*
18:*2* 20:*21* 28:*14*
29:*16* 58:*18, 19, 20*
69:*3* 75:*25* 98:*11*
106:*15, 19* 107:*2*
121:*3*
**paperworks** 18:*2*
**park** 22:*18*
**part** 26:*6* 48:*11*
63:*10* 66:*5* 71:*18, 19*

94:*17, 23*  115:*18*
**participating**  5:*15*
**particular**  14:*4*
  36:*24*  37:*6*  38:*22*
  43:*13, 14*  61:*2*  67:*4*
  92:*6*  147:*18*
**particularly**  49:*2*
**parties**  5:*23*  12:*7*
  87:*21*  152:*11, 12*
  153:*12*
**pass**  107:*6, 8*
**passes**  22:*10*  23:*17*
**pause**  103:*21*
**pay**  27:*14*  35:*23*
  40:*23*  41:*13*  45:*24*
  52:*25*  57:*5*  59:*19*
  100:*3*  107:*4, 5*  127:*9*
**paying**  52:*18*
**payment**  28:*6*  41:*11*
  53:*7, 10*  57:*7*  58:*5, 6,*
  *20*  87:*21*  143:*5*
**payments**  58:*2, 6*
  59:*14*
**payout**  60:*5*
**pedal**  40:*17, 19*
**penalties**  154:*22*
**pending**  8:*23*
**people**  22:*3, 23*  48:*4*
  58:*16*  71:*11*
**PERALTA**  2:*12*  3:*5*
  6:*7*  7:*2, 10*  11:*9, 13*
  12:*6*  14:*2, 12, 17, 25*
  15:*2*  18:*19*  19:*1*
  23:*25*  24:*2, 9*  26:*8,*
  *16, 19*  32:*12, 17, 20*
  33:*2, 6, 8, 10, 20, 25*
  34:*4*  35:*1*  38:*25*
  42:*20*  43:*19, 21*
  46:*22, 25*  49:*20*  64:*3*
  81:*15*  82:*7, 14*  83:*18*
  84:*14, 19*  89:*16*
  92:*18*  95:*20, 23*
  97:*12*  98:*2*  102:*5, 8,*
  *12, 16, 18, 24*  103:*14,*
  *19, 24*  104:*1, 3*
  110:*20*  113:*14*
  114:*11*  117:*5*  121:*9*
  122:*4, 7, 10, 21*  123:*5,*
  *13, 15*  124:*4, 22, 24*
  125:*2, 7, 11, 19*  126:*1,*

*4, 7, 10*  128:*11, 19*
  131:*3, 9, 12, 16, 20*
  132:*1, 2*  134:*11, 13,*
  *17, 22, 24*  136:*5, 12*
  137:*5, 22*  139:*7, 10,*
  *21*  140:*25*  142:*4, 6, 9,*
  *15*  143:*4, 8*  144:*10,*
  *15, 18*  148:*23*  149:*3,*
  *23*  150:*3, 9*  153:*2*
**percent**  19:*21*  41:*16*
  57:*5*  58:*7, 8*  91:*11,*
  *12*
**perfect**  26:*3*
**perform**  23:*22*
**performed**  53:*24*
  147:*18*
**perjury**  154:*22*
**person**  5:*20*  7:*6*
  26:*24*  36:*21*  45:*19,*
  *20*  46:*5*  108:*8*  110:*2*
  114:*15, 24*  115:*1, 19*
  119:*3*  137:*11, 14*
**personal**  55:*6*  57:*23*
  58:*11*  63:*4*
**personally**  7:*7*  20:*24*
  22:*19, 22, 24*  23:*1*
  45:*7*  58:*22*  62:*22*
  66:*1*  75:*19*  78:*13*
  105:*5*  151:*9*
**person's**  30:*17*
  114:*22*
**phone**  72:*12*  107:*20,*
  *22*  117:*19, 25*  118:*2,*
  *8, 10, 16, 17*  119:*14,*
  *15, 23*  120:*18*
**physical**  110:*18, 19*
  111:*6*  126:*19*
**physically**  5:*16*
**pick**  38:*13*  107:*4, 6*
  120:*23*
**picks**  23:*19*  113:*17*
**Pickup**  21:*25*
**picture**  30:*21*
**pictures**  22:*16, 24*
  23:*1*  39:*6*  67:*7*
**piece**  121:*1*
**place**  23:*10*  60:*12*
  65:*11*  147:*12*
**placed**  135:*15*

**PLAINTIFF**  3:*14*
  4:*1*  6:*3, 5*  13:*15*
  41:*22*  51:*23*  62:*22*
  64:*18*  67:*22*  73:*3*
  87:*4*  88:*3, 8*  90:*2, 17*
  93:*23*  94:*7*  95:*6*
  96:*13, 24*  99:*1*
  101:*17*  103:*3*  129:*13,*
  *15, 18*  130:*7*  142:*22*
  143:*18*  144:*3*  149:*10*
**Plaintiff(s**  1:*4*  2:*1*
**Plaintiffs**  142:*25*
**Plaintiff's**  13:*13*
  31:*25*  41:*21*  52:*10*
  56:*18, 25*  61:*18*
  64:*17*  67:*21*  87:*20*
  89:*14*  91:*14*  94:*16,*
  *23*  95:*17, 25*  96:*11*
  98:*25*  128:*22*  143:*10,*
  *14, 22, 25*  144:*5*
  149:*6*
**planning**  25:*21*
**platform**  60:*25*
**play**  25:*9*  26:*6*
**Please**  5:*25*  6:*12*
  7:*24*  8:*6*  24:*3*  43:*11*
  49:*22*  52:*7*  68:*10*
  74:*6*  89:*18, 19*  94:*20*
  103:*14*  106:*5*  109:*13*
  132:*9*  153:*6, 10, 12,*
  *16*
**PLLC**  2:*4*
**PLTF'S**  3:*14*
**plus**  41:*15, 16*
**point**  92:*5*  111:*5, 12*
  112:*21*
**pointing**  80:*6*  131:*2*
**policies**  147:*11*
**Ponce**  2:*17*
**portal**  116:*24*  117:*13*
**portion**  122:*16*
**position**  10:*25*  13:*8*
  65:*13*  69:*14*  70:*22*
  76:*20*  79:*10*  80:*1, 12,*
  *15*  86:*10*  111:*14*
  114:*6*  145:*25*  146:*4,*
  *8, 25*
**possession**  43:*5*
  48:*24*  56:*5*  82:*3, 12,*
  *23*  86:*3*  96:*2*  97:*2,*

