UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

GABRIEL LUC HADDON,  Case No. 8:23-cv-00709

    Plaintiff,

vs.

FS INVESTMENTS OF AMERICA, INC., and WESTLAKE SERVICES, LLC,

    Defendants.
_____/

## DEFENDANT FS INVESTMENTS OF AMERICA, INC.'S SEPARATE STATEMENT OF UNDISPUTED FACTS

Defendant, FS Investments of America, Inc. ("Defendant"), by and through the undersigned counsel, and pursuant to this Court's Amended Case Management and Scheduling Order [D.E. 24] (the "CMO"), hereby files its *Statement of Undisputed Facts* in connection with its *Motion for Summary Judgment* [D.E. 72] filed against plaintiff Gabriel Luc Haddon ("Plaintiff" or "Haddon"):[1]

    1.    Defendant owns and operates a used car dealership under the trade name "Powerhouse Automotive." On or about May 25, 2020, Plaintiff visited Defendant's dealership looking to purchase a used motor vehicle. (Strusberg Decl. ¶ 4; *see* Haddon's Dep. 20:25–21:12).[2] Plaintiff inspected and test drove a used 2012 Ford F-

---

[1] This Statement of Undisputed Facts is the same one set forth in Defendant's Motion for Summary Judgment [D.E. 72]. However, Defendant filed it separately to comply with this Court's Amended Case Management and Scheduling Order [D.E. 24].

[2] A copy of Defendant's declaration and Plaintiff's deposition transcript was filed with Defendant's Motion for Summary Judgment [D.E. 72].

150 with VIN 1FTFW1ET2CFA12718, and after being satisfied with its performance, chose this vehicle (the "Vehicle"). (Strusberg Decl. ¶ 4; *see* Haddon's Dep. 24:7–24:21, 25:7–9, 26:9–14).

2. Later that day, Plaintiff and his mother, non-party Maria Haddon, signed, *inter alia*, a Buyer's Order and Retail Installment Contract and Security Agreement ("RISC") (collectively, the "Purchase Documents") to purchase the Vehicle. (Strusberg Decl. ¶ 5; Haddon's Dep. 32:23–24). Defendant then assigned the RISC to Westlake. (Strusberg Decl. ¶ 5).

3. Pursuant to the RISC, Plaintiff and his mother agreed to finance $20,080.17 at an annual interest rate of 16.09% (the "Amount Financed"), resulting in 48 monthly payments of $573.32 each. (Strusberg Decl. ¶ 6).

4. Although Plaintiff and his mother both signed the Purchase Documents, Plaintiff testified that his mother gifted the Vehicle to him, as she had done for her other children. (*See* Haddon Dep. 38:22–39:5). She alone made all the payments to Westlake for the entire Financed Amount as well as the $5,000.00 down payment. (Haddon Dep. 38:16–21). Plaintiff is not obligated to reimburse his mother these payments. (Haddon Dep. 39:10–13).

5. After Plaintiff and his mother obtained possession of the Vehicle, members of Plaintiff's household, which include his wife, mother, father, and two brothers, "occasionally" drove this vehicle "to haul stuff that wouldn't normally fit into a car or a sedan." (Haddon's Dep. 9:19–10:5).

6. Plaintiff testified that he later repaired the turbo-charger and muffler, and purchased new tires (the "Replaced Parts"). (Haddon's Dep. 40:3–17). Plaintiff stated that the tires did not provide adequate traction on the snowy roads of Idaho; the Vehicle was purchased in Florida, but Plaintiff was attending college in Idaho. (Haddon's Dep. 50:7–51:2, 63:17–64:14).

7. Plaintiff testified that the Vehicle's tires had more tread initially, but his use of the Vehicle resulted in the reduced tread necessitating the replacement. (Haddon's Dep. 64:16–65:9).

8. Other than these repairs, the Vehicle was in good condition. (*See* Haddon's Dep. 51:3–20, 63:5–20). Plaintiff agreed that a motor vehicle with over 100,000 as the Vehicle will likely require repair, replacement parts, and usual maintenance costs. (Haddon's Dep. 60:12–18).

9. Plaintiff testified that all repairs to the Vehicle were done in Idaho. (Haddon's Dep. 54:14–16). However, Plaintiff never paid for any repair or maintenance regarding the Vehicle. (Haddon's Dep. 40:18–19). His mother assumed these costs as Plaintiff "didn't have money at the time." (Haddon's Dep. 40:24–25). Plaintiff is not obligated to reimburse his mother any repair or maintenance costs. (Haddon's Dep. 40:20–23).

10. Moreover, Plaintiff's mother paid for the Vehicle's insurance, which Plaintiff is also not obligated to reimburse. (Haddon's Dep. 56:23–57:4).

11. Plaintiff and his mother do not share a bank account, and the only expense incurred by Plaintiff related to the Vehicle is the cost of gasoline for its use. (Haddon's Dep. 67:12–20).

12. Plaintiff eventually decided to try and sell the Vehicle because "the miles per gallon [were] too low for [his] job at the time." (Haddon's Dep. 12:4–8). In other words, Plaintiff wanted to sell the Vehicle because gas was too expensive and he wanted to reduce the cost of commuting to work. (Haddon's Dep. 12:9–11).

