# EXHIBIT 1

GABRIEL LUC HADDON vs FS INVESTMENTS OF AMERICA, INC.                    April 23, 2024
CR of FS Investments (Franklyn Strusberg)                                        1

```
 1              UNITED STATES DISTRICT COURT
 2               MIDDLE DISTRICT OF FLORIDA
 3                    TAMPA DIVISION
 4         Civil Action No.: 8:23-cv-00709-WFJ-SPF
 5
    GABRIEL LUC HADDON,
 6
         Plaintiff(s),
 7
    vs.
 8
    FS INVESTMENTS OF AMERICA, INC.,
 9  d/b/a POWERHOUSE AUTOMOTIVE, a
    Florida corporation, and WESTLAKE
10  SERVICES, LLC, d/b/a WESTLAKE
    FINANCIAL SERVICES, a Foreign
11  corporation,
12         Defendant(s).
    _____ /
13
14
15            VIDEOCONFERENCE DEPOSITION OF
                    FRANKLYN STRUSBERG
16           (as corporate representative of
              FS Investments of America, Inc.)
17
18
                   Pages 1 through 154
19
20               Tuesday, April 23, 2024
                  10:13 a.m. - 1:19 p.m.
21
22
23
               Stenographically Reported By:
24         WANDA D. GOOD, CERTIFIED COURT REPORTER
25
```

```
 1    APPEARANCES:

 2

 3

      On behalf of Plaintiff(s)
 4         SUE YOUR DEALER - A LAW FIRM
           JOSHUA FEYGIN, PLLC
 5         P.O. Box 85293 (33008-5293)
           1930 Harrison St., Ste. 208F
 6         Hollywood, Florida   33020
           954.228.5674
 7         BY:  JOSHUA FEYGIN, ESQUIRE (VIA ZOOM)
                Josh@JFeyginEsq.com
 8

 9

      On behalf of Defendant FS Investments of America, Inc.,
10    d/b/a Powerhouse Automotive
           ARMSTRONG TEASDALE, LLP
11         355 Alhambra Cir., Ste. 1250
           Coral Gables, Florida   33134
12         305.371.8809
           BY:  JOSE ARIEL PERALTA, ESQUIRE (VIA ZOOM)
13              jperalta@atllp.com
                KEITH D. SILVERSTEIN, ESQUIRE (VIA ZOOM)
14              keith@silversteinpa.com
15

16    On behalf of Third-Party Defendant McCombs West Ford,
      LLC
17         NICKLAUS & ASSOCIATES, P.A.
           4651 Ponce De Leon Blvd., Ste. 200
18         Coral Gables, Florida   33146
           305.460.9888
19         BY:  NICOLAS TORRES, ESQUIRE (VIA ZOOM)
                nicolast@nicklauslaw.com
20

21

22

23

24

25
```

```
 1                    INDEX OF PROCEEDINGS
 2
 3
    WITNESS:                                        PAGE
 4
 5  FRANKLYN STRUSBERG
 6
    DIRECT EXAMINATION BY MR. FEYGIN                  5
 7
    CROSS-EXAMINATION BY MR. TORRES                 104
 8
    CROSS-EXAMINATION BY MR. PERALTA                125
 9
    REDIRECT EXAMINATION BY MR. FEYGIN              144
10
    RECROSS-EXAMINATION BY MR. TORRES               148
11
    RECROSS-EXAMINATION BY MR. PERALTA              149
12
13
14                       PLAINTIFF
15
    EXHIBIT              DESCRIPTION                 PAGE
16
        A    PLTF'S NOTICE OF TAKING CORP. REP DEPO  13
17
        B    VEHICLE INFORMATION SHEET               32
18
        C    TEXAS CERTIFICATE OF TITLE, FSIA 000020 41
19
        D    5/25/20 BUYER'S ORDER FORM              51
20
        E    5/25/20 RETAIL INSTALLMENT CONTRACT AND 56
21             SECURITY AGREEMENT
22      F    5/25/20 ODOMETER DISCLOSURE STATEMENT   61
23      G    5/25/20 APPLICATION FOR CERTIFICATE OF  64
               TITLE WITH/WITHOUT REGISTRATION
24
25
```

GABRIEL JONES vs FS INVESTMENTS (Volume 2 of 7) 12/19/2024
CR of FS Investments (Franklyn Strusberg)
Case 8:23-cv-00709-WFJ-SPF   Document 102-1   Filed 01/02/25   Page 5 of 174 PageID 1820
4

PLAINTIFF

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| H | 5/25/20 POWER OF ATTORNEY | 67 |
| I | 3/6/19 TEXAS CERTIFICATE OF TITLE SCAN TRANSACTION NUMBER 539994086 | 73 |
| J | DEFT FS INVESTMENTS AMENDED AFFIRMATIVE DEFENSES AND THIRD-PARTY COMPLAINT | 87 |
| K | DEFT FS INVESTMENTS MOTION FOR LEAVE TO FILE A THIRD-PARTY COMPLAINT AND AMEND ITS AFFIRMATIVE DEFENSES | 96 |
| L | 12/21/22 DEMAND FOR VIOLATIONS OF THE MOTOR VEHICLE AND INFORMATION COST SAVINGS ACT | 99 |
| M | 12/21/22 FEYGIN/POWERHOUSE AUTOMOTIVE LETTER W/ATTACHMENTS | 101 |

DEFENSE

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| A | FSIA 000011, Bill of Sale from Manheim | 136 |

(Reporter's Note:  Defendant Exhibit a was not provided for attachment.)

GABRIEL LUC HADDON vs FS INVESTMENTS OF AMERICA, INC., et al. April 23, 2024
CR of FS Investments (Franklyn Strusberg)                    5

Case 8:23-cv-00709-WFJ-SPF   Document 102-1   Filed 01/02/25   Page 6 of 174 PageID 1821

 1    Thereupon,

 2    the following proceedings began at 10:13 a.m.:

 3            THE COURT REPORTER:  Good morning.  My name

 4        is Wanda Good.  I am a Florida certified

 5        stenographic reporter.

 6            Today's date is Tuesday, April 23rd, 2024,

 7        and the time is approximately 10:13 a.m.

 8            This is the deposition of Frank Strusberg in

 9        the matter of Gabriel Luc Haddon versus FS

10        Investments of America, Inc., et. al.

11            This case is venued in the United States

12        District Court, Middle District of Florida, Tampa

13        Division.  The case number is

14        8:23-cv-00709-WFJ-SPF.

15            The attorneys participating in this

16        deposition acknowledge that I am not physically

17        present in the deposition room and that I will be

18        reporting this deposition remotely.  They further

19        acknowledge that in lieu of an oath administered in

20        person I will administer the oath remotely.  This

21        arrangement is pursuant to the Florida Supreme

22        Court Administrative Order Number AOSC20-16.

23            The parties and their counsel consent to the

24        arrangement and waive any objections to this manner

25        of reporting.  Please indicate your agreement by

```
 1        stating your name, whom you represent and your

 2        agreement on the record starting with the

 3        Plaintiff.

 4             MR. FEYGIN:  Attorney Joshua Feygin on behalf

 5        of the Plaintiff, Gabriel Luc Haddon.  We

 6        acknowledge.

 7             MR. PERALTA:  Jose Peralta on behalf of -- of

 8        the Defendant Powerhouse, and I acknowledge.

 9             MR. TORRES:  Nicolas Torres on behalf of

10        Third-Party Defendant McCombs Ford West, and we

11        acknowledge as well.

12             THE COURT REPORTER:  Please raise your right

13        hand.

14             Do you swear or affirm the testimony you

15        shall give in this matter will be the truth, the

16        whole truth and nothing but the truth?

17             THE WITNESS:  Yes.

18             THE COURT REPORTER:  Thank you.

19   Thereupon,

20                       FRANKLYN STRUSBERG,

21   having been first duly sworn or affirmed, was examined

22   and testified as follows:

23                       DIRECT EXAMINATION

24   BY MR. FEYGIN:

25        Q.   All righty.  Good morning, Mr. Strusberg.
```

```
 1   How are you today?
 2          MR. PERALTA:  Joshua, before -- before we
 3       begin, I'm so sorry, I just -- I just want to
 4       correct something that Wanda said.  This is the
 5       deposition of the corporate representative of FS
 6       Investments, not Frank Strusberg as -- as a person,
 7       so personally.  That makes sense?
 8          MR. FEYGIN:  Yes, this is the corporate
 9       representative deposition.
10          MR. PERALTA:  Correct, and then also I want
11       to get on the record that Mr. Keith Silverstein
12       might join us.  He's also an -- an attorney for the
13       Defendant in this case.  Go ahead, Joshua.
14   BY MR. FEYGIN:
15       Q.  All righty, Mr. Strusberg.
16          How are you this morning?
17       A.  Good.
18       Q.  Good to hear.  So, obviously we're here to
19   take the deposition of the corporate representative of
20   the dealership, which is FS Investments of America,
21   Inc.  I'm going to start off with a few ground rules to
22   hopefully make this an easy process.
23          So first, if I ask you a question and it's
24   unclear or confusing, please ask me to rephrase the
25   question.  Okay?
```

```
 1              A.   Yes.

 2              Q.   If you answer a question, I'm going to assume

 3    you understood it, though.  Okay?

 4              A.   Okay.

 5              Q.   Because the court reporter can't record both

 6    of us talking at the same time, please wait until I'm

 7    finished asking a question before you answer it.

 8              A.   Okay.

 9              Q.   When you provide a response, make sure you

10    provide an audible response.  Do not nod your head.  Do

11    not use some sort uh-uh, nuh-uh, anything like that

12    because she's not going to able to record it.  Okay?

13              A.   Okay.

14              Q.   Occasionally your attorney may raise an

15    objection, but unless you're instructed not to answer

16    the question, you may answer.

17                   Do you understand?

18              A.   Yes.

19              Q.   And if you need to take a break, I can

20    certainly accommodate you.  I hope we're not going to

21    be here for too long, but in the event that you do need

22    a break, the only thing I ask is that if there is a

23    question pending that you -- you finish answering that

24    question.  Okay?

25              A.   Okay.
```

```
 1        Q.   And if I refer to you, I'm referring to
 2   Powerhouse and I intend to refer to the -- to the
 3   Defendant FS Investments.  Okay?
 4        A.   Okay.
 5        Q.   All righty.  And state your name for the
 6   record.  Can you state your name for the record?
 7        A.   Franklyn Strusberg.
 8        Q.   And what is your date of birth?
 9        A.   5/30/81.
10        Q.   Have you ever been in a deposition before?
11        A.   Never in my life.
12        Q.   Have you ever been convicted of any felonies
13   or crimes of dishonesty?
14        A.   Never in my life.
15        Q.   Have you ever been accused of any felonies or
16   crimes of dishonesty?
17        A.   Never.
18        Q.   What is your educational background?
19        A.   Do what?
20        Q.   What is the highest level of education that
21   you achieved?
22        A.   University.
23        Q.   Okay.  And what did you study in the
24   university?
25        A.   Business administration.
```

```
 1          Q.    And was that in the United States?

 2          A.    In Colombia.

 3          Q.    How long have you been living in the United

 4   States?

 5          A.    I was born here.

 6          Q.    Okay.  So, what do you do for a living?

 7          A.    I sell cars.

 8          Q.    Okay.  And what is the name of the dealership

 9   that you sell cars at?

10          A.    Powerhouse Automotive.

11          Q.    Are you employed by or --

12          A.    Yes.

13          Q.    -- derive any --

14          A.    Correct.

15          Q.    Are you employed by or do you derive income

16   from any other dealership?

17          A.    Employed by.

18          Q.    Okay.  What other dealerships are you

19   employed by?

20          A.    Powerhouse Automotive.

21          Q.    Aside from Powerhouse, who else --

22          A.    Only -- only Powerhouse Automotive.

23          Q.    How long have you worked at the dealership?

24          A.    I don't remember.  Like, twelve years.

25          Q.    What is your position there?
```

```
 1        A.    I'm the owner.

 2        Q.    And did you start this business or did you

 3   acquire it from somebody else?

 4        A.    I start it.

 5        Q.    So, have you ever been involved in a lawsuit

 6   before?

 7        A.    Yes.

 8        Q.    Okay.  For what?

 9              MR. PERALTA:  Objection; relevance and

10        narrative.

11              MR. FEYGIN:  Go ahead and answer.

12              THE WITNESS:  Do what?

13              MR. PERALTA:  Yes, Frank.  I objected as to

14        relevance and narrative.

15   BY MR. FEYGIN:

16        Q.    You can proceed to answer the question.  What

17   was -- what was the lawsuit for or lawsuits?

18        A.    For we sold a car.

19        Q.    Okay.  And there was only one lawsuit against

20   you?

21        A.    Yeah.

22        Q.    Okay.  And when was this lawsuit?

23        A.    Like, a year and-a-half ago.

24        Q.    And where was this lawsuit filed?

25        A.    I don't remember.
```

1    Q.    State court or federal court?

2    A.    State.

3    Q.    And it's only one lawsuit?

4    A.    That I remember.

5    Q.    Okay.

6         MR. PERALTA:  I'm also -- I'm also objecting

7    because it goes against the parties' agreement as

8    to the scope of the question.

9         MR. FEYGIN:  Well, he already answered, but

10   we can get to that later.

11   BY MR. FEYGIN:

12   Q.    With respect to the preparation, did anybody

13   help you prepare for today's deposition?

14   A.    Excuse me?

15   Q.    Did anybody help you prepare for today's

16   deposition?

17   A.    What do you mean?

18   Q.    How did you prepare for today's deposition?

19   A.    I don't prepare for nothing.  I'm here to

20   answer questions about a car that I bought from Manheim

21   and Manheim made a mistake, and you took -- I already

22   told you this a hundred times.

23   Q.    Well, this is the first time we're speaking.

24   A.    It's -- it's a -- it's a very simple

25   situation that you guys are making it look big, but

```
 1    it's a -- it's a simple mistake from the auction.
 2         Q.   Sure.  We'll get to that.
 3         A.   This -- this doesn't need any preparation.
 4    It's -- it's -- it's -- it's a simple mistake from the
 5    auction.
 6         Q.   Okay.  So --
 7         A.   Anybody can make a mistake.
 8         Q.   So, your -- your position is that you did not
 9    prepare for today's deposition?
10         A.   No.  I have -- I -- I've been telling you
11    guys what happened since Day 1, and --
12              MR. FEYGIN:  I'm going to pull up what is
13         going to be Plaintiff's Exhibit A, which is the
14         Claimant's deposition notice.
15              (Plaintiff Exhibit A was marked for
16         identification.)
17              (Whereupon, document(s) shared on the
18         screen.)
19    BY MR. FEYGIN:
20         Q.   Have you seen this before?
21         A.   Yeah, but I didn't read it.
22         Q.   Okay.  What did you do when you saw it?
23         A.   Nothing.
24         Q.   Okay.  So, as you sit here today, you are not
25    prepared to testify on any of matters of examination?
```

```
 1          A.    I know exactly --
 2                MR. PERALTA:  Objection; leading.
 3                THE WITNESS:  I know exactly what happened
 4          with this -- with this particular truck, so any
 5          questions you have, I can answer them.
 6                MR. FEYGIN:  Okay.  But --
 7                THE WITNESS:  I don't need -- I don't need to
 8          read that.
 9   BY MR. FEYGIN:
10          Q.    Okay.  So, you -- you didn't read this,
11   you're not prepared to answer these questions, are you?
12                MR. PERALTA:  Objection; leading.
13                THE WITNESS:  I -- I am prepared to answer
14          any question, but I don't need to read nothing
15          because I know exactly what happened, so you can
16          ask me what --
17                MR. PERALTA:  Frank, if you could -- Frank,
18          if you could wait at least a second so I can get my
19          objection in.
20                Objection; leading and objection; mis- --
21          mis -- mischaracterizes the -- the testimony of the
22          witness.
23                MR. FEYGIN:  I think the testimony is
24          sufficiently clear.
25                MR. PERALTA:  No, it -- no.  No, it's not.
```

GABRIEL Case 8:23-cv-00709-WFJ-SPF Document 102-1    Filed 01/02/25    Page 16 of 174 23/2024
CR of FS Inve... DE ...n Strusberg)
Page ID 1831
15

```
 1                  MR. FEYGIN:  Okay.

 2                  MR. PERALTA:  And if you want to argue with

 3         me during your -- your depo, we can do that, but I

 4         suggest you use your time wisely, Joshua.

 5                  MR. FEYGIN:  Noted, Jose.  Thank you.

 6    BY MR. FEYGIN:

 7         Q.   So, Franklyn, to -- to recap, did you review

 8    this document or did you not review this document?

 9         A.   No, I did not.

10         Q.   Thank you.  Did you bring any documents with

11    you today?

12         A.   I have my computer in front of me.  I can

13    provide whatever you need.

14         Q.   What documents do you have up on your

15    computer?

16         A.   I can click on the -- on the Manheim site,

17    and I can see the truck when we bought it.

18         Q.   Aside from that, do you have any other

19    documents?

20         A.   No.

21         Q.   Okay.  Regarding the dealership, is it a

22    licensed car dealer under Florida law?

23         A.   Correct.

24         Q.   Since when?

25         A.   Like, four years.
```

```
 1        Q.   And prior to those four years, was the
 2   dealership operating without a license?
 3        A.   Do what?  No.
 4        Q.   You mentioned that you've been employed at
 5   the dealership for twelve years.
 6             Do you --
 7        A.   No, from FS Investments, which is my
 8   corporation.  Powerhouse is a d/b/a from FS
 9   Investments.  FS Investments has been open for, like
10   fourteen years.
11        Q.   Okay.  So, the dealership has only been in
12   operation for four years of those fourteen, correct?
13        A.   Almost five years.
14        Q.   Okay.  And you have been licensed for
15   approximately five years, then?
16        A.   Correct.
17        Q.   How many locations does the dealership have?
18        A.   One location.
19        Q.   How many employees?
20        A.   I don't know.  Like, fifteen.
21        Q.   Do you own any other dealerships?
22        A.   No.
23        Q.   How many cars does Powerhouse sell per month?
24        A.   Like, thirty.
25        Q.   And approximately how many per year?
```

GABRIEL ECHEVERRY (Corporate Rep. 30(b)6 FS Investment of America)   Case 8:23-cv-00709-WFJ-SPF   Document 102-1   Filed 01/02/25   Page 18 of 174   09/23/2024

CR of FS Investments of America (John Strusberg)

Page ID 1833

17

```
 1          A.    360.

 2          Q.    How many cars would you say the dealership

 3   has sold since it opened its door?

 4          A.    Multiply three-sixty times four.

 5          Q.    Do you agree the dealership has the

 6   responsibility to know the laws that govern its

 7   business?

 8          A.    Of course.

 9          Q.    As the corporate representative for the

10   dealership today, are you familiar with the laws that

11   the dealership must abide by?

12          A.    Of course.

13          Q.    Are truthful and accurate mileage disclosures

14   important in the used car industry?

15          A.    Very important.

16          Q.    And why is that?

17          A.    Because it's important.

18          Q.    Okay.  What is the reason for being

19   important?

20          A.    Do what?

21          Q.    Why is it important?  Why does the dealership

22   believe truthful and accurate mileage disclosures are

23   important?

24          A.    It has to go -- when you get your license,

25   you have to -- the DMV gives you paperwork.  And you
```

```
 1   have to provide every customer with the -- you know,
 2   with the paperwork, so one of the paperworks that are
 3   very important are the -- are the mileage disclosure.
 4   So, you have to -- whatever it says on the car, you
 5   have to put it on the mileage disclosure.
 6       Q.   And would that be because an odometer reading
 7   impacts the value of the vehicle?
 8       A.   The whole legal -- legal situation of the
 9   vehicle, when the car is -- you know, it's not a TMU,
10   it's not revealed, it's clean, of course it gives value
11   to the car.
12       Q.   Does the dealership believe it is important
13   that the Certificate of Title reflect truthful and
14   accurate disclosures of a vehicle's mileage history?
15       A.   Of course, and I do that on every car sold.
16       Q.   And would you agree that an inaccurate
17   odometer reading would negatively impact the vehicle's
18   value?
19            MR. PERALTA:  Objection; leading.
20            THE WITNESS:  Yes.
21   BY MR. FEYGIN:
22       Q.   Could a vehicle with an inaccurate odometer
23   be worth less than the same exact vehicle with an
24   accurate odometer?
25       A.   Yes.
```

```
 1              MR. PERALTA:  Objection; speculative.
 2    BY MR. FEYGIN:
 3         Q.   In your experience, would a vehicle with
 4    higher mileage need more maintenance than the
 5    lower-mileage vehicle?
 6         A.   It's relative.  I get cars with low mileage
 7    that are being rented -- rentals destroyed, and I get
 8    cars with really high mileage that are one owner in
 9    immaculate condition.
10         Q.   Is it important to Powerhouse that it be
11    considered as an honest company?
12         A.   Of course.  I'm the one here
13    twenty-four/seven.
14         Q.   And why is it important?
15         A.   My reputation is everything.  My reputation
16    is -- you know, is why I keep selling so much, you
17    know, the cars.  Customers keep coming back because
18    they trust us.
19         Q.   Is it important to Powerhouse that consumers
20    have trust in the dealership?
21         A.   100 percent.
22         Q.   So, in addition to selling vehicles, does the
23    dealership originate financing agreements for the
24    vehicles it sells?
25         A.   I sell, and I have lenders.  When the
```

 1   customer wants to finance, we use the lenders.

 2       Q.    Does the dealership have an in-house

 3   financing --

 4       A.    No.

 5       Q.    -- program?  No buy here/pay here, then?

 6       A.    No buy here/pay here.

 7       Q.    So, what did the dealership have to do to

 8   become licensed under Florida law to be a dealer?

 9       A.    To have an office, a printer, a computer,

10   insurance and a bond.

11       Q.    And does the DMV require that the dealership

12   take ongoing training courses?

13       A.    Yes.

14       Q.    Okay.  And has the dealership taken these

15   courses?

16       A.    Of course.

17       Q.    When was the last one?

18       A.    Five years ago.

19       Q.    Do you recall the topics that were covered

20   during that training session?

21       A.    Just to teach you how to print the paperwork.

22       Q.    And who do you use as the course provider?

23       A.    DLMRB.

24       Q.    And did you personally attend that course or

25   did somebody else from the dealership attend the

GABRIEL CASAUS, an individual, et al. Case 8:23-cv-00709-WFJ-SPF Document 102-1    Filed 01/02/25    Page 22 of 174 23/2024

CR of FS Investments (John Strusberg)

PageID 1837

21

```
 1    course?

 2         A.    No, I did.  The license is in my name.

 3         Q.    So, do you only sell used cars?

 4         A.    Only used cars.

 5         Q.    Okay.  And where do you get these used cars

 6    from?

 7         A.    I only buy from Manheim, the auction.  It's

 8    the biggest auction in the United States.

 9         Q.    You don't buy any vehicles that come in on

10    trade?

11         A.    I get a lot of trades.

12         Q.    So, in addition to Manheim, you also have

13    trade-in vehicles on your lot?

14         A.    Trade-in vehicles, yes.

15         Q.    So, explain to me how do you select used cars

16    for your inventory?

17         A.    I'm the buyer, so I dig very, very into it

18    when I buy them, and I look at the comments.  Every

19    car, when you buy it in the auction, they give you a

20    Condition Report, and they give you comments from the

21    seller, so when the car is revealed title, they put on

22    the comments revealed title.  They put a CR.  They tell

23    you the whole story about the car.

24         Q.    And what type of used cars do you buy?

25         A.    Pickup trucks and commercial vans.
```

 1       Q.    And why is that?

 2       A.    Because of the customers that my target is

 3   the people that has -- own businesses.

 4       Q.    Do you ever rely on CARFAX™ or AutoCheck

 5   reports when you decide to purchase a vehicle?

 6       A.    No.

 7       Q.    Do you inspect the vehicles at the time of

 8   the purchase?

 9       A.    When I buy them from the auction, the auction

10   inspects the vehicles for me, and if the car passes the

11   inspection, then I bring it to my dealer.

12       Q.    So, explain to me what happens when you get a

13   car from the auction, let's say, and you first get it

14   onto your lot.  What happens?

15       A.    I drive it myself.  I take it to the car

16   wash.  I put it on the spot to take pictures, and I

17   advise it everywhere.  I change the oil, make sure the

18   car is good, and I park it in my lot for sale.

19       Q.    Okay.  So, you do -- you personally do a test

20   drive?

21       A.    I do, yes, most of the times.

22       Q.    Do you personally wash the car?

23       A.    No.  I have a lot of people that wash them.

24       Q.    And do you personally take pictures of the

25   car?

 1          A.    I personally take pictures of the car, yes.

 2          Q.    And what about changing the oil?

 3          A.    I take it to Jiffy Lube.

 4          Q.    And is this every vehicle that comes in?

 5          A.    Most of them, because some of them, they come

 6     with a sticker with a new oil, so I don't change the

 7     oil on those, but most of them, I change the oil on

 8     Jiffy Lube.

 9          Q.    Do you ever look at the title before you

10     place the vehicle up for sale?

11          A.    Never.

12          Q.    So, let's discuss inspecting these vehicles.

13                Do you ever inspect them before you put them

14     for sale?

15          A.    The auction does.  The auction inspects the

16     whole car legally and technically, and if the car

17     passes the inspection, then I have a company that is

18     called Central Dispatch.  And I post the car, and a

19     truck driver picks it up because I buy nationwide, and

20     they bring it to my dealer.

21          Q.    Aside from the auction inspection, does the

22     dealership perform its own inspection of a vehicle

23     before it goes up for sale?

24          A.    I drive it.

25                MR. PERALTA:  Objection.

GABRIEL ... Case 8:23-cv-00709-WFJ-SPF Document 102-1    Filed 01/02/25    Page 25 of 174 ...23/2024
CR of FS Inve... ...n Strusberg)
PageID 1840
24

```
1                THE WITNESS:  I drive it.

2                MR. PERALTA:  Objection; asked and answered.

3                MR. FEYGIN:  Please answer.

4                THE WITNESS:  Yes.  I drive them to --

5    BY MR. FEYGIN:

6         Q.   Aside from driving the vehicle, what else do

7    you do to inspect it?

8         A.   That's it.  That's it.

9                MR. PERALTA:  Objection; asked and answered.

10        Yeah.

11               THE WITNESS:  If I feel any -- any funny,

12          maybe like the transmission is leaking or anything,

13          I file a claim, and then I can return the car to

14          the auction.

15   BY MR. FEYGIN:

16        Q.   Do you ever recondition vehicles aside from

17   the oil changes?

18        A.   If the car needs paint, yes.

19        Q.   Anything else?

20        A.   Tires, whatever the car -- maybe a

21   windshield.  Anything that the car needs, I like to

22   make them, you know, good so I can sell them.

23        Q.   Do you have an account with CARFAX™?

24        A.   No.

25        Q.   Do you have an account with AutoCheck?
```

    1          A.    No.

    2          Q.    Do you have an account with any other entity

    3     that would provide vehicle history reports aside from

    4     the Manheim Condition Report?

    5          A.    No.

    6          Q.    So, who determines the price that a used

    7     vehicle is sold for at the dealership?

    8          A.    Me.

    9          Q.    Okay.  And what -- what factors play into

   10     that analysis?

   11          A.    Depending on the car.  What the determines

   12     the car is the -- the trim.  If it's a Laramie, if

   13     it's -- if it's lifted, if it has wheels and tires, you

   14     know, like big ones, that determines the price of the

   15     car.

   16          Q.    Do you have a mechanic on your staff?

   17          A.    No.

   18          Q.    Do you have a vehicle lift on your premises?

   19          A.    No.

   20          Q.    When you're evaluating the price of a vehicle

   21     that you're planning on selling, is mileage a factor

   22     that goes into the evaluation?

   23          A.    No.

   24          Q.    So, mileage is irrelevant?

   25          A.    Irrelevant, depends on the condition.  Like I

```
 1   said, if I get a rental that has been low mileage but
 2   the car is destroyed or you get a car that is one owner
 3   with high mileage but it's in perfect condition.
 4        Q.   So, let's say you do you have a vehicle that
 5   is in good condition.
 6             Would the mileage play any part in
 7   determining the vehicle's value?
 8             MR. PERALTA:  Asked and answered; objection.
 9             Go ahead, Frank.
10             MR. FEYGIN:  You can answer the question.
11             THE WITNESS:  No.
12   BY MR. FEYGIN:
13        Q.   All right.  So, walk me through a typical car
14   transaction.  A client walks through the door, and what
15   happens?
16             MR. PERALTA:  Objection; narrative.
17             Go ahead, Frank.
18             MR. FEYGIN:  What was the objection?
19             MR. PERALTA:  You're asking for a narrative.
20        You're not asking for a specific answer.
21             MR. FEYGIN:  Okay.
22   BY MR. FEYGIN:
23        Q.   When the client walks in the door, who is the
24   first person that greets the client?
25        A.   The salesperson.
```

GABRIEL Case 8:23-cv-00709-WFJ-SPF Document 102-1 Filed 01/02/25 Page 28 of 174 23/2024
CR of FS Inves... (...n Strusberg)
PageID 1843
27

1    Q.   And once the salesperson greets the client,

2  what do they do?

3    A.   They listen to what the customer wants.

4    Q.   And once they determine what the customer

5  wants, what do they do?

6    A.   They show -- they show them cars.

7    Q.   And once they show them the car and they make

8  a decision on which car they want to purchase, what

9  happens?

10    A.   They do a test drive.

11    Q.   After the test drive, what happens?

12    A.   They come into the office.  They sit.  The

13  salesman takes the license, makes a copy.  Depending on

14  if they want to pay cash or finance, if it's financed,

15  they have to do a credit application.

16    Q.   So, once they take the driver's license and

17  complete a credit application, then what happens?

18    A.   Then the finance manager submits the deal to

19  the bank to get them approved.

20    Q.   And does the approval usually happen on the

21  spot?

22    A.   In one second.

23    Q.   And after that one second occurs, what

24  happens?

25    A.   It's under the lender's conditions, so they

```
 1    approve you under these conditions, and the conditions

 2    are proof of income, proof of residence, full coverage

 3    insurance.  If they have everything, then they sign the

 4    contract and they leave with the car.

 5         Q.    Okay.

 6         A.    They have to give a down payment, get a

 7    receipt, full insurance, full coverage with all the

 8    information, and they leave.

 9         Q.    How are the contracts presented to a consumer

10    for signing?

11         A.    On the computer.

12         Q.    Is it electronic?

13         A.    Electronic, and some of the -- the DMV

14    paperwork are handwritten.

15         Q.    And for the electronically-signed documents,

16    how are they presented to the consumer, is it an iPad

17    or is it on a computer screen?

18         A.    It's on a -- on a computer with a mouse.

19         Q.    And is that the same computer that the

20    finance manager or the sales agent is sitting at or is

21    it a completely separate computer dedicated for --

22         A.    It's the one with the finance manager.

23         Q.    And how does the consumer see the screen, is

24    it turned around to them?

25         A.    Of course.  They have to see it, and they
```

```
 1   have to click on -- it's like any contract.  You have
 2   to click on -- on the -- on the box.
 3        Q.   And does the signature get applied to every
 4   everywhere with one click or does the consumer have to
 5   go --
 6        A.   Just one click.
 7        Q.   -- click by click?
 8        A.   No, just one click.
 9             THE COURT REPORTER:  Mr. -- Mr. Strusberg, if
10        you could just wait until he finishes his complete
11        question, that way you're not talking over each
12        other, I would appreciate it.  Thank you.
13   BY MR. FEYGIN:
14        Q.   So, what would be the first document the
15   consumer sees when they sit down to start signing the
16   paperwork?
17        A.   I don't know.
18        Q.   Who would know?
19        A.   The finance manager.
20        Q.   And what are the names of your finance
21   managers?
22        A.   Heron Guzman and Angel Castillo.
23        Q.   And were these gentlemen employed by
24   Powerhouse at the time of my client's transaction?
25        A.   Angel was.  Alex Reyes is no longer with me.
```

```
 1        Q.   And why is that?

 2        A.   There's no reason.

 3        Q.   I'm sorry.  You said Guzman is no longer with

 4   you?

 5        A.   Alex Reyes.  He was the one who sold the car

 6   to your --

 7        Q.   And when did he leave the dealership?

 8        A.   Like, a month ago.

 9        Q.   And why did he leave the dealership?

10        A.   There's no reason.  He -- he tried --

11        Q.   Are you --

12        A.   -- to get better opportunities.

13        Q.   Okay.  So, once the deal is signed, then what

14   happens?

15        A.   They go to the lady with the tags to do the

16   transfer or the new tag to release the car under the

17   person's name.

18        Q.   Okay.  And once they get the tag done, what's

19   next?

20        A.   They put it on the car, and the customer

21   leaves.  We take a picture, and we get a good review.

22        Q.   What is the dealership management software

23   used by the dealership?

24        A.   DealerCenter.

25        Q.   And was that the same software you used
```

 1   during the time of my client's transaction?

 2         A.    Correct.

 3         Q.    Have you ever changed your DMS software?

 4         A.    No.  I have it since Day 1.

 5         Q.    So, what is Powerhouse's relation to Auto

 6   Deal Corp.?

 7         A.    The owner of Auto Deal is my friend.  When I

 8   first open, he put me cars on consignment.  I buy cars

 9   with his -- with his money pretty much.  He support me,

10   so I buy cars with his license.  And I bring it to my

11   dealer, and pretty much he's wholesaling the car to me.

12         Q.    Have you ever earned a salary from Auto Deal

13   Corp.?

14         A.    No.  It's straight commission.

15         Q.    Did you have authority to bind Auto Deal

16   Corp. to purchase the vehicle from McCombs Ford?

17         A.    Yes.  I was a buyer for Auto Deal Corp.

18         Q.    And how did you find the car that my client

19   purchased?

20         A.    Like I find all the cars.  In Manheim.

21         Q.    And what were you searching for when you came

22   across the car?

23         A.    Lifted trucks.

24               MR. FEYGIN:  I'm going to pull up what's

25         going to be Plaintiff's B.  It's going to be the

Case 8:23-cv-00709-WFJ-SPF    Document 102-1    Filed 01/02/25    Page 33 of 174
GABRIEL ... AMENDED ... 23/2024
CR of FS Inve... (...n Strusberg)
PageID 1848
32

```
 1            vehicle information sheet that we received in

 2            discovery.  This is FSIA 000014.

 3                 (Whereupon, document(s) shared on the

 4            screen.)

 5   BY MR. FEYGIN:

 6       Q.   Mr. Strusberg, does this look familiar to

 7   you?

 8       A.   Are you showing me something?

 9       Q.   Yes.

10       A.   I can't see the screen.  I'm sorry.  What do

11   I do?

12            MR. PERALTA:  Joshua, may I suggest that you

13       stop mirroring and mirror again, and I think that

14       will present the full screen to him one more time.

15            THE WITNESS:  No, because somebody called me,

16       and I put it on do not disturb.

17            MR. PERALTA:  Yeah.  Yeah.

18            THE WITNESS:  I don't know why I'm getting

19       the call if it's under do not disturb.

20            MR. PERALTA:  What about -- what about now,

21       Frank?

22            THE WITNESS:  No, I cannot see it.

23            THE COURT REPORTER:  Is you view on gallery

24       view?

25            THE WITNESS:  Now it is.  I'm sorry for my
```

GABRIEL AMAYA-JERKINS vs WFJ - SPF AMENITY CR of FS Investment (John Strusberg)
Case 8:23-cv-00709-WFJ-SPF   Document 102-1   Filed 01/02/25   Page 34 of 174   /23/2024
PageID 1849
33

```
 1              ignorance.
 2                      MR. PERALTA:  That's fine.  Make Zoom cover
 3              your whole screen, so not on -- what do you call
 4              it.  Let me see.
 5                      THE WITNESS:  Let me see.
 6                      MR. PERALTA:  Press maximize, the square.
 7                      THE WITNESS:  There we go.
 8                      MR. PERALTA:  Can you see it now?
 9                      THE WITNESS:  Yes.
10                      MR. PERALTA:  Okay.
11      BY MR. FEYGIN:
12              Q.   Okay.  So, does this document look familiar
13      to you?
14              A.   Of course.  That's the -- that's the Bill of
15      Sale from Manheim.
16              Q.   So, up here in the upper left-hand corner --
17              A.   How do I make it big?
18              Q.   (Complies with request.)
19              A.   Jesus Christ.
20                      MR. PERALTA:  So, if you -- if you click on
21              the right under the X, it says view, you can put
22              standard, actually, will make the --
23                      THE WITNESS:  I see, like four scares up on
24              the left corner.
25                      MR. PERALTA:  Okay.
```

```
 1              THE WITNESS:  And I click on each of them,
 2         and they it just shows you guys, and this one
 3         doesn't show.
 4              MR. PERALTA:  But do you see the document?
 5              THE WITNESS:  I see it, but it's super small.
 6         Like, on -- okay.  I can see it, yeah.  Yeah, I can
 7         see it.
 8    BY MR. FEYGIN:
 9         Q.   So, what I'm looking at is the upper
10    left-hand corner of this document.
11              Does what does CR stand for over here
12    (indicating)?
13         A.   Condition Report.
14         Q.   And in your experience, what is the purpose
15    of a Condition Report score?
16         A.   Two and up is -- is a good car.  It's a good
17    used car, and two and under is -- is a car, you know,
18    that is beat up with maybe scratches or -- it's very
19    relative.
20         Q.   And what is the grading scale, one through
21    ten, one through twenty?
22         A.   No.  One to five.
23         Q.   So, if I understood you correctly, a lower
24    score indicates that the vehicle is in bad condition?
25         A.   Yes.
```

 1              MR. PERALTA:  Objection; mischaracterizes his

 2         testimony.