*10*  122:*3*  123:*2*
  124:*1*  135:*9*
**possibility**  142:*17*
**possible**  98:*5*
**post**  23:*18*  47:*7*
  67:*5, 7*  137:*10*
  146:*20*
**posted**  67:*5, 6*
**potential**  138:*16*
**POWER**  4:*1*  68:*3,*
  *12, 16, 23, 25*  71:*4, 11*
  77:*9, 10*  80:*14, 16, 18,*
  *21*  81:*1*  83:*5*
**POWERHOUSE**  1:*9*
  2:*10*  6:*8*  9:*2*  10:*10,*
  *20, 21, 22*  16:*8, 23*
  19:*10, 19*  29:*24*  41:*7*
  59:*14, 16, 23*  74:*20*
  75:*7, 8, 12*  76:*4*  77:*9,*
  *18, 23, 25*  78:*17*
  81:*23*  125:*13*  126:*16,*
  *18, 21, 23*  127:*20, 22*
  128:*2*  129:*3, 5*  130:*6,*
  *16*  132:*6, 19, 20*
  133:*1, 11, 19, 21*
  134:*19, 25*  135:*19, 22*
  136:*19*  140:*17, 19, 21*
  141:*3, 11, 14, 22, 25*
  142:*1, 21, 23*  144:*2*
  146:*5*  147:*5*
**Powerhouse's**  31:*5*
**practice**  134:*6*  140:*3,*
  *7*
**practices**  115:*19*
**predelivery**  53:*15*
**prejudiced**  90:*1, 11*
**premises**  25:*18*
**preparation**  12:*12*
  13:*3*  81:*12*
**prepare**  12:*13, 15, 18,*
  *19*  13:*9*  46:*17*  78:*9*
**prepared**  13:*25*
  14:*11, 13*  52:*21*
  69:*18*
**prepares**  113:*17*
**present**  5:*17*  32:*14*
  78:*13*
**presented**  28:*9, 16*
**Press**  33:*6*

**pretty** 31:9, 11 36:20 91:24 100:4 127:12 138:18
**previously** 97:9
**price** 25:6, 14, 20 41:15 52:18 53:4
**prices** 36:2, 4, 5
**print** 20:21 58:18, 19, 20 69:5, 6
**printed** 52:17
**printer** 20:9
**prior** 16:1 40:15 56:4, 7, 14 91:15 100:6
**problem** 103:17
**problems** 116:19
**Procedures** 113:11 147:12
**proceed** 11:16 103:1
**PROCEEDINGS** 3:1 5:2 150:10
**process** 7:22 36:23 49:9 83:2 92:17, 20 99:25 105:24 118:13, 15 121:2
**processing** 105:25
**produced** 42:10, 11, 24 43:2 61:20
**Professional** 152:6
**profit** 59:23
**profits** 41:16
**program** 20:5
**pronounce** 99:7
**proof** 28:2
**provide** 8:9, 10 15:13 18:1 25:3 43:17, 20 47:15, 17 48:1 49:17 50:7 52:17 61:4, 7 72:13 74:22 92:25 101:3 137:16 138:1, 20
**provided** 4:17 48:22 50:11, 15, 20 51:1, 5 63:19 90:25 97:5 98:18, 19 101:7 130:14 132:6 135:7 136:15 137:2
**provider** 20:22 115:5, 6, 14

**provides** 92:23 147:15 149:7, 19
**providing** 49:2 101:25 141:22
**public** 73:1 151:18
**pull** 13:12 31:24 41:20 51:18 56:17 61:17
**purchase** 22:5, 8 27:8 31:16 35:14 36:17 38:12 53:12 60:13 89:1, 7, 10 90:13 106:16, 19, 20 107:14, 17 121:7 141:1
**purchased** 31:19 36:11 42:19 55:19 90:3 97:6 107:2, 4 140:14
**purchases** 107:17 127:23, 25
**purchasing** 106:12
**purple** 126:3
**purpose** 34:14 65:5 68:21
**pursuant** 5:21
**put** 18:5 21:21, 22 22:16 23:13 30:20 31:8 32:16 33:21 37:20 39:7 46:13 50:13 66:24 67:8 71:22, 25 80:2 128:13 131:22 135:7

**< Q >**
**question** 7:23, 25 8:2, 7, 16, 23, 24 11:16 12:8 14:14 26:10 29:11 51:4 73:2 79:24 82:21 83:12 87:18 88:6 89:19 90:14, 19 91:6 94:20 102:23 106:5 120:7 122:9 123:8 125:18 126:21 128:25 140:5 149:12, 18
**questions** 12:20 14:5, 11 102:10 104:7, 15 118:4 124:19, 25

125:3 137:17 142:12 144:19 148:10, 24 149:24

**< R >**
**raise** 6:12 8:14
**reach** 100:7 106:25
**read** 13:21 14:8, 10, 14 55:8 67:12, 13 68:10 69:12 74:4 96:20 114:2 122:15, 16 125:16 136:21 150:3 153:11, 12 154:22
**reading** 18:6, 17 44:25 59:3, 5 62:11 67:11 83:22, 24 84:4 88:4, 9 134:18, 20 135:2, 5, 15 138:12 146:2, 21 148:21 150:2
**reads** 58:14
**ready** 103:1
**really** 19:8 107:18 131:16
**reason** 17:18 30:2, 10 75:5, 10 129:25 154:7
**reasonable** 93:11, 14 153:14
**reasons** 86:6
**reassignment** 78:18
**recall** 20:19 74:10 99:14, 18 100:23 101:23, 25 110:9 118:11, 13 120:11, 15, 18 128:22, 25 147:17
**recap** 15:7 61:4, 7
**receipt** 28:7 121:6
**receive** 41:17 53:9 86:14 90:8 111:8 113:9 121:19 126:21, 23 127:4 142:23 143:21, 25 145:21
**received** 32:1 42:18 44:16, 20 88:11 98:21 109:14 110:1 115:24 125:13 126:18 132:20 133:1 147:1