13. Plaintiff testified that a potential buyer requested he obtain a CARFAX report of the Vehicle. (Haddon's Dep. 11:21–22). At that time, Plaintiff became aware of a potential mileage discrepancy with respect to the Vehicle. (Haddon's Dep. 12:12–20).

14. Although the Vehicle has not been sold, Plaintiff is no longer using the Vehicle. (*See* Haddon's Dep. 15:15–17, 16:15–17, 55:12–15).[3] The Vehicle is located at Plaintiff's mother's house. (Haddon's Dep. 55:22–56:4). Before Plaintiff is allowed to use the Vehicle, he must first ask permission from his mother — as she owns the Vehicle:

> Q. So[,] at the end of this lawsuit if you were to stay with the F-150, what do you plan to do with this vehicle?
>
> A. I haven't really talked with my mom about that so...
>
> Q. What do you have to talk to your mom about that?

---

[3] Plaintiff testified that on February 28, 2023, he purchased a 2023 Subaru Crosstrek because he likes how it looks, provides a better gas mileage ratio, and it is safe for his newborn. (Haddon's Dep. 10:6–11, 18:11–18, 19:4–22, 53:9–15).

Page 4 of 7

Armstrong Teasdale LLP | 355 Alhambra Circle, Suite 1200, Coral Gables, FL 33134  T. 786.822.3700 F. 305.675.3605  ArmstrongTeasdale.com

> A. I mean, technically, it's her – it's her truck.
>
> Q. Is that because she paid for it?
>
> A. Yes, sir.

(Haddon's Dep. 55:22–56:4, 56:12–22).

15. Although his mother paid for all expenses related to the Vehicle, Plaintiff testified that because of the mileage discrepancy in the CARFAX report, he seeks damages from Defendant for the cost to purchase the Vehicle as well as repair and insurance costs. (Haddon's Dep. 67:1–7; Strusberg's Decl. Ex. 4).

16. On or about December 21, 2022, FS Investments received a written settlement demand from Plaintiff's counsel titled "*Fla. Stat. 501.98 Demand*" ("Settlement Letter"). (Strusberg's Decl. ¶ 7). In the Settlement Letter, Plaintiff states that he is "willing to amicably resolve this matter and demands payment" of $8,799.20 "representing [his] good faith estimate of actual damages." (*Id*. ¶ 8)

17. On March 9, 2023, in an e-mail to counsel for Defendant's bond company, Plaintiff's counsel explained the calculation of Plaintiff's good faith estimate of actual damages as follows:

> As reflected in the documentation provided to Hudson in February, the purchase price of the vehicle was $21,998. My expert has informally opined that a diminution of value model would be inline *[sic]* with a 40% reduction in value of the vehicle. 40% of $21,988 comes out to $8,799.20 which is the Plaintiff's good faith estimate of damages in this claim as reflected in the statutory demand delivered to and ignored by the insured.[4]

---

[4] A copy of the e-mail from Plaintiff's counsel was filed with Defendant's Motion for Summary Judgment [D.E. 72].

18.     On or about March 17, 2024, in an effort to work a manageable compromise, avoid the expense of litigation, FS Investments delivered a check to Plaintiff in the amount of $8,799.20 to settle Plaintiff's alleged actual damages as set forth in the Settlement Letter. (Strusberg's Decl. ¶ 13; *see* Haddon's Dep. 67:21–23, 70:11–14). Plaintiff's counsel negotiated the check and has received the settlement payment. (Strusberg's Decl. ¶ 16).

19.     However, on March 30, 2023, Plaintiff filed its Complaint against Defendant, seeking economic and actual damages for Defendant's alleged violation of 49 U.S.C. § 32705(a) (the "Odometer Act") (Count I), alleged fraud (Count II), fraudulent inducement (Count III), and breach of express warranty (Count IV). (Strusberg's Decl. Ex. 4).

20.     Defendant, confused because he thought he had settled Plaintiff's claim for actual damages in connection with the Vehicle, contacted Plaintiff's counsel, who responded by stating:

> [B]y tendering the $9,000 *[sic]* for Mr. Haddon's claim for actual damages, the dealership arguably resolved the bond's liability in the matter since the bond company is only liable for actual damages and not statutory damages. However, the unconditional tender does not resolve Mr. Haddon's statutory damages and entitlement to attorney's fees which was all but ignored by the dealership."

(Strusberg's Decl. Ex. 15).

*[Intentionally left blank.]*

Dated <u>October 29, 2024</u>.

          Respectfully submitted,

          **ARMSTRONG TEASDALE LLP**
          Counsel for FS Investments of America, Inc.
          355 Alhambra Circle, Suite 1200
          Coral Gables, Florida 33134
          Telephone: (786) 822-3700
          Telecopier: (305) 675-3605

          By: */s/ Jose A. Peralta, Esq.*
             Keith D. Silverstein, Esq.
             Fla. Bar No. 086820
             ksilverstein@atllp.com
             Jose A. Peralta, Esq.
             Fla. Bar No. 1028554
             jperalta@atllp.com
             **FOR SERVICE:**
             miamiefiling@atllp.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on <u>October 29, 2024</u>, a true and correct copy of the foregoing was served to every counsel of record via transmission of notices of electronic filing generated by CM/ECF.

                                                */s/ Jose A. Peralta*
                                                Jose A. Peralta, Esq.