 3              THE WITNESS:  Two and up is a -- is a good --

 4         like, 2.8 to me is a good car.

 5    BY MR. FEYGIN:

 6         Q.   And what was the condition of this vehicle?

 7         A.   He's -- he's been driving it since then, so

 8    it's a good car.

 9         Q.   What was the Condition Report grade for the

10    vehicle when you bought it?

11         A.   Do what?  2.8.  I'm looking at it.  2.8.  It

12    says there, 2.8.

13         Q.   And when did the dealership, meaning Auto

14    Deal, purchase the vehicle from McCombs Ford?

15         A.   April 11th.  It says there April 11th.

16         Q.   And remind me, was this during the pandemic?

17         A.   I don't remember.  I'm sorry.

18         Q.   Can you describe the car market during the

19    pandemic in general based upon your experience?

20         A.   It was good.

21         Q.   In what sense?

22         A.   Every dealer closed because they give --

23    like, they didn't make you pay interest for, like six

24    months, so a lot of dealers closed, and we were open

25    helping the community.  Everybody was working.

```
 1   Everybody was sick at home, and we were working.
 2        Q.   Were wholesale prices on the used cars higher
 3   than normal?
 4        A.   No.  Prices were almost the same.
 5        Q.   And were retail prices on used cars higher
 6   than normal?
 7        A.   Kind of.
 8        Q.   In what sense?
 9        A.   All the -- the factories, they closed, the
10   new cars, so used cars were selling more than new cars.
11        Q.   So, when you purchased this vehicle, what
12   representations did McCombs Ford tell you about the
13   vehicle?
14        A.   No, I never get to speak with the seller.  I
15   buy the car -- the car through Manheim, and I bought it
16   based on the information that I saw.
17        Q.   So, did you complete the sale or purchase of
18   this vehicle directly with the seller or --
19        A.   No, never.  Never.  I -- I buy the car
20   through Manheim.  Manheim was pretty much the seller.
21   The auction is -- is, like the middle person.  You have
22   the seller and the buyer, and the auction is the one
23   who conducts the whole -- the whole process.
24             Like, for example, in this particular car, I
25   called them.  They made a mistake.  When I called them
```

GABRIEL CASTILLO/JAE MCDONALD (via Zoom transcription by Sharon Strusberg)
CR of FS Investment Finance LLC 10/23/2024
Case 8:23-cv-00709-WFJ-SPF   Document 102-1   Filed 01/02/25   Page 38 of 174   PageID 1853
37

 1    about the discrepancy in the mileage, I called Manheim

 2    because they are responsible for this.  Because if the

 3    car, they -- somebody get -- I mean, I always buy cars,

 4    let's say revealed.  They disclose the condition and

 5    the situation of the car, so on this -- on this

 6    particular car, I called Manheim.  They said that Ford,

 7    the seller, made a mistake.

 8         Q.   And what did Manheim do for you in this

 9    circumstance?

10         A.   No.  They told me that they were going to dig

11    into it, they were going to call the franchise who sold

12    it.  And they called me back and they say "yes, we

13    called the franchise," and they -- and Ford made a

14    mistake on the mileage.  Because if the car was a TMU,

15    then Manheim needs to disclose it to me TMU, and then I

16    know, and then when I -- when I sell the vehicle, I

17    have to sell it TMU.

18              I cannot sell a car TMU with original

19    mileage.  I can't.  That's why the auction is supposed

20    to inspect that before I do, and they -- they never put

21    no comments nowhere.  They sold me the car with a

22    131,000 miles, and the vehicle, you saw everywhere, was

23    131,000 miles.

24         Q.   What did -- what did Manheim do to compensate

25    you for this mistake?

GABRIEL Case 8:23-cv-00709-WFJ-SPF Document 102-1    Filed 01/02/25    Page 39 of 174 23/2024
CR of FS Inve... (...n Strusberg)
PageID 1854
38

 1        A.    Nothing yet.

 2        Q.    Why do you say "yet"?

 3        A.    They -- they asked me to bring the car back.

 4   They asked me if I can bring -- if I can return the car

 5   and they give me the money back.

 6        Q.    When did this occur?

 7        A.    I don't know.  When you guys first -- when I

 8   first find out about -- about this.

 9        Q.    And what about McCombs Ford, have they done

10   anything to correct this mistake?

11        A.    No.

12        Q.    So, getting back to the actual purchase of

13   the vehicle, did you pick it up or was it delivered to

14   you?

15        A.    It was delivered to us have.

16              (Whereupon, Counsel Silverstein enters Zoom

17        deposition.)

18   BY MR. FEYGIN:

19        Q.    And how was it delivered?

20        A.    On a tow truck.

21        Q.    Did you ever look at any sort of vehicle

22   history report before you bought this particular

23   vehicle aside from the Condition Report?

24        A.    Just the Condition Report.

25              MR. PERALTA:  Objection; asked -- asked and

| | |
|---|---|
| 1 | answered. |
| 2 | THE WITNESS:  No. |
| 3 | BY MR. FEYGIN: |
| 4 | Q.   Did you inspect the vehicle after you bought |
| 5 | it? |
| 6 | A.   I drove it, and I took it for pictures. |
| 7 | Q.   Aside from that, did you put it on a lift? |
| 8 | A.   No. |
| 9 | Q.   Did you inspect the engine? |
| 10 | A.   While I drive it, I feel it. |
| 11 | Q.   Did you inspect the brakes? |
| 12 | A.   Yeah.  When I drive it, I inspect the whole |
| 13 | car.  Like, when you drive it, you feel the car, and |
| 14 | you know if something's wrong or something's good. |
| 15 | Q.   So, the inspection itself was strictly |
| 16 | driving the vehicle, then? |
| 17 | A.   Correct. |
| 18 | Q.   Were the seats torn in the vehicle? |
| 19 | A.   I don't remember. |
| 20 | Q.   Were the seats worn? |
| 21 | A.   It's a 2012, but I don't remember.  Most of |
| 22 | the cars, they come with -- you know, a clean 2.8, it's |
| 23 | a clean car, but it's been too -- too long. |
| 24 | Q.   Was the steering wheel worn? |
| 25 | A.   I don't remember.  I'm sorry. |

 1        Q.    Was the bed scratched?

 2        A.    I don't remember.

 3        Q.    Was the bed dented?

 4        A.    I don't know.

 5        Q.    Were there signs of rust in the bed?

 6        A.    I don't remember.

 7        Q.    Were there dents on the exterior?

 8        A.    I don't remember.  I'm sorry.

 9        Q.    Were either of the turn signals chipped or

10   cracked?

11        A.    I don't remember.

12        Q.    Were either of the headlights chipped or

13   cracked?

14        A.    I don't remember.  I'm sorry.

15        Q.    Was there evidence of prior paint?

16        A.    No.

17        Q.    Was the brake pedal worn?

18        A.    I don't remember.

19        Q.    Was the gas pedal worn?

20        A.    I don't remember.  I'm sorry.

21        Q.    Was there any sludge in the engine?

22        A.    Not that I know of.

23        Q.    How much did you pay for the vehicle?

24        A.    9,000 and change.

25        Q.    And is that reflected in this invoice?  Is

GABRIEL CASAGRANDE v. POWERHOUSE AUTOMOTIVE, et al.
Case 8:23-cv-00709-WFJ-SPF   Document 102-1   Filed 01/02/25   Page 42 of 174
CR of FS Investigation (Jason Strusberg)                              12/23/2024
PageID 1857
41

```
 1    that a truthful and accurate --

 2         A.    Correct.

 3         Q.    -- representation of --

 4         A.    Correct.

 5         Q.    -- how much you paid?

 6         A.    Yes.  Correct.

 7         Q.    And did Powerhouse tender this money or did

 8    Auto Deal Corp. tender the money?

 9         A.    No.  Auto Deal paid Manheim.

10         Q.    And where did Auto Deal get the funds for the

11    payment?

12         A.    From his bank account.

13         Q.    How much did you pay Auto Deal Corp. for the

14    vehicle?

15         A.    The price of the car, plus the transport,

16    plus I -- I was giving him 25 percent of the profits.

17         Q.    Did you receive a Certificate of Title for

18    the vehicle when you bought it?

19         A.    No.

20               MR. FEYGIN:  Okay.  I'm going to pull up

21         what's going to be Plaintiff's Exhibit C.

22               (Plaintiff Exhibit C was marked for

23         identification.)

24               (Whereupon, document(s) shared on the

25         screen.)
```

 1    BY MR. FEYGIN:

 2         Q.    Can you see this?

 3         A.    What's that?  Yeah, I see it now.

 4         Q.    Does it look familiar?

 5         A.    It's a title.

 6         Q.    And this is FSIA 00019 and FSIA 00020, do we

 7    agree?

 8         A.    What is these numbers?

 9         Q.    It's Bates stamps.  It's how you identify a

10    document that was produced in discovery.  Your

11    attorneys produced it with these numbers stamped on

12    bottom (indicating.)

13         A.    Okay.

14         Q.    I just want to make sure we're looking at the

15    same thing.

16         A.    Yeah.  Yeah.  Okay.

17         Q.    Okay.  Is this a true and correct copy of the

18    Certificate of Title Auto Deal Corp. received when it

19    purchased the vehicle?

20              MR. PERALTA:  Objection; no -- no foundation

21         and facts not in evidence, speculative, et cetera.

22    BY MR. FEYGIN:

23         Q.    Is this a copy of the Certificate of Title

24    you produced in discovery?

25         A.    That's not a Certificate of Title.  That's --

```
 1  that's a title.
 2       Q.   Okay.  Is this the title that you produced in
 3  discovery?
 4       A.   When I sold the car, after the customer took
 5  possession of the car and left, I got the title in my
 6  hands, maybe like ten days later.
 7       Q.   So, let's unpack that.
 8       A.   Excuse me?
 9       Q.   Let's -- let's go into that a little bit.
10       A.   Do what?
11       Q.   Hold on one second, please.
12            How did you -- let's take a step back here.
13            How did you get this particular title in this
14  particular format?  Where did this come from?
15       A.   Auto Deal Corp.
16       Q.   Do you maintain this in your own business
17  records or did Auto Deal Corp. provide it to you?
18       A.   Auto Deal Corp. --
19            MR. PERALTA:  Objection.
20            THE WITNESS:  -- provide it to me.
21            MR. PERALTA:  Objection; asked and answered
22       and leading as well.
23  BY MR. FEYGIN:
24       Q.   When did Auto Deal Corp. get this title?
25       A.   It tells you there in -- one second.  I can
```

```
 1    tell you right now.  One second.  It shows the ship

 2    date and everything.

 3         Q.   What are you looking at?

 4         A.   When the auction send the title to Auto Deal.

 5         Q.   And where are you finding that information?

 6         A.   In Manheim.  My account with Manheim.  What

 7    is the last six of the VIN?

 8         Q.   I'm sorry?

 9         A.   What is the last six of the VIN?

10         Q.   A12718.

11         A.   So, it says there they shipped the title

12    to -- to Auto Deal Corp. on April 28, 2020 by USPS.

13    So, I bought it April 11th, and they sent the title

14    April 28.

15         Q.   And do you happen to know when Auto Deal

16    Corp. actually received the title?

17         A.   They shipped -- I'm assuming a day later, two

18    days later on April 30th.

19         Q.   Do you have the ability to determine the

20    exact date Auto Deal Corp. received --

21         A.   No.

22         Q.   -- the title?

23         A.   No.

24         Q.   So, looking at the face of the title, what is

25    the disclosed odometer reading (indicating)?
```

 1          A.    201150.

 2          Q.    And underneath that, what does the title

 3   state regarding the mileage?

 4          A.    The actual mileage.

 5          Q.    I'm going to move on to my client's

 6   transaction.

 7                Were you personally involved in the sale of

 8   the vehicle to my client?

 9          A.    No.

10          Q.    Who was?

11          A.    Alex Reyes.

12          Q.    And he's no longer employed by the

13   dealership, correct?

14          A.    Correct.

15          Q.    Who else was involved in the transaction?

16          A.    Might be a salesman, but I don't know which

17   salesman it was.

18          Q.    Do you have a way to figure it out?

19          A.    The only way is the -- the -- the person who

20   bought the car, he can tell me the name of the person,

21   and then I know exactly who it was.

22          Q.    Do you not have commissions for sales?

23          A.    I do.

24          Q.    Do you keep track of the commissions you pay?

25          A.    No.

 1          Q.   Do you keep track in any other way of who is

 2    involved in a sale?

 3          A.   No.  I got to see the deal jacket.  Maybe on

 4    top of the deal jacket it states the name of the

 5    person.

 6          Q.   Do you have the deal jacket with you?

 7          A.   No.

 8          Q.   Where is the deal jacket?

 9          A.   It's on a file cabinet.

10          Q.   And is that file cabinet in your office?

11          A.   No.

12          Q.   Where is the file cabinet located?

13          A.   It's in a container.  I put all the file

14    cabinets.

15          Q.   And where is this container located?

16          A.   In the dealership.

17          Q.   Did you speak with Alex Reyes to prepare for

18    today?

19          A.   No.

20          Q.   So, you're unable to testify as to what

21    occurred with my client during the transaction?

22               MR. PERALTA:  Objection; leading,

23          speculative.

24               THE WITNESS:  Correct.

25               MR. PERALTA:  And stating facts not in

GABRIEL CASALE, et al. v. SWIFT FINANCIAL, et al. 09/23/2024
Case 8:23-cv-00709-WFJ-SPF   Document 102-1   Filed 01/02/25   Page 48 of 174
CR of FS Investor (Johan Strusberg)   PageID 1863
47

 1      evidence.

 2  BY MR. FEYGIN:

 3      Q.   Are you able to testify what occurred during

 4  the transaction with my client?

 5      A.   Yes.

 6      Q.   How did he find the dealership?

 7      A.   We post everywhere; Marketplace, OfferUp,

 8  Craig's List.

 9      Q.   Where was this vehicle advertised?

10      A.   Everywhere; Craig's List, Marketplace, in my

11  web page, Cars for Sale.

12      Q.   Are you able to access any of the

13  advertisements for this vehicle?

14      A.   Yeah.

15      Q.   Are you able to provide them to me?

16      A.   Of course.

17      Q.   Do you agree to provide the advertisements to

18  me?

19      A.   If I find it.  Can I have the last six again?

20  Let me see if I can find it right now.

21      Q.   A12718.

22      A.   I found it.

23      Q.   Where is -- what -- what are you looking at?

24      A.   I'm looking at the web page.  I had it

25  advertised for twenty-one nine.

```
 1        Q.   And you'll agree to provide that copy?

 2        A.   Yes.  Of course, yes.

 3        Q.   So, when my client got to the dealership, was

 4   he by himself or was with people?

 5        A.   I don't know.

 6        Q.   What happened when he got there?

 7        A.   I don't know.

 8        Q.   Do you know if he actually test drove the

 9   vehicle?

10        A.   No.

11        Q.   Do you know what part of the day he arrived?

12        A.   No.

13        Q.   Do you know if the documents he signed were

14   done electronically or in wet ink?

15        A.   If it was wet ink?  I'm assuming it was, of

16   course, electronically and paper.  It's the standard

17   for every customer.

18        Q.   For the electronic documents, how did you get

19   his consent to sign the documents electronically?

20        A.   They have to go with the mouse on the

21   computer.

22        Q.   Do you know if he provided his consent on

23   paper or electronically?

24        A.   If he took possession of the car, he must

25   have.
```

```
 1        Q.   Well, was it done on paper or was it done

 2   electronically, particularly the providing of his

 3   consent?

 4        A.   They do both.  They do paper and Internet.

 5   They sign both papers.  They sign on the e-contracting

 6   and the DMV paper, like the ASCIIs.  The odometer,

 7   everything goes handwritten.

 8        Q.   Okay.  But before we even get to that

 9   process, he has to give his consent to sign a document,

10   correct?

11        A.   He has give -- no.  He has to give a credit

12   application.  He has to leave the commission to us.  Do

13   it on --

14        Q.   After that --

15        A.   -- on-line.

16        Q.   After that, before he starts signing the

17   contracts, does he have to provide consent to sign the

18   documents?

19        A.   There is no such thing.

20             MR. PERALTA:  Objection; asked and answered.

21   BY MR. FEYGIN:

22        Q.   Please repeat yourself, Mr. Strusberg?

23        A.   There is no such thing.

24        Q.   There is no consent form?

25        A.   No.  It's the credit application itself.  At
```

```
 1   the end of the credit application, we have a click box
 2   that says he's authorizing us to run his information,
 3   so yeah, he does it on-line, not on paper.
 4        Q.   So, that authorization comes at the end of
 5   the transaction?
 6        A.   At the beginning.
 7        Q.   What e-mail address did he use to provide his
 8   consent?
 9        A.   I don't know.
10        Q.   Who would know?
11        A.   I don't even know if he provided a -- an
12   e-mail address.  That's not required.  If they have
13   e-mail, they put it.  Sometimes they -- they don't have
14   an e-mail, but that's --
15        Q.   Do you know if he was provided notice that he
16   could get a copy of the contract in paper format?
17        A.   I don't know.
18        Q.   Who would know?
19        A.   Alexander Reyes.
20        Q.   Was he provided notice that he could withdraw
21   his consent to sign electronically?
22        A.   You do it on -- on the credit application.
23   In the beginning, you do the credit app, and then at
24   the end it's a click box that he authorizes us to run
25   the credit, so he has to claim that.
```

 1         Q.    But was he provided notice that he could

 2   withdraw consent?

 3         A.    What is that?  I don't understand the

 4   question.

 5         Q.    Was he provided notice that he can cancel his

 6   authorization?

 7         A.    No.

 8         Q.    How does the dealership store the electronic

 9   documents?

10         A.    It stays in the DMS, DealerCenter.

11         Q.    And is there a log of his electronic

12   signatures?

13         A.    In every deal, of course.  I can look for it.

14   One second.  The whole deal is saved in DealerCenter.

15   I can send you copies if you want.

16         Q.    That would be great.

17         A.    Yeah.

18              MR. FEYGIN:  I'm going to pull up what's

19         going to be Claimant's Exhibit D, which is

20         effectively a Buyer's Order -- Buyer's Order

21         Contract.  This is stamped FSIA 00005, and it goes

22         down to FSIA 00007.

23              (Plaintiff Exhibit D was marked for

24         identification.)

25              (Whereupon, document(s) shared on the

GABRIEL CABALLERO-CHAVEZ vs. FS INVESTMENTS OF AMERICA, INC.    10/23/2024
CR of FS Investments of America (Jonathan Strusberg)                    52

Case 8:23-cv-00709-WFJ-SPF   Document 102-1   Filed 01/02/25   Page 53 of 174   PageID 1868

 1          screen.)

 2               MR. FEYGIN:  Does everybody see this?

 3               THE WITNESS:  Yes.

 4     BY MR. FEYGIN:

 5          Q.   Mr. Strusberg, does this look familiar to

 6     you?

 7          A.   One -- one second, please.  That's the Bill

 8     of Sale.

 9          Q.   Is this a true and correct copy of the Bill

10     of Sale for my Plaintiff's transaction?

11          A.   Excuse me?

12          Q.   Is this a true and correct copy --

13          A.   Yes.

14          Q.   -- of the -- can you explain the significance

15     of a Bill of Sale?

16          A.   It's a -- it's a document that you have to

17     provide.  It's -- it's already printed.  It shows you

18     the -- the price the customer's paying, the taxes, the

19     transfer, the -- the -- the description of the vehicle

20     that he's buying, the money down he's coming up with.

21          Q.   Who prepared this document?

22          A.   The finance manager.

23          Q.   And who was that again?

24          A.   Alexander Reyes.

25          Q.   So, how much did my client pay for this

```
 1    vehicle?
 2         A.    Can you -- one second.  I have it here.
 3    He -- 25,000.
 4         Q.    And what was the vehicle sales price before
 5    all of the incidental charges?
 6         A.    Twenty-one nine ninety-eight.
 7         Q.    What was his down payment?
 8         A.    5,000.
 9         Q.    Did the dealership actually receive the
10    $5,000 down payment?
11         A.    Yes.
12         Q.    And what was the date of purchase?
13         A.    It says there, hang on, May 25th, 2020.
14         Q.    So, looking on the itemization of the sale on
15    the right-hand side over here, I see a predelivery
16    service fee of $799.
17         A.    That's dealer fee.
18         Q.    And what is this fee for?
19         A.    To cover my expenses.
20         Q.    And what would those expenses be in this
21    transaction?
22         A.    Rent, light bill, water bill, advertising,
23    secretary, et cetera.
24         Q.    Were any services performed specifically as
25    it relates to my client's vehicle --
```

GABRIEL Case 8:23-cv-00709-WFJ-SPF Document 102-1    Filed 01/02/25    Page 55 of 174 23/2024
CR of FS Investments of America (John Strusberg)
PageID 1870
54

```
 1        A.    No.

 2        Q.    -- for this fee?

 3        A.    No.

 4        Q.    Is everyone charged the same fee?

 5        A.    Yes.

 6        Q.    Has this fee ever changed?

 7        A.    Now, it's eight ninety-nine.  Now, it's more.

 8        Q.    And when did that change occur?

 9        A.    When I moved to this building location, like

10   two years ago.

11        Q.    So, what is the mileage disclosure here on

12   this form?

13        A.    The same mileage from the Bill of Sale from

14   Manheim from the auction.

15        Q.    Which was?

16        A.    One thirty-one six three six.

17        Q.    And does this form indicate anywhere that the

18   mileage was inaccurate?

19        A.    No.

20        Q.    Who signed the form on the dealership's

21   behalf?  I'll scroll down to the bottom so you can see

22   the signature.

23        A.    Alex Reyes.

24        Q.    Did you see this document before Mr. Reyes

25   signed it?
```

 1          A.    Yeah.

 2          Q.    Did you approve of this document?

 3          A.    No.  I'm not there when -- when he does it.

 4          Q.    So, when did you see this document?

 5          A.    I never saw it.  I just see it right now.

 6          Q.    Do you have personal knowledge of whether

 7   this document was ever explained to my client?

 8          A.    No.  They have to read it.

 9          Q.    I'm going to look at the top again over here.

10                I'm -- what does V#3 stand for in the upper

11   left-hand corner (indicating)?

12          A.    Do what?

13          Q.    Let me do this.

14          A.    I don't know.  I don't know.  That's -- oh,

15   that's the app number from the bank.  When you finance

16   it --

17          Q.    Uh-huh?

18          A.    -- every deal has an app number, and that's

19   the app number from when he purchased it.  I'm looking

20   at it right now in the deal here.  It's 57987168.

21   That's same one.

22          Q.    Okay.  And then what is this next to it

23   (indicating)?

24          A.    No, I don't know.

25          Q.    Would that be a version number?

GABRIEL Case 8:23-cv-00709-WFJ-SPF Document 102-1 Filed 01/02/25 Page 57 of 174 23/2024
CR of FS Inve... (...h Strusberg)
PageID 1872
56

 1          A.    No.  I don't know what is that.

 2          Q.    Who would know?

 3          A.    The DealerCenter.

 4          Q.    If there were prior versions of a contract,

 5    would they be in your possession?

 6          A.    Do what?

 7          Q.    If there were prior versions of a contract,

 8    would the dealership maintain copies of those

 9    documents?

10          A.    We maintain copies in the system for every

11    single customer.  Everything is in the system since we

12    open.

13          Q.    So, just to make sure I understand you

14    correctly, if there were prior versions, you would have

15    a copy, correct?

16          A.    Oh, yeah.  Yeah.  Yeah.

17          MR. FEYGIN:  I'm going to pull up what's

18          going to be Exhibit E, Plaintiff's Exhibit E, the

19          Retail Installment Sales Contract.  And this is

20          FSIA 000026, and it goes down through FSIA 000031.

21          Does everybody see this document?

22          THE WITNESS:  Yes.

23    BY MR. FEYGIN:

24          Q.    Is this a true and correct copy of the Retail

25    installment Sales Contract for the Plaintiff's

```
 1    transaction?

 2         A.    Yes.

 3         Q.    And in your words, what is this document?

 4         A.    That's the -- that's the contract with the

 5    terms; 16 percent, how much money they're going to pay

 6    in interest, how much he's financing, what's the

 7    payment, what's the -- the months.  It tells you the

 8    whole contract history.

 9         Q.    Would it be fair to call this a financing

10    agreement?

11         A.    Yes.

12         Q.    So, what is the difference between the first

13    contract we just saw and this one?

14         A.    No.  That's the Bill of Sale.  The Bill of

15    Sale is not a -- it's just a Bill of Sale.  It's not

16    a -- this is the contract.

17         Q.    And this was also electronically signed?

18         A.    Correct.  Right there, you can see the

19    signature.

20         Q.    And obviously Mr. Reyes signed this on behalf

21    of the dealership?

22         A.    Correct.

23         Q.    Was this -- do you have personal knowledge if

24    this contract was explained by Mr. Reyes to my client?

25         A.    He explains to every customer.  They -- they
```

 1   explain the terms to the customer before they sign, the

 2   payments, everything.

 3       Q.   And what was told to him?

 4       A.   I wasn't there.  I don't know, but I'm

 5   assuming these terms; the payment five seventy-three a

 6   month for 48 payments, the first payment begins July 7,

 7   2020.  He got 16.9 percent APR.  Because when you get a

 8   16 percent APR, it means you have bad credit, so I am

 9   assuming he got bad credit, so everything is explained

10   before they sign.

11       Q.   But that's an assumption and not personal

12   knowledge, correct?

13       A.   You have to tell -- disclose all the terms

14   before the customer signs.  Nobody signs and then reads

15   after.  They -- we explain, and that's what I, you

16   know, taught them to my people.  They first need to

17   explain everything, and after they explain it, they

18   agree.  Then we go ahead and print the paperwork,

19   not -- we don't print paperwork before the customer

20   knowing what's the payment.  We print paperwork after

21   the customer knows everything.

22       Q.   But you weren't there to personally witness

23   anybody --

24       A.   Correct, I was not there.

25       Q.   -- explain --

```
 1        A.    Correct.

 2        Q.    Okay.  Does this form disclose to my client

 3   that the vehicle had an inaccurate odometer reading?

 4        A.    No.

 5        Q.    And what was the odometer reading disclosure

 6   on this form?

 7        A.    Like, from Manheim, one thirty-one six three

 8   six.

 9        Q.    I'm going to scroll back to the top here.

10   Next to the application number, again we see this V#3.

11        Any idea what that's about?

12        A.    No.

13        Q.    So, after my client left with the vehicle,

14   did my client make his payments directly to Powerhouse?

15        A.    To the bank.

16        Q.    And is that because Powerhouse assigned the

17   Financing Agreement to Westlake?

18        A.    No.  Because we don't do buy here/pay here,

19   so he financed the car, and he needs to pay the lender

20   direct.

21        Q.    And the lender was Westlake, correct?

22        A.    Right.

23        Q.    How much did Powerhouse make in profit off of

24   the assignment of the financing agreement to Westlake?

25        A.    I can tell you right now.  Around $7,000.
```

```
 1        Q.   And what did you just look at to make that
 2   determination?
 3        A.   It's my -- my formula, the way I do the math.
 4        Q.   Is there a formal document that spells out
 5   the payout between Westlake and you?
 6        A.   No.  We're taking the customer.  They give me
 7   a check of 18,900.
 8        Q.   How did you come to this agreement with
 9   Westlake?  Is there a master dealer agreement between
10   Westlake and the dealership?
11        A.   Yes.
12        Q.   Okay.  And was that in place at the time of
13   my client's purchase?
14        A.   Yes.
15        Q.   And you have a copy of that?
16        A.   Well, I have my subscription with
17   DealerCenter.
18        Q.   What I'm asking for, is there a formal
19   contract between you and Westlake that dictates how
20   much the dealership is going to make?
21        A.   No.
22        Q.   So, how did you determine with Westlake how
23   much you were going to get paid?
24        A.   You submit the deal to the -- through the
25   platform from DealerCenter, and they give you a
```

```
 1    response based on the customer's information, the

 2    income, et cetera.  On this particular deal, my check

 3    was 18,900.

 4         Q.   Did Westlake provide you with a deal recap or

 5    washout sheet?

 6         A.   Yeah.  I have it here.

 7         Q.   Do you agree to provide the deal recap or

 8    washout --

 9         A.   Yes.

10         Q.   -- sheet?

11         A.   Yes, whatever you need.

12         Q.   Where is Westlake located, do you know?

13         A.   California.

14         Q.   How long have you been doing business with

15    Westlake?

16         A.   Five years.

17              MR. FEYGIN:  So, I'm going to pull up what's

18         going to be Plaintiff's Exhibit F.  It's going to

19         be an Odometer Disclosure Statement.  This was

20         produced in discovery by the Defendant, and it's

21         labelled FSIA 000018.

22              (Whereupon, document(s) shared on the

23         screen.)

24    BY MR. FEYGIN:

25         Q.   Does this document look familiar to you?
```

 1          A.    That's the odometer disclosure.

 2          Q.    Is this a true and correct copy of the

 3   odometer disclosure the dealership had my client

 4   execute?

 5          A.    That's it.  That's the only one.

 6          Q.    What was the mileage disclosure on this

 7   document?

 8          A.    131636.  I don't -- I don't see it.  Yeah,

 9   131636.

10          Q.    And was the checkbox selected where it says

11   "I certify the odometer reading is not the actual

12   mileage"?

13          A.    No.

14          Q.    Why did you have my client execute this

15   document?

16          A.    Because this is -- every customer needs to

17   sign it.  It's standard for every customer.

18          Q.    And is that because the DMV requires it or is

19   that because Westlake --

20          A.    The DMV requires it, yes.  The DMV requires

21   it.

22          Q.    Do you know if the Plaintiff personally

23   signed this document?

24          A.    I see both signatures, yes.

25          Q.    But you weren't there to actually see --

```
 1          A.    I wasn't there.

 2          Q.    -- them sign the document?

 3          A.    I was not there.

 4          Q.    Do you have personal knowledge of whether

 5   this form was explained to my client?

 6          A.    No.

 7          Q.    When did my client see this form, was it

 8   before or after the Buyer's Order?

 9          A.    While -- while signing all of the documents.

10   That's -- that's part of the package.

11          Q.    Was it before or after the Buyer's Order

12   form?

13          A.    That's after.

14          Q.    Was it before or after the Retail Installment

15   Sales Contract?

16          A.    I don't know.  I don't know the order, if

17   it's for -- if it's before or after.  I don't know.

18          Q.    Is there a way to figure out the order that

19   these contracts were provided to --

20          A.    I can --

21          Q.    -- to my client?

22          A.    I can ask the finance guy here, and he can

23   tell me.

24          Q.    Is there an actual log somewhere of how these

25   documents were signed with timestamps?
```

```
 1        A.   No.  I have to look a contract and tell you
 2   what's the order.
 3             MR. PERALTA:  Objection; asked and answered.
 4             THE WITNESS:  Actually, they have -- do you
 5        see the paper in the bottom?  They have, like --
 6        like a number.  It's a sequence.  If you scroll --
 7        if you scroll down, they -- like, in the corner, on
 8        the paper in the corner in the bottom, there has to
 9        be -- see it over there?  There is, like a --
10        that's the date.  It doesn't show the -- the
11        sequence.  Yeah, I don't know the sequence.
12   BY MR. FEYGIN:
13        Q.   Who would know?
14        A.   DealerCenter.
15             MR. FEYGIN:  I'll move on to the Application
16        for Certificate of Title.  This is going to be
17        Plaintiff's Exhibit G.
18             (Plaintiff Exhibit G was marked for
19        identification.)
20             (Whereupon, document(s) shared on the
21        screen.)
22             MR. FEYGIN:  And this is FSIA 000034.
23             Do we all see this document?
24             THE WITNESS:  Yes.
25   BY MR. FEYGIN:
```

GABRIEL CASABLANCA vs. AUTONATION (AMENDED) - 10/23/2024
CR of FS Investigations (John Strusberg)

Case 8:23-cv-00709-WFJ-SPF   Document 102-1   Filed 01/02/25   Page 66 of 174
PageID 1881
65

```
 1        Q.    Does this look like a true and accurate copy

 2   of the Application for Certificate of Title with --

 3   without registration my client signed?

 4        A.    Yes.

 5        Q.    What is the purpose of this document?

 6        A.    The customer authorizes the dealership to

 7   transfer the car over to his name.

 8        Q.    And why did my client have to sign this

 9   document?

10        A.    That's not something they have to sign.

11   There -- there's no place to -- to sign it.  Only the

12   dealership.

13        Q.    So, is it your position that it's only one

14   page, this document?

15        A.    Correct.

16        Q.    There is no second page?

17        A.    No, no second page.  No.  Whatever --

18   whatever they have to sign, they sign, and -- and if

19   there's no space for them to sign, they don't sign.

20        Q.    Over here in the bottom right corner there's

21   the dealer agent signature.

22              Whose signature is that?

23        A.    Alexander Reyes.

24        Q.    Did my client ever see this document?

25        A.    Yes.  All of them.
```

GABRIEL GARCIA (ALEXANDERS AUTO AMERICA - John Strusberg)    7/23/2024
Case 8:23-cv-00709-WFJ-SPF    Document 102-1    Filed 01/02/25    Page 67 of 174
CR of FS Investments of America
PageID 1882
66

```
 1          Q.    Were you there personally to witness my
 2     client --
 3          A.    No.
 4          Q.    -- sign this document?
 5          A.    No, but that's part of the package, and it
 6     shows the lienholder, Westlake Financial.
 7          Q.    So, when did Mr. Haddon see this form, was it
 8     before or after the Buyer's Order?
 9          A.    I don't know.
10          Q.    Was it before or after the Retail Installment
11     Sales Contract?
12          A.    I don't know.
13          Q.    So, how do you know that he saw it?
14          A.    It's in the package.  They give him a
15     package, and he needs to sign.  And whatever he doesn't
16     need to sign, he -- it's a package, but not all the
17     package is for him to sign.  Some -- some -- some
18     papers, like this one, doesn't need the customer's
19     signature.
20          Q.    What was the mileage disclosure on this form?
21          A.    131636.
22          Q.    And that was filled out by who?
23          A.    By the system, DealerCenter.
24          Q.    Who put the information into DealerCenter?
25          A.    Me and Alexander.
```

1    Q.   And on what date was this information entered

2    into the system?

3    A.   I can tell you right now.  Well, this one

4    particular, when they sold the car, but I -- when I

5    post the cars on the web page -- let's see.  I posted

6    this car, so when I posted -- when -- when the first --

7    the car first arrived, I take pictures, and I post it.

8    The mileage, I put 131636.  It's on the -- the web page

9    since Day 1.

10    Q.   Getting back to this form, it says the

11    mileage reading is one thirty-one six thirty-six, date

12    read 5/25/2020.

13        Was the mileage read on that date?

14    A.   Yeah.

15    Q.   And did the dealership select that it was

16    actual mileage or --

17    A.   Yes.

18    Q.   -- not the actual mileage?

19    A.   Actual mileage.

20        MR. FEYGIN:  I'm going to move on to

21    Exhibit H.  This is Plaintiff's RFP 018.

22        (Plaintiff Exhibit H was marked for

23        identification.)