**receives** 115:20 121:21
**receiving** 99:14, 18 100:6 101:23
**recess** 102:20 144:16
**recondition** 24:16
**record** 6:2 7:11 8:5, 12 9:6 68:10 122:16 152:8
**recorded** 109:9
**records** 43:17 73:1 86:2, 4 112:12, 13 129:3, 5
**recross** 148:24
**RECROSS-EXAMINATION** 3:5 148:11 149:2
**REDIRECT** 3:5 144:20, 21
**refer** 9:1, 2
**referring** 9:1 94:1 136:18
**reflect** 18:13 98:6 111:1 113:3
**reflected** 40:25 111:2 124:2
**reflecting** 111:6
**reflects** 123:3
**refund** 90:9
**Regarding** 15:21 45:3 93:3, 7 107:17 130:15 132:18
**register** 97:15
**registered** 109:3
**REGISTRATION** 3:23 65:3
**Regular** 107:25 111:24
**related** 116:6
**relates** 53:25 146:1
**relation** 31:5
**relationship** 104:10, 12
**relative** 19:6 34:19 152:11, 12
**release** 30:16 91:15 93:3, 7 127:9
**relevance** 11:9, 14
**relied** 92:16 98:17
**relief** 94:19 95:1

**rely** 22:4 87:14, 19
88:2, 7 89:13 90:16,
21 91:4, 14 93:10, 22
94:7, 16 95:2, 6, 17
96:8
**relying** 147:13
**remember** 10:24
11:25 12:4 35:17
39:19, 21, 25 40:2, 6,
8, 11, 14, 18, 20 74:9
77:12 93:5 95:13
96:9 98:1, 10 99:16,
17 101:9 102:2
103:7, 11 109:20, 24
119:9 120:3 145:18
146:7
**remind** 35:16
**remotely** 5:18, 20
**Rent** 53:22
**rental** 26:1
**rentals** 19:7
**rented** 19:7
**REP** 3:14 105:9
**repeat** 49:22 94:20
**rephrase** 7:24
**replaced** 83:3
**replacement** 114:8, 10
**Report** 21:20 25:4
34:13, 15 35:9 38:22,
23, 24 97:3 152:7
**Reported** 1:20
**REPORTER** 1:24
5:3, 5 6:12, 18 8:5
29:9 32:23 106:2, 4,
9 122:14, 17 142:4, 7
151:18 152:6, 20
153:18
**Reporter's** 4:17
**reporting** 5:18, 25
153:21
**reports** 22:5 25:3
**represent** 6:1 104:9
121:5
**representation** 41:3
73:16
**representations** 36:12
**representative** 1:16
7:5, 9, 19 17:9
108:20 141:14

**represented** 116:17
**reputation** 19:15
**request** 33:18 74:7
95:22 139:6, 19, 24,
25 140:4, 7, 13
**requested** 99:24
122:16 152:8
**requesting** 147:17
**require** 20:11
**required** 50:12
**requirement** 115:18
**requires** 62:18, 20
**residence** 28:2
**resolved** 87:20
**resolving** 143:13
**respect** 12:12 147:22
**response** 8:9, 10 61:1
**responsibility** 17:6
**responsible** 37:2
114:3 123:25
**restroom** 102:6, 13
**RETAIL** 3:14 36:5
56:19, 24 63:14
66:10 70:14 135:3
**retains** 128:2
**return** 24:13 38:4
103:5 153:12, 17
**revealed** 18:10 21:21,
22 37:4
**review** 15:7, 8 30:21
122:2 152:7 153:9
**reviewed** 70:20
**Reyes** 29:25 30:5
45:11 46:17 50:19
52:24 54:23, 24
57:20, 24 65:23
**RFP** 67:21
**right** 6:12 26:13
33:21 44:1 47:20
55:5, 20 57:18 59:22,
25 65:20 67:3 76:11
79:9, 19 80:9 82:23
91:8, 11, 12 92:7, 9
102:7, 19 103:12, 23
105:10 107:9 109:7
110:2 112:19 115:24
116:3, 11 117:22, 25
118:8 119:5, 14
120:24 123:21
124:18 126:14, 22

132:16 143:16
144:20 148:21
**right-hand** 53:15
**rights** 91:5, 7
**righty** 6:25 7:15 9:5
**RISC** 70:11
**road** 95:14
**role** 115:3
**rollback** 88:15
**rolled** 88:25
**room** 5:17 117:4
144:14
**routinely** 146:22
**rude** 147:9
**rules** 7:21
**run** 50:2, 24
**rust** 40:5

< S >
**salaried** 77:5
**salary** 31:12
**Sale** 4:17 22:18
23:10, 14, 23 33:15
36:17 45:7 46:2
47:11 52:8, 10, 15
53:14 54:13 57:14,
15 70:12, 15, 18, 21
72:23 82:1 92:22
93:20 98:20 109:23
126:16 128:6 129:8,
21, 25 136:14, 21
146:15
**sales** 28:20 45:22
53:4 56:19, 25 63:15
66:11 70:14 133:11
134:8
**salesman** 27:13
45:16, 17
**salesperson** 26:25
27:1
**San** 117:17, 18, 21
**satisfaction** 87:15
**saved** 51:14 100:20
**SAVINGS** 4:10
**saw** 13:22 36:16
37:22 55:5 57:13
66:13 96:19
**saying** 92:14 100:1
103:19 120:15