24        (Whereupon, document(s) shared on the

25        screen.)

```
 1   BY MR. FEYGIN:

 2        Q.   Does this document look familiar to you?

 3        A.   That's the Power of Attorney.

 4        Q.   And what is the scan number at the top of

 5   this document (indicating)?

 6        A.   I don't know.

 7        Q.   Can you see it now?

 8        A.   Yeah, I can see it, but I don't know what is

 9   it.

10        Q.   Can you read that into the record, please?

11        A.   539994090.

12        Q.   Is this a true and correct copy of the Power

13   of Attorney the dealership had my client sign?

14        A.   Yes, and that's their signatures.

15        Q.   And is this a true and correct copy of the

16   Power of Attorney that was submitted to the DMV by the

17   dealership --

18        A.   Yes.

19        Q.   -- for this transaction?

20        A.   Yes.

21        Q.   In your words, what is the purpose of this

22   document?

23        A.   It's a Power of Attorney that the customer

24   authorizes to transfer the car over to them.

25        Q.   And why does the dealership use a Power of
```

```
 1    Attorney form?
 2         A.   It's a standard.  The DMV gives you the
 3    paperwork.
 4         Q.   How often does the dealership use this form?
 5         A.   Every single deal.  When you print it, you
 6    hit print, and the package comes automatically.  It's
 7    standard in every customer.
 8         Q.   And I just want to make sure that we're on
 9    the same page here.
10              This is HSMV form 82053?
11         A.   Correct.
12         Q.   Read 12/11?
13         A.   Correct.
14         Q.   And it is your position as you sit here today
15    that you use this form in every single vehicle
16    transaction?
17         A.   Correct.
18         Q.   Who prepared this form for my client's
19    signature?
20         A.   The system and the -- and the finance
21    manager.
22         Q.   Okay.  And how do you know my client signed
23    this document?
24         A.   Because I can see the signature there.  I can
25    see two signatures.
```

 1       Q.    And was this ever explained to my client?

 2       A.    Like I said, everything is explained, yes.

 3       Q.    Were you there --

 4       A.    I was not there.

 5       Q.    -- to watch --

 6       A.    No, I was not there.

 7       Q.    When did Mr. Haddon see this form?

 8       A.    When he signed it.

 9       Q.    I should have been a little bit more

10  specific.

11             Was it before or after the RISC?

12       A.    At the moment of the sale.

13       Q.    Okay.  Was it before or after signing the

14  Retail Installment Sales Contract.

15       A.    At the moment of the sale?

16       Q.    Was it before or after signing the Buyer's

17  Order form?

18       A.    At the moment of the sale.

19       Q.    Was it before or after any of the other

20  documents we just reviewed?

21       A.    At the moment of the sale.

22       Q.    Okay.  Is it your position that you don't

23  know when this document was actually signed, then?

24       A.    Correct.

25       Q.    So, at the top over here, on what date was

 1    this signed?

 2        A.    It says 5/25/2020.

 3        Q.    And then beneath that, who is it that my

 4    client appointed as the Power of Attorney (indicating)?

 5        A.    Don Hall.

 6        Q.    Who is Don Hall?

 7        A.    I don't know.

 8        Q.    Does Don Hall work for the dealership?

 9        A.    No.

10        Q.    Is the dealership in the business of having

11    consumers sign Power of Attorneys appointing people

12    that are not employed by the dealership to act on their

13    behalf?

14        A.    Who's not -- who's not --

15        Q.    I'm asking you.  This is the form that you

16    submitted to the DMV that you just testified --

17        A.    No, because I --

18        Q.    -- that was part of my client's transaction.

19        A.    That part is -- it's the DMV office.  They

20    do --

21        Q.    Okay.

22        A.    They put names on them.  I think that must be

23    the DMV office where they transferred the car.

24        Q.    Okay.  When my client signed this document,

25    was the name Don Hall already put onto this document?

GABRIEL CHARLES TABAK, ESQ. v. J.P. SPF AMENDED Case 8:23-cv-00709-WFJ-SPF   Document 102-1   Filed 01/02/25   Page 73 of 174 23/2024
CR of FS Investments of America (John Strusberg)
PageID 1888
72

  1          A.   I don't know.

  2          Q.   Who would know?

  3          A.   The lady who does the transfers for -- for

  4  me.

  5          Q.   Who is that?

  6          A.   Oh, I think -- Betty.  Betty does my titles.

  7          Q.   And where does Betty work?

  8          A.   She's mobile.

  9          Q.   What is the name of her company?

 10          A.   I don't know.

 11          Q.   What is her contact information?

 12          A.   I have her phone number.

 13          Q.   Do you agree to provide that to me?

 14          A.   Yes.

 15          Q.   Okay.

 16          A.   Yeah.  That whole -- the DMV office where

 17  they transfer the car.

 18          Q.   And how do you know that?

 19          A.   It -- the name sounds familiar.

 20          Q.   Does this document disclose the vehicle's

 21  mileage anywhere?

 22          A.   Not this one.  The odometer disclosure does

 23  and the Bill of Sale and the contract.

 24          MR. FEYGIN:  Okay.  I'm going to move on to

 25          Exhibit I.  This is the Certificate of Title we

GABRIEL Case 8:23-cv-00709-WFJ-SPF Document 102-1 Filed 01/02/25 Page 74 of 174 23/2024
CR of FS Inv... ...n Strusberg)
PageID 1889
73

```
 1              obtained from the DMV through a public records

 2              question.

 3                   (Plaintiff Exhibit I was marked for

 4              identification.)

 5                   (Whereupon, document(s) shared on the

 6              screen.)

 7    BY MR. FEYGIN:

 8         Q.   Does this look familiar to you?

 9         A.   No.

10         Q.   You have never seen this document before?

11         A.   I've seen on other ones, but not this one.

12         Q.   Okay.  Did you submit title documents to the

13    DMV?

14         A.   No.  Betty.

15         Q.   Okay.  We can agree that this is a truthful

16    and accurate representation of the face of the title?

17         A.   Correct.

18         Q.   And what is this scan number at the top of

19    this document (indicating)?

20         A.   I don't know.

21         Q.   Okay.  Let me zoom in so you can see it

22    better.

23              What is the number over here?

24         A.   No, I already told you.  539994086.  It's a

25    transaction number there.
```

GABRIEL CASAS, et al. v. AEG ... AMENDED ... 10/23/2024
Case 8:23-cv-00709-WFJ-SPF   Document 102-1   Filed 01/02/25   Page 75 of 174
CR of FS Investments (Maximilian Strusberg)
PageID 1890
74

```
 1          Q.    Correct.  The scan transaction number?

 2          A.    Yes.

 3          Q.    Going to the second page, which is the back

 4    of the title, can you read the scan transaction number

 5    on the top?

 6          A.    Can you please zoom out a little bit, please?

 7          Q.    Sure.  (Complies with request.)

 8          A.    539994087.

 9          Q.    And you said that you don't remember or you

10    don't recall this form, do you?

11          A.    No.

12          Q.    Do you have a copy of the Certificate of

13    Title.

14          A.    In the deal jacket, might be.

15          Q.    Do you have a copy of the Certificate of

16    Title my client actually signed?

17          A.    Yes.  It has to be in the deal jacket.

18          Q.    Okay.  Do you have a copy of the Certificate

19    of Title where Auto Deal Corp. transferred the title to

20    Powerhouse?

21          A.    It must be in the -- in the papers.

22          Q.    Okay.  And do you agree to provide this

23    document?

24          A.    Yes, whatever you need.

25          Q.    Do you have the document in front of you now?
```

 1        A.    No.

 2        Q.    Can you find the document as we sit here?

 3        A.    No.

 4        Q.    So, looking at this document here, do you

 5   have any reason to believe this is not the document

 6   where the Certificate of Title was transferred from

 7   Powerhouse to Auto Deal -- I'm sorry, from Auto Deal to

 8   Powerhouse?

 9        A.    No.

10        Q.    Do you have any reason to believe that this

11   document is not the Certificate of Title in which

12   Powerhouse transferred the title to my client?

13        A.    No.

14        Q.    Okay.  I'm going to start off with the

15   transaction from McCombs to Auto Deal Corp, which is --

16   I'm going to highlight it so we can all focus in on it.

17             Do you see what I'm looking at?

18        A.    Yes.

19        Q.    Were you personally involved in this

20   transfer?

21        A.    No.

22        Q.    So, you did not sign this?

23        A.    No.

24        Q.    You did not see this transfer?

25        A.    I never touch titles.  I never do paperwork,

GABRIEL CASA 8:23-cv-00709-WFJ-SPF AMEX Document 102-1    Filed 01/02/25    Page 77 of 174 23/2024
CR of FS Inver... (FL... n Strusberg)
PageID 1892
76

```
 1   not -- not one in my life.  I don't even know how to do
 2   it.
 3        Q.   Okay.  Moving on to the transfer from Auto
 4   Deal to Powerhouse, see where I'm highlighting?
 5        A.   Yes.
 6        Q.   Okay.  Whose signature is this on the
 7   left-hand side (indicating)?
 8        A.   I don't know.
 9        Q.   Who would know?
10        A.   Betty.
11        Q.   And is this your name to the right of the
12   signature (indicating)?
13        A.   Yes.
14        Q.   Why would your name be there, then?
15        A.   Because I'm the owner of the dealership.
16        Q.   But that's not your signature, though, is it?
17        A.   No.
18        Q.   Okay.  And we don't know who signed it?
19        A.   Betty.
20        Q.   So, now it's your position that this is
21   Betty's signature?
22        A.   I'm assuming because she's the only one that
23   does the -- the transfers at the moment of the -- of
24   the -- of the transfers.  In -- in that moment, back in
25   2020, she was the only one doing it.
```

 1         Q.    And Betty is not an employee of the

 2    dealership, is she?

 3         A.    Yeah, she works in the time.  Not anymore,

 4    but back in the day she was working with me.

 5         Q.    Was she a 1099 or a salaried employee?

 6         A.    1099.

 7         Q.    And how often did she get paid?

 8         A.    Weekly.

 9         Q.    Did Powerhouse ever sign a Power of Attorney

10    appointing Betty as the Power of Attorney to bind it in

11    this Certificate of Title transaction?

12         A.    I don't remember.

13         Q.    Let's look at the odometer disclosure here.

14         A.    One thirty-one three six -- 131630.

15         Q.    Okay.  And I'm going to delete the

16    highlighting so it might be easier for you.

17               On what date was the Certificate of Title

18    transferred to Powerhouse?

19         A.    I don't know.

20         Q.    What is the date that is listed on --

21         A.    Oh, it says 5/15/20.

22         Q.    And is that the actual date that the

23    Certificate of Title was transferred to Powerhouse?

24         A.    If it's there, yes.

25         Q.    Okay.  And when Powerhouse accepted this

```
 1    Certificate of Title, did it look at the face of the
 2    title before signing this document, whoever --
 3         A.   I don't know.
 4         Q.   -- signed this?
 5         A.   I don't know.
 6         Q.   And who would know?
 7         A.   Betty.
 8         Q.   Okay.  And you didn't speak with her to
 9    prepare for today, did you?
10         A.   No.
11         Q.   And do we know who Juliana A. is?
12         A.   That's the secretary from Auto Deal Corp.
13         Q.   Okay.  And you weren't present personally
14    when this transfer occurred?
15         A.   Correct.
16              MR. FEYGIN:  Okay.  I'm going to scroll down
17         to the transaction from Powerhouse to Gabriel Luc
18         Haddon.  It's the third reassignment.  I'm going to
19         highlight it just for a moment so everybody can see
20         what we're looking at.
21              Does everybody see what I'm talking about?
22              THE WITNESS:  Yes.
23    BY MR. FEYGIN:
24         Q.   What was the mileage disclosure at the time
25    of this transfer?
```

 1          A.    131636.

 2          Q.    And what was the date that this disclosure

 3    was made?

 4          A.    It says there 5/25/20.

 5          Q.    And is that the date that the -- the

 6    disclosure was actually made on this title?

 7          A.    Yes.

 8          Q.    And how do you know that?

 9          A.    By looking at the date right here.

10          Q.    And it's your position that the information

11    on this title document is truthful and accurate and

12    depicts exactly the date that this transfer occurred?

13          A.    Correct.

14          Q.    Who signed on behalf of the dealership?

15          A.    Betty.

16          Q.    And again, Betty's name doesn't appear there,

17    does it?

18          A.    No.   That's my name.

19          Q.    Okay.  So, to the right, that is your name,

20    Franklyn Strusberg?

21          A.    Correct.

22          Q.    And who signed on behalf of my client?

23          A.    He signed on the front, not on the title.

24          Q.    That's not the question.  I'm looking at --

25          A.    Him, the -- the customer.

```
 1          Q.   So, it's your position --
 2          A.   You don't -- you don't sign.  They put the
 3     name on it.
 4          Q.   Okay.  Let's look at it a little bit more
 5     closely here.
 6               Do you see where I'm pointing at
 7     (indicating)?
 8          A.   Yes.
 9          Q.   Underneath, what does it say right there
10     (indicating)?
11          A.   "Signature of borrower."
12          Q.   Okay.  And is it your position that my client
13     did not sign this document?
14          A.   That's why you got the Power of Attorney.
15          Q.   Okay.  And now is it your position that a
16     Power of Attorney signed this document on my client's
17     behalf?
18          A.   No.  He signed it.  He signed the Power of
19     Attorney for me to sign for him.
20          Q.   Okay.  So, let's unpack that.
21               My client signed a Power of Attorney,
22     correct?
23          A.   Correct.
24          Q.   And he let you sign this document on his
25     behalf?
```

GABRIEL CASADA....SHERRIFF....AMENDED Case 8:23-cv-00709-WFJ-SPF    Document 102-1    Filed 01/02/25    Page 82 of 174 ...23/2024

CR of FS Inventory....(John Strusberg)

PageID 1897

81

```
1          A.   That's what the Power of Attorney says.

2          Q.   And did you sign this document on my client's

3    behalf?

4          A.   No.

5          Q.   Who signed this document on my client's

6    behalf?

7          A.   Somebody in the dealership.  Betty.  I'm

8    assuming Betty.

9          Q.   How would you find out who signed this

10   document?

11         A.   I can call her and ask her.

12         Q.   And you didn't speak with her in preparation

13   for today's deposition?

14         A.   Oh, no.  No.  No.

15              MR. PERALTA:  Asked and answered.

16              THE WITNESS:  I haven't talked to her for,

17         like two months.

18   BY MR. FEYGIN:

19         Q.   And why is that?

20         A.   She no longer works with me.  I have a new

21   lady.

22         Q.   When this mileage disclosure was made on

23   5/25/2020, did Powerhouse Automotive look at the face

24   of the title?

25         A.   No.
```

GABRIEL HADDON vs. GUNTHER MOTORS, INC. and AMERICREDIT FINANCIAL SERVICES, INC. 11/23/2024
CR of FS Investigator Francis J. (John Strusberg)

Case 8:23-cv-00709-WFJ-SPF    Document 102-1    Filed 01/02/25    Page 83 of 174
PageID 1898

82

```
 1        Q.    And at the time of the sale of the vehicle to

 2   Mr. Haddon, did the dealership have this title in its

 3   possession?

 4        A.    No.

 5        Q.    Didn't you just testify that it was sign on

 6   May 25th of 2020?

 7             MR. PERALTA:  Objection; mischaracterizes his

 8        testimony.

 9             Go ahead, Frank.

10             THE WITNESS:  I got the title on 5/15.

11   BY MR. FEYGIN:

12        Q.    Okay.  So, was the dealership in possession

13   of this title on 5/25?

14             MR. PERALTA:  Objection; asked and answered.

15             THE WITNESS:  On 5/25?  Yes.

16   BY MR. FEYGIN:

17        Q.    Okay.  So, it wasn't being held by a lender

18   when my client signed it, was it?

19        A.    By Auto Deal Corp.

20        Q.    Let me -- let me ask you a different

21   question.

22             Looking at the document we're looking at here

23   today, right, it wasn't in the possession of a lender

24   at the time this signature was applied to the title,

25   was it?
```

GABRIEL CASTILLO vs GAULT AUTO SALE INC, et al AMENDED, 12/23/2024
Case 8:23-cv-00709-WFJ-SPF   Document 102-1   Filed 01/02/25   Page 84 of 174
PageID 1899
CR of FS Investments (John Strusberg)
83

```
 1        A.    No.

 2        Q.    And the title wasn't lost or in the process

 3   of being replaced, was it?

 4        A.    Correct.

 5        Q.    So, why is it that a Power of Attorney was

 6   used to sign this document instead of having my client

 7   sign the document?

 8        A.    I don't know.

 9        Q.    Who would know?

10        A.    Betty.

11        Q.    Okay.  Again, you didn't speak to her about

12   this question either, did you?

13        A.    Correct.

14        Q.    So, after the vehicle was sold, did the

15   dealership ever inform my client that it had a tampered

16   odometer?

17        A.    No.

18              MR. PERALTA:  Objection; assumes facts not in

19        evidence.

20   BY MR. FEYGIN:

21        Q.    When did the dealership first learn that the

22   odometer reading was inaccurate?

23        A.    When the bond called me.

24        Q.    And do we agree that the mileage reading is

25   inaccurate?
```

```
 1        A.    Yes.
 2        Q.    Okay.  And why do we have that agreement, is
 3   that because the face of the title says a different
 4   mileage reading?
 5        A.    Because we dig -- dig into it when the bond
 6   called me.  And I called Manheim, and Manheim told me
 7   that the seller, Ford, made a mistake.
 8        Q.    So, there's no dispute that the mileage is
 9   inaccurate on this vehicle?
10        A.    Correct.
11        Q.    Excellent.  Has the dealership ever been sued
12   before?
13        A.    No.
14              MR. PERALTA:  Asked and answered; objection.
15   BY MR. FEYGIN:
16        Q.    Has the dealership ever been sued for
17   odometer issues before?
18        A.    Never.
19              MR. PERALTA:  Asked and answered; objection.
20   BY MR. FEYGIN:
21        Q.    Has a consumer ever filed a Complaint against
22   the dealership with the Better Business Bureau?
23        A.    Yes.
24        Q.    When?
25        A.    I don't know.
```

GABRIEL AMADOR vs. FS Investments of America, et al. 12/23/2024
Case 8:23-cv-00709-WFJ-SPF Document 102-1 Filed 01/02/25 Page 86 of 174
CR of FS Investments (Johann Strusberg) PageID 1901
85

```
 1        Q.   Who would know?

 2        A.   The -- if you look into the Better Business

 3   Bureau page, you can see that.

 4        Q.   Do you have access to the Better Business

 5   Bureau page and all of the Complaints that were waged

 6   against you?

 7        A.   No.

 8        Q.   Do you have an account with the Better

 9   Business Bureau?

10        A.   I think so.

11        Q.   How can you determine whether or not you have

12   an account?

13        A.   I might have it, but maybe it expired.  I

14   have to activate it again.

15        Q.   Did anybody ever file a Complaint with a

16   county department against the -- the dealership?

17        A.   Not that I know of.

18        Q.   Did anybody ever file a Complaint with the

19   Department of Agriculture and Consumer Services against

20   the dealership?

21        A.   No.  With the DMV.

22        Q.   Has anybody filed a Complaint with the DMV?

23        A.   Yes.

24        Q.   How many?

25        A.   I don't know.
```

 1          Q.    Who would know?

 2          A.    The DMV records.

 3          Q.    Do you not maintain possession of these

 4     records in -- in your office?

 5          A.    No, because they -- we solved all the issues.

 6     The Complaints are for different reasons, like the

 7     compressor is not working, the -- the -- the

 8     transmission is -- any mechanical issues, and we always

 9     help the -- the community.

10          Q.    And is it your position that you were never

11     cited by the DMV?

12          A.    Every time there is a complaint, the DMV

13     comes to the dealer to solve the issue.

14          Q.    Did you ever receive a citation from the DMV?

15          A.    Yes.

16          Q.    What was that citation for?

17          A.    I don't know.

18          Q.    Has anybody filed a Complaint with the

19     attorney general's office against the dealership?

20          A.    Not that I know of.

21          Q.    Who would know?

22          A.    No, I don't know.

23          Q.    I understand you don't know, but who in the

24     organization would know?

25          A.    Nobody.

```
 1              MR. FEYGIN:  Okay.  I'm going to move on to

 2       Exhibit J, which is going to be the Amended Answer

 3       and Affirmative Defenses.

 4              (Plaintiff Exhibit J was marked for

 5       identification.)

 6              (Whereupon, document(s) shared on the

 7       screen.)

 8    BY MR. FEYGIN:

 9       Q.    Have you ever seen this document?

10       A.    No.

11       Q.    Okay.  I'm going to look at the affirmative

12    defenses that your attorneys filed with the Court.

13              For your first affirmative defense, what

14    facts do you rely upon to assert accord and

15    satisfaction?

16       A.    You're asking me?

17       Q.    Yes.

18       A.    I don't understand the question.

19       Q.    What facts do you rely upon when you say the

20    Plaintiff's actual damages have been fully resolved by

21    the parties' agreement and the Defendant's payment?

22       A.    The -- the bond called me asking for a check

23    for $9,000, and I sent it.

24       Q.    For your third affirmative defense -- I'm

25    sorry.
```

GABRIEL RAFAEL SUAREZ VELASQUEZ - 03/23/2024
Case 8:23-cv-00709-WFJ-SPF    Document 102-1    Filed 01/02/25    Page 89 of 174
CR of FS Investment of America (John Strusberg)
PageID 1904
88

```
 1          For your second affirmative defense, what

 2   facts do you rely upon when you assert that the

 3   Plaintiff was aware of any discrepancy in the odometer

 4   reading of the subject vehicle on or soon after

 5   May 25th, 2020?

 6          A.   What is the question?

 7          Q.   What facts do you rely upon when the

 8   dealership asserts that the Plaintiff was aware of any

 9   discrepancy in the odometer reading?

10          A.   I called -- I called Manheim automatically.

11   The second I -- I received the -- the call from the

12   bond about the claim of the mileage, the discrepancy, I

13   called the -- Manheim, the auction.

14          And I asked them why if the car was a

15   rollback they didn't disclose it on the comments,

16   because normally when the car has a discrepancy with

17   the mileage they have to disclose it on the comments

18   and they sell me the car TMU.  This car was sold to me.

19   I bought the car under the -- under the impression that

20   the car had a 131,000 miles.  That's why I bought it,

21   but then when I find out, that is when I called

22   Manheim.  And they dig into it, and the answer was

23   Ford, the seller, made a mistake.

24          Q.   What facts do you have that my client knew

25   that the odometer was rolled back shortly after the
```

GABRIEL ... (on ... AMENDED ... 23/2024
CR of FS Inver... (... Strusberg)

```
 1    purchase?
 2         A.   No.  I find out because of the bond.  That's
 3    when I find out.
 4         Q.   I understand when you found out.  What I'm
 5    asking you is:  You have asserted that my client knew
 6    that the mileage was inaccurate shortly after the
 7    purchase.
 8              What facts do you have to support my client
 9    knew that the mileage was inaccurate shortly after
10    purchase?
11         A.   I don't know.
12         Q.   For your third affirmative defense, what
13    facts do you rely upon when you assert that the
14    Plaintiff's cause of action is barred by the doctrine
15    of laches?
16              MR. PERALTA:  Objection; calls for a legal
17         conclusion.
18              THE WITNESS:  Can you please explain the
19         question a little better for me, please?
20              MR. FEYGIN:  For the third affirmative
21         defense --
22              THE WITNESS:  Yes.
23              MR. FEYGIN:  -- the dealership has asserted
24         that the client -- the consumer's causes of action
25         are barred by the doctrine of laches.
```

```
 1              How was the dealership prejudiced by the
 2       Plaintiff filing a lawsuit two years and ten months
 3       after he purchased the vehicle?
 4              THE WITNESS:  No, this is -- we completely
 5       understand that it's a human mistake.  We're not
 6       here to blame nobody.  It's -- it's -- they made a
 7       mistake, and since Day 1 when I contacted the bond,
 8       I told them that Manheim was open to receive the
 9       car back and to refund me the money.
10  BY MR. FEYGIN:
11       Q.   How was the dealership prejudiced by the
12  filing of this lawsuit two years and ten months after
13  the purchase?
14       A.   I don't understand the question.  I'm sorry.
15       Q.   As in for your fourth affirmative defense,
16  what facts does the dealership rely upon when you
17  assert that the Plaintiff has not suffered and cannot
18  honestly allege any actual damages?
19       A.   I don't understand the question.
20       Q.   For your sixth affirmative defense, what
21  facts do you rely upon when you assert Counts II and
22  III are barred under the Independent Tort Doctrine?
23       A.   Are you talking to me in Chinese.
24       Q.   Are we in agreement that the mileage
25  disclosures provided to my client on the title
```

```
 1    documents was inaccurate?

 2        A.   Yes.

 3        Q.   So, for your seventh affirmative defense,

 4    what facts does the dealership rely upon when it

 5    asserts my client waived his rights?

 6        A.   I don't understand the question.

 7        Q.   What rights did my client waive?

 8        A.   No, he's -- he's -- he -- it's his right

 9    to -- to complain about that.  If I was him, I -- I

10    would have done the same.  I -- there's no -- I'm not

11    discussing that.  He's a hundred percent right.  Your

12    client is 100 percent right, and I'm with him.

13        Q.   For your eighth affirmative defense, what

14    facts do you rely upon when you assert Plaintiff's

15    claims are barred by a prior settlement and release?

16        A.   Well, the -- the solution that I offered

17    since Day 1 is just to unwind the deal so I can just

18    give the car back to Manheim so -- so he doesn't need

19    to keep that car, and Manheim opened up that -- that

20    door for us.  They say just to unwind the deal.

21        Q.   Are you still willing to unwind the deal?

22        A.   I got to call Manheim again.  I spoke with

23    them maybe, like a year ago, but I've got to talk to

24    them again.  I'm pretty sure they're going to want the

25    deal.
```

1      Q.   And would you be interested in exploring that

2   option again?

3      A.   Whatever we need to do to -- to -- I mean,

4   it's -- it's a -- it's a mistake, and I understand your

5   point.  And me as a dealer, I learned my lesson with

6   this particular case because next time I'm going to try

7   to -- to make sure the mileage are right, to ask --

8   triple check with the auction, "are you sure this

9   mileage are right?"  Call them when they do the

10  inspection, make sure they check on -- because they

11  have access to -- to CARFAX™ and all that, so just to

12  make sure they -- they check the mileage.

13     Q.   And so, from what I understand, and correct

14  me if I'm wrong, but I think you're saying that you

15  didn't take necessary steps to verify the mileage, you

16  just relied on --

17     A.   No.  We go -- my process is --

18          MR. PERALTA:  Objection; mischaracterizes his

19     testimony.

20          THE WITNESS:  Yeah.  My -- my process is

21     simple.  When we buy the cars, we go by the Bill of

22     Sale of Manheim and -- and the odometer that

23     Manheim provides.  Because Manheim is the biggest

24     company in the U.S., so we go by -- whatever they

25     provide, we go by that.

 1   BY MR. FEYGIN:

 2        Q.   Did my client ever sign a Settlement and

 3   Release Agreement regarding his odometer claim

 4   odometer?

 5        A.   I don't remember.

 6        Q.   Did my client ever sign a Settlement and

 7   Release Agreement regarding his fraud claim?

 8        A.   I don't know.

 9        Q.   For your ninth affirmative defense, what

10   facts do you rely upon when you assert Defendant acted

11   in good faith and followed commercially and reasonable

12   standards?

13        A.   He acted in good faith, yes.

14        Q.   What commercial reasonable standards did the

15   dealership follow?

16        A.   We go by -- like, I said, by whatever

17   Manheim -- we only buy from Manheim because it's --

18   it's a trustworthy company, so whatever they tell us is

19   what we tell the -- the customers, whatever is on the

20   paper, on the Bill of Sale of the truck.

21        Q.   For your eleventh and twelfth affirmative

22   defenses, what facts do you rely upon when you assert

23   Plaintiff is estopped from asserting the actions in the

24   Complaint as his own conduct and/or the conduct of

25   third-parties outside of the Defendant's control?  What

```
 1    third-parties are you referring to?
 2         A.   I don't know.
 3         Q.   What did those third-parties do to contribute
 4    to this liability?
 5         A.   I don't know.
 6         Q.   For your thirteenth affirmative defense, what
 7    facts do you rely upon when you assert Plaintiff was
 8    negligent?
 9         A.   Who was negligent?
10         Q.   My client.
11         A.   Why was he?
12         Q.   It says my client was negligent.
13              How was my client negligent?
14         A.   I don't know.
15         Q.   For your fourteenth affirmative defense, what
16    facts do you rely upon when you assert Plaintiff's
17    claims are barred in whole or in part by of the
18    Doctrines of Unclean Hands, estoppel, laches,
19    acquiescence and other doctrines of equitable relief?
20         A.   Can you please repeat that question again?
21         Q.   For your fourteenth affirmative defense, it's
22    titled unclean hands, and it states that the
23    Plaintiff's claims are barred in whole or in part by
24    the doctrines of unclean hands, estoppel, laches,
25    anquience (sic) -- acquiescence and other doctrines of
```

1    equitable relief.

2          What facts do you rely upon to assert this

3    affirmative defense?

4          A.    I don't know.

5          Q.    For your sixteenth affirmative defense, what

6    facts do you rely upon when you assert Plaintiff failed

7    to mitigate damages?

8          A.    We always help the customers.

9          Q.    What should have my client done differently

10   here?

11         A.    I mean, it -- he did what he thought it was

12   good to do.  He's -- he's been down -- he's been down

13   before, because I remember when he was talking about a

14   lawsuit that he win, so he's been down this road

15   before.  Me, no.  For me, this is new.

16         Q.    For your nineteenth affirmative defense, what

17   facts do you rely upon when you assert Plaintiff's

18   cause of action for breach of express warranty is

19   barred by his alteration of the vehicle?

20         MR. PERALTA:  Would you mind showing it,

21      Joshua?

22         MR. FEYGIN:  (Complies with request.)

23         MR. PERALTA:  Thank you.

24   BY MR. FEYGIN:

25         Q.    Number 19 over here, Plaintiff's cause of

1  action for breach of express warranty is barred by his

2  alteration of the vehicle while in his possession.

3          What facts do you have to support that my

4  client altered the vehicle?

5      A.   I don't know.

6      Q.   Are you aware of any other affirmative

7  defenses in this case that they the dealership intends

8  to rely on?

9      A.   I don't remember.  I'm sorry.

10         MR. FEYGIN:  Okay.  I'm going to move on to

11     Plaintiff's Exhibit K, and this is the Leave to

12     Amend, Motion for Leave to Amend.

13         (Plaintiff Exhibit K was marked for

14     identification.)

15         (Whereupon, document(s) shared on the

16     screen.)

17 BY MR. FEYGIN:

18     Q.   Have you ever seen this document?

19     A.   I don't -- let me see.  I saw it, yeah, but I

20  didn't read it.

21     Q.   Okay.  I'm going to scroll down to what

22  appears to be Page 3 of 12.  In here in the highlighted

23  section it states:  However, before selling the vehicle

24  to Plaintiff, Defendant did not have any knowledge or

25  information that a 131,636 miles was not the actual

```
 1   mileage of the vehicle.  The Defendant was not in
 2   possession, nor was it aware of the content of the
 3   Certificate of Title or CARFAX™ report.  Defendant was
 4   guided only by the vehicle's dashboard and the
 5   information provided by the McCombs when Defendant
 6   purchased the vehicle from McCombs.
 7             Is this truthful and accurate?
 8        A.   Correct.
 9        Q.   Okay.  You previously testified, though, that
10   you did have possession of the title at the time of the
11   transfer?
12             MR. PERALTA:  Objection mis- --
13        mischaracterizes his testimony.
14             THE WITNESS:  No.  When you sell the car, you
15        get -- you give them a temporary register.  In that
16        moment, you don't have the title.  I got the title
17        after I sold the car.
18             MR. FEYGIN:  So, you testified that the date
19        on the Certificate of Title for the transfer for my
20        client's transaction was 5/25/20, and you're --
21             THE WITNESS:  That's what's -- that's what is
22        on the title.
23   BY MR. FEYGIN:
24        Q.   That's not the date that it was transferred,
25   though, was it?
```

```
 1            A.   I don't remember.
 2                 MR. PERALTA:  Objection; leading.
 3                 THE WITNESS:  I got to ask the lady, Betty.
 4    BY MR. FEYGIN:
 5            Q.   So, is it possible that the date on the
 6    Certificate of Title does not reflect the actual date
 7    that the transfer occurred to my client?
 8            A.   It could be.
 9            Q.   How would you figure this out?
10            A.   I don't know.  I -- I -- I don't remember.  I
11    don't know how they do paperwork.  I'm sorry.
12            Q.   After --
13            A.   I've got to ask Betty.
14            Q.   Okay.  And Betty was working for the
15    dealership at the time that this occurred?
16            A.   At the time, correct.
17            Q.   So, over here, it states that you relied upon
18    the information provided by McCombs.
19                 What information was provided by McCombs?
20            A.   The Bill of Sale.
21            Q.   That was the only information you received
22    from McCombs?
23            A.   Correct.
24                 MR. FEYGIN:  I'm going to move on to what's
25            going to be Plaintiff's Exhibit L.
```

```
 1            (Plaintiff Exhibit L was marked for
 2       identification.)
 3            (Whereupon, document(s) shared on the
 4       screen.)
 5            THE WITNESS:  McCombs.
 6            MR. FEYGIN:  McCombs, McCumbs.  I don't know
 7       how to pronounce it.
 8            THE WITNESS:  It's McCombs.
 9  BY MR. FEYGIN:
10       Q.   Have you done a lot of business with them?
11       A.   No.  First.  First and last.
12       Q.   First and last, huh?  Yeah, I don't blame
13  you.
14            So, do you recall receiving this demand
15  letter?
16       A.   See, what is that?  Not that I remember.  Not
17  that I remember.
18       Q.   Okay.  Do you recall receiving demand letters
19  from my dealer -- my -- my law firm?
20       A.   No.  I only got a letter from -- from the
21  bond.
22       Q.   Okay.  And what did the bond attach with that
23  letter?
24       A.   They only requested $9,000.
25       Q.   So, walk me through that process.  They
```

 1    simply sent you a letter saying "we need 9,000 from

 2    you"?

 3         A.    Yes, and -- and if -- if you don't pay the

 4    bond, they -- they pretty much, they cancel your bond,

 5    and if I don't have a bond, I cannot sell cars, so...

 6         Q.    Prior to receiving that letter, did Stephanie

 7    reach out to you to let you know that there was an

 8    active bond claim?

 9         A.    Yes.  That's why I had to send the check, and

10    then I say, "Let me dig into it."  And that's when I

11    called my attorney, and that's why --

12         Q.    How did Stephanie contact you?

13         A.    That's when I called Manheim.  I'm sorry.

14    What?

15         Q.    How did Stephanie from Hudson contact you

16    first?

17         A.    She sent me an e-mail.  Through e-mail.

18    We -- we spoke through e-mails.

19         Q.    Do you have a copy of that e-mail string

20    saved?

21         A.    I got to look for it, but it might be in my

22    e-mail.

23         Q.    Do you recall what was attached to the e-mail

24    Stephanie sent to you?

25         A.    I don't know.

```
 1            Q.    Do you agree to search for that e-mail?

 2            A.    Yes.

 3            Q.    And if you can find it, you agree to provide

 4    it?

 5            A.    Yes, sir.

 6            Q.    Where did you send the check?

 7            A.    To the address they provided.

 8            Q.    And what was the amount of the check?

 9            A.    I don't remember.

10            Q.    Was it $10,000?

11            A.    It was under that.

12            Q.    Was it less than $9,000?

13            A.    It was like, 8,000-something, yes.

14    8,900-something.

15            MR. FEYGIN:  I'm going to move on to what's

16       Exhibit M.

17            (Plaintiff Exhibit M was marked for

18       identification.)

19            (Whereupon, document(s) shared on the

20       screen.)

21    BY MR. FEYGIN:

22            Q.    This is another one of the demand letters.

23            Do you recall receiving this?

24            A.    No.

25            Q.    Do you recall Stephanie providing you with
```

```
 1    this?
 2         A.    I don't remember.  I'm sorry.
 3              MR. FEYGIN:  I think that's about it.
 4              Jose, got any cross?
 5              MR. PERALTA:  Yes, I will.  I need to go to
 6         the restroom first.
 7              MR. FEYGIN:  All right.  Let's take a break.
 8              MR. PERALTA:  McCombs, are you -- well, I --
 9         I -- I would rather go after McCombs, so if -- does
10         McCombs have any questions?
11              MR. TORRES:  I do have a few.
12              MR. PERALTA:  Can we wait so I can go to the
13         restroom?
14              MR. TORRES:  Yeah, I'm okay with taking a
15         five-minute break.
16              MR. PERALTA:  Thank you.
17              MR. TORRES:  You want to be back at 12:06?
18              MR. PERALTA:  Yeah, that works for me.
19              MR. TORRES:  All right.
20              (Thereupon, an off-the-record recess was had
21         from 12:01 until 12:06 p.m.)
22              MR. FEYGIN:  Before we move on, I have one
23         more question to ask.
24              MR. PERALTA:  Yeah.
25    BY MR. FEYGIN:
```

 1      Q.   Mr. Strusberg, are you ready to proceed?

 2      A.   Yeah.  Yeah, I'm here.

 3      Q.   Are you aware that the Plaintiff issued a

 4 settlement offer on March 14th where he agreed to

 5 return the vehicle is-as, where-is in exchange for

 6 $30,000 to settle the case?