**says** 18:4 33:21
35:12, 15 44:11 50:2
53:13 62:10 67:10
71:2 77:21 79:4
81:1 84:3 94:12
123:1 126:13, 14, 15,
20 134:18 142:20
**scale** 34:20
**SCAN** 4:5 68:4
73:18 74:1, 4
**scares** 33:23
**scope** 12:8
**score** 34:15, 24
**scratch** 121:20
**scratched** 40:1
**scratches** 34:18
**screen** 13:18 28:17,
23 32:4, 10, 14 33:3
41:25 52:1 61:23
64:21 67:25 73:6
87:7 96:16 99:4
101:20 125:7, 9, 24
126:3 128:18 131:14,
22, 25 132:15 134:12,
16 136:2, 11 142:8,
14
**screens** 131:18
**scroll** 54:21 59:9
64:6, 7 78:16 96:21
**search** 101:1
**searching** 31:21
104:20
**seats** 39:18, 20
**second** 14:18 27:22,
23 43:11, 25 44:1
51:14 52:7 53:2
65:16, 17 74:3 88:1,
11 128:14 132:9
134:11 136:1, 5
**seconds** 123:16
**secretary** 53:23
78:12
**section** 96:23 142:20
143:2
**SECURITY** 3:21
**see** 15:17 28:23, 25
32:10, 22 33:4, 5, 8,
23 34:4, 5, 6, 7 42:2,
3 46:3 47:20 52:2
53:15 54:21, 24 55:4,

*5* 56:*21* 57:*18* 59:*10*
62:*8, 24, 25* 63:*7*
64:*5, 9, 23* 65:*24*
66:*7* 67:*5* 68:*7, 8*
69:*24, 25* 70:*7* 73:*21*
75:*17, 24* 76:*4* 78:*19,*
*21* 80:*6* 85:*3* 96:*19*
99:*16* 104:*2* 131:*13,*
*19* 132:*10, 11, 12*
144:*11*
**seen** 13:*20* 73:*10, 11*
87:*9* 96:*18* 110:*25*
**sees** 29:*15*
**select** 21:*15* 67:*15*
**selected** 62:*10* 107:*13*
**sell** 10:*7, 9* 16:*23*
19:*25* 21:*3* 24:*22*
37:*16, 17, 18* 88:*18*
97:*14* 100:*5* 110:*19*
111:*9* 112:*22* 127:*1,*
*6, 14, 16* 128:*1, 3, 4*
134:*9* 137:*25* 140:*16,*
*22* 149:*11*
**seller** 21:*21* 36:*14,*
*18, 20, 22* 37:*7* 84:*7*
88:*23* 117:*15* 121:*8*
136:*23* 137:*12, 16, 18*
**sellers** 138:*16, 19*
**seller's** 147:*13*
**selling** 19:*16, 22*
25:*21* 36:*10* 96:*23*
121:*17* 124:*13* 134:*2,*
*3* 138:*14* 140:*2, 9*
**sells** 19:*24*
**send** 44:*4* 51:*15*
100:*9* 101:*6* 111:*14,*
*15, 23* 112:*25* 118:*18,*
*22* 122:*18* 143:*9*
**sending** 113:*12*
122:*5* 125:*4*
**sends** 112:*8* 127:*15*
**sense** 7:*7* 35:*21* 36:*8*
100:*1, 17, 24* 103:*25*
107:*8* 121:*7* 125:*4*
130:*4, 5* 143:*12*
144:*2*
**separate** 28:*21*
**sequence** 64:*6, 11*

**serve** 108:*19*
**service** 53:*16*
**SERVICES** 1:*10*
53:*24* 85:*19* 141:*22*
**session** 20:*20*
**set** 115:*10*
**settle** 103:*6*
**settlement** 91:*15*
93:*2, 6* 103:*4*
**settling** 143:*13*
**seventh** 91:*3*
**seventy-three** 58:*5*
**Share** 125:*7* 148:*15*
**shared** 13:*17* 32:*3*
41:*24* 51:*25* 61:*22*
64:*20* 67:*24* 73:*5*
87:*6* 96:*15* 99:*3*
101:*19* 125:*8* 128:*17*
131:*24* 134:*15*
136:*10* 142:*13*
**shares** 138:*19*
**sharing** 128:*15*
131:*17, 23* 134:*12*
136:*2* 142:*8*
**SHEET** 3:*14* 32:*1*
61:*5, 10* 154:*1*
**ship** 44:*1* 113:*23*
**shipment** 112:*13, 14*
**shipped** 44:*11, 17*
110:*5*
**shipping** 112:*10*
**shortly** 88:*25* 89:*6, 9*
**show** 27:*6, 7* 34:*3*
64:*10* 107:*3*
**showing** 32:*8* 95:*20*
128:*15, 23* 136:*6*
**shows** 34:*2* 44:*1*
52:*17* 66:*6* 129:*12*
130:*24*
**sic** 94:*25*
**sick** 36:*1*
**side** 53:*15* 76:*7*
**sign** 28:*3* 48:*19*
49:*5, 9, 17* 50:*21*
58:*1, 10* 62:*17* 63:*2*
65:*8, 10, 11, 18, 19*
66:*4, 15, 16, 17* 68:*13*
71:*11* 75:*22* 77:*9*
80:*2, 13, 19, 24* 81:*2*

82:*5* 83:*6, 7* 93:*2, 6*
153:*12, 16*
**signals** 40:*9*
**signature** 29:*3* 54:*22*
57:*19* 65:*21, 22*
66:*19* 69:*19, 24* 76:*6,*
*12, 16, 21* 80:*11*
82:*24* 129:*15, 17*
153:*8, 16, 23*
**signatures** 51:*12*
62:*24* 68:*14* 69:*25*
**signed** 30:*13* 48:*13*
54:*20, 25* 57:*17, 20*
62:*23* 63:*25* 65:*3*
69:*22* 70:*8, 23* 71:*1,*
*24* 74:*16* 76:*18* 78:*4*
79:*14, 22, 23* 80:*16,*
*18, 21* 81:*5, 9* 82:*18*
129:*12, 20* 149:*10*
151:*14*
**significance** 52:*14*
**signing** 28:*10* 29:*15*
49:*16* 63:*9* 70:*13, 16*
78:*2* 106:*13*
**signs** 40:*5* 58:*14*
**SILVERSTEIN** 2:*13*
7:*11* 38:*16* 143:*6*
**simple** 12:*24* 13:*1, 4*
92:*21*
**simply** 100:*1*
**single** 56:*11* 69:*5, 15*
**sir** 101:*5*
**sit** 13:*24* 27:*12*
29:*15* 69:*14* 75:*2*
**site** 15:*16* 117:*21*
**sitting** 28:*20*
**situation** 12:*25* 18:*8*
37:*5* 117:*24*
**six** 35:*23* 44:*7, 9*
47:*19* 54:*16* 59:*7, 8*
67:*11* 77:*14* 136:*4,*
*22*
**sixteenth** 95:*5*
**sixth** 90:*20*
**sludge** 40:*21*
**small** 34:*5*
**software** 30:*22, 25*
31:*3* 115:*5, 6, 14*
**sold** 11:*18* 17:*3*
18:*15* 25:*7* 30:*5*