 7      A.   I don't remember.

 8      Q.   That offer was never conveyed to you?

 9      A.   Through who, through my attorney?

10      Q.   Correct.

11      A.   I don't remember.  I'm sorry.

12           MR. FEYGIN:  Okay.  All right.  That's good

13      enough for now.

14           MR. PERALTA:  Josh, if you could please

15      e-mail me that -- the Certificate of -- of Title

16      with the transfer history attached?

17           MR. FEYGIN:  Sure.  Not a problem.  It was

18      disclosed in discovery.

19           MR. PERALTA:  I'm not saying that it wasn't,

20      but since you have it, you know, it will be nice;

21      otherwise, I would have to pause the deposition and

22      look for it and you know.

23           MR. FEYGIN:  Oh, you want it right now?

24           MR. PERALTA:  Yeah, if you don't mind.

25           MR. FEYGIN:  Sent.

```
 1              MR. PERALTA:  Thank you.

 2              MR. TORRES:  See?  Can we go?

 3              MR. PERALTA:  Yeah.

 4              MR. TORRES:  Awesome.

 5                           CROSS-EXAMINATION

 6   BY MR. TORRES:

 7       Q.   I just have a few questions, Mr. Strusberg.

 8   Thank you so much.  My name is Nicolas Torres.  I

 9   represent McCombs in this case.

10              First you went over your relationship with

11   Auto Deal Corp.  You mentioned that you and their owner

12   are friends, so you-all have a relationship where he

13   helped you get started, helped you with the financing

14   at first.

15              Whenever you -- and these questions, I'm not

16   talking about what you and your operation is like now.

17   I want to take you back to 2020 when this specific

18   transaction happened.

19              At the time when you were going through the

20   Manheim website and you were searching for vehicles,

21   you were making deals at that time, were you doing so

22   under an account that was named for Auto Deal Corp. or

23   was it one that was under your dealership's name?

24       A.   Auto Deal Corp.

25       Q.   So, the -- the Manheim account itself was
```

 1   under Auto Deal Corp.'s name?

 2        A.   No.  No.  It's -- it's -- it's my Manheim

 3   account.  I'm just added as a buyer on Auto Deal Corp.

 4        Q.   Got it, but the Manheim account is you

 5   personally?

 6        A.   Is mine, yeah, yeah.  Yeah, FS -- FS

 7   Investments.  Yes, it's my account.

 8        Q.   Okay.  And I know that you're here as a

 9   corporate rep, so when you say yours and FS Investment,

10   you mean it's under the company name, right?

11        A.   Correct.  Correct.

12        Q.   Not under Franklyn Strusberg?

13        A.   Correct, yes.

14        Q.   Okay.  And are you -- at the time were you

15   added as a buyer to any other company or any other --

16        A.   Just --

17        Q.   -- car buyer?

18        A.   Just Auto Deal Corp.

19        Q.   Just Auto Deal Corp.?

20        A.   Correct.

21        Q.   So, whenever you would identify a vehicle and

22   you would say "okay, this is the vehicle that I want to

23   buy," you would submit information to Auto Deal Corp.

24   to finalize that process or would you do the clicking

25   and the processing yourself?

```
 1        A.    I -- I do the click, and I buy it.

 2              THE COURT REPORTER:  Again, Mr. Strusberg --

 3              MR. TORRES:  Why --

 4              THE COURT REPORTER:  I'm sorry.  Again,

 5        Mr. Strusberg, please let him finish his question

 6        before you begin your answer.  You're talking over

 7        each other.  Thank you.

 8              THE WITNESS:  I'm sorry, your honor.

 9              THE COURT REPORTER:  No worries.

10   BY MR. TORRES:

11        Q.    Okay.  If it was you that made the

12   purchasing, why is it that this Juliana name comes out

13   as the agent signing the Certificates of Title on

14   behalf of Auto Deal and not you, yourself?

15        A.    She's the one who does the paperwork.

16        Q.    So, whenever you purchase a vehicle through

17   the Manheim website, does Juliana or does Auto Deal

18   Corp. automatically get notified that there's been a

19   purchase and they have to get the paperwork started and

20   done for that purchase?

21        A.    Yes.

22        Q.    Is that notification automatic from Manheim

23   to Auto Deal Corp.?

24        A.    Yes.

25        Q.    Do you, yourself, then reach out to Auto Deal
```

 1  Corp. in any way to let them know what vehicles you

 2  purchased and what paperwork needs to be done?

 3      A.   No.  Just to show them the cars that are --

 4  that I purchased so they can pay for them so I can pick

 5  them up.  Because as soon as they pay, they generate a

 6  gate pass, and then I can have the truck driver pick it

 7  up.

 8      Q.   That gate pass is sent to Auto Deal Corp.,

 9  though, right?

10      A.   Correct.

11      Q.   So, Auto Deal essentially gets notified

12  twice, once from Manheim and once from you, that

13  there's been vehicles that you've selected for

14  purchase?

15      A.   Correct.

16      Q.   Your communication with Auto Deal during this

17  time regarding specific purchases, over any purchase

18  really that you were making during this time, but

19  specifically this one vehicle, is that communication

20  done through e-mail, phone, any messaging within the

21  Manheim website?

22      A.   Phone.  Phone call.

23      Q.   Any text messages?

24      A.   Sometimes.

25      Q.   Regular text messages, WhatsApp?

```
 1          A.    WhatsApp.

 2          Q.    WhatsApp?

 3          A.    Correct.

 4          Q.    Who would you be contacting from Auto Deal

 5    Corp. through WhatsApp?

 6          A.    My friend, Martine.

 7          Q.    Did you ever communicate directly with

 8    Juliana or any other person --

 9          A.    I don't know --

10          Q.    -- Auto Deal Corp.?

11          A.    I don't even know her.  I don't know her.

12          Q.    Did you ever communicate with anyone from

13    Auto Deal that was not your friend?

14          A.    No.

15          Q.    Do you know how many employees Auto Deal

16    Corp. has?

17          A.    No.

18          Q.    Have you ever entered into any formal

19    agreement or contract with Auto Deal to serve as their

20    agent or representative in any way?

21          A.    No.

22          Q.    The nature of your authority to buy cars on

23    behalf of them or using their account, that is strictly

24    a conversation between you and your friend --

25          A.    I'm --
```

1          Q.    -- and an understanding with you and your

2    friend.

3          A.    I'm registered in Manheim under Auto Deal

4    Corp. as a buyer.

5          Q.    But the authority to add you as a buyer under

6    Manheim, that was given to you by your friend from Auto

7    Deal Corp., right?

8          A.    Correct.

9          Q.    Is there any written or recorded copy of that

10   agreement in any way?

11         A.    No.

12         Q.    Based on what you've testified to so far, and

13   please correct me if I'm wrong, the first notice that

14   you received of there being any issues with the

15   odometer was when you were contacted by the bond

16   office?

17         A.    Correct.

18         Q.    And that was sometime in 2022?

19         A.    No clue.

20         Q.    Do you remember when that was?

21         A.    No.

22         Q.    And an estimation, was it within months of

23   the sale, within a year, within two?

24         A.    I don't remember.  I'm sorry.

25         Q.    Okay.  And the first notice of -- the first

```
 1    time that you received any notice was through the
 2    Stephanie person from the bond company, right?
 3         A.   Correct.
 4         Q.   You also testified earlier that Manheim
 5    shipped a -- the Certificate of Title, the actual
 6    Certificate of Title sometime, I believe the date was
 7    April 28th, 2020 and that they Fed Ex'd it or UPS'ed it
 8    over to Auto Deal Corp.
 9              Do you recall that?
10         A.   Yes.
11         Q.   Do you know or do you have any memory of how
12    Auto Deal Corp. then transferred that title to you?
13         A.   No.
14         Q.   Did Auto Deal Corp. ever transfer that title
15    to you?
16         A.   They have to.
17         Q.   So, Auto Deal transfers the title, the
18    physical title to you, and then you transfer that
19    physical title to whoever you sell the vehicle to?
20              MR. PERALTA:  Objection; assumes facts not in
21         evidence.
22    BY MR. TORRES:
23         Q.   Is that correct?
24         A.   Correct.
25         Q.   Now, as we have seen now, that Certificate of
```

```
 1   Title does reflect mileage that is above the 131,000

 2   that is reflected elsewhere in that deal, correct?

 3        A.   Correct.

 4        Q.   So, it's fair to say that at least at some

 5   point in May of 2020 your company had a copy of the

 6   physical Certificate of Title reflecting 2000 -- at

 7   least 200,000 miles as the actual miles, correct?

 8        A.   No.  No.  I always receive the title after I

 9   sell the car.

10        Q.   Okay.

11        A.   Not before.

12        Q.   Okay.  So, at some point after 4/28/2020 Auto

13   Deal Corp. gets the certificate, the actual title, then

14   your position is that they do not immediately send that

15   to you, but they send that to you only after you have

16   sold the vehicle?

17        A.   Yes.  That's the agreement I have with my

18   investor.

19        Q.   Okay.  So, Auto Deal holds the Certificate of

20   Title.

21             Do you know what type of envelope or what

22   type of packaging that comes in from Manheim?

23        A.   They -- they always send them Fed Ex.

24        Q.   Okay.  Regular, one of those Fed Ex

25   envelopes, the flat --
```

GABRIEL LUGO vs AMERICA'S HOME PLACE, INC., et al.
CR of FS Investor (February 6th Strusberg)
Case 8:23-cv-00709-WFJ-SPF    Document 102-1    Filed 01/02/25    Page 113 of 174
PageID 1928
02/06/2024
112

```
 1        A.    Fed Ex envelopes, correct.

 2        Q.    Is it -- is there any further packaging once

 3   you open one of those envelopes?

 4        A.    No.

 5        Q.    So, if you open up the envelope, you take out

 6   the Certificate of Title?

 7        A.    Yes.

 8        Q.    Whenever Auto Deal Corp. sends the

 9   Certificate of Title to you, do they also use UPS or

10   any type of shipping company?

11        A.    They use Fed Ex only.

12        Q.    Fed Ex only.  Do you have records of that

13   shipment or are you able to get records of that

14   shipment --

15        A.    I can try to --

16        Q.    -- or do we need --

17        A.    I can try to get it.

18        Q.    If we can't get those from you, we can get

19   those directly from Auto Deal Corp., right?

20        A.    Correct.

21        Q.    So, at some point in -- okay.

22              So, you sell the vehicle, then you let Auto

23   Deal Corp. know that you've sold the vehicle --

24        A.    Correct.

25        Q.    -- so they can send you the title?
```

```
 1          A.    Correct.

 2          Q.    Now, that Certificate of Title on it will

 3   only reflect the transaction between McCombs and Auto

 4   Deal Corp., correct?

 5          A.    Correct.

 6          Q.    There would be no indication there of the

 7   transfer between Auto Deal and your dealership?

 8          A.    Correct.

 9          Q.    Once you do receive this from Auto Deal

10   Corp., what is your normal Standard Operating

11   Procedures for your dealership when it comes to getting

12   that title and sending it out to the buyer?

13          A.    Betty, the lady that I have --

14                MR. PERALTA:  Objection; assumes facts not in

15          evidence.

16                THE WITNESS:  The -- the -- the lady that I

17          have, she comes, picks up the deals, prepares them

18          and takes them to the DMV.

19   BY MR. TORRES:

20          Q.    So, that Certificate of Title then goes to

21   the DMV along with what?

22          A.    I don't know.

23          Q.    But then you don't ship anything directly to

24   the buyer?

25          A.    No.
```

 1         Q.    Okay.  Do you have any employee handbook that
 2    you have your employees read or hold or have to be
 3    responsible for?
 4         A.    No.
 5         Q.    You mentioned that Betty recently left her
 6    position.
 7              Did she have an opportunity to train her
 8    replacement?
 9         A.    No.
10         Q.    Who trained her replacement?
11              MR. PERALTA:  Objection; facts not in
12         evidence.
13              THE WITNESS:  The finance guy.
14              MR. TORRES:  The finance guy would have been
15         the one who trained the new person who does the
16         titling for your dealers --
17              THE WITNESS:  Yes.
18              MR. TORRES:  -- correct?
19              THE WITNESS:  Yes.
20    BY MR. TORRES:
21         Q.    And who would have trained the finance guy to
22    train the title person's job?
23         A.    Betty.
24         Q.    So, if that person were to leave, who teaches
25    that afterwards?

GABRIEL CARINGTON vs SPF AMERICA, et al., 12/03/2024
Case 8:23-cv-00709-WFJ-SPF   Document 102-1   Filed 01/02/25   Page 116 of 174
CR of FS Investments (John Strusberg)                                    PageID 1931
                                                                              115

```
 1          A.    Which person?  I'm sorry?

 2          Q.    If your finance manager leaves unexpectedly,

 3   who will teach that role if he's the one that teaches

 4   it?

 5          A.    The -- the -- the -- the software provider.

 6   She can just call the software provider, and they do,

 7   like a -- like a composition on-line.

 8          Q.    On how to use the system?

 9          A.    How to use the system, correct.

10          Q.    How to set up and --

11          A.    Correct.  Correct.

12          Q.    So, the dealership itself does not have or

13   does not offer any further training aside from what the

14   DMV's software provider gives --

15          A.    Correct.

16          Q.    -- to the dealership?

17          A.    Correct.

18          Q.    So, there's no written requirement as part of

19   your standard business practices that has the person

20   who receives the title from Auto Deal Corp. or from

21   Manheim to take a look at that Certificate of Title and

22   verify it for accuracy, correct?

23          A.    Correct.

24          Q.    All right.  So, when you first received

25   notice that there was an issue with the miles on this
```

```
 1    car, you said you immediately called Manheim because

 2    that's who you usually go to, and -- and you called

 3    them, right?  That's what you did?

 4         A.   Correct.

 5         Q.   Did you file a formal claim with Manheim

 6    related to this car?

 7         A.   No.

 8         Q.   Why was that?

 9         A.   Because at the time they give you a timeframe

10    to do it.

11         Q.   All right.  And this was outside of the

12    timeframe that Manheim --

13         A.   Correct.

14         Q.   -- gave you?

15         A.   They only give you two weeks.

16         Q.   Those two weeks are for you to inspect the

17    vehicle, make sure what they represented is fair and

18    accurate, that was --

19         A.   Any -- any legal mechanical problems, you

20    have two weeks to -- to file a claim.  After that, you

21    just have to just call them like I did.

22         Q.   Okay.  When you do contact them to -- to

23    bring out an issue like this, do you go through your

24    portal with Manheim and --

25         A.   Yes.
```

 1          Q.    Sorry?

 2          A.    Okay.  I'm sorry.

 3          Q.    You're good.  Is there anybody else in the

 4    room with you?

 5                MR. PERALTA:  You can mute yourself, Frank.

 6                THE WITNESS:  I'm sorry.  I'm sorry about

 7          that.

 8    BY MR. TORRES:

 9          Q.    You're good.  Are you alone now?

10          A.    Yes.

11          Q.    Okay.  Whenever you do go into or whenever

12    you contact Manheim to bring its -- bring up this

13    issue, do you do it through your web portal access that

14    you normally go through?

15          A.    Yeah.  I gave -- on the seller location,

16    Manheim was -- in this case, it was Manheim Houston, I

17    think, if I'm not mistaken.  San Antonio.  I'm sorry.

18    I contacted -- if you click on San Antonio, it gives

19    you a phone number, so I called that phone number.

20          Q.    Okay.  So, you called the number directly for

21    the San Antonio warehouse or option site for Manheim,

22    right?

23          A.    Correct.  I called them, and I explained to

24    them the situation.

25          Q.    All right.  Did you use your cell phone or

GABRIEL Case 8:23-cv-00709-WFJ-SPF AMEDocument 102-1    Filed 01/02/25    Page 119 of 1743/2024
CR of FS Inve...     (T...n Strusberg)
Page ID 1934
118

```
 1    did you use your --

 2         A.   My cell phone.

 3         Q.   The judge is going to yell us again.  You're

 4    going to have to wait until I finish with my questions.

 5         A.   Okay.  Okay.

 6         Q.   That way there's no issues.  Okay?

 7         A.   Yes.

 8         Q.   All right.  So, did you use your cell phone

 9    or did you use the office or any other company number?

10         A.   My cell phone.

11         Q.   Do you recall who you spoke to in Manheim?

12         A.   No.

13         Q.   Do you recall if this process of -- of

14    talking to them and them offering you to take the car

15    back, was that a one-phone-call process or did that

16    take more than one phone call?

17         A.   One phone call.

18         Q.   Did Manheim ever send you any e-mails or any

19    type of correspondence confirming or verifying the

20    conversation that you-all had?

21         A.   No.

22         Q.   Did you ever send out an e-mail, a text

23    message or any other type of communication around the

24    time that you had that conversation with Manheim that

25    memorializes what Manheim told you?
```

GABRIEL LOPEZ-GOMEZ vs. FS INVESTMENTS AMERICAS, INC.
Case 8:23-cv-00709-WFJ-SPF    Document 102-1    Filed 01/02/25    Page 120 of 174
CR of FS Investments (John Strusberg)
PageID 1935
12/13/2024
119

```
 1        A.   No.

 2        Q.   Other than going straight to Manheim and

 3   getting the person who you spoke to, the only way to

 4   know what Manheim said about the issue of the miles is

 5   what you are telling us here today, right?

 6        A.   Correct.

 7        Q.   So, what exactly did Manheim tell you about

 8   the mileage issue?

 9        A.   I don't remember too much, but what -- what

10   I'm thinking is I -- I -- I spoke with an agent from

11   Manheim.  They told me they were going to call Ford to

12   dig into it.  And then she called me back, and she told

13   me that they made a mistake.

14        Q.   So, it wasn't just one phone call, right?

15        A.   It was, like two phone calls.

16        Q.   How sure are you about there just being two?

17   Are you sure there wasn't other call-backs?  You didn't

18   have to follow up?  They didn't have to follow up

19   anymore?

20        A.   No.  No.  No.  I just called them, and -- and

21   they confirmed that there was a discrepancy with the

22   mileage and that they made a mistake.

23        Q.   How long after that initial phone call did

24   Manheim call you back?

25        A.   Same day.
```

 1        Q.    Was it the same agent that you had spoken to?

 2        A.    Correct.

 3        Q.    Do you remember their name?

 4        A.    No.  It was a lady.  I don't know her name.

 5        Q.    It was a lady?

 6        A.    Mm-hmm.  Yes.

 7        Q.    Sorry if this question is inappropriate in

 8  any way, but was that conversation in Spanish or

 9  English?

10        A.    English.

11        Q.    Okay.  From what you recall from what Manheim

12  told you, they said that they called Ford and then Ford

13  told them that, indeed, they had made a mistake?

14        A.    Yes.

15        Q.    So, you recall specifically Manheim saying

16  that was Ford who made a mistake?

17        A.    Yes.

18        Q.    Do you recall how long those phone calls

19  took?

20        A.    A couple of minutes.

21        Q.    Is it hard to get ahold of them or do they

22  leave you on hold forever or is there --

23        A.    Automatically.  You call them, and they pick

24  up right away.

25        Q.    Now, you had also testified that Manheim

1  acts as a, sort of the center piece where everything

2  gets handled, they take the car, they process the

3  paperwork, they make sure that the car is both legally

4  and mechanically up to -- up to standards for what they

5  represent and then they are ones who give you as the

6  buyer the title, the -- you know, the -- the receipt

7  for the purchase, all of the documents are sent from

8  entitlement and not the seller, correct?

9            MR. PERALTA:  Objection mischaracterizes his

10     testimony.

11            THE WITNESS:  Yes.

12  BY MR. TORRES:

13     Q.    That's why you never had any direct contact

14  with McCombs, correct?

15     A.    Correct.

16     Q.    Your contact was limited to Manheim, who is

17  selling you the vehicle?

18     A.    Correct.

19     Q.    So, whenever you receive the Certificate of

20  Title -- or scratch that.

21            Whatever Auto Deal Corp. receives that

22  Certificate of Title, they're getting that from

23  Manheim, correct?

24     A.    Correct.

25     Q.    Isn't it fair to say that if Manheim is doing

GABRIEL GUERRERO v. 21ST MORTGAGE AMERICA Case 8:23-cv-00709-WFJ-SPF   Document 102-1   Filed 01/02/25   Page 123 of 174 11/13/2024

CR of FS Investments (Josh Strusberg)   Page ID 1938   122

```
 1    the checking of the legal status of the vehicle that
 2    they would review the Certificate of Title in their
 3    possession before --
 4              MR. PERALTA:  Objection.
 5              MR. TORRES:  -- sending it, correct?
 6              THE WITNESS:  What --
 7              MR. PERALTA:  Objection; speculation.
 8              MR. TORRES:  You should wait until I'm done
 9         with my question, man, because otherwise --
10              MR. PERALTA:  That's the first time it
11         happened, man.  Go ahead.  First time it happened,
12         man.  Go head.  Say it again.  Say -- say it again
13         because it was -- it was cut, so go ahead.
14              MR. TORRES:  Madam Court Reporter, can you
15         read that back?
16              (Requested portion of the record was read by
17         the court reporter.)
18              MR. TORRES:  Before they send it out to Auto
19         Deal Corp.
20              THE WITNESS:  Yes.
21              MR. PERALTA:  Objection; speculative.
22    BY MR. TORRES:
23         Q.   Was that a yes?
24         A.   Yes.
25         Q.   So, isn't it -- does it not add up when
```

```
 1   Manheim says that it was Ford who made a mistake but
 2   they themselves have in their own possession a
 3   Certificate of Title that reflects higher mileage than
 4   what was listed?
 5           MR. PERALTA:  Objection; speculative and
 6       assumes facts not in evidence.
 7           MR. TORRES:  You can answer.
 8           THE WITNESS:  What is the question?
 9           MR. TORRES:  Do you not find it weird or at
10       all concerning that Manheim tells you that --
11           THE WITNESS:  Yes.
12           MR. TORRES:  Again, you got to let me finish.
13           MR. PERALTA:  Yeah, Frank.  Frank, just --
14           THE WITNESS:  Let him finish.  I'm sorry.
15           MR. PERALTA:  No.  No.  Just -- just count
16       two seconds, and then you answer.  Always just, you
17       know, they -- they -- they -- they ask.  One, two,
18       and then you answer.
19           THE WITNESS:  Okay.
20   BY MR. TORRES:
21       Q.   All right.  So, let's try that one more time.
22           Do you find it at all troublesome or
23   disturbing in any way that Manheim would tell you that
24   two years after the event that McCombs made a mistake
25   when they, themselves, were responsible for doing the
```

```
 1    investigation as to the mileage, had possession of a

 2    Certificate of Title that reflected higher mileage than

 3    what was communicated to you?

 4            MR. PERALTA:  Same objection, and I'm going

 5        to add leading and argumentative.

 6            Go ahead, Frank.

 7            THE WITNESS:  Yes.

 8    BY MR. TORRES:

 9        Q.    You mentioned that you -- you did your own

10    inspection when -- when you got the vehicle or when the

11    vehicle was delivered to you.

12            Was there anything, based on your experience

13    selling and buying vehicles and inspecting them, was

14    there anything about the condition of the vehicle when

15    you were testing it that would lead you to believe that

16    the mileage on the odometer was not accurate?

17        A.    No.

18            MR. TORRES:  All right.  I don't have any

19        other questions.  Thank you very much,

20        Mr. Strusberg.

21            THE WITNESS:  Thank you, Mr. Torres.

22            MR. PERALTA:  Josh?

23            MR. FEYGIN:  Go ahead.

24            MR. PERALTA:  You don't have anymore

25        questions?
```

GABRIEL MADOR vs POWERHOUSE AMERICA (2:23-cv-00709-WFJ-SPF) 12/13/2024
Case 8:23-cv-00709-WFJ-SPF    Document 102-1    Filed 01/02/25    Page 126 of 174
CR of FS Investments (Jordan Strusberg)    PageID 1941
125

```
 1              MR. FEYGIN:  No.  Done?

 2              MR. PERALTA:  No.  I have -- I have some

 3        questions.  Let me just look at the documents you

 4        just sent to me.  Thank you for sending them, by

 5        the way.  You didn't have to.

 6              MR. FEYGIN:  Anything for you, my friend.

 7              MR. PERALTA:  Share screen.

 8              (Whereupon, document(s) shared on the

 9        screen.)

10                          CROSS-EXAMINATION

11   BY MR. PERALTA:

12        Q.   Okay.  There -- there appears to be some

13   confusion as to when Powerhouse received a copy of the

14   Certificate of Title, and I'm talking about the

15   document entitled Texas Certificate of Title, of which

16   the numbers were read in deposition, and those numbers

17   are 539994086.

18              MR. FEYGIN:  Is there a question?

19              MR. PERALTA:  So, Mr. -- I'm trying to -- to

20        identify the document because there's no Bates

21        stamp, and I'm not sure what -- what exhibit was

22        it.

23              MR. FEYGIN:  It should be on the title

24        itself.  If you look on the top of your screen,

25        it's Exhibit I, Transfer of Title.
```

```
 1              MR. PERALTA:  I'm looking at it.

 2              MR. FEYGIN:  If you look at the top of your

 3         screen in the purple bar.

 4              MR. PERALTA:  Oh, in the -- as -- as a

 5         document of -- as the title of the document?

 6              MR. FEYGIN:  Correct.

 7              MR. PERALTA:  Okay.  Well, I think this is --

 8         this conversation was enough to identify the

 9         document.

10    BY MR. PERALTA:

11         Q.    Okay.  So, Frank?

12         A.    Yes.

13         Q.    Here -- here it says that Auto Deal Corp.,

14    right -- wait.  Here, it says -- in this box here, it

15    says that Auto Deal Corp. transferred title to the

16    vehicle to Powerhouse and it has the date of sale

17    5/15/20.

18              Was that the date that Powerhouse received a

19    physical copy of this title?

20         A.    When?  It says when?

21         Q.    So, my question is:  Did Powerhouse receive a

22    copy of this document, right, this document up here

23    (indicating), did Powerhouse receive a copy of this

24    document on May --

25         A.    After -- after -- after we sold the car.
```

GABRIEL Case 8:23-cv-00709-WFJ-SPF AME Document 102-1 Filed 01/02/25 Page 128 of 174 3/2024
CR of FS Inve PageID 1943 n Strusberg)
127

```
 1        Q.    And when did you sell the car?

 2        A.    Whatever is on the contract.

 3        Q.    Okay.

 4        A.    We always receive it -- we always get the

 5   titles after -- I mean, from -- specifically from Auto

 6   Deal after I sell the car.

 7        Q.    Okay.  And why is that?

 8        A.    Because the owner of Auto Deal is not going

 9   to release the title until I pay him.

10        Q.    Okay.  So, that is the agreement that you

11   have --

12        A.    That's the agreement, yes, pretty much.

13        Q.    -- with McCombs?

14        A.    After -- after I sell the car and -- and the

15   deal is booked by the bank, then he sends the title

16   after I sell the car.

17        Q.    Okay.  And that is -- this is the agreement

18   between Auto Deal Corp. --

19        A.    Correct.

20        Q.    -- and Powerhouse?

21        A.    Yes.

22        Q.    Okay.  So, every time that Powerhouse

23   purchases a vehicle -- sorry.  Strike that.

24              Every time that you as an agent of Auto Deal

25   Corp. purchases a vehicle through Auto Deal Corp. for
```

GABRIEL... Case 8:23-cv-00709-WFJ-SPF ...AME Document 102-1   Filed 01/02/25   Page 129 of 174 ...3/2024
CR of FS Inve...f... (...n Strusberg)
PageID 1944
128

 1  you to sell in -- in -- in the dealership that's

 2  operated by Powerhouse, Auto Deal retains a copy of the

 3  title until you sell the vehicle?

 4       A.   Yes, only when I sell it.

 5       Q.   Okay.  So, I think we all know for a fact

 6  that the sale did not happen on 5/15/2020.

 7            Does this mean that --

 8            MR. FEYGIN:  Objection.  It assumes facts not

 9       in evidence.  It's a narration.  I mean, what are

10       we doing here?

11            MR. PERALTA:  Sure.  That's fine.  I mean,

12       you -- you actually covered that in the deposition,

13       but I could -- I could put up some documents.  Give

14       me one second.  Actually, I'm going to stop

15       sharing.  Okay.  Auto Deal, okay.  Is it showing me

16       here?  Yes.

17            (Whereupon, document(s) shared on the

18       screen.)

19  BY MR. PERALTA:

20       Q.   Okay.  Frank, this is a document Bates

21  stamped FSIA 00005.

22            Do you recall Plaintiff's attorney,

23  Mr. Feygin, showing you this document earlier?

24       A.   Yes.

25       Q.   Do you recall answering his question that

 1  stated that this document was true and accurate --
 2  was -- was a true and accurate document that was kept
 3  in the business records of Powerhouse?  Is this a true
 4  and accurate document that's kept in the business
 5  records of Powerhouse?
 6      A.   Yes.
 7      Q.   Okay.  It states here that the date of the
 8  sale was May 25, 2020; is that correct?
 9      A.   Yes.
10      Q.   Okay.  So, if the buyer orders -- hold on.
11  Actually, let's go down here.  Here on Page 3 of 3 it
12  shows that the document was signed by Gabriel Haddon.
13           Is that the -- the name of the Plaintiff?
14      A.   Yes.
15      Q.   Is that the signature of the Plaintiff?
16      A.   Yes.
17      Q.   What is the date next to the signature of the
18  Plaintiff?
19      A.   5/25/2020.
20      Q.   If the Buyer's Order was signed on 5/25/2020,
21  is that an indication that the sale occurred on
22  5/25/2020?
23      A.   Yes.
24      Q.   Okay.  Would there ever be -- is there any
25  reason why the sale did not happen on 5/25/2020?

```
 1        A.    No.

 2        Q.    Okay.  So, you testified earlier that Auto

 3   Deal only -- strike that.

 4              You testified earlier that Auto Deal sent

 5   the -- sent a copy of the Certificate of Title to

 6   Powerhouse only after Powerhouse sold the vehicle to

 7   Mr. Haddon, the Plaintiff; is that correct?

 8        A.    Yes.

 9        Q.    Okay.  So, is -- is it fair to say that on

10   May -- sorry.  Strike that.

11              Is it fair to say to say that this date --

12   let me -- here.

13              Is it fair to say that May 15, 2020 was not

14   the date that Auto Deal Corp. provided a copy of the

15   title that -- regarding the vehicle that's at issue to

16   Powerhouse?

17        A.    Correct.

18        Q.    Okay.  Do you have any -- do you know why it

19   would say 5/15 --

20        A.    No clue --

21        Q.    -- here?

22        A.    -- but I can get the Fed Ex label.

23        Q.    Okay.  There's more down here.  Here, it

24   shows --

25              MR. FEYGIN:  We're -- we're looking at the
```

 1        Buyer's Order form, Jose.  I don't know what you're

 2        pointing at.

 3             MR. PERALTA:  This one here (indicating.)  I

 4        don't know -- I don't know how to do the whole

 5        highlighting thing, though it's super nice,

 6        actually.

 7             MR. FEYGIN:  Are we looking at the Buyer's

 8        Order form?

 9             MR. PERALTA:  No, because we're looking at

10        the --

11             MR. FEYGIN:  Because --

12             MR. PERALTA:  -- Certificate of Title.

13             MR. FEYGIN:  -- all I see at the top of my

14        screen is the Buyer's Order form.

15             THE WITNESS:  Yeah, me too.

16             MR. PERALTA:  Really?

17             MR. TORRES:  You're only sharing one of your

18        screens, so if you have multiple screens, we won't

19        be able to see it.

20             MR. PERALTA:  Oh.  Actually, hold on.  I

21        don't know how this works, because what I did was:

22        I put the Certificate of Title on the screen that I

23        was sharing.  Interesting.  Hold on.

24             (Whereupon, document(s) shared on the

25        screen.)

```
 1              MR. PERALTA:  Okay.  Thank you, Joshua.
 2    BY MR. PERALTA:
 3         Q.   Just to clarify, Frank, when I asked you
 4    earlier about 5/15/2020 not being the date that
 5    Automotive -- that Auto Deal Corp. transferred title to
 6    Powerhouse or provided a copy of a title to Powerhouse,
 7    were you aware that I was talking about this box down
 8    here (indicating)?
 9         A.   One second, please.  Okay.  There we go.
10         Q.   Can you see it?
11         A.   Now I can see it.
12         Q.   Now you can see it?  Okay.
13         A.   Yeah.
14         Q.   Let me ask you it this way now -- now that I
15    have the document on the screen:  This date that
16    appears here (indicating), this one here, right,
17    5/15/2020, is that the date -- this date, 5/15/2020
18    that appears in the Certificate of Title regarding the
19    transfer as to Auto Deal Corp. to Powerhouse, is this
20    the date that Powerhouse received a copy of the
21    Certificate of Title?
22         A.   No.
23         Q.   Okay.  So, let's go down here, this one here
24    (indicating.)
25              So then, is it fair to say then this date
```

 1   also does not depict the date that Powerhouse received

 2   a copy of the Certificate of Title from Auto -- from

 3   Auto Deal Corp.?

 4        A.   Correct.

 5        Q.   Is that correct?

 6        A.   Correct.

 7        Q.   And do you know why this date appears in this

 8   box down here, the date 5/15?

 9        A.   No clue.

10        Q.   Five -- okay.  Now, when you -- when

11   Powerhouse included the mileage on its sales documents

12   to Haddon, did it get the mileage of the vehicle by

13   looking at the odometer of the vehicle, by looking at

14   the dashboard of the vehicle?

15        A.   The web page.

16        Q.   The web page.  What -- what --

17        A.   Web page.

18        Q.   What web page?

19        A.   Powerhouse web page.

20        Q.   Okay.  So, the information that appears on

21   the Powerhouse web page, is that gathered by looking at

22   the dashboard --

23        A.   Of the dashboard, correct.

24        Q.   -- of the vehicle?

25        A.   Yes.

1      Q.   Okay.  You've been -- you've been in -- in

2  the business of selling vehicles for how long now,

3  selling used -- used vehicles?

4      A.   15 years.

5      Q.   15 years.  Would you say that it's customary

6  practice for dealers to look at the dashboard of the

7  vehicle and guide themselves by the information that

8  appears there when they are filling out sales documents

9  to sell the -- the vehicles?

10     A.   Yes.

11          MR. PERALTA:  Okay.  One second.

12          (Whereupon, screen sharing was stopped.)

13          MR. PERALTA:  Here, we have the Buyer's Order

14     again.  That's Bates Stamp FSIA 000005.

15          (Whereupon, document(s) shared on the

16     screen.)

17          MR. PERALTA:  Okay.  So, let me zoom in.

18          Here where it says odometer reading, a

19     131,636, did Powerhouse obtain this odometer

20     reading from looking at the dashboard --

21          THE WITNESS:  Yes.

22          MR. PERALTA:  -- of the vehicle?

23          THE WITNESS:  Yes.

24  BY MR. PERALTA:

25     Q.   Okay.  When Powerhouse filled in the

GABRIEL LUC HADDON v. FS INVESTMENTS OF AMERICA (3/13/2024
CR of FS Investments (John Strusberg)                        135

 1   information, this information here, the odometer

 2   reading (indicating) in the Buyer's Order, in the

 3   Odometer Disclosure and in the Retail Installment

 4   Contract, a/k/a financing agreement, did it obtain the

 5   odometer reading from the vehicle dashboard?

 6        A.   Yes.

 7        Q.   When it provided that information and you put

 8   that information in those documents, did it have in its

 9   possession a copy of the Certificate of Title involving

10   this vehicle?

11        A.   No.

12        Q.   Okay.  Did it have any other documents --

13   strike that.

14             Did it have any document that would

15   contradict -- contradict the reading placed in the

16   Buyer's Orders?

17        A.   No.

18        Q.   Okay.  Now, besides looking at the vehicles

19   dashboard, did Powerhouse obtain the odometer -- strike

20   that.