37:*11, 21* 43:*4* 67:*4*
83:*14* 88:*18* 97:*17*
111:*16* 112:*23*
126:*25* 130:*6* 137:*6*
142:*24* 145:*23* 146:*2,*
*23* 147:*1* 149:*8, 9, 13,*
*15*
**solution** 91:*16*
**solve** 86:*13*
**solved** 86:*5*
**somebody** 11:*3*
20:*25* 32:*15* 37:*3*
81:*7*
**something's** 39:*14*
**soon** 88:*4* 107:*5*
**sorry** 7:*3* 30:*3*
32:*10, 25* 35:*17*
39:*25* 40:*8, 14, 20*
44:*8* 75:*7* 87:*25*
90:*14* 96:*9* 98:*11*
100:*13* 102:*2* 103:*11*
106:*4, 8* 109:*24*
115:*1* 117:*1, 2, 6, 17*
120:*7* 123:*14* 127:*23*
130:*10* 138:*24* 140:*5*
141:*6*
**sort** 8:*11* 38:*21*
121:*1* 147:*5*
**sounds** 72:*19*
**space** 65:*19* 148:*15*
**Spanish** 120:*8*
**speak** 36:*14* 46:*17*
78:*8* 81:*12* 83:*11*
**speaking** 12:*23*
**specific** 26:*20* 70:*10*
104:*17* 107:*17*
**specifically** 53:*24*
107:*19* 120:*15* 127:*5*
**speculation** 122:*7*
**speculative** 19:*1*
42:*21* 46:*23* 122:*21*
123:*5*
**spells** 60:*4*
**spoke** 91:*22* 100:*18*
118:*11* 119:*3, 10*
**spoken** 120:*1*
**spot** 22:*16* 27:*21*
**square** 33:*6*
**St** 2:*5*

**staff** 25:*16*

**stamp** 125:*21* 134:*14*

**stamped** 42:*11*
51:*21* 128:*21*

**stamps** 42:*9*

**stand** 34:*11* 55:*10*

**standard** 33:*22*
48:*16* 62:*17* 69:*2, 7*
113:*10* 115:*19*

**standards** 93:*12, 14*
121:*4*

**start** 7:*21* 11:*2, 4*
29:*15* 75:*14*

**started** 104:*13*
106:*19* 145:*14, 16*

**starting** 6:*2*

**starts** 49:*16*

**state** 9:*5, 6* 12:*1, 2*
45:*3* 151:*4, 18* 152:*1*

**stated** 129:*1* 142:*16*
154:*22*

**STATEMENT** 3:*22*
61:*19*

**STATES** 1:*1* 5:*11*
10:*1, 4* 21:*8* 46:*4*
94:*22* 96:*23* 98:*17*
129:*7*

**stating** 6:*1* 46:*25*

**status** 122:*1*

**stay** 142:*11*

**stays** 51:*10*

**Ste** 2:*5, 11, 17* 153:*4*

**steering** 39:*24*

**stenographic** 5:*5*
152:*9*

**Stenographically**
1:*20* 152:*7*

**step** 43:*12*

**Stephanie** 100:*6, 12,*
*15, 24* 101:*25* 110:*2*

**steps** 92:*15*

**sticker** 23:*6*

**stop** 32:*13* 128:*14*

**stopped** 134:*12*
136:*2* 142:*8*

**store** 51:*8*

**story** 21:*23*

**straight** 31:*14* 119:*2*

**strictly** 39:*15* 108:*23*

**Strike** 127:*23* 130:*3,*
*10* 135:*13, 19* 137:*10*

**string** 100:*19*

**STRUSBERG** 1:*15*
3:*5* 5:*8* 6:*20, 25* 7:*6,*
*15* 9:*7* 29:*9* 32:*6*
49:*22* 52:*5* 79:*20*
103:*1* 104:*7* 105:*12*
106:*2, 5* 124:*20*
144:*23* 151:*9* 152:*7*
153:*2, 25* 154:*6, 23*

**study** 9:*23*

**sub** 142:*2*

**subcontractor** 142:*2*

**subject** 88:*4*

**submit** 60:*24* 73:*12*
105:*23*

**submits** 27:*18*

**submitted** 68:*16*
71:*16*

**subscription** 60:*16*

**SUE** 2:*4*

**sued** 84:*11, 16*

**suffered** 90:*17*

**sufficiently** 14:*24*

**suggest** 15:*4* 32:*12*

**Suite** 153:*21*

**super** 34:*5* 131:*5*

**support** 31:*9* 89:*8*
96:*3*

**supported** 145:*18*

**supposed** 37:*19*

**Supreme** 5:*21*

**sure** 8:*9* 13:*2* 22:*17*
42:*14* 56:*13* 69:*8*
74:*7* 91:*24* 92:*7, 8,*
*10, 12* 103:*17* 116:*17*
119:*16, 17* 121:*3*
125:*21* 128:*11*

**surprised** 144:*5*

**swear** 6:*14*

**sworn** 6:*21* 151:*10*

**system** 56:*10, 11*
66:*23* 67:*2* 69:*20*
115:*8, 9*

**< T >**

**tag** 30:*16, 18*

**tags** 30:*15*

**take** 7:*19* 8:*19*
20:*12* 22:*15, 16, 24*
23:*1, 3* 27:*16* 30:*21*
43:*12* 67:*7* 92:*15*
102:*7* 104:*17* 112:*5*
115:*21* 118:*14, 16*
121:*2* 144:*12* 146:*19*
153:*6*