21             Besides looking at the vehicle's dashboard,

22   did Powerhouse obtain the mileage of the vehicle by

23   looking at -- at the Manheim website?

24        A.   Yes.

25        Q.   Okay.  And was -- and did the -- did the --

GABRIEL [illegible] 11/13/2024
CR of FS Inventory [illegible] (John Strusberg)
Page ID 1952

```
 1    actually, give me one second.
 2              (Whereupon, screen sharing was stopped.)
 3              THE WITNESS:  Eight miles difference, one
 4         thirty-one six twenty-eight from Manheim.
 5              MR. PERALTA:  Okay.  One second.  Okay.  I'm
 6         showing you a document, FSA -- no, FSIA 000011.  We
 7         can make that Defendant's Exhibit A.
 8              (Defendant Exhibit A was marked for
 9         identification.)
10              (Whereupon, document(s) shared on the
11         screen.)
12    BY MR. PERALTA:
13         Q.   Okay.  Is this -- what is this document?
14         A.   The Bill of Sale from Manheim.
15         Q.   Okay.  And does Manheim provided you this
16    document?
17         A.   Correct.
18         Q.   Okay.  And when I say "you," I'm referring to
19    Powerhouse, just to make clear.
20              Okay.  What is the mileage that appears on
21    the Bill of Sale, if you can read it?
22         A.   One thirty-one six twenty-eight.
23         Q.   Okay.  And who's the seller?
24         A.   McCombs Ford West.
25         Q.   Okay.  Based on your knowledge, from where
```

```
1   does Manheim get the information as to the mileage of

2   the vehicle, is it provided by McCombs West Ford?

3           MR. TORRES:  Objection; form.

4           THE WITNESS:  I don't know.

5   BY MR. PERALTA:

6       Q.   Have you sold any -- any vehicles through

7   Manheim?

8       A.   Yeah.

9       Q.   Okay.  So, walk me through how you do it.

10  When you -- when you post -- well, strike that.

11          Does Manheim works as a middle person between

12  the seller and the buyer of the vehicle?

13      A.   Correct.

14      Q.   Okay.  And when we say "middle person," is

15  it -- is it only to facilitate the transaction, meaning

16  that they will provide information from the seller to

17  the buyer and if the buyer has any questions then

18  Manheim might -- may get back that to the seller,

19  correct?

20      A.   Correct.

21          MR. TORRES:  Objection; form.

22  BY MR. PERALTA:

23      Q.   Correct, you said?

24      A.   Yes.

25      Q.   Okay.  So, when you want to sell a vehicle
```

1    through the Manheim website, do you have to provide

2    Manheim information as to the vehicle?

3        A.    Yes.

4        Q.    Okay.  Does that information include the year

5    of the vehicle?

6        A.    Everything, the -- the VIN.

7        Q.    Everything?

8        A.    Yes.

9        Q.    Everything, including -- including the --

10    the --

11        A.    Mileage.

12        Q.    -- the odometer reading?

13        A.    Yes.

14        Q.    Okay.  Now, based on your experience selling

15    vehicles through Manheim, would -- will Manheim just

16    transfer that information to potential sellers?

17        A.    Buyers, yes.

18        Q.    Thank you.  Buyers.  So, Manheim pretty much

19    just shares the information that the sellers of

20    vehicles provide to it --

21        A.    Correct.

22        Q.    -- correct?  Okay.

23            You mentioned yesterday -- not yesterday.

24    Sorry.  You mentioned earlier that Manheim conducts its

25    own inspection.

```
 1              Do you -- I mean, do they do more than drive
 2     vehicles?
 3              MR. FEYGIN:  Objection; assumes facts not in
 4         evidence.
 5              THE WITNESS:  After you buy them, you --
 6         you request --
 7              MR. PERALTA:  No.  No.  Manheim.  Manheim.
 8         Does --
 9              THE WITNESS:  Yeah.
10     BY MR. PERALTA:
11         Q.    Does Manheim do more than drive the vehicles?
12         A.    They inspect it.
13         Q.    When you say "inspect it," do they just look
14     at it?
15         A.    Yeah.
16         Q.    Okay.  Do they do any mechanical inspection,
17     like, you know --
18              MR. FEYGIN:  Asked and answered.
19              THE WITNESS:  Sometimes if you request it.
20         It's not always.
21     BY MR. PERALTA:
22         Q.    It's not always?
23         A.    No.
24         Q.    So, you have to request it?
25         A.    You have to request it.
```

```
 1        Q.   Okay.  Would you say, based -- based on your
 2   experience in selling used vehicles, that it is not the
 3   customary practice for used car dealers in -- to
 4   request that inspection?
 5        A.   What's the question?  I'm sorry?
 6        Q.   Would you say that it is not customary
 7   practice for used car dealers to request the inspection
 8   of every vehicle from which -- you know, that they --
 9   that they're selling?
10        A.   If it's legible, yes.
11        Q.   What do you mean legible?
12        A.   Sometimes it's as-is.  Then you cannot
13   request an inspection.
14        Q.   Okay.  Now, when you purchased the vehicle
15   through Auto Deal Corp., as their agent, was your
16   intention all along to sell this vehicle through
17   Powerhouse?
18        A.   Yes.
19        Q.   So, Powerhouse bought the vehicle as an agent
20   of Auto Deal Corp., but it was understood between Auto
21   Deal Corp. and Powerhouse that Powerhouse was going to
22   try to sell this vehicle on its lot?
23             MR. FEYGIN:  Objection.  Objection to form.
24             THE WITNESS:  Correct.
25   BY MR. PERALTA:
```

1    Q.   Okay.  Now, when you purchase -- you said
2    that the account of Manheim is in the name of
3    Powerhouse?
4        A.   Yes.
5        Q.   But that -- but that you also bought it --
6    sorry.
7            But that you also use this account as an
8    agent of Auto Deal Corp.?
9        A.   Correct.
10       Q.   Okay.  Would you say then that you were using
11   the account for the benefit of Powerhouse?
12       A.   Yes.
13       Q.   Would you say that you were using the account
14   as a representative of Powerhouse --
15       A.   Yes.
16       Q.   -- as well?
17       A.   Yes.
18       Q.   Okay.  Okay.  Hold on.  So, let's talk
19   about -- let's talk about Betty.  You said that Betty
20   was -- she was paid under a 1099.
21           Did she have her own company while she was
22   providing services to Powerhouse?
23       A.   Yes.
24       Q.   So, when you said that she was an employee of
25   Powerhouse, do you mean -- did you mean that she was

GABRIEL ... 8:23-cv-00709-WFJ-SPF AMB Document 102-1    Filed 01/02/25    Page 143 of 174 ...3/2024
CR of FS Inves...tiga...h Strusberg)
PageID 1958                                                                                    142

```
 1    a -- a contractor or an actual employee of Powerhouse?

 2         A.   No, contractor, like sub- -- subcontractor.

 3         Q.   Okay.

 4              THE COURT REPORTER:  Mr. Peralta, are

 5         finished with this document?

 6              MR. PERALTA:  Yes, I am.

 7              THE COURT REPORTER:  Thank you.

 8              (Whereupon, screen sharing was stopped.)

 9              MR. PERALTA:  Okay.  So, okay.  Now let's

10         talk about the -- well, actually, before -- before

11         I leave Betty, let's stay with Betty for just a few

12         more questions.

13              (Whereupon, document(s) shared on the

14         screen.)

15    BY MR. PERALTA:

16         Q.   So, you stated before that you believe

17    that -- that -- that there's a possibility that this

18    document was completed by Betty; is that correct?

19         A.   Correct.

20         Q.   This section down here where it says -- where

21    Powerhouse transfers title to Gabriel -- to the -- to

22    the Plaintiff, and it's dated 5/25/2020.

23              So, if Powerhouse did not receive a copy of

24    the Certificate of Title until it sold the vehicle to

25    the Plaintiffs, then Betty would not have a copy of
```

```
 1    that Certificate of Title when she might have completed

 2    this section that -- that I'm highlighting?

 3         A.   Correct.

 4              MR. PERALTA:  Okay.  Let's move on to the

 5         bond payment.

 6              (Whereupon, Counsel Silverstein leaves Zoom

 7         deposition.)

 8    BY MR. PERALTA:

 9         Q.   When you -- did you send a check to

10    Plaintiff's counsel of around $9,000?

11         A.   Yes.

12         Q.   Okay.  When you sent that check, was it your

13    understanding that you were settling or -- or resolving

14    Plaintiff's claims in this lawsuit?

15         A.   Correct.

16         Q.   Okay.  You know what damages are, right?

17         A.   Yes.

18         Q.   Is the Plaintiff claiming actual damages in

19    this case?

20         A.   I don't know.

21         Q.   Okay.  Did you receive an e-mail from

22    Plaintiff's counsel telling you --

23         A.   Yes, that that was for damages.

24         Q.   Well, hold on.  Let me -- let me finish.

25              Did you receive an e-mail from Plaintiff's
```

```
 1    counsel telling you that your -- that -- that the check
 2    that Powerhouse sent him was to cover the actual
 3    damages that the Plaintiff alleges?
 4         A.   Yes.
 5         Q.   Okay.  Were you surprised when Plaintiff's
 6    counsel told you that he was going to still file a
 7    lawsuit even though you had already paid him some
 8    money?
 9         A.   Yes.
10              MR. PERALTA:  Okay.  Gentlemen, allow me
11         three minutes, and then let me see if I'm done.
12              MR. FEYGIN:  Let's do this:  Let's take a
13         five-minute break so I can use the little boy's
14         room.
15              MR. PERALTA:  That works for me too.
16              (Thereupon, an off-the-record recess was had
17         1:04 until 1:12 p.m.)
18              MR. PERALTA:  Okay.  I'm done with -- with my
19         questions for now.
20              MR. FEYGIN:  All right.  I have a redirect.
21                        REDIRECT EXAMINATION
22    BY MR. FEYGIN:
23         Q.   Mr. Strusberg, you have an agreement with
24    Auto Deal Corp. where one way or the other you acquire
25    vehicles from Auto Deal Corp.; is that correct?
```

```
 1          A.   Correct.

 2          Q.   How many vehicles have you acquired from Auto

 3    Deal Corp. based upon this agreement?

 4          A.   I don't know.

 5          Q.   Would it be more than ten?

 6          A.   Yes.

 7          Q.   Would it be more than twenty?

 8          A.   Yes.

 9          Q.   More than fifty?

10          A.   I don't know.  Somewhere there.

11          Q.   So, between twenty to fifty cars?

12          A.   Correct.

13          Q.   How many years has this been going on for?

14          A.   It was just one year when I first started,

15    not anymore.

16          Q.   So, you first started in May of 2020-ish?

17          A.   When I first opened the dealership back in --

18    I don't -- I don't remember.  He -- he supported me in

19    the beginning.

20          Q.   Okay.  And it's your testimony that you would

21    only receive titles to those vehicles, the twenty to

22    fifty that you bought from them, after you actually

23    sold the vehicle; is that accurate?

24          A.   Correct.

25          Q.   Okay.  Is it the dealership's position that
```

 1    it can execute title disclosures as it relates to a

 2    mileage reading after a vehicle is sold?

 3         A.   Yes.

 4         Q.   Is it the dealership's position that the

 5    title transfer from Auto Deal to Powerhouse was not

 6    actually filled in on 5/15/2020?

 7         A.   I don't remember.

 8         Q.   Is it now the dealership's position that the

 9    title transfer and mileage disclosure to my client did

10    not actually get filled out on May 25th of 2020?

11         A.   Correct.

12         Q.   How did the dealership know that the mileage

13    it entered on May 25th, 2020 was the actual mileage on

14    that date?

15         A.   Based on the -- the Bill of Sale from

16    Manheim.

17         Q.   But it wasn't based upon its own inspection

18    of the vehicle?

19         A.   Yeah.  When -- when we take -- get the cars,

20    we -- I post it myself on the page based on the

21    odometer reading.

22         Q.   Does the dealership routinely execute title

23    transfers after a vehicle is sold?

24         A.   Yes.

25         Q.   Is it now the dealership's position that it

```
 1   received this title after it sold the vehicle to my
 2   client?
 3        A.   Correct.
 4        Q.   Aside from Manheim and the dashboard of the
 5   vehicle, did Powerhouse complete any other sort of
 6   investigation into the mileage history?
 7        A.   No.
 8             MR. FEYGIN:  My apologies.  I just noticed my
 9        video was off.  I don't want to be rude.
10   BY MR. FEYGIN:
11        Q.   Does the dealership have any other policies
12   or procedures in place to investigate vehicle mileage
13   other than relying upon a seller's disclosure?
14        A.   No.
15        Q.   And you mentioned that Manheim provides the
16   option to inspect vehicles.
17             Do you ever recall requesting an inspection
18   of this particular vehicle to be performed by Manheim?
19        A.   No.
20        Q.   And is that because it never occurred?
21        A.   Correct.
22        Q.   And with respect to Betty, was Betty acting
23   with the dealer's authority when she completed the
24   title transfers --
25        A.   -- correct.
```

GABRIEL ... Case 8:23-cv-00709-WFJ-SPF AMENDED Document 102-1    Filed 01/02/25    Page 149 of 174 3/2024
CR of FS Inve... (F... n Strusberg)
Page ID 1964                                                         148

1          Q.   -- to my client?

2               And she wasn't doing this for her on benefit,

3    was she?

4          A.   She gets paid for that.

5          Q.   Okay.  But she was doing it on behalf of the

6    dealership, though, correct?

7          A.   Correct.

8               MR. FEYGIN:  Okay.  Okay.  Nothing further.

9               MR. TORRES:  I just have only, like two

10        questions.

11                         RECROSS-EXAMINATION

12   BY MR. TORRES:

13         Q.   Back in 2021 when your friend at Auto Deal

14   Corp. was working with you and helping you out, did

15   y'all at any time share office space?

16         A.   No.

17         Q.   Was Betty ever in the same location as

18   Juliana?

19         A.   No, never.

20              MR. TORRES:  That's all.  Thank you.

21              MR. FEYGIN:  All right.  Explain reading

22        versus waiving?

23              MR. PERALTA:  No, I have -- I have -- I have

24        some questions too on -- on recross.  It's just

25        like, one -- like three.

```
 1              MR. FEYGIN:  That's fine.
 2                        RECROSS-EXAMINATION
 3    BY MR. PERALTA:
 4         Q.    Frank?
 5         A.    Yes.
 6         Q.    When Plaintiff's counsel just asked you if
 7    the dealership provides odometer disclosures and title
 8    transfers after the vehicle is sold, let's talk about
 9    the -- the word -- the term after the vehicle is sold.
10              Does that mean after the Plaintiff has signed
11    all documents to sell the vehicle?
12         A.    What is the question?
13         Q.    So, what does it mean after it's sold?  It
14    means that that's -- that's after -- that is after --
15         A.    Before it's sold.
16         Q.    Huh?
17         A.    Before.
18         Q.    Okay.  Listen to my question.
19              Does the dealership provides the -- the --
20    the transfer the --
21         A.    The title.
22         Q.    No.  Hold on.
23              MR. PERALTA:  Okay.  That's fine.  I have no
24         more questions for my friend.  I'll -- I'll leave
25         it at that.
```

```
 1              MR. FEYGIN:  Jose, do you want to explain to

 2       him reading versus waiving?

 3              MR. PERALTA:  We're going to read.

 4              MR. TORRES:  And I will go ahead and order.

 5       If no one else orders, then I'll make it the first.

 6       Otherwise, a copy.

 7              MR. FEYGIN:  I don't want to be ordering just

 8       yet.  I'll let you know.

 9              MR. PERALTA:  Okay.  Me neither.

10              (Thereupon, the proceedings concluded at

11       1:19 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE  OF  OATH

 2

 3                          -   -   -

 4    THE STATE OF FLORIDA,      )

 5    COUNTY OF PALM BEACH.      )

 6

 7

 8            I, the undersigned authority, certify that

 9    FRANKLYN STRUSBERG personally appeared before me and

10    was duly sworn on the 23rd day of April, 2024.

11

12

13

14            Signed this 6th day of May, 2024.

15

16

17

18            Wanda D. Good, Certified Court Reporter

              Notary Public - State of Florida

19            My Commission No. #HH 216106

              My Commission Expires:  January 26, 2026

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2

      THE STATE OF FLORIDA,      )

 3

      COUNTY OF PALM BEACH.      )

 4

 5

 6           I, WANDA D. GOOD, Florida Professional

      Reporter, certify that I was authorized to and did

 7    stenographically report the deposition of FRANKLYN

      STRUSBERG, pages numbered 1 through 151; that a review

 8    of the transcript was requested; and that the

      transcript is a true and complete record of my

 9    stenographic notes.

10

11           I further certify that I am not a relative,

      employee, attorney, or counsel of any of the parties,

12    nor am I a relative or employee of any of the parties'

      attorney or counsel connected with the action, nor am I

13    financially interested in the action.

14

15

             DATED this 6th day of May, 2024.

16

17

18

19

20           WANDA D. GOOD, Certified Court Reporter

21

22

23

24

25
```

```
 1  May 6, 2024
 2  FRANKLYN STRUSBERG
    c/o Jose Ariel Peralta, Esquire
 3  jperalta@atllp.com
    ARMSTRONG TEASDALE, LLP
 4  355 Alhambra Cir., Ste. 1250
    Coral Gables, Florida   33134
 5
    IN RE:  GABRIEL LUC HADDON v. FS INVESTMENTS OF
 6          AMERICA, INC., et. al.
    CASE NO.:  8:23-cv-00709-WFJ-SPF
 7
    Please take notice that on the 23rd day of April, 2024,
 8  you gave your deposition in the above cause.  At that
    time you did not waive your signature.  The transcript
 9  is now available for your review.
10  Please call (561) 689-0999 or 1-800-765-3576 or e-mail
    Depos@FloridaCourtReporting.com between the hours of
11  9:00 a.m. and 4:00 p.m., Monday through Friday, to make
    arrangements to read your deposition transcript.  Once
12  completed, please sign and return same to us for
    distribution to all parties.
13
    If you do not read and sign the deposition within a
14  reasonable amount of time, the original, which has
    already been forwarded to the ordering attorney, may be
15  filed with the Clerk of the Court.
16  If you wish to waive your signature now, please sign
    your name in the blank at the bottom of this letter and
17  return it to the address listed below.
18  Very truly yours,
19
20
    Wanda D. Good, Certified Court Reporter
21  Florida Court Reporting
    2161 Palm Beach Lakes Boulevard, Suite 302
22  West Palm Beach, Florida 33409
23  I do hereby waive my signature.
24
25  FRANKLYN STRUSBERG
```

```
 1              ERRATA SHEET

 2      DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

 3  IN RE:  GABRIEL LUC HADDON v. FS INVESTMENTS OF

 4          AMERICA, INC., et. al.

 5  CASE NO.:  8:23-cv-00709-WFJ-SPF

 6  WITNESS: FRANKLYN STRUSBERG  TAKEN: APRIL 23, 2024

 7  Page No.    Line No.           Change          Reason

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22      Under penalties of perjury, I declare that I have

    read the foregoing document and that the facts stated

23  in it are true.

24

25

    DATE                        FRANKLYN STRUSBERG
```

## WORD INDEX

**< $ >**
**$10,000** 101:*10*
**$30,000** 103:*6*
**$5,000** 53:*10*
**$7,000** 59:*25*
**$799** 53:*16*
**$9,000** 87:*23* 99:*24*
 101:*12* 143:*10*

**< 0 >**
**000005** 134:*14*
**000011** 4:*17* 136:*6*
**000014** 32:*2*
**000018** 61:*21*
**000020** 3:*14*
**000026** 56:*20*
**000031** 56:*20*
**000034** 64:*22*
**00005** 51:*21* 128:*21*
**00007** 51:*22*
**00019** 42:*6*
**00020** 42:*6*
**018** 67:*21*

**< 1 >**
**1** 1:*16* 13:*11* 31:*4*
 67:*9* 90:*7* 91:*17*
 152:*7*
**1:04** 144:*17*
**1:12** 144:*17*
**1:19** 1:*20* 150:*11*
**10:13** 1:*20* 5:*2, 7*
**100** 19:*21* 91:*12*
**101** 4:*10*
**104** 3:*5*
**1099** 77:*5, 6* 141:*20*
**11th** 35:*15* 44:*13*
**12** 96:*22*
**12/11** 69:*12*
**12/21/22** 4:*8, 10*
**12:01** 102:*21*
**12:06** 102:*17, 21*
**125** 3:*5*
**13** 3:*14*
**131,000** 37:*22, 23*
 88:*20* 111:*1*

**131,636** 96:*25* 134:*19*
**131630** 77:*14*
**131636** 62:*8, 9* 66:*21*
 67:*8* 79:*1*
**136** 4:*17*
**144** 3:*5*
**148** 3:*5*
**149** 3:*5*
**14th** 103:*4*
**15** 130:*13* 134:*4, 5*
**151** 152:*7*
**154** 1:*16*
**16** 57:*5* 58:*8*
**16.9** 58:*7*
**18,900** 60:*7* 61:*3*
**1-800-765-3576**
 153:*10*
**19** 95:*25*
**1930** 2:*5*

**< 2 >**
**2.8** 35:*4, 11, 12* 39:*22*
**200** 2:*17*
**200,000** 111:*7*
**2000** 111:*6*
**201150** 45:*1*
**2012** 39:*21*
**2020** 44:*12* 53:*13*
 58:*7* 76:*25* 82:*6*
 88:*5* 104:*17* 110:*7*
 111:*5* 129:*8* 130:*13*
 146:*10, 13*
**2020-ish** 145:*16*
**2021** 148:*13*
**2022** 109:*18*
**2024** 1:*20* 5:*6*
 151:*10, 14* 152:*13*
 153:*1, 6* 154:*6*
**2026** 151:*19*
**208F** 2:*5*
**2161** 153:*21*
**216106** 151:*19*
**23** 1:*20* 154:*6*
**23rd** 5:*6* 151:*10*
 153:*6*
**25** 41:*16* 129:*8*
**25,000** 53:*3*
**25th** 53:*13* 82:*6*
 88:*5* 146:*10, 13*

**26** 151:*19*
**28** 44:*12, 14*
**28th** 110:*7*

**< 3 >**
**3** 96:*22* 129:*11*
**3/6/19** 4:*1*
**302** 153:*21*
**305.371.8809** 2:*12*
**305.460.9888** 2:*18*
**30th** 44:*18*
**32** 3:*14*
**33008-5293** 2:*5*
**33020** 2:*6*
**33134** 2:*11* 153:*4*
**33146** 2:*18*
**33409** 153:*22*
**355** 2:*11* 153:*4*
**360** 17:*1*

**< 4 >**
**4/28/2020** 111:*12*
**4:00** 153:*11*
**41** 3:*14*
**4651** 2:*17*
**48** 58:*6*

**< 5 >**
**5** 3:*5*
**5,000** 53:*8*
**5/15** 82:*10* 130:*19*
 133:*8*
**5/15/20** 77:*21* 126:*17*
**5/15/2020** 128:*6*
 132:*4, 17* 146:*6*
**5/25** 82:*13, 15*
**5/25/20** 3:*14, 22, 23*
 4:*1* 79:*4* 97:*20*
**5/25/2020** 67:*12* 71:*2*
 81:*23* 129:*19, 20, 22,*
 *25* 142:*22*
**5/30/81** 9:*9*
**51** 3:*14*
**539994086** 4:*5* 73:*24*
 125:*17*
**539994087** 74:*8*
**539994090** 68:*11*
**56** 3:*14*
**561** 153:*10*

**57987168** 55:*20*

**< 6 >**
**6** 153:*1*
**61** 3:*22*
**64** 3:*23*
**67** 4:*1*
**689-0999** 153:*10*
**6th** 151:*14* 152:*13*

**< 7 >**
**7** 58:*6*
**73** 4:*1*

**< 8 >**
**8,000-something**
 101:*13*
**8,900-something**
 101:*14*
**8:23-cv-00709-WFJ-**
**SPF** 1:*4* 5:*14* 153:*6*
 154:*5*
**82053** 69:*10*
**85293** 2:*5*
**87** 4:*6*

**< 9 >**
**9,000** 40:*24* 100:*1*
**9:00** 153:*11*
**954.228.5674** 2:*6*
**96** 4:*6*
**99** 4:*8*

**< A >**
**a.m** 1:*20* 5:*2, 7*
 153:*11*
**a/k/a** 135:*4*
**A12718** 44:*10* 47:*21*
**abide** 17:*11*
**ability** 44:*19*
**able** 8:*12* 47:*3, 12,*
 *15* 112:*13* 131:*19*
**accepted** 77:*25*
**access** 47:*12* 85:*4*
 92:*11* 117:*13*
**accommodate** 8:*20*
**accord** 87:*14*
**account** 24:*23, 25*
 25:*2* 41:*12* 44:*6*
 85:*8, 12* 104:*22, 25*

105:*3*, *4*, *7*  108:*23*
141:*2*, *7*, *11*, *13*
**accuracy**  115:*22*
**accurate**  17:*13*, *22*
18:*14*, *24*  41:*1*  65:*1*
73:*16*  79:*11*  97:*7*
116:*18*  124:*16*  129:*1*,
*2*, *4*  145:*23*
**accused**  9:*15*
**achieved**  9:*21*
**acknowledge**  5:*16*, *19*
6:*6*, *8*, *11*
**acquiescence**  94:*19*,
*25*
**acquire**  11:*3*  144:*24*
**acquired**  145:*2*
**ACT**  4:*10*  71:*12*
**acted**  93:*10*, *13*
**acting**  147:*22*
**Action**  1:*4*  89:*14*, *24*
95:*18*  96:*1*  152:*12*,
*13*
**actions**  93:*23*
**activate**  85:*14*
**active**  100:*8*
**acts**  121:*1*
**actual**  38:*12*  45:*4*
62:*11*  63:*24*  67:*16*,
*18*, *19*  77:*22*  87:*20*
90:*18*  96:*25*  98:*6*
110:*5*  111:*7*, *13*
142:*1*  143:*18*  144:*2*
146:*13*
**add**  109:*5*  122:*25*
124:*5*
**added**  105:*3*, *15*
**addition**  19:*22*  21:*12*
**address**  50:*7*, *12*
101:*7*  153:*17*
**administer**  5:*20*
**administered**  5:*19*
**administration**  9:*25*
**Administrative**  5:*22*
**advertised**  47:*9*, *25*
**advertisements**  47:*13*,
*17*
**advertising**  53:*22*
**advise**  22:*17*
**affirm**  6:*14*

**AFFIRMATIVE**  4:*6*,
*8*  87:*3*, *11*, *13*, *24*
88:*1*  89:*12*, *20*  90:*15*,
*20*  91:*3*, *13*  93:*9*, *21*
94:*6*, *15*, *21*  95:*3*, *5*,
*16*  96:*6*
**affirmed**  6:*21*
**agent**  28:*20*  65:*21*
106:*13*  108:*20*
119:*10*  120:*1*  127:*24*
140:*15*, *19*  141:*8*
**ago**  11:*23*  20:*18*
30:*8*  54:*10*  91:*23*
**agree**  17:*5*  18:*16*
42:*7*  47:*17*  48:*1*
58:*18*  61:*7*  72:*13*
73:*15*  74:*22*  83:*24*
101:*1*, *3*
**agreed**  103:*4*
**AGREEMENT**  3:*21*
5:*25*  6:*2*  12:*7*  57:*10*
59:*17*, *24*  60:*8*, *9*
84:*2*  87:*21*  90:*24*
93:*3*, *7*  108:*19*
109:*10*  111:*17*
127:*10*, *12*, *17*  135:*4*
144:*23*  145:*3*
**agreements**  19:*23*
**Agriculture**  85:*19*
**ahead**  7:*13*  11:*11*
26:*9*, *17*  58:*18*  82:*9*
122:*11*, *13*  124:*6*, *23*
150:*4*
**ahold**  120:*21*
**al**  5:*10*  153:*6*  154:*4*
**Alex**  29:*25*  30:*5*
45:*11*  46:*17*  54:*23*
**Alexander**  50:*19*
52:*24*  65:*23*  66:*25*
**Alhambra**  2:*11*
153:*4*
**allege**  90:*18*
**alleges**  144:*3*
**allow**  144:*10*
**alteration**  95:*19*  96:*2*
**altered**  96:*4*
**AMEND**  4:*8*  96:*12*
**AMENDED**  4:*6*  87:*2*

**AMERICA**  1:*4*, *16*
2:*7*  5:*10*  7:*20*  153:*6*
154:*4*
**amount**  101:*8*  153:*14*
**analysis**  25:*10*
**and/or**  93:*24*
**and-a-half**  11:*23*
**Angel**  29:*22*, *25*
**anquience**  94:*25*
**answer**  8:*2*, *7*, *15*, *16*
11:*11*, *16*  12:*20*  14:*5*,
*11*, *13*  24:*3*  26:*10*, *20*
87:*2*  88:*22*  106:*6*
123:*7*, *16*, *18*
**answered**  12:*9*  24:*2*,
*9*  26:*8*  39:*1*  43:*21*
49:*20*  64:*3*  81:*15*
82:*14*  84:*14*, *19*
139:*18*
**answering**  8:*23*
128:*25*
**Antonio**  117:*17*, *18*,
*21*
**anybody**  12:*12*, *15*
13:*7*  58:*23*  85:*15*, *18*,
*22*  86:*18*  117:*3*
**anymore**  77:*3*
119:*19*  124:*24*
145:*15*
**AOSC20-16**  5:*22*
**apologies**  147:*8*
**app**  50:*23*  55:*15*, *18*,
*19*
**appear**  79:*16*
**APPEARANCES**  2:*1*
**appeared**  151:*9*
**appears**  96:*22*
125:*12*  132:*16*, *18*
133:*7*, *20*  134:*8*
136:*20*
**APPLICATION**  3:*23*
27:*15*, *17*  49:*12*, *25*
50:*1*, *22*  59:*10*  64:*15*
65:*2*
**applied**  29:*3*  82:*24*
**appointed**  71:*4*
**appointing**  71:*11*
77:*10*
**appreciate**  29:*12*

**approval**  27:*20*
**approve**  28:*1*  55:*2*
**approved**  27:*19*
**approximately**  5:*7*
16:*15*, *25*
**APR**  58:*7*, *8*
**April**  1:*20*  5:*6*
35:*15*  44:*12*, *13*, *14*,
*18*  110:*7*  151:*10*
153:*6*  154:*6*
**argue**  15:*2*
**argumentative**  124:*5*
**ARIEL**  2:*12*  153:*2*
**ARMSTRONG**  2:*10*
153:*3*
**arrangement**  5:*21*, *24*
**arrangements**  153:*11*
**arrived**  48:*11*  67:*7*
**ASCIIs**  49:*6*
**Aside**  10:*21*  15:*18*
23:*21*  24:*6*, *16*  25:*3*
38:*23*  39:*7*  115:*13*
147:*4*
**as-is**  140:*12*
**asked**  24:*2*, *9*  26:*8*
38:*3*, *4*, *25*  43:*21*
49:*20*  64:*3*  81:*15*
82:*14*  84:*14*, *19*
88:*14*  132:*3*  139:*18*
149:*6*
**asking**  8:*7*  26:*19*, *20*
60:*18*  71:*15*  87:*16*,
*22*  89:*5*
**assert**  87:*14*  88:*2*
89:*13*  90:*17*, *21*
91:*14*  93:*10*, *22*  94:*7*,
*16*  95:*2*, *6*, *17*
**asserted**  89:*5*, *23*
**asserting**  93:*23*
**asserts**  88:*8*  91:*5*
**assigned**  59:*16*
**assignment**  59:*24*
**ASSOCIATES**  2:*17*
**assume**  8:*2*
**assumes**  83:*18*
110:*20*  113:*14*  123:*6*
128:*8*  139:*3*
**assuming**  44:*17*
48:*15*  58:*5*, *9*  76:*22*

GABRIEL... Case 8:23-cv-00709-WFJ-SPF Document 102-1 Filed 01/02/25 Page 158 of 174 ...3/2024
CR of FS Inventory... (...h Strusberg)
PageID 1973
3

81:*8*
**assumption** 58:*11*
**attach** 99:*22*
**attached** 100:*23*
103:*16*
**attachment** 4:*21*
**attend** 20:*24, 25*
**ATTORNEY** 4:*1*
6:*4* 7:*12* 8:*14* 68:*3,
13, 16, 23* 69:*1* 71:*4*
77:*9, 10* 80:*14, 16, 19,
21* 81:*1* 83:*5* 86:*19*
100:*11* 103:*9* 128:*22*
152:*11, 12* 153:*14*
**attorneys** 5:*15* 42:*11*
71:*11* 87:*12*
**auction** 13:*1, 5* 21:*7,
8, 19* 22:*9, 13* 23:*5,
21* 24:*14* 36:*21, 22*
37:*19* 44:*4* 54:*14*
88:*13* 92:*8*
**audible** 8:*10*
**authority** 31:*15*
108:*22* 109:*5* 147:*23*
151:*8*
**authorization** 50:*4*
51:*6*
**authorized** 152:*6*
**authorizes** 50:*24*
65:*6* 68:*24*
**authorizing** 50:*2*
**Auto** 31:*5, 7, 12, 15,
17* 35:*13* 41:*8, 9, 10,
13* 42:*18* 43:*15, 17,
18, 24* 44:*4, 12, 15, 20*
74:*19* 75:*7, 15* 76:*3*
78:*12* 82:*19* 104:*11,
22, 24* 105:*1, 3, 18, 19,
23* 106:*14, 17, 23, 25*
107:*8, 11, 16* 108:*4,
10, 13, 15, 19* 109:*3, 6*
110:*8, 12, 14, 17*
111:*12, 19* 112:*8, 19,
22* 113:*3, 7, 9* 115:*20*
121:*21* 122:*18*
126:*13, 15* 127:*5, 8,
18, 24, 25* 128:*2, 15*
130:*2, 4, 14* 132:*5, 19*
133:*2, 3* 140:*15, 20*

141:*8* 144:*24, 25*
145:*2* 146:*5* 148:*13*
**AutoCheck** 22:*4*
24:*25*
**automatic** 106:*22*
**automatically** 69:*6*
88:*10* 106:*18* 120:*23*
**AUTOMOTIVE** 1:*9*
2:*10* 4:*10* 10:*10, 20,
22* 81:*23* 132:*5*
**available** 153:*9*
**aware** 88:*3, 8* 96:*6*
97:*2* 103:*3* 132:*7*
**Awesome** 104:*4*

< B >
**back** 19:*17* 37:*12*
38:*3, 5, 12* 43:*12*
59:*9* 67:*10* 74:*3*
76:*24* 77:*4* 88:*25*
90:*9* 91:*18* 102:*17*
104:*17* 118:*15*
119:*12, 24* 122:*15*
137:*18* 145:*17*
148:*13*
**background** 9:*18*
**bad** 34:*24* 58:*8, 9*
**bank** 27:*19* 41:*12*
55:*15* 59:*15* 127:*15*
**bar** 126:*3*
**barred** 89:*14, 25*
90:*22* 91:*15* 94:*17,
23* 95:*19* 96:*1*
**based** 35:*19* 36:*16*
61:*1* 109:*12* 124:*12*
136:*25* 138:*14* 140:*1*
145:*3* 146:*15, 17, 20*
**Bates** 42:*9* 125:*20*
128:*20* 134:*14*
**BEACH** 151:*5* 152:*1*
153:*21, 22*
**beat** 34:*18*
**bed** 40:*1, 3, 5*
**began** 5:*2*
**beginning** 50:*6, 23*
145:*19*
**begins** 58:*6*
**behalf** 2:*1, 7, 16* 6:*4,
7, 9* 54:*21* 57:*20*
71:*13* 79:*14, 22*