**taken** 20:*14* 154:*6*

**takes** 27:*13* 113:*18*

**talk** 91:*23* 141:*18,*
*19* 142:*10* 149:*8*

**talked** 81:*16*

**talking** 8:*6* 29:*11*
78:*21* 90:*23* 95:*13*
104:*16* 106:*6* 118:*14*
125:*14* 132:*7*

**TAMPA** 1:*3* 5:*12*

**tampered** 83:*15*

**target** 22:*2*

**taught** 58:*16*

**taxes** 52:*18*

**teach** 20:*21* 115:*3*

**teaches** 114:*24* 115:*3*

**TEASDALE** 2:*10*
153:*3*

**technically** 23:*16*

**tell** 21:*22* 36:*12*
44:*1* 45:*20* 58:*13*
59:*25* 63:*23* 64:*1*
67:*3* 93:*18, 19* 119:*7*
123:*23*

**telling** 13:*10* 119:*5*
143:*22* 144:*1*

**tells** 43:*25* 57:*7*
123:*10*

**temporary** 97:*15*

**ten** 34:*21* 43:*6* 90:*2,*
*12* 145:*5*

**tender** 41:*7, 8*

**term** 149:*9*

**terms** 57:*5* 58:*1, 5,*
*13*

**test** 22:*19* 27:*10, 11*
48:*8*

**testified** 6:*22* 71:*16*
97:*9, 18* 109:*12*
110:*4* 120:*25* 130:*2,*
*4*

**testify** 13:*25* 46:*20*
47:*3* 82:*5*

**testimony** 6:*14*
14:*21, 23* 35:*2* 82:*8*
92:*19* 97:*13* 121:*10*
145:*20*

**testing** 124:*15*

**TEXAS** 3:*14* 4:*1*
125:*15*

**text** 107:*23, 25*
118:*22*

**Thank** 6:*18* 15:*5, 10*
29:*12* 95:*23* 102:*16*
104:*1, 8* 106:*7*
124:*19, 21* 125:*4*
132:*1* 138:*18* 142:*7*
148:*20*

**thing** 8:*22* 42:*15*
49:*19, 23* 131:*5*

**think** 14:*23* 32:*13*
71:*22* 72:*6* 85:*10*
92:*14* 102:*3* 117:*17*
126:*7* 128:*5*

**thinking** 119:*10*

**third** 78:*18* 87:*24*
89:*12, 20*

**third-parties** 93:*25*
94:*1, 3*

**Third-Party** 2:*16*
4:*6, 8* 6:*10*

**thirteenth** 94:*6*

**thirty** 16:*24*

**thirty-one** 54:*16*
59:*7* 67:*11* 77:*14*
136:*4, 22*

**thirty-six** 67:*11*

**thought** 95:*11*

**three** 54:*16* 59:*7*
77:*14* 144:*11* 148:*25*

**three-sixty** 17:*4*

**time** 5:*7* 8:*6* 12:*23*
15:*4* 22:*7* 29:*24*
31:*1* 32:*14* 60:*12*
77:*3* 78:*24* 82:*1, 24*
86:*12* 92:*6* 97:*10*
98:*15, 16* 104:*19, 21*
105:*14* 107:*17, 18*
110:*1* 116:*9* 118:*24*
122:*10, 11* 123:*21*

127:*22*, *24*  148:*15*
153:*8*, *14*
**timeframe**  116:*9*, *12*
**times**  12:*22*  17:*4*
22:*21*
**timestamps**  63:*25*
**Tires**  24:*20*  25:*13*
**TITLE**  3:*14*, *23*  4:*1*
18:*13*  21:*21*, *22*  23:*9*
41:*17*  42:*5*, *18*, *23*, *25*
43:*1*, *2*, *5*, *13*, *24*  44:*4*,
*11*, *13*, *16*, *22*, *24*  45:*2*
64:*16*  65:*2*  72:*25*
73:*12*, *16*  74:*4*, *13*, *16*,
*19*  75:*6*, *11*, *12*  77:*11*,
*17*, *23*  78:*1*, *2*  79:*6*,
*11*, *23*  81:*24*  82:*2*, *10*,
*13*, *24*  83:*2*  84:*3*
90:*25*  97:*3*, *10*, *16*, *19*,
*22*  98:*6*  103:*15*
106:*13*  110:*5*, *6*, *12*,
*14*, *17*, *18*, *19*  111:*1*, *6*,
*8*, *13*, *20*  112:*6*, *9*, *25*
113:*2*, *12*, *20*  114:*22*
115:*20*, *21*  121:*6*, *20*,
*22*  122:*2*  123:*3*
124:*2*  125:*14*, *15*, *23*,
*25*  126:*5*, *15*, *19*
127:*9*, *15*  128:*3*
130:*5*, *15*  131:*12*, *22*
132:*5*, *6*, *18*, *21*  133:*2*
135:*9*  142:*21*, *24*
143:*1*  146:*1*, *5*, *9*, *22*
147:*1*, *24*  149:*7*, *21*
**titled**  94:*22*
**titles**  72:*6*  75:*25*
127:*5*  145:*21*
**titling**  114:*16*
**TMU**  18:*9*  37:*14*, *15*,
*17*, *18*  88:*18*
**today**  7:*1*  13:*24*
15:*11*  17:*10*  46:*18*
69:*14*  78:*9*  82:*23*
119:*5*
**Today's**  5:*6*  12:*13*,
*15*, *18*  13:*9*  81:*13*
**told**  12:*22*  37:*10*
58:*3*  73:*24*  84:*6*
90:*8*  118:*25*  119:*11*,
*12*  120:*12*, *13*  144:*6*