80:*17, 25* 81:*3, 6*
106:*14* 108:*23* 148:*5*
**believe** 17:*22* 18:*12*
75:*5, 10* 110:*6*
124:*15* 142:*16*
**beneath** 71:*3*
**benefit** 141:*11* 148:*2*
**better** 30:*12* 73:*22*
84:*22* 85:*2, 4, 8*
89:*19*
**Betty** 72:*6, 7* 73:*14*
76:*10, 19* 77:*1, 10*
78:*7* 79:*15* 81:*7, 8*
83:*10* 98:*3, 13, 14*
113:*13* 114:*5, 23*
141:*19* 142:*11, 18, 25*
147:*22* 148:*17*
**Betty's** 76:*21* 79:*16*
**big** 12:*25* 25:*14*
33:*17*
**biggest** 21:*8* 92:*23*
**Bill** 4:*17* 33:*14* 52:*7,
9, 15* 53:*22* 54:*13*
57:*14, 15* 72:*23*
92:*21* 93:*20* 98:*20*
136:*14, 21* 146:*15*
**bind** 11:*13* 77:*10*
**birth** 9:*8*
**bit** 43:*9* 70:*9* 74:*6*
80:*4*
**blame** 90:*6* 99:*12*
**blank** 153:*16*
**Blvd** 2:*17*
**bond** 20:*10* 83:*23*
84:*5* 87:*22* 88:*12*
89:*2* 90:*7* 99:*21, 22*
100:*4, 5, 8* 109:*15*
110:*2* 143:*5*
**booked** 127:*15*
**born** 10:*5*
**borrower** 80:*11*
**bottom** 42:*12* 54:*21*
64:*5, 8* 65:*20* 153:*16*
**bought** 12:*20* 15:*17*
35:*10* 36:*15* 38:*22*
39:*4* 41:*18* 44:*13*
45:*20* 88:*19, 20*
140:*19* 141:*5* 145:*22*
**Boulevard** 153:*21*

**Box** 2:*5* 29:*2* 50:*1,
24* 126:*14* 132:*7*
133:*8*
**boy's** 144:*13*
**brake** 40:*17*
**brakes** 39:*11*
**breach** 95:*18* 96:*1*
**break** 8:*19, 22* 102:*7,
15* 144:*13*
**bring** 15:*10* 22:*11*
23:*20* 31:*10* 38:*3, 4*
116:*23* 117:*12*
**building** 54:*9*
**Bureau** 84:*22* 85:*3,
5, 9*
**Business** 9:*25* 11:*2*
17:*7* 43:*16* 61:*14*
71:*10* 84:*22* 85:*2, 4,
9* 99:*10* 115:*19*
129:*3, 4* 134:*2*
**businesses** 22:*3*
**buy** 20:*5, 6* 21:*7, 9,
18, 19, 24* 22:*9* 23:*19*
31:*8, 10* 36:*15, 19*
37:*3* 59:*18* 92:*21*
93:*17* 105:*23* 106:*1*
108:*22* 139:*5*
**buyer** 21:*17* 31:*17*
36:*22* 105:*3, 15, 17*
109:*4, 5* 113:*12, 24*
121:*6* 129:*10* 137:*12,
17*
**Buyers** 138:*17, 18*
**BUYER'S** 3:*14*
51:*20* 63:*8, 11* 66:*8*
70:*16* 129:*20* 131:*1,
7, 14* 134:*13* 135:*2,
16*
**buying** 52:*20* 124:*13*

< C >
**c/o** 153:*2*
**cabinet** 46:*9, 10, 12*
**cabinets** 46:*14*
**California** 61:*13*
**call** 32:*19* 33:*3*
37:*11* 57:*9* 81:*11*
88:*11* 91:*22* 92:*9*
107:*22* 115:*6* 116:*21*

118:*16*, *17*   119:*11*, *14*, *23*, *24*   120:*23*   153:*10*
**call-backs**   119:*17*
**called**   23:*18*   32:*15*   36:*25*   37:*1*, *6*, *12*, *13*   83:*23*   84:*6*   87:*22*   88:*10*, *13*, *21*   100:*11*, *13*   116:*1*, *2*   117:*19*, *20*, *23*   119:*12*, *20*   120:*12*
**calls**   89:*16*   119:*15*   120:*18*
**cancel**   51:*5*   100:*4*
**car**   11:*18*   12:*20*   15:*22*   17:*14*   18:*4*, *9*, *11*, *15*   21:*19*, *21*, *23*   22:*10*, *13*, *15*, *18*, *22*, *25*   23:*1*, *16*, *18*   24:*13*, *18*, *20*, *21*   25:*11*, *12*, *15*   26:*2*, *13*   27:*7*, *8*   28:*4*   30:*5*, *16*, *20*   31:*11*, *18*, *22*   34:*16*, *17*   35:*4*, *8*, *18*   36:*15*, *19*, *24*   37:*3*, *5*, *6*, *14*, *18*, *21*   38:*3*, *4*   39:*13*, *23*   41:*15*   43:*4*, *5*   45:*20*   48:*24*   59:*19*   65:*7*   67:*4*, *6*, *7*   68:*24*   71:*23*   72:*17*   88:*14*, *16*, *18*, *19*, *20*   90:*9*   91:*18*, *19*   97:*14*, *17*   105:*17*   111:*9*   116:*1*, *6*   118:*14*   121:*2*, *3*   126:*25*   127:*1*, *6*, *14*, *16*   140:*3*, *7*
**CARFAX**   22:*4*   24:*23*   92:*11*   97:*3*
**cars**   10:*7*, *9*   16:*23*   17:*2*   19:*6*, *8*, *17*   21:*3*, *4*, *5*, *15*, *24*   27:*6*   31:*8*, *10*, *20*   36:*2*, *5*, *10*   37:*3*   39:*22*   47:*11*   67:*5*   92:*21*   100:*5*   107:*3*   108:*22*   145:*11*   146:*19*
**case**   5:*11*, *13*   7:*13*   92:*6*   96:*7*   103:*6*   104:*9*   117:*16*   143:*19*   153:*6*   154:*5*

**cash**   27:*14*
**Castillo**   29:*22*
**cause**   89:*14*   95:*18*, *25*   153:*8*
**causes**   89:*24*
**cell**   117:*25*   118:*2*, *8*, *10*
**center**   121:*1*
**Central**   23:*18*
**certainly**   8:*20*
**CERTIFICATE**   3:*14*, *23*   4:*1*   18:*13*   41:*17*   42:*18*, *23*, *25*   64:*16*   65:*2*   72:*25*   74:*12*, *15*, *18*   75:*6*, *11*   77:*11*, *17*, *23*   78:*1*   97:*3*, *19*   98:*6*   103:*15*   110:*5*, *6*, *25*   111:*6*, *13*, *19*   112:*6*, *9*   113:*2*, *20*   115:*21*   121:*19*, *22*   122:*2*   123:*3*   124:*2*   125:*14*, *15*   130:*5*   131:*12*, *22*   132:*18*, *21*   133:*2*   135:*9*   142:*24*   143:*1*   151:*1*
**Certificates**   106:*13*
**CERTIFIED**   1:*24*   5:*4*   151:*18*   152:*20*   153:*18*
**certify**   62:*11*   151:*8*   152:*6*, *11*
**cetera**   42:*21*   53:*23*   61:*2*
**change**   22:*17*   23:*6*, *7*   40:*24*   54:*8*   154:*7*
**changed**   31:*3*   54:*6*
**changes**   24:*17*   154:*2*
**changing**   23:*2*
**charged**   54:*4*
**charges**   53:*5*
**check**   60:*7*   61:*2*   87:*22*   92:*8*, *10*, *12*   100:*9*   101:*6*, *8*   143:*9*, *12*   144:*1*
**checkbox**   62:*10*
**checking**   122:*1*
**Chinese**   90:*23*
**chipped**   40:*9*, *12*
**Christ**   33:*19*

**Cir**   2:*11*   153:*4*
**circumstance**   37:*9*
**citation**   86:*14*, *16*
**cited**   86:*11*
**Civil**   1:*4*
**claim**   24:*13*   50:*25*   88:*12*   93:*3*, *7*   100:*8*   116:*5*, *20*
**Claimant's**   13:*14*   51:*19*
**claiming**   143:*18*
**claims**   91:*15*   94:*17*, *23*   143:*14*
**clarify**   132:*3*
**clean**   18:*10*   39:*22*, *23*
**clear**   14:*24*   136:*19*
**Clerk**   153:*15*
**click**   15:*16*   29:*1*, *2*, *4*, *6*, *7*, *8*   33:*20*   34:*1*   50:*1*, *24*   106:*1*   117:*18*
**clicking**   105:*24*
**client**   26:*14*, *23*, *24*   27:*1*   31:*18*   45:*8*   46:*21*   47:*4*   48:*3*   52:*25*   55:*7*   57:*24*   59:*2*, *13*, *14*   62:*3*, *14*   63:*5*, *7*, *21*   65:*3*, *8*, *24*   66:*2*   68:*13*   69:*22*   70:*1*   71:*4*, *24*   74:*16*   75:*12*   79:*22*   80:*12*, *21*   82:*18*   83:*6*, *15*   88:*24*   89:*5*, *8*, *24*   90:*25*   91:*5*, *7*, *12*   93:*2*, *6*   94:*10*, *12*, *13*   95:*9*   96:*4*   98:*7*   146:*9*   147:*2*   148:*1*
**client's**   29:*24*   31:*1*   45:*5*   53:*25*   60:*13*   69:*18*   71:*18*   80:*16*   81:*2*, *5*   97:*20*
**closed**   35:*22*, *24*   36:*9*
**closely**   80:*5*
**clue**   109:*19*   130:*20*   133:*9*
**Colombia**   10:*2*
**come**   21:*9*   23:*5*   27:*12*   39:*22*   43:*14*   60:*8*

**comes**   23:*4*   50:*4*   69:*6*   86:*13*   106:*12*   111:*22*   113:*11*, *17*
**coming**   19:*17*   52:*20*
**comments**   21:*18*, *20*, *22*   37:*21*   88:*15*, *17*
**commercial**   21:*25*   93:*14*
**commercially**   93:*11*
**commission**   31:*14*   49:*12*   151:*19*
**commissions**   45:*22*, *24*
**communicate**   108:*7*, *12*
**communicated**   124:*3*
**communication**   107:*16*, *19*   118:*23*
**community**   35:*25*   86:*9*
**company**   19:*11*   23:*17*   72:*9*   92:*24*   93:*18*   105:*10*, *15*   110:*2*   111:*5*   112:*10*   118:*9*   141:*21*
**compensate**   37:*24*
**complain**   91:*9*
**COMPLAINT**   4:*6*, *8*   84:*21*   85:*15*, *18*, *22*   86:*12*, *18*   93:*24*
**Complaints**   85:*5*   86:*6*
**complete**   27:*17*   29:*10*   36:*17*   147:*5*   152:*8*
**completed**   142:*18*   143:*1*   147:*23*   153:*12*
**completely**   28:*21*   90:*4*
**Complies**   33:*18*   74:*7*   95:*22*
**composition**   115:*7*
**compressor**   86:*7*
**computer**   15:*12*, *15*   20:*9*   28:*11*, *17*, *18*, *19*, *21*   48:*21*
**concerning**   123:*10*
**concluded**   150:*10*
**conclusion**   89:*17*

GABRIEL... Case 8:23-cv-00709-WFJ-SPF ...AMENDED... Document 102-1    Filed 01/02/25    Page 160 of 174 ...3/2024
CR of FS Inve...ff...(...n Strusberg)
PageID 1975
5

**condition** 19:9 21:20
25:4, 25 26:3, 5
34:13, 15, 24 35:6, 9
37:4 38:23, 24
124:14

**conditions** 27:25
28:1

**conduct** 93:24

**conducts** 36:23
138:24

**confirmed** 119:21

**confirming** 118:19

**confusing** 7:24

**confusion** 125:13

**connected** 152:12

**consent** 5:23 48:19,
22 49:3, 9, 17, 24
50:8, 21 51:2

**considered** 19:11

**consignment** 31:8

**consumer** 28:9, 16,
23 29:4, 15 84:21
85:19

**consumers** 19:19
71:11

**consumer's** 89:24

**contact** 72:11 100:12,
15 116:22 117:12
121:13, 16

**contacted** 90:7
109:15 117:18

**contacting** 108:4

**container** 46:13, 15

**content** 97:2

**CONTRACT** 3:14
28:4 29:1 50:16
51:21 56:4, 7, 19, 25
57:4, 8, 13, 16, 24
60:19 63:15 64:1
66:11 70:14 72:23
108:19 127:2 135:4

**contractor** 142:1, 2

**contracts** 28:9 49:17
63:19

**contradict** 135:15

**contribute** 94:3

**control** 93:25

**conversation** 108:24
118:20, 24 120:8

126:8

**conveyed** 103:8

**convicted** 9:12

**copies** 51:15 56:8, 10

**copy** 27:13 42:17, 23
48:1 50:16 52:9, 12
56:15, 24 60:15 62:2
65:1 68:12, 15 74:12,
15, 18 100:19 109:9
111:5 125:13 126:19,
22, 23 128:2 130:5,
14 132:6, 20 133:2
135:9 142:23, 25
150:6

**Coral** 2:11, 18 153:4

**corner** 33:16, 24
34:10 55:11 64:7, 8
65:20

**CORP** 3:14 31:6, 13,
16, 17 41:8, 13 42:18
43:15, 17, 18, 24
44:12, 16, 20 74:19
75:15 78:12 82:19
104:11, 22, 24 105:3,
18, 19, 23 106:18, 23
107:1, 8 108:5, 10, 16
109:4, 7 110:8, 12, 14
111:13 112:8, 19, 23
113:4, 10 115:20
121:21 122:19
126:13, 15 127:18, 25
130:14 132:5, 19
133:3 140:15, 20, 21
141:8 144:24, 25
145:3 148:14

**Corp.'s** 105:1

**corporate** 1:16 7:5,
8, 19 17:9 105:9

**corporation** 1:9, 11
16:8

**correct** 7:4, 10 10:14
15:23 16:12, 16 31:2
38:10 39:17 41:2, 4,
6 42:17 45:13, 14
46:24 49:10 52:9, 12
56:15, 24 57:18, 22
58:12, 24 59:1, 21
62:2 65:15 68:12, 15
69:11, 13, 17 70:24
73:17 74:1 78:15

79:13, 21 80:22, 23
83:4, 13 84:10 92:13
97:8 98:16, 23
103:10 105:11, 13, 20
107:10, 15 108:3
109:8, 13, 17 110:3,
23, 24 111:2, 3, 7
112:1, 20, 24 113:1, 4,
5, 8 114:18 115:9, 11,
15, 17, 22, 23 116:4,
13 117:23 119:6
120:2 121:8, 14, 15,
18, 23, 24 122:5
126:6 127:19 129:8
130:7, 17 133:4, 5, 6,
23 136:17 137:13, 19,
20, 23 138:21, 22
140:24 141:9 142:18,
19 143:3, 15 144:25
145:1, 12, 24 146:11
147:3, 21, 25 148:6, 7

**correctly** 34:23 56:14

**correspondence**
118:19

**COST** 4:10

**counsel** 5:23 38:16
143:6, 10, 22 144:1, 6
149:6 152:11, 12

**count** 123:15

**Counts** 90:21

**county** 85:16 151:5
152:1

**couple** 120:20

**course** 17:8, 12
18:10, 15 19:12
20:16, 22, 24 21:1
28:25 33:14 47:16
48:2, 16 51:13

**courses** 20:12, 15

**COURT** 1:1, 24 5:3,
12, 22 6:12, 18 8:5
12:1 29:9 32:23
87:12 106:2, 4, 9
122:14, 17 142:4, 7
151:18 152:20
153:15, 18, 21

**cover** 33:2 53:19
144:2

**coverage** 28:2, 7

**covered** 20:19 128:12

**CR** 21:22 34:11

**cracked** 40:10, 13

**Craig's** 47:8, 10

**credit** 27:15, 17
49:11, 25 50:1, 22, 23,
25 58:8, 9

**crimes** 9:13, 16

**cross** 102:4

**CROSS-
EXAMINATION** 3:5
104:5 125:10

**customary** 134:5
140:3, 6

**customer** 18:1 20:1
27:3, 4 30:20 43:4
48:17 56:11 57:25
58:1, 14, 19, 21 60:6
62:16, 17 65:6 68:23
69:7 79:25

**Customers** 19:17
22:2 93:19 95:8

**customer's** 52:18
61:1 66:18

**cut** 122:13

**< D >**

**d/b/a** 1:9, 10 2:10
16:8

**damages** 87:20
90:18 95:7 143:16,
18, 23 144:3

**dashboard** 97:4
133:14, 22, 23 134:6,
20 135:5, 19, 21
147:4

**date** 5:6 9:8 44:2,
20 53:12 64:10 67:1,
11, 13 70:25 77:17,
20, 22 79:2, 5, 9, 12
97:18, 24 98:5, 6
110:6 126:16, 18
129:7, 17 130:11, 14
132:4, 15, 17, 20, 25
133:1, 7, 8 146:14
154:23

**dated** 142:22 152:13

**Day** 13:11 31:4
44:17 48:11 67:9
77:4 90:7 91:17

GABRIEL... Case 8:23-cv-00709-WFJ-SPF   Document 102-1   Filed 01/02/25   Page 161 of 174 3/2024
CR of FS Inve... (...h Strusberg)
PageID 1976
6

119:*25*  151:*10, 14*
152:*13*  153:*6*
**days**  43:*6*  44:*18*
**De**  2:*17*
**deal**  27:*18*  30:*13*
31:*6, 7, 12, 15, 17*
35:*14*  41:*8, 9, 10, 13*
42:*18*  43:*15, 17, 18,*
*24*  44:*4, 12, 15, 20*
46:*3, 4, 6, 8*  51:*13, 14*
55:*18, 20*  60:*24*  61:*2,*
*4, 7*  69:*5*  74:*14, 17,*
*19*  75:*7, 15*  76:*4*
78:*12*  82:*19*  91:*17,*
*20, 21, 25*  104:*11, 22,*
*24*  105:*1, 3, 18, 19, 23*
106:*14, 17, 23, 25*
107:*8, 11, 16*  108:*4,*
*10, 13, 15, 19*  109:*3, 7*
110:*8, 12, 14, 17*
111:*2, 13, 19*  112:*8,*
*19, 23*  113:*4, 7, 9*
115:*20*  121:*21*
122:*19*  126:*13, 15*
127:*6, 8, 15, 18, 24, 25*
128:*2, 15*  130:*3, 4, 14*
132:*5, 19*  133:*3*
140:*15, 20, 21*  141:*8*
144:*24, 25*  145:*3*
146:*5*  148:*13*
**DEALER**  2:*4*  15:*22*
20:*8*  22:*11*  23:*20*
31:*11*  35:*22*  53:*17*
60:*9*  65:*21*  86:*13*
92:*5*  99:*19*
**DealerCenter**  30:*24*
51:*10, 14*  56:*3*  60:*17,*
*25*  64:*14*  66:*23, 24*
**dealers**  35:*24*  114:*16*
134:*6*  140:*3, 7*
**dealer's**  147:*23*
**dealership**  7:*20*  10:*8,*
*16, 23*  15:*21*  16:*2, 5,*
*11, 17*  17:*2, 5, 10, 11,*
*21*  18:*12*  19:*20, 23*
20:*2, 7, 11, 14, 25*
23:*22*  25:*7*  30:*7, 9,*
*22, 23*  35:*13*  45:*13*
46:*16*  47:*6*  48:*3*
51:*8*  53:*9*  56:*8*

57:*21*  60:*10, 20*  62:*3*
65:*6, 12*  67:*15*  68:*13,*
*17, 25*  69:*4*  71:*8, 10,*
*12*  76:*15*  77:*2*  79:*14*
81:*7*  82:*2, 12*  83:*15,*
*21*  84:*11, 16, 22*
85:*16, 20*  86:*19*  88:*8*
89:*23*  90:*1, 11, 16*
91:*4*  93:*15*  96:*7*
98:*15*  113:*7, 11*
115:*12, 16*  128:*1*
145:*17*  146:*12, 22*
147:*11*  148:*6*  149:*7,*
*19*
**dealerships**  10:*18*
16:*21*
**dealership's**  54:*20*
104:*23*  145:*25*  146:*4,*
*8, 25*
**deals**  104:*21*  113:*17*
**decide**  22:*5*
**decision**  27:*8*
**declare**  154:*22*
**dedicated**  28:*21*
**Defendant**  2:*7, 16*
4:*17*  6:*8, 10*  7:*13*
9:*3*  61:*20*  93:*10*
96:*24*  97:*1, 3, 5*
136:*8*
**Defendant(s**  1:*12*
**Defendant's**  87:*21*
93:*25*  136:*7*
**DEFENSE**  4:*12*
87:*13, 24*  88:*1*  89:*12,*
*21*  90:*15, 20*  91:*3, 13*
93:*9*  94:*6, 15, 21*
95:*3, 5, 16*
**DEFENSES**  4:*6, 8*
87:*3, 12*  93:*22*  96:*7*
**DEFT**  4:*6*
**delete**  77:*15*
**delivered**  38:*13, 15,*
*19*  124:*11*
**DEMAND**  4:*8*  99:*14,*
*18*  101:*22*
**dented**  40:*3*
**dents**  40:*7*
**department**  85:*16, 19*
**Depending**  25:*11*

27:*13*
**depends**  25:*25*
**depict**  133:*1*
**depicts**  79:*12*
**DEPO**  3:*14*  15:*3*
**Depos@FloridaCourt**
**Reporting.com**  153:*10*
**DEPOSITION**  1:*15*
5:*8, 16, 17, 18*  7:*5, 9,*
*19*  9:*10*  12:*13, 16, 18*
13:*9, 14*  38:*17*  81:*13*
103:*21*  125:*16*
128:*12*  143:*7*  152:*7*
153:*8, 11, 12*
**derive**  10:*13, 15*
**describe**  35:*18*
**DESCRIPTION**  3:*14*
4:*1, 16*  52:*19*
**destroyed**  19:*7*  26:*2*
**determination**  60:*2*
**determine**  27:*4*
44:*19*  60:*22*  85:*11*
**determines**  25:*6, 11,*
*14*
**determining**  26:*7*
**dictates**  60:*19*
**difference**  57:*12*
136:*3*
**different**  82:*20*  84:*3*
86:*6*
**differently**  95:*9*
**dig**  21:*17*  37:*10*
84:*5*  88:*22*  100:*10*
119:*12*
**DIRECT**  3:*5*  6:*23*
59:*20*  121:*13*
**directly**  36:*18*  59:*14*
108:*7*  112:*19*  113:*23*
117:*20*
**disclose**  37:*4, 15*
58:*13*  59:*2*  72:*20*
88:*15, 17*
**disclosed**  44:*25*
103:*18*
**DISCLOSURE**  3:*22*
18:*3, 5*  54:*11*  59:*5*
61:*19*  62:*1, 3, 6*
66:*20*  72:*22*  77:*13*
78:*24*  79:*2, 6*  81:*22*
135:*3*  146:*9*  147:*13*

**disclosures**  17:*13, 22*
18:*14*  90:*25*  146:*1*
149:*7*
**discovery**  32:*2*  42:*10,*
*24*  43:*3*  61:*20*
103:*18*
**discrepancy**  37:*1*
88:*3, 9, 12, 16*  119:*21*
**discuss**  23:*12*
**discussing**  91:*11*
**dishonesty**  9:*13, 16*
**Dispatch**  23:*18*
**dispute**  84:*8*
**distribution**  153:*12*
**DISTRICT**  1:*1, 2*
5:*12*
**disturb**  32:*16, 19*
**disturbing**  123:*23*
**DIVISION**  1:*3*  5:*13*
**DLMRB**  20:*23*
**DMS**  31:*3*  51:*10*
**DMV**  17:*25*  20:*11*
28:*13*  49:*6*  62:*18, 20*
68:*16*  69:*2*  71:*16, 19,*
*23*  72:*16*  73:*1, 13*
85:*21, 22*  86:*2, 11, 12,*
*14*  113:*18, 21*
**DMV's**  115:*14*
**doctrine**  89:*14, 25*
90:*22*
**Doctrines**  94:*18, 19,*
*24, 25*
**document**  15:*8*
29:*14*  33:*12*  34:*4, 10*
42:*10*  49:*9*  52:*16, 21*
54:*24*  55:*2, 4, 7*
56:*21*  57:*3*  60:*4*
61:*25*  62:*7, 15, 23*
63:*2*  64:*23*  65:*5, 9,*
*14, 24*  66:*4*  68:*2, 5,*
*22*  69:*23*  70:*23*
71:*24, 25*  72:*20*
73:*10, 19*  74:*23, 25*
75:*2, 4, 5, 11*  78:*2*
79:*11*  80:*13, 16, 24*
81:*2, 5, 10*  82:*22*
83:*6, 7*  87:*9*  96:*18*
125:*15, 20*  126:*5, 9,*
*22, 24*  128:*20, 23*
129:*1, 2, 4, 12*  132:*15*

GABRIEL... Case 8:23-cv-00709-WFJ-SPF   Document 102-1   Filed 01/02/25   Page 162 of 174 3/2024
CR of FS Inve... ...f...h Strusberg)
PageID 1977
7

135:*14*  136:*6, 13, 16*
142:*5, 18*  154:*22*
**document(s** 13:*17*
32:*3*  41:*24*  51:*25*
61:*22*  64:*20*  67:*24*
73:*5*  87:*6*  96:*15*
99:*3*  101:*19*  125:*8*
128:*17*  131:*24*
134:*15*  136:*10*
142:*13*
**documents** 15:*10, 14,*
*19*  28:*15*  48:*13, 18,*
*19*  49:*18*  51:*9*  56:*9*
63:*9, 25*  70:*20*  73:*12*
91:*1*  121:*7*  125:*3*
128:*13*  133:*11*  134:*8*
135:*8, 12*  149:*11*
**doing** 61:*14*  76:*25*
104:*21*  121:*25*
123:*25*  128:*10*  148:*2,*
*5*
**Don** 71:*5, 6, 8, 25*
**door** 17:*3*  26:*14, 23*
91:*20*
**drive** 22:*15, 20*
23:*24*  24:*1, 4*  27:*10,*
*11*  39:*10, 12, 13*
139:*1, 11*
**driver** 23:*19*  107:*6*
**driver's** 27:*16*
**driving** 24:*6*  35:*7*
39:*16*
**drove** 39:*6*  48:*8*
**duly** 6:*21*  151:*10*

**< E >**
**earlier** 110:*4*  128:*23*
130:*2, 4*  132:*4*
138:*24*
**earned** 31:*12*
**easier** 77:*16*
**easy** 7:*22*
**e-contracting** 49:*5*
**education** 9:*20*
**educational** 9:*18*
**effectively** 51:*20*
**eight** 54:*7*  136:*3*
**eighth** 91:*13*
**either** 40:*9, 12*  83:*12*

**electronic** 28:*12, 13*
48:*18*  51:*8, 11*
**electronically** 48:*14,*
*16, 19, 23*  49:*2*  50:*21*
57:*17*
**electronically-signed**
28:*15*
**eleventh** 93:*21*
**e-mail** 50:*7, 12, 13,*
*14*  100:*17, 19, 22, 23*
101:*1*  103:*15*  107:*20*
118:*22*  143:*21, 25*
153:*10*
**e-mails** 100:*18*
118:*18*
**employed** 10:*11, 15,*
*17, 19*  16:*4*  29:*23*
45:*12*  71:*12*
**employee** 77:*1, 5*
114:*1*  141:*24*  142:*1*
152:*11, 12*
**employees** 16:*19*
108:*15*  114:*2*
**engine** 39:*9*  40:*21*
**English** 120:*9, 10*
**ENTER** 154:*2*
**entered** 67:*1*  108:*18*
146:*13*
**enters** 38:*16*
**entitled** 125:*15*
**entitlement** 121:*8*
**entity** 25:*2*
**envelope** 111:*21*
112:*5*
**envelopes** 111:*25*
112:*1, 3*
**equitable** 94:*19*  95:*1*
**ERRATA** 154:*1*
**ESQUIRE** 2:*7, 12, 13,*
*19*  153:*2*
**essentially** 107:*11*
**estimation** 109:*22*
**estopped** 93:*23*
**estoppel** 94:*18, 24*
**et** 5:*10*  42:*21*  53:*23*
61:*2*  153:*6*  154:*4*
**evaluating** 25:*20*
**evaluation** 25:*22*
**event** 8:*21*  123:*24*

**Everybody** 35:*25*
36:*1*  52:*2*  56:*21*
78:*19, 21*
**evidence** 40:*15*
42:*21*  47:*1*  83:*19*
110:*21*  113:*15*
114:*12*  123:*6*  128:*9*
139:*4*
**Ex** 111:*23, 24*  112:*1,*
*11, 12*  130:*22*
**exact** 18:*23*  44:*20*
**exactly** 14:*1, 3, 15*
45:*21*  79:*12*  119:*7*
**EXAMINATION** 3:*5*
6:*23*  13:*25*  144:*21*
**examined** 6:*21*
**example** 36:*24*
**Excellent** 84:*11*
**exchange** 103:*5*
**Excuse** 12:*14*  43:*8*
52:*11*
**Ex'd** 110:*7*
**execute** 62:*4, 14*
146:*1, 22*
**EXHIBIT** 3:*14*  4:*1,*
*16, 17*  13:*13, 15*
41:*21, 22*  51:*19, 23*
56:*18*  61:*18*  64:*17,*
*18*  67:*21, 22*  72:*25*
73:*3*  87:*2, 4*  96:*11,*
*13*  98:*25*  99:*1*
101:*16, 17*  125:*21, 25*
136:*7, 8*
**expenses** 53:*19, 20*
**experience** 19:*3*
34:*14*  35:*19*  124:*12*
138:*14*  140:*2*
**expired** 85:*13*
**Expires** 151:*19*
**explain** 21:*15*  22:*12*
52:*14*  58:*1, 15, 17, 25*
89:*18*  148:*21*  150:*1*
**explained** 55:*7*
57:*24*  58:*9*  63:*5*
70:*1, 2*  117:*23*
**explains** 57:*25*
**exploring** 92:*1*
**express** 95:*18*  96:*1*
**exterior** 40:*7*

**< F >**
**face** 44:*24*  73:*16*
78:*1*  81:*23*  84:*3*
**facilitate** 137:*15*
**fact** 128:*5*
**factor** 25:*21*
**factories** 36:*9*
**factors** 25:*9*
**facts** 42:*21*  46:*25*
83:*18*  87:*14, 19*  88:*2,*
*7, 24*  89:*8, 13*  90:*16,*
*21*  91:*4, 14*  93:*10, 22*
94:*7, 16*  95:*2, 6, 17*
96:*3*  110:*20*  113:*14*
114:*11*  123:*6*  128:*8*
139:*3*  154:*22*
**failed** 95:*6*
**fair** 57:*9*  111:*4*
116:*17*  121:*25*  130:*9,*
*11, 13*  132:*25*
**faith** 93:*11, 13*
**familiar** 17:*10*  32:*6*
33:*12*  42:*4*  52:*5*
61:*25*  68:*2*  72:*19*
73:*8*
**far** 109:*12*
**Fed** 110:*7*  111:*23,*
*24*  112:*1, 11, 12*
130:*22*
**federal** 12:*1*
**fee** 53:*16, 17, 18*
54:*2, 4, 6*
**feel** 24:*11*  39:*10, 13*
**felonies** 9:*12, 15*
**FEYGIN** 2:*4, 7*  3:*5*
6:*4, 24*  7:*8, 14*  11:*11,*
*15*  12:*9, 11*  13:*12, 19*
14:*6, 9, 23*  15:*1, 5, 6*
18:*21*  19:*2*  24:*3, 5,*
*15*  26:*10, 12, 18, 21,*
*22*  29:*13*  31:*24*  32:*5*
33:*11*  34:*8*  35:*5*
38:*18*  39:*3*  41:*20*
42:*1, 22*  43:*23*  47:*2*
49:*21*  51:*18*  52:*2, 4*
56:*17, 23*  61:*17, 24*
64:*12, 15, 22, 25*
67:*20*  68:*1*  72:*24*
73:*7*  78:*16, 23*  81:*18*

82:*11, 16* 83:*20*
84:*15, 20* 87:*1, 8*
89:*20, 23* 90:*10* 93:*1*
95:*22, 24* 96:*10, 17*
97:*18, 23* 98:*4, 24*
99:*6, 9* 101:*15, 21*
102:*3, 7, 22, 25*
103:*12, 17, 23, 25*
124:*23* 125:*1, 6, 18,*
*23* 126:*2, 6* 128:*8, 23*
130:*25* 131:*7, 11, 13*
139:*3, 18* 140:*23*
144:*12, 20, 22* 147:*8,*
*10* 148:*8, 21* 149:*1*
150:*1, 7*
**FEYGIN/POWERHO**
**USE** 4:*10*
**fifteen** 16:*20*
**fifty** 145:*9, 11, 22*
**figure** 45:*18* 63:*18*
98:*9*
**FILE** 4:*8* 24:*13*
46:*9, 10, 12, 13* 85:*15,*
*18* 116:*5, 20* 144:*6*
**filed** 11:*24* 84:*21*
85:*22* 86:*18* 87:*12*
153:*15*
**filing** 90:*2, 12*
**filled** 66:*22* 134:*25*
146:*6, 10*
**filling** 134:*8*
**finalize** 105:*24*
**finance** 20:*1* 27:*14,*
*18* 28:*20, 22* 29:*19,*
*20* 52:*22* 55:*15*
*63:22* 69:*20* 114:*13,*
*14, 21* 115:*2*
**financed** 27:*14* 59:*19*
**FINANCIAL** 1:*10*
66:*6*
**financially** 152:*13*
**financing** 19:*23* 20:*3*
57:*6, 9* 59:*17, 24*
104:*13* 135:*4*
**find** 31:*18, 20* 38:*8*
47:*6, 19, 20* 75:*2*
81:*9* 88:*21* 89:*2, 3*
101:*3* 123:*9, 22*
**finding** 44:*5*

**fine** 33:*2* 128:*11*
149:*1, 23*
**finish** 8:*23* 106:*5*
118:*4* 123:*12, 14*
143:*24*
**finished** 8:*7* 142:*5*
**finishes** 29:*10*
**FIRM** 2:*4* 99:*19*
**first** 6:*21* 7:*23*
12:*23* 22:*13* 26:*24*
29:*14* 31:*8* 38:*7, 8*
57:*12* 58:*6, 16* 67:*6,*
*7* 83:*21* 87:*13* 99:*11,*
*12* 100:*16* 102:*6*
104:*10, 14* 109:*13, 25*
115:*24* 122:*10, 11*
145:*14, 16, 17* 150:*5*
**five** 16:*13, 15* 20:*18*
34:*22* 58:*5* 61:*16*
133:*10*
**five-minute** 102:*15*
144:*13*
**flat** 111:*25*
**FLORIDA** 1:*2, 9*
2:*6, 11, 18* 5:*4, 12, 21*
15:*22* 20:*8* 151:*4, 18*
152:*1, 6* 153:*4, 21, 22*
**focus** 75:*16*
**follow** 93:*15* 119:*18*
**followed** 93:*11*
**following** 5:*2*
**follows** 6:*22*
**Ford** 2:*16* 6:*10*
31:*16* 35:*14* 36:*12*
37:*6, 13* 38:*9* 84:*7*
88:*23* 119:*11* 120:*12,*
*16* 123:*1* 136:*24*
137:*2*
**foregoing** 154:*22*
**Foreign** 1:*10*
**forever** 120:*22*
**FORM** 3:*14* 49:*24*
54:*12, 17, 20* 59:*2, 6*
63:*5, 7, 12* 66:*7, 20*
67:*10* 69:*1, 4, 10, 15,*
*18* 70:*7, 17* 71:*15*
74:*10* 131:*1, 8, 14*
137:*3, 21* 140:*23*
**formal** 60:*4, 18*

108:*18* 116:*5*
**format** 43:*14* 50:*16*
**formula** 60:*3*
**forwarded** 153:*14*
**found** 47:*22* 89:*4*
**foundation** 42:*20*
**four** 15:*25* 16:*1, 12*
17:*4* 33:*23*
**fourteen** 16:*10, 12*
**fourteenth** 94:*15, 21*
**fourth** 90:*15*
**franchise** 37:*11, 13*
**Frank** 5:*8* 7:*6*
11:*13* 14:*17* 26:*9, 17*
32:*21* 82:*9* 117:*5*
123:*13* 124:*6* 126:*11*
128:*20* 132:*3* 149:*4*
**FRANKLYN** 1:*5*
3:*5* 6:*20* 9:*7* 15:*7*
79:*20* 105:*12* 151:*9*
152:*7* 153:*2, 25*
154:*6, 23*
**fraud** 93:*7*
**Friday** 153:*11*
**friend** 31:*7* 108:*6,*
*13, 24* 109:*2, 6* 125:*6*
148:*13* 149:*24*
**friends** 104:*12*
**front** 15:*12* 74:*25*
79:*23*
**FS** 1:*4, 16* 2:*7* 4:*6*
5:*9* 7:*5, 20* 9:*3* 16:*7,*
*8, 9* 105:*6, 9* 153:*4*
154:*3*
**FSA** 136:*6*
**FSIA** 3:*14* 4:*17*
32:*2* 42:*6* 51:*21, 22*
56:*20* 61:*21* 64:*22*
128:*21* 134:*14* 136:*6*
**full** 28:*2, 7* 32:*14*
**fully** 87:*20*
**funds** 41:*10*
**funny** 24:*11*
**further** 5:*18* 112:*2*
115:*13* 148:*8* 152:*11*