**top**  46:*4*  55:*9*  59:*9*
68:*4*  70:*25*  73:*18*
74:*5*  125:*24*  126:*2*
131:*13*
**topics**  20:*19*
**torn**  39:*18*
**TORRES**  2:*19*  3:*5*
6:*9*  102:*11*, *14*, *17*, *19*
104:*2*, *4*, *6*, *8*  106:*3*,
*10*  110:*22*  113:*19*
114:*14*, *18*, *20*  117:*8*
121:*12*  122:*5*, *8*, *14*,
*18*, *22*  123:*7*, *9*, *12*, *20*
124:*8*, *18*, *21*  131:*17*
137:*3*, *21*  148:*9*, *12*,
*20*  150:*4*
**Tort**  90:*22*
**touch**  75:*25*
**tow**  38:*20*
**track**  45:*24*  46:*1*
**trade**  21:*10*
**trade-in**  21:*13*, *14*
**trades**  21:*11*
**train**  114:*7*, *22*
**trained**  114:*10*, *15*, *21*
**training**  20:*12*, *20*
115:*13*
**TRANSACTION**  4:*5*
26:*14*  29:*24*  31:*1*
45:*6*, *15*  46:*21*  47:*4*
50:*5*  52:*10*  53:*21*
57:*1*  68:*19*  69:*16*
71:*18*  73:*25*  74:*1*, *4*
75:*15*  77:*11*  78:*17*
97:*20*  104:*18*  113:*3*
137:*15*
**transcript**  152:*8*
153:*8*, *11*  154:*2*
**transfer**  30:*16*  52:*19*
65:*7*  68:*24*  72:*17*
75:*20*, *24*  76:*3*  78:*14*,
*25*  79:*12*  97:*11*, *19*
98:*7*  103:*16*  110:*14*,
*18*  113:*7*  125:*25*
132:*19*  138:*16*  146:*5*,
*9*  149:*20*
**transferred**  71:*23*
74:*19*  75:*6*, *12*  77:*18*,
*23*  97:*24*  110:*12*
126:*15*  132:*5*

**transfers**  72:*3*  76:*23*,
*24*  110:*17*  142:*21*
146:*23*  147:*24*  149:*8*
**transmission**  24:*12*
86:*8*
**transport**  41:*15*
**tried**  30:*10*
**trim**  25:*12*
**triple**  92:*8*
**troublesome**  123:*22*
**truck**  14:*4*  15:*17*
23:*19*  38:*20*  93:*20*
107:*6*
**trucks**  21:*25*  31:*23*
**true**  42:*17*  52:*9*, *12*
56:*24*  62:*2*  65:*1*
68:*12*, *15*  129:*1*, *2*, *3*
152:*8*  154:*23*
**truly**  153:*18*
**trust**  19:*18*, *20*
**trustworthy**  93:*18*
**truth**  6:*15*, *16*
**truthful**  17:*13*, *22*
18:*13*  41:*1*  73:*15*
79:*11*  97:*7*
**try**  92:*6*  112:*15*, *17*
123:*21*  140:*22*
**trying**  125:*19*
**Tuesday**  1:*20*  5:*6*
**turn**  40:*9*
**turned**  28:*24*
**twelfth**  93:*21*
**twelve**  10:*24*  16:*5*
**twenty**  34:*21*  145:*7*,
*11*, *21*
**twenty-eight**  136:*4*, *22*
**twenty-four/seven**
19:*13*
**twenty-one**  47:*25*
53:*6*
**twice**  107:*12*
**Two**  34:*16*, *17*  35:*3*
44:*17*  54:*10*  69:*25*
81:*17*  90:*2*, *12*
109:*23*  116:*15*, *16*, *20*
119:*15*, *16*  123:*16*, *17*,
*24*  148:*9*
**type**  21:*24*  111:*21*,
*22*  112:*10*  118:*19*, *23*

**typical**  26:*13*

< U >
**U.S**  92:*24*
**Uh-huh**  55:*17*
**uh-uh**  8:*11*
**unable**  46:*20*
**Unclean**  94:*18*, *22*, *24*
**unclear**  7:*24*
**underneath**  45:*2*
80:*9*
**undersigned**  151:*8*
**understand**  8:*17*
51:*3*  56:*13*  86:*23*
87:*18*  89:*4*  90:*5*, *14*,
*19*  91:*6*  92:*4*, *13*
**understanding**  109:*1*
143:*13*
**understood**  8:*3*
34:*23*  140:*20*
**unexpectedly**  115:*2*
**UNITED**  1:*1*  5:*11*
10:*1*, *3*  21:*8*
**University**  9:*22*, *24*
**unpack**  43:*7*  80:*20*
**unwind**  91:*17*, *20*, *21*
**upper**  33:*16*  34:*9*
55:*10*
**UPS**  112:*9*
**UPS'ed**  110:*7*
**use**  8:*11*  15:*4*  20:*1*,
*22*  50:*7*  68:*25*  69:*4*,
*15*  112:*9*, *11*  115:*8*, *9*
117:*25*  118:*1*, *8*, *9*
141:*7*  144:*13*
**USPS**  44:*12*
**usually**  27:*20*  116:*2*

< V >
**V#3**  55:*10*  59:*10*
**value**  18:*7*, *10*, *18*
26:*7*
**vans**  21:*25*
**VEHICLE**  3:*14*
4:*10*  18:*7*, *9*, *22*, *23*
19:*3*, *5*  22:*5*  23:*4*, *10*,
*22*  24:*6*  25:*3*, *7*, *18*,
*20*  26:*4*  31:*16*  32:*1*
34:*24*  35:*6*, *10*, *14*
36:*11*, *13*, *18*  37:*16*,

22 38:*13*, *21*, *23*  39:*4*,
*16*, *18*  40:*23*  41:*14*,
*18*  42:*19*  45:*8*  47:*9*,
*13*  48:*9*  52:*19*  53:*1*,
*4*, *25*  59:*3*, *13*  69:*15*
82:*1*  83:*14*  84:*9*
88:*4*  90:*3*  95:*19*
96:*2*, *4*, *23*  97:*1*, *6*
103:*5*  105:*21*, *22*
106:*16*  107:*19*
110:*19*  111:*16*
112:*22*, *23*  116:*17*
121:*17*  122:*1*  124:*10*,
*11*, *14*  126:*16*  127:*23*,
*25*  128:*3*  130:*6*, *15*
133:*12*, *13*, *14*, *24*
134:*7*, *22*  135:*5*, *10*,
*22*  137:*2*, *12*, *25*
138:*2*, *5*  140:*8*, *14*, *16*,
*19*, *22*  142:*24*  145:*23*
146:*2*, *18*, *23*  147:*1*, *5*,
*12*, *18*  149:*8*, *9*, *11*
**vehicles**  19:*22*, *24*
21:*9*, *13*, *14*  22:*7*, *10*
23:*12*  24:*16*  104:*20*
107:*1*, *13*  124:*13*
134:*2*, *3*, *9*  135:*18*
137:*6*  138:*15*, *20*
139:*2*, *11*  140:*2*
144:*25*  145:*2*, *21*
147:*16*
**vehicle's**  18:*14*, *17*
26:*7*  72:*20*  97:*4*
135:*21*
**venued**  5:*11*
**verify**  92:*15*  115:*22*
**verifying**  118:*19*
**version**  55:*25*
**versions**  56:*4*, *7*, *14*
**versus**  5:*9*  148:*22*
150:*2*
**video**  147:*9*
**VIDEOCONFERENC
E**  1:*15*
**view**  32:*23*, *24*  33:*21*
**VIN**  44:*7*, *9*  138:*6*
**VIOLATIONS**  4:*8*
**vs**  1:*4*