**< G >**
**Gables** 2:*11, 18*
153:*4*

**GABRIEL** 1:*4* 5:*9*
6:*5* 78:*17* 129:*12*
142:*21* 153:*4* 154:*3*
**gallery** 32:*23*
**gas** 40:*19*
**gate** 107:*6, 8*
**gathered** 133:*21*
**general** 35:*19*
**general's** 86:*19*
**generate** 107:*5*
**gentlemen** 29:*23*
144:*10*
**getting** 32:*18* 38:*12*
67:*10* 113:*11* 119:*3*
121:*22*
**give** 6:*15* 21:*19, 20*
28:*6* 35:*22* 38:*5*
49:*9, 11* 60:*6, 25*
66:*14* 91:*18* 97:*15*
116:*9, 15* 121:*5*
128:*13* 136:*1*
**given** 109:*6*
**gives** 17:*25* 18:*10*
69:*2* 115:*14* 117:*18*
**giving** 41:*16*
**Go** 7:*13* 11:*11*
17:*24* 26:*9, 17* 29:*5*
30:*15* 33:*7* 43:*9*
48:*20* 58:*18* 82:*9*
92:*17, 21, 24, 25*
93:*16* 102:*5, 9, 12*
104:*2* 116:*2, 23*
117:*11, 14* 122:*11, 12,*
*13* 124:*6, 23* 129:*11*
132:*9, 23* 150:*4*
**goes** 12:*7* 23:*23*
25:*22* 49:*7* 51:*21*
56:*20* 113:*20*
**going** 7:*21* 8:*2, 12,*
*20* 13:*12, 13* 31:*24,*
*25* 37:*10, 11* 41:*20,*
*21* 45:*5* 51:*18, 19*
55:*9* 56:*17, 18* 57:*5*
59:*9* 60:*20, 23* 61:*17,*
*18* 64:*16* 67:*20*
72:*24* 74:*3* 75:*14, 16*
77:*15* 78:*16, 18* 87:*1,*
*2, 11* 91:*24* 92:*6*
96:*10, 21* 98:*24, 25*
101:*15* 104:*19* 118:*3,*

*4* 119:*2, 11* 124:*4*
127:*8* 128:*14* 140:*21*
144:*6* 145:*13* 150:*3*
**GOOD** 1:*24* 5:*3, 4*
6:*25* 7:*17, 18* 22:*18*
24:*22* 26:*5* 30:*21*
34:*16* 35:*3, 4, 8, 20*
39:*14* 93:*11, 13*
95:*12* 103:*12* 117:*3,*
*9* 151:*18* 152:*6, 20*
153:*18*
**govern** 17:*6*
**grade** 35:*9*
**grading** 34:*20*
**great** 51:*16*
**greets** 26:*24* 27:*1*
**ground** 7:*21*
**guide** 134:*7*
**guided** 97:*4*
**guy** 63:*22* 114:*13, 14,*
*21*
**guys** 12:*25* 13:*11*
34:*2* 38:*7*
**Guzman** 29:*22* 30:*3*

**< H >**
**HADDON** 1:*4* 5:*9*
6:*5* 66:*7* 70:*7* 78:*18*
82:*2* 129:*12* 130:*7*
133:*12* 153:*4* 154:*3*
**Hall** 71:*5, 6, 8, 25*
**hand** 6:*13*
**handbook** 114:*1*
**handled** 121:*2*
**hands** 43:*6* 94:*18, 22,*
*24*
**handwritten** 28:*14*
49:*7*
**hang** 53:*13*
**happen** 27:*20* 44:*15*
128:*6* 129:*25*
**happened** 13:*11*
14:*3, 15* 48:*6* 104:*18*
122:*11*
**happens** 22:*12, 14*
26:*15* 27:*9, 11, 17, 24*
30:*14*
**hard** 120:*21*
**Harrison** 2:*5*

**head** 8:*10* 122:*12*
**headlights** 40:*12*
**hear** 7:*18*
**held** 82:*17*
**help** 12:*13, 15* 86:*9*
95:*8*
**helped** 104:*13*
**helping** 35:*25* 148:*14*
**here/pay** 20:*5, 6*
59:*18*
**Heron** 29:*22*
**HH** 151:*19*
**high** 19:*8* 26:*3*
**higher** 19:*4* 36:*2, 5*
123:*3* 124:*2*
**highest** 9:*20*
**highlight** 75:*16* 78:*19*
**highlighted** 96:*22*
**highlighting** 76:*4*
77:*16* 131:*5* 143:*2*
**history** 18:*14* 25:*3*
38:*22* 57:*8* 103:*16*
147:*6*
**hit** 69:*6*
**Hold** 43:*11* 114:*2*
120:*22* 129:*10*
131:*20, 23* 141:*18*
143:*24* 149:*22*
**holds** 111:*19*
**Hollywood** 2:*6*
**home** 36:*1*
**honest** 19:*11*
**honestly** 90:*18*
**honor** 106:*8*
**hope** 8:*20*
**hopefully** 7:*22*
**hours** 153:*10*
**Houston** 117:*16*
**HSMV** 69:*10*
**Hudson** 100:*15*
**huh** 99:*12* 149:*16*
**human** 90:*5*
**hundred** 12:*22* 91:*11*

**< I >**
**idea** 59:*11*
**identification** 13:*16*
41:*23* 51:*24* 64:*19*
67:*23* 73:*4* 87:*5*

96:*14* 99:*2* 101:*18*
136:*9*
**identify** 42:*9* 105:*21*
125:*20* 126:*8*
**ignorance** 33:*1*
**II** 90:*21*
**III** 90:*22*
**immaculate** 19:*9*
**immediately** 111:*14*
116:*1*
**impact** 18:*17*
**impacts** 18:*7*
**important** 17:*14, 15,*
*17, 19, 21, 23* 18:*3, 12*
19:*10, 14, 19*
**impression** 88:*19*
**inaccurate** 18:*16, 22*
54:*18* 59:*3* 83:*22, 25*
84:*9* 89:*6, 9* 91:*1*
**inappropriate** 120:*7*
**incidental** 53:*5*
**include** 138:*4*
**included** 133:*11*
**including** 138:*9*
**income** 10:*15* 28:*2*
61:*2*
**Independent** 90:*22*
**INDEX** 3:*1*
**indicate** 5:*25* 54:*17*
**indicates** 34:*24*
**indicating** 34:*12*
42:*12* 44:*25* 55:*11,*
*23* 68:*5* 71:*4* 73:*19*
76:*7, 12* 80:*7, 10*
126:*23* 131:*3* 132:*8,*
*16, 24* 135:*2*
**indication** 113:*6*
129:*21*
**industry** 17:*14*
**inform** 83:*15*
**INFORMATION**
3:*14* 4:*10* 28:*8* 32:*1*
36:*16* 44:*5* 50:*2*
61:*1* 66:*24* 67:*1*
72:*11* 79:*10* 96:*25*
97:*5* 98:*18, 19, 21*
105:*23* 133:*20* 134:*7*
135:*1, 7, 8* 137:*1, 16*
138:*2, 4, 16, 19*

**in-house** 20:*2*
**initial** 119:*23*
**ink** 48:*14, 15*
**inspect** 22:*7* 23:*13*
24:*7* 37:*20* 39:*4, 9,*
*11, 12* 116:*16* 139:*12,*
*13* 147:*16*
**inspecting** 23:*12*
124:*13*
**inspection** 22:*11*
23:*17, 21, 22* 39:*15*
92:*10* 124:*10* 138:*25*
139:*16* 140:*4, 7, 13*
146:*17* 147:*17*
**inspects** 22:*10* 23:*15*
**INSTALLMENT**
3:*14* 56:*19, 25* 63:*14*
66:*10* 70:*14* 135:*3*
**instructed** 8:*15*
**insurance** 20:*10*
28:*3, 7*
**intend** 9:*2*
**intends** 96:*7*
**intention** 140:*16*
**interest** 35:*23* 57:*6*
**interested** 92:*1*
152:*13*
**Interesting** 131:*23*
**Internet** 49:*4*
**inventory** 21:*16*
**investigate** 147:*12*
**investigation** 124:*1*
147:*6*
**Investment** 105:*9*
**INVESTMENTS** 1:*4,*
*16* 2:*7* 4:*6* 5:*10* 7:*6,*
*20* 9:*3* 16:*7, 9* 105:*7*
153:*4* 154:*3*
**investor** 111:*18*
**invoice** 40:*25*
**involved** 11:*5* 45:*7,*
*15* 46:*2* 75:*19*
**involving** 135:*9*
**iPad** 28:*16*
**irrelevant** 25:*24, 25*
**is-as** 103:*5*
**issue** 86:*13* 115:*25*
116:*23* 117:*13* 119:*4,*
*8* 130:*15*
**issued** 103:*3*

**issues** 84:*17* 86:*5, 8*
109:*14* 118:*6*
**itemization** 53:*14*
**ITS** 4:*8* 17:*3, 6*
23:*22* 82:*2* 117:*12*
133:*11* 135:*8* 138:*24*
140:*22* 146:*17*

**< J >**
**jacket** 46:*3, 4, 6, 8*
74:*14, 17*
**January** 151:*19*
**Jesus** 33:*19*
**Jiffy** 23:*3, 8*
**job** 114:*22*
**join** 7:*12*
**JOSE** 2:*12* 6:*7* 15:*5*
102:*4* 131:*1* 150:*1*
153:*2*
**Josh** 103:*14* 124:*22*

**Josh@JFeyginEsq.com**
2:*7*
**JOSHUA** 2:*4, 7* 6:*4*
7:*2, 13* 15:*4* 32:*12*
95:*21* 132:*1*
**jperalta@atllp.com**
2:*13* 153:*3*
**judge** 118:*3*
**Juliana** 78:*11*
106:*12, 17* 108:*8*
148:*18*
**July** 58:*6*

**< K >**
**keep** 19:*16, 17* 45:*24*
46:*1* 91:*19*
**KEITH** 2:*13* 7:*11*
**keith@silversteinpa.co**
**m** 2:*14*
**kept** 129:*2, 4*
**Kind** 36:*7*
**knew** 88:*24* 89:*5, 9*
**know** 14:*1, 3, 15*
16:*20* 17:*6* 18:*1, 9*
19:*16, 17* 24:*22*
25:*14* 29:*17, 18*
32:*18* 34:*17* 37:*16*
38:*7* 39:*14, 22* 40:*4,*
*22* 44:*15* 45:*16, 21*

48:*5, 7, 8, 11, 13, 22*
50:*9, 10, 11, 15, 17, 18*
55:*14, 24* 56:*1, 2*
58:*4, 16* 61:*12* 62:*22*
63:*16, 17* 64:*11, 13*
66:*9, 12, 13* 68:*6, 8*
69:*22* 70:*23* 71:*7*
72:*1, 2, 10, 18* 73:*20*
76:*1, 8, 9, 18* 77:*19*
78:*3, 5, 6, 11* 79:*8*
83:*8, 9* 84:*25* 85:*1,*
*17, 25* 86:*1, 17, 20, 21,*
*22, 23, 24* 89:*11* 93:*8*
94:*2, 5, 14* 95:*4* 96:*5*
98:*10, 11* 99:*6* 100:*7,*
*25* 103:*20, 22* 105:*8*
107:*1* 108:*9, 11, 15*
110:*11* 111:*21*
112:*23* 113:*22* 119:*4*
120:*4* 121:*6* 123:*17*
128:*5* 130:*18* 131:*1,*
*4, 21* 133:*7* 137:*4*
139:*17* 140:*8* 143:*16,*
*20* 145:*4, 10* 146:*12*
150:*8*
**knowing** 58:*20*
**knowledge** 55:*6*
57:*23* 58:*12* 63:*4*
96:*24* 136:*25*
**knows** 58:*21*

**< L >**
**label** 130:*22*
**labelled** 61:*21*
**laches** 89:*15, 25*
94:*18, 24*
**lady** 30:*15* 72:*3*
81:*21* 98:*3* 113:*13,*
*16* 120:*4, 5*
**Lakes** 153:*21*
**Laramie** 25:*12*
**LAW** 2:*4* 15:*22*
20:*8* 99:*19*
**laws** 17:*6, 10*
**lawsuit** 11:*5, 17, 19,*
*22, 24* 12:*3* 90:*2, 12*
95:*14* 143:*14* 144:*7*
**lawsuits** 11:*17*
**lead** 124:*15*

**leading** 14:*2, 12, 20*
18:*19* 43:*22* 46:*22*
98:*2* 124:*5*
**leaking** 24:*12*
**learn** 83:*21*
**learned** 92:*5*
**LEAVE** 4:*6* 28:*4, 8*
30:*7, 9* 49:*12* 96:*11,*
*12* 114:*24* 120:*22*
142:*11* 149:*24*
**leaves** 30:*21* 115:*2*
143:*6*
**left** 33:*24* 43:*5*
59:*13* 114:*5*
**left-hand** 33:*16*
34:*10* 55:*11* 76:*7*
**legal** 18:*8* 89:*16*
116:*19* 122:*1*
**legally** 23:*16* 121:*3*
**legible** 140:*10, 11*
**lender** 59:*19, 21*
82:*17, 23*
**lenders** 19:*25* 20:*1*
**lender's** 27:*25*
**Leon** 2:*17*
**lesson** 92:*5*
**LETTER** 4:*12* 99:*15,*
*20, 23* 100:*1, 6*
153:*16*
**letters** 99:*18* 101:*22*
**level** 9:*20*
**liability** 94:*4*
**license** 16:*2* 17:*24*
21:*2* 27:*13, 16* 31:*10*
**licensed** 15:*22* 16:*14*
20:*8*
**lienholder** 66:*6*
**lieu** 5:*19*
**life** 9:*11, 14* 76:*1*
**lift** 25:*18* 39:*7*
**lifted** 25:*13* 31:*23*
**light** 53:*22*
**limited** 121:*16*
**Line** 154:*7*
**List** 47:*8, 10*
**listed** 77:*20* 123:*4*
153:*17*
**listen** 27:*3* 149:*18*
**little** 43:*9* 70:*9* 74:*6*

80:*4* 89:*19* 144:*13*
**living** 10:*3, 6*
**LLC** 1:*10* 2:*16*
**LLP** 2:*10* 153:*3*
**located** 46:*12, 15*
61:*12*
**location** 16:*18* 54:*9*
117:*15* 148:*17*
**locations** 16:*17*
**log** 51:*11* 63:*24*
**long** 8:*21* 10:*3, 23*
39:*23* 61:*14* 119:*23*
120:*18* 134:*2*
**longer** 29:*25* 30:*3*
45:*12* 81:*20*
**look** 12:*25* 21:*18*
23:*9* 32:*6* 33:*12*
38:*21* 42:*4* 51:*13*
52:*5* 55:*9* 60:*1*
61:*25* 64:*1* 65:*1*
68:*2* 73:*8* 77:*13*
78:*1* 80:*4* 81:*23*
85:*2* 87:*11* 100:*21*
103:*22* 115:*21* 125:*3,*
*24* 126:*2* 134:*6*
139:*13*
**looking** 34:*9* 35:*11*
42:*14* 44:*3, 24* 47:*23,*
*24* 53:*14* 55:*19* 75:*4,*
*17* 78:*20* 79:*9, 24*
82:*22* 126:*1* 130:*25*
131:*7, 9* 133:*13, 21*
134:*20* 135:*18, 21, 23*
**lost** 83:*2*
**lot** 21:*11, 13* 22:*14,*
*18, 23* 35:*24* 99:*10*
140:*22*
**low** 19:*6* 26:*1*
**lower** 34:*23*
**lower-mileage** 19:*5*
**Lube** 23:*3, 8*
**LUC** 1:*4* 5:*9* 6:*5*
78:*17* 153:*4* 154:*3*

**< M >**
**Madam** 122:*14*
**maintain** 43:*16* 56:*8,*
*10* 86:*3*
**maintenance** 19:*4*

**making** 12:25
104:21 107:18
**man** 122:9, 11, 12
**management** 30:22
**manager** 27:18
28:20, 22 29:19
52:22 69:21 115:2
**managers** 29:21
**Manheim** 4:17
12:20, 21 15:16 21:7,
12 25:4 31:20 33:15
36:15, 20 37:1, 6, 8,
15, 24 41:9 44:6
54:14 59:7 84:6
88:10, 13, 22 90:8
91:18, 19, 22 92:22,
23 93:17 100:13
104:20, 25 105:2, 4
106:17, 22 107:12, 21
109:3, 6 110:4
111:22 115:21 116:1,
5, 12, 24 117:12, 16,
21 118:11, 18, 24, 25
119:2, 4, 7, 11, 24
120:11, 15, 25 121:16,
23, 25 123:1, 10, 23
135:23 136:4, 14, 15
137:1, 7, 11, 18 138:1,
2, 15, 18, 24 139:7, 11
141:2 146:16 147:4,
15, 18
**manner** 5:24
**March** 103:4
**marked** 13:15 41:22
51:23 64:18 67:22
73:3 87:4 96:13
99:1 101:17 136:8
**market** 35:18
**Marketplace** 47:7, 10
**Martine** 108:6
**master** 60:9
**math** 60:3
**matter** 5:9 6:15
**matters** 13:25
**maximize** 33:6
**McCombs** 2:16 6:10
31:16 35:14 36:12
38:9 75:15 97:5, 6
98:18, 19, 22 99:5, 6,
8 102:8, 9, 10 104:9

113:3 121:14 123:24
127:13 136:24 137:2
**McCumbs** 99:6
**mean** 12:17 37:3
92:3 95:11 105:10
127:5 128:7, 9, 11
139:1 140:11 141:25
149:10, 13
**meaning** 35:13
137:15
**means** 58:8 149:14
**mechanic** 25:16
**mechanical** 86:8
116:19 139:16
**mechanically** 121:4
**memorializes** 118:25
**memory** 110:11
**mentioned** 16:4
104:11 114:5 124:9
138:23, 24 147:15
**message** 118:23
**messages** 107:23, 25
**messaging** 107:20
**MIDDLE** 1:2 5:12
36:21 137:11, 14
**mileage** 17:13, 22
18:3, 5, 14 19:4, 6, 8
25:21, 24 26:1, 3, 6
37:1, 14, 19 45:3, 4
54:11, 13, 18 62:6, 12
66:20 67:8, 11, 13, 16,
18, 19 72:21 78:24
81:22 83:24 84:4, 8
88:12, 17 89:6, 9
90:24 92:7, 9, 12, 15
97:1 111:1 119:8, 22
123:3 124:1, 2, 16
133:11, 12 135:22
136:20 137:1 138:11
146:2, 9, 12, 13 147:6,
12
**miles** 37:22, 23
88:20 96:25 111:7
115:25 119:4 136:3
**mind** 95:20 103:24
**mine** 105:6
**minutes** 120:20
144:11
**mirror** 32:13

**mirroring** 32:13
**mis** 14:20, 21 97:12
**mischaracterizes**
14:21 35:1 82:7
92:18 97:13 121:9
**mistake** 12:21 13:1,
4, 7 36:25 37:7, 14,
25 38:10 84:7 88:23
90:5, 7 92:4 119:13,
22 120:13, 16 123:1,
24
**mistaken** 117:17
**mitigate** 95:7
**Mm-hmm** 120:6
**mobile** 72:8
**moment** 70:12, 15, 18,
21 76:23, 24 78:19
97:16
**Monday** 153:11
**money** 31:9 38:5
41:7, 8 52:20 57:5
90:9 144:8
**month** 16:23 30:8
58:6
**months** 35:24 57:7
81:17 90:2, 12
109:22
**morning** 5:3 6:25
7:16
**MOTION** 4:6 96:12
**MOTOR** 4:10
**mouse** 28:18 48:20
**move** 45:5 64:15
67:20 72:24 87:1
96:10 98:24 101:15
102:22 143:4
**moved** 54:9
**Moving** 76:3
**multiple** 131:18
**Multiply** 17:4
**mute** 117:5

**< N >**
**name** 5:3 6:1 9:5, 6
10:8 21:2 30:17
45:20 46:4 65:7
71:25 72:9, 19 76:11,
14 79:16, 18, 19 80:3
104:8, 23 105:1, 10

106:12 120:3, 4
129:13 141:2 153:16
**named** 104:22
**names** 29:20 71:22
**narration** 128:9
**narrative** 11:10, 14
26:16, 19
**nationwide** 23:19
**nature** 108:22
**necessary** 92:15
**need** 8:19, 21 13:3
14:7, 14 15:13 19:4
58:16 61:11 66:16,
18 74:24 91:18 92:3
100:1 102:5 112:16
**needs** 24:18, 21
37:15 59:19 62:16
66:15 107:2
**negatively** 18:17
**negligent** 94:8, 9, 12,
13
**neither** 150:9
**Never** 9:11, 14, 17
23:11 36:14, 19
37:20 55:5 73:10
75:25 84:18 86:10
103:8 121:13 147:20
148:19
**new** 23:6 30:16
36:10 81:20 95:15
114:15
**nice** 103:20 131:5
**NICKLAUS** 2:17
**NICOLAS** 2:19 6:9
104:8
**nicolast@nicklauslaw.
com** 2:19
**nine** 47:25 53:6
**nineteenth** 95:16
**ninety-eight** 53:6
**ninety-nine** 54:7
**ninth** 93:9
**nod** 8:10
**normal** 36:3, 6
113:10
**normally** 88:16
117:14
**Notary** 151:18
**Note** 4:17

GABRIEL... Case 8:23-cv-00709-WFJ-SPF Document 102-1 Filed 01/02/25 Page 167 of 174 ...3/2024
CR of FS Inve... (...n Strusberg)
PageID 1982
12

**Noted** 15:*5*
**notes** 152:*9*
**NOTICE** 3:*14* 13:*14*
50:*15, 20* 51:*1, 5*
109:*13, 25* 110:*1*
115:*25* 153:*6*
**noticed** 147:*8*
**notification** 106:*22*
**notified** 106:*18*
107:*11*
**nuh-uh** 8:*11*
**NUMBER** 4:*5* 5:*13,*
*22* 55:*15, 18, 19, 25*
59:*10* 64:*6* 68:*4*
72:*12* 73:*18, 23, 25*
74:*1, 4* 95:*25* 117:*19,*
*20* 118:*9*
**numbered** 152:*7*
**numbers** 42:*8, 11*
125:*16*

**< O >**
**oath** 5:*19, 20* 151:*1*
**objected** 11:*13*
**objecting** 12:*6*
**objection** 8:*15* 11:*9*
14:*2, 12, 19, 20* 18:*19*
19:*1* 23:*25* 24:*2, 9*
26:*8, 16, 18* 35:*1*
38:*25* 42:*20* 43:*19,*
*21* 46:*22* 49:*20* 64:*3*
82:*7, 14* 83:*18* 84:*14,*
*19* 89:*16* 92:*18*
97:*12* 98:*2* 110:*20*
113:*14* 114:*11* 121:*9*
122:*4, 7, 21* 123:*5*
124:*4* 128:*8* 137:*3,*
*21* 139:*3* 140:*23*
**objections** 5:*24*
**obtain** 134:*19* 135:*4,*
*19, 22*
**obtained** 73:*1*
**obviously** 7:*18* 57:*20*
**Occasionally** 8:*14*
**occur** 38:*6* 54:*8*
**occurred** 46:*21* 47:*3*
78:*14* 79:*12* 98:*7, 15*
129:*21* 147:*20*
**occurs** 27:*23*

**ODOMETER** 3:*22*
18:*6, 17, 22, 24* 44:*25*
49:*6* 59:*3, 5* 61:*19*
62:*1, 3, 11* 72:*22*
77:*13* 83:*16, 22*
84:*17* 88:*3, 9, 25*
92:*22* 93:*3, 4* 109:*15*
124:*16* 133:*13*
134:*18, 19* 135:*1, 3, 5,*
*19* 138:*12* 146:*21*
149:*7*
**offer** 103:*4, 8* 115:*13*
**offered** 91:*16*
**offering** 118:*14*
**OfferUp** 47:*7*
**office** 20:*9* 27:*12*
46:*10* 71:*19, 23*
72:*16* 86:*4, 19*
109:*16* 118:*9* 148:*15*
**off-the-record** 102:*20*
144:*16*
**oh** 55:*14* 56:*16* 72:*6*
77:*21* 81:*14* 103:*23*
126:*4* 131:*20*
**oil** 22:*17* 23:*2, 6, 7*
24:*17*
**Okay** 7:*25* 8:*3, 4, 8,*
*12, 13, 24, 25* 9:*3, 4,*
*23* 10:*6, 8, 18* 11:*8,*
*19, 22* 12:*5* 13:*6, 22,*
*24* 14:*6, 10* 15:*1, 21*
16:*11, 14* 17:*18*
20:*14* 21:*5* 22:*19*
25:*9* 26:*21* 28:*5*
30:*13, 18* 33:*10, 12,*
*25* 34:*6* 41:*20* 42:*13,*
*16, 17* 43:*2* 49:*8*
55:*22* 59:*2* 60:*12*
69:*22* 70:*13, 22*
71:*21, 24* 72:*15, 24*
73:*12, 15, 21* 74:*18,*
*22* 75:*14* 76:*3, 6, 18*
77:*15, 25* 78:*8, 13, 16*
79:*19* 80:*4, 12, 15, 20*
82:*12, 17* 83:*11* 84:*2*
87:*1, 11* 96:*10, 21*
97:*9* 98:*14* 99:*18, 22*
102:*14* 103:*12* 105:*8,*
*14, 22* 106:*11* 109:*25*
111:*10, 12, 19, 24*

112:*21* 114:*1* 116:*22*
117:*2, 11, 20* 118:*5, 6*
120:*11* 123:*19*
125:*12* 126:*7, 11*
127:*3, 7, 10, 17, 22*
128:*5, 15, 20* 129:*7,*
*10, 24* 130:*2, 9, 18, 23*
132:*1, 9, 12, 23*
133:*10, 20* 134:*1, 11,*
*17, 25* 135:*12, 18, 25*
136:*5, 13, 15, 18, 20,*
*23, 25* 137:*9, 14, 25*
138:*4, 14, 22* 139:*16*
140:*1, 14* 141:*1, 10,*
*18* 142:*3, 9* 143:*4, 12,*
*16, 21* 144:*5, 10, 18*
145:*20, 25* 148:*5, 8*
149:*18, 23* 150:*9*
**once** 27:*1, 4, 7, 16*
30:*13, 18* 107:*12*
112:*2* 113:*9* 153:*11*
**one-phone-call** 118:*15*
**ones** 25:*14* 73:*11*
121:*5*
**ongoing** 20:*12*
**on-line** 49:*15* 50:*3*
115:*7*
**open** 16:*9* 31:*8*
35:*24* 56:*12* 90:*8*
112:*3, 5*
**opened** 17:*3* 91:*19*
145:*17*
**operated** 128:*2*
**operating** 16:*2*
113:*10*
**operation** 16:*12*
104:*16*
**opportunities** 30:*12*
**opportunity** 114:*7*
**option** 92:*2* 117:*21*
147:*16*
**ORDER** 3:*14* 5:*22*
51:*20* 63:*8, 11, 16, 18*
64:*2* 66:*8* 70:*17*
129:*20* 131:*1, 8, 14*
134:*13* 135:*2* 150:*4*
**ordering** 150:*7*
153:*14*
**orders** 129:*10*

135:*16* 150:*5*
**organization** 86:*24*
**original** 37:*18* 153:*14*
**originate** 19:*23*
**outside** 93:*25* 116:*11*
**owner** 11:*1* 19:*8*
26:*2* 31:*7* 76:*15*
104:*11* 127:*8*

**< P >**
**P.A** 2:*17*
**p.m** 1:*20* 102:*21*
144:*17* 150:*11*
153:*11*
**P.O** 2:*5*
**package** 63:*10* 66:*5,*
*14, 15, 16, 17* 69:*6*
**packaging** 111:*22*
112:*2*
**PAGE** 3:*1, 14* 4:*1,*
*16* 47:*11, 24* 65:*14,*
*16, 17* 67:*5, 8* 69:*9*
74:*3* 85:*3, 5* 96:*22*
129:*11* 133:*15, 16, 17,*
*18, 19, 21* 146:*20*
154:*7*
**Pages** 1:*16* 152:*7*
**paid** 41:*5, 9* 60:*23*
77:*7* 141:*20* 144:*7*
148:*4*
**paint** 24:*18* 40:*15*
**PALM** 151:*5* 152:*1*
153:*21, 22*
**pandemic** 35:*16, 19*
**paper** 48:*16, 23* 49:*1,*
*4, 6* 50:*3, 16* 64:*5, 8*
93:*20*
**papers** 49:*5* 66:*18*
74:*21*
**paperwork** 17:*25*
18:*2* 20:*21* 28:*14*
29:*16* 58:*18, 19, 20*
69:*3* 75:*25* 98:*11*
106:*15, 19* 107:*2*
121:*3*
**paperworks** 18:*2*
**park** 22:*18*
**part** 26:*6* 48:*11*
63:*10* 66:*5* 71:*18, 19*

94:*17*, *23* 115:*18*
**participating** 5:*15*
**particular** 14:*4*
36:*24* 37:*6* 38:*22*
43:*13*, *14* 61:*2* 67:*4*
92:*6* 147:*18*
**particularly** 49:*2*
**parties** 5:*23* 12:*7*
87:*21* 152:*11*, *12*
153:*12*
**pass** 107:*6*, *8*
**passes** 22:*10* 23:*17*
**pause** 103:*21*
**pay** 27:*14* 35:*23*
40:*23* 41:*13* 45:*24*
52:*25* 57:*5* 59:*19*
100:*3* 107:*4*, *5* 127:*9*
**paying** 52:*18*
**payment** 28:*6* 41:*11*
53:*7*, *10* 57:*7* 58:*5*, *6*,
*20* 87:*21* 143:*5*
**payments** 58:*2*, *6*
59:*14*
**payout** 60:*5*
**pedal** 40:*17*, *19*
**penalties** 154:*22*
**pending** 8:*23*
**people** 22:*3*, *23* 48:*4*
58:*16* 71:*11*
**PERALTA** 2:*12* 3:*5*
6:*7* 7:*2*, *10* 11:*9*, *13*
12:*6* 14:*2*, *12*, *17*, *25*
15:*2* 18:*19* 19:*1*
23:*25* 24:*2*, *9* 26:*8*,
*16*, *19* 32:*12*, *17*, *20*
33:*2*, *6*, *8*, *10*, *20*, *25*
34:*4* 35:*1* 38:*25*
42:*20* 43:*19*, *21*
46:*22*, *25* 49:*20* 64:*3*
81:*15* 82:*7*, *14* 83:*18*
84:*14*, *19* 89:*16*
92:*18* 95:*20*, *23*
97:*12* 98:*2* 102:*5*, *8*,
*12*, *16*, *18*, *24* 103:*14*,
*19*, *24* 104:*1*, *3*
110:*20* 113:*14*
114:*11* 117:*5* 121:*9*
122:*4*, *7*, *10*, *21* 123:*5*,
*13*, *15* 124:*4*, *22*, *24*
125:*2*, *7*, *11*, *19* 126:*1*,

*4*, *7*, *10* 128:*11*, *19*
131:*3*, *9*, *12*, *16*, *20*
132:*1*, *2* 134:*11*, *13*,
*17*, *22*, *24* 136:*5*, *12*
137:*5*, *22* 139:*7*, *10*,
*21* 140:*25* 142:*4*, *6*, *9*,
*15* 143:*4*, *8* 144:*10*,
*15*, *18* 148:*23* 149:*3*,
*23* 150:*3*, *9* 153:*2*
**percent** 19:*21* 41:*16*
57:*5* 58:*7*, *8* 91:*11*,
*12*
**perfect** 26:*3*
**perform** 23:*22*
**performed** 53:*24*
147:*18*
**perjury** 154:*22*
**person** 5:*20* 7:*6*
26:*24* 36:*21* 45:*19*,
*20* 46:*5* 108:*8* 110:*2*
114:*15*, *24* 115:*1*, *19*
119:*3* 137:*11*, *14*
**personal** 55:*6* 57:*23*
58:*11* 63:*4*
**personally** 7:*7* 20:*24*
22:*19*, *22*, *24* 23:*1*
45:*7* 58:*22* 62:*22*
66:*1* 75:*19* 78:*13*
105:*5* 151:*9*
**person's** 30:*17*
114:*22*
**phone** 72:*12* 107:*20*,
*22* 117:*19*, *25* 118:*2*,
*8*, *10*, *16*, *17* 119:*14*,
*15*, *23* 120:*18*
**physical** 110:*18*, *19*
111:*6* 126:*19*
**physically** 5:*16*
**pick** 38:*13* 107:*4*, *6*
120:*23*
**picks** 23:*19* 113:*17*
**Pickup** 21:*25*
**picture** 30:*21*
**pictures** 22:*16*, *24*
23:*1* 39:*6* 67:*7*
**piece** 121:*1*
**place** 23:*10* 60:*12*
65:*11* 147:*12*
**placed** 135:*15*

**PLAINTIFF** 3:*14*
4:*1* 6:*3*, *5* 13:*15*
41:*22* 51:*23* 62:*22*
64:*18* 67:*22* 73:*3*
87:*4* 88:*3*, *8* 90:*2*, *17*
93:*23* 94:*7* 95:*6*
96:*13*, *24* 99:*1*
101:*17* 103:*3* 129:*13*,
*15*, *18* 130:*7* 142:*22*
143:*18* 144:*3* 149:*10*
**Plaintiff(s** 1:*4* 2:*1*
**Plaintiffs** 142:*25*
**Plaintiff's** 13:*13*
31:*25* 41:*21* 52:*10*
56:*18*, *25* 61:*18*
64:*17* 67:*21* 87:*20*
89:*14* 91:*14* 94:*16*,
*23* 95:*17*, *25* 96:*11*
98:*25* 128:*22* 143:*10*,
*14*, *22*, *25* 144:*5*
149:*6*
**planning** 25:*21*
**platform** 60:*25*
**play** 25:*9* 26:*6*
**Please** 5:*25* 6:*12*
7:*24* 8:*6* 24:*3* 43:*11*
49:*22* 52:*7* 68:*10*
74:*6* 89:*18*, *19* 94:*20*
103:*14* 106:*5* 109:*13*
132:*9* 153:*6*, *10*, *12*,
*16*
**PLLC** 2:*4*
**PLTF'S** 3:*14*
**plus** 41:*15*, *16*
**point** 92:*5* 111:*5*, *12*
112:*21*
**pointing** 80:*6* 131:*2*
**policies** 147:*11*
**Ponce** 2:*17*
**portal** 116:*24* 117:*13*
**portion** 122:*16*
**position** 10:*25* 13:*8*
65:*13* 69:*14* 70:*22*
76:*20* 79:*10* 80:*1*, *12*,
*15* 86:*10* 111:*14*
114:*6* 145:*25* 146:*4*,
*8*, *25*
**possession** 43:*5*
48:*24* 56:*5* 82:*3*, *12*,
*23* 86:*3* 96:*2* 97:*2*,

*10* 122:*3* 123:*2*
124:*1* 135:*9*
**possibility** 142:*17*
**possible** 98:*5*
**post** 23:*18* 47:*7*
67:*5*, *7* 137:*10*
146:*20*
**posted** 67:*5*, *6*
**potential** 138:*16*
**POWER** 4:*1* 68:*3*,
*12*, *16*, *23*, *25* 71:*4*, *11*
77:*9*, *10* 80:*14*, *16*, *18*,
*21* 81:*1* 83:*5*
**POWERHOUSE** 1:*9*
2:*10* 6:*8* 9:*2* 10:*10*,
*20*, *21*, *22* 16:*8*, *23*
19:*10*, *19* 29:*24* 41:*7*
59:*14*, *16*, *23* 74:*20*
75:*7*, *8*, *12* 76:*4* 77:*9*,
*18*, *23*, *25* 78:*17*
81:*23* 125:*13* 126:*16*,
*18*, *21*, *23* 127:*20*, *22*
128:*2* 129:*3*, *5* 130:*6*,
*16* 132:*6*, *19*, *20*
133:*1*, *11*, *19*, *21*
134:*19*, *25* 135:*19*, *22*
136:*19* 140:*17*, *19*, *21*
141:*3*, *11*, *14*, *22*, *25*
142:*1*, *21*, *23* 144:*2*
146:*5* 147:*5*
**Powerhouse's** 31:*5*
**practice** 134:*6* 140:*3*,
*7*
**practices** 115:*19*
**predelivery** 53:*15*
**prejudiced** 90:*1*, *11*
**premises** 25:*18*
**preparation** 12:*12*
13:*3* 81:*12*
**prepare** 12:*13*, *15*, *18*,
*19* 13:*9* 46:*17* 78:*9*
**prepared** 13:*25*
14:*11*, *13* 52:*21*
69:*18*
**prepares** 113:*17*
**present** 5:*17* 32:*14*
78:*13*
**presented** 28:*9*, *16*
**Press** 33:*6*