**< W >**

**W/ATTACHMENTS**
4:*12*
**waged**  85:*5*
**wait**  8:*6*  14:*18*
29:*10*  102:*12*  118:*4*
122:*8*  126:*14*
**waive**  5:*24*  91:*7*
153:*8*, *16*, *23*
**waived**  91:*5*
**waiving**  148:*22*  150:*2*
**walk**  26:*13*  99:*25*
137:*9*
**walks**  26:*14*, *23*
**WANDA**  1:*24*  5:*4*
7:*4*  151:*18*  152:*6*, *20*
153:*18*
**want**  7:*3*, *10*  15:*2*
27:*8*, *14*  42:*14*  51:*15*
69:*8*  91:*24*  102:*17*
103:*23*  104:*17*
105:*22*  137:*25*  147:*9*
150:*1*, *7*
**wants**  20:*1*  27:*3*, *5*
**warehouse**  117:*21*
**warranty**  95:*18*  96:*1*
**wash**  22:*16*, *22*, *23*
**washout**  61:*5*, *8*
**watch**  70:*5*
**water**  53:*22*
**way**  29:*11*  45:*18*, *19*
46:*1*  60:*3*  63:*18*
107:*1*  108:*20*  109:*10*
118:*6*  119:*3*  120:*8*
123:*23*  125:*5*  132:*14*
144:*24*
**web**  47:*11*, *24*  67:*5*,
*8*  117:*13*  133:*15*, *16*,
*17*, *18*, *19*, *21*
**website**  104:*20*
106:*17*  107:*21*
135:*23*  138:*1*
**Weekly**  77:*8*
**weeks**  116:*15*, *16*, *20*
**weird**  123:*9*
**well**  6:*11*  12:*9*, *23*
43:*22*  49:*1*  60:*16*
67:*3*  91:*16*  102:*8*
126:*7*  137:*10*  141:*16*
142:*10*  143:*24*
**went**  104:*10*

**we're**  7:*18*  8:*20*
12:*23*  42:*14*  60:*6*
69:*8*  78:*20*  82:*22*
90:*5*  130:*25*  131:*9*
150:*3*
**West**  2:*16*  6:*10*
136:*24*  137:*2*  153:*22*
**WESTLAKE**  1:*9*, *10*
59:*17*, *21*, *24*  60:*5*, *9*,
*10*, *19*, *22*  61:*4*, *12*, *15*
62:*19*  66:*6*
**wet**  48:*14*, *15*
**WhatsApp**  107:*25*
108:*1*, *2*, *5*
**wheel**  39:*24*
**wheels**  25:*13*
**where-is**  103:*5*
**wholesale**  36:*2*
**wholesaling**  31:*11*
**willing**  91:*21*
**win**  95:*14*
**windshield**  24:*21*
**wisely**  15:*4*
**wish**  153:*16*
**WITH/WITHOUT**
3:*23*
**withdraw**  50:*20*  51:*2*
**WITNESS**  3:*1*  6:*17*
11:*12*  14:*3*, *7*, *13*, *22*
18:*20*  24:*1*, *4*, *11*
26:*11*  32:*15*, *18*, *22*,
*25*  33:*5*, *7*, *9*, *23*  34:*1*,
*5*  35:*3*  39:*2*  43:*20*
46:*24*  52:*3*  56:*22*
58:*22*  64:*4*, *24*  66:*1*
78:*22*  81:*16*  82:*10*,
*15*  89:*18*, *22*  90:*4*
92:*20*  97:*14*, *21*  98:*3*
99:*5*, *8*  106:*8*  113:*16*
114:*13*, *17*, *19*  117:*6*
121:*11*  122:*6*, *20*
123:*8*, *11*, *14*, *19*
124:*7*, *21*  131:*15*
134:*21*, *23*  136:*3*
137:*4*  139:*5*, *9*, *19*
140:*24*  154:*6*
**word**  149:*9*
**words**  57:*3*  68:*21*
**work**  71:*8*  72:*7*
**worked**  10:*23*

**working**  35:*25*  36:*1*
77:*4*  86:*7*  98:*14*
148:*14*
**works**  77:*3*  81:*20*
102:*18*  131:*21*
137:*11*  144:*15*
**worn**  39:*20*, *24*
40:*17*, *19*
**worries**  106:*9*
**worth**  18:*23*
**WRITE**  154:*2*
**written**  109:*9*  115:*18*
**wrong**  39:*14*  92:*14*
109:*13*

**< Y >**
**y'all**  148:*15*
**Yeah**  11:*21*  13:*21*
24:*10*  32:*17*  34:*6*
39:*12*  42:*3*, *16*  47:*14*
50:*3*  51:*17*  55:*1*
56:*16*  61:*6*  62:*8*
64:*11*  67:*14*  68:*8*
72:*16*  77:*3*  92:*20*
96:*19*  99:*12*  102:*14*,
*18*, *24*  103:*2*, *24*
104:*3*  105:*6*  117:*15*
123:*13*  131:*15*
132:*13*  137:*8*  139:*9*,
*15*  146:*19*
**year**  11:*23*  16:*25*
91:*23*  109:*23*  138:*4*
145:*14*
**years**  10:*24*  15:*25*
16:*1*, *5*, *10*, *12*, *13*, *15*
20:*18*  54:*10*  61:*16*
90:*2*, *12*  123:*24*
134:*4*, *5*  145:*13*
**yell**  118:*3*
**yesterday**  138:*23*
**you-all**  104:*12*
118:*20*

**< Z >**
**ZOOM**  2:*7*, *12*, *13*,
*19*  33:*2*  38:*16*  73:*21*
74:*6*  134:*17*  143:*6*