GABRIEL... Case 8:23-cv-00709-WFJ-SPF AMEN Document 102-1 Filed 01/02/25 Page 169 of 174 /2024
CR of FS Inve...ment...(...n Strusberg)
PageID 1984
14

**pretty** 31:9, 11  36:20
91:24  100:4  127:12
138:18
**previously** 97:9
**price** 25:6, 14, 20
41:15  52:18  53:4
**prices** 36:2, 4, 5
**print** 20:21  58:18,
19, 20  69:5, 6
**printed** 52:17
**printer** 20:9
**prior** 16:1  40:15
56:4, 7, 14  91:15
100:6
**problem** 103:17
**problems** 116:19
**Procedures** 113:11
147:12
**proceed** 11:16  103:1
**PROCEEDINGS** 3:1
5:2  150:10
**process** 7:22  36:23
49:9  83:2  92:17, 20
99:25  105:24  118:13,
15  121:2
**processing** 105:25
**produced** 42:10, 11,
24  43:2  61:20
**Professional** 152:6
**profit** 59:23
**profits** 41:16
**program** 20:5
**pronounce** 99:7
**proof** 28:2
**provide** 8:9, 10
15:13  18:1  25:3
43:17, 20  47:15, 17
48:1  49:17  50:7
52:17  61:4, 7  72:13
74:22  92:25  101:3
137:16  138:1, 20
**provided** 4:17  48:22
50:11, 15, 20  51:1, 5
63:19  90:25  97:5
98:18, 19  101:7
130:14  132:6  135:7
136:15  137:2
**provider** 20:22
115:5, 6, 14

**provides** 92:23
147:15  149:7, 19
**providing** 49:2
101:25  141:22
**public** 73:1  151:18
**pull** 13:12  31:24
41:20  51:18  56:17
61:17
**purchase** 22:5, 8
27:8  31:16  35:14
36:17  38:12  53:12
60:13  89:1, 7, 10
90:13  106:16, 19, 20
107:14, 17  121:7
141:1
**purchased** 31:19
36:11  42:19  55:19
90:3  97:6  107:2, 4
140:14
**purchases** 107:17
127:23, 25
**purchasing** 106:12
**purple** 126:3
**purpose** 34:14  65:5
68:21
**pursuant** 5:21
**put** 18:5  21:21, 22
22:16  23:13  30:20
31:8  32:16  33:21
37:20  39:7  46:13
50:13  66:24  67:8
71:22, 25  80:2
128:13  131:22  135:7

**< Q >**
**question** 7:23, 25
8:2, 7, 16, 23, 24
11:16  12:8  14:14
26:10  29:11  51:4
73:2  79:24  82:21
83:12  87:18  88:6
89:19  90:14, 19  91:6
94:20  102:23  106:5
120:7  122:9  123:8
125:18  126:21
128:25  140:5  149:12,
18
**questions** 12:20  14:5,
11  102:10  104:7, 15
118:4  124:19, 25

125:3  137:17  142:12
144:19  148:10, 24
149:24

**< R >**
**raise** 6:12  8:14
**reach** 100:7  106:25
**read** 13:21  14:8, 10,
14  55:8  67:12, 13
68:10  69:12  74:4
96:20  114:2  122:15,
16  125:16  136:21
150:3  153:11, 12
154:22
**reading** 18:6, 17
44:25  59:3, 5  62:11
67:11  83:22, 24  84:4
88:4, 9  134:18, 20
135:2, 5, 15  138:12
146:2, 21  148:21
150:2
**reads** 58:14
**ready** 103:1
**really** 19:8  107:18
131:16
**reason** 17:18  30:2,
10  75:5, 10  129:25
154:7
**reasonable** 93:11, 14
153:14
**reasons** 86:6
**reassignment** 78:18
**recall** 20:19  74:10
99:14, 18  100:23
101:23, 25  110:9
118:11, 13  120:11, 15,
18  128:22, 25  147:17
**recap** 15:7  61:4, 7
**receipt** 28:7  121:6
**receive** 41:17  53:9
86:14  90:8  111:8
113:9  121:19  126:21,
23  127:4  142:23
143:21, 25  145:21
**received** 32:1  42:18
44:16, 20  88:11
98:21  109:14  110:1
115:24  125:13
126:18  132:20  133:1
147:1

**receives** 115:20
121:21
**receiving** 99:14, 18
100:6  101:23
**recess** 102:20  144:16
**recondition** 24:16
**record** 6:2  7:11  8:5,
12  9:6  68:10  122:16
152:8
**recorded** 109:9
**records** 43:17  73:1
86:2, 4  112:12, 13
129:3, 5
**recross** 148:24
**RECROSS-
EXAMINATION** 3:5
148:11  149:2
**REDIRECT** 3:5
144:20, 21
**refer** 9:1, 2
**referring** 9:1  94:1
136:18
**reflect** 18:13  98:6
111:1  113:3
**reflected** 40:25
111:2  124:2
**reflecting** 111:6
**reflects** 123:3
**refund** 90:9
**Regarding** 15:21
45:3  93:3, 7  107:17
130:15  132:18
**register** 97:15
**registered** 109:3
**REGISTRATION**
3:23  65:3
**Regular** 107:25
111:24
**related** 116:6
**relates** 53:25  146:1
**relation** 31:5
**relationship** 104:10,
12
**relative** 19:6  34:19
152:11, 12
**release** 30:16  91:15
93:3, 7  127:9
**relevance** 11:9, 14
**relied** 92:16  98:17
**relief** 94:19  95:1

rely 22:4 87:14, 19
88:2, 7 89:13 90:16,
21 91:4, 14 93:10, 22
94:7, 16 95:2, 6, 17
96:8
relying 147:13
remember 10:24
11:25 12:4 35:17
39:19, 21, 25 40:2, 6,
8, 11, 14, 18, 20 74:9
77:12 93:5 95:13
96:9 98:1, 10 99:16,
17 101:9 102:2
103:7, 11 109:20, 24
119:9 120:3 145:18
146:7
remind 35:16
remotely 5:18, 20
Rent 53:22
rental 26:1
rentals 19:7
rented 19:7
REP 3:14 105:9
repeat 49:22 94:20
rephrase 7:24
replaced 83:3
replacement 114:8, 10
Report 21:20 25:4
34:13, 15 35:9 38:22,
23, 24 97:3 152:7
Reported 1:20
REPORTER 1:24
5:3, 5 6:12, 18 8:5
29:9 32:23 106:2, 4,
9 122:14, 17 142:4, 7
151:18 152:6, 20
153:18
Reporter's 4:17
reporting 5:18, 25
153:21
reports 22:5 25:3
represent 6:1 104:9
121:5
representation 41:3
73:16
representations 36:12
representative 1:16
7:5, 9, 19 17:9
108:20 141:14

represented 116:17
reputation 19:15
request 33:18 74:7
95:22 139:6, 19, 24,
25 140:4, 7, 13
requested 99:24
122:16 152:8
requesting 147:17
require 20:11
required 50:12
requirement 115:18
requires 62:18, 20
residence 28:2
resolved 87:20
resolving 143:13
respect 12:12 147:22
response 8:9, 10 61:1
responsibility 17:6
responsible 37:2
114:3 123:25
restroom 102:6, 13
RETAIL 3:14 36:5
56:19, 24 63:14
66:10 70:14 135:3
retains 128:2
return 24:13 38:4
103:5 153:12, 17
revealed 18:10 21:21,
22 37:4
review 15:7, 8 30:21
122:2 152:7 153:9
reviewed 70:20
Reyes 29:25 30:5
45:11 46:17 50:19
52:24 54:23, 24
57:20, 24 65:23
RFP 67:21
right 6:12 26:13
33:21 44:1 47:20
55:5, 20 57:18 59:22,
25 65:20 67:3 76:11
79:9, 19 80:9 82:23
91:8, 11, 12 92:7, 9
102:7, 19 103:12, 23
105:10 107:9 109:7
110:2 112:19 115:24
116:3, 11 117:22, 25
118:8 119:5, 14
120:24 123:21
124:18 126:14, 22

132:16 143:16
144:20 148:21
right-hand 53:15
rights 91:5, 7
righty 6:25 7:15 9:5
RISC 70:11
road 95:14
role 115:3
rollback 88:15
rolled 88:25
room 5:17 117:4
144:14
routinely 146:22
rude 147:9
rules 7:21
run 50:2, 24
rust 40:5

< S >
salaried 77:5
salary 31:12
Sale 4:17 22:18
23:10, 14, 23 33:15
36:17 45:7 46:2
47:11 52:8, 10, 15
53:14 54:13 57:14,
15 70:12, 15, 18, 21
72:23 82:1 92:22
93:20 98:20 109:23
126:16 128:6 129:8,
21, 25 136:14, 21
146:15
sales 28:20 45:22
53:4 56:19, 25 63:15
66:11 70:14 133:11
134:8
salesman 27:13
45:16, 17
salesperson 26:25
27:1
San 117:17, 18, 21
satisfaction 87:15
saved 51:14 100:20
SAVINGS 4:10
saw 13:22 36:16
37:22 55:5 57:13
66:13 96:19
saying 92:14 100:1
103:19 120:15

says 18:4 33:21
35:12, 15 44:11 50:2
53:13 62:10 67:10
71:2 77:21 79:4
81:1 84:3 94:12
123:1 126:13, 14, 15,
20 134:18 142:20
scale 34:20
SCAN 4:5 68:4
73:18 74:1, 4
scares 33:23
scope 12:8
score 34:15, 24
scratch 121:20
scratched 40:1
scratches 34:18
screen 13:18 28:17,
23 32:4, 10, 14 33:3
41:25 52:1 61:23
64:21 67:25 73:6
87:7 96:16 99:4
101:20 125:7, 9, 24
126:3 128:18 131:14,
22, 25 132:15 134:12,
16 136:2, 11 142:8,
14
screens 131:18
scroll 54:21 59:9
64:6, 7 78:16 96:21
search 101:1
searching 31:21
104:20
seats 39:18, 20
second 14:18 27:22,
23 43:11, 25 44:1
51:14 52:7 53:2
65:16, 17 74:3 88:1,
11 128:14 132:9
134:11 136:1, 5
seconds 123:16
secretary 53:23
78:12
section 96:23 142:20
143:2
SECURITY 3:21
see 15:17 28:23, 25
32:10, 22 33:4, 5, 8,
23 34:4, 5, 6, 7 42:2,
3 46:3 47:20 52:2
53:15 54:21, 24 55:4,

GABRIEL Case 8:23-cv-00709-WFJ-SPF AMEDocument 102-1 Filed 01/02/25 Page 171 of 174 3/2024
CR of FS Inventory of (John Strusberg)
PageID 1986
16

5 56:21 57:18 59:10
62:8, 24, 25 63:7
64:5, 9, 23 65:24
66:7 67:5 68:7, 8
69:24, 25 70:7 73:21
75:17, 24 76:4 78:19,
21 80:6 85:3 96:19
99:16 104:2 131:13,
19 132:10, 11, 12
144:11
**seen** 13:20 73:10, 11
87:9 96:18 110:25
**sees** 29:15
**select** 21:15 67:15
**selected** 62:10 107:13
**sell** 10:7, 9 16:23
19:25 21:3 24:22
37:16, 17, 18 88:18
97:14 100:5 110:19
111:9 112:22 127:1,
6, 14, 16 128:1, 3, 4
134:9 137:25 140:16,
22 149:11
**seller** 21:21 36:14,
18, 20, 22 37:7 84:7
88:23 117:15 121:8
136:23 137:12, 16, 18
**sellers** 138:16, 19
**seller's** 147:13
**selling** 19:16, 22
25:21 36:10 96:23
121:17 124:13 134:2,
3 138:14 140:2, 9
**sells** 19:24
**send** 44:4 51:15
100:9 101:6 111:14,
15, 23 112:25 118:18,
22 122:18 143:9
**sending** 113:12
122:5 125:4
**sends** 112:8 127:15
**sense** 7:7 35:21 36:8
**sent** 44:13 87:23
100:1, 17, 24 103:25
107:8 121:7 125:4
130:4, 5 143:12
144:2
**separate** 28:21
**sequence** 64:6, 11

**serve** 108:19
**service** 53:16
**SERVICES** 1:10
53:24 85:19 141:22
**session** 20:20
**set** 115:10
**settle** 103:6
**settlement** 91:15
93:2, 6 103:4
**settling** 143:13
**seventh** 91:3
**seventy-three** 58:5
**Share** 125:7 148:15
**shared** 13:17 32:3
41:24 51:25 61:22
64:20 67:24 73:5
87:6 96:15 99:3
101:19 125:8 128:17
131:24 134:15
136:10 142:13
**shares** 138:19
**sharing** 128:15
131:17, 23 134:12
136:2 142:8
**SHEET** 3:14 32:1
61:5, 10 154:1
**ship** 44:1 113:23
**shipment** 112:13, 14
**shipped** 44:11, 17
110:5
**shipping** 112:10
**shortly** 88:25 89:6, 9
**show** 27:6, 7 34:3
64:10 107:3
**showing** 32:8 95:20
128:15, 23 136:6
**shows** 34:2 44:1
52:17 66:6 129:12
130:24
**sic** 94:25
**sick** 36:1
**side** 53:15 76:7
**sign** 28:3 48:19
49:5, 9, 17 50:21
58:1, 10 62:17 63:2
65:8, 10, 11, 18, 19
66:4, 15, 16, 17 68:13
71:11 75:22 77:9
80:2, 13, 19, 24 81:2

82:5 83:6, 7 93:2, 6
153:12, 16
**signals** 40:9
**signature** 29:3 54:22
57:19 65:21, 22
66:19 69:19, 24 76:6,
12, 16, 21 80:11
82:24 129:15, 17
153:8, 16, 23
**signatures** 51:12
62:24 68:14 69:25
**signed** 30:13 48:13
54:20, 25 57:17, 20
62:23 63:25 65:3
69:22 70:8, 23 71:1,
24 74:16 76:18 78:4
79:14, 22, 23 80:16,
18, 21 81:5, 9 82:18
129:12, 20 149:10
151:14
**significance** 52:14
**signing** 28:10 29:15
49:16 63:9 70:13, 16
78:2 106:13
**signs** 40:5 58:14
**SILVERSTEIN** 2:13
7:11 38:16 143:6
**simple** 12:24 13:1, 4
92:21
**simply** 100:1
**single** 56:11 69:5, 15
**sir** 101:5
**sit** 13:24 27:12
29:15 69:14 75:2
**site** 15:16 117:21
**sitting** 28:20
**situation** 12:25 18:8
37:5 117:24
**six** 35:23 44:7, 9
47:19 54:16 59:7, 8
67:11 77:14 136:4,
22
**sixteenth** 95:5
**sixth** 90:20
**sludge** 40:21
**small** 34:5
**software** 30:22, 25
31:3 115:5, 6, 14
**sold** 11:18 17:3
18:15 25:7 30:5

37:11, 21 43:4 67:4
83:14 88:18 97:17
111:16 112:23
126:25 130:6 137:6
142:24 145:23 146:2,
23 147:1 149:8, 9, 13,
15
**solution** 91:16
**solve** 86:13
**solved** 86:5
**somebody** 11:3
20:25 32:15 37:3
81:7
**something's** 39:14
**soon** 88:4 107:5
**sorry** 7:3 30:3
32:10, 25 35:17
39:25 40:8, 14, 20
44:8 75:7 87:25
90:14 96:9 98:11
100:13 102:2 103:11
106:4, 8 109:24
115:1 117:1, 2, 6, 17
120:7 123:14 127:23
130:10 138:24 140:5
141:6
**sort** 8:11 38:21
121:1 147:5
**sounds** 72:19
**space** 65:19 148:15
**Spanish** 120:8
**speak** 36:14 46:17
78:8 81:12 83:11
**speaking** 12:23
**specific** 26:20 70:10
104:17 107:17
**specifically** 53:24
107:19 120:15 127:5
**speculation** 122:7
**speculative** 19:1
42:21 46:23 122:21
123:5
**spells** 60:4
**spoke** 91:22 100:18
118:11 119:3, 10
**spoken** 120:1
**spot** 22:16 27:21
**square** 33:6
**St** 2:5

staff 25:16
stamp 125:21 134:14
stamped 42:11
  51:21 128:21
stamps 42:9
stand 34:11 55:10
standard 33:22
  48:16 62:17 69:2, 7
  113:10 115:19
standards 93:12, 14
  121:4
start 7:21 11:2, 4
  29:15 75:14
started 104:13
  106:19 145:14, 16
starting 6:2
starts 49:16
state 9:5, 6 12:1, 2
  45:3 151:4, 18 152:1
stated 129:1 142:16
  154:22
STATEMENT 3:22
  61:19
STATES 1:1 5:11
  10:1, 4 21:8 46:4
  94:22 96:23 98:17
  129:7
stating 6:1 46:25
status 122:1
stay 142:11
stays 51:10
Ste 2:5, 11, 17 153:4
steering 39:24
stenographic 5:5
  152:9
Stenographically
  1:20 152:7
step 43:12
Stephanie 100:6, 12,
  15, 24 101:25 110:2
steps 92:15
sticker 23:6
stop 32:13 128:14
stopped 134:12
  136:2 142:8
store 51:8
story 21:23
straight 31:14 119:2
strictly 39:15 108:23

Strike 127:23 130:3,
  10 135:13, 19 137:10
string 100:19
STRUSBERG 1:15
  3:5 5:8 6:20, 25 7:6,
  15 9:7 29:9 32:6
  49:22 52:5 79:20
  103:1 104:7 105:12
  106:2, 5 124:20
  144:23 151:9 152:7
  153:2, 25 154:6, 23
study 9:23
sub 142:2
subcontractor 142:2
subject 88:4
submit 60:24 73:12
  105:23
submits 27:18
submitted 68:16
  71:16
subscription 60:16
SUE 2:4
sued 84:11, 16
suffered 90:17
sufficiently 14:24
suggest 15:4 32:12
Suite 153:21
super 34:5 131:5
support 31:9 89:8
  96:3
supported 145:18
supposed 37:19
Supreme 5:21
sure 8:9 13:2 22:17
  42:14 56:13 69:8
  74:7 91:24 92:7, 8,
  10, 12 103:17 116:17
  119:16, 17 121:3
  125:21 128:11
surprised 144:5
swear 6:14
sworn 6:21 151:10
system 56:10, 11
  66:23 67:2 69:20
  115:8, 9

< T >
tag 30:16, 18
tags 30:15

take 7:19 8:19
  20:12 22:15, 16, 24
  23:1, 3 27:16 30:21
  43:12 67:7 92:15
  102:7 104:17 112:5
  115:21 118:14, 16
  121:2 144:12 146:19
  153:6
taken 20:14 154:6
takes 27:13 113:18
talk 91:23 141:18,
  19 142:10 149:8
talked 81:16
talking 8:6 29:11
  78:21 90:23 95:13
  104:16 106:6 118:14
  125:14 132:7
TAMPA 1:3 5:12
tampered 83:15
target 22:2
taught 58:16
taxes 52:18
teach 20:21 115:3
teaches 114:24 115:3
TEASDALE 2:10
  153:3
technically 23:16
tell 21:22 36:12
  44:1 45:20 58:13
  59:25 63:23 64:1
  67:3 93:18, 19 119:7
  123:23
telling 13:10 119:5
  143:22 144:1
tells 43:25 57:7
  123:10
temporary 97:15
ten 34:21 43:6 90:2,
  12 145:5
tender 41:7, 8
term 149:9
terms 57:5 58:1, 5,
  13
test 22:19 27:10, 11
  48:8
testified 6:22 71:16
  97:9, 18 109:12
  110:4 120:25 130:2,
  4

testify 13:25 46:20
  47:3 82:5
testimony 6:14
  14:21, 23 35:2 82:8
  92:19 97:13 121:10
  145:20
testing 124:15
TEXAS 3:14 4:1
  125:15
text 107:23, 25
  118:22
Thank 6:18 15:5, 10
  29:12 95:23 102:16
  104:1, 8 106:7
  124:19, 21 125:4
  132:1 138:18 142:7
  148:20
thing 8:22 42:15
  49:19, 23 131:5
think 14:23 32:13
  71:22 72:6 85:10
  92:14 102:3 117:17
  126:7 128:5
thinking 119:10
third 78:18 87:24
  89:12, 20
third-parties 93:25
  94:1, 3
Third-Party 2:16
  4:6, 8 6:10
thirteenth 94:6
thirty 16:24
thirty-one 54:16
  59:7 67:11 77:14
  136:4, 22
thirty-six 67:11
thought 95:11
three 54:16 59:7
  77:14 144:11 148:25
three-sixty 17:4
time 5:7 8:6 12:23
  15:4 22:7 29:24
  31:1 32:14 60:12
  77:3 78:24 82:1, 24
  86:12 92:6 97:10
  98:15, 16 104:19, 21
  105:14 107:17, 18
  110:1 116:9 118:24
  122:10, 11 123:21

GABRIEL... Case 8:23-cv-00709-WFJ-SPF   Document 102-1   Filed 01/02/25   Page 173 of 174 .../2024
CR of FS Inve... (...gh Strusberg)
PageID 1988
18

127:*22*, *24*  148:*15*
153:*8*, *14*
**timeframe**  116:*9*, *12*
**times**  12:*22*  17:*4*
22:*21*
**timestamps**  63:*25*
**Tires**  24:*20*  25:*13*
**TITLE**  3:*14*, *23*  4:*1*
18:*13*  21:*21*, *22*  23:*9*
41:*17*  42:*5*, *18*, *23*, *25*
43:*1*, *2*, *5*, *13*, *24*  44:*4*,
*11*, *13*, *16*, *22*, *24*  45:*2*
64:*16*  65:*2*  72:*25*
73:*12*, *16*  74:*4*, *13*, *16*,
*19*  75:*6*, *11*, *12*  77:*11*,
*17*, *23*  78:*1*, *2*  79:*6*,
*11*, *23*  81:*24*  82:*2*, *10*,
*13*, *24*  83:*2*  84:*3*
90:*25*  97:*3*, *10*, *16*, *19*,
*22*  98:*6*  103:*15*
106:*13*  110:*5*, *6*, *12*,
*14*, *17*, *18*, *19*  111:*1*, *6*,
*8*, *13*, *20*  112:*6*, *9*, *25*
113:*2*, *12*, *20*  114:*22*
115:*20*, *21*  121:*6*, *20*,
*22*  122:*2*  123:*3*
124:*2*  125:*14*, *15*, *23*,
*25*  126:*5*, *15*, *19*
127:*9*, *15*  128:*3*
130:*5*, *15*  131:*12*, *22*
132:*5*, *6*, *18*, *21*  133:*2*
135:*9*  142:*21*, *24*
143:*1*  146:*1*, *5*, *9*, *22*
147:*1*, *24*  149:*7*, *21*
**titled**  94:*22*
**titles**  72:*6*  75:*25*
127:*5*  145:*21*
**titling**  114:*16*
**TMU**  18:*9*  37:*14*, *15*,
*17*, *18*  88:*18*
**today**  7:*1*  13:*24*
15:*11*  17:*10*  46:*18*
69:*14*  78:*9*  82:*23*
119:*5*
**Today's**  5:*6*  12:*13*,
*15*, *18*  13:*9*  81:*13*
**told**  12:*22*  37:*10*
58:*3*  73:*24*  84:*6*
90:*8*  118:*25*  119:*11*,
*12*  120:*12*, *13*  144:*6*

**top**  46:*4*  55:*9*  59:*9*
68:*4*  70:*25*  73:*18*
74:*5*  125:*24*  126:*2*
131:*13*
**topics**  20:*19*
**torn**  39:*18*
**TORRES**  2:*19*  3:*5*
6:*9*  102:*11*, *14*, *17*, *19*
104:*2*, *4*, *6*, *8*  106:*3*,
*10*  110:*22*  113:*19*
114:*14*, *18*, *20*  117:*8*
121:*12*  122:*5*, *8*, *14*,
*18*, *22*  123:*7*, *9*, *12*, *20*
124:*8*, *18*, *21*  131:*17*
137:*3*, *21*  148:*9*, *12*,
*20*  150:*4*
**Tort**  90:*22*
**touch**  75:*25*
**tow**  38:*20*
**track**  45:*24*  46:*1*
**trade**  21:*10*
**trade-in**  21:*13*, *14*
**trades**  21:*11*
**train**  114:*7*, *22*
**trained**  114:*10*, *15*, *21*
**training**  20:*12*, *20*
115:*13*
**TRANSACTION**  4:*5*
26:*14*  29:*24*  31:*1*
45:*6*, *15*  46:*21*  47:*4*
50:*5*  52:*10*  53:*21*
57:*1*  68:*19*  69:*16*
71:*18*  73:*25*  74:*1*, *4*
75:*15*  77:*11*  78:*17*
97:*20*  104:*18*  113:*3*
137:*15*
**transcript**  152:*8*
153:*8*, *11*  154:*2*
**transfer**  30:*16*  52:*19*
65:*7*  68:*24*  72:*17*
75:*20*, *24*  76:*3*  78:*14*,
*25*  79:*12*  97:*11*, *19*
98:*7*  103:*16*  110:*14*,
*18*  113:*7*  125:*25*
132:*19*  138:*16*  146:*5*,
*9*  149:*20*
**transferred**  71:*23*
74:*19*  75:*6*, *12*  77:*18*,
*23*  97:*24*  110:*12*
126:*15*  132:*5*

**transfers**  72:*3*  76:*23*,
*24*  110:*17*  142:*21*
146:*23*  147:*24*  149:*8*
**transmission**  24:*12*
86:*8*
**transport**  41:*15*
**tried**  30:*10*
**trim**  25:*12*
**triple**  92:*8*
**troublesome**  123:*22*
**truck**  14:*4*  15:*17*
23:*19*  38:*20*  93:*20*
107:*6*
**trucks**  21:*25*  31:*23*
**true**  42:*17*  52:*9*, *12*
56:*24*  62:*2*  65:*1*
68:*12*, *15*  129:*1*, *2*, *3*
152:*8*  154:*23*
**truly**  153:*18*
**trust**  19:*18*, *20*
**trustworthy**  93:*18*
**truth**  6:*15*, *16*
**truthful**  17:*13*, *22*
18:*13*  41:*1*  73:*15*
79:*11*  97:*7*
**try**  92:*6*  112:*15*, *17*
123:*21*  140:*22*
**trying**  125:*19*
**Tuesday**  1:*20*  5:*6*
**turn**  40:*9*
**turned**  28:*24*
**twelfth**  93:*21*
**twelve**  10:*24*  16:*5*
**twenty**  34:*21*  145:*7*,
*11*, *21*
**twenty-eight**  136:*4*, *22*
**twenty-four/seven**
19:*13*
**twenty-one**  47:*25*
53:*6*
**twice**  107:*12*
**Two**  34:*16*, *17*  35:*3*
44:*17*  54:*10*  69:*25*
81:*17*  90:*2*, *12*
109:*23*  116:*15*, *16*, *20*
119:*15*, *16*  123:*16*, *17*,
*24*  148:*9*
**type**  21:*24*  111:*21*,
*22*  112:*10*  118:*19*, *23*

**typical**  26:*13*

< U >
**U.S**  92:*24*
**Uh-huh**  55:*17*
**uh-uh**  8:*11*
**unable**  46:*20*
**Unclean**  94:*18*, *22*, *24*
**unclear**  7:*24*
**underneath**  45:*2*
80:*9*
**undersigned**  151:*8*
**understand**  8:*17*
51:*3*  56:*13*  86:*23*
87:*18*  89:*4*  90:*5*, *14*,
*19*  91:*6*  92:*4*, *13*
**understanding**  109:*1*
143:*13*
**understood**  8:*3*
34:*23*  140:*20*
**unexpectedly**  115:*2*
**UNITED**  1:*1*  5:*11*
10:*1*, *3*  21:*8*
**University**  9:*22*, *24*
**unpack**  43:*7*  80:*20*
**unwind**  91:*17*, *20*, *21*
**upper**  33:*16*  34:*9*
55:*10*
**UPS**  112:*9*
**UPS'ed**  110:*7*
**use**  8:*11*  15:*4*  20:*1*,
*22*  50:*7*  68:*25*  69:*4*,
*15*  112:*9*, *11*  115:*8*, *9*
117:*25*  118:*1*, *8*, *9*
141:*7*  144:*13*
**USPS**  44:*12*
**usually**  27:*20*  116:*2*

< V >
**V#3**  55:*10*  59:*10*
**value**  18:*7*, *10*, *18*
26:*7*
**vans**  21:*25*
**VEHICLE**  3:*14*
4:*10*  18:*7*, *9*, *22*, *23*
19:*3*, *5*  22:*5*  23:*4*, *10*,
*22*  24:*6*  25:*3*, *7*, *18*,
*20*  26:*4*  31:*16*  32:*1*
34:*24*  35:*6*, *10*, *14*
36:*11*, *13*, *18*  37:*16*,

22 38:*13, 21, 23* 39:*4,*
*16, 18* 40:*23* 41:*14,*
*18* 42:*19* 45:*8* 47:*9,*
*13* 48:*9* 52:*19* 53:*1,*
*4, 25* 59:*3, 13* 69:*15*
82:*1* 83:*14* 84:*9*
88:*4* 90:*3* 95:*19*
96:*2, 4, 23* 97:*1, 6*
103:*5* 105:*21, 22*
106:*16* 107:*19*
110:*19* 111:*16*
112:*22, 23* 116:*17*
121:*17* 122:*1* 124:*10,*
*11, 14* 126:*16* 127:*23,*
*25* 128:*3* 130:*6, 15*
133:*12, 13, 14, 24*
134:*7, 22* 135:*5, 10,*
*22* 137:*2, 12, 25*
138:*2, 5* 140:*8, 14, 16,*
*19, 22* 142:*24* 145:*23*
146:*2, 18, 23* 147:*1, 5,*
*12, 18* 149:*8, 9, 11*
**vehicles** 19:*22, 24*
21:*9, 13, 14* 22:*7, 10*
23:*12* 24:*16* 104:*20*
107:*1, 13* 124:*13*
134:*2, 3, 9* 135:*18*
137:*6* 138:*15, 20*
139:*2, 11* 140:*2*
144:*25* 145:*2, 21*
147:*16*
**vehicle's** 18:*14, 17*
26:*7* 72:*20* 97:*4*
135:*21*
**venued** 5:*11*
**verify** 92:*15* 115:*22*
**verifying** 118:*19*
**version** 55:*25*
**versions** 56:*4, 7, 14*
**versus** 5:*9* 148:*22*
150:*2*
**video** 147:*9*
**VIDEOCONFERENC**
**E** 1:*15*
**view** 32:*23, 24* 33:*21*
**VIN** 44:*7, 9* 138:*6*
**VIOLATIONS** 4:*8*
**vs** 1:*4*

< W >

**W/ATTACHMENTS**
4:*12*
**waged** 85:*5*
**wait** 8:*6* 14:*18*
29:*10* 102:*12* 118:*4*
122:*8* 126:*14*
**waive** 5:*24* 91:*7*
153:*8, 16, 23*
**waived** 91:*5*
**waiving** 148:*22* 150:*2*
**walk** 26:*13* 99:*25*
137:*9*
**walks** 26:*14, 23*
**WANDA** 1:*24* 5:*4*
7:*4* 151:*18* 152:*6, 20*
153:*18*
**want** 7:*3, 10* 15:*2*
27:*8, 14* 42:*14* 51:*15*
69:*8* 91:*24* 102:*17*
103:*23* 104:*17*
105:*22* 137:*25* 147:*9*
150:*1, 7*
**wants** 20:*1* 27:*3, 5*
**warehouse** 117:*21*
**warranty** 95:*18* 96:*1*
**wash** 22:*16, 22, 23*
**washout** 61:*5, 8*
**watch** 70:*5*
**water** 53:*22*
**way** 29:*11* 45:*18, 19*
46:*1* 60:*3* 63:*18*
107:*1* 108:*20* 109:*10*
118:*6* 119:*3* 120:*8*
123:*23* 125:*5* 132:*14*
144:*24*
**web** 47:*11, 24* 67:*5,*
*8* 117:*13* 133:*15, 16,*
*17, 18, 19, 21*
**website** 104:*20*
106:*17* 107:*21*
135:*23* 138:*1*
**Weekly** 77:*8*
**weeks** 116:*15, 16, 20*
**weird** 123:*9*
**well** 6:*11* 12:*9, 23*
43:*22* 49:*1* 60:*16*
67:*3* 91:*16* 102:*8*
126:*7* 137:*10* 141:*16*
142:*10* 143:*24*
**went** 104:*10*

**we're** 7:*18* 8:*20*
12:*23* 42:*14* 60:*6*
69:*8* 78:*20* 82:*22*
90:*5* 130:*25* 131:*9*
150:*3*
**West** 2:*16* 6:*10*
136:*24* 137:*2* 153:*22*
**WESTLAKE** 1:*9, 10*
59:*17, 21, 24* 60:*5, 9,*
*10, 19, 22* 61:*4, 12, 15*
62:*19* 66:*6*
**wet** 48:*14, 15*
**WhatsApp** 107:*25*
108:*1, 2, 5*
**wheel** 39:*24*
**wheels** 25:*13*
**where-is** 103:*5*
**wholesale** 36:*2*
**wholesaling** 31:*11*
**willing** 91:*21*
**win** 95:*14*
**windshield** 24:*21*
**wisely** 15:*4*
**wish** 153:*16*
**WITH/WITHOUT**
3:*23*
**withdraw** 50:*20* 51:*2*
**WITNESS** 3:*1* 6:*17*
11:*12* 14:*3, 7, 13, 22*
18:*20* 24:*1, 4, 11*
26:*11* 32:*15, 18, 22,*
*25* 33:*5, 7, 9, 23* 34:*1,*
*5* 35:*3* 39:*2* 43:*20*
46:*24* 52:*3* 56:*22*
58:*22* 64:*4, 24* 66:*1*
78:*22* 81:*16* 82:*10,*
*15* 89:*18, 22* 90:*4*
92:*20* 97:*14, 21* 98:*3*
99:*5, 8* 106:*8* 113:*16*
114:*13, 17, 19* 117:*6*
121:*11* 122:*6, 20*
123:*8, 11, 14, 19*
124:*7, 21* 131:*15*
134:*21, 23* 136:*3*
137:*4* 139:*5, 9, 19*
140:*24* 154:*6*
**word** 149:*9*
**words** 57:*3* 68:*21*
**work** 71:*8* 72:*7*
**worked** 10:*23*

**working** 35:*25* 36:*1*
77:*4* 86:*7* 98:*14*
148:*14*
**works** 77:*3* 81:*20*
102:*18* 131:*21*
137:*11* 144:*15*
**worn** 39:*20, 24*
40:*17, 19*
**worries** 106:*9*
**worth** 18:*23*
**WRITE** 154:*2*
**written** 109:*9* 115:*18*
**wrong** 39:*14* 92:*14*
109:*13*

< Y >

**y'all** 148:*15*
**Yeah** 11:*21* 13:*21*
24:*10* 32:*17* 34:*6*
39:*12* 42:*3, 16* 47:*14*
50:*3* 51:*17* 55:*1*
56:*16* 61:*6* 62:*8*
64:*11* 67:*14* 68:*8*
72:*16* 77:*3* 92:*20*
96:*19* 99:*12* 102:*14,*
*18, 24* 103:*2, 24*
104:*3* 105:*6* 117:*15*
123:*13* 131:*15*
132:*13* 137:*8* 139:*9,*
*15* 146:*19*
**year** 11:*23* 16:*25*
91:*23* 109:*23* 138:*4*
145:*14*
**years** 10:*24* 15:*25*
16:*1, 5, 10, 12, 13, 15*
20:*18* 54:*10* 61:*16*
90:*2, 12* 123:*24*
134:*4, 5* 145:*13*
**yell** 118:*3*
**yesterday** 138:*23*
**you-all** 104:*12*
118:*20*

< Z >

**ZOOM** 2:*7, 12, 13,*
*19* 33:*2* 38:*16* 73:*21*
74:*6* 134:*17* 143:*6*